IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 0 9 2012

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

CARROLYN CAMPBELL, CRYSTAL WALTERS,
HEATHER CROW, AMANDA HODGES,
TABITHA RILEY, TERESA KNIGHT, AND EBONY BRADFORD,
INDIVIDUALLY & ON BEHALF OF OTHERS
SIMILARLY SITUATED,                                                      PLAINTIFFS

v.                                    Case No. 4:12-CV-00176-DPM

RELIANCE HEALTH CARE, INC.,
NORTHWEST HEALTH AND REHAB, INC., d/b/a
NORTH HILLS LIFE CARE AND REHAB,
OCNC, INC. d/b/a SILVER OAKS HEALTH AND REHABILITATION,
SCNC, INC. d/b/a SPRING CREEK HEALTH & REHAB,
JBNC, INC. d/b/a RIDGECREST HEALTH AND REHABILITATION,
HERITAGE SQUARE NURSING AND REHABILITATION CENTER INC.,
BRANDON ADAMS, AND BRYAN M. ADAMS, individually
and in their capacity as owners, managers, officers, and/or
incorporators of the above referenced corporate defendants            DEFENDANTS

## FOURTH AMENDED AND SUBSTITUTED COLLECTIVE ACTION COMPLAINT

Come now Plaintiffs Carrolyn Campbell, Crystal Walters, Heather Crow, Amanda

Hodges, Tabitha Riley, Teresa Knight, and Ebony Bradford individually and on behalf of others

similarly situated, by and through their attorneys, Holleman & Associates, P.A., and Donati Law

Firm, LLP, and bring this Fourth Amended and Substituted Complaint (hereinafter "Complaint")

against Defendants Reliance Health Care, Inc., Northwest Health and Rehab, Inc., OCNC, Inc.,

SCNC, Inc., JBNC, Inc., Heritage Square Nursing and Rehabilitation Center Inc., Brandon

Adams, and Bryan M. Adams, individually and in their capacity as owners, managers, officers,

and/or incorporators of Reliance Health Care, Inc., Northwest Health and Rehab, Inc., OCNC,

Inc., SCNC, Inc., JBNC, Inc., and Heritage Square Nursing and Rehabilitation Center Inc. (hereinafter collectively referred to as "Defendants"), for violations of the Fair Labor Standards Act ("FLSA") and the Arkansas Minimum Wage Act, Ark. Code Ann. § 11-4-201, *et seq.* Plaintiffs state and allege as follows:

## JURISDICTION

1.      Jurisdiction of this action is conferred on the Court by 29 U.S.C. §§ 216(b), 28 U.S.C. § 1331 and 28 U.S.C. § 1337(a).  Venue lies within the district, pursuant to 28 U.S.C. § 1391.

## THE PARTIES

### I. Plaintiffs

2.      Plaintiff Carrolyn Campbell is a resident and citizen of the state of Arkansas. From April of 2010, through February of 2012, Plaintiff Campbell was employed as a Licensed Practical Nurse (hereinafter "LPN") and Medical Records Director at the Northwest Health and Rehab, Inc. nursing home and rehab facility located in Fayetteville, Arkansas.  She was classified as an hourly employee and non-exempt from the overtime requirements of the FLSA.

3.      Plaintiff Crystal Walters is a resident and citizen of Ouachita County, Arkansas. From October of 2011, she was employed as an LPN at OCNC, Inc. d/b/a Silver Oaks Health and Rehabilitation nursing home and rehab located in Camden, Arkansas.  She was classified as an hourly employee and non-exempt from the overtime requirements of the FLSA.

4.      Plaintiff Heather Crow is a resident and citizen of Lonoke County, Arkansas. From about June of 2010, through December of 2011, she was employed as a Certified Nurse Assistant (hereinafter "CNA") at SCNC, Inc. d/b/a Spring Creek Health and Rehab nursing home and rehab located in Cabot, Arkansas.  She was classified as an hourly employee and non-

exempt from the overtime requirements of the FLSA.

5.      Plaintiff Amanda Hodges is a resident and citizen of Lonoke County, Arkansas. From November of 2010, through June of 2011, she was employed as a CNA at SCNC, Inc. d/b/a Spring Creek Health and Rehab nursing home and rehabilitation facility located in Cabot, Arkansas.   She was classified as an hourly employee and non-exempt from the overtime requirements of the FLSA.

6.      Plaintiff Tabitha Riley is a resident and citizen of Craighead County, Arkansas. From about May of 2009, through September of 2011, she was employed as a CNA at JBNC, Inc. d/b/a Ridgecrest Health and Rehabilitation nursing home located in Jonesboro, Arkansas. She was classified as an hourly employee and non-exempt from the overtime requirements of the FLSA.

7.      Plaintiff Teresa Knight is a resident and citizen of Craighead County, Arkansas. From about February of 2011, through February of 2012, she was employed as a CNA at JBNC, Inc. d/b/a Ridgecrest Health and Rehabilitation nursing home located in Jonesboro, Arkansas. She was classified as an hourly employee and non-exempt from the overtime requirements of the FLSA.

8.      Plaintiff Ebony Bradford is a resident and citizen of Pulaski County, Arkansas. From August of 2010, through June of 2011, she was employed as a CNA at Heritage Square Nursing and Rehabilitation Center, Inc. located in Blytheville, Arkansas. She was classified as an hourly employee and non-exempt from the overtime requirements of the FLSA.

## II. Defendants

**Reliance Health Care, Inc.**

9.      Defendant Reliance Health Care, Inc. (hereinafter "Reliance") is an Arkansas corporation, with its principal place of business located in Conway, AR.  Brandon and Bryan Adams are owners of the corporation. Reliance's registered agent for service is Brandon Adams, 824 Salem Road Suite 210, Conway, AR.

10.     Reliance owns and operates approximately nineteen (19) nursing homes and rehabilitation facilities throughout the state of Arkansas, such as:

   a.   TXKNS, Inc. d/b/a Bailey Creek Health and Rehab,
   b.   Beebe Retirement Center, Inc.,
   c.   FSNC, Inc. d/b/a Chapen Ridge Health and Rehab,
   d.   Gardner Health, LLC d/b/a Gardner Nursing Center,
   e.   HLNC, Inc. d/b/a Heritage Living Center,
   f.   Heritage Square Nursing and Rehabilitation Center, Inc.,
   g.   WCNC, Inc. d/b/a Katherine's Place at Wedington,
   h.   Lakeside Nursing and Rehabilitation Center, Inc. d/b/a Lakeside Nursing Center,
   i.   Manila Nursing and Rehabilitation Center, Inc. d/b/a Manila Nursing Center,
   j.   Nashville Nursing and Rehab, Inc.,
   k.   Northwest Health and Rehab, Inc. d/b/a North Hills Life Care and Rehab,
   l.   JBNC, Inc. d/b/a Ridgecrest Health and Rehabilitation,
   m.   OCNC, Inc. d/b/a Silver Oaks Health and Rehabilitation,
   n.   SCNC, Inc. d/b/a Spring Creek Health and Rehab,
   o.   Jonesboro Care and Rehabilitation Center d/b/a St. Elizabeth's Place,
   p.   NWA Nursing Center, LLC. d/b/a The Maples at Har-Ber Meadows,
   q.   Timberlane Care and Rehabilitation Center, LLC d/b/a Timberlane Health and Rehabilitation,
   r.   Westwood Health and Rehab, Inc., and
   s.   Windcrest Health and Rehab, Inc.

11.     At all relevant times, Reliance was "primarily engaged in the care of the sick, the aged, or the mentally ill", and is a covered employer under Section 3(s)(1)(B) of the FLSA.

12.    Reliance is a health care provider for all of the other corporate Defendants pursuant to the terms of the Healthcare Provider Services Agreements (hereinafter "Agreements").[1]

13.    At all relevant times, Reliance, through its officers and owners Brandon and Bryan Adams, has managed and directed business of all of the above referenced nursing facilities, including corporate Defendants in this case.  Reliance's ownership and operation of other Defendants was as part of a single enterprise within the meaning of the FLSA, 29 U.S.C. § 203(r).

14.    At all relevant times, Plaintiffs were Reliance's employees within the meaning of the FLSA, 29 U.S.C. § 203 (d) and (e)(1).

**Northwest Health and Rehab, Inc., d/b/a North Hills Life Care and Rehab**

15.    Northwest Health and Rehab, Inc., d/b/a North Hills Life Care and Rehab (hereinafter "Northwest") is a nursing home and rehab facility located in Fayetteville, Arkansas. The registered agent for Northwest is Mike Millar, whose address is 401 W. Center, Searcy, AR 72143.

16.    At all relevant times, Northwest was "primarily engaged in the care of the sick, the aged, or the mentally ill", and is a covered employer under Section 3(s)(1)(B) of the FLSA.

17.    Northwest is a wholly owned subsidiary of Reliance.  Brandon and Bryan Adams are officers of Northwest, and are owners/officers of Reliance.

18.    At all relevant times, Northwest was Plaintiff Campbell's employer within the meaning of the FLSA, 29 U.S.C. § 203(d).  Because Reliance and Northwest had the same officers and owners, both corporations had control over Plaintiff Campbell's conditions of

---

[1] Healthcare Provider Services Agreements between Reliance and other corporate Defendants are attached hereto as Exhibit A. Upon information and belief, both Ridgecrest and Heritage executed the same agreement with Reliance.

employment, including but not limited to her wages, schedule, the manner in which her work was performed, etc. As president of both Northwest and Reliance, Brandon Adams could fire and hire employees of Northwest, and had control over their wages. Northwest and Reliance are/were the joint employers of Plaintiff Campbell and other similarly situated employees.

### OCNC, Inc. d/b/a Silver Oaks Health and Rehabilitation

19.     OCNC, Inc. d/b/a Silver Oaks Health and Rehabilitation (hereinafter "Silver Oaks") is a nursing home and rehab facility located in Camden, Arkansas. The registered agent for Silver Oaks is Brandon Adams, whose address is 824 Salem Road Suite 210, Conway, AR.

20.     At all relevant times, Silver Oaks was "primarily engaged in the care of the sick, the aged, or the mentally ill", and is a covered employer under Section 3(s)(1)(B) of the FLSA.

21.     Silver Oaks is a wholly owned subsidiary of Reliance. Brandon and Bryan Adams are officers of Silver Oaks, and are owners/officers of Reliance.

22.     At all relevant times, Silver Oaks was Plaintiff Walters' employer within the meaning of the FLSA, 29 U.S.C. § 203(d). Because Reliance and Silver Oaks had the same officers and owners, both corporations had control over Plaintiff Walters' conditions of employment, including but not limited to her wages, schedule, the manner in which her work was performed, etc. As president of both, Silver Oaks and Reliance, Brandon Adams could fire and hire employees of Silver Oaks, and had control over their wages. Silver Oaks and Reliance are/were the joint employers of Plaintiff Walters and other similarly situated employees.

### SCNC, Inc. d/b/a Spring Creek Health and Rehab

23.     SCNC, Inc. d/b/a Spring Creek Health and Rehab (hereinafter "Spring Creek") is a nursing home and rehab facility located in Cabot, Arkansas. The registered agent for Spring Creek is Brandon Adams, whose address is 824 Salem Road Suite 210, Conway, AR.

24.     At all relevant times, Spring Creek was "primarily engaged in the care of the sick, the aged, or the mentally ill", and is a covered employer under Section 3(s)(1)(B) of the FLSA.

25.     Spring Creek is a wholly owned subsidiary of Reliance.  Brandon and Bryan Adams are officers of Spring Creek, and are owners/officers of Reliance.

26.     At all relevant times, Spring Creek was Plaintiffs Crow and Hodges' employer within the meaning of the FLSA, 29 U.S.C. § 203(d).  Because Reliance and Spring Creek had the same officers and owners, both corporations had control over Plaintiffs Crow and Hodges' conditions of employment, including but not limited to their wages, schedule, the manner in which their work was performed, etc.  As president of both, Spring Creek and Reliance, Brandon Adams could fire and hire employees of Spring Creek, and had control over their wages.  Spring Creek and Reliance are/were the joint employers of Plaintiffs Crow and Hodges and other similarly situated employees.

### JBNC, Inc. d/b/a Ridgecrest Health and Rehabilitation

27.     JBNC, Inc. d/b/a Ridgecrest Health and Rehabilitation (hereinafter "Ridgecrest") is a nursing home and rehabilitation facility located in Jonesboro, Arkansas.  The registered agent for Ridgecrest is Dawn Bicker, whose address is 824 Salem Road Suite 210, Conway, AR 72034.

28.     At all relevant times, Ridgecrest was "primarily engaged in the care of the sick, the aged, or the mentally ill", and is a covered employer under Section 3(s)(1)(B) of the FLSA.

29.     Ridgecrest is a wholly owned subsidiary of Reliance.  Brandon and Bryan Adams are officers of Ridgecrest, and are owners/officers of Reliance.

30.     At all relevant times, Ridgecrest was Plaintiffs Riley and Knight's employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

31.     Because Reliance and Ridgecrest had the same officers and owners, both corporations had control over Plaintiffs Riley and Knight's conditions of employment, including but not limited to their wages, schedule, the manner in which their work was performed, etc.

32.     As president of both, Ridgecrest and Reliance, Brandon Adams could fire and hire employees of Ridgecrest, and had control over their wages.

33.     Ridgecrest and Reliance are/were the joint employers of Plaintiffs Riley and Knight and other similarly situated employees.

**Heritage Square Nursing and Rehabilitation Center, Inc.**

34.     Heritage Square Nursing and Rehabilitation Center, Inc. (hereinafter "Heritage") is a nursing home and Rehabilitation facility located in Blytheville, Arkansas. The registered agent for Heritage is Dawn Bicker, whose address is 824 Salem Road Suite 210, Conway, AR 72034.

35.     At all relevant times, Heritage was "primarily engaged in the care of the sick, the aged, or the mentally ill", and is a covered employer under Section 3(s)(1)(B) of the FLSA.

36.     Heritage is a wholly owned subsidiary of Reliance.  Brandon and Bryan Adams are officers of Heritage, and are owners/officers of Reliance.

37.     At all relevant times, Heritage was Plaintiffs Bradford's employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

38.     Because Reliance and Heritage had the same officers and owners, both corporations had control over Plaintiff Bradford's conditions of employment, including but not limited to her wages, schedule, the manner in which her work was performed, etc.

39.     As president of both, Heritage and Reliance, Brandon Adams could fire and hire employees of Heritage, and had control over their wages.

40.     Heritage and Reliance are/were the joint employers of Plaintiff Bradford and other similarly situated employees.

**Brandon Adams**

41.     Defendant Brandon Adams owns 50% of Reliance.  Pursuant to the information provided by the Arkansas Secretary of State website, Brandon Adams is also the president of Reliance, Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage.  Reliance owns 100% of Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage.

42.     As president of Reliance, Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage, Brandon Adams could hire and fire employees of these corporations, supervised and controlled their schedules and conditions of employment, and had control over employees' wages and employment records.

43.     As president of Reliance, Northwest, Silver Oaks, Spring Creek, Ridgecrest and Heritage, Brandon Adams managed and directed the business of these corporations.

44.     Brandon Adams was the Plaintiffs' employer for all relevant time periods.  For all similarly situated employee Plaintiffs, Brandon Adams is currently or was their employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

**Bryan Adams**

45.     Defendant Bryan Adams owns 50% of Reliance.  Bryan Adams is also the vice-president of Reliance, Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage.  Reliance owns 100% of Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage.

46.     As vice-president of Reliance, Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage, Bryan Adams could hire and fire employees of these corporations, supervised and

controlled their schedules and conditions of employment, and had control over employees' wages and employment records.

47.      As vice-president of Reliance, Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage, Bryan Adams managed and directed the business of these corporations.

48.      Bryan Adams was the Plaintiffs' employer for all relevant time periods.  For all similarly situated employee Plaintiffs, Bryan Adams is currently or was their employer within the meaning of the FLSA, 29 U.S.C. § 203(d).

49.      Plaintiffs and those similarly situated seek an action for declaratory judgment under 28 U.S.C. §§ 2201 and 2202 and for compensation and other relief under the FLSA, as amended, 29 U.S.C. § 216(b).

50.      At all times material herein, Plaintiffs and those similarly situated have been entitled to the rights, protection and benefits provided under the FLSA, as amended, 29 U.S.C. § 201, *et seq.*, and the Arkansas Minimum Wage Act, Ark. Code Ann. § 11-4-201, *et seq.*

## FACTS

**Defendants Constitute a Single Enterprise Under the FLSA and Are Joint Employers of Plaintiffs**

51.      Reliance is the owner of Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage.

52.      Brandon and Bryan Adams are the owners of Reliance, and each owns 50% of the corporation.

53.      President of Reliance, Brandon Adams, is also the president of Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage.

54.      Vice-president of Reliance, Bryan Adams, is also the vice-president of Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage.

55.    Defendants share the common business purpose of operating skilled nursing and rehabilitation facilities in Arkansas.  Reliance is the health care provider for other corporate Defendants, pursuant to the terms of the Agreements between other corporate Defendants and Reliance.[2]

56.    Pursuant to the terms of the Agreements, Reliance is responsible for developing other corporate Defendants' policies and procedures.  The Agreements state in relevant part:

> (a)    Policies and Procedures.    Contractor shall develop and recommend to the Provider such policies and procedures as Contractor may elect to develop and/or recommend relating to the operation of the Facility.[3]

57.    Pursuant to the terms of the Agreements, Reliance assists other corporate Defendants in recruiting and training personnel.  It also provides consultation and recommends personnel for hiring, promotion and discharge as it deems appropriate.  Paragraph 1.1. (b) of the Agreements state as follows:

> All staff of the Facility shall be employees or contractors of Provider.  Contractor will assist Provider in recruiting and training personnel.    Contractor may also provide consultation on and recommend to Provider the hiring, promotion and discharge of such personnel as it deems appropriate.  Provider shall have and shall exercise final control over and responsibility for all personnel recruitment, training, employment, termination and staffing levels.[4]

58.    Reliance is also responsible for reviewing other corporate Defendants' employees' salary levels and benefits and recommending changes as it deems appropriate.  Paragraph 1.1.(d) of the Agreements state in relevant part:

> Contractor shall review Provider's salary levels and employee benefits and recommend such changes as it deems appropriate to

---

[2] Healthcare Provider Services Agreements between Reliance and other corporate Defendants are attached hereto as Exhibit A.  Upon information and belief, Ridgecrest and Heritage executed the same agreement with Reliance.
[3] See Article I, paragraph 1.1. (a) of the Agreements, attached hereto as Exhibit A.
[4] See Article I, paragraph 1.1. (b) of the Agreements, attached hereto as Exhibit A.

enable Provider to remain competitive within its market and to assure employee retention to the greatest extent possible.[5]

59.     All of the Defendants share the same owners and corporate officers, and operate under common control of Brandon and Bryan Adams.

60.     As officers of all of the Defendants, Brandon and Bryan Adams create and enforce policies of Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage, and make decisions affecting the wages and hours of their employees, including Plaintiffs and those similarly situated.

61.     As officers of all of the Defendants, Brandon and Bryan Adams manage and control Reliance, Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage, and make all critical decisions regarding staffing, budgets and census.  Defendants benefit financially from their policies, decisions, control and management of the facilities in the form of income and profits received by them.

62.     Reliance, through its officers and owners, has the power to hire and fire employees of other corporate Defendants.

63.     Reliance, through its officers and owners, supervises and controls employees of other corporate Defendants.

64.     Reliance, through its officers and owners, has control over the other corporate Defendants employees' conditions of employment, their schedules, the rates and methods of payment wages to employees.

65.     At all times relevant to this lawsuit, Reliance, Northwest, Silver Oaks, Spring Creek, Ridgecrest, and Heritage conducted related activities and were joined into a unified business system or economic unit through unified operation and common control.

---

[5] See Article I, paragraph 1.1. (d) of the Agreements, attached hereto as Exhibit A.

66.     At all times relevant to this lawsuit, Reliance, Northwest, Silver Oaks, a Spring Creek, Ridgecrest, and Heritage served a common business purpose.

67.     Defendants are joint employers of Plaintiffs and other similarly situated employees.

**Plaintiff Carrolyn Campbell**

68.     From April of 2010, through February of 2012, Plaintiff Campbell was employed at the Northwest nursing home and rehabilitation facility located in Fayetteville, Arkansas.

69.     Northwest has approximately 92 bed capacity, with approximately 70 beds occupied by long term-care and rehab patients.

70.     Plaintiff Campbell started to work at Northwest as an LPN.  For the last 10 months of her employment, she held the position of a Director of Medical Records.  During the time when Plaintiff Campbell was employed as LPN, her primary job duty was nursing, and taking care of the patients of the facility.  As Director of Medical Records, Plaintiff Campbell was responsible for checking glucometers and refrigerator logs, picking up the telephone orders and making sure that the medication was ordered and in the building.  She responded to concerns of her patients and their family members.  Plaintiff Campbell set up charts and input all orders for new patients, completed Medicaid forms, and Part B billing, contacted various facilities to get copies of patients' medical records.

71.     Plaintiff Campbell worked the 8:30 a.m. to 5:00 p.m. shift Monday through Friday.  Plaintiff Campbell had to work through her lunch on a regular basis due to understaffing and business of the facility.  Plaintiff Campbell also frequently had to work off the clock to complete her job duties.

72.     Northwest knew about Plaintiff Campbell working through her lunch time, and yet automatically deducted 30 minutes from Plaintiff Campbell's time reports on a daily basis. As a result, Plaintiff Campbell was not compensated for hours worked during her lunch time.

73.     Plaintiff Campbell regularly worked in excess of forty (40) hours per week, and was not compensated for this time.  Plaintiff Campbell frequently worked 60-65 hours per work week.

**Plaintiff Crystal Walters**

74.     From October of 2011, through March of 2012, Plaintiff Walters was employed at Silver Oaks nursing home and rehabilitation facility located in Camden, Arkansas.

75.     Silver Oaks has approximately 104 bed capacity.  Plaintiff Walters was employed as an LPN, and her primary duty was nursing, and taking care of the patients of the facility.

76.     Plaintiff Walters had to work through her lunch on a regular basis due to understaffing and business of facility.

77.     Silver Oaks knew about Plaintiff Walters working through her lunch time, and yet automatically deducted 30 minutes from her time reports on a daily basis.  As a result, Plaintiff Walters was not compensated for hours worked during her lunch time.  Plaintiff Walters performed her regular job duties during her lunch time.

78.     Plaintiff Walters regularly worked in excess of forty (40) hours per week, and was not compensated for this time. Plaintiff Walters frequently worked 42.5 and more hours per work week.

**Plaintiff Heather Crow**

79.     From about June of 2010, through December of 2011, Plaintiff Crow was employed as a CNA at Spring Creek nursing home and rehabilitation facility located in Cabot,

Arkansas.

80.     Spring Creek has approximately 109 bed capacity.  Plaintiff Crow's job duties included assisting patients, feeding, changing them, giving showers to the patients, and checking their vital signs.

81.     Spring Creek adopted a timekeeping policy that rounded Plaintiff Crow's hours worked.  For example, if Plaintiff Crow clocked in 7 minutes before her shift, her time was rounded to the time when her shift began.  If Plaintiff Crow clocked out 7 minutes after her shift, her time was rounded to the time when her shift ended.  As a result of this timekeeping policy Plaintiff Crow's reported time was reduced and she was not compensated for all hours worked.

82.     Plaintiff Crow frequently worked off the clock to complete her regular job duties and was not compensated for this time.

83.     Plaintiff Crow had to work through her lunch on a regular basis due to understaffing and business of facility.

84.     Spring Creek knew about Plaintiff Crow working through her lunch time, and yet automatically deducted 30 minutes from her time reports on a daily basis.  As a result, Plaintiff Crow was not compensated for hours worked during her lunch time. Plaintiff Crow performed her regular job duties during her lunch time.

85.     Plaintiff Crow regularly worked in excess of forty (40) hours per week, and was not compensated for this time. Plaintiff Crow frequently worked 42.5 and more hours per work week.

**Plaintiff Amanda Hodges**

86.     From November of 2010, through June of 2011, Plaintiff Hodges was employed as a CNA at Spring Creek nursing home and rehabilitation facility located in Cabot, Arkansas.

Plaintiff Hodges' job duties included assisting patients, feeding, changing them, giving showers to the patients, and checking their vital signs.

87.     Spring Creek adopted a timekeeping policy that rounded Plaintiff Hodges' hours worked. For example, if Plaintiff Hodges clocked in 7 minutes before her shift, her time was rounded to the time when her shift began. If Plaintiff Hodges clocked out 7 minutes after her shift, her time was rounded to the time when her shift ended. As a result of this timekeeping policy Plaintiff Hodges' reported time was reduced and she was not compensated for all hours worked.

88.     Plaintiff Hodges frequently worked off the clock filling out patient books, cleaning the trash, and was not compensated for this time.

89.     Plaintiff Hodges had to work through her lunch on a regular basis due to understaffing and business of facility. Plaintiff Hodges performed her regular job duties during her lunch time.

90.     Spring Creek knew about Plaintiff Hodges working through her lunch time, and yet automatically deducted 30 minutes from her time reports on a daily basis. As a result, Plaintiff Hodges was not compensated for hours worked during her lunch time.

91.     Plaintiff Hodges regularly worked in excess of forty (40) hours per week, and was not compensated for this time. Plaintiff Hodges estimates that she frequently worked 45-50 hours per work week.

**Plaintiff Tabitha Riley**

92.     From May of 2009, through September of 2011, Plaintiff Riley was employed as a CNA at Ridgecrest nursing home and rehabilitation facility located in Jonesboro, Arkansas.

Plaintiff Riley's job duties included assisting patients, feeding, changing them, and giving showers to the patients.

93.   Upon information and belief, Ridgecrest adopted a timekeeping policy that rounded Plaintiff Riley's hours worked.  For example, if Plaintiff Riley clocked in 7 minutes before her shift, her time was rounded to the time when her shift began.  If Plaintiff Riley clocked out 7 minutes after her shift, her time was rounded to the time when her shift ended.  As a result of this timekeeping policy Plaintiff Riley's reported time was reduced and she was not compensated for all hours worked.

94.   Plaintiff Riley frequently worked off the clock and was not compensated for this time.  For example, Plaintiff Riley was required to participate in service meetings and was not paid for this time.  Plaintiff Riley was frequently asked to continue to work after she clocked out, and arrive to work fifteen (15) minutes early.  She performed her regular job duties during the time when she worked "off the clock."

95.   Plaintiff Riley frequently had to work through her lunch on a regular basis due to understaffing and business of facility.  Plaintiff Riley performed her regular job duties during her lunch time.

96.   Ridgecrest knew about Plaintiff Riley working through her lunch time, and yet deducted 30 minutes from her time reports on a daily basis.  As a result, Plaintiff Riley was not compensated for hours worked during her lunch time.

97.   Plaintiff Riley regularly worked in excess of forty (40) hours per week, and was not compensated for this time.  The exact amount of time worked in excess of forty (40) hours per week will be estimated by Plaintiff Riley upon obtaining Defendant's time records.

**Plaintiff Teresa Knight**

98.     From February of 2011, through February of 2012, Plaintiff Knight was employed as a CNA at Ridgecrest nursing home and rehabilitation facility located in Jonesboro, Arkansas. Plaintiff Knight's job duties included assisting patients, feeding, changing them, and giving showers to the patients.

99.     Upon information and belief, Ridgecrest adopted a timekeeping policy that rounded Plaintiff Knight's hours worked.  For example, if Plaintiff Knight clocked in 7 minutes before her shift, her time was rounded to the time when her shift began.  If Plaintiff Knight clocked out 7 minutes after her shift, her time was rounded to the time when her shift ended.  As a result of this timekeeping policy Plaintiff Knight's reported time was reduced and she was not compensated for all hours worked.

100.    Plaintiff Knight frequently worked off the clock and was not compensated for this time.  For example, Plaintiff Knight was required to clock in early for her shift, and was not paid for that time.

101.    Plaintiff Knight frequently had to work through her lunch on a regular basis due to understaffing and business of facility.  Plaintiff Knight performed her regular job duties during her lunch time.

102.    Ridgecrest knew about Plaintiff Knight working through her lunch time, and yet deducted 30 minutes from her time reports on a daily basis.  As a result, Plaintiff Knight was not compensated for hours worked during her lunch time.

103.    Plaintiff Knight regularly worked in excess of forty (40) hours per week, and was not compensated for this time.  The exact amount of time worked in excess of forty (40) hours per week will be estimated by Plaintiff Knight upon obtaining Defendant's time records.

**Plaintiff Ebony Bradford**

104.    From August 2010, through June 2011, Plaintiff Bradford was employed as a CNA at Heritage nursing home and rehabilitation facility located in Blytheville, Arkansas. Plaintiff Bradford's job duties included assisting patients, feeding, changing them, and giving showers to the patients.

105.    Heritage nursing home has an 86 bed capacity.

106.    Plaintiff Bradford had to work through her lunch on a regular basis due to understaffing and business of facility.

107.    Heritage knew about Plaintiff Bradford working through her lunch time, and yet automatically deducted 30 minutes from her time reports on a daily basis.  As a result, Plaintiff Bradford was not compensated for hours worked during her lunch time.  Plaintiff Bradford performed her regular job duties during her lunch time.

108.    Plaintiff Bradford, at several times other times during her employment with Heritage, worked off the clock and was not compensated for this time.  For example, Plaintiff Bradford was required to clock out at the end of her shift, but was then instructed to finish any work that had not yet been completed.

109.    Plaintiff Bradford regularly worked in excess of forty (40) hours per week, and was not compensated for this time. Plaintiff Bradford frequently worked 42.5 and more hours per work week.

110.    Plaintiffs bring this action on behalf of themselves and on behalf of all other hourly employees of Defendants, who worked in excess of forty (40) hours per work week during the time period relevant to this lawsuit, and were not compensated for their overtime pursuant to the requirements of the FLSA.

111.    As set forth below, while working for Defendants, Plaintiffs were regularly required to work overtime without proper compensation.

112.    Plaintiffs Carrolyn Campbell, Crystal Walters, Heather Crow, Amanda Hodges, Tabitha Riley, and Teresa Knight previously filed consents to join this case. Plaintiff Bradford's consent to join is attached hereto as Exhibit B.

113.    This action is filed on behalf of all nonexempt employees of Defendants who worked in excess of 40 hours per week and were not compensated for this time. These persons include, but are not limited to, secretaries, house- keepers, custodians, registered nurses, licensed practical nurses, administrative personnel, and others employed by Defendants during the three years preceding the filing of this action.

114.    Plaintiffs from time to time confronted Defendants about their practice of not fully paying them for all hours worked on many occasions.

115.    The violations previously plead are ongoing and continuing and the named Plaintiffs and those similarly situated should be awarded damages for a time period up to and including the day of the trial.

116.    Defendants have been notified on previous occasions, or should have known, about the violations of the FLSA. They have taken no action, despite demands and notice. Defendants' actions are willful and are taken with knowledge that its acts violate the wage and hour provisions of the FLSA.

## COLLECTIVE ACTION ALLEGATIONS

117.    The preceding paragraphs are incorporated by reference as if the same were fully set forth herein.

118.    Plaintiffs bring this FLSA collective action on behalf of Plaintiffs and all others similarly situated pursuant to 29 U.S.C. §§ 207 and 216(b), specifically, as follows:

> All hourly paid employees of Defendants, who worked for Defendants in excess of forty (40) hours per week within the three (3) years preceding the filing of this action and were not compensated for this time.

119.    Plaintiffs believe that the definition of the class may be further refined following discovery of Defendants' books and records.

120.    Questions of law and fact common to the collective action as a whole include, but are not limited to, the following:

> a.    Whether Defendants unlawfully failed and continues to fail to compensate FLSA Collective Action Plaintiffs and prospective FLSA Collective Action Plaintiffs for all hours worked in violation of the FLSA, 29 U.S.C. § 201 *et seq.;*

> b.    Whether Defendants unlawfully failed and continue to fail to pay overtime compensation in violation of the FLSA, 29 U.S.C. § 201 *et seq.;*

> c.    Whether Defendants' failure to pay overtime to the FLSA Collective Action Plaintiffs was willful within the meaning of FLSA;

> d.    Whether Defendants failed and continue to fail to maintain accurate records of actual time worked by the FLSA Collective Action Plaintiffs;

> e.    Whether Defendants failed and continue to fail to record or report all actual time worked by the FLSA Collective Action Plaintiffs; and

> f.    Whether Defendants failed and continue to fail to provide accurate wage statements itemizing all actual time worked and wages earned by the FLSA Collective Action Plaintiffs.

121.    The claims of Plaintiffs are typical of the claims of the class in that Plaintiffs were denied overtime wages as a result of Defendants' uniform policy of not compensating its non-

exempt employees for all hours worked. This is the predominant issue which pertains to the claims of Plaintiffs and others similarly situated.

122.    The collective action mechanism is superior to other available methods for a fair and efficient adjudication of the controversy.

123.    Plaintiffs will fairly and adequately protect the interests of the class, as their interests are in complete alignment with others similarly situated, i.e., to prove and then eradicate Defendants' illegal practice of not paying overtime wages to their non-exempt employees.

124.    Counsel for Plaintiffs will adequately protect the interests of Plaintiffs and others similarly situated and is experienced with class/collective litigation and has previously served as class counsel in FLSA litigation.

125.    Plaintiffs and the class Plaintiffs represent have suffered and will continue to suffer irreparable damage from the illegal policy, practice and custom regarding Defendants' pay practices.

126.    Plaintiffs and the FLSA Collective Action Plaintiffs are similarly situated and are subject to Defendants' common practice, policy or plan of refusing to compensate all hours worked and refusing to pay overtime in violation of the FLSA.

127.    The names and addresses of the FLSA Collective Action Plaintiffs are available from Defendants, and notice should be provided to the FLSA Collective Action Plaintiffs *via* first class mail to their last known address as soon as possible.

## **PLAINTIFFS' FIRST CLAIM FOR RELIEF**

**(Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, Brought by Plaintiffs on Behalf of Themselves and all FLSA Collective Action Plaintiffs)**

128.    Plaintiffs, on behalf of themselves and all FLSA Collective Action Plaintiffs, re-allege and incorporate by reference paragraphs above as if they were set forth again herein.

129.    At all relevant times, Defendants have been "employers" engaged in interstate commerce.   At all relevant times, Defendants employed Plaintiffs and each member of the collective action class consistent with the terms of the FLSA.

130.    At all relevant times, Defendants have had annual gross revenues in excess of $500,000.00. Together Defendants constituted a single enterprise within the meaning of the FLSA, 29 U.S.C. § 203(r).

131.    The FLSA requires Defendants, as covered employers, to compensate all non-exempt employees for all hours worked, and to compensate all non-exempt employees at a rate of not less than one and one-half times their regular rate of pay for work performed in excess of forty (40) hours in a work week.

132.    Plaintiffs and all FLSA Collective Action Plaintiffs are entitled to compensation for all hours worked.

133.    Plaintiffs and all FLSA Collective Action Plaintiffs are entitled to be paid overtime compensation for all overtime hours worked.

134.    At all relevant times, Defendants, pursuant to their policies and practices, failed and refused to compensate Plaintiffs and the FLSA Collective Action Plaintiffs for work performed in excess of 40 hours per week.

135.    At all relevant times Defendants, pursuant to their policies and practices, failed and refused to pay overtime premiums to Plaintiffs and the FLSA Collective Action Plaintiffs for their hours worked in excess of 40 hours per week.

136.    At all relevant times, the overtime work performed by Defendant's non-exempt employees, including Plaintiffs and the FLSA Collective Action Plaintiffs, was and continues to be required or permitted by Defendants, for the benefit of Defendants, and is directly related to

such employees' principal employment with Defendants, and is an integral and indispensable part of such employees' employment with Defendants.

137.    Defendants violated and continue to violate the FLSA, 29 U.S.C. § 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a), by failing to pay FLSA Collective Action Plaintiffs for all hours actually worked and by failing to pay FLSA Collective Action Plaintiffs at least one-and-a-half times their regular rates of pay for all hours worked in excess of forty (40) in a workweek.  These violations of the FLSA were knowing and willful within the meaning of 29 U.S.C. § 201 *et seq.*

138.    The FLSA also imposes specific employment record-keeping requirements, including the obligation to keep accurate records of all hours worked.  By failing to record, report, and/or preserve records of hours worked by Plaintiffs and the prospective FLSA Collective Action Plaintiffs, Defendants have failed to make, keep, and preserve records with respect to each of its employees sufficient to determine their wages, hours, and other conditions and practice of employment, in violation of the FLSA, 29 U.S.C. § 201 *et seq.*, including 29 U.S.C. §§ 211(c) and 215(a).  These violations of the FLSA were knowing and willful within the meaning of 29 U.S.C. § 201 *et seq.*

139.    As a result of Defendants' violations of law, FLSA Collective Action Plaintiffs are entitled to recover from Defendants the amount of their unpaid wages and overtime compensation, an additional equal amount as liquidated damages, as provided by the FLSA, 29 U.S.C. § 216(b), prejudgment interest, attorneys' fees, litigation expenses and court costs, pursuant to 29 U.S.C. § 216(b), and such other legal and equitable relief as the Court deems just and proper.

## PLAINTIFFS' SECOND CLAIM FOR RELIEF
### (Violations of the Arkansas Minimum Wage Act)

140.   The allegations set forth in the preceding paragraphs are incorporated herein.

141.   At all relevant times, Defendants have been Plaintiffs' "employers" within the meaning of Ark. Code Ann. § 11-4-203(4).

142.   At all relevant times, Plaintiffs have been Defendants' "employees" within the meaning of Ark. Code Ann. § 11-4-203(3), without exemption or exception.

143.   Ark. Code Ann. § 11-4-211(a) states as follows:

144.   Except as otherwise provided in this section and §§ 11-4-210 and 11-4-212, no employer shall employ any of his or her employees for a work week longer than forty (40) hours unless the employee receives compensation for his or her employment in excess of the hours above specified at a rate not less than one and one-half (1 1/2) times the regular rate of pay at which he or she is employed.

145.   Plaintiffs are entitled to compensation for all hours worked in excess of 40 per week at a rate not less than one and one-half (1 1/2) times her regular rate of pay.

146.   At all relevant times, Defendants, pursuant to its policies and practices, failed and refused to compensate Plaintiffs for work performed at the rate required by Ark. Code Ann. § 11-4-211.

147.   Defendants violated and continue to violate the Arkansas State law by failing to pay Plaintiffs for all hours actually worked at the rate prescribed therein.

148.   Plaintiffs have sustained substantial damages as a result of the Defendants' violations of the Arkansas State law.

149.    Defendants' violations entitle Plaintiffs to liquidated damages pursuant to Ark. Code Ann. § 11-4-218(a)(2) in the form of double the compensatory damages set forth in Ark. Code Ann. § 11-4-218(a)(1)(B)(i).

150.    Plaintiffs are entitled to an award of attorneys' fees and court costs pursuant to Ark. Code Ann. § 11-4-218(a)(1)(B)(ii).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and all others similarly situated who join in this action demand:

a) Issuance of notice as soon as possible to all persons who were employed by Defendants on a nonexempt basis during any portion of the three years immediately preceding the filing of this action. Generally, this notice should inform them that this action has been filed, describe the nature of the action, and explain their right to opt into this lawsuit if they were not paid the proper overtime compensation for their hours worked in any week during the statutory period;

b) Designation of this action as a collective action on behalf of the FLSA collective class pursuant to 29 U.S.C. § 216(b);

c) Judgment against Defendants for an amount equal to the unpaid back wages of Plaintiff and others similarly situated at the applicable overtime rates;

d) Judgment against Defendants that their violations of the FLSA were willful;

e) An equal amount to the overtime damages as liquidated damages;

f) All recoverable costs, expenses, and attorney's fees incurred in prosecuting these claims;

g) Leave to add additional plaintiffs by motion, the filing of written consent forms, or any other method approved by the Court;

h) Leave to amend to add claims under applicable state and federal laws, including claims for minimum wages pursuant to 29 U.S.C. § 206;

i) Leave to amend to add other defendants who meet the definition of "employer" as defined at 29 U.S.C. § 203(d);

j) An order requiring Defendants to preserve all electronically stored information relevant to this lawsuit, and

For all such further relief as the Court deems just and equitable.

Respectfully submitted,

John T. Holleman – AR Bar #91056
jholleman@johnholleman.net
Maryna O. Jackson – AR Bar #2009111
maryna@johnholleman.net
Amber R. Schubert – AR Bar #2009150
amber@johnhollema.net

HOLLEMAN & ASSOCIATES, P.A.
1008 West Second Street
Little Rock, AR 72201
Tel. 501.975.5040
Fax 501.975.5041

&

William B. Ryan - TN Bar #20268
billy@donatilawfirm.com
Bryce W. Ashby - TN Bar #26179
bryce@donatilawfirm.com
DONATI LAW FIRM, LLP
1545 Union Avenue
Memphis, TN 38104
Tel. 901.278.1004
Fax 901.278.3111

## CERTIFICATE OF SERVICE

I, John T. Holleman, hereby certify that a true and correct copy of the foregoing document was filed via the CM/ECF system, this the 9th day of November, 2012, and that the foregoing shall send notification of such filing to the following:

Angelo Spinola   aspinola@littler.com
Anne M. Mellen  amellen@littler.com
Eva C. Madison   emadison@littler.com
Rebecca Adelman  rebecca@adelmanfirm.com

John T. Holleman – AR Bar #91056
Jholleman@johnholleman.net

## HEALTHCARE PROVIDER SERVICES AGREEMENT
### ADMINISTRATIVE SERVICES PROVIDER

**THIS HEALTHCARE PROVIDER SERVICES AGREEMENT** (this "Agreement") made as of the day of the __1st__ day of ____January___, 2011_ by and between **OCNC, INC. DBA SILVER OAKS HEALTH AND REHABILITATION,** an Arkansas corporation ("Provider"), and **RELIANCE HEALTH CARE, INC.,** an Arkansas corporation {"Contractor", or "ASP" (Administrative Services Provider)}.

### WITNESSETH:

**WHEREAS,** Provider is a provider of healthcare and related services at **SILVER OAKS HEALTH AND REHABILITATION** at 1875 Old Wire Rd. in Camden, AR (the "Facility").

**WHEREAS,** Provider desires to enter into this Agreement to obtain certain services of Contractor at the Facility on the terms set forth herein.

**NOW, THEREFORE,** in consideration of the premises, the promises and the mutual covenants herein contained and Ten and No/100 Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party unto the other, the parties agree as follows:

### ARTICLE 1.

### DUTIES AND OBLIGATIONS OF CONTRACTOR AND PROVIDER

**1.1.** **Duties, Responsibilities and Authority of Contractor.** During the term of this Agreement, Provider hereby engages Contractor to provide and Contractor covenants and agrees to provide the following services to Provider on an as-needed basis in connection with the operation of the Facility:

(a) **Policies and Procedures.** Contractor shall develop and recommend to the Provider such policies and procedures as Contractor may elect to develop and/or recommend relating to the operation of the Facility. It is the sole responsibility of Provider to adopt, amend and implement all policies and procedures necessary for the operation of the Facility in a manner required by applicable laws and regulations.

(b) **Personnel.** All staff of the Facility shall be employees or contractors of Provider. Contractor will assist Provider in recruiting and training personnel. Contractor may also provide consultation on and recommend to Provider the hiring, promotion and discharge of such personnel as it deems appropriate. Provider shall have and shall exercise final control over and responsibility for all personnel recruitment, training, employment, termination and staffing levels.

(c) **Specialist Staff.** Contractor shall make available to Provider for consultation and advice, specialists in the fields of accounting, auditing, budgeting, care

1952723v1

**EXHIBIT**

**A**

procedures shall be consistent with applicable local, state and Federal laws and regulations and with applicable third party payor reimbursement guidelines. Provider shall be solely responsible for determining whether such standards and procedures will be utilized by Provider and such standards and procedures shall be implemented by Provider only after approval by Provider.

   (i)   **Accounting and Reimbursement Matters.**

          (1)    Subject to Provider's prior approval, Contractor shall recommend and implement on behalf of Provider, per the request of Provider, in accordance with recognized sound operational accounting principles applied in a manner consistent with accepted industry standards ("Sound Principles"), appropriate accounting, financial operations, capital and cash management programs; maintain accounting, billing and collection records; and issue appropriate bills for goods and services furnished by the Facility. Contractor shall use its best efforts to assist in the collection of accounts receivable and monies owed to the Facility; prepare and file insurance, Medicare, Medicaid and any and all other necessary or desirable applications and claims for the purpose of maximizing the production of revenue of Provider at the Facility; and respond to Medicare, Medicaid or other third party payor audits in a manner which will minimize the expenses incurred by the Facility in responding to such audits. Contractor shall recommend and implement, with Provider's approval, all necessary internal controls to prevent loss or damage to the operation of the Facility and the financial position of Provider with respect thereto. Contractor shall not materially alter the accounting or bookkeeping procedures unless requested or approved by Provider.

          (2)    To accomplish the billing requirements of Section 1.1(i)(1), Provider has separately executed, if required in the state where the Facility is located, a power of attorney or billing agreement to authorize Contractor to serve as or designate a billing agent for Provider, to authorize electronic data exchanges, to authorize electronic funds transfers and for similar purposes, all to accomplish the submission on behalf of Provider of its Medicare and Medicaid claims. If Provider has not executed such power(s) of attorney, then Provider shall execute a power of attorney in form substantially similar to the one required, and/or such other forms as may be required for Contractor to be able to bill on behalf of Provider in the format required in the state where the Facility is located.

   (j)   **Maintenance of Books of Accounts and Records.** Contractor shall establish and maintain books of account in accordance with Sound Principles for the Facility using accounts and classifications consistent with those used in similar operations and as herein provided, and at all times maintain full and complete documentation regarding all of Contractor's actions taken to fulfill its duties hereunder. The books and records for the Facility shall be maintained by Contractor at the expense of Provider. Any books and records maintained off-site of the Facility by Contractor shall be maintained at the sole expense of Contractor, but Contractor shall, when requested by Provider, deliver photocopies of all reports and documentation related thereto to Provider. Contractor shall promptly respond to any questions of Provider with respect to such books and records and shall confer with Provider at all reasonable times, upon request, concerning operation of the Facility and the books of account and other

from time to time and reporting to Provider with respect thereto. Provider shall be responsible for determining whether to implement any recommendations of Contractor. Provider shall have sole responsibility for identifying need for facility repair, for making needed repairs and for the day-to-day and overall physical condition of the facility.

(r)   **Annual Reports.** Within one hundred twenty (120) days after the end of each fiscal year of Provider, Contractor shall have prepared and delivered to Provider financial statements and related notations thereto in accordance with Sound Principles for the Facility showing the results of operation of the Facility for the preceding fiscal year. Such financial statements shall include, at a minimum, a balance sheet and operating income statement. Contractor shall assist and cooperate with Provider in connection with the preparation of Provider's tax returns. If state or federal government authorities require a certified audit of the Facility, Contractor shall assist and cooperate in connection with the preparation of Provider's certified audits.

(s)   **Working Capital.** Contractor shall review and consult with Provider concerning the Facility's working capital needs and coordinate the use of Provider's available working capital so as to allow Provider to effectively and economically utilize the cash of the Facility. Contractor shall seek to avoid circumstances that would result in the business at the Facility being conducted by Provider on a "cash on delivery" basis to the extent possible and shall use its best efforts to assist Provider in obtaining favorable credit terms from all operating vendors. Contractor shall notify Provider of any such terms for payment other than sixty (60) days after goods are delivered or services are provided. Contractor may, but is not obligated to, advance its own funds to Provider to supplement Provider's working capital.

(t)   **Equipment Leases.** Contractor shall review all equipment leases entered into by the Provider, including both capital and non-capital equipment leases. Contractor shall not agree to the terms of any equipment lease on behalf of the Facility without Provider's approval. Any equipment leases executed by Contractor on behalf of Provider must be included within the Budgets (as hereinafter defined) previously approved by Provider.

(u)   **Technology.** Contractor shall provide to Facility the telephone, computer and associated technology structure backbone necessary to its operation and to facilitate compliance by both parties with the terms of this Agreement.

1.2.   **Reports to Provider.** Contractor shall prepare and provide quarterly financial reports to Provider consisting of a balance sheet and a current and year-to-date operating income and expense statement (which shall include a comparison to that quarter's and the year-to-date's budgeted income and expenses), a current aging of accounts receivable report, and such other financial reports reasonably requested by Provider. The first such report shall cover the period from the date of this Agreement to the close of business on the last day of the calendar quarter in which this Agreement is executed. All quarterly reports shall be delivered by Contractor to Provider on or before the forty-fifth (45th) day after the end of the calendar quarter to which such report pertains. All reports and statements required hereby shall be unaudited unless otherwise required by Provider (at its expense). Contractor shall prepare or cause to be prepared

pursuant to this Section 1.3 must be approved by Provider prior to the implementation of such Budgets at the Facility.

(e)   **Emergency Expenditures.**  Contractor may expend funds of the Facility in excess of the budgetary limits to make repairs or perform maintenance if the failure to make such repairs or perform such maintenance will create an immediate and serious threat to the health or safety of the patients or the employees of the Facility.  If any repairs made pursuant to the previous sentence are estimated to be less than or equal to $10,000.00, then Contractor shall make such repairs without the requirement of prior notice to Provider, but shall notify Provider as soon as practicable of the necessity for such repairs.  In the event repairs are estimated to be greater than $10,000.00, then Contractor shall not commence any repairs without the prior approval of Provider.

   **1.4.**   **Bank Accounts and Working Capital.**  Contractor shall deposit or cause to be deposited in a bank or banks designated by Provider and in an operating account or accounts (the "Accounts") established by Provider all funds received from the operations of the Facility. Provider shall deposit into the Accounts any Facility-related revenues paid directly to Provider or which are otherwise received by Provider.  All costs and expenses incurred in the operation of the Facility, including payroll expenses, shall be paid out of the revenue deposited into the Accounts.   Provider hereby authorizes Contractor, by its duly authorized representative or designee, to sign all checks or other documents of withdrawal, or such other persons as Contractor and Provider shall mutually designate in writing for this purpose.  Deposits to the Accounts may be made by the Provider's designee.  In addition to any other indemnification of Contractor to Provider set forth herein, Contractor shall and does hereby agree to indemnify, hold harmless and defend Provider, its officers, directors, partners, employees, shareholders, agents, successors and assigns, from and against any loss, liability, damage or expense incurred by Provider and/or the Facility (including attorneys' and investigatory fees) as the result of any misappropriation or negligent handling of any of Facility's funds or patient trust funds by Contractor, its employees and/or agents.  Contractor shall not withdraw any monies from the Accounts to pay any item other than as contemplated by the Budgets or otherwise herein. Contractor shall cooperate with Provider in reviewing the working capital needs of the Facility and shall consult with Provider regarding such needs.

   **1.5.**   **Licenses and Additional Terms.**

   (a)   Contractor may, at the request of Provider, assist Provider in applying for and obtaining in the name and for the use of Provider all necessary licenses, permits, consents and approvals from all governmental bodies having jurisdiction over the use, occupancy and operation of the Facility.

   (b)   Contractor shall use its best efforts to avoid any action on its part and to notify Provider of any action on its part that may (1) cause any governmental agency or authority to institute any proceeding for the rescission or revocation of any necessary license, permit, consent or approval of the Facility, or (2) adversely affect the Facility's or Provider's rights to accept and obtain payments under the Medicaid/Medicare programs or any other public or

Provider, Contractor may contest the validity or amount of any such tax or imposition on the Facility in the same manner as described in Section 1.5(d).

**1.8.** **Costs.** All salary and other compensation or expenses associated with Contractor's direct or indirect overhead and other expenses incurred by Contractor in connection with the operation of its home or regional office(s) or the home or regional office(s) of any of its subsidiaries, including, without limitation, postage and supplies (including all checks, all forms required by Contractor's computer system or any other documents or materials generated in the course of Contractor's performance of its obligations hereunder), shall be borne by Contractor and not charged to the Facility or Provider; provided, however, nothing in this Section 1.8 shall be deemed to prevent Contractor from being entitled, and Contractor shall be so entitled, to reimbursement from Provider in the event Contractor advances any sum to or on behalf of Provider. Contractor shall not shift any functions or services and any costs related thereto from such home or regional office(s) to the Facility without the prior approval of Provider.

**1.9.** **Provider Duties.** Provider shall, in addition to those duties and functions of Provider expressly provided for herein, perform the following:

(a) **Review Performance of Contractor.** Review, monitor and assess the quality of services being provided by Contractor ~~at the Facility~~ and the effectiveness of Contractor in performing its functions under this Agreement.

(b) **Labor Matters.** Review and approve, if acceptable, Contractor's negotiations on behalf of the Facility with any labor union lawfully entitled to represent employees at the Facility. All legal fees and other costs in connection with such negotiations shall be at the sole cost of Provider.

(c) **Purchasing Contracts.** Review and approve all purchasing contracts negotiated by Contractor on behalf of the Facility. At its option, Provider may also negotiate such contracts.

**1.10.** **Retention of Control by Provider.** Notwithstanding anything to the contrary herein, Provider shall at all times retain and exercise overall control over the Facility and its operations, personnel, and patient care, and Contractor shall perform the duties herein required to be performed by it in accordance with the policies and directives from time to time adopted by Provider and the terms and provisions of this Agreement.

**1.11.** **Fines and Penalties.** All fines, civil monetary penalties, or late filing penalties, including, without limitation, any civil monetary penalties imposed pursuant to 42 U.S.C. Section 1396r(h) or 42 U.S.C. Section 1395i-3(h) (collectively, the "Fines") shall be the responsibility of and paid by Provider unless caused by Contractor's bad faith or gross negligence, in which event Contractor shall have responsibility for and pay the fines, if any.

## ARTICLE 2.

## CONTRACTOR FEE

(a)   **Corporate Existence.**  Contractor is a corporation duly organized, validly existing and in good standing under the laws of the State of Arkansas and has all requisite power and has taken all requisite action necessary to authorize it to enter into this Agreement.  During the term of this Agreement, Contractor shall maintain its organization and existence as a corporation in good standing and duly qualified or authorized to conduct business in all jurisdictions in which such qualification or authorization is required.

(b)   **Records.**  During the term of this Agreement, and until the expiration of four years after the last furnishing of services pursuant to this Agreement, Contractor shall, as provided in Section 952 of the Omnibus Budget Reconciliation Act of 1980 and regulations promulgated thereunder, make available upon written request to the Secretary of Health and Human Services or, upon written request, to the Comptroller General of the United States or any of their duly authorized representatives, this Agreement, and all books, documents and records in Contractor's possession that are necessary to verify the nature and extent of the costs of any services furnished pursuant to this Agreement for which payment may be made under the Medicare program, or if Contractor carries out any of the duties of this Agreement through a subcontract or subcontracts with an aggregate value or cost of $10,000.00 or more over a twelve-month period with a related organization, such subcontract or subcontracts shall contain a clause to the effect that until the expiration of four years after the furnishing of such services pursuant to such subcontract or subcontracts, the related organization shall as provided in said Section 952, make available, upon request, to the Secretary of Health and Human Services or upon request, to the Comptroller General of the United States or any of their duly authorized representatives, the subcontract or subcontracts, that are necessary to verify the nature and extent of the costs of any services furnished pursuant to such subcontract or subcontracts for which payment may be made under the Medicare program; provided, however, that this provision shall not be deemed to authorize Contractor to perform its duties hereunder through subcontracts, except as may be otherwise provided herein.

(c)   **Good Standing.**  Contractor is and shall remain a corporation duly organized, validly existing, in good standing and licensed to do business (to the extent requirements exist) under the laws of the State of Arkansas and is and will be qualified or authorized to do business in all jurisdictions in which the nature of its business makes such qualification or authorization necessary.

(d)   **Due Authority.**  This Agreement has been duly authorized, executed and delivered by Contractor in conformance with Contractor's organizational charter and bylaws, pursuant to a validly taken vote of approval of Contractor's board of directors duly constituted that is still in full force and effect.

(e)   **Binding Obligation.**  This Agreement constitutes a valid and binding obligation of Contractor, enforceable against Contractor in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

all or a substantial part of its assets, or if Contractor is financially impaired from performing its duties under this Agreement; or

         **(iii)**    The Facility is damaged or destroyed and cannot remain open and provide substantially all services previously provided for a period of ninety (90) days or, as a result of such damage or destruction, is closed by applicable authorities, and Provider elects not to or is unable to reopen the Facility.

       **(d)**   Contractor shall have cause for termination, and may terminate this Agreement upon five (5) days written notice, if:

         **(i)**    the Medicare (if applicable) or Medicaid provider agreement(s) or certification(s) of the Facility will be terminated and: (a) the termination action is not rescinded at least twenty-one (21) days prior to the scheduled termination date; or (b) the termination action is based upon a finding that the Facility's patients are in immediate jeopardy or that there is an immediate and serious threat to patient health, safety or welfare; or

         **(ii)**    the license or permit of the Facility will be suspended or revoked and such license suspension or revocation proceeding is not rescinded at least twenty-one (21) days prior to the scheduled license suspension or revocation date; or

         **(iii)**    the Facility is placed under receivership or temporary management in accordance with 42 U.S.C. Section 1396r(h), 42 U.S.C. Section 1395i-3(b) or similar state or Federal laws providing for the imposition of receivership or temporary management upon any facility providing substandard care; or

         **(iv)**    the Facility's premises or a material portion (i.e. greater than 50%) thereof is damaged or destroyed by fire or other casualty and the Facility fails to commence to repair, restore, rebuild or replace any such damage or destruction within ninety (90) days thereafter, and fails to complete such work within a reasonable period of time thereafter;

         **(v)**    Provider is dissolved or liquidated, or shall apply for or consent to the appointment of a receiver, trustee or liquidator of it or all or a substantial part of its assets, files a voluntary petition in bankruptcy, makes a general assignment for the benefit of creditors, files a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Provider bankrupt or insolvent or approving a petition seeking reorganization of Provider or appointing a receiver, trustee or liquidator for Provider or all or a substantial part of its assets; or

         **(vi)**    Provider fails to observe, follow or comply with the terms and provisions of any compliance policy implemented by Provider and Contractor.

    (a)  to Provider, by addressing the same to:

          OCNC, Inc. DBA Silver Oaks Health and Rehabilitation
          1875 Old Wire Road
          Camden, AR  71701

          Attn:  Administrator of Record
          Fax No.: (870) 836-7842

    (b)  to Contractor by addressing the same to:

          Reliance Health Care, Inc.
          824 Salem Road Ste. 210
          Conway, Arkansas 72034
          Attn: Amy Rollins
          Fax No.: (501) 932-0056

       All such notices, consents, requests and other communications shall be deemed given:  (a) when given and receipted for (or upon the date of attempted delivery when delivery is refused), if sent via personal delivery, via certified or registered mail, return receipt requested, or via statutory overnight delivery; or (b) when received if sent via telephone facsimile transmission during normal business hours (confirmation of such receipt shall be a confirmed telephone facsimile transmission, such facsimile transmission being deemed receipt of any such notice, consent, request or other communication sent via telephone facsimile transmission during normal business hours).

       **5.4.**   <u>**Costs and Expenses.**</u>  All fees, costs, expenses and purchases arising out of, relating to or incurred in the operation of the Facility, shall be the responsibility of Provider, except the Contractor shall be responsible for the salaries of Contractor's home office and regional employees and the expenses and costs incurred at Contractor's central administrative offices.  Contractor will not be liable in the performance of its duties hereunder for any loss incurred by or damage to Provider, unless such loss or damage arises out of, results from, or is related to the gross negligence of or intentional misconduct by Contractor.

       **5.5**   <u>**Advances by Contractor.**</u>  Contractor shall have the right, but not the obligation, to advance to Provider any and all sums required to maintain all necessary licenses and permits and to otherwise keep the Facility operating in good condition and repair.  All such sums advanced by Contractor to Provider shall be promptly repaid by Provider, with interest commencing on the date such sums were advanced, at the prime rate of interest as denominated and published in the "Money Rates" section of *The Wall Street Journal* from time to time (the "Prime Rate").  In the event that *The Wall Street Journal* shall abolish or abandon the practice of publishing the Prime Rate, Contractor shall designate a comparable reference rate which shall be deemed to be the Prime Rate.  The rate of interest on sums advanced shall be adjusted daily to the rate of interest equal to the Prime Rate in effect on each date.  Interest shall be computed by

(a)     Provider and Contractor shall be responsible to, and shall, maintain the safety, security and integrity of all information created in connection with the Agreement from unauthorized access, tampering, hacking, copying or other intrusions. Without limitation of any other obligation set forth in this Agreement, Provider agrees to comply with all reasonably required and applicable components of any then-applicable HIPAA Corporate Compliance Program promulgated by Contractor and Contractor agrees to comply with all reasonably required and applicable components of any then-applicable HIPAA Corporate Compliance Program promulgated by Provider.

(b)     Each Party (a "Receiving Party") does hereby assure the other Party (the "Disclosing Party") that the Receiving Party will appropriately safeguard "protected health information," as defined from time to time under HIPAA ("Protected Information"), made available to or obtained by or accessed by such Receiving Party pursuant to this Agreement or otherwise in connection with their contractual relationship. In implementation of such assurance and without limiting the obligations of either party otherwise set forth in this Agreement or imposed by applicable law, each Receiving Party hereby agrees to comply with applicable requirements of law relating to Protected Information and with respect to any task or other activity such Receiving Party performs with respect to the contractual relationship, to the extent the applicable Disclosing Party would be required to comply with such requirements. The permitted and required uses and disclosures of such Protected Information by a Disclosing Party extend only to utilizing Protected Information within the contractual relationship and accessing and making disclosures of such Protected Information solely in connection with such Disclosing Party's operation or maintenance of the contractual relationship and in a manner consistent with the then-applicable requirements of HIPAA.

(c)     In amplification and not in limitation of the foregoing provisions of this Agreement, each Receiving Party agrees that such Receiving Party shall:

(1) Not use or further disclose Protected Information other than as permitted or required by this Agreement and any and all other agreements between Receiving Party and Disclosing Party;

(2) Not use or further disclose Protected Information in a manner that would violate the requirements of applicable law, if done by Disclosing Party;

(3) Use appropriate safeguards to prevent use or disclosure of Protected Information other than as provided for by this Agreement;

(4) Promptly report to Disclosing Party any use or disclosure of Protected Information not provided for by this Agreement or any other agreements of which Receiving Party becomes aware;

(5) Ensure that any subcontractors or agents to whom Receiving Party provides Protected Information received from Disclosing Party agree in writing to the same restrictions and conditions that apply to Receiving Party with respect to such Protected Information.

(g)    The Parties agree to negotiate in good faith any modification to this Agreement that may be necessary or required to ensure consistency with amendments to and changes in applicable federal and state laws and regulations, including without limitation regulations promulgated pursuant to HIPAA.

**5.10   Compliance.**   Contractor follows the Reliance Health Care, Inc. Compliance Program, including the Corporate Code of Conduct ("Reliance Code of Conduct"). Provider shall maintain and promote its own compliance program to ensure compliance with the Federal OIG Compliance Program Guidance and other applicable state and federal rules and regulations and shall adopt a Provider Code of Conduct which shall contain, at a minimum, substantially the same legal and ethical guidance as is described in the Reliance Code of Conduct. Provider shall be solely responsible for the implementation and enforcement of the Provider's Code of Conduct at the Facility. By executing this Agreement, Provider agrees to abide by the Reliance Code of Conduct and the Provider's Code of Conduct. Provider further agrees to conduct periodic education and training for all employees who provide services at the Facility on the Reliance Code of Conduct and Provider's Code of Conduct, and report any suspected violations of the described Codes of Conduct to the Facility Administrator. The Facility Administrator shall immediately report all alleged violations of the Reliance Code of Conduct to the Chief Operating Officer of the Contractor, in writing. The Facility Administrator shall handle alleged violations of Provider's Code of Conduct in accordance with Facility's Compliance Program requirements and applicable law. Provider may request the assistance of Contractor with employee education and training relating to Provider's compliance program and Contractor may provide such assistance pursuant hereto. However, the provision by Contractor of such assistance shall be for educational purposes only and Provider shall remain fully responsible for its compliance program.

**5.11   Marketing - Use of Contractor's Name.**   Recognizing that Contractor is well-known in the State in which the Facility is located because of its many years of service in and to the healthcare industry, Contractor grants to Provider a limited license to use the name "Reliance Health Care, Inc." or "Reliance Health Care" (the "Name") in advertising and promotional materials for the Facility, under the following terms and conditions:

(a)    Provider will always emphasize Provider's name or the Facility's name if different, when using the name to advertise and/or promote the Facility so that it is clear that Provider does at all times retain and exercise overall control over the Facility and its operations and personnel.

(b)    In all materials utilizing the Name, Provider shall, at least once, use the following phrase, or comparable language, in connection with the Provider's name or the Facility name: "An independent facility which receives administrative support services from Reliance Health Care, Inc.", unless otherwise agreed to by Provider and Contractor.

(c)    Prior to any dissemination of advertising or related material under the limited license granted herein, Provider shall submit all such proposed uses to Contractor for its approval. Contractor will approve or disapprove such materials within ten days of receipt.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement, deemed effective the day and year first above written.

PROVIDER:

OCNC, INC. D/B/A SILVER OAKS
HEALTH AND REHABILITATION

By: *Kathy Presley*
Name: Kathy Presley
Its: Administrator of Record

CONTRACTOR:

RELIANCE HEALTH CARE, INC.

By: *Brandon Adams*
Name: Brandon Adams
Its: Chief Executive Officer

## HEALTHCARE PROVIDER SERVICES AGREEMENT
## ADMINISTRATIVE SERVICES PROVIDER

**THIS HEALTHCARE PROVIDER SERVICES AGREEMENT** (this "Agreement") made as of the day of the ___1st___ day of _____January_____, 2011_ by and between **NORTHWEST HEALTH & REHAB, INC. DBA NORTH HILLS LIFE CARE AND REHAB**, an Arkansas corporation ("Provider"), and **RELIANCE HEALTH CARE, INC.**, an Arkansas corporation {"Contractor", or "ASP" (Administrative Services Provider)}.

### W I T N E S S E T H:

**WHEREAS,** Provider is a provider of healthcare and related services at **NORTHWEST HEALTH & REHAB, INC. DBA NORTH HILLS LIFE CARE AND REHAB** at 27 East Appleby Road in Fayetteville, AR (the "Facility").

**WHEREAS,** Provider desires to enter into this Agreement to obtain certain services of Contractor at the Facility on the terms set forth herein.

**NOW, THEREFORE,** in consideration of the premises, the promises and the mutual covenants herein contained and Ten and No/100 Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party unto the other, the parties agree as follows:

### ARTICLE 1.

### DUTIES AND OBLIGATIONS OF CONTRACTOR AND PROVIDER

**1.1.** **Duties, Responsibilities and Authority of Contractor.** During the term of this Agreement, Provider hereby engages Contractor to provide and Contractor covenants and agrees to provide the following services to Provider on an as-needed basis in connection with the operation of the Facility:

(a) **Policies and Procedures.** Contractor shall develop and recommend to the Provider such policies and procedures as Contractor may elect to develop and/or recommend relating to the operation of the Facility. It is the sole responsibility of Provider to adopt, amend and implement all policies and procedures necessary for the operation of the Facility in a manner required by applicable laws and regulations.

(b) **Personnel.** All staff of the Facility shall be employees or contractors of Provider. Contractor will assist Provider in recruiting and training personnel. Contractor may also provide consultation on and recommend to Provider the hiring, promotion and discharge of such personnel as it deems appropriate. Provider shall have and shall exercise final control over and responsibility for all personnel recruitment, training, employment, termination and staffing levels.

1952723v1

(c) **Specialist Staff.**   Contractor shall make available to Provider for consultation and advice, specialists in the fields of accounting, auditing, budgeting, care management, collections, compliance, dietary services, information services, internal risk management, health and safety, legal, maintenance, nursing, personnel, pharmacy operations, public relations, purchasing, quality assurance, systems and procedures, third-party reimbursement and other areas as needed by Provider and which Contractor has available. Any advice or recommendation provided by such Specialists shall be for the purpose of providing information and advice to Provider for consideration by Provider.   Provider shall have the responsibility for seeking the assistance of Specialists and determining whether to utilize or implement the advice and/or recommendations provided by such Specialists. Provider shall have the option of seeking other professional opinions on any matter involving consultation with a Specialist. Provider shall provide such Specialists with such information as is needed to make informed recommendations and any advice or recommendation made by the Specialists will be within the context of the information received from Provider on the matter.   Provider agrees to defend, indemnify and hold harmless Contractor and any such Specialist from any and all claims, demands, actions, lawsuits, administrative penalties, damages, costs, sanctions or fees which arise from or relate in any way to the provision by such Specialists of services to Provider pursuant to this Agreement.

(d) **Employee Benefits.**   Contractor shall review Provider's salary levels and employee benefits and recommend such changes as it deems appropriate to enable Provider to remain competitive within its market and to assure employee retention to the greatest extent possible. Employee benefits may include, without limitation, pensions and profit sharing plans of a non-equity nature, insurance benefits, incentive plans for key employees, and vacation, holiday and sick policies.   Contractor shall not institute any such recommended employee benefits or changes thereto without Provider's prior written approval.

(e) **Capital Expenditures.**   Contractor may purchase equipment, furniture and furnishings on behalf of and in the name of Provider in accordance with the "Capital Expenditures Budget" (as hereinafter defined).

(f) **Services.**   Provider shall determine the ancillary services needed by the Facility and Contractor shall assist Provider in negotiating agreements for the Facility's ancillary services, including but not limited to, speech therapy, occupational therapy, respiratory therapy, physical therapy, rental of equipment, food and dietary services and any other services deemed reasonably necessary by Provider in connection with the operation of the Facility. Provider shall be solely responsible for ensuring the sufficiency of the ancillary services provided by third parties to the Facility and any other matters related thereto.

(g) **Orderly Payments.**   Contractor shall provide for the orderly payment (from the funds of the Facility or funds available to the Facility therefor) of accounts payable, amounts due on indebtedness, rents, utilities, equipment leases, employee payroll, taxes and insurance premiums, and all other obligations of the Facility in accordance with Section 1.4 hereof. In no event shall Contractor be obligated to make such payments from its own funds.

**(h)** **Admitting and Charging Patients.**  Contractor shall recommend for Provider's consideration standards and procedures for admitting patients, for charging patients for services, and for collecting the charges from the patients or third parties.  Such standards and procedures shall be consistent with applicable local, state and Federal laws and regulations and with applicable third party payor reimbursement guidelines.  Provider shall be solely responsible for determining whether such standards and procedures will be utilized by Provider and such standards and procedures shall be implemented by Provider only after approval by Provider.

**(i)** **Accounting and Reimbursement Matters.**

(1)     Subject to Provider's prior approval, Contractor shall recommend and implement on behalf of Provider, per the request of Provider, in accordance with recognized sound operational accounting principles applied in a manner consistent with accepted industry standards ("Sound Principles"), appropriate accounting, financial operations, capital and cash management programs; maintain accounting, billing and collection records; and issue appropriate bills for goods and services furnished by the Facility.  Contractor shall use its best efforts to assist in the collection of accounts receivable and monies owed to the Facility; prepare and file insurance, Medicare, Medicaid and any and all other necessary or desirable applications and claims for the purpose of maximizing the production of revenue of Provider at the Facility; and respond to Medicare, Medicaid or other third party payor audits in a manner which will minimize the expenses incurred by the Facility in responding to such audits.  Contractor shall recommend and implement, with Provider's approval, all necessary internal controls to prevent loss or damage to the operation of the Facility and the financial position of Provider with respect thereto.  Contractor shall not materially alter the accounting or bookkeeping procedures unless requested or approved by Provider.

(2)     To accomplish the billing requirements of Section 1.1(i)(1), Provider has separately executed, if required in the state where the Facility is located, a power of attorney or billing agreement to authorize Contractor to serve as or designate a billing agent for Provider, to authorize electronic data exchanges, to authorize electronic funds transfers and for similar purposes, all to accomplish the submission on behalf of Provider of its Medicare and Medicaid claims.  If Provider has not executed such power(s) of attorney, then Provider shall execute a power of attorney in form substantially similar to the one required, and/or such other forms as may be required for Contractor to be able to bill on behalf of Provider in the format required in the state where the Facility is located.

**(j)** **Maintenance of Books of Accounts and Records.**  Contractor shall establish and maintain books of account in accordance with Sound Principles for the Facility using accounts and classifications consistent with those used in similar operations and as herein provided, and at all times maintain full and complete documentation regarding all of Contractor's actions taken to fulfill its duties hereunder.  The books and records for the Facility shall be maintained by Contractor at the expense of Provider.  Any books and records maintained off-site of the Facility by Contractor shall be maintained at the sole expense of Contractor, but Contractor shall, when requested by Provider, deliver photocopies of all reports and

documentation related thereto to Provider.  Contractor shall promptly respond to any questions of Provider with respect to such books and records and shall confer with Provider at all reasonable times, upon request, concerning operation of the Facility and the books of account and other records in connection therewith.  All financial books and records generated, prepared or obtained by Contractor pursuant to this Agreement shall be deemed the property of Provider.

(k)    **Non-capital Expenditures**.  Contractor shall within the budgetary limits set forth in the "Operating Budget" (as hereinafter defined) proposed by Contractor and approved by Provider as herein provided, purchase in the name of the Provider all necessary foods, drugs, beverages, medical supplies, cleaning supplies and solutions and other services and items contemplated herein.  Notwithstanding the foregoing provision, Provider shall have authority to make any expenditures necessary for adequate staffing and patient care.

(l)    **Public Relations/Marketing**.  Contractor shall advise and assist Provider in designing adequate and appropriate public relations and marketing programs.

(m)    **Labor Matters**.  Contractor shall monitor all labor relations, including any union organizing activities, at the Facility and promptly notify and report to Provider about any union activity which may increase the rights, powers or authority of any union or affect any compensation arrangements.

(n)    **Bank Loan Covenants**.  Contractor shall monitor and, to the extent Contractor  is made aware of the terms and requirements, recommend to Provider steps necessary to allow it to comply with all bank loan covenants affecting Provider or the Facility.

(o)    **Insurance**.  Contractor shall obtain and maintain with financially sound, reputable and highly rated responsible companies, naming Provider, the Facility and, to the extent available (at no additional cost), Contractor as insureds or additional insureds thereunder, in amounts approved by Provider, the following types of insurance as required:  general public liability insurance; boiler insurance; elevator liability insurance (when applicable); workers' compensation; business interruption insurance; flood and earthquake insurance (where available); employer's liability or similar insurance as may be required by law; insurance against loss or damage to the Facility from fire and such other risks and casualties now or hereafter embraced by "Extended Coverage", as well as such other risks and casualties with respect to which insurance is customarily carried for similar facilities as the Facility; personal injury liability insurance against claims for bodily injury or death or otherwise arising out of the operations of the Facility or bodily injury or death to any one person; and surety bonds for patient trust funds and such other additional insurance as the Provider shall deem necessary or appropriate for protection against claims, liabilities and losses arising from the operation of the Facility.  All such insurance shall name Provider as named insured and, unless otherwise agreed by Provider.

(p)    **Contracts**.   Provider shall review and approve all contracts and agreements relative to the Facility which are submitted by Provider for review.  Contractor shall have no authority to enter into any written contracts on behalf of Provider without Provider's prior approval and then only on behalf of Provider.

(q)   **Physical Condition of Facility.**   Contractor may, but shall not be obligated to, assist Provider by reviewing and monitoring the physical condition of the Facility from time to time and reporting to Provider with respect thereto.  Provider shall be responsible for determining whether to implement any recommendations of Contractor.  Provider shall have sole responsibility for identifying need for facility repair, for making needed repairs and for the day-to-day and overall physical condition of the facility.

(r)   **Annual Reports.**   Within one hundred twenty (120) days after the end of each fiscal year of Provider, Contractor shall have prepared and delivered to Provider financial statements and related notations thereto in accordance with Sound Principles for the Facility showing the results of operation of the Facility for the preceding fiscal year.  Such financial statements shall include, at a minimum, a balance sheet and operating income statement. Contractor shall assist and cooperate with Provider in connection with the preparation of Provider's tax returns.  If state or federal government authorities require a certified audit of the Facility, Contractor shall assist and cooperate in connection with the preparation of Provider's certified audits.

(s)   **Working Capital.**   Contractor shall review and consult with Provider concerning the Facility's working capital needs and coordinate the use of Provider's available working capital so as to allow Provider to effectively and economically utilize the cash of the Facility.  Contractor shall seek to avoid circumstances that would result in the business at the Facility being conducted by Provider on a "cash on delivery" basis to the extent possible and shall use its best efforts to assist Provider in obtaining favorable credit terms from all operating vendors. Contractor shall notify Provider of any such terms for payment other than sixty (60) days after goods are delivered or services are provided.  Contractor may, but is not obligated to, advance its own funds to Provider to supplement Provider's working capital.

(t)   **Equipment Leases.**   Contractor shall review all equipment leases entered into by the Provider, including both capital and non-capital equipment leases.  Contractor shall not agree to the terms of any equipment lease on behalf of the Facility without Provider's approval.  Any equipment leases executed by Contractor on behalf of Provider must be included within the Budgets (as hereinafter defined) previously approved by Provider.

(u)   **Technology.**   Contractor shall provide to Facility the telephone, computer and associated technology structure backbone necessary to its operation and to facilitate compliance by both parties with the terms of this Agreement.

1.2.   **Reports to Provider.**   Contractor shall prepare and provide quarterly financial reports to Provider consisting of a balance sheet and a current and year-to-date operating income and expense statement (which shall include a comparison to that quarter's and the year-to-date's budgeted income and expenses), a current aging of accounts receivable report, and such other financial reports reasonably requested by Provider.  The first such report shall cover the period from the date of this Agreement to the close of business on the last day of the calendar quarter in which this Agreement is executed.  All quarterly reports shall be delivered by Contractor to Provider on or before the forty-fifth (45th) day after the end of the calendar quarter to which

such report pertains.  All reports and statements required hereby shall be unaudited unless otherwise required by Provider (at its expense).  Contractor shall prepare or cause to be prepared all cost reports for the Facility for Provider's review, approval and filing.  If required by applicable authorities, Provider shall sign such reports.

    **1.3.**   **Budgets.**  Commencing with the first fiscal year after the effective date of this Agreement Contractor shall prepare for the Facility, and submit to Provider for each fiscal year for its consideration and approval, a recommended "Operating Budget" and a "Capital Expenditures Budget", in the form defined and described below (collectively referred to as the "Budgets" and individually, as a "Budget").  The Operating Budget and Capital Expenditures Budget shall be presented on a month-by-month and aggregate year-to-date basis.  Expenses included in such Budgets shall also be classified according to Medicaid reimbursement "Cost Centers".  A "Cost Center" shall be defined for purposes hereof as the grouping of expenses by which reimbursable costs are reported to the applicable State Medicaid program and by which the applicable State Medicaid program calculates per diem reimbursement rates.  Thus, for example only, the Budgets will classify expenses into the following categories, as appropriate, under the applicable Medicaid program:  routine and special services; dietary; laundry, housekeeping, operation and maintenance of plant; administrative and general; property; and any other applicable Cost Centers.  The format of the Budgets shall be amended from time to time to reflect changes in applicable State Medicaid program definitions of Cost Centers or classification of reimbursable costs and shall be classified in a manner that will facilitate the grouping of the Medicare and/or State Medicaid programs.  Subcategories or line item expense detail shall be reflected on the Budgets in order to cause each Budget to reflect all expenses and reimbursements with reasonable particularity.

        **(a)**   **Capital Expenditures.**  Contractor shall outline and recommend to Provider a program of capital expenditures and repairs as Contractor reasonably believes will be required for the Facility for the next fiscal year.  Provider may approve or reject, in its discretion, each proposed capital expenditure.  All repairs, maintenance and other services and expenditures that are not capital expenditures and repairs at the Facility shall be included in the Operating Budget.

        **(b)**   **Operating Budget.**  The Operating Budget shall set forth a recommended budgeted amount for operating revenues and expenses for the Facility for the next fiscal year together with an explanation of any assumptions used for determining (i) anticipated changes in Facility utilization, (ii) charges to patients, (iii) census, (iv) reimbursement rates, (v) payroll rates and positions, (vi) wage and non-wage costs, (vii) and all other material factors differing from the current year.

        **(c)**   **Reports.**  Contractor shall, except for the calendar quarter that includes the date of this Agreement, prepare and deliver to Provider within forty-five (45) days after the end of each March, June, September and December reports on a current quarter and year-to-date basis comparing actual performance to that budgeted for each of the Budgets and an explanation stating the reasons for any Budget discrepancies.  With respect to the Operating Budget, cash receipts shall be shown on an accrual basis.

(d)    **Approval of Budgets.**  The Budgets shall be in form and content in compliance with the requirements of this Agreement.  The Budgets prepared by Contractor pursuant to this Section 1.3 must be approved by Provider prior to the implementation of such Budgets at the Facility.

(e)    **Emergency Expenditures.**  Contractor may expend funds of the Facility in excess of the budgetary limits to make repairs or perform maintenance if the failure to make such repairs or perform such maintenance will create an immediate and serious threat to the health or safety of the patients or the employees of the Facility.  If any repairs made pursuant to the previous sentence are estimated to be less than or equal to $10,000.00, then Contractor shall make such repairs without the requirement of prior notice to Provider, but shall notify Provider as soon as practicable of the necessity for such repairs.  In the event repairs are estimated to be greater than $10,000.00, then Contractor shall not commence any repairs without the prior approval of Provider.

1.4.    **Bank Accounts and Working Capital.**  Contractor shall deposit or cause to be deposited in a bank or banks designated by Provider and in an operating account or accounts (the "Accounts") established by Provider all funds received from the operations of the Facility.  Provider shall deposit into the Accounts any Facility-related revenues paid directly to Provider or which are otherwise received by Provider.  All costs and expenses incurred in the operation of the Facility, including payroll expenses, shall be paid out of the revenue deposited into the Accounts.   Provider hereby authorizes Contractor, by its duly authorized representative or designee, to sign all checks or other documents of withdrawal, or such other persons as Contractor and Provider shall mutually designate in writing for this purpose.  Deposits to the Accounts may be made by the Provider's designee.  In addition to any other indemnification of Contractor to Provider set forth herein, Contractor shall and does hereby agree to indemnify, hold harmless and defend Provider, its officers, directors, partners, employees, shareholders, agents, successors and assigns, from and against any loss, liability, damage or expense incurred by Provider and/or the Facility (including attorneys' and investigatory fees) as the result of any misappropriation or negligent handling of any of Facility's funds or patient trust funds by Contractor, its employees and/or agents.  Contractor shall not withdraw any monies from the Accounts to pay any item other than as contemplated by the Budgets or otherwise herein.  Contractor shall cooperate with Provider in reviewing the working capital needs of the Facility and shall consult with Provider regarding such needs.

1.5.    **Licenses and Additional Terms.**

(a)    Contractor may, at the request of Provider, assist Provider in applying for and obtaining in the name and for the use of Provider all necessary licenses, permits, consents and approvals from all governmental bodies having jurisdiction over the use, occupancy and operation of the Facility.

(b)    Contractor shall use its best efforts to avoid any action on its part and to notify Provider of any action on its part that may (1) cause any governmental agency or authority to institute any proceeding for the rescission or revocation of any necessary license, permit, consent or approval of the Facility, or (2) adversely affect the Facility's or Provider's rights to

accept and obtain payments under the Medicaid/Medicare programs or any other public or private third party payor program in which the Facility has elected to participate as a provider of healthcare goods or services.

(c)     All reports and related paperwork for governmental agencies prepared by Contractor shall be submitted to Provider for review and approval prior to submission of such materials to the appropriate agencies, including, without limitation, all licensure reports; provided, however, that the Provider shall be deemed to have consented to the form and content thereof if Provider fails to deliver notice of objection to Contractor within ten (10) days after Provider's receipt of such materials.

(d)     Contractor shall, with the prior approval of Provider, have the right to contest on behalf of Provider by appropriate legal proceedings, diligently conducted in good faith in the name of Provider, the validity or application of any law, ordinance, rule, ruling, regulation, order or requirement of any governmental agency having jurisdiction over the operation of the Facility or Provider.   Provider, after having given its written-approval, shall cooperate with Contractor with regard to the contest, and Provider shall pay all attorneys' fees incurred with regard to the contest.   Counsel for any such contest shall be mutually selected by Provider and Contractor.

1.6.   **Legal Proceedings.**   Contractor and Provider shall each promptly notify the other of all actual, threatened, or potential legal claims, actions, administrative proceedings or other proceedings affecting Provider or the Facility of which either has actual knowledge.   Provider shall receive from Contractor copies of all documents Contractor receives related to any such litigation.   Provider shall control and determine all matters related to any litigation, potential or threatened litigation, administrative application or proceeding, arbitration or other similar matters arising in connection with the Facility, including without limitation, all legal proceedings, all administrative proceedings and all other proceedings involving the application of any law, ordinance, rule, ruling, regulation, order or requirement of any governmental agency having jurisdiction over Provider and the operation of the Facility.   Counsel for any disputes, potential disputes or other matters related to the Facility or Provider not contemplated by Section 1.5(d) of this Agreement shall be selected by Provider with Contractor's assistance.   Upon request by Provider, Contractor shall provide cooperation and assistance with regard to any of the above. Provider shall pay attorneys' fees incurred with regard to such proceedings even if not within the budgeted amounts.     Provider retains the right to make all decisions, judgments and communications with respect to matters described in this Section.   Notwithstanding anything to the contrary in this Section 1.6, Contractor shall have the right, subject to the approval of Provider, which approval shall not be unreasonably withheld, to process all third-party payment claims for the services of the Facility, including the right to contest to the exhaustion of all applicable administrative proceedings or procedures, adjustments and denials by governmental agencies or their fiscal intermediaries as third-party payors, at the expense of Provider in accordance with Contractor's responsibilities under Section 1.1(i) and pursuant to the documents executed by Provider as described in Section 1.1(i)(2).

1.7.   **Taxes.**   Any taxes or other governmental obligations properly imposed on the Provider are the obligations of the Provider, not of Contractor, and shall be paid out of the

Accounts in accordance with the terms hereof.   Upon receiving consent of or request from Provider, Contractor may contest the validity or amount of any such tax or imposition on the Facility in the same manner as described in Section 1.5(d).

**1.8.   Costs.**   All salary and other compensation or expenses associated with Contractor's direct or indirect overhead and other expenses incurred by Contractor in connection with the operation of its home or regional office(s) or the home or regional office(s) of any of its subsidiaries, including, without limitation, postage and supplies (including all checks, all forms required by Contractor's computer system or any other documents or materials generated in the course of Contractor's performance of its obligations hereunder), shall be borne by Contractor and not charged to the Facility or Provider; provided, however, nothing in this Section 1.8 shall be deemed to prevent Contractor from being entitled, and Contractor shall be so entitled, to reimbursement from Provider in the event Contractor advances any sum to or on behalf of Provider.   Contractor shall not shift any functions or services and any costs related thereto from such home or regional office(s) to the Facility without the prior approval of Provider.

**1.9.   Provider Duties.**   Provider shall, in addition to those duties and functions of Provider expressly provided for herein, perform the following:

(a)   **Review Performance of Contractor.**   Review, monitor and assess the quality of services being provided by Contractor and the effectiveness of Contractor in performing its functions under this Agreement.

(b)   **Labor Matters.**   Review and approve, if acceptable, Contractor's negotiations on behalf of the Facility with any labor union lawfully entitled to represent employees at the Facility.   All legal fees and other costs in connection with such negotiations shall be at the sole cost of Provider.

(c)   **Purchasing Contracts.**   Review and approve all purchasing contracts negotiated by Contractor on behalf of the Facility.   At its option, Provider may also negotiate such contracts.

**1.10.   Retention of Control by Provider.**   Notwithstanding anything to the contrary herein, Provider shall at all times retain and exercise overall control over the Facility and its operations, personnel, and patient care, and Contractor shall perform the duties herein required to be performed by it in accordance with the policies and directives from time to time adopted by Provider and the terms and provisions of this Agreement.

**1.11.   Fines and Penalties.**   All fines, civil monetary penalties, or late filing penalties, including, without limitation, any civil monetary penalties imposed pursuant to 42 U.S.C. Section 1396r(h) or 42 U.S.C. Section 1395i-3(h) (collectively, the "Fines") shall be the responsibility of and paid by Provider unless caused by Contractor's bad faith or gross negligence, in which event Contractor shall have responsibility for and pay the fines, if any.

**ARTICLE 2.**

## CONTRACTOR FEE

2.1.**Contractor Services.** On or before the first day of each calendar month during the Term, Provider shall pay to Contractor an administrative services fee in an amount determined as **4% of revenue** for the previous calendar month. If the fee is not paid by the 5th day of the month such payment is due, then the amount due shall accrue interest at the highest rate permitted by Arkansas law until paid. In addition, Provider shall pay to Contractor such other additional amounts to which Contractor is entitled to payment or reimbursement in accordance with the provisions of this Agreement (collectively with the amount specified in the preceding sentence, the "Fee")

## ARTICLE 3.

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PARTIES

3.1.     **Representations, Warranties and Covenants of Provider.**     Provider does represent, warrant, covenant and agree as follows:

(a)    **Good Standing.** Provider is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation. During the term of this Agreement, Provider shall maintain its organization and existence as a corporation in good standing and shall act promptly to become qualified or authorized to conduct business in all jurisdictions where such qualification or authorization is required.

(b)    **Due Authority.** This Agreement has been duly authorized, executed and delivered by Provider in conformance with Provider's organizational charter and Bylaws, and pursuant to a validly existing approval of Provider's Board of Directors duly constituted.

(c)    **Binding Obligation.** This Agreement constitutes a valid and binding obligation of Provider, enforceable against Provider in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

(d)    **Exercise of Provider's Judgment.** The exercise of judgment, discretion and authority required of Provider under this Agreement shall at all times be exercised in good faith.

(e)    **No Default.** To Provider's knowledge, neither the execution and delivery of this Agreement by Provider, nor the consummation by the parties hereto of the services contemplated hereby, (i) has constituted or resulted in or will, with the passage of time, or the giving of notice or both constitute or result in the breach of, or constitute a default under any contract, agreement or understanding, whether written or oral, or (ii) has violated any court order, judgment, law, ordinance, regulation, or restriction or agreement to which Provider is a party, or by which Provider, or any of Provider's assets may be bound.

**3.2.**   **Representations, Warranties and Covenants of Contractor.**   Contractor represents, warrants, covenants and agrees as follows:

(a)   **Corporate Existence.**   Contractor is a corporation duly organized, validly existing and in good standing under the laws of the State of Arkansas and has all requisite power and has taken all requisite action necessary to authorize it to enter into this Agreement.   During the term of this Agreement, Contractor shall maintain its organization and existence as a corporation in good standing and duly qualified or authorized to conduct business in all jurisdictions in which such qualification or authorization is required.

(b)   **Records.**   During the term of this Agreement, and until the expiration of four years after the last furnishing of services pursuant to this Agreement, Contractor shall, as provided in Section 952 of the Omnibus Budget Reconciliation Act of 1980 and regulations promulgated thereunder, make available upon written request to the Secretary of Health and Human Services or, upon written request, to the Comptroller General of the United States or any of their duly authorized representatives, this Agreement, and all books, documents and records in Contractor's possession that are necessary to verify the nature and extent of any services furnished pursuant to this Agreement for which payment may be made under the Medicare program, or if Contractor carries out any of the duties of this Agreement through a subcontract or subcontracts with an aggregate value or cost of $10,000.00 or more over a twelve-month period with a related organization, such subcontract or subcontracts shall contain a clause to the effect that until the expiration of four years after the furnishing of such services pursuant to such subcontract or subcontracts, the related organization shall as provided in said Section 952, make available, upon request, to the Secretary of Health and Human Services or upon request, to the Comptroller General of the United States or any of their duly authorized representatives, the subcontract or subcontracts, that are necessary to verify the nature and extent of the costs of any services furnished pursuant to such subcontract or subcontracts for which payment may be made under the Medicare program; provided, however, that this provision shall not be deemed to authorize Contractor to perform its duties hereunder through subcontracts, except as may be otherwise provided herein.

(c)   **Good Standing.**   Contractor is and shall remain a corporation duly organized, validly existing, in good standing and licensed to do business (to the extent requirements exist) under the laws of the State of Arkansas and is and will be qualified or authorized to do business in all jurisdictions in which the nature of its business makes such qualification or authorization necessary.

(d)   **Due Authority.**   This Agreement has been duly authorized, executed and delivered by Contractor in conformance with Contractor's organizational charter and bylaws, pursuant to a validly taken vote of approval of Contractor's board of directors duly constituted that is still in full force and effect.

(e)   **Binding Obligation.**   This Agreement constitutes a valid and binding obligation of Contractor, enforceable against Contractor in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

**3.3.**   **Continuing Nature of Representations, Covenants and Warranties.**   All representations, covenants and warranties under this Section 3. shall be continuing and shall remain effective throughout the term of this Agreement, and, for the provisions of Section 3.2(b), for a period of four (4) years after the last furnishing of f services hereunder.

## ARTICLE 4.

## TERM AND TERMINATION

**4.1.**   **Term.** The initial term of this Agreement shall commence on the date of this Agreement and shall continue for the remainder of this calendar year followed by a period of two (2) years thereafter (the "Initial Term"). If this Agreement is not earlier terminated pursuant hereto, upon the expiration of the Initial Term, this Agreement shall automatically renew for successive one year terms (each, a "Renewal Term") unless either party delivers to the other, at least sixty (60) days prior to the expiration of the Initial Term or the then current Renewal Term, as applicable, written notice of such party's intent not to renew this Agreement. The entire term of this Agreement, including the Initial Term and any and all Renewal Terms, is herein referred to as the "Term."

**4.2.**   **Termination.**

    **(a)**   This Agreement may be terminated (i) by mutual consent of the parties at any time or (ii) without cause by either party giving ninety (90) days written notice to the other party of intent to terminate.

    **(b)**   This Agreement may be terminated by mutual consent of the parties at any time with or without cause by the signing of an alternate, modified, or new agreement between the parties for the provision of Administrative Services to the Provider replacing this agreement.

    **(c)**   Provider shall have cause for termination, and may terminate this Agreement upon five (5) days written notice, if:

        **(i)**   Contractor defaults in the performance of any covenant, agreement, term or provision of this Agreement to be performed by Contractor, and such default continues for a period of twenty (20) days after written notice to Contractor from Provider stating the specific default; provided, however, such termination shall not limit any other remedy Provider may have, whether at law or at equity; or

        **(ii)**   Contractor is dissolved or liquidated, or shall apply for or consent to the appointment of a receiver, trustee or liquidator of it or all or a substantial part of its assets, files a voluntary petition in bankruptcy, makes a general assignment for the benefit of creditors, files a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Contractor a bankrupt or insolvent or approving a petition seeking

reorganization of said party or appointing a receiver, trustee or liquidator for said party or all or a substantial part of its assets, or if Contractor is financially impaired from performing its duties under this Agreement; or

(iii)    The Facility is damaged or destroyed and cannot remain open and provide substantially all services previously provided for a period of ninety (90) days or, as a result of such damage or destruction, is closed by applicable authorities, and Provider elects not to or is unable to             reopen the Facility.

(d)    Contractor shall have cause for termination, and may terminate this Agreement upon five (5) days written notice, if:

(i)    the Medicare (if applicable) or Medicaid provider agreement(s) or certification(s) of the Facility will be terminated and: (a) the termination action is not rescinded at least twenty-one (21) days prior to the scheduled termination date; or (b) the termination action is based upon a finding that the Facility's patients are in immediate jeopardy or that there is an immediate and serious threat to patient health, safety or welfare; or

(ii)    the license or permit of the Facility will be suspended or revoked and such license suspension or revocation proceeding is not rescinded at least twenty-one (21) days prior to the scheduled license suspension or revocation date; or

(iii)    the Facility is placed under receivership or temporary management in accordance with 42 U.S.C. Section 1396r(h), 42 U.S.C. Section 1395i-3(b) or similar state or Federal laws providing for the imposition of receivership or temporary management upon any facility providing substandard care; or

(iv)    the Facility's premises or a material portion (i.e. greater than 50%) thereof is damaged or destroyed by fire or other casualty and the Facility fails to commence to repair, restore, rebuild or replace any such damage or destruction within ninety (90) days thereafter, and fails to complete such work within a reasonable period of time thereafter;

(v)    Provider is dissolved or liquidated, or shall apply for or consent to the appointment of a receiver, trustee or liquidator of it or all or a substantial part of its assets, files a voluntary petition in bankruptcy, makes a general assignment for the benefit of creditors, files a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Provider bankrupt or insolvent or approving a petition seeking reorganization of Provider or appointing a receiver, trustee or liquidator for Provider or all or a substantial part of its assets; or

(vi)    Provider fails to observe, follow or comply with the terms and provisions of any compliance policy implemented by Provider and Contractor.

(e)      Upon termination of this Agreement, all records in the possession of Contractor relating to Provider and the Facility, the patients of the Facility and the maintenance and operation of the Facility, together with all supplies, assets or any other items belonging to Provider or the Facility in Contractor's possession or control, shall be promptly delivered to Provider, except for such records which Contractor is required by law to retain, in which case Contractor shall promptly make copies of such documents and deliver the originals, to the extent available.  Upon expiration or termination (or abandonment of this Agreement by Contractor), Contractor shall fully cooperate in the orderly, efficient and professional turnover of any or all records of the Facility to Provider, or such other party as Provider may designate, and shall continue to provide services to the Facility in accordance herewith until all of its obligations hereunder are fully performed.

## ARTICLE 5.

## MISCELLANEOUS

**5.1.**    **Successors.**  The terms, covenants, conditions, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

**5.2.**    **No Partnership, Joint Venture or Lease.**  Nothing in this Agreement shall constitute or be construed to be or to create a partnership, joint venture or lease between Provider and Contractor with respect to the Facility.  In the performance of duties and obligations under this Agreement, it is mutually understood and agreed that Contractor is at all times acting and performing Contractor's duties and functions in the capacity of an independent contractor, that Provider shall neither have nor exercise any control or direction over the methods by which Contractor shall perform the services, nor shall Provider and Contractor be deemed partners or joint venturers.  Contractor agrees to perform the services, at all times, in strict accordance with currently approved and accepted methods and practices in Contractor's business.  Provider shall have the right to control the result achieved but not the manner in which the work is performed.  It is expressly agreed by the parties hereto that no work, act, commission or omission by Contractor pursuant to the terms and conditions of this Agreement shall be construed to make or render Contractor the agent, employee or servant of Provider.  Contractor shall pay all compensation, federal, state, or local income or occupational taxes, F.I.C.A. taxes, unemployment compensation, and workers' compensation, benefits, and any other payment for Contractor's employees and/or sub-contractors.

**5.3.**    **Notices.**  All notices, consents, requests and other communications to any party under or in connection with this Agreement shall be in writing and shall be sent via personal delivery, via telephone facsimile transmission, via certified or registered mail, return receipt requested, or via statutory overnight delivery, addressed to such parties at such parties' address or telephone facsimile number set forth below or at such other address or telephone facsimile number as shall be designated by such party in a written notice to each other party complying as to the delivery with the terms of this Section 5.3:

(a)   to Provider, by addressing the same to:

Northwest Health & Rehab, Inc. DBA North Hills Life Care and Rehab
27 East Appleby Road
Fayetteville, AR  72703-3902

Attn:  Administrator of Record
Fax No.: (479) 444-9090

(b)   to Contractor by addressing the same to:

Reliance Health Care, Inc.
824 Salem Road Ste. 210
Conway, Arkansas 72034
Attn: Amy Rollins
Fax No.: (501) 932-0056

All such notices, consents, requests and other communications shall be deemed given:  (a) when given and receipted for (or upon the date of attempted delivery when delivery is refused), if sent via personal delivery, via certified or registered mail, return receipt requested, or via statutory overnight delivery; or (b) when received if sent via telephone facsimile transmission during normal business hours (confirmation of such receipt shall be a confirmed telephone facsimile transmission, such facsimile transmission being deemed receipt of any such notice, consent, request or other communication sent via telephone facsimile transmission during normal business hours).

**5.4.**   **Costs and Expenses.**  All fees, costs, expenses and purchases arising out of, relating to or incurred in the operation of the Facility, shall be the responsibility of Provider, except the Contractor shall be responsible for the salaries of Contractor's home office and regional employees and the expenses and costs incurred at Contractor's central administrative offices.  Contractor will not be liable in the performance of its duties hereunder for any loss incurred by or damage to Provider, unless such loss or damage arises out of, results from, or is related to the gross negligence of or intentional misconduct by Contractor.

**5.5**   **Advances by Contractor.**  Contractor shall have the right, but not the obligation, to advance to Provider any and all sums required to maintain all necessary licenses  and  permits and to otherwise keep the Facility operating in good condition and repair.  All such sums advanced by Contractor to Provider shall be promptly repaid by Provider, with interest commencing on the date such sums were advanced, at the prime rate of interest as denominated and published in the "Money Rates" section of *The Wall Street Journal* from time to time (the "Prime Rate").  In the event that *The Wall Street Journal* shall abolish or abandon the practice of publishing the Prime Rate, Contractor shall designate a comparable reference rate which shall be deemed to be the Prime Rate.  The rate of interest on sums advanced shall be adjusted daily to the rate of interest equal to the Prime Rate in effect on each date.  Interest shall be computed by

multiplying the outstanding principal balance at the close of business on that day by a daily interest factor calculated by dividing the aforesaid interest rate per annum in effect on that day by 360. Interest so computed shall accrue for each and every day (365 days per year, 366 days per leap year) on which any outstanding indebtedness, including the day on which funds are initially advanced regardless of the time of day such advance is made, and including the day on which funds are repaid unless repayment is credited prior to close of business.

**5.6**   **Indemnities.**   To the extent not promptly paid for by an insurance company, Provider shall and does hereby agree to indemnify, hold harmless and defend Contractor, its officers, directors, shareholders, partners, employees, successors, assigns and agents, from and against all demands, settlements, actions, injuries, losses, costs, liabilities, expenses (including reasonable attorney's fees and court costs), claims, actions, causes of actions and judgments arising out of Contractor's entering into and performance under the Agreement with the exception of any event or occurrence which is caused, created, acquiesced to or otherwise occurred due to any willful misconduct on the part of Contractor, its agents and subcontractors.

**5.7**   **Special Covenants.**

**(a)**   Provider acknowledges that the systems, methods, procedures and controls employed by Contractor are to remain the property of Contractor and are not, to the extent unique to Contractor and proprietary in nature, to be utilized, distributed, copied or otherwise employed or acquired by Provider, at any time, except as authorized by the Contractor.

**(b)**   Without the consent of the other, neither Provider nor Contractor will seek to employ the employees of the other or any affiliate of either Provider or Contractor during the term of this Agreement and for a period of one (1) year thereafter; provided, however, that if Contractor or an affiliate acquires a leasehold, sublease, or fee interest in the Facility, Contractor or such affiliate shall have the right to employ such Facility's administrator and other employees.

**5.8**   **Arbitration.**   With the exception of an action for injunctive relief, any controversy between the parties in the performance, interpretation and application of this Agreement may be submitted by either party to and shall be resolved by a single arbitrator selected in accordance with the rules of the American Arbitration Association. Unless the parties mutually agree otherwise, the arbitration hearing shall be held at the office of the American Arbitration Association that is nearest to Conway, Arkansas. Arbitration of such controversy, disagreement or dispute shall be conducted in accordance with the rules then in force of the American Arbitration Association, and the decision and award of the arbitrator so selected shall be binding upon both parties hereto. Provider and Contractor shall split equally the expenses of such arbitration. Contractor and Provider shall have and retain the right to seek injunctive relief before a court against the other in connection with any dispute arising in connection herewith. The judgment on any award by the arbitrator may be entered in any court of competent jurisdiction.

**5.9**   **HIPAA Privacy Rule.**

(a)      Provider and Contractor shall be responsible to, and shall, maintain the safety, security and integrity of all information created in connection with the Agreement from unauthorized access, tampering, hacking, copying or other intrusions. Without limitation of any other obligation set forth in this Agreement, Provider agrees to comply with all reasonably required and applicable components of any then-applicable HIPAA Corporate Compliance Program promulgated by Contractor and Contractor agrees to comply with all reasonably required and applicable components of any then-applicable HIPAA Corporate Compliance Program promulgated by Provider.

(b)      Each Party (a "Receiving Party") does hereby assure the other Party (the "Disclosing Party") that the Receiving Party will appropriately safeguard "protected health information," as defined from time to time under HIPAA ("Protected Information"), made available to or obtained by or accessed by such Receiving Party pursuant to this Agreement or otherwise in connection with their contractual relationship. In implementation of such assurance and without limiting the obligations of either party otherwise set forth in this Agreement or imposed by applicable law, each Receiving Party hereby agrees to comply with applicable requirements of law relating to Protected Information and with respect to any task or other activity such Receiving Party performs with respect to the contractual relationship, to the extent the applicable Disclosing Party would be required to comply with such requirements.   The permitted and required uses and disclosures of such Protected Information by a Disclosing Party extend only to utilizing Protected Information within the contractual relationship and accessing and making disclosures of such Protected Information solely in connection with such Disclosing Party's operation or maintenance of the contractual relationship and in a manner consistent with the then-applicable requirements of HIPAA.

(c)      In amplification and not in limitation of the foregoing provisions of this Agreement, each Receiving Party agrees that such Receiving Party shall:

(1) Not use or further disclose Protected Information other than as permitted or required by this Agreement and any and all other agreements between Receiving Party and Disclosing Party;

(2) Not use or further disclose Protected Information in a manner that would violate the requirements of applicable law, if done by Disclosing Party;

(3) Use appropriate safeguards to prevent use or disclosure of Protected Information other than as provided for by this Agreement;

(4) Promptly report to Disclosing Party any use or disclosure of Protected Information not provided for by this Agreement or any other agreements of which Receiving Party becomes aware;

(5) Ensure that any subcontractors or agents to whom Receiving Party provides Protected Information received from Disclosing Party agree in writing to the same restrictions and conditions that apply to Receiving Party with respect to such Protected Information.

(6) Make available Protected Information in accordance with applicable law (in all events, Receiving Party shall immediately notify Disclosing Party upon receipt by Receiving Party of any such request, and shall provide Disclosing Party with copies of any such materials);

(7) Make Receiving Party's internal practices, books, and records relating to the use and disclosure of Protected Information received available to the Secretary of the United States Health and Human Services and the Office of Civil Rights for purposes of determining Receiving Party's compliance with applicable law (in all events, Receiving Party shall immediately notify Disclosing Party upon receipt by Receiving Party of any such request, and shall provide Disclosing Party with copies of any such materials);

(8) At termination of this Agreement, return, destroy and expunge all Protected Information received from the Disclosing Party, or created or received by the Receiving Party on behalf of the Disclosing Party, that Receiving Party still maintains in any form and retain no copies of such information, or, if such return or destruction is not feasible, extend the protection of this Agreement and applicable law to the Protected Information and limit further uses and disclosures of the Protected Information after termination of the Agreement to those purposes that make the return or destruction of the Protected Information feasible, and

(9) Incorporate any amendments or corrections to Protected Information when notified pursuant to applicable law.

    **(d)**    Notwithstanding anything herein to the contrary, and without limiting the rights and remedies of Disclosing Party elsewhere set forth in this Agreement or available under applicable law, Disclosing Party may terminate this Agreement without penalty or recourse to Disclosing Party if Disclosing Party determines that Receiving Party has violated a material term of the provisions of this Section 5.8 of the Agreement, or such violation is imminent and material.

    **(e)**    Receiving Party acknowledges that under HIPAA, Disclosing Party could be deemed to be in violation of HIPAA if Disclosing Party knew of a pattern of activity or practice of Receiving Party that constitutes a material breach or violation of Receiving Party's obligations under this Agreement to maintain privacy, confidentiality and security of Protected Information, unless Disclosing Party takes reasonable steps to cure the breach or end the violation; and if such steps are unsuccessful, terminates this Agreement or reports the problem to the Secretary of Health and Human Services. Accordingly, Receiving Party agrees promptly to notify Disclosing Party of any pattern of activity or practice of Receiving Party that constitutes any such material breach or violation as aforesaid.

    **(f)**    Notwithstanding anything herein to the contrary, Provider acknowledges and agrees that Contractor may and Contractor acknowledges and agrees that Provider may store, analyze, access and use deidentified information derived from Protected Information, provided none of such information contains individually identifiable health information, and further provided that any such use is then consistent with applicable law.

(g)    The Parties agree to negotiate in good faith any modification to this Agreement that may be necessary or required to ensure consistency with amendments to and changes in applicable federal and state laws and regulations, including without limitation regulations promulgated pursuant to HIPAA.

**5.10   Compliance.**   Contractor follows the Reliance Health Care, Inc. Compliance Program, including the Corporate Code of Conduct ("Reliance Code of Conduct").  Provider shall maintain and promote its own compliance program to ensure compliance with the Federal OIG Compliance Program Guidance and other applicable state and federal rules and regulations and shall adopt a Provider Code of Conduct which shall contain, at a minimum, substantially the same legal and ethical guidance as is described in the Reliance Code of Conduct.  Provider shall be solely responsible for the implementation and enforcement of the Provider's Code of Conduct at the Facility.  By executing this Agreement, Provider agrees to abide by the Reliance Code of Conduct and the Provider's Code of Conduct. Provider further agrees to conduct periodic education and training for all employees who provide services at the Facility on the Reliance Code of Conduct and Provider's Code of Conduct, and report any suspected violations of the described Codes of Conduct to the Facility Administrator.   The Facility Administrator shall immediately report all alleged violations of the Reliance Code of Conduct to the Chief Operating Officer of the Contractor, in writing.  The Facility Administrator shall handle alleged violations of Provider's Code of Conduct in accordance with Facility's Compliance Program requirements and applicable law.  Provider may request the assistance of Contractor with employee education and training relating to Provider's compliance program and Contractor may provide such assistance pursuant hereto.  However, the provision by Contractor of such assistance shall be for educational purposes only and Provider shall remain fully responsible for its compliance program.

**5.11   Marketing - Use of Contractor's Name.**   Recognizing that Contractor is well-known in the State in which the Facility is located because of its many years of service in and to the healthcare industry, Contractor grants to Provider a limited license to use the name "Reliance Health Care, Inc." or "Reliance Health Care" (the "Name") in advertising and promotional materials for the Facility, under the following terms and conditions:

(a)    Provider will always emphasize Provider's name or the Facility's name if different, when using the name to advertise and/or promote the Facility so that it is clear that Provider does at all times retain and exercise overall control over the Facility and its operations and personnel.

(b)    In all materials utilizing the Name, Provider shall, at least once, use the following phrase, or comparable language, in connection with the Provider's name or the Facility name: "An independent facility which receives administrative support services from Reliance Health Care, Inc.", unless otherwise agreed to by Provider and Contractor.

(c)    Prior to any dissemination of advertising or related material under the limited license granted herein, Provider shall submit all such proposed uses to Contractor for its approval.  Contractor will approve or disapprove such materials within ten days of receipt.

Failure to approve or disapprove such materials within such ten days period shall constitute approval by of Contractor.

      **(d)**    The Name may only be used in connection with healthcare services and only in connection with the Facility.

      **(e)**    Provider will only use the Name in connection with services that are equal to, or greater than the quality of the services currently being offered by Provider.

      **(f)**    Provider recognizes that, aside from the limited license granted herein, Provider acquires no other rights in the Name.

      **(g)**    Provider shall fully indemnify Contractor for any and all liabilities or claims for damages arising out of Provider's use of the Name and for all costs, expenses, attorneys' fees, judgments, decrees and interest thereon suffered or incurred in connection therewith.

    **5.12**   **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when taken together with the others shall be deemed one original.  Signature pages may be copied and transmitted by facsimile machine.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement, deemed effective the day and year first above written.

PROVIDER:

NORTHWEST HEALTH & REHAB, INC.
DBA NORTH HILLS LIFE CARE AND
REHAB

By: _____
Name: Lauren Dowless
Its: Administrator of Record

CONTRACTOR:

RELIANCE HEALTH CARE, INC.

By: _____
Name: Brandon Adams
Its: Chief Executive Officer

1952723v1 21

## HEALTHCARE PROVIDER SERVICES AGREEMENT
## ADMINISTRATIVE SERVICES PROVIDER

**THIS HEALTHCARE PROVIDER SERVICES AGREEMENT** (this "Agreement") made as of the day of the __1st___ day of ____March____, 2011_ by and between **SCNC, INC. DBA SPRING CREEK HEALTH & REHAB**, an Arkansas corporation ("Provider"), and **RELIANCE HEALTH CARE, INC.**, an Arkansas corporation {"Contractor", or "ASP" (Administrative Services Provider)}.

## WITNESSETH:

**WHEREAS,** Provider is a provider of healthcare and related services at **SPRING CREEK HEALTH & REHAB** at 804 N. 2nd Street in Cabot, AR (the "Facility").

**WHEREAS,** Provider desires to enter into this Agreement to obtain certain services of Contractor at the Facility on the terms set forth herein.

**NOW, THEREFORE,** in consideration of the premises, the promises and the mutual covenants herein contained and Ten and No/100 Dollars ($10.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party unto the other, the parties agree as follows:

## ARTICLE 1.

## DUTIES AND OBLIGATIONS OF CONTRACTOR AND PROVIDER

**1.1.    Duties, Responsibilities and Authority of Contractor.**  During the term of this Agreement, Provider hereby engages Contractor to provide and Contractor covenants and agrees to provide the following services to Provider on an as-needed basis in connection with the operation of the Facility:

**(a)    Policies and Procedures.**  Contractor shall develop and recommend to the Provider such policies and procedures as Contractor may elect to develop and/or recommend relating to the operation of the Facility.  It is the sole responsibility of Provider to adopt, amend and implement all policies and procedures necessary for the operation of the Facility in a manner required by applicable laws and regulations.

**(b)    Personnel.**  All staff of the Facility shall be employees or contractors of Provider.  Contractor will assist Provider in recruiting and training personnel.  Contractor may also provide consultation on and recommend to Provider the hiring, promotion and discharge of such personnel as it deems appropriate. Provider shall have and shall exercise final control over and responsibility for all personnel recruitment, training, employment, termination and staffing levels.

**(c)    Specialist Staff.**  Contractor shall make available to Provider for consultation and advice, specialists in the fields of accounting, auditing, budgeting, care

1952723v1

management, collections, compliance, dietary services, information services, internal risk management, health and safety, legal, maintenance, nursing, personnel, pharmacy operations, public relations, purchasing, quality assurance, systems and procedures, third-party reimbursement and other areas as needed by Provider and which Contractor has available. Any advice or recommendation provided by such Specialists shall be for the purpose of providing information and advice to Provider for consideration by Provider. Provider shall have the responsibility for seeking the assistance of Specialists and determining whether to utilize or implement the advice and/or recommendations provided by such Specialists. Provider shall have the option of seeking other professional opinions on any matter involving consultation with a Specialist. Provider shall provide such Specialists with such information as is needed to make informed recommendations and any advice or recommendation made by the Specialists will be within the context of the information received from Provider on the matter. Provider agrees to defend, indemnify and hold harmless Contractor and any such Specialist from any and all claims, demands, actions, lawsuits, administrative penalties, damages, costs, sanctions or fees which arise from or relate in any way to the provision by such Specialists of services to Provider pursuant to this Agreement.

(d) **Employee Benefits.** Contractor shall review Provider's salary levels and employee benefits and recommend such changes as it deems appropriate to enable Provider to remain competitive within its market and to assure employee retention to the greatest extent possible. Employee benefits may include, without limitation, pensions and profit sharing plans of a non-equity nature, insurance benefits, incentive plans for key employees, and vacation, holiday and sick policies. Contractor shall not institute any such recommended employee benefits or changes thereto without Provider's prior written approval.

(e) **Capital Expenditures.** Contractor may purchase equipment, furniture and furnishings on behalf of and in the name of Provider in accordance with the "Capital Expenditures Budget" (as hereinafter defined).

(f) **Services.** Provider shall determine the ancillary services needed by the Facility and Contractor shall assist Provider in negotiating agreements for the Facility's ancillary services, including but not limited to, speech therapy, occupational therapy, respiratory therapy, physical therapy, rental of equipment, food and dietary services and any other services deemed reasonably necessary by Provider in connection with the operation of the Facility. Provider shall be solely responsible for ensuring the sufficiency of the ancillary services provided by third parties to the Facility and any other matters related thereto.

(g) **Orderly Payments.** Contractor shall provide for the orderly payment (from the funds of the Facility or funds available to the Facility therefor) of accounts payable, amounts due on indebtedness, rents, utilities, equipment leases, employee payroll, taxes and insurance premiums, and all other obligations of the Facility in accordance with Section 1.4 hereof. In no event shall Contractor be obligated to make such payments from its own funds.

(h) **Admitting and Charging Patients.** Contractor shall recommend for Provider's consideration standards and procedures for admitting patients, for charging patients for services, and for collecting the charges from the patients or third parties. Such standards and

procedures shall be consistent with applicable local, state and Federal laws and regulations and with applicable third party payor reimbursement guidelines. Provider shall be solely responsible for determining whether such standards and procedures will be utilized by Provider and such standards and procedures shall be implemented by Provider only after approval by Provider.

      (i)     **Accounting and Reimbursement Matters.**

      (1)     Subject to Provider's prior approval, Contractor shall recommend and implement on behalf of Provider, per the request of Provider, in accordance with recognized sound operational accounting principles applied in a manner consistent with accepted industry standards ("Sound Principles"), appropriate accounting, financial operations, capital and cash management programs; maintain accounting, billing and collection records; and issue appropriate bills for goods and services furnished by the Facility. Contractor shall use its best efforts to assist in the collection of accounts receivable and monies owed to the Facility; prepare and file insurance, Medicare, Medicaid and any and all other necessary or desirable applications and claims for the purpose of maximizing the production of revenue of Provider at the Facility; and respond to Medicare, Medicaid or other third party payor audits in a manner which will minimize the expenses incurred by the Facility in responding to such audits. Contractor shall recommend and implement, with Provider's approval, all necessary internal controls to prevent loss or damage to the operation of the Facility and the financial position of Provider with respect thereto. Contractor shall not materially alter the accounting or bookkeeping procedures unless requested or approved by Provider.

      (2)     To accomplish the billing requirements of Section 1.1(i)(1), Provider has separately executed, if required in the state where the Facility is located, a power of attorney or billing agreement to authorize Contractor to serve as or designate a billing agent for Provider, to authorize electronic data exchanges, to authorize electronic funds transfers and for similar purposes, all to accomplish the submission on behalf of Provider of its Medicare and Medicaid claims. If Provider has not executed such power(s) of attorney, then Provider shall execute a power of attorney in form substantially similar to the one required, and/or such other forms as may be required for Contractor to be able to bill on behalf of Provider in the format required in the state where the Facility is located.

      (j)     **Maintenance of Books of Accounts and Records.** Contractor shall establish and maintain books of account in accordance with Sound Principles for the Facility using accounts and classifications consistent with those used in similar operations and as herein provided, and at all times maintain full and complete documentation regarding all of Contractor's actions taken to fulfill its duties hereunder. The books and records for the Facility shall be maintained by Contractor at the expense of Provider. Any books and records maintained off-site of the Facility by Contractor shall be maintained at the sole expense of Contractor, but Contractor shall, when requested by Provider, deliver photocopies of all reports and documentation related thereto to Provider. Contractor shall promptly respond to any questions of Provider with respect to such books and records and shall confer with Provider at all reasonable times, upon request, concerning operation of the Facility and the books of account and other

records in connection therewith. All financial books and records generated, prepared or obtained by Contractor pursuant to this Agreement shall be deemed the property of Provider.

  **(k)**   **Non-capital Expenditures.** Contractor shall within the budgetary limits set forth in the "Operating Budget" (as hereinafter defined) proposed by Contractor and approved by Provider as herein provided, purchase in the name of the Provider all necessary foods, drugs, beverages, medical supplies, cleaning supplies and solutions and other services and items contemplated herein. Notwithstanding the foregoing provision, Provider shall have authority to make any expenditures necessary for adequate staffing and patient care.

  **(l)**   **Public Relations/Marketing.** Contractor shall advise and assist Provider in designing adequate and appropriate public relations and marketing programs.

  **(m)**   **Labor Matters.** Contractor shall monitor all labor relations, including any union organizing activities, at the Facility and promptly notify and report to Provider about any union activity which may increase the rights, powers or authority of any union or affect any compensation arrangements.

  **(n)**   **Bank Loan Covenants.** Contractor shall monitor and, to the extent Contractor is made aware of the terms and requirements, recommend to Provider steps necessary to allow it to comply with all bank loan covenants affecting Provider or the Facility.

  **(o)**   **Insurance.** Contractor shall obtain and maintain with financially sound, reputable and highly rated responsible companies, naming Provider, the Facility and, to the extent available (at no additional cost), Contractor as insureds or additional insureds thereunder, in amounts approved by Provider, the following types of insurance as required: general public liability insurance; boiler insurance; elevator liability insurance (when applicable); workers' compensation; business interruption insurance; flood and earthquake insurance (where available); employer's liability or similar insurance as may be required by law; insurance against loss or damage to the Facility from fire and such other risks and casualties now or hereafter embraced by "Extended Coverage", as well as such other risks and casualties with respect to which insurance is customarily carried for similar facilities as the Facility; personal injury liability insurance against claims for bodily injury or death or otherwise arising out of the operations of the Facility or bodily injury or death to any one person; and surety bonds for patient trust funds and such other additional insurance as the Provider shall deem necessary or appropriate for protection against claims, liabilities and losses arising from the operation of the Facility. All such insurance shall name Provider as named insured and, unless otherwise agreed by Provider.

  **(p)**   **Contracts.** Provider shall review and approve all contracts and agreements relative to the Facility which are submitted by Provider for review. Contractor shall have no authority to enter into any written contracts on behalf of Provider without Provider's prior approval and then only on behalf of Provider.

  **(q)**   **Physical Condition of Facility.** Contractor may, but shall not be obligated to, assist Provider by reviewing and monitoring the physical condition of the Facility

from time to time_and reporting to Provider with respect thereto. Provider shall be responsible for determining whether to implement any recommendations of Contractor. Provider shall have sole responsibility for identifying need for facility repair, for making needed repairs and for the day-to-day and overall_physical condition of the facility.

(r)  **Annual Reports.**  Within one hundred twenty (120) days after the end of each fiscal year of Provider, Contractor shall have prepared and delivered to Provider financial statements and related notations thereto in accordance with Sound Principles for the Facility showing the results of operation of the Facility for the preceding fiscal year. Such financial statements shall include, at a minimum, a balance sheet and operating income statement. Contractor shall assist and cooperate with Provider in connection with the preparation of Provider's tax returns. If state or federal government authorities require a certified audit of the Facility, Contractor shall assist and cooperate in connection with the preparation of Provider's certified audits.

(s)  **Working Capital.**  Contractor shall review and consult with Provider concerning the Facility's working capital needs and coordinate the use of Provider's available working capital so as to allow Provider to effectively and economically utilize the cash of the Facility. Contractor shall seek to avoid circumstances that would result in the business at the Facility being conducted by Provider on a "cash on delivery" basis to the extent possible and shall use its best efforts to assist Provider in obtaining favorable credit terms from all operating vendors. Contractor shall notify Provider of any such terms for payment other than sixty (60) days after goods are delivered or services are provided. Contractor may, but is not obligated to, advance its own funds to Provider to supplement Provider's working capital.

(t)  **Equipment Leases.**  Contractor shall review all equipment leases entered into by the Provider, including both capital and non-capital equipment leases. Contractor shall not agree to the terms of any equipment lease on behalf of the Facility without Provider's approval. Any equipment leases executed by Contractor on behalf of Provider must be included within the Budgets (as hereinafter defined) previously approved by Provider.

(u)  **Technology.**  Contractor shall provide to Facility the telephone, computer and associated technology structure backbone necessary to its operation and to facilitate compliance by both parties with the terms of this Agreement.

1.2.  **Reports to Provider.**  Contractor shall prepare and provide quarterly financial reports to Provider consisting of a balance sheet and a current and year-to-date operating income and expense statement (which shall include a comparison to that quarter's and the year-to-date's budgeted income and expenses), a current aging of accounts receivable report, and such other financial reports reasonably requested by Provider. The first such report shall cover the period from the date of this Agreement to the close of business on the last day of the calendar quarter in which this Agreement is executed. All quarterly reports shall be delivered by Contractor to Provider on or before the forty-fifth (45th) day after the end of the calendar quarter to which such report pertains. All reports and statements required hereby shall be unaudited unless otherwise required by Provider (at its expense). Contractor shall prepare or cause to be prepared

all cost reports for the Facility for Provider's review, approval and filing.   If required by applicable authorities, Provider shall sign such reports.

    **1.3.**   **Budgets.**   Commencing with the first fiscal year after the effective date of this Agreement Contractor shall prepare for the Facility, and submit to Provider for each fiscal year for its consideration and approval, a recommended "Operating Budget" and a "Capital Expenditures Budget", in the form defined and described below (collectively referred to as the "Budgets" and individually, as a "Budget").   The Operating Budget and Capital Expenditures Budget shall be presented on a month-by-month and aggregate year-to-date basis.   Expenses included in such Budgets shall also be classified according to Medicaid reimbursement "Cost Centers".   A "Cost Center" shall be defined for purposes hereof as the grouping of expenses by which reimbursable costs are reported to the applicable State Medicaid program and by which the applicable State Medicaid program calculates per diem reimbursement rates.   Thus, for example only, the Budgets will classify expenses into the following categories, as appropriate, under the applicable Medicaid program:   routine and special services; dietary; laundry, housekeeping, operation and maintenance of plant; administrative and general; property; and any other applicable Cost Centers.   The format of the Budgets shall be amended from time to time to reflect changes in applicable State Medicaid program definitions of Cost Centers or classification of reimbursable costs and shall be classified in a manner that will facilitate the grouping of the Medicare and/or State Medicaid programs.   Subcategories or line item expense detail shall be reflected on the Budgets in order to cause each Budget to reflect all expenses and reimbursements with reasonable particularity.

    **(a)**   **Capital Expenditures.**   Contractor shall outline and recommend to Provider a program of capital expenditures and repairs as Contractor reasonably believes will be required for the Facility for the next fiscal year.   Provider may approve or reject, in its discretion, each proposed capital expenditure.   All repairs, maintenance and other services and expenditures that are not capital expenditures and repairs at the Facility shall be included in the Operating Budget.

    **(b)**   **Operating, Budget.**   The Operating Budget shall set forth a recommended budgeted amount for operating revenues and expenses for the Facility for the next fiscal year together with an explanation of any assumptions used for determining (i) anticipated changes in Facility utilization, (ii) charges to patients, (iii) census, (iv) reimbursement rates, (v) payroll rates and positions, (vi) wage and non-wage costs, (vii) and all other material factors differing from the current year.

    **(c)**   **Reports.**   Contractor shall, except for the calendar quarter that includes the date of this Agreement, prepare and deliver to Provider within forty-five (45) days after the end of each March, June, September and December reports on a current quarter and year-to-date basis comparing actual performance to that budgeted for each of the Budgets and an explanation stating the reasons for any Budget discrepancies.   With respect to the Operating Budget, cash receipts shall be shown on an accrual basis.

    **(d)**   **Approval of Budgets.**   The Budgets shall be in form and content in compliance with the requirements of this Agreement.   The Budgets prepared by Contractor

pursuant to this Section 1.3 must be approved by Provider prior to the implementation of such Budgets at the Facility.

(e) **Emergency Expenditures.** Contractor may expend funds of the Facility in excess of the budgetary limits to make repairs or perform maintenance if the failure to make such repairs or perform such maintenance will create an immediate and serious threat to the health or safety of the patients or the employees of the Facility. If any repairs made pursuant to the previous sentence are estimated to be less than or equal to $10,000.00, then Contractor shall make such repairs without the requirement of prior notice to Provider, but shall notify Provider as soon as practicable of the necessity for such repairs. In the event repairs are estimated to be greater than $10,000.00, then Contractor shall not commence any repairs without the prior approval of Provider.

**1.4.** **Bank Accounts and Working Capital.** Contractor shall deposit or cause to be deposited in a bank or banks designated by Provider and in an operating account or accounts (the "Accounts") established by Provider all funds received from the operations of the Facility. Provider shall deposit into the Accounts any Facility-related revenues paid directly to Provider or which are otherwise received by Provider. All costs and expenses incurred in the operation of the Facility, including payroll expenses, shall be paid out of the revenue deposited into the Accounts. Provider hereby authorizes Contractor, by its duly authorized representative or designee, to sign all checks or other documents of withdrawal, or such other persons as Contractor and Provider shall mutually designate in writing for this purpose. Deposits to the Accounts may be made by the Provider's designee. In addition to any other indemnification of Contractor to Provider set forth herein, Contractor shall and does hereby agree to indemnify, hold harmless and defend Provider, its officers, directors, partners, employees, shareholders, agents, successors and assigns, from and against any loss, liability, damage or expense incurred by Provider and/or the Facility (including attorneys' and investigatory fees) as the result of any misappropriation or negligent handling of any of Facility's funds or patient trust funds by Contractor, its employees and/or agents. Contractor shall not withdraw any monies from the Accounts to pay any item other than as contemplated by the Budgets or otherwise herein. Contractor shall cooperate with Provider in reviewing the working capital needs of the Facility and shall consult with Provider regarding such needs.

**1.5.** **Licenses and Additional Terms.**

(a) Contractor may, at the request of Provider, assist Provider in applying for and obtaining in the name and for the use of Provider all necessary licenses, permits, consents and approvals from all governmental bodies having jurisdiction over the use, occupancy and operation of the Facility.

(b) Contractor shall use its best efforts to avoid any action on its part and to notify Provider of any action on its part that may (1) cause any governmental agency or authority to institute any proceeding for the rescission or revocation of any necessary license, permit, consent or approval of the Facility, or (2) adversely affect the Facility's or Provider's rights to accept and obtain payments under the Medicaid/Medicare programs or any other public or

private third party payor program in which the Facility has elected to participate as a provider of healthcare goods or services.

(c)     All reports and related paperwork for governmental agencies prepared by Contractor shall be submitted to Provider for review and approval prior to submission of such materials to the appropriate agencies, including, without limitation, all licensure reports; provided, however, that the Provider shall be deemed to have consented to the form and content thereof if Provider fails to deliver notice of objection to Contractor within ten (10) days after Provider's receipt of such materials.

(d)     Contractor shall, with the prior approval of Provider, have the right to contest on behalf of Provider by appropriate legal proceedings, diligently conducted in good faith in the name of Provider, the validity or application of any law, ordinance, rule, ruling, regulation, order or requirement of any governmental agency having jurisdiction over the operation of the Facility or Provider.  Provider, after having given its written-approval, shall cooperate with Contractor with regard to the contest, and Provider shall pay all attorneys' fees incurred with regard to the contest.  Counsel for any such contest shall be mutually selected by Provider and Contractor.

**1.6.     Legal Proceedings.**  Contractor and Provider shall each promptly notify the other of all actual, threatened, or potential legal claims, actions, administrative proceedings or other proceedings affecting Provider or the Facility of which either has actual knowledge.  Provider shall receive from Contractor copies of all documents Contractor receives related to any such litigation.  Provider shall control and determine all matters related to any litigation, potential or threatened litigation, administrative application or proceeding, arbitration or other similar matters arising in connection with the Facility, including without limitation, all legal proceedings, all administrative proceedings and all other proceedings involving the application of any law, ordinance, rule, ruling, regulation, order or requirement of any governmental agency having jurisdiction over Provider and the operation of the Facility.  Counsel for any disputes, potential disputes or other matters related to the Facility or Provider not contemplated by Section 1.5(d) of this Agreement shall be selected by Provider with Contractor's assistance.  Upon request by Provider, Contractor shall provide cooperation and assistance with regard to any of the above.  Provider shall pay attorneys' fees incurred with regard to such proceedings even if not within the budgeted amounts.  Provider retains the right to make all decisions, judgments and communications with respect to matters described in this Section.  Notwithstanding anything to the contrary in this Section 1.6, Contractor shall have the right, subject to the approval of Provider, which approval shall not be unreasonably withheld, to process all third-party payment claims for the services of the Facility, including the right to contest to the exhaustion of all applicable administrative proceedings or procedures, adjustments and denials by governmental agencies or their fiscal intermediaries as third-party payors, at the expense of Provider in accordance with Contractor's responsibilities under Section 1.1(i) and pursuant to the documents executed by Provider as described in Section 1.1(i)(2).

**1.7.     Taxes.**  Any taxes or other governmental obligations properly imposed on the Provider are the obligations of the Provider, not of Contractor, and shall be paid out of the Accounts in accordance with the terms hereof.  Upon receiving consent of or request from

Provider, Contractor may contest the validity or amount of any such tax or imposition on the Facility in the same manner as described in Section 1.5(d).

**1.8.** **Costs.** All salary and other compensation or expenses associated with Contractor's direct or indirect overhead and other expenses incurred by Contractor in connection with the operation of its home or regional office(s) or the home or regional office(s) of any of its subsidiaries, including, without limitation, postage and supplies (including all checks, all forms required by Contractor's computer system or any other documents or materials generated in the course of Contractor's performance of its obligations hereunder), shall be borne by Contractor and not charged to the Facility or Provider; provided, however, nothing in this Section 1.8 shall be deemed to prevent Contractor from being entitled, and Contractor shall be so entitled, to reimbursement from Provider in the event Contractor advances any sum to or on behalf of Provider. Contractor shall not shift any functions or services and any costs related thereto from such home or regional office(s) to the Facility without the prior approval of Provider.

**1.9.** **Provider Duties.** Provider shall, in addition to those duties and functions of Provider expressly provided for herein, perform the following:

      **(a)** **Review Performance of Contractor.** Review, monitor and assess the quality of services being provided by Contractor ~~at the Facility~~ and the effectiveness of Contractor in performing its functions under this Agreement.

      **(b)** **Labor Matters.** Review and approve, if acceptable, Contractor's negotiations on behalf of the Facility with any labor union lawfully entitled to represent employees at the Facility. All legal fees and other costs in connection with such negotiations shall be at the sole cost of Provider.

      **(c)** **Purchasing Contracts.** Review and approve all purchasing contracts negotiated by Contractor on behalf of the Facility. At its option, Provider may also negotiate such contracts.

**1.10.** **Retention of Control by Provider.** Notwithstanding anything to the contrary herein, Provider shall at all times retain and exercise overall control over the Facility and its operations, personnel, and patient care, and Contractor shall perform the duties herein required to be performed by it in accordance with the policies and directives from time to time adopted by Provider and the terms and provisions of this Agreement.

**1.11.** **Fines and Penalties.** All fines, civil monetary penalties, or late filing penalties, including, without limitation, any civil monetary penalties imposed pursuant to 42 U.S.C. Section 1396r(h) or 42 U.S.C. Section 1395i-3(h) (collectively, the "Fines") shall be the responsibility of and paid by Provider unless caused by Contractor's bad faith or gross negligence, in which event Contractor shall have responsibility for and pay the fines, if any.

## ARTICLE 2.

## CONTRACTOR FEE

**2.1.** **Contractor Services.** On or before the first day of each calendar month during the Term, Provider shall pay to Contractor an administrative services fee in an amount determined as **3% of revenue** for the previous calendar month. If the fee is not paid by the 5th day of the month such payment is due, then the amount due shall accrue interest at the highest rate permitted by Arkansas law until paid. In addition, Provider shall pay to Contractor such other additional amounts to which Contractor is entitled to payment or reimbursement in accordance with the provisions of this Agreement (collectively with the amount specified in the preceding sentence, the "Fee")

## ARTICLE 3.

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE PARTIES

**3.1.** **Representations, Warranties and Covenants of Provider.** Provider does represent, warrant, covenant and agree as follows:

**(a)** **Good Standing.** Provider is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation. During the term of this Agreement, Provider shall maintain its organization and existence as a corporation in good standing and shall act promptly to become qualified or authorized to conduct business in all jurisdictions where such qualification or authorization is required.

**(b)** **Due Authority.** This Agreement has been duly authorized, executed and delivered by Provider in conformance with Provider's organizational charter and Bylaws, and pursuant to a validly existing approval of Provider's Board of Directors duly constituted.

**(c)** **Binding Obligation.** This Agreement constitutes a valid and binding obligation of Provider, enforceable against Provider in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

**(d)** **Exercise of Provider's Judgment.** The exercise of judgment, discretion and authority required of Provider under this Agreement shall at all times be exercised in good faith.

**(e)** **No Default.** To Provider's knowledge, neither the execution and delivery of this Agreement by Provider, nor the consummation by the parties hereto of the services contemplated hereby, (i) has constituted or resulted in or will, with the passage of time, or the giving of notice or both constitute or result in the breach of, or constitute a default under any contract, agreement or understanding, whether written or oral, or (ii) has violated any court order, judgment, law, ordinance, regulation, or restriction or agreement to which Provider is a party, or by which Provider, or any of Provider's assets may be bound.

**3.2.** **Representations, Warranties and Covenants of Contractor.** Contractor represents, warrants, covenants and agrees as follows:

   (a) **Corporate Existence.** Contractor is a corporation duly organized, validly existing and in good standing under the laws of the State of Arkansas and has all requisite power and has taken all requisite action necessary to authorize it to enter into this Agreement. During the term of this Agreement, Contractor shall maintain its organization and existence as a corporation in good standing and duly qualified or authorized to conduct business in all jurisdictions in which such qualification or authorization is required.

   (b) **Records.** During the term of this Agreement, and until the expiration of four years after the last furnishing of services pursuant to this Agreement, Contractor shall, as provided in Section 952 of the Omnibus Budget Reconciliation Act of 1980 and regulations promulgated thereunder, make available upon written request to the Secretary of Health and Human Services or, upon written request, to the Comptroller General of the United States or any of their duly authorized representatives, this Agreement, and all books, documents and records in Contractor's possession that are necessary to verify the nature and extent of the costs of any services furnished pursuant to this Agreement for which payment may be made under the Medicare program, or if Contractor carries out any of the duties of this Agreement through a subcontract or subcontracts with an aggregate value or cost of $10,000.00 or more over a twelve-month period with a related organization, such subcontract or subcontracts shall contain a clause to the effect that until the expiration of four years after the furnishing of such services pursuant to such subcontract or subcontracts, the related organization shall as provided in said Section 952, make available, upon request, to the Secretary of Health and Human Services or upon request, to the Comptroller General of the United States or any of their duly authorized representatives, the subcontract or subcontracts, that are necessary to verify the nature and extent of the costs of any services furnished pursuant to such subcontract or subcontracts for which payment may be made under the Medicare program; provided, however, that this provision shall not be deemed to authorize Contractor to perform its duties hereunder through subcontracts, except as may be otherwise provided herein.

   (c) **Good Standing.** Contractor is and shall remain a corporation duly organized, validly existing, in good standing and licensed to do business (to the extent requirements exist) under the laws of the State of Arkansas and is and will be qualified or authorized to do business in all jurisdictions in which the nature of its business makes such qualification or authorization necessary.

   (d) **Due Authority.** This Agreement has been duly authorized, executed and delivered by Contractor in conformance with Contractor's organizational charter and bylaws, pursuant to a validly taken vote of approval of Contractor's board of directors duly constituted that is still in full force and effect.

   (e) **Binding Obligation.** This Agreement constitutes a valid and binding obligation of Contractor, enforceable against Contractor in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and similar laws affecting the enforcement of creditors' rights generally and general principles of equity.

**3.3.**   **Continuing Nature of Representations, Covenants and Warranties.**   All representations, covenants and warranties under this Section 3 shall be continuing and shall remain effective throughout the term of this Agreement, and, for the provisions of Section 3.2(b), for a period of four (4) years after the last furnishing of f services hereunder.

## ARTICLE 4.

## TERM AND TERMINATION

**4.1.**   **Term.** The initial term of this Agreement shall commence on the date of this Agreement and shall continue for the remainder of this calendar year followed by a period of two (2) years thereafter (the "Initial Term").  If this Agreement is not earlier terminated pursuant hereto, upon the expiration of the Initial Term, this Agreement shall automatically renew for successive one year terms (each, a "Renewal Term") unless either party delivers to the other, at least sixty (60) days prior to the expiration of the Initial Term or the then current Renewal Term, as applicable, written notice of such party's intent not to renew this Agreement.  The entire term of this Agreement, including the Initial Term and any and all Renewal Terms, is herein referred to as the "Term."

**4.2.**   **Termination.**

    **(a)**   This Agreement may be terminated (i) by mutual consent of the parties at any time or (ii) without cause by either party giving ninety (90) days written notice to the other party of intent to terminate.

    **(b)**   This Agreement may be terminated by mutual consent of the parties at any time with or without cause by the signing of an alternate, modified, or new agreement between the parties for the provision of Administrative Services to the Provider replacing this agreement.

    **(c)**   Provider shall have cause for termination, and may terminate this Agreement upon five (5) days written notice, if:

        **(i)**   Contractor defaults in the performance of any covenant, agreement, term or provision of this Agreement to be performed by Contractor, and such default continues for a period of twenty (20) days after written notice to Contractor from Provider stating the specific default; provided, however, such termination shall not limit any other remedy Provider may have, whether at law or at equity; or

        **(ii)**   Contractor is dissolved or liquidated, or shall apply for or consent to the appointment of a receiver, trustee or liquidator of it or all or a substantial part of its assets, files a voluntary petition in bankruptcy, makes a general assignment for the benefit of creditors, files a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Contractor a bankrupt or insolvent or approving a petition seeking reorganization of said party or appointing a receiver, trustee or liquidator for said party or

all or a substantial part of its assets, or if Contractor is financially impaired from performing its duties under this Agreement; or

(iii)     The Facility is damaged or destroyed and cannot remain open and provide substantially all services previously provided for a period of ninety (90) days or, as a result of such damage or destruction, is closed by applicable authorities, and Provider elects not to or is unable to                reopen the Facility.

(d)     Contractor shall have cause for termination, and may terminate this Agreement upon five (5) days written notice, if:

(i)     the Medicare (if applicable) or Medicaid provider agreement(s) or certification(s) of the Facility will be terminated and: (a) the termination action is not rescinded at least twenty-one (21) days prior to the scheduled termination date; or (b) the termination action is based upon a finding that the Facility's patients are in immediate jeopardy or that there is an immediate and serious threat to patient health, safety or welfare; or

(ii)     the license or permit of the Facility will be suspended or revoked and such license suspension or revocation proceeding is not rescinded at least twenty-one (21) days prior to the scheduled license suspension or revocation date; or

(iii)     the Facility is placed under receivership or temporary management in accordance with 42 U.S.C. Section 1396r(h), 42 U.S.C. Section 1395i-3(b) or similar state or Federal laws providing for the imposition of receivership or temporary management upon any facility providing substandard care; or

(iv)     the Facility's premises or a material portion (i.e. greater than 50%) thereof is damaged or destroyed by fire or other casualty and the Facility fails to commence to repair, restore, rebuild or replace any such damage or destruction within ninety (90) days thereafter, and fails to complete such work within a reasonable period of time thereafter;

(v)     Provider is dissolved or liquidated, or shall apply for or consent to the appointment of a receiver, trustee or liquidator of it or all or a substantial part of its assets, files a voluntary petition in bankruptcy, makes a general assignment for the benefit of creditors, files a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Provider bankrupt or insolvent or approving a petition seeking reorganization of Provider or appointing a receiver, trustee or liquidator for Provider or all or a substantial part of its assets; or

(vi)     Provider fails to observe, follow or comply with the terms and provisions of any compliance policy implemented by Provider and Contractor.

(e)     Upon termination of this Agreement, all records in the possession of Contractor relating to Provider and the Facility, the patients of the Facility and the maintenance and operation of the Facility, together with all supplies, assets or any other items belonging to Provider or the Facility in Contractor's possession or control, shall be promptly delivered to Provider, except for such records which Contractor is required by law to retain, in which case Contractor shall promptly make copies of such documents and deliver the originals, to the extent available.  Upon expiration or termination (or abandonment of this Agreement by Contractor), Contractor shall fully cooperate in the orderly, efficient and professional turnover of any or all records of the Facility to Provider, or such other party as Provider may designate, and shall continue to provide services to the Facility in accordance herewith until all of its obligations hereunder are fully performed.

## ARTICLE 5.

### MISCELLANEOUS

**5.1.     Successors.**  The terms, covenants, conditions, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns.

**5.2.     No Partnership, Joint Venture or Lease.**  Nothing in this Agreement shall constitute or be construed to be or to create a partnership, joint venture or lease between Provider and Contractor with respect to the Facility.  In the performance of duties and obligations under this Agreement, it is mutually understood and agreed that Contractor is at all times acting and performing Contractor's duties and functions in the capacity of an independent contractor, that Provider shall neither have nor exercise any control or direction over the methods by which Contractor shall perform the services, nor shall Provider and Contractor be deemed partners or joint venturers.  Contractor agrees to perform the services, at all times, in strict accordance with currently approved and accepted methods and practices in Contractor's business.  Provider shall have the right to control the result achieved but not the manner in which the work is performed.  It is expressly agreed by the parties hereto that no work, act, commission or omission by Contractor pursuant to the terms and conditions of this Agreement shall be construed to make or render Contractor the agent, employee or servant of Provider.   Contractor shall pay all compensation, federal, state, or local income or occupational taxes, F.I.C.A. taxes, unemployment compensation, and workers' compensation, benefits, and any other payment for Contractor's employees and/or sub-contractors.

**5.3.     Notices.**  All notices, consents, requests and other communications to any party under or in connection with this Agreement shall be in writing and shall be sent via personal delivery, via telephone facsimile transmission, via certified or registered mail, return receipt requested, or via statutory overnight delivery, addressed to such parties at such parties' address or telephone facsimile number set forth below or at such other address or telephone facsimile number as shall be designated by such party in a written notice to each other party complying as to the delivery with the terms of this Section 5.3:

(a) to Provider, by addressing the same to:

SCNC, Inc. DBA Spring Creek Health & Rehab
804 N 2nd Street
Cabot, AR  72023

Attn:  Administrator of Record
Fax No.: (501) 843-7399

(b) to Contractor by addressing the same to:

Reliance Health Care, Inc.
824 Salem Road Ste. 210
Conway, Arkansas 72034
Attn: Amy Rollins
Fax No.: (501) 932-0056

All such notices, consents, requests and other communications shall be deemed given:  (a) when given and receipted for (or upon the date of attempted delivery when delivery is refused), if sent via personal delivery, via certified or registered mail, return receipt requested, or via statutory overnight delivery; or (b) when received if sent via telephone facsimile transmission during normal business hours (confirmation of such receipt shall be a confirmed telephone facsimile transmission, such facsimile transmission being deemed receipt of any such notice, consent, request or other communication sent via telephone facsimile transmission during normal business hours).

**5.4.**   **Costs and Expenses**.   All fees, costs, expenses and purchases arising out of, relating to or incurred in the operation of the Facility, shall be the responsibility of Provider, except the Contractor shall be responsible for the salaries of Contractor's home office and regional employees and the expenses and costs incurred at Contractor's central administrative offices.   Contractor will not be liable in the performance of its duties hereunder for any loss incurred by or damage to Provider, unless such loss or damage arises out of, results from, or is related to the gross negligence of or intentional misconduct by Contractor.

**5.5**   **Advances by Contractor**.   Contractor shall have the right, but not the obligation, to advance to Provider any and all sums required to maintain all necessary licenses  and  permits and to otherwise keep the Facility operating in good condition and repair.   All such sums advanced by Contractor to Provider shall be promptly repaid by Provider, with interest commencing on the date such sums were advanced, at the prime rate of interest as denominated and published in the "Money Rates" section of *The Wall Street Journal* from time to time (the "Prime Rate").  In the event that *The Wall Street Journal* shall abolish or abandon the practice of publishing the Prime Rate, Contractor shall designate a comparable reference rate which shall be deemed to be the Prime Rate.   The rate of interest on sums advanced shall be adjusted daily to the rate of interest equal to the Prime Rate in effect on each date.   Interest shall be computed by

multiplying the outstanding principal balance at the close of business on that day by a daily interest factor calculated by dividing the aforesaid interest rate per annum in effect on that day by 360. Interest so computed shall accrue for each and every day (365 days per year, 366 days per leap year) on which any outstanding indebtedness, including the day on which funds are initially advanced regardless of the time of day such advance is made, and including the day on which funds are repaid unless repayment is credited prior to close of business.

**5.6    Indemnities.**   To the extent not promptly paid for by an insurance company, Provider shall and does hereby agree to indemnify, hold harmless and defend Contractor, its officers, directors, shareholders, partners, employees, successors, assigns and agents, from and against all demands, settlements, actions, injuries, losses, costs, liabilities, expenses (including reasonable attorney's fees and court costs), claims, actions, causes of actions and judgments arising out of Contractor's entering into and performance under the Agreement with the exception of any event or occurrence which is caused, created, acquiesced to or otherwise occurred due to any willful misconduct on the part of Contractor, its agents and subcontractors.

**5.7    Special Covenants.**

**(a)**    Provider acknowledges that the systems, methods, procedures and controls employed by Contractor are to remain the property of Contractor and are not, to the extent unique to Contractor and proprietary in nature, to be utilized, distributed, copied or otherwise employed or acquired by Provider, at any time, except as authorized by the Contractor.

**(b)**    Without the consent of the other, neither Provider nor Contractor will seek to employ the employees of the other or any affiliate of either Provider or Contractor during the term of this Agreement and for a period of one (1) year thereafter; provided, however, that if Contractor or an affiliate acquires a leasehold, sublease, or fee interest in the Facility, Contractor or such affiliate shall have the right to employ such Facility's administrator and other employees.

**5.8    Arbitration.**   With the exception of an action for injunctive relief, any controversy between the parties in the performance, interpretation and application of this Agreement may be submitted by either party to and shall be resolved by a single arbitrator selected in accordance with the rules of the American Arbitration Association. Unless the parties mutually agree otherwise, the arbitration hearing shall be held at the office of the American Arbitration Association that is nearest to Conway, Arkansas. Arbitration of such controversy, disagreement or dispute shall be conducted in accordance with the rules then in force of the American Arbitration Association, and the decision and award of the arbitrator so selected shall be binding upon both parties hereto. Provider and Contractor shall split equally the expenses of such arbitration. Contractor and Provider shall have and retain the right to seek injunctive relief before a court against the other in connection with any dispute arising in connection herewith. The judgment on any award by the arbitrator may be entered in any court of competent jurisdiction.

**5.9    HIPAA Privacy Rule.**

(a)     Provider and Contractor shall be responsible to, and shall, maintain the safety, security and integrity of all information created in connection with the Agreement from unauthorized access, tampering, hacking, copying or other intrusions.  Without limitation of any other obligation set forth in this Agreement, Provider agrees to comply with all reasonably required and applicable components of any then-applicable HIPAA Corporate Compliance Program promulgated by Contractor and Contractor agrees to comply with all reasonably required and applicable components of any then-applicable HIPAA Corporate Compliance Program promulgated by Provider.

(b)     Each Party (a "Receiving Party") does hereby assure the other Party (the "Disclosing Party") that the Receiving Party will appropriately safeguard "protected health information," as defined from time to time under HIPAA ("Protected Information"), made available to or obtained by or accessed by such Receiving Party pursuant to this Agreement or otherwise in connection with their contractual relationship.  In implementation of such assurance and without limiting the obligations of either party otherwise set forth in this Agreement or imposed by applicable law, each Receiving Party hereby agrees to comply with applicable requirements of law relating to Protected Information and with respect to any task or other activity such Receiving Party performs with respect to the contractual relationship, to the extent the applicable Disclosing Party would be required to comply with such requirements.   The permitted and required uses and disclosures of such Protected Information by a Disclosing Party extend only to utilizing Protected Information within the contractual relationship and accessing and making disclosures of such Protected Information solely in connection with such Disclosing Party's operation or maintenance of the contractual relationship and in a manner consistent with the then-applicable requirements of HIPAA.

(c)     In amplification and not in limitation of the foregoing provisions of this Agreement, each Receiving Party agrees that such Receiving Party shall:

(1) Not use or further disclose Protected Information other than as permitted or required by this Agreement and any and all other agreements between Receiving Party and Disclosing Party;

(2) Not use or further disclose Protected Information in a manner that would violate the requirements of applicable law, if done by Disclosing Party;

(3) Use appropriate safeguards to prevent use or disclosure of Protected Information other than as provided for by this Agreement;

(4) Promptly report to Disclosing Party any use or disclosure of Protected Information not provided for by this Agreement or any other agreements of which Receiving Party becomes aware;

(5) Ensure that any subcontractors or agents to whom Receiving Party provides Protected Information received from Disclosing Party agree in writing to the same restrictions and conditions that apply to Receiving Party with respect to such Protected Information.

(6) Make available Protected Information in accordance with applicable law (in all events, Receiving Party shall immediately notify Disclosing Party upon receipt by Receiving Party of any such request, and shall provide Disclosing Party with copies of any such materials);

(7) Make Receiving Party's internal practices, books, and records relating to the use and disclosure of Protected Information received available to the Secretary of the United States Health and Human Services and the Office of Civil Rights for purposes of determining Receiving Party's compliance with applicable law (in all events, Receiving Party shall immediately notify Disclosing Party upon receipt by Receiving Party of any such request, and shall provide Disclosing Party with copies of any such materials);

(8) At termination of this Agreement, return, destroy and expunge all Protected Information received from the Disclosing Party, or created or received by the Receiving Party on behalf of the Disclosing Party, that Receiving Party still maintains in any form and retain no copies of such information, or, if such return or destruction is not feasible, extend the protection of this Agreement and applicable law to the Protected Information and limit further uses and disclosures of the Protected Information after termination of the Agreement to those purposes that make the return or destruction of the Protected Information feasible, and

(9) Incorporate any amendments or corrections to Protected Information when notified pursuant to applicable law.

**(d)** Notwithstanding anything herein to the contrary, and without limiting the rights and remedies of Disclosing Party elsewhere set forth in this Agreement or available under applicable law, Disclosing Party may terminate this Agreement without penalty or recourse to Disclosing Party if Disclosing Party determines that Receiving Party has violated a material term of the provisions of this Section 5.8 of the Agreement, or such violation is imminent and material.

**(e)** Receiving Party acknowledges that under HIPAA, Disclosing Party could be deemed to be in violation of HIPAA if Disclosing Party knew of a pattern of activity or practice of Receiving Party that constitutes a material breach or violation of Receiving Party's obligations under this Agreement to maintain privacy, confidentiality and security of Protected Information, unless Disclosing Party takes reasonable steps to cure the breach or end the violation; and if such steps are unsuccessful, terminates this Agreement or reports the problem to the Secretary of Health and Human Services. Accordingly, Receiving Party agrees promptly to notify Disclosing Party of any pattern of activity or practice of Receiving Party that constitutes any such material breach or violation as aforesaid.

**(f)** Notwithstanding anything herein to the contrary, Provider acknowledges and agrees that Contractor may and Contractor acknowledges and agrees that Provider may store, analyze, access and use de-identified information derived from Protected Information, provided none of such information contains individually identifiable health information, and further provided that any such use is then consistent with applicable law.

1952723v1 18

**(g)**     The Parties agree to negotiate in good faith any modification to this Agreement that may be necessary or required to ensure consistency with amendments to and changes in applicable federal and state laws and regulations, including without limitation regulations promulgated pursuant to HIPAA.

**5.10**   **Compliance.**   Contractor follows the Reliance Health Care, Inc. Compliance Program, including the Corporate Code of Conduct ("Reliance Code of Conduct"). Provider shall maintain and promote its own compliance program to ensure compliance with the Federal OIG Compliance Program Guidance and other applicable state and federal rules and regulations and shall adopt a Provider Code of Conduct which shall contain, at a minimum, substantially the same legal and ethical guidance as is described in the Reliance Code of Conduct. Provider shall be solely responsible for the implementation and enforcement of the Provider's Code of Conduct at the Facility. By executing this Agreement, Provider agrees to abide by the Reliance Code of Conduct and the Provider's Code of Conduct. Provider further agrees to conduct periodic education and training for all employees who provide services at the Facility on the Reliance Code of Conduct and Provider's Code of Conduct, and report any suspected violations of the described Codes of Conduct to the Facility Administrator.   The Facility Administrator shall immediately report all alleged violations of the Reliance Code of Conduct to the Chief Operating Officer of the Contractor, in writing. The Facility Administrator shall handle alleged violations of Provider's Code of Conduct in accordance with Facility's Compliance Program requirements and applicable law. Provider may request the assistance of Contractor with employee education and training relating to Provider's compliance program and Contractor may provide such assistance pursuant hereto. However, the provision by Contractor of such assistance shall be for educational purposes only and Provider shall remain fully responsible for its compliance program.

**5.11**   **Marketing - Use of Contractor's Name.**   Recognizing that Contractor is well-known in the State in which the Facility is located because of its many years of service in and to the healthcare industry, Contractor grants to Provider a limited license to use the name "Reliance Health Care, Inc." or "Reliance Health Care" (the "Name") in advertising and promotional materials for the Facility, under the following terms and conditions:

**(a)**     Provider will always emphasize Provider's name or the Facility's name if different, when using the name to advertise and/or promote the Facility so that it is clear that Provider does at all times retain and exercise overall control over the Facility and its operations and personnel.

**(b)**     In all materials utilizing the Name, Provider shall, at least once, use the following phrase, or comparable language, in connection with the Provider's name or the Facility name: "An independent facility which receives administrative support services from Reliance Health Care, Inc.", unless otherwise agreed to by Provider and Contractor.

**(c)**     Prior to any dissemination of advertising or related material under the limited license granted herein, Provider shall submit all such proposed uses to Contractor for its approval.   Contractor will approve or disapprove such materials within ten days of receipt.

Failure to approve or disapprove such materials within such ten days period shall constitute approval by of Contractor.

      **(d)**    The Name may only be used in connection with healthcare services and only in connection with the Facility.

      **(e)**    Provider will only use the Name in connection with services that are equal to, or greater than the quality of the services currently being offered by Provider.

      **(f)**    Provider recognizes that, aside from the limited license granted herein, Provider acquires no other rights in the Name.

      **(g)**    Provider shall fully indemnify Contractor for any and all liabilities or claims for damages arising out of Provider's use of the Name and for all costs, expenses, attorneys' fees, judgments, decrees and interest thereon suffered or incurred in connection therewith.

    **5.12**   **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when taken together with the others shall be deemed one original.  Signature pages may be copied and transmitted by facsimile machine.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement, deemed effective the day and year first above written.

PROVIDER:

SCNC, INC. D/B/A SPRING CREEK
HEALTH & REHAB

By: _____
Name: Tracey Burlison
Its: Administrator of Record

CONTRACTOR:

RELIANCE HEALTH CARE, INC.

By: _____
Name: Brandon Adams
Its: Chief Executive Officer

1952723v1 21

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

CARROLYN CAMPBELL, CRYSTAL WALTERS,
HEATHER CROW, AND AMANDA HODGES,
INDIVIDUALLY & ON BEHALF OF OTHERS
SIMILARLY SITUATED,                                              **PLAINTIFFS**

v.                              Case No. 4:12-CV-00176-DPM

RELIANCE HEALTH CARE, INC.,
NORTHWEST HEALTH AND REHAB, INC., d/b/a
NORTH HILLS LIFE CARE AND REHAB,
OCNC, INC. d/b/a SILVER OAKS HEALTH AND REHABILITATION,
SCNC, INC. d/b/a SPRING CREEK HEALTH & REHAB,
BRANDON ADAMS, AND BRYAN M. ADAMS, individually
and in their capacity as owners, managers, officers, and/or
incorporators of RELIANCE HEALTH CARE, INC.,
NORTHWEST HEALTH AND REHAB, INC.,
OCNC, INC., and SCNC, INC.                                       **DEFENDANTS**

### CONSENT TO JOIN

I hereby consent to join the action against **all above referenced Defendants (hereinafter referred to as "Defendants")** as a Plaintiff to assert claims for overtime pay.  If this case does not proceed collectively, I also consent to join any subsequent action to assert claims against **DEFENDANTS** for overtime pay.  During the past three years, there were occasions when I worked over 40 hours per week while employed by **DEFENDANTS**.  As an employee/former employee of **DEFENDANTS**, I consent to becoming a party Plaintiff to this lawsuit, to be represented by HOLLEMAN & ASSOCIATES, P.A. and to be bound by any settlement of this action or adjudication of the Court.  Consented to on this 19th day of _October_, 2012.

_Ebony Bradford_
Signature

_Ebony Bradford_
Printed name

**EXHIBIT**

**B**