**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

CAROLYN CAMPBELL, CRYSTAL WALTERS, HEATHER
CROW, AMANDA HODGES, TABITHA RILEY, TERESA
KNIGHT, AND EBONY BRADFORD INDIVIDUALLY & ON
BEHALF OF OTHERS SIMILARLY SITUATED,                                         PLAINTIFFS

vs.                                         Case No. 4:12-cv-00176-DPM

RELIANCE HEALTH CARE, INC., NORTHWEST HEALTH AND
REHAB, INC., d/b/a NORTH HILLS LIFE CARE AND REHAB,
OCNC, INC. d/b/a SILVER OAKS HEALTH AND
REHABILITATION, SCNC, INC. d/b/a SPRING CREEK HEALTH
& REHAB, JBNC, INC. d/b/a RIDGECREST HEALTH AND
REHABILITATION CENTER INC., BRANDON ADAMS, AND
BRYAN M. ADAMS, individually and in their capacity as owners,
managers, officers, and/or incorporators of the above-referenced
corporate defendants,                                         DEFENDANTS

**DEFENDANTS RELIANCE HEALTH CARE, INC.,
BRANDON ADAMS, AND BRYAN ADAMS' STATEMENT OF MATERIAL FACTS IN
SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Defendants Reliance Health Care, Inc. ("Reliance") and Brandon Adams and Bryan M.

Adams (the "Adams Defendants"), by and through their attorneys and pursuant to Rule 56 of the

Federal Rules of Civil Procedure, hereby file their Motion for Summary Judgment.  In support of

this Motion, Defendants state:

Pursuant to Local Rule 56.1 of the United States District Court for the Eastern District of

Arkansas, Reliance Health Care, Inc. ("Reliance") and Brandon Adams and Bryan M. Adams

(the "Adams Defendants") hereby sets forth, as part of their Motion for Summary Judgment, the

material facts to which there is no genuine issue to be tried.  This statement is based on

Plaintiffs' deposition testimony, which are attached hereto.  Defendants assume the truth of

Plaintiffs' testimony only for purposes of their Motion for Summary Judgment because in

considering a motion for summary judgment, the Court must construe all evidence in favor of the party opposing summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 547 (1986).

## STATEMENT OF FACTS

The undisputed facts relevant to Plaintiffs' allegations against Reliance and the Adams Defendants are as follows:

1.   Plaintiffs Were Employed By The Individual Facilities Where They Worked.

   a.   *Plaintiff Crow's Employment at Spring Creek.*

1.   SCNC, Inc. d/b/a Spring Creek Health & Rehab ("Spring Creek") employed Plaintiff Crow as a Certified Nursing Assistant ("CNA") from March 1, 2010 to December 19, 2011.  (Plaintiff's Fourth Amended Complaint [Dkt. 84] ("Compl.") ¶ 79; Deposition of Plaintiff Heather Crow[1] ("Crow Dep.") 10:4-5, 20:19-21:5, 62:18-21, 276:5-9.)

2.   Plaintiff Crow submitted her employment paperwork to Karen Buckner, Spring Creek's Personnel Director, who hired Plaintiff Crow.  (Crow Dep. 22:7-16, 24:9-21, 25:6-8.)

3.   Spring Creek is located in Cabot, Arkansas.  (Compl. ¶¶ 79, 86.)

4.   Plaintiff Crow's direct supervisor throughout her employment was Spring Creek's Assistant Director of Nursing ("ADON").  (Crow Dep. 27:14-22.)

5.   Plaintiff Crow was also supervised by Spring Creek's Director of Nursing ("DON"), Wanda Harris.  (Crow Dep. 11:14-21.)

6.   Throughout Plaintiff Crow's employment, Tracy Burlison was the Administrator of Spring Creek.  (Crow Dep. 27:2-8.)

---

[1] Plaintiff Crow's Condensed Deposition Transcript is attached hereto as Exhibit A.

7.     Wanda Harris was responsible for interviewing, hiring, and terminating nurses at Spring Creek, including Plaintiff Crow.  (Crow Dep. 32:20-33:8, 45:7-13.)

8.     If there was an issue with Plaintiff Crow's work performance, either her DON or ADON or both would raise the issue with her.  (Crow Dep. 45:21-46:4.)

9.     Plaintiff Crow understood that if she had a complaint regarding her employment with Spring Creek, she could submit a written grievance to her facility administrator or a supervisor within the facility.  (Crow Dep. 40:18-41:4.)

10.     Plaintiff Crow's ADON was responsible for setting her work schedule.  (Crow Dep. 46:18-22.)

11.     Plaintiff Crow's ADON assigned Plaintiff Crow her meal periods.  (Crow Dep. 27:14–28:21.)

12.     Every work day, Plaintiff Crow checked her department's daily assignment schedule to determine what hall the ADON scheduled her to work.  (Crow Dep. 63:9-65:3, 67:2-69:1.)

13.     The ADON also assigned the nursing department employees staggered meal break times on the department's daily assignment schedule.  (Crow Dep. 67:2-68:18.)

14.     At the end of each pay period, Spring Creek required Plaintiff Crow to review her reported hours of work to ensure that all of her time worked for the payroll period was accurately reported.  (Crow Dep. 73:15-74:5, Ex. 13.)

15.     If Plaintiff Crow experienced a missed or interrupted meal break, Spring Creek required her to submit a time adjustment form to report the missed or interrupted meal break to Spring Creek's payroll department immediately following her shift so that she could be paid for the missed or interrupted meal break.  (Crow Dep. 54:5-55:15.)

3

16.     Plaintiff Crow understood that this was Spring Creek's way of ensuring that if somebody missed a meal period or had a meal period interrupted, they could report it and be paid for the missed or interrupted meal period.  (Crow Dep. 54:23-55:12.)

17.     By signing each time card that she submitted to Spring Creek's payroll employees for processing, Plaintiff Crow certified the accuracy of her reported hours of work.  (Crow Dep. 73:15-74:5, 278:11-13, Ex. 13.)

18.     Ms. Burlison, Spring Creek's administrator, determined Plaintiff Crow's rate of pay upon hire and approved her pay raises.  (Crow Dep. 46:23-47:3, 51:3-10.)

19.     Plaintiff Crow understood that her supervisor or her department head could recommend changes in her rate of pay based on Plaintiff Crow's performance evaluation.  (Crow Dep. 50:22-51:2.)

20.     Plaintiff Crow's DON completed her annual performance evaluations, and no one else besides the DON, ADON and Licensed Practical Nurses ("LPNs") at her facility evaluated her work performance.  (Crow Dep. 46:5-17.)

21.     On December 19, 2011, Ms. Harris terminated Plaintiff Crow for numerous issues with her work performance, including having to be repeatedly asked to feed a resident, previous probation for work performance resulting in a suspension on July 26, 2011, a write up on July 13, 2011 for paperwork and performance issues, a written warning on February 22, 2011 for inappropriate conduct, a verbal warning on February 22, 2011 for sitting in a resident's room, and a written warning on August 8, 2010 for work performance and not obtaining patients' vital signs.  (Crow Dep. 276:5-278:7, 278:15-21, Exs. 27 & 28.)

22.     Plaintiff Crow has no knowledge of Reliance having anything to do with hiring Plaintiff Crow at Spring Creek, setting her wages, or setting her work schedule.  (Crow Dep. 266:11-267:03.)

23.     Plaintiff Crow is not aware of Reliance having involvement in scheduling her breaks, providing meal coverage plans, monitoring her meals, or reversing meal break deductions if she worked through her meal periods.  (Crow Dep. 266:17-267:18.)

24.     Plaintiff Crow is unaware of whether Reliance was responsible for supervising her or making any decisions regarding her employment at Spring Creek.  (Crow Dep. 266:11-16, 267:16-24.)

25.     Plaintiff Crow further admitted that Reliance did not take any action that would support Plaintiff Crow's claim that she was not properly paid.  (Crow Dep. 266:11-16, 267:22-24.)

26.     Plaintiff Crow does not know who the Adams Defendants are and has never heard of them.  (Crow Dep. 264:2-10.)

27.     She is not aware that she filed a lawsuit against the Adams Defendants.  (*Id.*)

28.     In addition to Spring Creek, Crow worked for one day at Beebe Retirement Center, Inc., a facility listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint.  (Crow Dep. 264:11-265:2.)

29.     Plaintiff Crow is not aware of any facility listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint (other than Spring Creek) having involvement in her hiring, setting her wages, setting her schedule, scheduling her breaks, providing meal coverage plans, monitoring her meals, or reversing meal break deductions if she worked through her meal periods.  (Crow Dep. 264:11-14, 266:11-267:18.)

30.     Plaintiff Crow is unaware of whether any facility listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint (other than Spring Creek) was responsible for supervising her or making any decisions regarding her employment at Spring Creek.  (Crow Dep. 264:11-14, 267:16-24.)

31.     Plaintiff Crow further admitted that none of the facilities listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint (other than Spring Creek) did anything to support Plaintiff Crow's claim that she was not properly paid.  (Crow Dep. 264:11-14, 267:22-24.)

*b.      Plaintiff Riley's Employment at Ridgecrest.*

32.     JBNC, Inc. d/b/a Ridgecrest Health and Rehabilitation ("Ridgecrest") employed Plaintiff Riley as a CNA from May 5, 2009 to August 26, 2011.  (Deposition of Plaintiff Tabitha Riley[2] ("Riley Dep.") 110:2-7, 274:21-24, Exs. 10 & 35.)

33.     Ridgecrest is located in Jonesboro, Arkansas.  (Compl. ¶ 92.)

34.     Plaintiff Riley received a copy of her employment application for Ridgecrest from Debbie Rose, DON at Ridgecrest.  (Riley Dep. 108:1-22.)

35.     Plaintiff Riley submitted her application for employment to Ridgecrest on May 1, 2009.  (Riley Dep. 107:25-108:13, Ex. 8.)

36.     Ms. Rose and Robin Haven, Personnel Director at Ridgecrest, cleared Plaintiff Riley for hire at Ridgecrest.  (Riley Dep. 109:2-25, Ex. 9.)

37.     Lisa Yahnke, Ridgecrest's Administrator, hired Plaintiff Riley.   (Riley Dep. 115:7-9.)

38.     Ms. Haven authorized Plaintiff Riley's rate of pay upon hire.  (Riley Dep. 110:3-17, Ex. 10.)

---

[2] Plaintiff Riley's Condensed Deposition Transcript is attached hereto as Exhibit B.

39.     Lisa Yahnke cleared Plaintiff Riley for orientation.  (Riley Dep. 114:9-115:1, Ex. 12.)

40.     Plaintiff Riley participated in Ridgecrest's general orientation on May 5, 2009. (Riley Dep. 114:8-115:3.)

41.     During general orientation, Plaintiff Riley received a copy of Ridgecrest's employee handbook and signed a handbook acknowledgment.  (Riley Dep. 115:21-116:2.)

42.     Plaintiff Riley also received a job description, personnel policies, and information about her salary, payday, and method of payment at the general orientation.  (Riley Dep. 116:3-16.)

43.     In addition to the general orientation, Plaintiff Riley participated in Ridgecrest's departmental orientation conducted by DON Debra Rose.  (Riley Dep. 115:17-18, 120:10-17.)

44.     Plaintiff Riley also participated in in-service training conducted by Ridgecrest employees.  (Riley Dep. 112:8-12, 118:5-21, 228:14-229:5.)

45.     Plaintiff Riley's signature on her time cards that she submitted to Ridgecrest certified that her reported work hours were correct. (Riley Dep. 154:2-5, Ex. 19.)

46.     Plaintiff Riley understood that if she experienced a missed meal break or worked off-the-clock, Ridgecrest required her to submit a time adjustment form.  (Riley Dep. 82:18-22.)

47.     Plaintiff Riley's DON was responsible for setting her work schedule.  (Riley Dep. 119:11-120:4.)

48.     Plaintiff Riley's DON was responsible for ensuring the quality of her work and providing her with whatever assistance she may need.  (Riley Dep. 119:11-120:9.)

49.     Ms. Yahnke and Ms. Rose approved Plaintiff Riley's wage increases.  (Riley Dep. 272:2-9.)

50.     As DON, Ms. Rose also verbally counseled Plaintiff Riley in January 2010 because Plaintiff Riley continued working beyond her scheduled shift without authorization. (Riley Dep. 272:20-273:3.)

51.     Ms. Rose informed Plaintiff Riley that she needed to obtain authorization to continue working beyond her scheduled shift.   (Riley Dep. 273:5-19.)

52.     Ms. Yahnke terminated Plaintiff Riley's employment on August 26, 2011.  (Riley Dep. 274:20-276:17, Ex. 35.)

53.     Plaintiff Riley was terminated from Ridgecrest after a patient alleged that Plaintiff Riley engaged in rude and disrespectful behavior toward the patient and that she borrowed money from the patient in violation of Ridgecrest's policies.  (*Id.*)

54.     Plaintiff Riley claims that Reliance owns Ridgecrest.  (Riley Dep. 95:25-96:3.)

55.     She has never met anyone from Reliance and does not know if any employees of Reliance have been to Ridgecrest.  (Riley Dep. 96:4-14.)

56.     Plaintiff Riley does not have any knowledge of the nature of Reliance's business. (Riley Dep. 96:15-20.)

57.     She does not have any reason to believe that anyone outside of Ridgecrest had the ability to control her schedule at Ridgecrest.  (Riley Dep. 107:1-10.)

58.     Plaintiff Riley does not know the Adams Defendants, has never heard the names of the Adams Defendants, and does not understand that she is suing them.  (Riley Dep. 107:13-19.)

59.     In addition to Spring Creek, Plaintiff Riley worked at two facilities listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint at different times.  (Riley Dep. 95:8-11, 96:25-97:8, 104:18-105:5, 106:7-13.)

60.   Plaintiff Riley does not claim that she is owed any unpaid overtime from those facilities.   (Riley Dep. 96:25-97:8, 104:18-105:5.)

c.   *Plaintiff Hodges' Employment at Spring Creek.*

61.   Spring Creek employed Plaintiff Hodges from July 19, 2011 to November 6, 2011.   (Compl. ¶ 86; Deposition of Plaintiff Amanda Hodges[3] ("Hodges Dep.") 71:11-12, 86:7-23, 289:16-20.)

62.   Spring Creek is located in Cabot, Arkansas.   (Compl. ¶ 86.)

63.   Tracey Burlison, the Facility Administrator of Spring Creek, cleared Plaintiff Hodges for hire and orientation.   (Hodges Dep. 85:2-14.)

64.   Karen Buckner, Spring Creek's Personnel Director, conducted Plaintiff Hodges' general orientation.   (Hodges Dep. 130:10-19.)

65.   Plaintiff Hodges' direct supervisor was Lawanda Harris, DON at Spring Creek throughout her employment at Spring Creek.   (Hodges Dep. 87:24-88:4, 119:20-120:2.)

66.   Plaintiff Hodges applied for employment at Spring Creek by contacting Michelle Higgins, Spring Creek's Staffing Coordinator.   (Hodges Dep. 19:7-17, 79:4-81:22.)

67.   Plaintiff Hodges went to Spring Creek that same day and filled out an application and returned it to Michelle Higgins.   (*Id.*)

68.   Plaintiff Hodges interviewed with Michelle Higgins on July 8, 2011.   (Hodges Dep. 81:23-82:7, 83:3-21.)

69.   Ms. Burlison, Spring Creek's Facility Administrator, hired Plaintiff Hodges on July 19, 2011.   (Hodges Dep. 85:2-14, 86:21-23.)

---

[3] Plaintiff Hodges' Condensed Deposition Transcript is attached hereto as Exhibit C.

70.     Ms. Burlison approved Plaintiff Hodges' rate of pay upon hire, and Karen Buckner, Spring Creek's Director of Personnel, discussed Plaintiff Hodges' rate of pay with her. (Hodges Dep. 86:24-87:20.)

71.     Karen Buckner, Spring Creek's Personnel Director, conducted Plaintiff Hodges' general orientation at Spring Creek on her first day of employment.  (Hodges Dep. 121:3-21.)

72.     On Plaintiff Hodges' second day of employment, she participated in additional training in which she "shadowed another CNA."  (Hodges Dep. 130:17-131:4.)

73.     As a CNA for Spring Creek, Plaintiff Hodges would attend in-service training with Wanda Harris and Tracey Burlison, among others.  (Hodges Dep. 95:24-96:10.)

74.     Laura Watt, Spring Creek's ADON, directly supervised Hodges' work performance throughout her employment.  (Hodges Dep. 119:1-19, 120:3-5.)

75.     Wanda Harris, Spring Creek's DON, was responsible for directing and evaluating Plaintiff Hodges' work performance and providing instructions regarding her job duties. (Hodges Dep. 119:20-120:19.)

76.     If a resident or family member had a complaint about Plaintiff Hodges' work performance, they could contact her DON.  (Hodges Dep. 120:20-23.)

77.     If Plaintiff Hodges had any problems with her employment at Spring Creek, she understood that she could submit a grievance pursuant to Spring Creek's policy regarding grievances and problems solving contained in Spring Creek's employee handbook.  (Hodges Dep. 133:24-134:23.)

78.     Plaintiff Hodges' signature on each time card that she submitted to Spring Creek verified the accuracy of her reported work hours.  (Hodges Dep. 251:4-252:1.)

79.     Plaintiff Hodges expected that Spring Creek would rely on her certification that she recorded all of her hours of work correctly.  (Hodges Dep. 252:3-7.)

80.     Plaintiff Hodges understood that if she experienced a missed or interrupted meal break, Spring Creek required her to submit a time adjustment form to report the missed or interrupted meal break to Spring Creek's payroll department immediately following her shift so that she could be paid for the missed or interrupted meal break.  (Hodges Dep. 139:3-6, 152:12-25.)

81.     Plaintiff Hodges understood that Wanda Harris, Spring Creek's DON, was responsible for planning Plaintiff Hodges' work schedule, ensuring Plaintiff Hodges performed quality work, and for providing Plaintiff Hodges with whatever assistance she needed.  (Hodges Dep. 129:20-130:9.)

82.     Plaintiff Hodges received work assignments from Ms. Harris and Michelle Higgins.  (Hodges Dep. 94:6-17.)

83.     Spring Creek was responsible for setting the hours of Plaintiff Hodges' shift. (Hodges Dep. 89:6-16.)

84.     Ms. Higgins set Plaintiff Hodges' monthly schedule, which was posted in Spring Creek's break room.  (Hodges Dep. 196:13-19.)

85.     Plaintiff Hodges believed Ms. Higgins set her daily assigned hall on an assignment sheet.  (Hodges Dep. 94:6-17, 197:8-198:2.)

86.     There is an assigned break schedule, consisting of two assigned fifteen (15) minute paid breaks and one thirty (30) minute meal break, on every daily assignment sheet, and Plaintiff Hodges had an assigned break time every work day.  (Hodges Dep. 199:12-200:9.)

87.   Plaintiff Hodges submitted an unscheduled time off request to Ms. Higgins, and it was approved by Wanda Harris and Tracey Burlison.  (Hodges Dep. 287:17-288:5.)

88.   Wanda Harris and Tracey Burlison also approved Plaintiff Hodges' unscheduled time off request.  (Hodges Dep. 288:7-289:6.)

89.   Facility Administrator Burlison, DON Wanda Harris, and ADON Laura Watt, terminated Plaintiff Hodges' employment at Spring Creek after Spring Creek investigated Plaintiff Hodges for elder abuse.  (Hodges Dep. 131:5-21, 289:25-290:12, 293:11-18, 294:15-295:19, 296:2-17.)

90.   Apart from claiming that Reliance is "the one that bought out Spring Creek," Plaintiff Hodges does not have any other understanding of what Reliance is as a company.  (Hodges Dep. 69:5-13.)

91.   Plaintiff Hodges is unaware of whether she ever met or spoke with an employee of Reliance.  (Hodges Dep. 70:4-12.)

92.   She does not know whether Reliance played any role in any aspect of her employment.  (Hodges Dep. 70:13-16.)

93.   Plaintiff Hodges is unaware of whether she has been supervised by anyone from Reliance.  (Hodges Dep. 70:17-19.)

94.   Plaintiff Hodges does not know anyone who works at Reliance or who works for Reliance.  (Hodges Dep. 70:10-12.)

95.   Plaintiff Hodges does not know who the Adams Defendants are.  (Hodges Dep. 70:20-71:3.)

96.   She does not understand that she has filed a lawsuit against the Adams Defendants.  (*Id.*)

97.     She does not know whether the Adams Defendant have ever visited Spring Creek, and she has never spoken with the Adams Defendants or taken work direction from them. (Hodges Dep. 70:20-71:5.)

98.     Plaintiff Hodges does not have any knowledge of any of the other facilities (apart from Spring Creek, the facility where she worked) that are named in paragraph 10 of Plaintiffs' Fourth Amended Complaint.  (Hodges Dep. 67:3-8, 71:13-72:10.)

99.     Aside from Spring Creek, Plaintiff Hodges has never worked at any of the other facilities for which Reliance provides administrative services.  (Hodges Dep. 71:11-24.)

100.    Plaintiff Hodges does not know who any of the supervisors are at any facility listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint other than Spring Creek. (Hodges Dep. 71:6-24.)

101.    Plaintiff Hodges has no knowledge of policies or practices regarding overtime or meal periods at any facility listed in paragraph 10 of Plaintiffs' Complaint other than Spring Creek.  (Hodges Dep. 71:6-72:9.)

d.      *Plaintiff Walters' Employment at Silver Oaks.*

102.    OCNC, Inc. d/b/a Silver Oaks Health and Rehabilitation ("Silver Oaks") employed Plaintiff Walters as an LPN from October 6, 2011 to February 29, 2012.  (Compl. ¶¶ 74-75; Deposition of Plaintiff Crystal Walters[4] ("Walters Dep.") 58:13-14, 204:22-25.)

103.    Silver Oaks is located in Camden, Arkansas.  (Compl. ¶ 74.)

104.    Plaintiff Walters submitted her application for employment at Silver Oaks on September 29, 2011.  (Walters Dep. 52:19-53:6.)

---

[4] Plaintiff Walters' Condensed Deposition Transcript is attached hereto as Exhibit D.

105.    Silver Oaks' DON Andrea Hammett and Personnel Director Kim Lucas interviewed Plaintiff Walters.  (Walters Dep. 56:10-20, Ex. 4.)

106.    Plaintiff Walters was approved for hire by Kathy Presley (now known as Kathy Beevers), the facility administrator at Silver Oaks.  (Walters Dep. 58:4-60:4, Ex. 5.)

107.    Plaintiff Walters participated in Silver Oaks' orientation, which was conducted by Ms. Lucas.  (Walters Dep. 60:18-25.)

108.    At orientation, Plaintiff Walters received a copy of Silver Oaks' employee handbook.  (Walters Dep. 60:18-61:2.)

109.    Plaintiff Walters received instruction on how to clock in and out on Silver Oaks' time clock.  (Walters Dep. 98:18-22.)

110.    Plaintiff Walters also participated in a departmental orientation, which was conducted by Jacob Weaver, an LPN at Silver Oaks. (Walters Dep. 111:24-25, 113:5-8.)

111.    Following orientation, Plaintiff Walters participated in in-service training at Silver Oaks.  (Walters Dep. 74:18-75:9.)

112.    As an LPN at Silver Oaks, Plaintiff Walters was generally responsible for providing direct nursing care to patients, administering medication, and maintaining documentation regarding patients.  (Walters Dep. 61:9-12, 63:9-14.)

113.    Plaintiff Walters was also responsible for supervising the CNAs on her assigned hall at Silver Oaks.  (Walter Dep. 61:15-62:13.)

114.    The DON at Silver Oaks was responsible for employee performance evaluations in the nursing department at Silver Oaks.  (Walters Dep. 67:6-9.)

115.    Together, the DON and facility administrator were responsible for employee dismissals and transfers.  (Walters Dep. 67:10-13.)

14

116.    Plaintiff Walters is unaware of any situation in which she had to report an issue to someone who was employed by a company other than Silver Oaks.  (Walters Dep.  73:24-74:7.)

117.    Silver Oaks maintained a break schedule that would advise the LPNs regarding the time of their staggered, scheduled meal periods.  (Walters Dep. 143:7-144:12.)

118.    Plaintiff Walters understood that it was her responsibility to review her reported hours of work at Silver Oaks and certify that her reported hours of work are accurate by signing her name after reviewing them.  (Walters Dep. 129:25-130:7.)

119.    Plaintiff Walters understood that Silver Oaks' policy required her to take an uninterrupted meal break for each shift that she worked.  (Walters Dep. 85:12-21.)

120.    Plaintiff Walters also understood that if she experienced a missed or interrupted meal break, Silver Oaks required her to submit a time adjustment form to Silver Oaks' payroll department so that she could be paid for the missed or interrupted meal period.  (Walters Dep. 114:1-9, 136:19-137:4.)

121.    On October 31, 2011, Silver Oaks' administrator and DON authorized Plaintiff Walters' transfer to a full-time LPN position.  (Walters Dep. 147:11-148:7.)

122.    Prior to that, Plaintiff Walters worked a part-time "PRN" shift on the occasions that Silver Oaks needed her assistance.  (Walters Dep. 58:15-19.)

123.    At the time of this transfer, Silver Oaks' facility administrator changed Plaintiff Walters' rate of pay.  (Walters Dep. 147:17-149:8.)

124.    Plaintiff Walters reported to the DON, Ms. Hammett, and Michelle King, Silver Oaks' Unit Manager.  (Walters Dep. 145:19-24, 201:1-8, Ex. 5.)

125.    On December 6, 2011, Plaintiff Walters received written discipline from Ms. King for an issue with dispensing medication.  (Walters Dep. 199:5-25.)

126. Separately, on February 2, 2012, Plaintiff Walters received written discipline from Ms. Hammett and Ms. King because Plaintiff Walters failed to properly administer medicine to a patient.  (Walters Dep. 200:3-19.)

127. On February 29, 2012, Ms. Hammett recommended and Ms. Presley approved Plaintiff Walters' termination for once again failing to properly account for medication (in this case, Xanax) that Plaintiff Walters was responsible for dispensing.  (Walters Dep.  204:17-207.)

128. Plaintiff Walters has heard of Reliance, but does not know whether she has spoken to anyone at Reliance and does not know whether it played any role in any aspect of her employment at Silver Oaks.  (Walters Dep. 42:13-19; 43:4-7.)

129. She does not know whether any employees of Reliance have ever visited Silver Oaks.  (Walters Dep. 42:20-24.)

130. Plaintiff Walters has no knowledge or information to suggest that Reliance had the ability to hire and fire employees at Silver Oaks.  (Walters Dep. 45:24-46:5.)

131. Plaintiff Walters has no evidence or knowledge that either of the Adams Defendants had anything to do with how she was paid, her work schedule, or the manner of work she performed.  (Walters Dep. 45:2-17.)

132. Plaintiff Walters has no knowledge that either Adams Defendants had the ability to hire or fire employees at Silver Oaks.  (Walters Dep. 45:18-23.)

133. Plaintiff Walters has never met the Adams Defendants and was unaware of who they were during her employment at Silver Oaks. (Walters Dep. 44:4-14.)

134. Plaintiff Walters also does not know whether the Adams Defendants ever visited Silver Oaks.  (Walters Dep. 44:4-16.)

135.    Walters never worked at any facility listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint other than Spring Creek.  (Walters Dep. 43:8-16.)

136.    She does not have any knowledge of any of the other facilities (apart from Silver Oaks) that are named in paragraph 10 of Plaintiffs' Fourth Amended Complaint.  (Walters Dep. 43:8-21.)

137.    Walters does not know whether any facility listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint other than Spring Creek played any role in her employment with Silver Oaks.  (Walters Dep. 43:8-14, 22-24.)

> e.    Plaintiff Campbell's Employment at North Hills.

138.    Plaintiff Campbell was employed by Northwest Health and Rehab, Inc. d/b/a North Hills Life Care and Rehab ("North Hills") as an LPN and Director of Medical Records. (Compl. ¶¶ 68, 70.)

139.    The North Hills facility is located in Fayetteville, Arkansas.  (Compl. ¶ 68.)

140.    Plaintiff Campbell submitted her employment application to North Hills on April 19, 2010.  (Deposition of Plaintiff Carrolyn Campbell[5] ("Campbell Dep.") 189:14-25, Ex. 11.)

141.    Plaintiff Campbell interviewed with DON Abra Pumphrey.   (Campbell Dep. 190:1-13.)

142.    Plaintiff Campbell also spoke with North Hills' administrator and Brenda Crosswhite, Personnel Director, during her interview process.  (Campbell Dep. 190:14-191:4.)

143.    Ms. Pumphrey hired Plaintiff Campbell on April 21, 2010.   (Compl.   ¶ 68; Campbell Dep. 191:9-24, 192:2-12.)

---

[5] Plaintiff Campbell's Condensed Deposition Transcript is attached hereto as Exhibit E.

144.    North Hills cleared Plaintiff Campbell to participate in its new employee orientation on April 21, 2010.  (Campbell Dep. 192:2-12.)

145.    During orientation, Plaintiff Campbell learned about North Hills' procedures for clocking in and out during orientation.  (Campbell Dep. 154:11-15, 155:4-7, 193:14-23.)

146.    Plaintiff Campbell received a copy of North Hills' employee handbook during her orientation.  (Campbell Dep. 194:10-12.)

147.    Plaintiff Campbell also participated in departmental orientation at North Hills, which was conducted by Kary Anne Baldwin, who was the ADON at North Hills at that time. (Campbell Dep. 158:3-6, 193:7-25, 195:1-8, 200:1-17.)

148.    Plaintiff Campbell certified to North Hills during orientation that she received instruction regarding North Hills' policies and procedures and fully understood those policies and procedures.  (Campbell Dep. 193:7-195:8.)

149.    During her employment, Plaintiff Campbell attended in-service training at North Hills, which included instruction regarding timekeeping policies and how to fill out time adjustment forms if the time clock was not working or if an employee forgot to clock in and out. (Campbell Dep. 159:9-18, 160:5-9, 280:1-2, 285:2-12.)

150.    Each pay period, North Hills required Plaintiff Campbell to review her reported hours of work and certify that the time is accurate before it is released to payroll.  (Campbell Dep. 161:4-9.)

151.    Plaintiff Campbell understood that her signature on each time card that she submitted to North Hills certified the accuracy of her time records for that pay period. (Campbell Dep. 216:2-5.)

152.     Plaintiff Campbell received training on how to fill out a time adjustment form if the time clock was not working, or if she forgot to clock in and out.  (Campbell Dep. 160:5-9.)

153.     Plaintiff Campbell certified to North Hills on December 27, 2011 that she received an addendum to North Hills' employee handbook.  (Campbell Dep. 201:16-21, Ex. 19.)

154.     The addendum contained North Hills' policy that required Plaintiff Campbell to submit a time adjustment form if she experienced a missed meal break.  (Campbell Dep. 203:10-12.)

155.     Plaintiff Campbell's signature certified to North Hills that she fully understood this policy and agreed to abide by it completely.  (Campbell Dep. 202:14-19, Ex. 19.)

156.     Plaintiff Campbell's supervisor at North Hills was DON Abra Pumphrey. (Campbell Dep. 48:21-49:3.)

157.     Plaintiff Campbell understood that Abra Pumphrey set her rate of pay at $20.00 per hour, and Ms. Pumphrey informed Plaintiff Campbell of her hourly rate.  (Campbell Dep. 192:14-193:5.)

158.     Plaintiff Campbell's work and break schedule was set by North Hills.  (Campbell Dep. 66:1-22.)

159.     On February 21, 2012, Ms. Pumphrey demoted Plaintiff Campbell and relieved her of her duties as Director of Medical Records.  (Compl. ¶¶ 68, 70; Campbell Dep. 94:18-95:21, 141:6-7, 269:18-21.)

160.     Plaintiff Campbell was demoted because she failed to ensure that North Hills had an adequate supply of a particular medicine, which caused a state assessor to issue a notice of violation to North Hills.  (Campbell Dep. 269:18-271:7.)

161.    Plaintiff Campbell resigned from North Hills following her demotion.  (Campbell Dep. 141:4-141:7, 268:18-21.)

162.    Plaintiff Campbell claims that she is suing Reliance as the "mother company" of North Hills.  (Campbell Dep. 46:5-9.)

163.    According to Plaintiff Campbell, she was "employed by North Hills, as the local facility, and then at Reliance Health Care as the corporation."  (Campbell Dep. 46:15-19.)

164.    However, Plaintiff Campbell admits that "no one" ever told her that she was an employee of Reliance.  (Campbell Dep. 46:20-22.)

165.    Moreover, Plaintiff Campbell admitted that nobody from Reliance ever dictated her work schedule or set her break schedule or told her how to perform her job. (Campbell Dep. 51:5-21, 52:1-4.)

166.    Plaintiff Campbell believed her pay rate was determined at the facility level. (Campbell Dep. 51:8-10.)

167.    Plaintiff Campbell further admits that, to her knowledge, nobody from Reliance ever disciplined her or was involved in her hiring process at North Hills.  (Campbell Dep. 51:22–52:1.)

168.    Plaintiff Campbell also admits that, to her knowledge, no one at Reliance made any decisions related to her employment in any way.  (Campbell Dep. 52:5-7.)

169.    Plaintiff Campbell claims that she had approximately six separate communications with "different people at Reliance" regarding medical records but she was unable to identify the name of a single employee of Reliance with whom she had communicated. (Campbell Dep. 46:23-47:20.)

170.     Plaintiff Campbell does not claim to have had a supervisor at Reliance. (Campbell Dep. 48:21-49:3.)

171.     Plaintiff Campbell claims that the Adams Defendants are "the owners" of North Hills but, she does not claim to have ever met or spoken with the Adams Defendants.  (Campbell Dep. 49:4-24, 50:12-15.)

172.     Plaintiff Campbell is unable to describe the appearance of either Adams Defendant.  (Campbell Dep. 50:12-17.)

173.     Plaintiff Campbell doubts that either Adams Defendant knew what her individual schedule was at North Hills.  (Campbell Dep. 66:1-6.)

174.     In addition to North Hills, Plaintiff Campbell worked at one of the non-Defendant facilities named in paragraph 10 of Plaintiffs' Fourth Amended Complaint, Westwood Health and Rehab ("Westwood").  (Compl. ¶ 10; Campbell Dep. 55:20-24; 67:22-68:2.)

175.     Plaintiff Campbell is not alleging that Westwood owes her unpaid overtime. (Campbell Dep. 56:23-25, 67:19-68:1.)

176.     Campbell does not have any knowledge whether any facility listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint (other than North Hills and Westwood) dictated her wages or schedule, had anything to do with hiring her, disciplined her in any way, set her break schedule, or did anything to cause her to be paid improperly.  (Campbell Dep. 67:19-68:8, 69:22-70:15.)

177.     Ebony Bradford testified that she has never heard of Reliance and did not realize she was suing Reliance in this lawsuit.   (Deposition of Ebony Bradford[6] ("Bradford Dep.") 31:22-25, 32:3-5.)

---

[6] Plaintiff Bradford's Condensed Deposition Transcript is attached hereto as Exhibit F.

178.     She does not even have any understanding of what Reliance is as a company. (Bradford Dep. 32:1-2.)

179.     Bradford never spoke with an employee of Reliance.  (Bradford Dep. 32:6-11.)

180.     To the best of Bradford's knowledge, Reliance had no role in her employment with Heritage Square.  (Bradford Dep. 32:12-14.)

181.     Bradford also does not know who the Adams Defendants are.  (Bradford Dep. 32:15-17.)

182.     She does not understand that she has filed a lawsuit against the Adams Defendants. (Bradford Dep. 32:17-18.)

183.     In fact, Bradford has never communicated with or heard of the Adams Defendants. (Bradford Dep. 32:19-33:7.)

184.     Aside from Heritage Square, Bradford has never worked at any of the other facilities listed in paragraph 10 of Plaintiffs' Fourth Amended Complaint.  (Bradford Dep. 33:15-34:5.)

185.     In addition to the facilities named as Defendants in this case, three of the Plaintiffs worked for some of the non-Defendant facilities named in Paragraph 10 of the Fourth Amended Complaint.  Specifically, Plaintiff Campbell worked at Westwood Health and Rehab ("Westwood"), Plaintiff Riley worked at Jonesboro Care and Rehabilitation Center d/b/a St. Elizabeth's Place ("St. Elizabeth's") and Lakeside Nursing and Rehabilitation Center, Inc. d/b/a Lakeside Nursing Center ("Lakeside") and Plaintiff Crow worked for one day at Beebe Retirement Center, Inc. ("Beebe").   (Campbell Dep. 55:20-24; 67:22-68:2; Riley Dep. 97:2; 104:21; Crow Dep. 264:20-23.)

186.    However, both Plaintiff Campbell and Plaintiff Riley testified that they are not alleging that Westwood or Lakeside owe them unpaid overtime.  (Campbell Dep. 56:23-25; Riley Dep. 97:6-8; 104:25-105:5.)

187.    Plaintiff Crow only claims to have worked at Beebe for one day.  (Crow. Dep. 264:20-265:4.)

188.    While Plaintiff Riley was coded as a "no rehire" after her termination at Ridgecrest, she was able to apply and obtain employment at Lakeside, another facility where Reliance provides administrative services that is named in Paragraph 10 of Plaintiffs' Fourth Amended Complaint.  (Riley Dep. 104:20-104:24.)

189.    When Plaintiff Riley applied at Lakeside she had to undergo a separate application process and a separate background check.  (Riley Dep. 102:22-103:2; 103:3-103:4.)

190.    Plaintiff Riley even testified that her file was not simply transferred from Ridgecrest to Lakeside – instead, she was required to do everything that she would have done to complete her application process at Ridgecrest.  (Riley Dep. 103:5-103:11.)

191.    Plaintiff Riley testified that Lakeside was essentially a brand new and separate employer.  (Riley Dep. 103:12-103:13.)

        2.    <u>Each Facility Administrator is Responsible for All Aspects of Managing the Facility.</u>

192.    Each nursing home facility named as a Defendant in this lawsuit (North Hills, Silver Oaks, Spring Creek, and Ridgecrest) has a Facility Administrator.  (Deposition of Lisa Yahnke[7] ("Yahnke Dep.") 6:12-15; Deposition of Tracey Burlison[8] ("Burlison Dep.") 6:20-24; Beevers Dep. 10:15-20; Bridges Dep. 9:1-7.)

---

[7] Ms. Yahnke's Condensed Deposition Transcript is attached hereto as Exhibit G.
[8]  Ms. Burlison's Condensed Deposition Transcript is attached hereto as Exhibit J.

193.     The Facility Administrator runs the facility's day-to-day operations, oversees the department managers within the facility to ensure they are managing their departments, oversees the business office to ensure they are appropriately billing and collecting money, oversees human resources and payroll to ensure these functions are being appropriately managed, and supervises the facility's employees.  (Burlison Dep. 11:22-12:16; Deposition of Kathy Beevers[9] ("Beevers Dep.") 13:15-14:2 (responsible for day-to-day operations of facility, management and operation of facility, and oversees every employee at the facility); Deposition of Maurice Bridges[10] ("Bridges Dep.") 22:19-23:2 ("I run the operation of North Hills.").)

194.     The facility administrators are responsible for setting each facility's budget and have final authority over the budget.  (Deposition of Brandon Anthony Adams[11] ("Brandon Adams Dep.") 229:24-230:11, 233:3-7.)

195.     Each facility has a nursing department.  (Yahnke Dep. 8:8-18; Bridges Dep. 11:4-23; Burlison Dep. 12:17-20; Beevers Dep. 27:19-28:5.)

196.     The nursing department is comprised of a DON, ADON, LPNs and CNAs. (Bridges Dep. 11:4-23; Yahnke Dep. 8:18; Burlison Dep. 16:11-23.)

197.     Other facility staff may include administrative staff consisting of a business office manager and personnel director, dietary department consisting of a dietary supervisor, cooks, and dietary aides, a housekeeping and laundry department consisting of a housekeeping and laundry supervisor, laundry staff, floor technicians and housekeeping staff, medical records manager, MDS coordinator, assessment nurses, a maintenance director, social services director, and an

---

[9] Ms. Beevers' Condensed Deposition Transcript is attached hereto as Exhibit H.
[10] Mr. Bridges' Condensed Deposition Transcript is attached hereto as Exhibit I.
[11] Mr. Brandon Adams' Condensed Deposition Transcript is attached hereto as Exhibit K.

activities director.   (Bridges Dep. 11:4-23; Yahnke Dep. 8:8-24; Burlison Dep. 16:11-17:4; Beevers Dep. 27:19-28:11.)

198.    Each facility conducts an orientation for new employees, during which the facility's personnel director explains the policies specific to the facility including the use of time adjustment forms to report any unpaid time and time clock process.  (Burlison Dep. 27:13-21, 28:3-17, 34:16-35:11; Yahnke Dep. 11:21-12:22; Bridges Dep. 24:12-25.)

199.    The newly hired employees are shown a hands-on demonstration of the time clock.  (Bridges Dep. 24:12-14; Yahnke Dep. 12:13-22; Burlison Dep. 27:13-24, 34:16-35:11.)

200.    The facility's employee handbook is distributed during orientation, and the personnel director reviews the facility's policies.   (Bridges Dep. 23:22-24:11; Yahnke Dep. 12:23-13:3; Burlison Dep. 36:10-15, 42:6-44:1.)

201.    The importance of taking a full, uninterrupted 30-minute meal break is discussed with employees during orientation and throughout their employment.  (Bridges Dep. 24:15-20, 37:24-38:6, 39:1-40:1; Yahnke Dep. 23:22-24:22; Burlison Dep. 48:13-49:3, 49:25-50:13, 56:13-57:10, 88:15-89:5; Beevers Dep. 46:5-17, 51:12-25, 75:25-76:15.)

202.    Facility personnel explain the purpose of time adjustment forms, instruct employees to fill out time adjustment forms if they experience a missed or interrupted meal break, and instruct employees on how to properly fill out a time adjustment form so that employees will receive payment for any missed or interrupted meal breaks.   (Bridges Dep. 24:15-25:12; Yahnke Dep. 11:18-12:24; Burlison Dep. 28:3-17, 50:14-51:5; Beevers Dep. 59:19-61:6.)

203.    The facility determines the appropriate level of staffing for each facility, typically staffing the facility beyond applicable state minimum requirements based on patient need and

patient acuity.   (Bridges Dep. 22:3-23:2, 29:23-30:16, 45:12-19; Burlison Dep. 65:2-67:13, 67:20-69:4.)

204.   The management employees of each facility (including the facility administrator, DON, and ADON) are responsible for disciplining staff members at the facility.  (Yahnke Dep. 25:23-2527:4; Walters Dep. 145:19-24, 199:5-25, 201:1-8, 200:3-19, 204:17-207; Crow Dep. 276:5-278:7, 278:15-21;  Hodges Dep. 131:5-21, 289:25-290:12, 293:11-18, 294:15-295:19, 296:2-17; Campbell Dep. 94:18-95:21, 141:6-7, 269:18-21.)

205.   Facility personnel schedule staggered meal breaks for employees in the nursing department.  (Bridges Dep. 28:4-29:22 (CNAs); Beevers 46:18-47:9 (CNAs and LPNs have assigned meal breaks).)

206.   Other departments (apart from the nursing department) have assigned breaks as well, which are assigned by the department heads who work at the facility.  (Yahnke Dep. 29:20-24.)

207.   Each facility compiles its own payroll, which Reliance in its administrative function processes for the facility and issues payroll checks.  (Brandon Adams Dep. 182:21-183:14; Deposition of Bryan Adams[12] ("Bryan Adams Dep.") 49:18-51:1, 68:25-69:5; Yahnke Dep. 29:3-19; Burlison Dep. 51:21-52:24.)

208.   Each facility's employees enter time into Timeforce each work day.  (Declaration of Kathy Beevers[13] ("Beevers Decl.") ¶ 6; Declaration of Maurice Bridges[14] ("Bridges Decl") ¶

---

[12] Mr. Bryan Adams' Condensed Deposition Transcript is attached hereto as Exhibit L.
[13] Ms. Beevers' Declaration is attached hereto as Exhibit M.
[14] Mr. Bridges' Declaration is attached hereto as Exhibit N.

6; Declaration of Tracey Burlison[15] ("Burlison Decl.") ¶ 6; Declaration of Lisa Yahnke[16] ("Yahnke Decl.") ¶ 6.)

209.    The facility's personnel director runs exception reports and reviews employees' reported hours of work. (*Id.*)

210.    The week of payroll, the personnel director prints time cards for department heads which show each department's employees' hours of work. (*Id.*)

211.    Each department head reviews his or her employees' hours of work and discusses any discrepancies with employees. (*Id.*)

212.    If there are any corrections, employees fill out a time adjustment form and submit it to the personnel director who makes the changes in Timeforce. (*Id.*)

213.    After the department heads verify their employees' reported hours of work, the personnel director prints time cards for every employee. (*Id.*)

214.    The facility requires the employees to review their hours of work and certify that the time they recorded is accurate by signing their time card. (*Id.*)

215.    However, if the employee determines there is an issue with his or her reported hours of work, the employee is required to fill out a time adjustment form and submit it to the facility's personnel director. (*Id.*)

216.    The personnel director reviews the time adjustment forms and enters all changes into Timeforce. (*Id.*)

217.    The personnel director uploads Timeforce to Americana by Tuesday at noon. Checks are cut at Reliance and sent to the facility for distribution. (*Id.*)

---

[15] Ms. Burlison's Declaration is attached hereto as Exhibit O.
[16] Ms. Yahnke's Declaration is attached hereto as Exhibit P.

218.    Facility personnel make policy decisions at the facility, such as the decision to cease using an automatic meal deduction.  (Yahnke Dep. 16:1-11; Bridges Dep. 14:4-15:15; Burlison Dep. 23:3-26:10.)

219.    Each individual facility is responsible for maintaining their employees' personnel files.  (Bridges Dep. 34:7-12; Burlison Dep. 80:22-81:1; Beevers Decl. ¶ 12; Bridges Decl. ¶ 12; Burlison Decl. ¶ 12; Yahnke Decl. ¶ 12.)

3.    <u>Reliance's Relationship With The Individual Facilities.</u>

220.    Reliance provides administrative services to each Defendant facility pursuant to a Healthcare Provider Services Agreement ("ASP Agreement").  (Brandon Adams Dep. 197:4-198:5.)

221.    The ASP Agreement states that all staff of a facility are employees of that facility, which has final control over and responsibility for all personnel recruitment, training, employment, termination, and staffing levels at the facility.  (Compl. Ex. A, Art. 1.1(b).)

222.    The ASP Agreement further provides that Reliance may develop and recommend policies for the facility, but that it "is the sole responsibility of [the Facility] to adopt, amend, and implement all policies and procedures necessary for the operation of the Facility."  (Compl. Ex. A, Art. 1.1(a); Bryan Adams Dep. 53:3-54:15.)

223.    Pursuant to its role as an administrative service provider, Reliance may provide and recommend policies to assist the facility in complying with state law and regulations. (Brandon Adams Dep. 202:18-203:8.)

224.    Reliance may also provide specialist advice to the facilities, including advice regarding dietary services, information services, internal risk management, health and safety issues, legal services, pharmacy operations, public relations, purchasing, quality assurance,

systems and procedures, and third-party reimbursement on an as needed basis.  (Brandon Adams Dep. 219:6-220:25.)

225.    Reliance may not directly employ the specialists, but Reliance can assist in locating specialists for a particular administrator or facility.  (*Id*.)

226.    The facility determines whether to utilize or implement advice and recommendations of specialists.  (Brandon Adams Dep. 221:4-17.)

227.    Each Facility Administrator has authority to seek the advice of outside specialists who are not affiliated with Reliance.  (Brandon Adams Dep. 222:6-18.)

228.    Reliance provides no input regarding staffing levels at the facilities. (Burlison Dep. 67:3-13, 67:20-69:4.)

4.    <u>The Adams Defendants' Relationship With The Individual Facilities.</u>

229.    Each nursing home for which Reliance provides administrative services is fully managed at the facility-level and not by Reliance or the Adams Defendants.  (Brandon Adams Dep. 117:9-12, 143:25-144:4, 144:23-25, 145:12-20; Bryan Adams Dep. 31:9-17, 48:22-49:8.)

230.    The Adams Defendants have never made decisions regarding hiring and firing employees at the facilities.  (Brandon Adams Dep. 148:22-149:16, 171:18-173:3; Bryan Adams Dep. 66:20-68:18.)

231.    The administrator, sometimes with the assistance of other facility personnel, is exclusively responsible for hiring all other staff (including all Plaintiffs) with no input from Reliance or the Adams Defendants.  (Beevers Decl. ¶ 4; Bridges Decl. ¶ 4; Burlison Decl. ¶ 4; Yahnke Decl. ¶ 4.)

232.     As president of the Defendant facilities, Brandon Adams has delegated his authority to the administrator at each facility.  (Brandon Adams Dep. 143:22-144:7, 144:23-25, 145:12-20, 198:6-12).

233.     Bryan Adams has eliminated his duties with respect to the facilities by delegating those responsibilities to other qualified individuals.  (Bryan Adams Dep. 58:22-59:18.)

234.     The Adams Defendants are not involved in the hiring or firing of the facility administrators.  (Brandon Adams Dep. 149:13-25; Bryan Adams Dep. 37:2-5.)

235.     The facility administrators do not report to the Adams Defendants.   (Brandon Adams Dep. 191:14-17; Burlison Dep. 11:13-21.)

236.     The Adams Defendants do not receive any reports or budgets from the nursing homes.  (Brandon Adams Dep. 177:3-178:2; Bryan Adams Dep. 70:2-10.)

237.     The Adams Defendants do not have any authority to change facility policies. (Brandon Adams Dep. 164:7-11; Bryan Adams Dep. 48:22-49:8.)

238.     The Adams Defendants do not utilize any authority they may have to influence the facility administrator's control over day-to-day operations of the facilities.  (Bryan Adams Dep. 58:22-59:18; Brandon Adams Dep. 145:12-148:5, 148:22-149:25.)

239.     They do not personally manage labor costs or participate in setting budgets for any of the facilities.  (Brandon Adams Dep. 163:16-25; Bryan Adams Dep. 70:3-10.)

240.     Moreover, the Adams Defendants were unaware of any automatic meal deduction practices at the facilities until this lawsuit was initiated.  (Brandon Adams Dep. 79:17-24, 196:1-3; Bryan Adams Dep. 47:23-48:11.)

241.     The Adams Defendants do not know if any of the facilities had an overtime budget or a limit on overtime.  (Brandon Adams Dep. 164:1-14; Bryan Adams Dep. 68:25-69:5.)

Respectfully submitted this 23rd day of August, 2013.

/s/ Angelo Spinola
Angelo Spinola
Georgia Bar No. 672191
Admitted *Pro Hac Vice*
Anne M. Mellen
Georgia Bar No. Bar No. 558694
Admitted *Pro Hac Vice*
**LITTLER MENDELSON, P.C.**
3344 Peachtree Road N.E.
Suite 1500
Atlanta, GA  30326.4803
Telephone:  404.233.0330
Facsimile:  404.233.2361
Email:  aspinola@littler.com
Email:  amellen@littler.com

Eva C. Madison, (98183)
**LITTLER MENDELSON, P.C.**
The Fulbright Building
217 E. Dickson Street, Suite 204
Fayetteville, Arkansas 72701
Telephone:  479.582.6100
Facsimile:  479.582.6111
Email:  emadison@littler.com

Rebecca Adelman
(Arkansas Bar No. 92012)
**HAGWOOD ADELMAN TIPTON, PC**
545 South Main Street, Suite 111
Memphis, TN  38103
Telephone:  901.529.9313
Facsimile:  901.529.8772

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on August 23, 2013, the foregoing **DEFENDANTS RELIANCE HEALTH CARE, INC., BRANDON ADAMS, AND BRYAN ADAMS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following counsel of record:

John T. Holleman
Maryna O. Jackson
Holleman & Associates, P.A.
1008 West Second Street
Little Rock, AR  72201
jholleman@johnholleman.net
maryna@johnholleman.net

William Ryan
Bryce William Ashby
Donati Law Firm, LLP
1545 Union Avenue
Memphis, TN  38104-3726
billy@donatilawfirm.com
Bryce@donatilawfirm.com

*/s/ Angelo Spinola*
Angelo Spinola
Attorney for Defendants