IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CARROLYN CAMPBELL, CRYSTAL WALTERS, HEATHER CROW, AND
AMANDA HODGES, INDIVIDUALLY AND ON BEHALF OF OTHERS
SIMILARLY SITUATED

                                        Plaintiffs

VS.          Case No. 4:12-CV-00176-DPM

RELIANCE HEALTH CARE, INC., NORTHWEST HEALTH AND REHAB,
INC. d/b/a NORTH HILLS LIFE CARE AND REHAB, OCNC, INC.
d/b/a SILVER OAKS HEALTH AND REHABILITATION, SCNC, INC.
d/b/a SPRING CREEK HEALTH AND REHAB, BRANDON ADAMS, AND
BRYAN M. ADAMS, INDIVIDUALLY AND IN THEIR CAPACITY AS
OWNERS, MANAGERS, OFFICERS, AND/OR INCORPORATORS OF
RELIANCE HEALTH CARE, INC., NORTHWEST HEALTH AND REHAB,
INC., OCNC, INC. AND SCNC, INC.
                                        Defendants

* * * * * *

ORAL DEPOSITION OF HEATHER AMANDA CROW
[Taken May 23, 2013]

* * * * * *

APPEARANCES:
     MS. MARYNA O. JACKSON, Esq.
        Holleman & Associates, P.A.
        1008 West Second Street
        Little Rock, Arkansas 72201
           *** For the Plaintiffs ***
     MR. ANGELO SPINOLA, Esq.
        Littler Mendelson, P.C.
        3344 Peachtree Road, NE
        Suite 1500
        Atlanta, Georgia 30326-4803; and
     MS. DAWN D. BICKER, Esq.
        Reliance General Counsel
        Director of Risk Management
        824 Salem Road
        Suite 230
        Conway, Arkansas 72034
           *** For the Defendants ***

ALSO PRESENT: Tracey Burlison
* * * * * *

EXHIBIT
A

BUSHMAN COURT REPORTING
501.372.5115

## Page 2

```
            I N D E X
    TOPIC                   PAGE
STIPULATIONS                  3
WITNESS SWORN:  HEATHER AMANDA CROW        3
    Examinat on by Mr. Spinola           4

        E X H I B I T S*

(Defendant's Exhibits)
Exhib t 1                   8
Exhib t 2                  20
Exhib t 3                  25
Exhib t 4                  29
Exhib t 5                  30
Exhib t 6                  41
Exhib t 7                  42
Exhib t 8                  51
Exhib t 9                  55
Exhib t 10                 56
Exhib t 11                 59
Exhib t 12                 60
Exhib t 13                 70
Exhib t 14                117
Exhib t 15                206
Exhib t 17                249
Exhib t 18                256
Exhib t 19                261
Exhib t 20                262
Exhib t 21                263
Exhib t 22                267
Exhib t 23                267
Exhib t 24                268
Exhib t 25                274
Exhib t 26                275
Exhib t 27                276
Exhib t 28                278
      [*Under separate cover.]

REPORTER'S CERTIFICATE              293

WITNESS' SIGNATURE                 294
```

BUSHMAN COURT REPORTING
501.372.5115

## Page 3

THE ORAL DEPOSITION OF HEATHER AMANDA CROW, a

witness produced pursuant to the Federal Rules of Civil

Procedure in the above-styled and numbered cause on the

23rd day of May, 2013, before Jeff Bennett, CCR, LS

#19, a Notary Publ c in and for Saline County, Arkansas,

at Holleman & Associates, 1008 West Second Street,

Little Rock, Arkansas beginning at 10:38 a.m..

* * * * * * * * * *

HEATHER AMANDA CROW

the witness, being first duly caut oned and sworn or

affirmed to tell the truth, testified as follows:
* * * * * * *

BUSHMAN COURT REPORTING
501.372.5115

## Page 4

EXAMINATION

BY MR. SPINOLA:

Q. Ms. Crow, would you state your full name and address,
for the record, please?

A. Heather Amanda Crow, Redacted ,
Arkansas.

Q. What was the Zip Code?

A. Redacted

Q. How long have you lived at that address?

A. A year.

Q. Where did you live before?

A. Redacted ,

Redacted

Q. Have you ever been married?

A. Redacte

Q. What was your name when you were married?

A. My maiden name is Heather Amanda Allen.

Q. So Heather Allen is your maiden name?

A. Yes.

Q. Are you still married now?

A. Redacte

Q. But you still go by Crow?

A. Yes.

Q. When did you get divorced?

A. April 11, 2011.

## Page 5

Q. Do you have any children?

A. Yes.

Q. How many?

A. Two.

Q. How old?

A. Seven and four months.

Q. What are their names?

A. Redacted

Q. What are the last names?

A. Redacted .

Q. Who is Redacted father?

A. Redacted .

Q. Is that a husband or boyfriend?

A. Boyfriend.

Q. Is there any reason that you could not testify
competently today, any medications that you're on or
anything that you're taking that would impact or impair
your ability to testify truthfully?

A. No.

Q. And you understand that you're under oath to tell the
truth?

A. Yes.

Q. And you understand that there are potential criminal
and civil penalties for not telling the truth under oath,
correct?

## Page 6

1  A.  Yes.
2  Q.  Let me go over a couple of ground rules with you on
3  the depositions.  Have you ever been deposed before?
4  A.  Deposed?
5  Q.  Yes.  What we're doing now?
6  A.  No.
7  Q.  Other than your divorce, have you been involved in
8  any criminal or civil proceeding before?
9  A.  No.
10  Q.  Have you ever been arrested?
11  A.  No.
12  Q.  Ever sued anyone?
13  A.  No.
14  Q.  Ever been sued?
15  A.  No.
16  Q.  Have you ever testified as a witness for anything?
17  A.  No.
18  Q.  The rules of a deposition are as follows.  I ask the
19  questions.  Our court reporter is going to take down the
20  questions I ask, and he's also going to transcript your
21  answers.  That's important because if you're talking while
22  I'm talking, he can't take us both down.  So wait for me
23  to finish the question and then answer.  Okay?
24  A.  All right.
25  Q.  When you answer, try to answer in the affirmative

## Page 7

1  rather than head nods or shakes, because that's difficult
2  for him to transcribe.  So if you can just say yes or no
3  or answer affirmatively.  Okay?
4  A.  All right.
5  Q.  Also, if you can avoid saying uh-huh and huh-uh.
6  Some people have that habit.  It's very difficult to
7  distinguish the two when they're written.  So yes or no
8  would be better than uh-huh or huh-uh.
9  A.  All right.
10  Q.  Is that fair?
11  A.  Yes.
12  Q.  If you need to take a break, you're welcome to.  The
13  only thing I'd ask is that if there's a question pending,
14  that you wa t until those questions are answered before
15  taking a break.  But you otherwise can take a break
16  whenever you want.  Okay?
17  A.  Okay.
18  Q.  If I ask you a question, and you don't understand the
19  question, then I would ask that you ask me to rephrase it
20  or explain to me you don't understand what I'm asking.
21  Okay?
22  A.  All right.
23  Q.  If you answer a quest on that I've asked you, then my
24  assumption is going to be that you understood the quest on
25  and you're answering it truthfully.  Is that fair?

## Page 8

1  A.  Yes.
2  Q.  There will be times when your attorney is going to
3  object to some of my questions, based on the form of the
4  quest on.  Nearly all object ons procedural objections to
5  establish the record later on if the case goes to trial.
6  But it doesn't mean that you shouldn't answer the
7  quest on.
8      MS. JACKSON:  And I will instruct you.
9  When you don't have to answer, I will specifically
10  instruct you not to answer.
11  A.  All right.
12  Q.  So unless you get that instruct on, then she's
13  preserving the record and you should still answer.
14  A.  Okay.
15      (Defendant's Exhibit 1 was marked.)
16  Q.  You've been handed what's been marked as Defendant's
17  Exhib t Number 1, which is a document out of your
18  personnel file.  Do you know who Regina Sullivan is?
19  A.  No.
20  Q.  Did you recall working somewhere before working at
21  Spring Creek?
22  A.  Yes.
23  Q.  Where was that?
24  A.  Phillips 66.
25  Q.  Phillips 66?

## Page 9

1  A.  Yes.
2  Q.  Do you recall working at the building that was called
3  -- that is now called Spring Creek?
4  A.  Spring Creek Living Center, yes.
5  Q.  And what was it before?
6  A.  Spring Creek Living Center.
7  Q.  And do you know who owned Spring Creek Living Center?
8  A.  No.
9  Q.  That was a separate entity from the Spring Creek that
10  you were later hired into, correct?
11  A.  Right.
12  Q.  There was a change in ownership?
13  A.  Yes.
14  Q.  Do you remember when that was?
15  A.  March 3, 2011.
16  Q.  And we'll look at some documents.  I think it might
17  have been 2010.  But we'll look at some documents to help
18  refresh your recollection.
19  A.  Okay.
20  Q.  Who was your supervisor when it was Spring Creek
21  Living Center?
22  A.  Quandi, I don't know the last name, and a John.  I
23  don't remember his last name.  I think he worked there
24  before Tracey d d.
25  Q.  And what was Quandi's pos t on?

## Page 10

1   A.   DON.

2   Q.   And John was also the DON?

3   A.   Administrator.

4   Q.   And what was your position?

5   A.   CNA.

6   Q.   And how long did you work at Spring Creek Living

7   Center?

8   A.   A year.

9   Q.   And prior to that, had you been a CNA anywhere else?

10   A.   No.

11   Q.   Did you have any issue receiving meal periods when

12   you were a CNA at Spring Creek Living Center?

13   A.   Yes.

14   Q.   And how frequently did you miss meal periods?

15   A.   About 75 percent of the time.

16   Q.   And why were you missing meal periods?

17   A.   Because of the work I had to do.

18   Q.   Did you ever work off the clock at Spring Creek

19   Living Center, either before your shift or after you

20   clocked out?

21   A.   No.

22   Q.   You understood that at Spring Creek Living Center you

23   were required to record all your working time, correct?

24   A.   Yes.

25   Q.   And you knew that you were not permitted to work,

## Page 11

1   perform any work after clocking out for the day, right?

2   A.   Yes.

3   Q.   And you knew you were not permitted to perform any

4   work prior to clocking in for the day, correct?

5   A.   Yes.

6   Q.   Did you understand that at Spring Creek Living Center

7   that you were not supposed to be working through meal

8   periods?

9   A.   Yes.

10   Q.   Okay.  Did you report it to anybody?

11   A.   Yes.

12   Q.   Who?

13   A.   Wanda, nurses that were on the hall with me.

14   Q.   Wanda who?

15   A.   Harris.

16   Q.   Wanda Harris?

17   A.   Yes.

18   Q.   And what was her position?

19   A.   DON.

20   Q.   At Spring Creek Living Center?

21   A.   No, Health & Rehab.

22   Q.   I'm only asking you right now about --

23   A.   Living Center.

24   Q.   -- Living Center.

25   A.   Okay.

## Page 12

1   Q.   You had said that you were --

2   A.   There was another DON.  I can't remember her name.

3   She was after Quandi.  And I did report to her.

4   Q.   So you reported at Spring Creek Living Center that

5   you were working through lunches.  And you understood you

6   were supposed to be paid for those, correct?

7   A.   Yes.

8   Q.   And did Spring Creek Living Center pay you for those

9   lunches?

10   A.   The lunches I missed?

11   Q.   Yes.

12   A.   Only a few.

13   Q.   Do you know why they paid for some and not others?

14   A.   Yes.  I wrote time adjustment sheets.

15   Q.   So Spring Creek Living Center had a time adjustment

16   process as well?  Remember my question is just limited to

17   Spring Creek Living Center, that year that you were

18   employed there.

19   A.   Yes, they had the -- well, the time adjustment was

20   only when it was Health & Rehab.  That's when I was aware

21   of it.  I was not told about the time adjustment until it

22   became Health & Rehab.

23   Q.   So as far as you knew, there was no time sheet

24   adjustment process at Spring Creek Living Center?

25   A.   There was a time adjustment.  I knew if I missed a

## Page 13

1   lunch I filled it out.  And I was told not to do it

2   anymore, because I was told to take my lunch no matter

3   what.

4   Q.   This is at Spring Creek Living Center, right?

5   A.   Yes.

6   Q.   So let me understand.  At Spring Creek Living Center

7   was there any time deducted for meal periods?

8   A.   I'm not sure if there was or if there wasn't.  I

9   don't know how they took it out.

10   Q.   Okay.

11   A.   I only became aware of the situation when it was

12   Health & Rehab.

13   Q.   And at Spring Creek Living Center only, that year

14   that you were employed there, did you fill out time sheet

15   adjustments for missed meal periods?

16   A.   Yes.

17   Q.   So they did have a time sheet adjustment process for

18   missed meal periods?

19   A.   Yes.

20   Q.   And when you filled out the time sheet adjustment,

21   you were paid for the meal period?

22   A.   Yes.

23   Q.   What was your understanding of what the Spring Creek

24   Living Center's time adjustment form was for?

25   A.   To pay us for time that we worked.

4 (Pages 10 to 13)

Page 14

1    Q.  So were there any occasons, while you were at Spring
2    Creek Living Center in that year, that you would have
3    worked through lunch and not filled out a time sheet
4    adjustment form?
5    A.  Yes.
6    Q.  And why would that be?
7    A.  Because when I would fill out time adjustment sheets,
8    I was told that I needed to not do that and make sure I
9    got my lunches.
10   Q.  Okay.  And how were you told at Spring Creek Living
11   Center to ensure that you got your meal perods?
12   A.  To get them?
13   Q.  Yes.
14   A.  I really wasn't told how to get them.  There was a
15   time on the sheet to take them.  There was times you
16   couldn't because you ddn't have time to.  You had to
17   work.  There was no other choce.
18   Q.  And what was staffing ratios -- well, did you work on
19   various halls at Spring Creek Living Center?
20   A.  I worked every hall.
21   Q.  And when it was Spring Creek Living Center, how many
22   CNAs were staffed to a hall?
23   A.  Two.
24   Q.  So while you were there, why weren't you able to take
25   a lunch sometimes if you had another CNA on your same

Page 15

1    hall?
2    A.  There were things to do: getting someone up, getting
3    call lights, reporting something.  There was always
4    something I had to do like a shower.
5    Q.  Why couldn't the other CNA do t while you were on
6    break?
7    A.  They were busy also.
8    Q.  Was there ever a time when there was more than two
9    CNAs on your hall when it was Spring Creek Living Center?
10   A.  No.
11   Q.  Did you feel that Spring Creek Living Center was
12   understaffed?
13   A.  Yes.
14   Q.  There was not enough CNAs to get a full meal break,
15   two CNAs on a hall?
16   A.  Yes.
17   Q.  How many CNAs would it take on a hall to be
18   adequately staffed?
19   A.  I would say three or four.
20   Q.  And if there had been three or four CNAs on a hall
21   that you worked on, you feel that you would have been able
22   to get your meal break?
23   A.  Yes.
24   Q.  And you understood that that meal break would be --
25   was to be 30 minutes and uninterrupted, correct?

Page 16

1    A.  Yes.
2    Q.  At least 30 minutes, right?
3    A.  Yes.
4    Q.  On the occasions at Spring Creek Living Center that
5    you were able to get a meal period, why would that be?
6    A.  Things were going good that day.  It just depends.
7    Usually we're super-busy or behind or something happened,
8    maybe somebody had to go to the hospital, get behind in
9    showers, which was most all the time.
10   Q.  Okay.  At Spring Creek Living Center, was there any
11   kind of floating system where a CNA would come from a
12   different hall to cover meal breaks?
13   A.  Rarely.
14   Q.  How frequently would you say?
15   A.  One out of three.  If someone was floating, it was
16   because we were short, and there was one CNA on each hall
17   and then one person floating on each hall, which would
18   make t even more difficult.
19   Q.  Okay.  So at Spring Creek Living Center, there would
20   not have been a floater any time there was more than one
21   CNA on a hall?
22   A.  Repeat that?
23   Q.  Sure.  And again, my question is just limited to
24   Living Center.
25   A.  Right.

Page 17

1    Q.  You said that there would rarely be floaters that
2    were utilized.  And the only time you'd use a floater is
3    if there was one CNA on the hall, correct?
4    A.  Right.  And if there was two on each, it would be one
5    only doing showers.
6    Q.  Okay.  Dd LPNs or RNs ever cover the work of CNAs at
7    Spring Creek Living Center?
8    A.  A few.
9    Q.  Did they ever cover for you?
10   A.  Like a couple of times.
11   Q.  How many times would you say?
12   A.  Between two and five.
13   Q.  Somewhere between two and five times?
14   A.  Yes.
15   Q.  After you were told that it was important for you to
16   take your meal break at Spring Creek Living Center, and
17   you continued to work through breaks on occasons, dd you
18   report that you were still working through breaks?
19   A.  Yes.
20   Q.  Who did you report that to?
21   A.  Wanda or my nurse.
22   Q.  Again, my questions are --
23   A.  Sorry.  I can't remember who.  Because there was
24   Quandi and there was another lady.  And I can't remember
25   what the other lady's name was.  And I didn't have as many

5 (Pages 14 to 17)

## Page 18

1  problems with Quandi.  And there was the other lady and
2  there was Wanda, which was when it was another facility
3  Q.  So there was a lady when it was the Living Center
4  that you --
5  A.  I'm sure it was Living Center.  I don't really
6  remember.
7  Q.  You said you did have or didn't have problems with
8  Quandi?
9  A.  Quandi, yes.
10  Q.  What do you mean by that?
11  A.  I didn't have problems as much.  I felt like I could
12  go to her and things got done.
13  Q.  Okay.  And she was the DON, right?
14  A.  Yes.
15  Q.  So when Quandi was the DON, did you get your meal
16  periods at the Living Center?
17  A.  No.
18  Q.  But if you reported a missed meal period to Quandi,
19  you'd be paid for it?
20  A.  Yes.
21  Q.  And then somebody else took over as the DON at the
22  Living Center?
23  A.  I don't want to say.  I don't really remember.  I
24  don't remember between the Living Center and Health &
25  Rehab -- well, I've had more problems out of Health &

## Page 19

1  Rehab than I did with the Living Center.
2  Q.  And what do you attribute that to?
3  A.  What do you mean?
4  Q.  Why did you have more problems at --
5  A.  Because I was treated very badly.
6  Q.  And your employment was terminated at Health & Rehab,
7  correct?
8  A.  Yes.
9  Q.  I want to continue to focus the questions just on the
10  Living Center for right now.
11  A.  Okay.
12  Q.  When it was the Living Center, did you clock in and
13  out for meal periods?
14  A.  No.
15  Q.  You would just take them --
16  A.  Yes.
17  Q.  -- at the facility?
18  A.  Yes.
19  Q.  Where would you take your meal period?
20  A.  In the breakroom.
21  Q.  Did the Living Center have a policy that you were not
22  permitted to eat on the floor that you worked, the hall
23  that you worked?
24  A.  Yes.
25  Q.  And did the Living Center have staggered meal shifts?

## Page 20

1  A.  What does that mean?
2  Q.  Meaning that there was an assigned meal for a CNA to
3  go at one time, and then another CNA to go later in the
4  day?
5  A.  Yes.
6  Q.  And since there were only two CNAs on a hall, it
7  would be for either you or the other CNA to go, and then
8  whoever didn't go would go later, right?
9  A.  Both had assigned times.
10  Q.  And they were different times, right?
11  A.  Yes.
12  Q.  Turn back to Exhibit Number 1.  And you see here
13  where t says the hire date of 3/1/2010?
14  A.  Where?
15  Q.  About the middle of the page.  I'm sorry.  I'm
16  looking at the next exhibit.  I haven't given this to you
17  yet.
18        (Defendant's Exhibit 2 was marked.)
19  Q.  You've been handed what's been marked as Defendant's
20  Exhibit Number 2, which is an employee information form
21  for you, indicating when you were hired by Spring Creek
22  Health & Rehab Center, correct?
23  A.  Yes.
24  Q.  And your claims in this case are against Spring Creek
25  Health & Rehab and not Spring Creek Living Center,

## Page 21

1  correct?
2  A.  Yes.
3  Q.  And you see that your hire date was March 1, 2010,
4  right?
5  A.  Yes.
6  Q.  And your previous hire date t looks like at Spring
7  Creek Living Center was June 16, 2009.  Does that sound
8  right?
9  A.  Yes.
10  Q.  Was there any break in your employment between you
11  hire at the Health & Rehab Center and Living Center, d d
12  you stop working for a while?
13  A.  No.
14  Q.  You just switched?
15  A.  Yes.
16  Q.  And was your rate of pay -- what was your rate of pay
17  at the Spring Creek Living Center?
18  A.  It started out Redacted , and then when t switched over
19  it was Redacted.
20  Q.  So your rate of pay increased significantly when it
21  became the Health & Rehab Center, correct?
22  A.  Yes.  I was certified.  I was a -- I wasn't certified
23  when I first started there.  And when I got certified they
24  bumped me up.
25  Q.  Okay.  When you were hired at the Health & Rehab

6  (Pages 18 to 21)

## Page 22

1   Center, who is it that hired you?
2   A.   The Living Center?
3   Q.   No, at the Health & Rehab Center.  So now I'm going
4   to trans tion from the Living Center to the Health & Rehab
5   Center.
6   A.   Who hired me?
7   Q.   Yeah.  Who hired you at the Health & Rehab Center?
8   A.   I guess the new owners.  When the new owners bought
9   it, they just had us refill out new hire orientat on
10   booklets and stuff like that, and just kept working for
11   the same --
12   Q.   When you say, they, who had you fill out the
13   paperwork?
14   A.   Human resources.
15   Q.   And who is that?
16   A.   Karen Buckner.
17   Q.   And who does she work for?
18   A.   I'm not sure if she still works for Reliance or not.
19   I guess Reliance.
20   Q.   Karen Buckner worked for Reliance?
21   A.   Yes.
22   Q.   That was her employer?
23   A.   Yes.
24   Q.   Where did she s t everyday?
25   A.   In the human resource office.

## Page 23

1   Q.   Of where?
2   A.   Spring Creek Health & Rehab.
3   Q.   And Spring Creek Health & Rehab is a separate
4   facility from the company called Reliance, right?
5   A.   Repeat that?
6   Q.   Spring Creek is a separate facility from a company
7   called Reliance, correct?
8   A.   No.
9   Q.   So you're saying that all the Spring Creek employees
10   were actually Reliance employees?
11   A.   Yes.
12   Q.   And what makes you say that?
13   A.   Because they worked for the company.
14   Q.   Did Karen Buckner go anywhere other than Spring
15   Creek, the Spring Creek facility, did she go to any other
16   facility or any other entity?
17   A.   I wouldn't know that.
18   Q.   As far as you knew, you always saw her at Spring
19   Creek, correct?
20   A.   Yes.
21        MS. JACKSON:  Objection to the form of
22   the question.  You can answer.
23   Q.   So who was it that you worked with when you were
24   being hired, what was the individual's name?
25   A.   Reliance.

## Page 24

1   Q.   Reliance is the name of an individual?
2   A.   No.  Repeat that?
3   Q.   What's the name of the individual that you worked
4   with to get hired or individuals?
5        MS. JACKSON:  So who hired you bas cally.
6   Q.   The name of the person?
7   A.   No one really hired me.  I was just given new paper
8   work.
9   Q.   Do you see this form here that says, new hire, at the
10   top, do you see that check mark?
11   A.   Yes.
12   Q.   Effective date 3/1/2010, do you see that?
13   A.   Yes.
14   Q.   And you see your signature at the bottom?
15   A.   Yes.
16   Q.   Who gave you this form?  What individual gave you
17   this form?
18   A.   Karen Buckner.
19   Q.   And Karen Buckner was located at Spring Creek,
20   correct?
21   A.   Yes.
22   Q.   And do you understand that there's a company called
23   Reliance Health Care that's located somewhere else?
24   A.   Yes.
25   Q.   And did you know that Reliance Health Care has

## Page 25

1   employees and Spring Creek has employees?
2   A.   Yes.
3   Q.   And do you know those employees were separate from
4   one another?
5   A.   Yes.
6   Q.   And did you understand that Karen Buckner was a
7   Spring Creek employee?
8   A.   Yes.
9        (Defendant's Exhibit 3 was marked.)
10   Q.   You've been handed what's been marked as Defendant's
11   Exhib t Number 3.  Is that your handwriting there on
12   employee name?
13   A.   Yes.
14   Q.   Okay.  And look at the last page.  Is that your
15   signature?
16   A.   Yes.
17   Q.   Dated March 9, 2010, correct?
18   A.   Yes.
19   Q.   Who provided you with this job descript on?
20   A.   Karen Buckner.
21   Q.   And when did she give you this job description?
22   A.   March 9, 2010.
23   Q.   And was this in connection with an orientat on to
24   Spring Creek Health & Rehab?
25   A.   Meaning was I orientated?

7 (Pages 22 to 25)

## Page 26

1   Q.   Yes.

2   A.   No.

3   Q.   You didn't receive an orientation?

4   A.   I received orientat on papers, but I was never

5   orientated.

6   Q.   Did you review the papers that you received?

7   A.   Yes.

8   Q.   What changed as far as your working responsibilities

9   between Living Center and the Health & Rehab Center?

10   A.   Nothing.

11   Q.   So you had the same job duties?

12   A.   Yes.

13   Q.   Were there other employees other than you that were

14   retained when the Living Center was acquired by the Health

15   & Rehab Center?

16   A.   What do you mean?

17   Q.   Were there other employees other than you that stayed

18   on to work for the Health & Rehab Center?

19   A.   Yes.

20   Q.   Was there anybody in management that was retained?

21   A.   No.

22   Q.   So it was a different DON?

23   A.   I can't remember if Wanda was at the Living Center.

24   I think she wasn't.

25   Q.   Different administrator?

## Page 27

1   A.   No.

2   Q.   So the administrator for the Living Center was

3   retained for the Health & Rehab Center?

4   A.   Yes.

5   Q.   And who was that?

6   A.   Tracey.

7   Q.   Tracey who?

8   A.   Burlison.

9   Q.   So who was the DON when  t became the Rehab Center?

10   A.   I'm not sure.  I'm assuming Wanda.  We've had a few

11   of them.

12   Q.   Remind me what was Wanda's last name?

13   A.   Wanda Harris.

14   Q.   And what about the ADON?

15   A.   The only one I can remember is Laura.  That was the

16   previous one, I believe, unless she's not there anymore.

17   Q.   Do you know Laura's last name?

18   A.   No.

19   Q.   And who was your direct supervisor?

20   A.   Laura.

21   Q.   The ADON?

22   A.   Yes.

23   Q.   And d d you work for any of the same LPNs --

24   A.   No.

25   Q.   -- on the hall?  They were all different?

## Page 28

1   A.   Yes.

2   Q.   While at the Rehab Center, what LPNs d d you report

3   to?

4   A.   I honestly don't remember their names.

5   Q.   You can't remember any of their names?

6   A.   No.

7   Q.   How many different LPNs would you say you reported

8   to?

9   A.   Three or four.

10   Q.   Three or four?

11   A.   Yes.

12   Q.   Did the LPNs have responsibil ty to make sure that

13   you were getting your meal per ods?

14   A.   No.

15   Q.   Who did?

16   A.   Who did what?

17   Q.   Who had the responsibil ty to ensure you're getting

18   meal per ods?

19   A.   Myself.

20   Q.   Who was responsible for assigning meal periods?

21   A.   The ADON would.

22   Q.   Let's look at your job description.  Look at

23   personnel functions at the bottom of page 1.  Was it your

24   understanding that one of your job requirements was to

25   perform all assigned tasks in accordance with established

## Page 29

1   pol cies and procedures?

2   A.   Yes.

3   Q.   Did you understand that you were obligated to follow

4   work assignments and work schedules in completing and

5   performing your assigned tasks?

6   A.   Yes.

7   Q.   Did you know that you were required to report all

8   complaints and grievances made by patients?

9   A.   Yes.

10   Q.   And by signing the job descript on, you were

11   acknowledging that you would indeed fulfill all these job

12   duties, correct?

13   A.   Yes.

14       (Defendant's Exhibit 4 was marked.)

15   Q.   You've been handed what's been marked as Defendant's

16   Exhib t Number 4.  And this is a general orientation

17   completion form for you.  Is that your signature at the

18   bottom of the page, dated February 24, 2010?

19   A.   It is.

20   Q.   And who reviewed this form with you?

21   A.   No one.

22   Q.   How d d you receive the form?

23   A.   It was handed to me.

24   Q.   By who?

25   A.   Karen Buckner.

8  (Pages 26 to 29)

Page 30

1    Q.   Who is a Spring Creek employee, correct?
2    A.   Yes.
3    Q.   At the bottom -- well, let's look at the
4    administrative job description, which we've already seen,
5    correct?
6    A.   Yes.
7    Q.   And one of the things that you would have received is
8    personnel policies, which we will look at.  You would have
9    received personnel policies, correct?
10   A.   Yes.
11   Q.   And instructions regarding clocking in and out,
12   correct?
13   A.   Yes.
14   Q.   And facility-specific policies, correct?
15   A.   Yes.
16   Q.   And looking at your acknowledgement at the bottom.
17   have received training where necessary, and fully
18   understand all policies, procedures and guidelines in each
19   of these areas.  Is that true?
20   A.   Yes.
21   Q.   So you did understand all of the facility policies,
22   procedures and guidelines, correct?
23   A.   Yes.
24            (Defendant's Exhibit 5 was marked.)
25   Q.   You've been handed what's been marked Defendant's

Page 31

1    Exhibit Number 5, which is a copy of a general orientation
2    manual for staff.  Do you recall receiving this?
3    A.   Yes.
4    Q.   On page 3, looking at the roles of the various
5    personnel.  The administrator says, Oversees the general
6    operation of the facility, correct?
7    A.   Where is that?
8    Q.   Right there.
9    A.   Okay.
10   Q.   And who was the administrator, Tracey, correct?
11   A.   Yes.
12   Q.   Do you know of anyone other than Tracey who was
13   responsible for the general operation of the facility?
14   A.   Operation of the facility.
15   Q.   Right.  Who was overseeing the general operation of
16   the facility?
17   A.   I guess.
18   Q.   And you understood that Tracey was the facility civil
19   rights compliance officer, correct?
20   A.   Yes.
21   Q.   The business office manager was responsible for
22   billing and collections for patients, patient trust, daily
23   census, admission paperwork and workers' compensation,
24   right?
25   A.   Yes.

Page 32

1    Q.   Do you know anybody other than the business office
2    manager that had those responsibilities?
3    A.   No.
4    Q.   The personnel director was responsible for accounts
5    payable, payroll, paycheck distribution, new hire
6    orientation and processing, employee insurance and
7    benefits, applications, and acted as the liaison to other
8    departments.
9         Do you know of anyone else other than the personnel
10   director who had those responsibilities?
11   A.   No.
12   Q.   And who was the personnel director?
13   A.   Karen Buckner.
14   Q.   And that was a Spring Creek employee?
15   A.   Spring Creek, yes.
16   Q.   And who was the business office manager?
17   A.   I forget her name.
18   Q.   She was a Spring Creek employee?
19   A.   Yes.
20   Q.   The director of nursing, that's the DON.  That's what
21   we've been referring to her as, right?
22   A.   Yes.
23   Q.   Was responsible for overseeing the nursing department
24   and coordinating with all departments on appropriate care
25   for each patient.  She handles all the nursing department

Page 33

1    scheduling, interviewing, hiring, employment termination
2    and conducts bi-weekly inservices for nursing and the
3    entire staff.
4         Do you know of anyone else that had those
5    responsibilities other than the director of nursing?
6    A.   No.
7    Q.   And that was a Spring Creek employee, correct?
8    A.   Yes.
9    Q.   Look at the medical records director.  The medical
10   records director oversaw all patient medical records, data
11   entry, chart maintenance, filling hospital, hospice,
12   doctor, family, coroner, requests for medical records,
13   correct?
14   A.   Yes.
15   Q.   And was there anyone else that had those
16   responsibilities that you know?
17   A.   No.
18   Q.   And the medical director -- the medical records
19   director was a Spring Creek employee, correct?
20   A.   Yes.
21   Q.   Do you know anything about the meal practices or
22   break schedule of the medical records director?
23   A.   No.
24   Q.   What about the maintenance services director or any
25   of that individual's employees?

9 (Pages 30 to 33)

Page 34

1   A.   No.
2   Q.   What about the Medicare manager or anybody who worked
3   under the Medicare manager?
4   A.   No.
5   Q.   What about the MDS care plan coordinator or any
6   employee that worked under the care plan coordinator?
7   A.   No.
8   Q.   What about the admissions coordinator or anybody
9   under the admissons coordinator?
10  A.   No.
11  Q.   What about the activities director or anybody under
12  the activties director?
13  A.   No.
14  Q.   What about the social services director or anybody
15  under the social services director?
16  A.   No.
17  Q.   Other than you and your practices under the director
18  of nursing, dd you know anybody else's meal practices
19  under the director of nursing?
20  A.   No.
21  Q.   And the personnel director, did you know anything
22  about the meal practices of anyone under the personnel
23  director?
24  A.   No.
25  Q.   Or the personnel director him or herself?

Page 35

1   A.   No.
2   Q.   About the business offce manager, the same question?
3   A.   No.
4   Q.   The administrator?
5   A.   No.
6   Q.   And nobody that worked under the business offce
7   manager or administrator, correct?
8   A.   Correct.
9   Q.   And so is it fair to say, that the only testimony
10  that you could provide today is testimony about your own
11  meal practices?
12  A.   Correct.
13  Q.   And you wouldn't know -- you have never reviewed pay
14  stubs from a different employee other than yourself,
15  correct?
16  A.   Correct.
17  Q.   And you've never seen time adjustment forms for any
18  employee other than yours, correct?
19  A.   Correct.
20  Q.   And you don't know whether any employee, other than
21  yourself, was subject to an automatc meal deduction,
22  correct?
23  A.   Correct.
24  Q.   And you don't know when or how other meal periods
25  were scheduled for other employees, correct?

Page 36

1   A.   Correct.
2   Q.   Can you turn to -- this is a document actually that
3   was provided by your counsel.  It doesn't have numbers on
4   it.  But it's maybe 18 pages in or so, a third of the way
5   in, there's something that says at the bottom, Clocking in
6   and out.  Are you there?
7   A.   Yes.
8   Q.   Start wth under employment classif cat on it says,
9   hourly non-exempt.  Do you see that?
10  A.   Yes.
11  Q.   And did you understand, reading this section, that
12  you're entitled to overtime at 1 1/2 times your regular
13  rate of pay for any work that was done over 40 hours,
14  right?
15  A.   Let me read over it.
16  Q.   Sure.
17       MS. JACKSON:  Angelo, this document is
18  not Bates stamped.  Is there any reason for this?
19       MR. SPINOLA:  No.  You gave this document
20  to us.  It's from your production.
21       MS. JACKSON:  I see.
22  Q.  (BY MR. SPINOLA)  Are you ready?
23  A.   Yes.  What was the question?
24  Q.   You understood that any work that you performed above
25  40 hours in a work week should be paid at time and a half,

Page 37

1   right?
2   A.   Yes.
3   Q.   Of your regular rate of pay?
4   A.   Yes.
5   Q.   Overtime?
6   A.   Yes.
7   Q.   And you understood that any overtime worked was to be
8   approved in advance, correct?
9   A.   Yes.
10  Q.   And who would need to approve overtime?
11  A.   The DON.
12  Q.   Under clocking in and out, you see that a few
13  paragraphs down?
14  A.   Yes.
15  Q.   You see that on the last bullet point there it says,
16  You must clock in when you arrive and out when you leave
17  the facility.  Did you understand that that was the
18  polcy?  Did you understand that that was the
19  A.   Yes.
20  Q.   And you understood that you weren't to perform any
21  work before clocking in, right?
22  A.   Yes.
23  Q.   And you understand you were not to perform any work
24  after clocking out, correct?
25  A.   Yes.

10  (Pages 34 to 37)

## Page 38

1  Q.  And you, in fact, d d not perform any work before
2  clocking in or after clocking out, correct?
3  A.  Correct.
4  Q.  It also says, If you remain on facility grounds for
5  lunch it's not necessary to clock out, correct?
6  A.  Correct.
7  Q.  And you understood that if you left the facility
8  grounds you had to clock out for meal per ods, right?
9  A.  Correct.
10  Q.  And was it your pract ce if you left the facility to
11  clock out for meal per ods?
12  A.  Yes.
13  Q.  And would you have ever clocked out for a meal period
14  if you were not leaving the facil ty?
15  A.  Did I?
16  Q.  Would you ever do that?
17  A.  If I d dn't leave the facility, no.
18  Q.  So if you weren't leaving the facility you wouldn't
19  be clocking out for lunch, right?
20  A.  Correct.
21  Q.  And any time you did clock out for lunch, that means
22  you left the facil ty, correct?
23  A.  Correct.
24  Q.  Okay.  Turn to maybe another three or four pages
25  down, there's something that says, Standard of conduct and

## Page 39

1  reporting requirements.  Do you see that?
2  A.  Yes.
3  Q.  You see where it says, no retaliation permitted?
4  A.  Yes.
5  Q.  Did you understand that the facility will not
6  retaliate against any employee for informing the
7  administrator, supervisor or outs de compliance officer,
8  Department of Just ce or Attorney General, or any other
9  agency or individual representing the State and/or Federal
10  Government of any possible violat on.  You understood
11  that, right?
12  A.  Let me read it.  Give me an example?
13  Q.  So retaliation would mean that the company doesn't
14  have a right, as a result of a complaint that you raise
15  about a violation of law, to terminate your employment, o
16  taking adverse employment action against you.  Did you
17  understand that?
18  A.  Am I aware of that if -- I'm sorry.  I'm confused.
19  Q.  So d d you understand that the company policy would
20  be that there would be no retaliation for any complaint
21  that you made about violations of the law?
22  A.  I wasn't aware of that, no.
23  Q.  So this is something you didn't know?
24  A.  No.
25  Q.  All right.  And had you read this pol cy you would

## Page 40

1  have known that, correct?
2         MS. JACKSON:  Object on to the form of
3  the question, but you can answer.  Do you understand what
4  retaliat on means?  Do you understand his question?
5  A.  No.
6         MS. JACKSON:  Okay.  Can you explain to
7  her what retaliation means?  She doesn't clearly
8  understand what you're asking.
9  Q.  (BY MR. SPINOLA)  Okay.  So what I'm asking is,
10  retaliat on basically means that  t would be -- think of
11  it as pay back.  If you make a complaint about a v olation
12  of law, the company was not allowed, and there's a pol cy
13  prohibiting the company from taking a negative employment
14  action against you, reducing your pay, suspending you,
15  terminating you because of the complaint you made.
16  Did you know that that was a company pol cy?
17  A.  No.
18  Q.  Okay.  Let's look at the next one, written grievance
19  procedure.  The facil ty strongly encourages that when an
20  employee makes such a report to the administrator or
21  supervisor within the facility, that the employee submit
22  the report using the written grievance procedure in
23  existence at the facility, or via some other form of
24  written complaint.  The employee should keep a photocopy
25  of the wr tten grievance for his or her own records.

## Page 41

1         So did you know that, that the company was expecting
2  you, if you had a complaint, to put the complaint in
3  writing?
4  A.  Yes.
5         (Defendant's Exhibit 6 was marked.)
6  Q.  You've been handed what's been marked as Defendant's
7  Exhibit 6, which is actually two separate handbook
8  acknowledgements that you signed.  That is your signature
9  at the bottom of the first page, correct?
10  A.  Yes.
11  Q.  And turning to the second page, which is Bates
12  numbered 8983.  That is your signature, correct?
13  A.  Yes.
14  Q.  And do you recall receiving the handbook on February
15  24, 2010?
16  A.  Yes.
17  Q.  And do you recall receiving it again on October 22,
18  2010?
19  A.  The handbook?
20  Q.  Yes.
21  A.  Yes.
22  Q.  Do you remember why it is that the company gave you a
23  handbook and orientat on materials a second time?
24  A.  Yes.
25  Q.  Why?

11 (Pages 38 to 41)

## Page 42

1    A.   To look over it and read it.

2    Q.   Do you know why they did that?

3    A.   No.

4    Q.   Let's look at the acknowledgement.  Start on page 1.

5  They're the same.  I hereby acknowledge that I have both

6  received and read a copy of my facility's handbook.

7        Is that true that you received it and read t?

8    A.   Yes.

9    Q.   And you further acknowledge that you understood t

10  was your responsibility to make sure that you fully

11  comprehend the handbook, right?

12    A.   Yes.

13    Q.   And you understood that your supervisor or the

14  administrative personnel could answer any quest ons you

15  had about the content in the handbook, right?

16    A.   Yes.

17    Q.   And you agreed to consider the handbook and employee

18  code of conduct and to abide by all the policies,

19  procedures and guidelines contained in the handbook,

20  right?

21    A.   Yes.

22    Q.   And those same agreements you reconfirmed your

23  agreement on October 22, 2010, right?

24    A.   Yes.

25        (Defendant's Exhib t 7 was marked.)

## Page 43

1    Q.   You've been handed what's been marked as Defendant's

2  Exhibit Number 7, which is the Spring Creek Health & Rehab

3  handbook that your counsel produced to us.  Do you

4  recognize this document?

5    A.   Yes.

6    Q.   Is this the document that you received when you

7  signed the acknowledgement of the handbook receipt?

8    A.   Yes.

9    Q.   This is the document that you reviewed, correct?

10    A.   Yes.

11    Q.   Let's look at page 4 of the handbook.  Look at the

12  bottom and you see the page numbers?

13    A.   Yes.

14    Q.   You see where  t says, Employees are required to

15  ab de by the facil ty's code of non-retaliation wh ch is

16  as follows?

17    A.   Yes.

18    Q.   This facility and its employees take seriously all

19  good faith reports of possible non-compliance.  Anonymous

20  reporting is permitted.

21        D d you understand that you could make an anonymous

22  complaint?

23    A.   Yes.

24    Q.   It says, We will tolerate no retaliation against any

25  employee or other person who reports suspected misconduct

## Page 44

1  in conformity with the facility compliance program and

2  applicable law.

3        So that's the same concept we talked about before,

4  that there would be no adverse employment action taken

5  against somebody who had a good faith complaint?

6    A.   Okay.

7    Q.   Did you understand that?

8    A.   Yes.

9    Q.   Any employee dishonesty, misconduct or fraud which

10  you believe in good faith is a violation of the compliance

11  requirements or applicable law shall be reported to the

12  facility administrator/compliance officer in the manner

13  required by facility policy.

14        Did you understand that?

15    A.   Yes.

16    Q.   So you knew that if there was any kind of violation

17  of law, that you had to go to the facility administrator,

18  correct?

19    A.   Correct.

20    Q.   And we looked before that the facility administrator

21  is defined as the compliance officer, correct?

22    A.   Correct.

23    Q.   Look at page 6, where it says, Inservice staff

24  meeting.  Do you see that?

25    A.   Yes.

## Page 45

1    Q.   You understood that employees who attended inserv ce

2  staff meetings were paid for those meetings, correct?

3    A.   Yes.

4    Q.   And you were paid for the inserv ces staff meetings

5  you attended, correct?

6    A.   Yes.

7    Q.   Look at page 7, the department head and supervisor's

8  responsibilities.  You understood that the department head

9  had the responsibility for planning the work schedule,

10  ensuring the quality of work, and prov ding you w th

11  whatever assistance you may need for that department,

12  right?

13    A.   Yes.

14    Q.   Looking at the next paragraph.  D d you receive a

15  departmental orientation?  It says, Your department head

16  or immediate supervisor will conduct your departmental

17  orientation.

18        Do you recall receiving a departmental orientation

19  specific to nursing?

20    A.   No.

21    Q.   Who advised you of your work performance?

22    A.   What do you mean advised?

23    Q.   If there was an issue with your work performance, who

24  would raise that issue with you?

25    A.   The DON or ADON.

## Page 46

1  Q.   The ADON or the DON or both?

2  A.   Both.

3  Q.   Okay.

4  A.   One or the other, sometimes both.

5  Q.   Who would complete your annual performance evaluation

6  with you?

7  A.   The DON.

8  Q.   The DON?

9  A.   Yes.

10  Q.   Was there anybody else involved in evaluating your

11  performance other than the DON or ADON?

12  A.   No.

13  Q.   What about the LPNs, did they have any role in

14  evaluating your performance?

15  A.   Yes, they do.

16  Q.   Anyone else?

17  A.   No.

18  Q.   And who did you say set your work schedule?

19  A.   ADON.

20  Q.   Other than the ADON, was there anyone else that set

21  your work schedule?

22  A.   No, not that I'm aware of.

23  Q.   Who is it that would determine your rate of pay and

24  whether you would get a pay raise?

25  A.   The administrator.

## Page 47

1  Q.   Anyone else other than the administrator that would

2  determine your rate of pay?

3  A.   No.

4  Q.   Turn to page 10 under, Work schedule.  Do you see

5  that?

6  A.   Yes.

7  Q.   The handbook says, Each department of the Care Center

8  has its own shift times, which will be posted.

9       Do you recall schedules being posted in each

10  department?

11  A.   Yes.

12  Q.   And I guess you would have seen the schedule for the

13  nursing department, right, when you were working there?

14  A.   Yes.

15  Q.   Did you see any other department schedules posted?

16  A.   No.

17  Q.   Do you know anything about any other department

18  shifts?

19  A.   No.

20  Q.   Okay.  Turn to page 14.  And what we're looking here

21  at is the grounds for immediate dismissal.  Did you

22  understand that verbal or physical abuse of anyone while

23  at the center was grounds for immediate dismissal?

24  A.   Yes.

25  Q.   And did you understand that acting or speaking in a

## Page 48

1  rude, disrespectful or offensive manner to anyone while at

2  the center was grounds for immediate dismissal?

3  A.   Yes, I did.

4  Q.   Okay.  Did you understand, looking at number 9, that

5  acts in disregard or violation of facility policies was

6  grounds for immediate dismissal?

7  A.   Yes.

8  Q.   And did you understand that falsification of hours is

9  grounds for immediate dismissal, number 15?

10  A.   Yes.

11  Q.   Turn to page 24.

12  A.   24?

13  Q.   Yes.  Do you see the meal policy there?

14  A.   Yes.

15  Q.   Did you understand that the facility required you to

16  take a meal break during each shift that you worked?

17  A.   That I was required to take one?

18  Q.   Yes.

19  A.   Yes.

20  Q.   And you understood that you were to be provided an

21  undisturbed meal break, which can be taken on or off the

22  premises, correct?

23  A.   Yes.

24  Q.   And did you take advantage of the meal ticket

25  program?

## Page 49

1  A.   No.

2  Q.   Was there a meal ticket program?

3  A.   No.

4  Q.   Look at page 26.  Recording of time worked.  All

5  employees must record their own time worked by the use of

6  the time clock (or time sheets provided in certain

7  instances).

8       You understood that, right?

9  A.   Yes.

10  Q.   And that nobody could punch in for you, correct?

11  A.   Yes.

12  Q.   And at the end of that paragraph it says, The actual

13  punch times should be recorded on the staffing logs, as

14  state calculation methods require to-the-minute

15  monitoring.

16       Did you understand that?

17  A.   Yes.

18  Q.   And did you sign staffing logs with your accurate

19  start and end times?

20  A.   Yes.

21  Q.   And just to make sure that we're on the same page.

22  There was a staffing log for each day of work, correct?

23  A.   Yes.

24  Q.   And you would sign your name, position and the floor

25  that you were going to work on, right?

**BUSHMAN COURT REPORTING**
**501.372.5115**

Page 50

1    A.   Yes.
2    Q.   And you would identify the time that you arrived at
3    work, correct?
4    A.   Yes.
5    Q.   And the time that you left work, correct?
6    A.   Yes.
7    Q.   And those times were accurate, correct?
8    A.   On the paper.
9    Q.   Right.
10   A.   Correct.
11   Q.   And  t was actually a state requirement that those
12   times be accurate, correct?
13   A.   Correct.
14   Q.   Look at page 29.  Did you understand that your rate
15   of pay would be determined by a variety of factors, which
16   could include the facility's pay scale, job experience,
17   educat on, market standards and industry level financial
18   factors?
19   A.   Where are you reading from?
20   Q.   Under wage rates.
21   A.   Yes.
22   Q.   And did you understand that your wage increases could
23   be recommended by supervisors and/or the department heads
24   based on your performance evaluat ons?
25   A.   Yes.

Page 51

1    Q.   You understood that, right?
2    A.   Yes.
3    Q.   And you knew, and I think you've already testified to
4    this, that wage increases had to be approved by the
5    administrator before being subm tted to payroll, correct?
6    A.   Correct.
7    Q.   Okay.  So that confirms that it's the administrator
8    that's going to determine what your rate increase would
9    be, right?
10   A.   Yes.
11           (Defendant's Exhib t 8 was marked.)
12   Q.   You've been handed what's been marked as Defendant's
13   Exhibit Number 8, which is an addendum to the handbook
14   pertaining to a new meal pol cy.  Do you recall receiving
15   this?
16   A.   Yes.
17   Q.   And you received it on or about October 7, 2011,
18   right?
19   A.   Correct.
20   Q.   And that is your signature on the bottom?
21   A.   Yes.
22   Q.   Was this provided to you in connection w th a meeting
23   with other nursing staff?
24   A.   Yes.
25   Q.   And do you remember who it was that gave it to you?

Page 52

1    A.   Karen Buckner.  She gave us all of our documents.
2    Q.   And do you recall what you were told about the new
3    policy?
4    A.   I'm sorry?
5    Q.   Why don't we just go through it.  Let's look at the
6    first paragraph.  It says that your signature following
7    indicates that I have received a copy of, have read and
8    fully understand this policy and agree to abide by it
9    completely.  Is that true?
10   A.   Correct.
11   Q.   You d d review this, and you confirmed that you would
12   abide by it completely, correct?
13   A.   Correct.
14   Q.   And you agreed that you would speak w th the facil ty
15   personnel director, wh ch is Karen, right?
16   A.   Correct.
17   Q.   If you have any questions regarding the policy,
18   right?
19   A.   Correct.
20   Q.   And you understood that  t would be -- the
21   acknowledgement would be placed in your file as proof of
22   receipt and acceptance of the policy, right?
23   A.   Correct.
24   Q.   Let's look at the language.  You understood that the
25   company policy was to provide you with a meal break that

Page 53

1    was undisturbed, and at least 30 minutes, that could be
2    taken on or off the premises, right?
3    A.   Correct.
4    Q.   Now, did you understand -- you see under the first
5    bullet point, Direct care staff are expected to take a 30
6    minute lunch.  This results in a 7.5 hour shift.
7           You knew that, right?
8    A.   Correct.
9    Q.   So your shift was an 8 hour shift, with the
10   expectation that you would take a 30 minute meal period
11   and be paid 7.5 hours, right?
12   A.   Correct.
13   Q.   What was your shift, was it day shift?
14   A.   Yes.
15   Q.   And that was 7:00 a.m. to 3:00 p.m.?
16   A.   Yes.
17   Q.   And you also understood, and we've talked about this
18   you had to clock out for your lunch if you left the
19   facility, right?
20   A.   Correct.
21   Q.   It says, You must sign out and back in on the
22   facility break log regardless of whether or not you leave
23   the facility grounds, right?
24   A.   Correct.
25   Q.   D d you, in fact, sign in and out on the facility

14  (Pages 50 to 53)

## Page 54

1  break logs when you took your meal periods?
2  A.  There was some I may have forgot.
3  Q.  The ones you signed, were they accurate?
4  A.  Correct.
5  Q.  It says, If you are unable to take your lunch break
6  and work the shift without a lunch, you must submit a time
7  adjustment form to payroll, properly completed and signed,
8  immediately following the shift.
9       Did you understand that policy?
10  A.  Yes.
11  Q.  And this was to be done in order to document and
12  verify that you were actually working and a lunch break
13  was not possible, right?
14  A.  Correct.
15  Q.  Once the document is received, the time could be
16  credit back to you, correct?
17  A.  Correct.
18  Q.  You understood this was the company's way of ensuring
19  that if somebody missed a meal period or had a meal period
20  interrupted, that they could report it and have a record
21  of it and be paid for it, right?
22  A.  Correct.
23  Q.  And you understood that if you didn't follow this
24  procedure, the company would not be able to determine that
25  you had a missed or interrupted meal period?

## Page 55

1  A.  Correct.
2  Q.  And And that's why they put this procedure in place,
3  right?
4       MS. JACKSON:  Objection to the form of
5  the question.  You can answer.
6  A.  Repeat it?
7  Q.  That's the reason that they put the procedure in
8  place, was so that they could confirm and know if somebody
9  had a missed or interrupted meal period, correct?
10       MS. JACKSON:  Objection.  But you can
11  answer.
12  A.  Correct.
13  Q.  Did you follow this process when you had a missed or
14  interrupted meal period?
15  A.  Yes.
16       (Defendant's Exhibit 9 was marked.)
17  Q.  You've been handed what's been marked as Defendant's
18  Exhibit Number 9, which is another general orientation
19  completion form.  And this, as we saw with the handbook, I
20  think you got it in February or March.  Let me just check.
21  It was February 2010.  And then again in October of 2010,
22  there was actually a second orientation in October of
23  2010, correct?
24  A.  Correct.
25  Q.  And you acknowledged at the bottom of the first page

## Page 56

1  of Exhibit 9, that you received training where necessary,
2  and fully understood all policies, procedures and
3  guidelines in each of the areas that were listed above,
4  right?
5  A.  Correct.
6  Q.  And you agreed again that you would abide by all
7  policies, procedures and guidelines as presented and
8  documented in the orientation, correct?
9  A.  Correct.
10  Q.  And turning to page 2.  Those policies that were
11  reviewed with you included the meal policy and recording
12  of hours worked policy, correct?
13  A.  Correct.
14  Q.  And that is your signature by the list of policies,
15  right?
16  A.  Yes.
17       (Defendant's Exhibit 10 was marked.)
18  Q.  You've been handed what's been marked as Defendant's
19  Exhibit Number 10, which is another acknowledgement form
20  acknowledging -- that's your signature, right?
21  A.  Correct.
22  Q.  And that also is dated October 8, 2010, right?
23  A.  Correct.
24  Q.  And if you look at the second page.  There's another
25  one, the same acknowledgement, but this one was received

## Page 57

1  on October 22, 2010, correct?
2  A.  Correct.
3  Q.  And do you recall why there were two separate
4  acknowledgements a few weeks apart?
5  A.  Do I know why?
6  Q.  Yes.
7  A.  No.  But I acknowledged that I did it.
8  Q.  Okay.  And what you acknowledged was that you
9  received training and agreed to comply with all policies
10  and procedures of Spring Creek Health, correct?
11  A.  Correct.
12  Q.  And that was expected as part of your continued
13  employment with the facility, right?
14  A.  Correct.
15  Q.  And you made that same acknowledgement on the 22nd,
16  right?
17  A.  Correct.
18       MR. SPINOLA:  Why don't we take a break
19  there for a minute.
20       MS. JACKSON:  Okay.
21       (A recess was had.)
22  Q.  (BY MR. SPINOLA)  Ms. Crow, you had an opportunity to
23  take a break and think about your testimony.  Is there
24  anything that you need to change or clarify about your
25  testimony so far today?

Page 58

1    A.   No.

2    Q.   And have you told me the truth so far today, to the

3    best of your ability?

4    A.   Yes.

5    Q.   What I want to do now is recap a couple of things to

6    make sure that we're on the same page.

7    A.   Okay.

8    Q.   And the questions I'm asking pertain to your entire

9    employment at Spring Creek, not Spring Creek Living

10   Center, but Spring Creek Rehab, the company you sued in

11   this case.  Okay?

12   A.   Yes.

13   Q.   For the time you were employed at Spring Creek,

14   you're not claiming that you performed any work before

15   clocking in for the day, right?

16   A.   Correct.

17   Q.   And you're not claiming that you performed any work

18   after clocking out for the day, correct?

19   A.   Correct.

20   Q.   And with respect to your meal periods, you're

21   acknowledging that any time you would have clocked out for

22   a meal period you would have left the facility, right?

23   A.   Correct.

24   Q.   And on those days you would have gotten your full,

25   uninterrupted meal period, right?

Page 59

1    A.   Correct.

2    Q.   And you have also testified, that you don't have any

3    ability to testify about any of the meal practices for

4    other employees other than yourself, correct?

5    A.   That's correct.

6    Q.   And that's also true for any of their work habits

7    around their punches, right?

8    A.   Yes, sir.

9    Q.   You can't talk about somebody else's practices for

10   punching in and punching out, right?

11   A.   Correct.

12            (Defendant's Exhibit 11 was marked.)

13   Q.   You've been handed what's been marked as Defendant's

14   Exhibit Number 11, which is your consent to join the

15   lawsuit, right?

16   A.   Correct.

17   Q.   Is that your signature on the bottom of the page?

18   A.   Yes.

19   Q.   And the document is dated May 15, 2012, correct?

20   A.   Correct.

21   Q.   Look at the top here where it says, Filed 5/17/2012,

22   correct?

23   A.   Correct.

24   Q.   Do you understand that your consent to join the

25   lawsuit was filed on May 17, 2012, right?

Page 60

1    A.   Correct.

2    Q.   And you understand, looking at the first line, that

3    you consented to join the lawsuit seeking overtime pay,

4    right?

5    A.   Correct.

6    Q.   And you understand that your claims are limited to

7    claims for overtime pay, correct?

8    A.   Repeat that?

9    Q.   You understand that the only claim that you have is

10   for overtime in this case, correct?

11   A.   Yes.

12            (Defendant's Exhibit 12 was marked.)

13   Q.   What I would like to do with Defendant's Exhibit

14   Number 12 is just go through what your rates of pay were

15   and how they changed.

16   A.   Okay.

17   Q.   We've talked about when you were first hired your

18   rate of pay was Redacted  right?

19   A.   Correct.

20   Q.   And that was March 1, 2010, right?

21   A.   Correct.

22   Q.   And that was set by the administrator --

23   A.   Correct.

24   Q.   -- of the facility Tracey, right?

25   A.   Correct.

Page 61

1    Q.   The next pay change -- well, let's back up.  How is

2    your math?

3    A.   It's okay.

4    Q.   What I want to do is come up with your overtime rate,

5    what that would be.  And you understood that overtime

6    would be if you worked more than 40 hours in a work week,

7    right?

8    A.   Correct.

9    Q.   So the overtime rate for Redacted  is what?

10   A.   Time and a half.

11   Q.   And that would be 9.2 times 1.5.

12   A.   Redacted .

13   Q.   Right.  So for the time that you earned Redacted your

14   overtime rate for any hour worked over 40 hours in a work

15   week would be Redacted , right?

16   A.   Correct.

17   Q.   Then it looks like on June 28th you got a promotion.

18   You were still a CNA, right?

19   A.   Correct.

20   Q.   Was it just an increase in pay?

21   A.   Correct.

22   Q.   And that was provided to you by Tracey?

23   A.   Correct.

24   Q.   And nobody else, right?

25   A.   Correct.

16  (Pages 58 to 61)

Page 62

1    Q.   And that increased your rate of pay to Redacte an hour,
2    right?
3    A.   Correct.
4    Q.   So the overtime rate at Redacte an hour would be Redacte,
5    right?
6    A.   Correct.
7    Q.   So from it looks like June 28, 2010 to March 7, 2011,
8    any hour worked over 40 hours in a work week would be Reda
9    right?
10   A.   Correct.
11   Q.   You know where I'm going next.  March 7, 2011 you had
12   another pay increase, pursuant to the annual evalual on,
13   that gave you an additional 20 cents.  So your new rate of
14   was Redacted , right?
15   A.   Correct.
16   Q.   And what is the overtime rate on Redacted ?
17   A.   Redacted
18   Q.   Right.  So from March 7, 2011 until your terminat on
19   date on December 19, 2011, any hour that you worked above
20   40 hours would have been paid at Redacted , right?
21   A.   Correct.
22   Q.   Let's talk a little bit about your practices, your
23   actual work.  You said your schedule was 7:00 a.m. to 3:00
24   p.m., right?
25   A.   Correct.

Page 63

1    Q.   And d d you understand that the company pol cy was
2    that you could clock in any time between 7 minutes before
3    your start time to 7 minutes after your start time,
4    without being cons dered late, right?
5    A.   I'm sorry.
6    Q.   Did you understand that there was a grace per od for
7    when you could clock in without being late?
8    A.   Yes.
9    Q.   What time d d you typ cally arrive at work, was it
10   right about 7:00?
11   A.   Yes.
12   Q.   Would you clock in on the time clock first?
13   A.   Yes.
14   Q.   And where was the time clock located?
15   A.   In the front of the building.
16   Q.   Not in the breakroom?
17   A.   No.
18   Q.   Was there only one time clock?
19   A.   Yes.
20   Q.   Was the time clock that first thing that you saw
21   basically when you come in?
22   A.   Yes.
23   Q.   And when did you sign the staffing log?
24   A.   Right after.
25   Q.   So you clock in and then sign?

Page 64

1    A.   Yes.  That's where your assignments were.
2    Q.   Okay.  The staffing log, where was that, where was it
3    located?
4    A.   The nurse's stat on.
5    Q.   So you'd go to the nurse's stat on?
6    A.   Yes.
7    Q.   Sign the staffing log, right?
8    A.   Yes.
9    Q.   And you already testified that you always signed that
10   accurately, right?
11   A.   Correct.
12   Q.   The accurate time.  And who would be at the nurse's
13   station, is there somebody that supervised that process?
14   A.   No.
15   Q.   You d d t on your own?
16   A.   Yes.
17   Q.   And then you said that your assignment would be there
18   as well?
19   A.   Yes.
20   Q.   What does that mean?
21   A.   Wh ch hall you would be working that day.
22   Q.   Which halls d d you work on?
23   A.   I've worked every hall.  They would put me on any
24   hall.  I didn't have an assigned hall.
25   Q.   How many halls were there?

Page 65

1    A.   Four.
2    Q.   100, 200, 300 and 400?
3    A.   Yes.
4    Q.   What was the 100 hall?
5    A.   The Medicaid hall.
6    Q.   What does that mean?
7    A.   Medicaid patients only.
8    Q.   And what is the difference between a Medicaid patient
9    and a non-Med ca d patient?
10   A.   A Med ca d patient has -- that's their insurance, and
11   private pay they pay out of pocket.
12   Q.   Is there any difference in their condition compared
13   to a non-Medicaid patient?
14   A.   Not that I'm aware of.
15   Q.   What is the 200 hall?
16   A.   The 100 hall is Medicaid, and 2, 3 and 4 are the
17   other patients.
18   Q.   That were non-Medicaid?
19   A.   Non-Med ca d.
20   Q.   Was there any hall ded cated specifically to rehab or
21   anything like that?
22   A.   No.
23   Q.   Okay.  Were there any differences in the number of
24   patients on each hall?
25   A.   Yes.

17 (Pages 62 to 65)

## Page 66

1  Q.  Wh ch was the heaviest hall?
2  A.  300.
3  Q.  Was that consistent throughout your employment?
4  A.  No, it changed.  Sometimes 400.
5  Q.  And that means there were more patients there?
6  A.  Yes.
7  Q.  And was it consistent that either 300 or 400 were the
8  heavier halls throughout your employment?
9  A.  Yes.
10  Q.  What was the lightest hall?
11  A.  100.
12  Q.  Is that consistent throughout your employment?
13  A.  Yes.
14  Q.  Do you remember how many patients were on 100?
15  A.  No.
16  Q.  And was 200 kind of in the middle?
17  A.  Yes.
18  Q.  Second lightest or --
19  A.  Yes.
20  Q.  -- third heaviest?
21  A.  Yes.  It was depending on how many res dents moved i
22  and moved out.
23  Q.  All right.  So it typically went 100 and 200 are the
24  lighter halls, and 300 and 400 are the heavier halls,
25  correct?

## Page 67

1  A.  Yes.
2  Q.  Tell me about the assignment sheet that you were
3  looking at behind the nurse's station, what did that look
4  like?
5  A.  It had each hall like the names of the employees, and
6  then the name and what hall you'd be on.  And then the
7  nurses were at the top of which hall they would be
8  supervising.
9  Q.  What else did it have on it?
10  A.  Sometimes it would have their lunch written down on
11  it, but not most of the time though.
12  Q.  Was that in handwriting or was it printed?
13  A.  Handwriting.
14  Q.  And how was the lunch indicated?
15  A.  Like 1, 2, 3, 4 and you would have a number by your
16  name.
17  Q.  And what did the 1, 2, 3, 4 mean?
18  A.  Like who went first, second, third or fourth.
19  Q.  And where were those lunch times listed?
20  A.  At the bottom of the page.
21  Q.  So if you were a 1, then you were going to lunch
22  before anyone else?
23  A.  Yes.
24  Q.  And if you were a 4 you were going to lunch last,
25  right?

## Page 68

1  A.  Correct.
2  Q.  So that's staggered lunches, right?
3  A.  Yes.
4  Q.  Not everybody is going at the same time?
5  A.  Correct.
6  Q.  The staffing of each hall, how many CNAs were on the
7  100 hall?
8  A.  Two.
9  Q.  Was that consistent?
10  A.  Yes.
11  Q.  What about 200?
12  A.  There was two on each hall.
13  Q.  And that was consistent throughout your employment?
14  A.  Yes.
15  Q.  Okay.  Who prepared the schedule that would be behind
16  the nurse's station?
17  A.  The ADON.
18  Q.  ADON?
19  A.  Yes.
20  Q.  And how did the ADON determine who would go to what
21  hall, which CNAs would go to wh ch hall?
22  A.  I don't know how she determined that.
23  Q.  How d d --
24  A.  Sometimes I guess if someone wanted a hall they would
25  put them on there.  And other times they just put anyone

## Page 69

1  where they needed to be.
2  Q.  Okay.  Was the scheduling of lunches ever performed
3  by a scheduler?  Do you remember if somebody had a role a
4  a scheduler?
5  A.  Yes.
6  Q.  Do you remember who that was, or a staffing
7  coordinator?
8  A.  I think Michelle Higgins was at a time, and I think
9  Joe Brinsfield.
10  Q.  Do you recall talking to Joe at the beginning of your
11  shift asking to be scheduled with Amanda Hodges for
12  lunches?
13  A.  No.
14  Q.  You don't ever recall asking to have your number
15  sw tched?
16  A.  No.
17  Q.  D d you ever switch your -- try to get your hall
18  sw tched to work with Amanda Hodges?
19  A.  No.
20  Q.  Do you know who Amanda Hodges is?
21  A.  Yes.
22  Q.  Who is that?
23  A.  An employee, a prev ous employee from Spring Creek.
24  Q.  Was she also a CNA?
25  A.  Yes.

BUSHMAN COURT REPORTING
501.372.5115

Page 70

1    Q.   Did you have lunches with her?
2    A.   When I get one, I have had lunches with her.
3    Q.   Okay.  If there was only one CNA on hall 1, how did
4    that CNA take a meal break?
5    A.   I don't know.  I was never down there by myself.  I
6    guess a nurse or another CNA would watch their hall for
7    them.
8    Q.   Okay.  In most of 2010 you were clocking in and out
9    for lunch, correct?
10   A.   No.
11   Q.   You don't believe that's true?
12   A.   No.  I was told it was already taken out unless you
13   were going to leave the facility, and then you have to
14   clock out.
15   Q.   Right.  That's what I'm saying.  In most of 2010 you
16   left the facility and clocked out for lunch, right?
17   A.   No.
18   Q.   So you're saying you did not clock out for lunch most
19   of 2010?
20   A.   No.
21             (Defendant's Exhibit 13 was marked.)
22   Q.   I want to try to keep this together.  It's not really
23   -- actually, never mind.  It's stapled.
24        There's going to be something else I'll give you
25   that's not together, and do your best to try to keep it

Page 71

1    together.  We had a night here the other night where
2    another witness scrambled all the documents up, and it was
3    not pleasant.  So we don't have to worry about that yet,
4    but there'll be some documents that we keep out for a
5    while.
6    A.   Okay.
7    Q.   All right.  You've been handed what's been marked as
8    Defendant's Exhibit Number 13.  And what this is is a
9    report of your punches and meal periods.  Okay?
10   A.   Okay.
11   Q.   And this is actually -- you've seen these before,
12   because this is what you would -- you would certify when
13   you're certifying your time.
14        And let's talk about that for a minute?
15   A.   Okay.
16   Q.   Let's actually finish how you would work.
17        So once you got your assignment, you would then go to
18   the floor that you were assigned?
19   A.   No, to the cafeteria.
20   Q.   The cafeteria.
21        And what would you do there?
22   A.   Pass meal trays and assist with residents eating.
23   Q.   Okay.  Then what?
24   A.   Would observe and make sure that they don't choke and
25   things like that and refill their refreshments if they

Page 72

1    needed it.  And after the cafeteria, get them ready for
2    activity or take to the room and do rounds.
3    Q.   Okay.  Then what?
4    A.   Answer call lights, hydrate -- the CNAs answer call
5    lights.  I sa d that.  Do rounds every two hours until
6    lunch time and take them to their rehab therapy they
7    needed and then get them ready for lunch and take them to
8    the lunchroom.
9    Q.   Okay.  Then what?
10   A.   V tal signs, showers.  That'd be before lunch.  And
11   then finish showers and stuff after lunch.
12   Q.   Okay.  Then what?
13   A.   And then rounds again.
14   Q.   Then?
15   A.   And then it would be like the end of the day, and I
16   would clock out.
17   Q.   So at the end of the day, then you'd clock out, and
18   then would you clock out and then sign the staffing log or
19   sign the staffing log and then clock out?
20   A.   Sign the staffing log and then clock out or either
21   the other way.
22   Q.   All right.  And then you would leave?
23   A.   Yes.
24   Q.   Okay.  And when you were taking meal breaks, you
25   would take them somewhere in between your job duties in

Page 73

1    the day, right?
2    A.   During what?
3    Q.   If you were taking a meal break, you would take it
4    somewhere in between the duties that you had described
5    right?
6    A.   When I take a meal break --
7    Q.   Would you take a meal break at the time you were
8    assigned the meal break on the break log?
9    A.   No.
10   Q.   Okay.  When did you take your meal breaks?
11   A.   If I would get one, I would take them whenever I
12   could.  It'd be before the residents went to lunch.
13   Q.   Okay.  All right.  Let's take a look at Exhibit
14   Number 13.
15        You were also required to certify the accuracy of
16   your time, correct?
17   A.   Correct.
18   Q.   And that was something that we reviewed in the
19   handbook, right?
20   A.   Correct.
21   Q.   And, also, in the -- the time keeping policy, right?
22   A.   Correct.
23   Q.   And you understood that by certifying that your time
24   card was correct, the company was relying on you to tell
25   them that your time was correct, right?

## Page 74

1    A.   Correct.

2    Q.   And when you would sign Exhibit 13, one of these

3    pages, were you in fact certifying the accuracy of your

4    time?

5    A.   Correct, but -- I mean -- yes.

6    Q.   Now, you had said you didn't think you were clocking

7    in and out for lunch.

8    A.   Uh-huh.

9    Q.   Let's look at some of these.  Start w th where it

10   says RHC11749 at the bottom, about April 20, 2010.  Do you

11   see that?

12   A.   April 20th?

13   Q.   Uh-huh?

14   A.   Yes.

15   Q.   Do you see that you have a clock in time of 7:00,

16   right?

17   A.   Correct.

18   Q.   The clock out time at 11:30.  Do you see that?

19   A.   Correct.

20   Q.   You clocked back in at noon, and then clocked out for

21   the day at 3:00, right?

22   A.   Right.

23   Q.   So you clocked out for a half hour for lunch, right?

24   A.   It looks like I did.

25   Q.   And you see under the deductions column there, and it

## Page 75

1    says zero?

2    A.   Yes.

3    Q.   Because you clocked out for lunch, right?

4    A.   Correct.

5    Q.   Now, the following day, 7:15 to 7:00 -- 7:00 a.m. to

6    3:00.  You clocked in at 7:00, you clocked out at 3:00,

7    but you d d not clock out for lunch, right?

8    A.   Correct.

9    Q.   And you see the .5 there?

10   A.   Correct.

11   Q.   That's where the meal deduction would have applied,

12   right?

13   A.   Correct.

14   Q.   So because you didn't clock out, there was 30 minutes

15   deducted from your pay?

16   A.   Correct.

17   Q.   Based on the assumpt on that you were taking your

18   meal period, right?

19   A.   Correct.

20   Q.   So on 4/22, again, you did not clock out and there

21   was a deduction, right?

22   A.   Yes.

23   Q.   4/23, you d dn't work long enough of a shift for

24   there to be a deduction, because it was only an hour and

25   25 here means 15 minutes.

## Page 76

1    A.   Uh-huh.

2    Q.   So you worked for an hour and 15 minutes, right?

3    From 7:00 to 8:15, right?

4    A.   Correct.

5    Q.   The next week 4/26, in at 7:00, out at 3:15.  No

6    clock out for lunch, right?

7    A.   Correct.

8    Q.   The auto deduct on applied, right?

9    A.   Yes.

10   Q.   The same thing with 4/27, clocked in at 7:00 out at

11   3:00, right?  No clock out for lunch?

12   A.   Correct.

13   Q.   Okay.  Now, on the 29th you clocked out 7:00 -- or

14   clocked in at 7:00, right?

15   A.   Correct.

16   Q.   Clocked out at 11:30 for lunch, right?  You clocked

17   back in at noon, for a 30 minute lunch there, right?

18   A.   Correct.

19   Q.   And it looks like this was a double shift?

20   A.   Yes.

21   Q.   So there was also a clock out at 3 o'clock to 3:30,

22   right?  That was your second lunch, right?

23   A.   Correct.

24   Q.   And then you finally clocked out for the night at

25   11:15, right?

## Page 77

1    A.   Correct.

2    Q.   And there's no deduct ons there, because you had

3    clocked out for both lunches, right?

4    A.   Correct.

5    Q.   Now, follow with me the next several weeks.  4/30,

6    you clocked out -- well, 4/30, actually, there was no

7    clock out but no deduction, e ther.  Do you know why that

8    would be?

9    A.   No.

10   Q.   Okay.  I'll come back to that.

11      On the 2nd, May 2nd, you clocked in at 7:00 in the

12   morning, clocked out at 11:30, you clocked back in at

13   12:15 for a 45 minute lunch, right?

14   A.   Correct.

15   Q.   And there was no deduction there.

16      So let's go to the next pay period.  On this pay

17   period of the one, two, three, four, five, six, seven,

18   eight, nine days, there was only three deductions, right?

19   See deductions .5?

20   A.   Yes.

21   Q.   And on the other days, you can see you clocking out

22   for 30 minutes for lunch, right? 5/8, 5/9, 5/10, 5/11,

23   5/15 and 5/16, right?

24   A.   Yes.

25   Q.   You got your meal per ods all those days, correct?

20  (Pages 74 to 77)

## Page 78

1    A.   Yes.

2    Q.   All right.  Let's look at the next one.  On this pay

3  period there was a deducton of half hour, 15 minutes,

4  then no deduction, no deduction, 15 minutes and then three

5  deductions.  So t looks like on two days, during this

6  work week, you had clocked out for lunch on May 22nd for

7  45 minutes, right?  From 11:45 to 12:30, right?

8    A.   May when?

9    Q.   22nd?

10    A.   For how long?

11    Q.   11:45 to 12:30.

12    A.   That's a long time.

13    Q.   45 minutes.

14    A.   Huh.

15    Q.   And then, also, on May 23rd, from 11:30 to 12:00, 30

16  minutes, correct?

17    A.   Right.

18    Q.   So you would have gotten meal periods on those days,

19  right?

20    A.   Yes, or -- there's sometimes, like I don't remember

21  ever really clocking out, but --

22    Q.   Let's keep looking.  Let's look at the next pay

23  period.

24        And these are all signed by you, correct?

25    A.   Correct.

## Page 79

1    Q.   Signed that you're certifying that they're accurate,

2  right?

3    A.   Correct.

4    Q.   So look at the pay period starting on 6/1/2010?  And

5  there are one, two, three, four, five days where you

6  clocked out for meal periods, right?  6/3 from 11:00 to

7  11:30; 6/4, from 11:30 to 12:00; 6/9 from 11:30 to 12:00;

8  6/10 from 11:45 to 12:15, correct?

9    A.   No, I don't remember clocking out like all this time.

10    Q.   Okay.  How would you explain this?

11    A.   I have no idea.

12    Q.   You were certifying that your time was accurate,

13  correct?

14    A.   No, I was just told to sign -- sign this was the

15  hours, yes.  But I wasn't told to look at my time outs

16  when I signed this.

17    Q.   Okay.  So when you testified before that you

18  understood when you were certifying your time that you're

19  certifying accurate time, are you changing that testimony?

20    A.   No.

21    Q.   And do you see where it says, above your signature, I

22  certify the above time card is correct?

23    A.   Correct.

24    Q.   And you understood that if t wasn't correct, you

25  were to notify somebody so that t could be adjusted,

## Page 80

1  correct?

2    A.   Correct.

3    Q.   And when you punched in, d d you use your finger?

4    A.   Correct.

5    Q.   So the time clock was taking your fingerprint to

6  determine that t was you, correct?

7    A.   Correct.

8    Q.   There's not anybody else that has your fingerprint,

9  is there?

10    A.   No.

11    Q.   And so there's nobody else that could have clocked

12  out for you, correct?

13    A.   Correct.

14    Q.   All right.  So does this refresh your recollection

15  that you were taking meal periods off campus during these

16  days?

17    A.   No.

18    Q.   Do you have any explanation for how --

19    A.   Well, I don't know if I was, but I don't remember

20  like leaving this entire time.  There's sometimes -- like

21  I wasn't aware of the, like, clock -- well, I guess I was,

22  because I read t in the handbook.  But, yes, I guess it's

23  correct.

24    Q.   And you had testified before that any time you would

25  clock out on the time clock, that meant you left the

## Page 81

1  facility and got your full lunch.  You remember that

2  testimony, right?

3    A.   That's correct.

4    Q.   You're not changing that, correct?

5    A.   Right.

6    Q.   Okay.  So on these days you -- the days where there

7  was no deduction and punch outs, you were taking your

8  meals, right?

9    A.   Repeat the quest on?

10    Q.   On the days like 6/3/2010 --

11    A.   6/8?

12    Q.   6/3.

13    A.   6/3.

14    Q.   2010, when it says you clocked out at 11:00, clocked

15  back in at 11:30, you took a meal per od that day?

16    A.   No.  I mean --

17    Q.   When you -- I just want to make sure.  You told me

18  you're not changing your testimony.  So previously you had

19  testified that, if you were clocking out for a meal

20  period, that means you were leaving the facil ty, and you

21  would never clock out unless you left the facility; that's

22  true, correct?

23    A.   That's true.

24    Q.   Okay.  And here on 6/3 -- and we also know that the

25  only person that clock out is you with your fingerprint,

21 (Pages 78 to 81)

Page 82

1  right?
2  A.  Correct.
3  Q.  And there's a clock out here at 11:00 o'clock and a
4  clock back in by you at 11:30, right?
5  A.  Correct.
6  Q.  So you took a meal period on that day, correct?
7  A.  I guess so.
8  Q.  And on these other days.
9       Now, it's going to change in 2011, it looks like --
10  A.  Yes.
11  Q.  -- it's different.  But let's just stick with 2010
12  for now.  Maybe you're thinking about 2011.
13       But continuing along with 2010, go to 6/14?
14  A.  6/14?
15  Q.  Yeah, the next week.
16  A.  Okay.
17  Q.  2010.  You're looking at 2011.
18  A.  I'm just looking through.  It says like everyday I
19  clocked out.
20  Q.  Okay.
21  A.  I remember getting always in trouble for always
22  forgetting to clock out.  And it's just strange how like I
23  always clocked out.
24  Q.  That was at the end of your shift, right?
25  A.  What was the end of my shift?

Page 83

1  Q.  You would get in trouble for not clocking out at the
2  end of your shift, correct?
3  A.  I've gotten in trouble for clocking out before then.
4  Q.  And when that happened, you'd fill out a time sheet
5  adjustment form, right?
6  A.  Yes, and I was told not to do it again, because I
7  needed my lunch and not to go over anything.
8  Q.  Okay.  So when you filled out a time sheet adjustment
9  form saying what time you would --
10  A.  Clock in and out.
11  Q.  -- clock in and out, then they would make that
12  adjustment onto your time, correct?
13  A.  Yes.
14  Q.  Okay.
15  A.  Well, I don't ever remember -- the only time I made
16  time adjustment is when I d d not get my lunch.
17  Q.  So you did make time sheet adjustments when you
18  missed your lunch?
19  A.  A couple.
20  Q.  All right.  So on 6/15 there's a clock out at 11:45
21  and clock back in at 12:15, right?
22  A.  Correct.
23  Q.  So you would have gotten your meal period that day,
24  right?
25  A.  Yes.

Page 84

1  Q.  On 6/21 you clocked out at 11:30 and clocked back in
2  at 12:00.  You got your meal per od that day, correct?
3  A.  Correct.
4  Q.  6/22, clock out at 11:30 -- or, excuse me.  You clock
5  out at 11:00 and clocked back in at 11:30 for a 30 minute
6  lunch, right?
7  A.  Correct.
8  Q.  And that's your signature at the bottom of the page
9  certifying the accuracy of your time, right?
10  A.  Yes.
11  Q.  All right.  Looking at the next pay period, starting
12  6/28, there was a clock out on 6/28 at 11:00 o'clock and
13  you clocked back in at 11:45, correct?
14  A.  Correct.
15  Q.  A 45 minute meal period, correct?
16  A.  Correct.
17  Q.  On July 4th there was a -- July 3rd was not long
18  enough of a shift to incur a meal deduction, correct?
19  A.  What time?
20  Q.  Four hours and 25 minutes.
21  A.  Correct.
22  Q.  Or four hours and 15 minutes.
23       On July 4th, you clocked out at 11:00 and you clocked
24  back in 11:30 for a half hour lunch, correct?
25  A.  Correct.

Page 85

1  Q.  You got your meal period on July 4th, correct?
2  A.  Correct.
3  Q.  And there was deduct on that applied on July 4th,
4  right?
5  A.  Correct.
6  Q.  On July 9th, you clocked out at 11:15 and you clocked
7  back in at 11:45 for a 30 minute meal period, correct?
8  A.  What day?
9  Q.  July 9th.
10  A.  Correct.
11  Q.  And so you got a 30 minute meal period that day,
12  correct?
13  A.  Correct.
14  Q.  And there was no deduct ons applied to you on that
15  day, right?
16  A.  Correct.
17  Q.  The same thing for July 10th, you clocked out at
18  11:45 and you clocked back in at 12:15, right?
19  A.  Correct.
20  Q.  For a 30 minute meal period with no deduct on,
21  correct?
22  A.  Correct.
23  Q.  Then you signed the bottom of this certification --
24  A.  Correct.
25  Q.  -- time certification certifying that the time card

22 (Pages 82 to 85)

Page 86

1    is correct, right?
2    A.   Correct.
3    Q.   All right.
4            MS. JACKSON:  Angelo, let's take a break.
5            MR. SPINOLA:  All right.
6            (A recess was had.)
7    Q.   (BY MR. SPINOLA)  Continuing down the list here for
8    July 13, 2010, days where there's no deduction applied at
9    all were July 19th, 21st and 22nd, correct?
10   A.   Correct.
11   Q.   And on each of those days, there was a 30 minute mea
12   period, correct?
13   A.   Correct.
14   Q.   And you certified the accuracy of this time card by
15   signing it, correct?
16   A.   Correct.
17   Q.   Okay.  On the next week starting on 7/13, looks like
18   there were four days where there was no meal deduction
19   applied at all, and on those days it looks like 7/19,
20   7/21, 7/22 and 7/25, right?
21   A.   Correct.
22   Q.   And on each of these days, you had punched out for 30
23   minutes for a meal period, correct?
24   A.   Correct.
25   Q.   That would have been away from work?

Page 87

1    A.   Correct.
2    Q.   And then look at the next one?
3        On the week of 7/26 through -- I should say pay
4    period, because  t's a two week pay period, right?
5    A.   Correct.
6    Q.   From 7/26 to 8/8, everyday was a punch out for meals,
7    right?
8    A.   Correct.
9    Q.   And they were either 30 or 45 minutes long, correct?
10   A.   Correct.
11   Q.   And you certified that the time card was right,
12   correct?
13   A.   Correct.
14   Q.   So on this pay period, you would have received all
15   your meal per ods, right?
16   A.   Correct.
17   Q.   On the next one, which is 8/9 through 8/21, there
18   were no deductions.  You had punched out 30 minutes on
19   8/9, 30 minutes on 8/12, 30 minutes on 8/13, 30 minutes on
20   8/14, 30 minutes on 8/15, 30 minutes on 8/18.  8/19
21   there's not a punch out, but there's also not a deduct on,
22   if you look at --
23   A.   8/19?
24   Q.   8/19, see  t?
25   A.   Uh-huh.

Page 88

1    Q.   So you clocked in at 7:00 and you clocked out at
2    4:00, right?
3    A.   Yes.
4    Q.   So that's a 9 hour shift, right?
5    A.   Correct.
6    Q.   And you see that under hours you got the full 9 hours
7    with no deduction, right?
8    A.   Correct.
9    Q.   Do you have any  dea why no deduction applied there?
10   A.   No idea.
11   Q.   All right.  And then 8/20 there's a 45 minute clock
12   out, correct?
13   A.   What date: 8/20?
14   Q.   Yeah.
15   A.   Correct.
16   Q.   Okay.  So you certified the accuracy of this time
17   record as well, correct?
18   A.   Right.
19   Q.   Okay.  And you received your meal periods on that pay
20   per od, right?
21   A.   Correct.
22   Q.   All right.  Now, let's look at the week of 8/24?
23       On the week of 8/24, there are punch outs on -- or,
24   excuse me, the pay per od of 8/24 to 9/5/2010, you punched
25   out for meal periods of either 30 or 45 minutes except for

Page 89

1    on 8/31, where there was a half hour meal deduction,
2    right?
3    A.   Correct.
4    Q.   So that's one, two, three, four, five, six, seven of
5    the eight shifts where you worked five hours or more that
6    you had punched out for your meal per od, right?
7    A.   Which days?
8    Q.   So 8/24 was a 30 minute, from 11:00 to 11:30, right?
9    A.   Yes.
10   Q.   You got your meal period that day, right?
11   A.   Correct.
12   Q.   8/25 was 10:30 to 11:00.  You got your meal period
13   that day, correct?
14   A.   Correct.
15   Q.   8/26 you didn't work long enough of a shift to have a
16   meal period or a deduction.  You worked three and a half
17   hours and there's no deduct on, right?
18   A.   Correct.
19   Q.   8/27, you clocked out at 11:30, you clocked back in
20   at noon for a 30 minute meal per od, right?
21   A.   Correct.
22   Q.   8/30 you clocked out at 11:15 and clocked back in at
23   noon for a 45 minute meal period, right?
24   A.   Correct.
25   Q.   8/31 is the day where there's no clock out for a meal

23 (Pages 86 to 89)

## Page 90

1  per od, 7:30 to 3 o'clock.  Clocked in at 7:30 and clocked

2  out at 3:00?

3  A.  I guess I didn't get one.

4  Q.  So you think the one -- one day here that you d dn't

5  clock out would be one that you missed?

6  A.  Must have, because I've clocked out every other day,

7  and I still got deducted.

8  Q.  Or it could mean that you didn't take your meal

9  per od off campus, right, because you would only clock out

10  if you were leaving the facil ty, correct?

11  A.  Correct.

12  Q.  All right.  Is there any way for you to tell, s tting

13  here now, whether you took any meal period at the facility

14  or didn't get one?

15  A.  Do what?

16  Q.  Would you have any -- is there any way for you to sit

17  here today, just looking at this record, and know this

18  would have been a day that I took a lunch at the facility

19  versus I didn't get a lunch; you can't tell one way or the

20  other, right?

21  A.  It was probably that I d dn't.

22  Q.  Well, how do you know?

23  A.  Because I didn't clock out, when I've made it a

24  routine to clock out.

25  Q.  Do you remember -- do you remember what you were

## Page 91

1  doing on August 31st?

2  A.  Working.

3  Q.  Do you recall the day?

4  A.  No.

5  Q.  Do you remember any patients you saw?

6  A.  No.

7  Q.  And you did take meal periods that were at the

8  facil ty, correct?

9  A.  I didn't take meal -- I didn't take a meal.  Like I

10  would go to the breakroom, but I'm not saying I ate and

11  took a break.

12  Q.  What were you doing in the breakroom?

13  A.  Taking a break.

14  Q.  Okay.  So you would take breaks -- some days you

15  would take a break at the facility and some days you would

16  leave the facility, correct?

17  A.  Yes, when I got one.

18  Q.  Right.  So all I'm saying is, for this part cular day

19  on August 31st, you can't say whether you didn't get a

20  break or you just didn't leave the facility when you took

21  your break, correct?

22  A.  Correct.

23  Q.  On 9/1, you took a 30 minute break clocking out at

24  10:45 and clocking back in at 11:15, right?

25  A.  Correct.

## Page 92

1  Q.  On 9/2, the clock out time was 11:30, clocking back

2  in at 12:15 for a 45 minute break, correct?

3  A.  Correct.

4  Q.  On 9/5/2010, you clocked out at 10:30 and back in at

5  11:15, correct?

6  A.  Correct.

7  Q.  45 minute break, correct?

8  A.  Correct.

9  Q.  All right.  And you signed and certified the accuracy

10  of your time sheet, right?

11  A.  Correct.

12  Q.  Looking at the next pay period from September 2010 --

13  September 6, 2010 to September 19, 2010, in that two week

14  time per od there were no deductions whatsoever, correct?

15  And you were clocking out for at least a 30 minute,

16  sometimes a 45 minute meal period, right?

17  A.  30 minute lunch, correct.

18  Q.  And sometimes 45 minutes, right?

19      So, for example, on 9/14, you clocked out at 10:45,

20  clocked back in at 11:30 for a 45 minute meal period,

21  right?

22  A.  Correct.

23  Q.  Okay.  And you certified the accuracy of this time,

24  right?

25  A.  Correct.

## Page 93

1  Q.  And you got your meal periods on each day of this

2  week, correct -- or

3  A.  Correct.

4  Q.  -- this pay period, correct?

5  A.  Correct.

6  Q.  All right.  On September 20th, looking at the next

7  pay period, through October 2, 2010, it looks like there

8  were only two meal deductions applied, right?

9  A.  Correct.

10  Q.  And on each other occasion, you were clocking out --

11  A.  Three deductions.

12  Q.  Three?

13  A.  Three.

14  Q.  Oh, yes.  I'm sorry.  I missed that one.  10/2.

15      So three deductions, and each other time you were

16  clocking out for meal periods, right?

17  A.  Correct.

18  Q.  And you certified the accuracy of that time, right?

19  A.  Correct.

20  Q.  All right.  Let's look at the next one, 10/5 through

21  10/17.  Looks like you clocked out for a meal period on

22  every -- everyday of this two week pay period, correct?

23  A.  Correct.

24  Q.  And you signed the accuracy of the time?

25  A.  Correct.

24  (Pages 90 to 93)

## Page 94

1  Q.  And you received a meal period on every day that's on

2  this time sheet, correct?

3  A.  Correct.

4  Q.  Okay.

5  A.  Are we going through all of these?

6  Q.  Yeah.

7  A.  Okay.

8  Q.  On all the ones in 2010.

9  A.  Okay.

10  Q.  On October 18th -- well, I'll tell you what, we could

11  stipulate, will you stipulate that on every occasion that

12  we see a -- you clocking out for a meal per od --

13  A.  Right.

14  Q.  -- that you took your meal period and did not miss

15  your meal period?

16  A.  I missed a lot, like missed a lot of lunches, and

17  this -- and this -- this is saying different.

18  Q.  Well, what I'm asking you -- I'm not asking you about

19  -- because I think we'll see in 2011 you were not clocking

20  out for meal periods.

21  A.  Correct.

22  Q.  I'm just asking you, on these days where you did

23  clock out for a meal period --

24  A.  Yes.

25  Q.  -- you did in fact get that meal period, it was

## Page 95

1  uninterrupted and there was no deduct on that applied to

2  it, right?

3  A.  Yes.

4  Q.  So you're not arguing, on these days that you clocked

5  out for meal periods, that you're somehow owed for your

6  meal period, correct?

7  A.  Repeat that?

8  Q.  Sure.  On the days that you clocked out for a meal

9  period, you're not contesting -- you're admitting that you

10  did in fact get your meal period on each of those dates,

11  that you actually clocked out for a meal period, correct?

12  A.  Well, it says I d d, but I know that there's a lot of

13  days I missed.

14  Q.  All right.  So are you then saying that on these days

15  that you clocked out, you d dn't really get the meal

16  period, because that would be different than your

17  testimony from before?

18  A.  Well, this says that I d d take it, but I'm saying I

19  don't remember.

20  Q.  But at the time you signed saying that the time card

21  was correct, right?

22  A.  Correct.

23  Q.  And you would remember then, three years ago, bette

24  than you would today, correct?

25  A.  I remember today better than three years ago.

## Page 96

1  Q.  So you remember today what you did better than you

2  did three years ago when it happened?

3      You were signing these contemporaneous with the work

4  right?

5  A.  Yes.

6  Q.  So you -- you signed this on or about October 31,

7  2010 saying that  t was accurate, right?

8  A.  Correct.

9  Q.  And that's when you were doing the work, right?

10  A.  Correct.

11  Q.  And now it's been three years, not quite three years,

12  two and a half years since that time.  So your memory

13  about what you worked would be better at the time, in

14  2010, when you were signing this --

15  A.  I guess I'm saying that this is correct.

16  Q.  Okay.  So just to make sure we're clear and then we

17  can move on to 2011.  But I want to make sure that we're

18  on the same page.

19  A.  Okay.

20  Q.  You acknowledged that on any occas on where you were

21  clocking in and out for lunch for 30 minutes or more that

22  you actually received that lunch, right?

23  A.  Correct.

24  Q.  And that lunch was uninterrupted and not at the

25  facility, correct?

## Page 97

1  A.  It was probably at the -- it was at the facil ty,

2  because I d d not go everyday out.  So I was clocking in

3  and out and staying at the facility as well.

4  Q.  Okay.  Now, your previous testimony was that you

5  would not clock in and out unless you were leaving the

6  facility?

7  A.  Yes.

8  Q.  So are you changing that testimony, or do you believe

9  that you were having meals outside the facil ty on these

10  days you were clocking in and out?

11  A.  I'm gonna go with my first testimony.

12  Q.  That you were not --

13  A.  That I was leaving the facility.

14  Q.  Okay.  So to make we're on the same page.  When you

15  clocked out for lunch, you were leaving the facil ty to

16  take your lunch, correct?

17  A.  Correct.

18  Q.  And you don't have -- you're not claiming that you

19  didn't receive your lunch on those days, correct?

20  A.  That I didn't?

21  Q.  That you d d not.

22      You are admitting that you got your full,

23  uninterrupted 30 minute lunch, yes?

24  A.  Yes.

25  Q.  Okay.  So let's move forward then to when we start

25 (Pages 94 to 97)

Page 98

1  seeing consistent deductions.

2      And it looks to me like it's in December of -- about

3  the middle of December.  Look at the one for 12/15/2010?

4      So on the 15th, you had -- you d d clock in and out

5  for lunch and there's no meal deduction, right?

6  A.  Correct.

7  Q.  So you did get your meal period that day?

8  A.  Correct.

9  Q.  On the 16th, there was not a clock in and out and

10  there was a deduction that was applied, correct?

11  A.  Correct.

12  Q.  17th, you clocked in and out, and there was no

13  deduct on for a half hour meal period, right?

14  A.  Correct.

15  Q.  And then, after that, the 18th, 19th, 21st, 22nd,

16  23rd, and  t looks like deduct ons are applying.  And

17  turning to the next page, 12/27 through 1/9 and

18  thereafter, on most occas ons, you're not clocking out and

19  there isn't a meal deduction?

20  A.  Correct.

21  Q.  Okay.  There are occasional times where you do clock

22  in and out.  Like turn to 5/2/2011 on are RCH11782, the

23  bottom of the page?  Here, on May 5th, you clocked out

24  from 11:15 to 11:45, right?

25  A.  Uh-huh.

Page 99

1  Q.  And on May 10th from 11:00 to 11:30 for two half hour

2  breaks and there's no deduct on applied, right?

3  A.  Yes.

4  Q.  The other days there is a deduct on applied, right?

5  A.  Correct.

6  Q.  Same thing on 5/28, on the next page, there was a

7  clock out, and occasionally we see these clock outs, but

8  not as frequently -- not as frequently as in 2010, right?

9  A.  Correct.

10  Q.  Okay.  So what changed, between 2010 and 2011, whe e

11  you were not leaving the facility for your meal breaks?

12  A.  What changed?

13  Q.  Yes.  What was different about 2010 and 2011, if

14  anything?

15  A.  I guess I was staying in the facil ty.

16  Q.  Okay.

17  A.  Because I wasn't getting my lunches.

18  Q.  All right.  So is  t your testimony that in 2010, you

19  were getting lunches, but in 2011, you stopped getting

20  lunches as consistently?

21  A.  Yes.

22  Q.  All right.  And why is that?

23  A.  I guess I was working.  It was busy.  Wasn't getting

24  them.

25  Q.  And d d any of your job responsibilities change in

Page 100

1  2011?

2  A.  No.

3  Q.  Compared to 2010?

4  A.  No.

5  Q.  Did any of the staffing change between 2010 and 2011?

6  A.  No.

7  Q.  Did the census of patients change between 2010 and

8  2011?

9  A.  Probably.

10  Q.  Do you know which way it changed?

11  A.  Probably grew.

12  Q.  Do you have any ev dence of that?

13  A.  No, not on me.

14  Q.  Do you have any specific recollect on of that?

15  A.  Yes, I remember we were getting more patients at a

16  time.

17  Q.  Okay.  How many patients did you have in 2011?

18  A.  All together, I don't know.

19  Q.  On your halls -- well, your halls, you said you

20  worked different halls, right?

21  A.  Yes.

22  Q.  So on each hall, how many more patients would there

23  be in 2011 compared to 2010?

24  A.  Probably from like 20 to 30.  Like 20 patients to 30

25  patients.

Page 101

1  Q.  So in 2010, it'd be 20 patients per hall, and in

2  2011,  t would be 30 patients per hall, right?

3  A.  Correct.

4  Q.  All right.  And you testified before that the

5  staffing always remained at two CNAs per hall, right?

6  A.  Correct.

7  Q.  All right.  On weeks where there more days, when

8  there were more than two CNAs per hall, would there be any

9  reason you couldn't take a full, uninterrupted, 30 minute

10  meal break?

11  A.  No.

12  Q.  All right.  And so you would agree that on days where

13  there was three or more CNAs on your hall, you would have

14  gotten your break, correct?

15  A.  Correct.

16  Q.  All right.  Did you make any complaints during your

17  employment at Spring Creek about missed or interrupted

18  meal periods?

19  A.  Yes.

20  Q.  To who?

21  A.  Human resource lady, the nurse and Wanda.

22  Q.  All right.  And was this in the form of a time sheet

23  adjustment form?

24  A.  There was a couple.

25  Q.  Okay.  And the human resource lady is who?

## Page 102

1  A.  Karen Buckner.

2  Q.  Huh?

3  A.  Karen Buckner.

4  Q.  Karen Buckner?

5  A.  Yes.

6  Q.  So independently of submitting a time sheet

7  adjustment form, did you ever talk to Karen Buckner about

8  missing meal periods?

9  A.  Yes.

10  Q.  All right.  And when was that?

11  A.  Several occasions.

12  Q.  When were they?

13  A.  It was like three or four times, I think, in July

14  when I filled out a time sheet, where I'd go in there and

15  just complain to her.

16  Q.  When you were filling out a time sheet adjustment?

17  A.  Yes.

18  Q.  Okay.  And on those occasions, were you paid for you

19  meal period?

20  A.  Yes, whenever I did a time adjustment.

21  Q.  Okay.  And the three or four occasions that you're

22  talking about talking to Karen is when you were filling

23  out a time sheet adjustment, right?

24  A.  Yes.

25  Q.  All right.  Any other -- who else did you say you

## Page 103

1  mentioned  t to?

2  A.  Wanda, when I'd give her my time adjustments.  The

3  nurse.

4  Q.  Wanda?

5  A.  Harris.

6  Q.  Harris.  And she's the?

7  A.  DON.

8  Q.  DON.  All right.

9      So when you gave Wanda a time sheet adjustment, you

10  complained that you weren't able to get your meal per od?

11  A.  Yes.

12  Q.  Okay.

13  A.  And she said that I needed to stop filling them out,

14  and I needed to make time for my lunch.

15  Q.  Okay.  So she told you to find a way to make time for

16  your lunch?

17  A.  Yes.

18  Q.  Okay.  Anyone else?

19  A.  Just nurses, and I don't remember their names, that

20  were on the hall theirselves, different ones.

21  Q.  These are other CNAs?

22  A.  LPNs.

23  Q.  Okay.  So anything else: is that all of them?

24  A.  Yes.

25  Q.  All right.  And you said July of what year for Karen

## Page 104

1  Buckner?

2  A.  2011.

3  Q.  All right.  And what about your conversat on with

4  Wanda Harris, was that also in July?

5  A.  Yes.  And she -- I qu t writing time adjustments

6  because I was told I was starting to be wrote up if I kept

7  missing.  So I d dn't want to get wrote-up and fired.  So

8  I just kept my mouth shut and would miss my lunch and just

9  about my day.

10  Q.  And who told you that?

11  A.  Wanda Harris.

12  Q.  So Wanda Harris told you that it was important that

13  you had to take your lunch, and if you weren't taking your

14  lunch, you'd be written up for not taking your lunch?

15  A.  Yes.

16  Q.  Okay.  D d she tell you to come to her if you were

17  having a problem getting your lunch?

18  A.  No.

19  Q.  Did she tell you there's no reason you shouldn't be

20  taking a lunch?

21  A.  Yeah, she told me there's no reason.  I should not be

22  -- not missing them.

23  Q.  Because there's ample staffing, correct.

24      MS. JACKSON:  Object on to the form of

25  the question.

## Page 105

1  Q.  That's what she told you, correct?  There was enough

2  people to cover for your lunch, that you should be able to

3  take your lunch, right?

4      MS. JACKSON:  Objection.  That's not her

5  testimony.

6      MR. SPINOLA:  That was a question.

7  Q.  (BY MR. SPINOLA)  That's what she told you, correct?

8      MS. JACKSON:  Objection to the form of

9  the question, but you can answer.

10  Q.  Do you understand the question?

11  A.  Repeat your question?

12  Q.  Sure.

13      Ms. Harris told you that you should be able to take

14  your lunch because there's other people that can cover

15  your responsibilities while you're at lunch, correct?

16  A.  No.

17  Q.  She didn't tell you that?

18  A.  She told me what?  Say  t again?

19  Q.  Okay.  Ms. Harris told you that there's no reason for

20  you to miss your lunch because you have an ability to take

21  your lunch, right?

22      MS. JACKSON:  Objection to the form of

23  the question.  You can answer.

24  A.  She sa d that I can -- there's no reason not to miss

25  my lunch because we have enough staffing -- that there is

Page 106

1   too much work and I could not just not miss -- like I
2   couldn't just go to lunch.
3   Q.   But as far as what she told you, it was there are
4   enough people on your hall, there's somebody that can
5   cover you.  So you have to take a lunch and make sure they
6   cover your work, correct?
7          MS. JACKSON:  Objection to the form of
8   the question.  You can answer.
9   A.   No.
10  Q.   Okay.  You said there's enough -- she sa d there's
11  enough staff for you to be able to take your lunch, right?
12  A.   She never said there's enough staff.  She just said I
13  could -- there's -- I can take my lunch, is what she said.
14  There's no reason for them not -- not that there's enough
15  of staff.
16  Q.   Okay.
17  A.   She just said to take my lunch.
18  Q.   And there's no reason that you should be missing your
19  lunch, right?
20  A.   Correct.
21  Q.   And why is that?
22  A.   She didn't give me a reason.  She just sa d, You just
23  take your -- you need to take your lunch.
24  Q.   Okay.  And she didn't tell you that, if you have an
25  issue getting your lunch, to get coverage for your work?

Page 107

1   A.   Yes, but there is no coverage.
2   Q.   I'm not asking you -- I understand your position.
3   But that's what she told you, correct?
4   A.   Correct.
5   Q.   That you can have somebody cover your work, correct?
6   A.   Correct.
7   Q.   Okay.  But she was not telling you you have to work
8   through lunch and not fill out a form, right?
9   A.   Correct.
10  Q.   She never said that?
11  A.   Never said what?
12  Q.   She never said you have to work through your lunch
13  and not be paid for  t, right?
14  A.   No.
15  Q.   She was telling you to take your lunch?
16  A.   Yes, like policy.
17  Q.   Okay.  So then, in July, that's when you stopped
18  filling out time sheet adjustments?
19  A.   Yes.
20  Q.   Okay.  So pr or to July, would there ever have been a
21  lunch that you missed and you failed to fill out a time
22  sheet adjustment for?
23  A.   Yes.
24  Q.   And why is that?
25  A.   Because I was working.

Page 108

1   Q.   You understood the policy, though, was to fill out a
2   time adjustment, right?
3   A.   Yes, but I was threatened to be fired pretty much by
4   write-ups, and I could not afford to lose my job.
5   Q.   That conversation you had with Wanda about, if you
6   don't take your lunch, you'd be written up, you said was
7   in July of 2011, right?
8   A.   Correct.
9   Q.   And so -- and you were filling out time sheet
10  adjustments --
11  A.   Yes, I --
12  Q.   Let me finish the question.
13  A.   Sorry.
14  Q.   You were filling out time sheet adjustments for
15  missed lunches prior to that conversation, right?
16  A.   Yes.
17  Q.   So there'd be no reason, any time you missed a mea
18  period, not to fill out a time sheet just form, right?
19  A.   Yeah, because she said I was gonna end up getting
20  wrote up, and I d dn't want to get wrote up.
21  Q.   That was in July of 2011, right?
22  A.   Yes.
23  Q.   I'm talking about prior to July of 2011.
24  A.   She just told me to -- when I'd give her time
25  adjustments, she told me not to fill them out -- like she

Page 109

1   told me not to give -- to stop doing that and take my
2   lunches.  And so I -- every time I missed my lunch, I'd
3   try not to write one out.  And I was missing so much, I
4   would wr te one out and give them to her and she was
5   telling me the same thing, Don't miss your lunch.  Take
6   your lunch.  And then the last one I remember writing out
7   she said, You're gonna get wrote up.  You don't need to
8   miss lunch.
9   Q.   And that was in --
10  A.   Yes.
11  Q.   -- July of 2011, right?
12  A.   Yes.
13  Q.   Prior to July of 2011, you were actually submitting
14  your time adjustments if you missed a lunch, right?
15  A.   Yes.
16  Q.   And there was no reason for you not to follow that
17  procedure; you didn't have an excuse to not follow that
18  procedure until you claim that Ms. Harris threatened to
19  wr te you up, right?
20  A.   Correct.
21  Q.   Okay.  So was there a time, before July of 2011, that
22  you missed a lunch and d dn't fill out a time sheet
23  adjustment?
24  A.   Yes.
25  Q.   Why?

Page 110

1   A.   Because I didn't want to get in trouble by her.  I
2   didn't want her to keep seeing that I was missing lunch
3   and her getting angry with me.
4   Q.   Okay.  But then you did fill out the time sheet
5   adjustment forms?
6   A.   Yes, there's a few I did.
7   Q.   So what -- what was the difference when you decided
8   you would fill out a time sheet adjustment form and when
9   you wouldn't?
10  A.   I wanted to get paid.
11  Q.   So how did you make that decision that on some
12  occasions you'd follow the policy and others you wouldn't?
13  A.   Because I was getting angry that I wasn't getting
14  them.
15  Q.   So sometimes you'd be angry and you'd decide to
16  follow policy, correct?
17  A.   Correct.
18  Q.   And other times you decided you would not follow
19  policy, correct?
20  A.   It's not that I did not follow policy.  I had no
21  choice.
22  Q.   Okay.  On the occasions that you turned in the time
23  sheet adjustment form, did you get paid for your lunches?
24  A.   Yes.
25  Q.   So you did have a choice, because you actually

Page 111

1   exercised your choice and you were paid, right?
2   A.   No, it was not my fault.  I feel like -- I mean, I
3   worked and --
4   Q.   This has nothing to do with fault.  I'm not saying
5   that anything was your fault.
6        I'm saying that you understood that the policy was,
7   if you missed a lunch, fill out a form and get paid for
8   the lunch, right?
9   A.   Right.
10  Q.   You understood that was the company policy?
11  A.   Correct.
12  Q.   And you actually did that, correct?
13  A.   Several times, yes.
14  Q.   And on the occasions you did that, you were in fact
15  paid for your lunch, right?
16  A.   Correct.
17  Q.   And there were sometimes you decided wouldn't do
18  that, right?
19  A.   I didn't decide to, I didn't because she told me not
20  to keep filling them out.
21  Q.   That was in July of 2011, right?
22  A.   '10.
23  Q.   You said it was in July of 2011?
24  A.   That was the last -- I remember that was the last -
25  one of the last time adjustments I did.

Page 112

1   Q.   Okay.  And that's the occasion that she told you to
2   stop filling them out and take your lunch, right?
3   A.   I was going to get wrote up.
4   Q.   For not taking your lunch, right?
5   A.   Correct.
6   Q.   So the writing up was for taking your lunch, not for
7   filling out the form, right?
8   A.   It was what?
9   Q.   She said that if you don't take your lunches --
10  there's no reason that you can't take your lunch.  If you
11  don't take your lunch, you'll be written up for not taking
12  your lunch, right?
13  A.   Correct.
14  Q.   And that was in July of 2011?
15  A.   Correct.
16  Q.   Prior to that conversation, sometimes you'd fill out
17  a form and get paid for your lunches and sometimes you
18  would elect not to, right?
19  A.   Yes.
20  Q.   And you said the reason that you elected not to,
21  prior to July of 2011, was because you didn't have a
22  choice.  But that can't be true if sometimes you did fill
23  out the form; you were making a choice?
24  A.   She was telling me that I needed to, but then when
25  I'd turn them in, she'd be like, You don't need to turn

Page 113

1   these in.  You need -- there's no excuse for you to not
2   miss lunch, and made me feel bad.
3   Q.   So that was a conversation in July of 2011, I
4   thought, right?
5   A.   Those were the prior to July for making me -- you
6   know, it was before when I decided to stop doing them,
7   because she told me she was going to write me up.
8   Q.   Well, wait a minute.  She told you she was going to
9   write you up in July of 2011, right?
10  A.   Yes.  Prior to that, she was telling me, the other
11  ones that I -- the few that I did, she told me to quit
12  doing that.
13  Q.   Okay.  So by, "quit doing that," what she was telling
14  you is take your lunch, right?
15  A.   Correct.
16  Q.   Okay.  So the reason you sometimes didn't fill out
17  the time sheet adjustment form to be paid for your lunch
18  is because you felt bad when she told you to take your
19  lunch; is that why?
20  A.   I felt bad?
21  Q.   You said, I felt bad when I'd turn them in, because
22  she'd tell me I had to take my lunch; is that why you
23  sometimes didn't fill them out?
24  A.   Correct.
25  Q.   Okay.  And there's no way that she could have known

29 (Pages 110 to 113)

Page 114

1 if you didn't fill out the time sheet, that you weren't
2 getting your lunch, correct?
3 A.  No, because I was complaining.
4 Q.  Okay.  And we talked about your complaints.  And you
5 said there are three people you complained to: Karen
6 Buckner, right?
7 A.  LPNs that were on the hall.
8 Q.  Okay.  Hold on.  I want to talk about the ones you
9 can remember, because you don't remember anybody's names
10 A.  No, I don't.
11 Q.  You remember Karen Buckner?
12 A.  Yeah, I remember her.
13 Q.  You talked to her three or four times, correct?
14 A.  Several times.
15 Q.  And each time you spoke to her is when you were
16 handing her a time sheet adjustment form, right?
17 A.  Yes, and other times, too.  Like she knew I wasn't
18 getting my lunches.
19 Q.  Okay.  So this is different than your prior
20 testimony.  When I asked you before, you told me that the
21 times that you talked to Karen Buckner were the times you
22 were giving her time sheet adjustment forms: is that true
23 or not?
24 A.  What's -- repeat that?
25 Q.  The last -- when I asked you about your -- your --

Page 115

1 any time you reported not being able to take your lunch,
2 you identified Karen Buckner, right?
3 A.  Correct.
4 Q.  Wanda Harris, right?
5 A.  Correct.
6 Q.  And then you said some unspecified nurses that you
7 couldn't remember, right?
8 A.  Correct.
9 Q.  So with Karen Buckner, I asked you when, and you said
10 it was July of 2011 when you were turning in your time
11 sheet adjustment forms?
12 A.  That was one of the times.
13 Q.  Okay.  What were the other times?
14 A.  Three or four times I remember turning in time
15 adjustments, and several occasions like going in there and
16 just complaining about it.
17 Q.  Okay.  And was this always when you were filling --
18 or turning in a time sheet adjustment form?
19 A.  Not every time, no.
20 Q.  All right.  and So there would be times you would go in
21 there --
22 A.  Yeah, and just talk to her.
23 Q.  Okay.  And do you know what she did as a result of
24 that?
25 A.  No.

Page 116

1 Q.  Do you know if she paid you for the lunch that you
2 were complaining about?
3 A.  No.
4 Q.  You don't know one way or another?
5 A.  No.
6 Q.  And we've seen some examples on your time sheet where
7 you worked without clocking out but there was no meal
8 deduction, right?
9 A.  Correct.
10 Q.  Okay.  Could that have been Karen adjusting your time
11 as a result of your complaints?
12        MS. JACKSON:  Objection to the form of
13 the quest on.  But you can answer.
14 Q.  Do you know whether --
15 A.  I don't know whether she did or not.
16 Q.  Okay.  So with Wanda Harris, my understanding is that
17 you talked to her in July of 2011, when you were filling
18 out a time sheet adjustment.  And in July of 2011, Ms.
19 Harris told you, You need to start taking your lunches.  I
20 want you to start taking your lunches.  If you don't take
21 your lunches, you're going to be written up.  Correct?
22 A.  Correct.
23 Q.  Okay.  Other than that conversation with Wanda
24 Harris, did you have any other conversations w th Wanda
25 Harris --

Page 117

1 A.  Yes.
2 Q.  -- about missed or interrupted meal per ods?
3 A.  Yes.
4 Q.  And what were those?
5 A.  I know in the beginning of January, like -- or
6 beginning of 2011, like in January, there a couple of
7 months after that, and then one other time, and then came
8 to the July incident.
9 Q.  Okay.  So is that all of them?
10 A.  I believe so.
11 Q.  All right.  Because I want to make sure that I have
12 this completely everything.  Okay?
13 A.  Okay.
14 Q.  And that's very important.
15 A.  Okay.
16 Q.  So I have everything on Karen Buckner now, right?
17 A.  I believe so.
18 Q.  Okay.  Now, for Wanda Harris, beginning of 2011, you
19 talked to her, and then again in July of 2011, correct?
20 A.  Correct.
21 Q.  Is there anything else with Wanda Harris, any other
22 time you talked to her about missed or interrupted meal
23 periods?
24 A.  No.
25 Q.  Okay.  So we've talked about July of 2011, what that

30 (Pages 114 to 117)

## Page 118

1   conversation entailed, right?
2   A.   Correct.
3   Q.   She felt that you had adequate coverage to take a
4   meal per od and instructed you to take them, right?
5   A.   Correct.
6   Q.   In January of 2011, tell me about that conversation?
7   A.   With Wanda Harris?
8   Q.   Yes.
9   A.   She told me that -- I remember turning in my time
10  adjustment, she said that she -- I mean, to -- to take my
11  lunch or I'm going to be wrote up.
12  Q.   Okay.
13  A.   Because I shouldn't be missing.
14  Q.   Okay.  So the same conversation like as in July, that
15  you have adequate coverage to take your lunch.  You should
16  take your lunch.  If you don't take your lunch, you're
17  going to be written up for missing lunch?
18  A.   Correct.
19  Q.   Okay.  Anything else about that conversation I'm
20  missing?
21  A.   No.
22  Q.   All right.  And you did fill out the time sheet
23  adjustment form at that time and you were paid for your
24  lunch, correct?
25  A.   Correct.

## Page 119

1   Q.   All right.  Anything else at all with Karen Buckner
2   or Wanda Harris that we haven't discussed?
3   A.   No, not that I can think of.
4   Q.   Okay.  And neither of them instructed you to work
5   through meal periods without being pa d, right?
6   A.   No.
7   Q.   What Wanda Harris was telling you is that you should
8   take your meal per ods as --
9   A.   Yeah, I couldn't.
10  Q.   -- directed by policy?  I'm not asking you about what
11  your actual experience was.  I'm just -- this is about
12  what Wanda Harris sa d to you.
13  A.   Okay.
14  Q.   Right?
15  A.   Right.
16  Q.   Okay.  Your commun cations w th other nurses, can you
17  remember any specifics about those commun cations?
18  A.   Just letting them know that I needed help on a hall,
19  that I wasn't able to do things, and I wasn't able to get
20  my lunch or maybe a break.
21  Q.   Okay.  And can you remember any of the names of any
22  of those people?
23  A.   No.
24  Q.   Okay.  And can you remember anything they said in
25  response to you telling them that you needed some coverage

## Page 120

1   to get your breaks?
2   A.   No.
3   Q.   Okay.
4   A.   They -- like they said something about helping me on
5   a hall or if they had time.
6   Q.   Okay.
7   A.   But that was very, very rare.
8   Q.   So it was an offer to cover your responsibil ties for
9   you?
10  A.   Help me like with my duties on the hall.
11  Q.   And the goal of helping you was to ensure that you
12  could take your break, right?
13  A.   Take a 15 minute break, not my lunch.
14  Q.   So is what you were complaining to them about was
15  your 15 minute break?
16  A.   And my lunches.
17  Q.   Okay.  So you said, I'm having a hard time getting my
18  15 minute break and my lunches.  And they were responded,
19  Well, I'll cover for you so you can get your 15 minute
20  break but not your lunch?
21  A.   They sa d they'll help me with like duties.  They
22  didn't say they'd cover me.
23  Q.   What was the purpose of the help they were gonna
24  provide?
25  A.   Like with a res dent to be able to get things done

## Page 121

1   faster.
2   Q.   Why were they offering that to you?
3   A.   To help with the res dents.
4   Q.   Was it to help you take your breaks?
5   A.   I guess, yes.
6   Q.   You were complaining about the concern that you were
7   missing your breaks or you might miss your breaks, and
8   they say, I'll help you.
9   A.   Yes.
10  Q.   Why are they offering to help you?
11          MS. JACKSON:  Object on to the form of
12  the question.  Speculative.  But you can answer.
13  Q.   Was it your understanding they were offering to help
14  you so that you could take your breaks, correct?
15  A.   Correct.
16  Q.   All right.  And did you take that help?
17  A.   Yes.
18  Q.   Okay.  Do you have any reason to believe that they
19  would think, after having helped you, that you d dn't get
20  your break?
21  A.   Repeat that?
22  Q.   Do you have any reason to believe that, after helping
23  you as they offered to do, they would have known if you
24  d dn't get your break?
25  A.   Correct.

31 (Pages 118 to 121)

Page 122

1  Q.  They would not have, correct?
2  A.  Oh, they would not have?  No, they wouldn't have if I
3  d dn't take it or not.
4  Q.  If they --
5  A.  I would complain.
6  Q.  Let me make sure I understand.  This is my
7  understanding what you told me.  You would go to a CNA or
8  an LPN and say, I'm having a hard time.  I've got a lot of
9  work to do.  I'm worried I'm not going to be able to get
10  my break.  That LPN then sa d to you, I will help you so
11  that you can get your break.  I will help you with your
12  work.  Then you're telling me that they did in fact help
13  you, right?
14         MS. JACKSON:  Objection.  You completely
15  misstate her testimony.
16  Q.  Okay.  Explain it?
17         MS. JACKSON:  That's not what she sa d.
18         MR. SPINOLA:  Could you reread the
19  testimony, that whole line.  I think that's exactly what
20  she said, and if I'm wrong.
21         MS. JACKSON:  Can you explain what you
22  mean.  Just explain what you actually sa d?
23  A.  They I asked for help to get my duties done.
24  Q.  (BY MR. SPINOLA)  And they helped you, right?
25  A.  Correct.  But I don't know if they help me so I can

Page 123

1  get my duties done for the resident or for me.
2  Q.  So you don't know the purpose of why they helped you
3  A.  No, they d dn't say why.  They'd just say they'd
4  help.
5  Q.  And they said they'd help in response to you telling
6  them you were worried about not being able to get your
7  breaks, right?
8  A.  No, I d dn't say I was worried about my breaks.  I
9  said, I worried about getting my duties done.
10  Q.  Okay.
11  A.  Nothing about my breaks or my lunches.
12  Q.  All right.  So when you spoke to these CNAs and LPNs,
13  you weren't talking to them about your breaks, you were
14  just talking about --
15  A.  My duties, because I was overworked --
16  Q.  Okay.
17  A.  -- and needed help.
18  Q.  So if you did not tell them that you were concerned
19  about not getting your break, there would be no reason for
20  them to think you weren't getting your break, correct?
21  A.  Correct.
22  Q.  Okay.  Other than the nurses and CNAs that you spoke
23  to generally about having a lot of duties, right?
24  A.  Right.
25  Q.  Having a lot of work to do.  Karen Buckner, who,

Page 124

1  while you were filling out or handing in time sheet
2  adjustment forms, you told her you weren't getting your
3  break, right?
4  A.  Correct.
5  Q.  For that day that you were handing in a time sheet
6  adjustment, right?
7  A.  Correct.
8  Q.  And the commun cation in January and July with Wanda
9  Harris where you said that you talked to her about breaks,
10  and she said it's important that you get your meal break?
11  A.  Correct.
12  Q.  Are there any other conversations you've had w th
13  anybody about missed meal breaks of any kind or
14  interrupted meal breaks or concerns about not being able
15  to get your breaks or have you told me everything that you
16  can remember?
17  A.  As far as I can think of right now, that's all I can
18  remember.
19         MR. SPINOLA:  Okay.  Why don't we take
20  our lunch break now.  It's a good time.
21         MS. JACKSON:  Okay.
22         (A recess was had.)
23  Q.  (BY MR. SPINOLA)  Ms. Crow, you've had an opportunity
24  to take a break for lunch and contemplate your testimony
25  so far today.  Is there anything that you would like to

Page 125

1  change or clarify?
2  A.  Yes, I feel like, when you asked me some of the
3  quest ons before, that like I have to give you answers,
4  like I felt like I was getting confused and feel like when
5  I was saying, like when you kept asking me about if my
6  DON, when I told -- if I addressed her about the time
7  adjustment sheets.
8  Q.  Uh-huh.
9  A.  Like when I told her about them, you asked me if --
10  if she knew any other times, other than when I gave her
11  the time adjustment, of me complaining about me missing my
12  lunches.  And then if she asked me, when se -- when I
13  gave her the time adjustments, that -- if -- if she told
14  me -- because she told me not -- when I gave those to her,
15  she told me not to sign them anymore.  And you kept saying
16  something different, saying is -- what were you saying?
17  You were saying, you were saying, and the three got me
18  confused when I was telling you about those.  What were
19  you asking me?
20  Q.  Well, you tell me.  I mean, tell me what  t is she
21  told you.  I'm not trying to confuse you or anything.  I'm
22  just trying to understand what it is that you all
23  discussed.  Is there something you want to change
24  about that or clarify, then --
25  A.  I want to clarify that.  When I gave her those time

32 (Pages 122 to 125)

Page 126

1   adjustments, she told me that I don't need to fill them
2   out anymore, because I needed to take my lunches. And you
3   kept saying what you were saying, which was confusing me,
4   because what I said is what happened, because when I
5   addressed her and went in her office and gave her those,
6   she told me not to fill them out anymore because I needed
7   to take them.
8   Q.  Take your lunches?
9   A.  Correct.
10  Q.  Okay.  And that was in July of 2011, right?
11  A.  That was beginning of July to July, from when I
12  terminated to give her the time adjustments, and she --
13  and when I was giving them to her, she said, Don't -- she
14  kept telling me, Don't do it, because she wanted me to
15  take my lunches.
16  Q.  Okay.  Anything else?
17  A.  No.
18  Q.  Okay.  So let's just go through that again.
19      So everything that you told me with respect to your
20  conversation w th Wanda -- with Karen Buckner --
21  A.  Yes, that I also addressed about time adjustments and
22  missing lunches.
23  Q.  So everything that you told me about that, you're not
24  trying to clarify in any way, right?
25  A.  I'm trying to clarify that what I sa d when I went to

Page 127

1   -- the time adjustments when I missed lunch, I would tel
2   her that I missing lunches, and I'd tell Wanda, as well.
3   Q.  Okay.  So I guess the question I'm asking is, your
4   prior testimony about Karen Buckner, is that accurate
5   testimony or is there anything you want to clarify about
6   that testimony?
7           MS. JACKSON:  Objection to the form of
8   the question.  Too general.
9   Q.  Is there anything you want to clarify about that
10  testimony, or did you testify accurately?
11  A.  I testified accurately about talking to her about
12  missing lunches, yes.
13  Q.  Okay.  So let's just make sure with Karen Buckner.
14  Okay.  Let's start there.  I want to make sure I
15  understand what your testimony is.
16      When you missed a meal period, you filled out a time
17  sheet adjustment form, correct?
18  A.  Yes.
19          MS. JACKSON:  Objection to the form of
20  the question.  You can answer.
21  Q.  When you missed the meal period, you filled out a
22  time sheet adjustment form, right?
23          MS. JACKSON:  Objection to the form of
24  the question.
25  Q.  Okay.  Can you answer the question?

Page 128

1   A.  Yes, I filled one out.
2   Q.  All right.  And you took the form you gave to Karen
3   Buckner, right?
4           MS. JACKSON:  Object on to the form of
5   the question.  You can answer.
6   A.  No, I gave it to Wanda.
7   Q.  Okay.  You gave  t to Wanda?
8   A.  Correct.
9   Q.  In July?
10  A.  And a couple of times before that.
11  Q.  Okay.  And then, on the same time frame, you went and
12  talked to Karen about missing that meal period: is that
13  right?
14  A.  The same time period and before and after that.
15  Q.  Okay.  And when you talked to Karen Buckner, was it
16  always when you filled out a time sheet adjustment form
17  and you're talking to her about that meal period?
18  A.  Not the only time, no.
19  Q.  Okay.  So when else did you talk to Karen other than
20  when you were filling out --
21  A.  I don't know exact dates.  I just know I d d.
22  Q.  And that was -- is your testimony still that  t was
23  three or four times or is  t more than that?
24  A.  It was three -- like three out of four times.  So
25  most of the time, it was all the time.

Page 129

1   Q.  I don't understand.  You testified before that you
2   spoke to her three or four times?
3   A.  Three out of the four times.  That went three or four
4   times.
5   Q.  Three out of what -- what --
6   A.  We're confused.
7   Q.  Okay.
8   A.  Out of the times I missed.
9   Q.  Okay.  So you missed four lunches, and you talked to
10  her three out of the four?
11  A.  I didn't miss four lunches.  I don't remember how
12  many lunches I have missed.  I know I missed several.  And
13  when -- and I would address her about them.  And I --
14  there's only a couple of times I did get a time sheet
15  adjustment.
16  Q.  All right.  Now, was your testimony previously that
17  you spoke to her three or four times?
18          MS. JACKSON:  Object on to the form of
19  the question.  But you can answer.
20  Q.  Okay.  So then let me ask the quest on again.
21      How many times did you talk to Ms. Buckner about
22  missed or interrupted meal periods?
23  A.  Estimate, I'd saying working at Health & Rehab,
24  probably 75 percent of the time.
25  Q.  What do you mean?

## Page 130

1   A.   Like 75 -- like out of that time I was working there,
2   most -- 75 percent.
3   Q.   You talked to her 75 percent of your shifts; is that
4   what you're saying?
5   A.   No, that's not what I said.
6   Q.   All right.  I don't understand.  It's a number,
7   right?  How many times did you talk to her, what would
8   that number be?  Not 75 percent or three out of four.  How
9   many times: 5, 10, 100, what number?
10  A.   I don't know an exact number.  I just know I talked
11  to her a lot about missing lunches.
12  Q.   Okay.  Can you give me your best estimate of how many
13  times you spoke to her about it?
14  A.   25.  I don't know.  25.  I don't know.
15  Q.   Okay.  25 times you spoke to Ms. Buckner?
16  A.   Yeah.
17  Q.   And what did you say to Ms. Buckner?
18  A.   That I was missing my lunches because I had a lot of
19  things to do.  I d dn't make the time to do it.
20  Q.   And what did Ms. Buckner say to you?
21  A.   She didn't need to say anything.  I think she just
22  said -- she agreed with me that, you know, I worked hard
23  and she understood me.
24  Q.   And d d you tell her which specific meals you missed?
25  A.   The lunch that I missed?

## Page 131

1   Q.   Yeah, what day you missed a lunch?
2   A.   No, I d dn't tell her specific days.
3   Q.   So what exactly did you say to her?
4   A.   I missed my lunch.  That's all I would really say to
5   her.
6   Q.   On the day that you missed the lunch?  Like you'd
7   just walk into her off ce and say, I missed my lunch?
8   A.   No.
9   Q.   Okay.  I'm just trying to understand what you said.
10  So you would say to her what?
11  A.   I would say to her that I missed my lunch.
12  Q.   Okay.  And what lunch were you referring to when you
13  said that to her?
14  A.   I think I was really referring to any lunch.  I think
15  I'd just go in there venting to her.
16  Q.   Okay.  So when you spoke to her 25 times, is that
17  telling her that you missed 25 lunches?
18  A.   I just went in there, I was just venting, saying, I
19  miss my lunch all the time.  Oh, I missed my lunch today.
20  Q.   Okay.  And what -- what d d she say in response?
21  A.   That she understood.  She d dn't really say anything
22  about  t.
23  Q.   Did she tell you to fill out a time sheet adjustment
24  form?
25  A.   No.

## Page 132

1   Q.   Okay.  And you testified before that you don't know
2   what her response to that was, right?
3   A.   Right.
4   Q.   Is that still accurate?
5   A.   Correct.
6   Q.   So you don't know whether she made an adjustment to
7   pay you for the lunch you missed or not?
8   A.   I don't know what she decided to do.
9   Q.   All right.  Is there anything else about the
10  conversations w th Ms. Buckner?
11  A.   No.
12  Q.   All right.  Now, move on to Wanda Harris.  And tell
13  me is  t the still accurate that you had two conversations
14  went Wanda Harris; one in January and one in July?
15  A.   No, there's several other occas ons.  Like if I was
16  pulled in the off ce to talk about something, you're wrote
17  up for something different other than like missing my
18  breaks.  I wasn't wrote up for that.  But like if I'd go
19  in and get counseled or something, that would be like a
20  discussion.
21  Q.   So how many times did you talk to Wanda
22  Harris?  Now, I understood your previous testimony to be
23  two.  So what is it now?
24  A.   I'm not really sure.
25  Q.   What's your best estimate?

## Page 133

1   A.   Out of what time period?
2   Q.   The entire employment.
3   A.   Entire employment.
4        Well, 10 -- 10 to 20 times, maybe.
5   Q.   Okay.  So you talked to her 10 to 20 times about
6   missed or interrupted meal periods?
7   A.   Yes.  When I would go in and I'd get counseled and
8   would complain about something going on, that would get
9   brought up that we're missing lunches because of not
10  having time and not having enough CNAs on the hall.
11  Q.   Okay.  And do you remember -- so 10 to 20 times when
12  you were being counseled.  Were you counseled 10 to 20
13  times?
14  A.   Yes.
15  Q.   Okay.  For performance issues?
16  A.   Yes.
17  Q.   Okay.  So however many times you were counseled,
18  you're saying every time you were counseled, you'd raise
19  the issue of a missed or interrupted meal period, right?
20  A.   Yes,  t was brought up.
21  Q.   All right.  And what did Ms. Harris say to you?
22  A.   About the missing lunches?
23  Q.   Yeah.  What exactly would you say to Ms. Harris?
24  Let's start there.
25  A.   I would just tell her about me not having time,

BUSHMAN COURT REPORTING
501.372.5115

Page 134

1  needing more help, not getting a lunch because of that
2  issue, and that's what I would speak to her about.
3  Q.  Okay.  And was there a specific lunch you were
4  referring to when you spoke to her?
5  A.  No, just in general.
6  Q.  Okay.  And what did Ms. Harris say to you in
7  response?
8  A.  That -- like she's always just say to make time and
9  try to get your lunch.  That's what she would say to me.
10  Q.  Is your testimony still that she explained that
11  there's no reason you shouldn't be able to take a lunch?
12  A.  Yeah.  I mean, she would say -- yes, she would say
13  that.
14  Q.  And is your testimony still that she said that there
15  was adequate staffing for you to be able to get your
16  lunches?
17        MS. JACKSON:  Object to the form of the
18  question.  But you can answer.
19  A.  She didn't specifically say that there was enough
20  staff to get it.  She just said that you could get it.
21  Those weren't her exact words.
22  Q.  Okay.  And that was because there was other people
23  that could cover your work responsibilities; is that still
24  correct?
25  A.  No, there was not always someone there to help out.

Page 135

1  Q.  But did she say that to you or not?  You can -- I
2  guess that's what I'm trying to understand.  Before you
3  said that she told you you can take your lunch because
4  there are other people that can handle your work
5  responsibilities --
6        MS. JACKSON:  Objection to the form of
7  the question.
8  Q.  -- is that -- is that accurate are not?
9  A.  That there's other people?
10  Q.  Other employees that can cover you while you're at
11  your lunch?
12        MS. JACKSON:  He's asking is it accurate
13  that she said  t to you.
14  A.  No, she didn't exactly say that.
15  Q.  What exactly did she say?
16  A.  She said that -- she didn't say there was people --
17  like what did you say, there's people on the shift to
18  help?
19  Q.  You tell me.  I don't want to put words in your
20  mouth.
21     My understanding before was that she told you that
22  you could take your lunch because there are other CNAs
23  that could do your duties.  I don't want to get tied up
24  w th if she said exactly do your duties or adequate
25  staffing or what words she used.  I'm trying to understand

Page 136

1  what she commun cated to you about why it is that she felt
2  you should be able to take your lunches.  You can put it
3  in your own words.
4  A.  I don't know why she felt that way, but there's --
5  all the other CNAs were on their halls doing their own
6  work.
7        MS. JACKSON:  He's just asking what she
8  told you.  That's what he's asking.  Just what exactly she
9  told you.
10  A.  She just told me to, pretty much, just figure -- like
11  just figure it out.  She d dn't really -- she said I could
12  ask for help, but there was never help.
13  Q.  So you were the only CNA on the floor?
14  A.  No, there's two.
15  Q.  Okay.  And that CNA would cover for you to take
16  lunch?
17  A.  No.  Like if they'd be busy doing their -- their own
18  thing or I'd be having to help them or they would be
19  having to help me.
20  Q.  Okay.  Is there anything else about the conversat on
21  that you want to explain and clarify with Wanda Harris?
22  A.  No.
23  Q.  No?
24  A.  No.
25  Q.  All right.  And Wanda Harris, nor anybody at Spring

Page 137

1  Creek, ever told you to work through any meal per ods and
2  not report that, right?
3  A.  They had told me not to take -- they'd had told me
4  not to make a time adjustment.  To find time to get my
5  lunch.  She never said what you just sa d.
6  Q.  That's what I was trying to confirm.
7  A.  Okay.
8  Q.  So Wanda Harris didn't say, You have to work through
9  your lunches and not get paid?
10        MS. JACKSON:  Object on.  You're
11  restating her testimony.
12        MR. SPINOLA:  Okay.
13  Q.  (BY MR. SPINOLA)  Is that right; she never said that
14  to you, right?
15  A.  She never said what?
16        MS. JACKSON:  Object on to the form of
17  the question.  You can answer.
18        MR. SPINOLA:  It's the same thing she
19  just sa d.  It's exactly what she just sa d.
20        MS. JACKSON:  Well, you're restating her
21  testimony.
22        MR. SPINOLA:  Every time you object, you
23  just confuse her.  Okay.  It's what she just said.
24        MS. JACKSON:  I'll keep doing it.  Okay.
25        MR. SPINOLA:  It's really aggravating.

35 (Pages 134 to 137)

1          MS. JACKSON:  I don't really care.
2     Q.  (BY MR. SPINOLA)  Nobody instructed you, nobody eve
3  told you that you had to work through lunch and not get
4  pa d for it, right?
5     A.  Never sa d to work through it?
6     Q.  Did anybody ever say --
7     A.  And not -- no, they never said that.
8     Q.  Ms. Crow, you have to work through your lunch w thout
9  pay --
10    A.  No.
11    Q.  -- did anyone ever say that?
12    A.  No.
13    Q.  Okay.  Nobody told you to do that, right?
14    A.  No.
15    Q.  Okay.  What she told you to do was to take your
16  lunch, right?
17         MS. JACKSON:  Objection to the form of
18  the question.  but You can answer.
19    A.  She told me to -- say it again?  Sorry.
20    Q.  She told you to take your lunches?
21         MS. JACKSON:  Objection.  Restate
22  testimony.  Asked and answered.
23    A.  She told me to, yeah, take my lunches, but -- I
24  could.
25    Q.  Right.  I understand.  But she told you to take them,

1  right?
2          MS. JACKSON:  Objection to the form of
3  the question.  Asked and answered.  Restating her
4  testimony.
5     Q.  I'm not misstating you, right?  You just answered
6  yes, right?
7     A.  She never said not to take it.
8          MS. JACKSON:  And she already testified
9  about --
10         MR. SPINOLA:  Let me finish my question,
11  please?
12         MS. JACKSON:  I'm just addressing my
13  object on.
14         MR. SPINOLA:  Let me finish my question,
15  and you can make whatever objection you want.
16    Q.  (BY MR. SPINOLA)  She told you to take your lunches;
17  is that a true or false statement?
18         MS. JACKSON:  Objection to the form of
19  the question.  You can answer.
20    Q.  Ms. Harris told you to take your lunches, correct?
21    A.  She told me to find time to -- to take my lunches.
22    Q.  All right.  Thank you.
23    Is there anything else about that conversation that
24  you want to tell me?
25    A.  That -- well, the time adjustment.  She told me to

1  take my lunches, but --
2     Q.  About the conversation.
3          MS. JACKSON:  D d you want to finish your
4  answer?
5     Q.  I just want to make sure she's answering the quest on
6  I asked.
7     Is there anything else about the conversation that
8  you had with Ms. Harris or any conversation about your
9  meal periods that you need to tell me?  I'm not asking you
10  about --
11    A.  The time adjustments.  Like when I handed them to
12  her, she would tell me to stop filling those out, and I
13  needed to take my lunch.  And if I didn't take my lunch,
14  like on July, I quit doing the time adjustments because
15  she had threatened to write me up.
16    Q.  For not taking your lunches, correct?
17         MS. JACKSON:  Objection to the form of
18  the question.  You can answer.
19    A.  Not for not taking my lunch, for the time -- for
20  wr ting a time adjustment, because she wanted me to take
21  my lunch.
22    Q.  So she -- if you're writing a time adjustment, that's
23  because you weren't taking your lunch, right?
24    A.  If I was wr ting a time adjustment and wasn't taking
25  my lunch?

1     Q.  Okay.  It seems very easy to me, but I don't
2  understand the problem.
3     She told you to take your lunches, correct?
4     A.  Correct.
5     Q.  And she said, If you don't take your lunches, you're
6  going to be wr tten up, correct?
7          MS. JACKSON:  Object on to the form of
8  the question.
9     A.  She sa d if I filled out the time sheets, pretty
10  much, and knew that I was not taking them, that she was
11  gonna write me up.
12    Q.  And that's because you wouldn't be taking your
13  lunches, right?
14         MS. JACKSON:  Object on to the form of
15  the question.  You can answer.
16    A.  You're -- I feel like that's not what I sa d.
17    Q.  So she would wr te you up -- are you saying that she
18  would wr te you up because you filled out a time sheet
19  adjustment asking to be paid for lunch?
20    A.  That's how I felt, yes.
21    Q.  Is that what she said?
22    A.  That's how I took it.
23    Q.  What did she say?  I'm not asking you -- what you
24  have to separate is what you felt or what you thought or
25  whatever and what she sa d.  I'm asking you what she said

## Page 142

1  And what I've heard you say repeatedly is, she told you to
2  take your lunches and she was gonna write you up if you
3  didn't take your lunches.  And the evidence of you not
4  taking your lunches would be filling out a time sheet
5  adjustment form saying I didn't take my lunches; is that
6  accurate or is that not accurate?
7        MS. JACKSON:  Objection to the form of
8  the question.  You can answer.  Did you understand his
9  quest on?
10  A.  I did, but, I mean, that's not -- I'm confused.
11  Q.  Okay.  So let's break it down to its simplest
12  possible element.
13        Did Ms. Harris say to you, if you fill out a time
14  sheet adjustment form, I will wr te you up?  D d those
15  words come out of Ms. Harris' mouth?
16  A.  Yes.
17  Q.  That's what she said to you?
18  A.  Yes, because she knew I d dn't take my lunch, and I
19  filled time adjustments.  And the last one, she goes, If
20  you don't take your lunch, I'm gonna wr te you -- wr te
21  you up because of the time adjustment, yeah.
22  Q.  Okay.
23  A.  Because that's how -- if I have to write out the time
24  adjustment, she knows I d dn't take my lunch, she's gonna
25  write me up.

## Page 143

1        MR. SPINOLA:  All right.  Will you just
2  read back, instead of me rephrasing what she said, just
3  read back that answer.  And you can confirm that what you
4  just said is what you mean, and then we'll be done.
5        (The court reporter read back the
6  requested answer.)
7  Q.  Is that your testimony?  What he just said, that's
8  what you just said; is that your testimony?
9  A.  Yes.
10  Q.  Okay.  Is it still your testimony that when there
11  were three CNAs on the hall, including yourself, that you
12  would have always gotten your 30 minute, uninterrupted
13  meal period?
14  A.  Yes.
15  Q.  Is there anything else you would like to change or
16  clarify that you've testified to previously?
17  A.  No.
18  Q.  D d you maintain any record of when you worked
19  through a meal period or missed a meal period?
20  A.  Did I wr te it down?
21  Q.  Yeah.
22  A.  No.
23  Q.  You d dn't keep a diary or anything like that?
24  A.  No.
25  Q.  Are you able to tell me today which meal periods you

## Page 144

1  missed and which meal periods you took?
2  A.  No.  I mean, there's a couple that are -- when you're
3  looking through that I remember wr ting down, like doing
4  time adjustments.
5  Q.  Okay.  So if there's a time adjustment, you would
6  know you would have missed that meal period because there
7  would be a record of it, right?
8  A.  Yes, but like other days -- I mean, there's -- most
9  of the time I d d not get one.
10  Q.  Okay.  Now, we looked at 2010 and --
11  A.  Yeah, it states --- yeah, this --
12  Q.  -- it looked to me, my rough numbers, that there was
13  about 156 shifts where you clocked in and out for lunch.
14  That's about 31 weeks, if you assume a five day week.  And
15  you've already confirmed that you're not alleging that you
16  didn't receive your meal per od on those shifts, correct?
17  A.  Yeah, I signed this just knowing my hours.  I wasn't
18  really looking at my times.
19  Q.  Now, I want to make sure -- if you're changing this
20  testimony, I need to know that.
21  A.  Well, I guess so, because when we were looking
22  through it before, I told you like in here I didn't really
23  remember clocking in and out, but I signed these to get --
24  because they told us we had to sign these to get our
25  paychecks.

## Page 145

1  Q.  All right.  Ms. Crow, I'm gonna ask you again,
2  because we've been through this ad nauseum before lunch,
3  and you told me, whenever you clocked in and out for
4  lunch, you got your lunch, it was off campus and you're
5  not -- you're not claiming that you didn't receive your
6  meal period?
7  A.  I'm confused, because I don't really remember this
8  far back.  I know that I -- when I signed these, I was
9  told to sign these to get our paychecks.  And the clocking
10  in and out wasn't looking at -- or anything, and I don't
11  ever really remember going out that much to eat.
12  Q.  All right.  So tell me what your testimony is now?
13  And I want to remind you that you are under the penalty of
14  perjury.  And so, one way or another, if you change your
15  testimony, one version of your testimony is going to be
16  inaccurate; you understand that, right?  E ther what you
17  told me before or what you're telling me now, and you can
18  dec de which one is right --
19        MS. JACKSON:  Is that a quest on or are
20  you discouraging her from changing her testimony.
21        MR. SPINOLA:  I want to make sure she
22  understands.
23        MS. JACKSON:  Just ask your quest on.
24        MR. SPINOLA:  I want to find out who --
25        MS. JACKSON:  She has a right to change

37 (Pages 142 to 145)

Page 146

1  her testimony or explain her testimony.
2      MR. SPINOLA:  She can change t, but
3  you're not the one that's subject to the penalty of
4  perjury, she is.
5      MR. JACKSON:  I'm not, but you just ask a
6  quest on.  It's not your job.  It's my job whether I'm
7  doing a good job with respect to my client.  You are here
8  just to quest on.  If this is a question, please ask her.
9  Don't volunteer legal consequences --
10  Q.  (BY MR. SPINOLA)  You understand that you're subject
11  to the penalty of perjury for lying under oath?  Do you
12  understand that?
13      MS. JACKSON:  Objection to the form of
14  the question.
15  A.  I'm not lying.
16  Q.  Okay.  So are you testifying that when you -- when
17  your records show you clocking in and out for meal
18  per ods, you actually did not --
19  A.  Yes, it does, but --
20  Q.  Let me finish the question.
21      Are you testifying, and I want you to answer the
22  quest on I'm asking, when you clocked in and out on these
23  records for meal periods, is it your testimony now that
24  you didn't actually clock in and out for meal per ods?
25      MS. JACKSON:  Objection to the form of

Page 147

1  the question.  but You can answer to the best you can.
2  What do you want to say about that?
3  A.  Well, I don't remember clocking in and out, as I said
4  before in my first testimony, all this time, but it states
5  that, but I don't remember doing that like that.
6  Q.  Okay.  Are you testifying that you did not or that
7  you just don't remember doing t?
8  A.  I don't remember, because I want to say I didn't.
9  Q.  Well, what are you going to say?  Before you said I'm
10  going to stick w th my testimony the first time.  I'm just
11  trying to figure out what your -- what your claim is and
12  what -- let's first recap.
13      Before you told me you -- every time that your
14  records showed that you clocked in and out, you admitted
15  that that meant you left the facil ty for lunch, right?
16      MS. JACKSON:  Objection to the form of
17  the question.  You can answer.
18  Q.  And rather than telling me something else, I'd like
19  you to answer the question I asked.  That is what your
20  testimony was before, right?
21      MS. JACKSON:  Objection to the form of
22  the question.  Her testimony speaks for itself.  You can
23  answer, if you understood the question.
24  A.  Like what I sa d before was that I agree that I
25  signed this knowing this.  But I told you before I was

Page 148

1  confused about me clocking in and out, because I don't
2  remember -- or I don't remember going out that much.
3  Q.  That's not the question I asked.  This is the
4  question I'm asking.  Not about your confusion of what you
5  remember.  I'm asking what your testimony is.
6      Before lunch your testimony was any time the records
7  would show you clocking in and out, you left the facil ty
8  and took your lunch, and you are not claiming that you
9  missed a lunch on that day: is that still true or is that
10  no longer true?
11      MS. JACKSON:  Object on to the form of
12  the quest on.  but You can answer.
13  A.  It's true.
14  Q.  Okay.  You understood that the reason that the
15  company had a time sheet adjustment policy was to ensure
16  that the company knew if an employee missed a meal period,
17  right?
18      MS. JACKSON:  Object on to the form of
19  the quest on.  You can answer.
20  A.  That I knew that I needed to do a time adjustment?
21  Q.  For the company to --
22  A.  Correct.
23  Q.  -- be aware that you had a missed or interrupted meal
24  per od, correct?
25  A.  Correct.

Page 149

1  Q.  And if you did not fill out such a form, the company
2  would have no way of knowing that you missed or had an
3  interrupted meal period, correct?
4      MS. JACKSON:  Object on to the form of
5  the question.  Speculative.  You can answer.  Did you
6  understand his question?
7  A.  Can you repeat what he asked?
8      MR. SPINOLA:  Can you read t back,
9  please?
10  A.  They would not know, no.
11  Q.  I don't understand your answer.  They would not know,
12  no.
13  A.  They would not know.
14  Q.  They would not be aware that you had a missed or
15  interrupted meal period, right?  If you didn't fill out a
16  form, the company wouldn't know that you had a missed or
17  interrupted meal period, right?
18      MS. JACKSON:  Object on to the form of
19  the question.  You can answer.
20  A.  If I didn't turn in the time adjustment, they
21  wouldn't know, no.  But they told me not to fill one out
22  or I was gonna get wrote up.
23  Q.  Okay.  Now, in 2010, when you're getting meal
24  per ods, compared to 2011, you said that the only
25  difference that you're aware of is the census increasing;

38 (Pages 146 to 149)

## Page 150

1  is that correct?
2  A.  That would be my only, yes, only understanding of
3  why.
4  Q.   Is there any other reason that you could think why
5  you'd be getting meal per ods in 2010, but not in 2011?
6  A.  No.
7  Q.  And you're certain of that right,
8  A.  Correct.
9  Q.  Are you a smoker?
10  A.  Yes.
11  Q.  And d d you smoke while you were at this facil ty?
12  A.  Correct.
13  Q.  Did you take smoke breaks?
14  A.  Short ones.
15  Q.  Who d d you take smoke breaks w th?
16  A.  No one.  Myself.
17  Q.  Okay.  And how many smoke breaks would you take a
18  day?
19  A.  One or two.  They wouldn't last but maybe 5 or 10
20  minutes and -- maybe.  I'd smoke and go back in.
21  Q.  We talked before about what your schedule was: 7:00
22  to 3:00, right?
23  A.  Yes.
24  Q.  Five days a week?
25  A.  Five or six, depends.  Four on/two off.

## Page 151

1  Q.  Four on/two off?
2  A.  Yes.
3  Q.  And so would -- the part cular days that you worked
4  would vary each week: is that what you mean by four on/two
5  off?
6  A.  Yes.
7  Q.  All right.  So on a typical five day work week, if
8  you were working 7:00 to 3:00, how many hours would that
9  be?
10  A.  A little over 30.
11  Q.  40, right?
12  A.  30.
13  Q.  Do the -- 7:00 to 3:00 is how many hours?
14  A.  Do you want to take off or --
15  Q.  Assume that you worked through every lunch.
16  A.  Worked through every lunch.
17  Q.  Yeah.
18  A.  So eight hours.  40 hours.
19  Q.  Okay.  So on a typ cal work week, even if you had
20  missed every single meal period, the maximum hours you
21  would have worked was 40 hours, right?
22  A.  Correct.
23  Q.  And that would not have entitled you to overtime,
24  correct?
25  A.  No, not until after 40.

## Page 152

1  Q.  Okay.  All right.  Let's take a look back at Exhib t
2  Number 13 here.
3      Let me first ask this.  Are you -- do you have any
4  meal claims in 2010 when you were frequently taking your
5  meal breaks?
6  A.  When I was taking my meal breaks.
7  Q.  Yeah.  I mean, do you have -- are you alleging that
8  in 2010 you missed any breaks?
9  A.  Yes, I missed breaks.
10  Q.  Okay.  And how many -- obviously those weren't any of
11  the breaks where you were clocking out.  So the remaining
12  breaks where you weren't clocking out, how many of those
13  would you say you missed?
14  A.  That I wasn't -- that I wasn't clocking out?
15  Q.  Uh-huh.
16  A.  I'm gonna estimate, 75 percent of those.
17  Q.  Okay.  And what would that reason be?  If you were
18  able to take a meal period so frequently, what would
19  happen on the occasions where you d dn't leave the
20  facility?
21  A.  The days I d d --
22  Q.  Didn't leave the facility.
23  A.  What -- the reason --
24  Q.  Why would t be -- so, for example, if you took a
25  lunch four out of the five days of the week, why would one

## Page 153

1  day be different than the other four?  What would have
2  changed so that you wouldn't be able to --
3  A.  It just depended on the residents.  Things go on
4  that, you know, you can't -- that are unexplainable at
5  work w th the res dents and getting them a shower, you
6  know, resident having to go to the hospital, more call
7  lights than others, if they're more demanding.  It just --
8  t depends on those days that you would not be able to get
9  a lunch break.
10  Q.  Okay.  So let's look back at Exhibit 13.  And you're
11  going to need your calculator for this.  I want to do is
12   dentify any work week and just -- just to confirm with
13  you what you're claiming.  Again, you're not claiming any
14  -- any preshift work or postshift work, right?  Correct?
15  A.  Right.
16  Q.  You're not claiming to have worked before clocking
17  in?
18  A.  Yes.  That's correct.
19  Q.  You're not claiming to have worked after clocking
20  out, right?
21  A.  That's correct.
22  Q.  So on a typ cal day, your maximum claim of off the
23  clock work, of unpaid work would be typically a half hour
24  if there was a meal deduction, right?
25  A.  Correct.

**BUSHMAN COURT REPORTING**
**501.372.5115**

## Page 154

1    Q.   Okay.  So what I want to do is  identify weeks where
2    you could have potentially worked over 40 hours.  Okay?
3    A.   Uh-huh.
4    Q.   And for this, and I'm certainly not conceding this,
5    but let's just assume, for the sake of argument, so we can
6    identify what possible weeks there may be damages --
7    A.   Okay.
8    Q.   -- let's assume that every time there's a meal
9    deduct, you weren't paid for that meal, you worked through
10   that meal period.  Okay.
11   A.   Okay.
12   Q.   I know that's not your testimony.  That's not what
13   you're saying.  But let's just assume that so we can
14   identify the weeks.  Okay?
15   A.   Okay.
16   Q.   So let's start with your first week of employment,
17   3/1/2010.  And this one is easy because it's one week, and
18   you can see total hours.
19   A.   Uh-huh.
20   Q.   You see that, 31.75?
21   A.   Yes.
22   Q.   Which is 31 hours and 45 minutes, right?
23   A.   Correct.
24   Q.   So even if all of these deductions didn't really
25   happen.  All right?

## Page 155

1    A.   Uh-huh.
2    Q.   You should be -- have been paid for them because you
3    had a working meal period, that would be two hours, right?
4    There's four deduct ons there.
5    A.   Yes.
6    Q.   So 31.75 plus 2 is 33.75, right?
7    A.   Uh-huh.
8    Q.   Right?
9    A.   You sa d that really fast, so.
10   Q.   31.75 plus 2 equals what?
11   A.   63.
12   Q.   Plus two hours?
13   A.   Oh, sorry.  33.
14   Q.   And that's less than 40, right?
15   A.   Yes.
16   Q.   So even if you worked through all your lunches,
17   there'd be no claim for overtime on that work week,
18   correct?
19   A.   Correct.
20   Q.   All right.  Let's look at the next one.
21        Now, the way the pay period works is a two week pay
22   period.  So you have to divide this, and you can write on
23   your -- do you have a pen?  The pay period which started
24   on March 8th, that one ends on March 12th.  Then you have
25   March 15th through the 21st is a separate pay period.

## Page 156

1    A.   Okay.
2    Q.   All right.  So add up the hours for March 8th through
3    12th?
4    A.   31.
5    Q.   31 1/2, right?
6    A.   Uh-huh.
7    Q.   Okay.  So 31 1/2.  And it's how many shifts?
8    A.   Four.
9    Q.   So four shifts, if there was a 1/2 hour meal
10   deduction for each shift, would be two hours, right?
11   A.   Yes.
12   Q.   And that would be 33 1/2 hours, correct?
13   A.   You said there's 31 1/2 minus two hours --
14   Q.   Plus two.  You're adding the deductions as though you
15   d dn't get them.
16   A.   Yes, 33 1/2.
17   Q.   So that would not be an overtime week, correct?
18   A.   Correct.
19   Q.   All right.  Let's look at the next week.  We can add
20   up those hours?
21   A.   30 1/2.
22   Q.   30.5, right?
23   A.   Uh-huh.
24   Q.   Now, even if you missed every meal and there was a
25   deduction on every shift, that still would not equal 40,

## Page 157

1    correct?
2    A.   Correct.
3    Q.   So that's not an overtime week, correct?
4    A.   Correct.
5    Q.   All right.  Let's look at the next week, 3/22.  Add
6    that one up?
7    A.   The whole two weeks?
8    Q.   No.  I'm sorry.  The divide there is between March
9    28th and March 29th.  So add up 3/22 through 3/28.
10   A.   41.75.
11   Q.   Try again?  I've got a different number.  8.5, right?
12   Plus 7.75, plus 9, plus .5, plus 8, plus 8.  Oh, I know
13   what the problem is.
14   A.   I'm getting 41.75.
15   Q.   Yeah.  What it is is this military time.  So let
16   me explain how this works.
17        This is 7.75 here.  You see this 7.75?
18   A.   Yes.
19   Q.   That actually means 7 hour and 45 minutes.  Okay?
20        MS. JACKSON:  Which one?  Sorry.  The
21   second one?
22   Q.    See how you clocked in 7:15 and out at 3:00, right?
23   So instead of --
24   A.   Yes.
25   Q.   -- 8 hours, it would be 7 hours and 45 minutes.

**BUSHMAN COURT REPORTING**
**501.372.5115**

Page 158

1    A.   So should it be wr tten different on the paper?

2    Q.   (BY MR. SPINOLA)  Yeah.  Let me -- hold on one

3    second.

4        All right.  What number did you have?  I have the

5    hours for that week at 39.25.  In other words, 39 hours

6    and 15 minutes.  And the next week got 31 hours and 45

7    minutes?

8    A.   How many hours?

9    Q.   31.45.  If you take  t out of military time.

10   A.   So how is the 7.75 supposed to be written up?

11   Q.   As a 7 hours and 45 minutes.

12   A.   So it'd be --

13   Q.   It's just -- it's just in military time.  It's

14   telling you 7.75 means 7 hours and 45 minutes.

15       But if you look at the bottom -- well, first let's

16   look at deductions for the week of 3/22.  There are how

17   many?

18   A.   5.

19   Q.   5.  So that's 2 1/2 additional work hours if you

20   worked through every meal break, right?

21   A.   Uh-huh.

22   Q.   So that would be a week where there would be

23   potential overtime, right?

24   A.   This week, yes.

25   Q.   Because if you worked 39.25 hours or 39 hours and 1

Page 159

1    minutes and you add another 2 1/2 hours, that would put

2    you over 40 hours, right?

3    A.   This week, yes.

4    Q.   Okay.  All right.  So we'll come back to that week.

5        The next week, 3/29 through 4/4, it's 31 hours,

6    31.75, mil tary time.  And how many -- how many deductions

7    are there?

8    A.   An hour and a half.

9    Q.   It's actually 2, right, because there's four

10   deductions?

11   A.   Oh, yeah.

12   Q.   So that would not be an overtime eligible week,

13   right?  Because even if it was 31 1/2 -- or 31.75 hours

14   and adding 2 hours would make it 33.75, right?

15   A.   Are we still on the same 3/29 to 4/4?

16   Q.   Right.

17   A.   And you said how -- would you repeat the hours for

18   that week?

19   Q.   31 hours and 45 minutes.

20   A.   And there's only four deductions, that makes 2 hours?

21   Q.   Yeah.  2 plus 31 hours is 33 hours?

22   A.   Yeah, 33.

23   Q.   So that's not an overtime eligible week, right?

24   A.   Not this one.

25   Q.   All right.  Go to the next one?

Page 160

1        On this week you recorded the week break is between

2    4/11 and 4/14.  The first week is recorded at 45.75, which

3    is 45 hours and 45 minutes?

4    A.   The first week is 32.75.

5    Q.   No, 45.75?

6    A.   The 4/5 --

7    Q.   No, 4/11.

8    A.   I worked 16 hours that day.

9    Q.   Yeah.

10   A.   48.75.

11   Q.   All right.  So I'm trying give you the total because

12   of the way this is done in military time.

13   A.   It's confusing.

14   Q.   Yeah.

15       All right.  E ther way, with your number or my

16   number, we're into an overtime week, correct?

17   A.   Correct.

18   Q.   It's more than 40 hours?

19   A.   Correct.

20   Q.   And how many deductions do you see?

21   A.   Of the whole thing?

22   Q.   Uh-huh.

23   A.   5 hours.

24   Q.   Sorry.  Just the week that we're talking about?

25   A.   The first week?

Page 161

1    Q.   Yeah, 4/5 through 4/11.

2    A.   3.

3    Q.   3 hours, right?

4    A.   Uh-huh.

5    Q.   And those would be pure overtime hours, right, if you

6    had worked through every meal deduction there?

7    A.   Yes.

8    Q.   So the week of 4/5, I'm going to add that, and that

9    is 3 overtime hours, right?  We'll come back to that one.

10       Okay.  The next week you see there are -- this one is

11   an easy one to do, four days?

12   A.   32.

13   Q.   So that's not an overtime week, correct?

14   A.   No.

15   Q.   Even if you added the deductions in, right?

16   A.   Correct.

17   Q.   All right.  Go to the next one?

18   A.   You said the top half was 48.75 and then the bottom

19   half was 32, right?

20   Q.   Right.

21   A.   And so I add that up, and I make 80 hours point 75,

22   and this only says 75.75.

23   Q.   I think the problem is that we're adding military

24   time.  What week are you asking about?

25   A.   I'm asking about the total of the first week and the

Page 162

1 second week, and then I added them two together and I got
2 80.75, and down here it says a grand total is 75.75.
3 Q. Okay. The top week is 45.75.
4 A. Okay. So I missed a deduct on, so.
5 Q. It's 45.75.
6 A. Okay.
7 Q. And then the next week is 32.
8 MS. JACKSON: What are you using for
9 these calculations? If -- how do we convert these
10 numbers?
11 A. Don't they add all of these numbers up to get this
12 number?
13 Q. Well, you had -- you had overtime. See, the 70 plus
14 the 5.75? See that? That was overtime, because in -- on
15 the first week here, you had 45.75. So that's 40 hours of
16 regular plus 5.75 of overtime. Okay. Then we're adding
17 -- you've got to add in net hours. I think what you're
18 adding is the full hours. Remember we're adding the
19 deduction back in?
20 A. This is before the deduct on?
21 Q. Yes.
22 A. Okay.
23 Q. So you're adding your deduction twice is basically
24 what you're doing.
25 A. Okay.

Page 163

1 Q. So add the net hours?
2 A. 38 1/2. Oh, wa t. No. I forgot the 16. So that's
3 54.50.
4 Q. All right. Let's do it together.
5 A. Okay.
6 Q. 7.5 plus 7.75, right?
7 A. Yes.
8 Q. Plus 7.75, plus 7.75, plus 15?
9 A. Okay. 46.75.
10 Q. 40 -- try t again? 45.75. 7.5 --
11 A. Wait. Oh, that's what I d d. I put 16 instead of
12 15. 45.75.
13 Q. Okay. 45.75, have you got that?
14 A. Yeah.
15 Q. So, and then we said that there would be 3 hours in
16 potential deduct ons that you would have worked through as
17 the maximum possible claim, right, if you worked through
18 every lunch on that week, right?
19 A. Right.
20 Q. All right. So the following week, do the same math
21 except for instead of using 9 use the 7.5.
22 A. All right. 30.
23 Q. Okay. Now, just so you can see how this adds up, add
24 the 45.75?
25 A. To the 30?

Page 164

1 Q. Yes.
2 A. 75.75.
3 Q. All right. Now, so 30 hours would not be -- they
4 would not get you into overtime, even if you worked
5 through every one of these lunches, right?
6 A. Correct.
7 Q. Okay. So we're gonna exclude that week.
8 So what I have so far is the week of March 22nd and
9 April 5th. Okay?
10 A. Okay.
11 Q. Let's go to the next week. Add up your net hours
12 there?
13 A. All of them together?
14 Q. Just the -- the break there is between 4/23 and 4/26.
15 And I've add these already, if you want to stipulate
16 to any of these, but if you want to add it yourself, I
17 completely understand.
18 What I came up with was 23.75 for the first week.
19 A. 23.75?
20 Q. Yes. Is that what you have?
21 A. Yes.
22 Q. All right. And then second week I've got 52 hours.
23 A. 52.50. What did you say?
24 Q. I just had 52. Why don't you try it again?
25 A. I have 52.50 again.

Page 165

1 Q. You know, you're right. 52.50. Either way, you're
2 in overtime, right?
3 A. Yes.
4 Q. Okay. So on first one at -- we agree t's 23.75,
5 right?
6 A. It's how much? I'm sorry.
7 Q. 23.75.
8 A. Yes.
9 Q. So even if you took these two deduct ons and added
10 them in, that would just be 34.75, right -- 24.75, right?
11 A. Okay.
12 Q. Not an overtime week, right?
13 A. Yes.
14 Q. So we can exclude that week. The next one, you're
15 already in overtime whether it was 52 or 52.5, right?
16 A. Yes.
17 Q. And so how many meal deductions do you see in that
18 week?
19 A. Three.
20 Q. So that's an hour and a half, right?
21 A. Yes.
22 Q. That's 4/26. 1.5 in overtime, right, would be
23 maximum potential damages, right --
24 A. Uh-huh.
25 Q. -- in that week?

BUSHMAN COURT REPORTING
501.372.5115

## Page 166

1    All right.  Let's look at the next one, which you go
2    two pages because you had actually signed off on a
3    different the same week.  And we'll explain what happened
4    here on 4/30/2010.
5    A.  On 4/30?
6    Q.  Yes.  So where you signed, you see how that --
7    there's a meal deduct on there?
8    A.  Yes.
9    Q.  You signed it, and then you filled out a time sheet
10   adjustment form.  So look at 4/30/2010, on the page
11   before?
12   A.  On this page?  What --
13   Q.  Yeah.  You see the .5 deduct on?
14   A.  Yes.
15   Q.  All right.  Now, clip it to the page before and look
16   at the same date, 4/30?
17   A.  Oh, there's two.  I see this now.
18   Q.  And you see there's no deduct on on that one?
19   A.  Correct.
20   Q.  And that's because you filled out a time sheet
21   adjustment form, wh ch we'll look at in a little while.
22   That's -- they made the change that you had requested?
23   A.  Correct.
24   Q.  All right.  And so let's go to the next week,
25   5/4/2010.  Add  t up for me?

## Page 167

1            MS. JACKSON:  Hold on.  What happened
2    with regard to our deduction there?
3    A.  When I clocked out that day.
4            MS. JACKSON:  Okay.
5    A.  It was already deducted.
6            MS. JACKSON:  That day still counts as a
7    weekday, right?  The week is supposed to start on the 2nd.
8            MR. SPINOLA:  5/2 is part of the 4/26
9    week.  See at the top of the time card where it says, date
10   range and it ends at 5/2.
11           MS. JACKSON:  I see.  Okay.
12           MR. SPINOLA:  That goes into that week
13   that was 52.5 hours.
14           MS. JACKSON:  Sorry.
15           MR. SPINOLA:  Okay.
16   Q.  (BY MR. SPINOLA)  All right.  So the next week,  t
17   ends at between 5/9 and 5/10.  That's the cutoff in your
18   pay periods.
19   A.  5/9 and 5/10?
20   Q.  Uh-huh.
21   A.  Looks like everyday that I clocked out  t was taken
22   out.
23   Q.  5/4.  5/4 there was a deduction.
24   A.  Yes.
25   Q.  5/5 there was a deduction.

## Page 168

1    A.  On the 8th there wasn't, but I clocked out.
2    Q.  Yeah.  Right.  On 5/8 and 5/9.
3         But there would -- so there would be 1 hour that you
4    would add to the net hours total, right, for two
5    deduct ons, two 1/2 hour deduct ons, if you had worked
6    through on --
7    A.  If I worked through, then I'd have two, yes.
8    Q.  And that would not equal 40 hours, correct?  If you
9    add up the net hours,  t's only 30?
10   A.  Yes.
11   Q.  Okay.  So that's an excluded week, do you agree?
12   A.  Yes.  What do you mean by excluded, like --
13   Q.  It means that there's no way, even if -- even if you
14   worked through every meal period on this -- on this week,
15   you wouldn't have been entitled to overtime.
16   A.  Okay.
17   Q.  So there's no overtime damages that would be due on
18   that week, even if everything you said was true and you
19   worked through every lunch?
20   A.  Yes.
21   Q.  Okay.  And what I'm trying to do, I'm trying to boil
22   down what the actual potential weeks are where there could
23   be damages.
24   A.  Okay.
25   Q.  So we can only, you know, worry about discussing

## Page 169

1    those.
2         All right.  So 5/10 through 5/16, add that one up?
3    This is a close one, so I want to make sure you add it up
4    yourself and see  t, the net hours.
5    A.  37 1/2.
6    Q.  37 1/2, and there's only one deduction that week,
7    right?
8    A.  Yes.
9    Q.  Which would put your hours into 38, right?
10   A.  39.
11   Q.  Well, if there's one -- if it's 37 1/2 and  t's a 1/2
12   hour deduction, 37.5 plus .5 is what?
13   A.  You're right.
14   Q.  Okay.  38.  Not an overtime week, right?
15   A.  Right.
16   Q.  So those are out.
17   A.  I see something on here.  On the 28th and 29th, I
18   worked more than 8 hours and only got 1/2 an hour lunch
19   taken out, and shouldn't I have taken -- got taken an hou
20   out?
21   Q.  Where are you?
22   A.  On the 5/28, 5/29.  I worked 10 -- 10 hours and only
23   got 1/2 an hour lunch.  Don't that require an hour lunch?
24   Q.  No, because it's at 16 hours.
25   A.  16.  Okay.

## Page 170

1  Q.  If you worked two double -- a double shift, then
2  there would be two.
3  A.  Uh-huh.
4  Q.  All right.  So let's look at -- and the cutoff here
5  is between 5/23 and 5/26.
6      Okay.  So the 5/17 through 5/23, net hours, do you
7  want to add that up?
8  A.  It's less than 40 hours.
9  Q.  Yeah, it's 30 hours -- 30.25, and you had potential
10 deductions of only .75, right?  So that would make it 31
11 hours, right --
12 A.  Correct.
13 Q.  -- if you worked through all that time?
14         MS. JACKSON:  What would be the 25, is it
15 25 minutes or 15 minutes?
16         MR. SPINOLA:  That's 15.
17         MS. JACKSON:  15.
18         MR. SPINOLA:  Yeah.
19 A.  Because it's military time?
20 Q.  Yeah.  And so every quarter, every 25 means 15.  So
21 that's why .5 is really 30 minutes.  Okay.
22     All right.  So the week of 5/17 is not a -- actually,
23 .75 would be 45.
24 A.  45.  Okay.
25 Q.  And .5 would be 30 minutes.  So think of it as every

## Page 171

1  25 being worth 15 minutes.
2  A.  Okay.
3  Q.  So the next week of 5/26, add that one up?
4  A.  This one?
5  Q.  Yeah.
6  A.  Oh, by -- what day?  I'm sorry.
7  Q.  Remember to start with the net hours.  5/26 through
8  5/29.
9  A.  38.25.
10 Q.  Okay.  That's what I got, too.
11     Now, add the meal deductions to that, assuming that
12 you worked through all this time?  It's four shifts.
13 A.  40.
14 Q.  So it's 40 hours exactly, right?
15 A.  Correct.
16 Q.  Not an overtime week, right, even if you had worked
17 through all these meals?
18 A.  Well, the policy says 40 hours or more is overtime.
19 So it starts at like 40 point whatever.
20 Q.  Right.  40 hours is no overtime.  Anything beyond 40
21 would be overtime eligible.
22     Okay.  Let's continue on.  Can you see by looking
23 that -- oh, let me tell you the cutoff for the next week,
24 which is the pay period between 5/31 and 6/13.  The 6/4,
25 between 6/4 and 6/7 are the cutoff.

## Page 172

1  A.  6/7 and 6/8?
2  Q.  6/4 and 6/7.
3      Okay.  And so if you add up the net hours for between
4  6/1 and 6/4.  Yeah, it's 30.5.  And the only deductions
5  there are 1/2 hour anyways.  So that would be 31 hours.
6  Not an overtime eligible week, right?
7  A.  Correct.
8  Q.  Now, 6/7 through 6/13.  That's 36 hours, but I'll let
9  you do the math.
10 A.  36.
11 Q.  Yeah, 36.  And how many deductions do you see?
12 A.  Two.
13 Q.  One .5 and one .25, right?  So .75?
14 A.  36.75, yes.
15 Q.  Yes.  So that's not an overtime eligible week,
16 correct?
17 A.  Correct.
18 Q.  Let's look at the next one -- the cutoff is between
19 6/20 and 6/21.
20 A.  6/20 and 6/21?
21 Q.  Uh-huh.  You see there that neither of those are 40
22 hour weeks?  You can add them up, if you'd like?
23 A.  I see that it's not.
24 Q.  Yeah.  The first week is 30 hours and the next is
25 32.75.  And even if you added all the deductions, it would

## Page 173

1  not get you to 40 hours, right?
2  A.  Right.
3  Q.  So neither of those are overtime eligible weeks, yes?
4  A.  Correct.
5  Q.  All right.  Let's look at the next one.
6  A.  Which one?
7  Q.  It's 6/28.
8  A.  Okay.
9  Q.  And the cutoff there is between 7/4 and 7/7.  Let's
10 add up the first one?
11 A.  39 1/2.
12 Q.  And how many deductions do you see?
13 A.  Two.  40 1/2.
14 Q.  Yeah.  So that one is eligible for overtime, right?
15 A.  Correct.
16 Q.  One hour, right?
17 A.  It's in overtime if you add the deductions?
18 Q.  Correct.
19 A.  So that really doesn't mean like you get paid for
20 overtime, because this was my worked hours.
21 Q.  Right.  You worked 39 1/2?
22 A.  Right.
23 Q.  And so you were not paid overtime.  On this work
24 week, you were not paid any overtime.  But if you were to
25 claim --

BUSHMAN COURT REPORTING
501.372.5115

## Page 174

1    A.  My lunches.

2    Q.  -- that you worked through both those lunches, then

3    you would have gotten an 1/2 hour of overtime.  Okay?  So

4    it's one hour.

5    A.  And that was the one day I didn't clock out.

6    Q.  Right.  The next week, you see that that's not gonna

7    add up to 40 hours, it's 30.25 hours?

8    A.  Correct.

9    Q.  And there's only .75 in deductions.  So even if you

10   had worked through all those deductions, that would only

11   add up to 31 hours, correct?

12   A.  Correct.

13   Q.  So that's not an overtime eligible week?

14   A.  Correct.

15   Q.  Okay.  The next one, the break is between 7/16 and

16   7/19.  So you see the first week is 30 hours?

17   A.  Yes.

18   Q.  So even w th the deduct ons, that would only be 31

19   hours, correct?

20   A.  Correct.

21   Q.  Not an overtime eligible week?

22   A.  No.

23   Q.  And then the next week, you can add this if you want

24   because it's a close one, it's 38 hours is what I've got.

25   Do you want to add it?  7.75 plus --

## Page 175

1    A.  34.

2    Q.  I've got 38.  Are you --

3    A.  Which one: this one down here?

4    Q.  7/19 through 7/25.

5    A.  We'll go with yours.

6    Q.  So 7.75, plus 7.5, plus 7.5, plus 7.75, plus --

7    A.  I still got 34 again.  I don't know.

8    q.  Let's do it together.  You're starting with 7/19,

9    right?

10   A.  Yes.

11   Q.  7.75, right?

12   A.  Yes.

13   Q.  And then the next one is 7.5, right?

14   A.  Yes.

15   Q.  And then 7.5 again, then 7.75, and then 7.5, right?

16   A.  Uh-huh.

17   Q.  What did you get this time?

18   A.  34.

19   Q.  You're getting 34?

20   A.  Yeah.

21   Q.  All right.  Oh, I see.  Okay.  There was a time

22   adjustment here.  Okay.  You actually got paid credit for

23   more time.  See, you signed this one, but then you did an

24   adjustment.

25   A.  Uh-huh.

## Page 176

1    Q.  So this 3.5 on 7/25 went up to 7.5.  See it?

2    A.  Yes.

3    Q.  Okay.  And so that's the difference is another four

4    hours?

5    A.  Correct.

6    Q.  The difference between 3.5 and 7.5.  So add 4 to

7    there and you'll get your 38?

8    A.  Okay.

9    Q.  Okay.  So 38 hours, good on that?

10   A.  Yes.

11   Q.  So 38 hours and there was only a .25 deduction that

12   week, right?

13   A.  Right.

14   Q.  So not an overtime eligible week, right?

15   A.  Right.

16   Q.  Okay.  Let's go to the next one.  The break here is

17   between 8/1 and 8/3.

18        All right.  8/1 and 8/3.  So you can see that one is

19   a three day work week, right?

20   A.  Yes.

21   Q.  That's 17 hours.  7.5, 7.25 and 2.25.

22        Not overtime eligible, right?

23   A.  No.

24   Q.  And there are also no deductions.  That's going to

25   make this easier for this entire pay period because you're

## Page 177

1    clocking out, right?

2    A.  Right.

3    Q.  So the next one, you can see that's not a 40 hour

4    work week, either?  That's 30.25 from 8/3 to 8/8.  You see

5    that?  Four days of work.

6    A.  Uh-huh.

7    Q.  7.5, 7.5, 7.5 and 7.75.  So neither of those are

8    overtime eligible weeks, correct?

9    A.  Correct.

10   Q.  All right.  8/9.  What I need to do now, this is --

11   every once in a while you get one of these that you signed

12   off on, t doesn't show you what the deduct ons are.

13   A.  Uh-huh.

14   Q.  There aren't any, but you can't tell that from here.

15   So I want to be fair about it and give you another exhibit

16   that will show you that.

17        MS. JACKSON:  Let's take a break while

18   you're looking.

19        MR. SPINOLA:  That's fine.

20        (Defendant's Exhibit 14 was marked.)

21   Q.  (BY MR. SPINOLA)  I'm handing you what's been marked

22   as Exhib t 14, which is another punch report.  And I just

23   want to go to the -- the same --

24   A.  8/9.

25   Q.  Yeah, for the 8/9, because this one does show

## Page 178

1  deduct ons.

2  A.  You sa d not to mess these up?

3  Q.  Yeah.  Try to keep them together.

4  And you see that, from the dates of 8/9/2010 -- I

5  think this is the only one we'll have this issue with.

6  8/9/2010 through 8/21/2010, there was no deductions,

7  right?

8  A.  Yeah, there's no deductions on here.

9  Q.  Okay.  There actually is one on 8/21, you see it?

10  .5.

11  A.  Oh, okay.  Yes.

12  Q.  That's  t.

13  So just put that on 8/21, put a .5 there.

14  All right.  So put this one aside now?

15  A.  This one?

16  Q.  Yeah.  Put 13 as de, and let's go back to the one

17  we've been working on.  And add up your -- I told you the

18  div de, I think, is between 8/15 and 8/18.

19  You're on the wrong -- stay with the one we've been

20  working on.  The new one, just put it back in the same

21  order and put it to the side.

22  A.  Oh, okay.

23  Q.  All right.  So between 8/9 and 8/15, you have to draw

24  that line in there, right?

25  A.  Okay.

## Page 179

1  Q.  Between 8/15 and 8/18.  Got it?

2  A.  Correct.

3  Q.  All right.  So between 8/9 and 8/15, add up those

4  hours?

5  A.  39.25.

6  Q.  Yeah, that's what I got, too.

7  And there were no deductions on any of those days.

8  So that's not an overtime eligible week, right?

9  A.  No, it's not.

10  Q.  And on the next week, that's 8/18 through 8/21.  It's

11  four days.  Add up that time?  That's the one that's got

12  one, 1/2 hour deduction.

13  A.  32.25.

14  Q.  Yelp.  So if we added the 1/2 hour deduct on,  t'd be

15  32.75, right?

16  A.  Correct.

17  Q.  Not overtime eligible week.

18  Let's go to the next one.  And that's 8/24 through

19  9/5, right?

20  A.  I'm sorry?

21  Q.  The next page.  8/24 through 9/5?

22  A.  Yes.

23  Q.  The break goes between 8/27 and 8/30, the pay weeks

24  The  first week you can pretty clearly see is not an

25  overtime week.  It was 26.25.

## Page 180

1  A.  Uh-huh.

2  Q.  The next week is close.  So if you want to add that

3  one, make sure we have the same number, starting on 8/30?

4  A.  37.25.

5  Q.  Right.  And there's only one deduction, right?  So

6  that would make  t 37.75, right?

7  A.  Correct.

8  Q.  Not an overtime eligible work week, correct?

9  A.  No, it's not overtime.

10  Q.  Even if you had worked through that meal period.

11  Okay.  Let's look at the next one.  This is 9/6/2010

12  through 9/19/2010.  The break is between 9/12 and 9/13.

13  There were no meal deduct ons taken on any of these days,

14  correct?

15  A.  There was no meal deductions?  No, not that is on the

16  paper.

17  Q.  Right.  They're all -- if you look, you clocked out

18  on each day, right?

19  A.  Except 7 -- or 9/7, I didn't clock out.

20  Q.  Okay.  Yeah, that's the one that was actually a time

21  adjustment form for that that we'll look at.  That was a

22  cancelled automatic deduction.

23  So add up the net hours then, the net hours column

24  for each work week?

25  A.  39 1/2.

## Page 181

1  Q.  Okay.  39 1/2 with no deduction means  t's not

2  overtime eligible, right?

3  A.  No, it's not eligible.

4  Q.  Huh?

5  A.  It's not eligible.

6  Q.  Okay.  And how about the next week?

7  A.  36 1/2.

8  Q.  And with no deductions, that also would not be

9  overtime eligible because there's no way to go beyond 40

10  hours based on your claims, correct?

11  A.  Correct.

12  Q.  All right.  So let's look at 9/20 now, 2010.  Are you

13  there?

14  A.  Yes.

15  Q.  The break here is between 9/25 and 9/26.  So for the

16  week of 9/20 through 9/25, I have a total of -- net hours

17  of 30.25?

18  A.  How many?

19  Q.  30.25.  Is that what you have?

20  A.  No.  I'll do  t again.  30.25.

21  Q.  Yeah.  And there was only one deduction, right?

22  A.  Correct.

23  Q.  The 1/2 hour.  So that would make it 30.75, and not

24  eligible for overtime, right?

25  A.  Correct.

46 (Pages 178 to 181)

## Page 182

1  Q.  Okay.  The next week I've got as 37.75.  Do you want
2  to check that one?
3  A.  37.25.
4  Q.  And there was one hour in deductions, right?
5  A.  Yeah.  So 38.25.
6  Q.  Not overtime eligible, right?
7  A.  Right.
8  Q.  Let's go to the next one.  This is the week of -- or
9  the pay period from 10/5/2010 through 10/17/2010, right?
10  A.  Correct.
11  Q.  And there were no deductions taken from your pay,
12  correct?
13  A.  Correct.
14  Q.  The first week I have --
15  A.  I'm sorry.  10/15, I didn't clock in and out and
16  didn't get no deduct ons.
17  Q.  So that was only for .75, right?  So 45 minutes?
18  A.  Oh, I didn't see that.  Sorry.
19  Q.  So that's why, because if it's under 5 hours, no
20  deduct on would apply to you.  So there are no deductions
21  So the net hours for the first week I have is 31
22  hours?
23  A.  What was the -- div de --
24  Q.  Oh, between 10/8 and 10/11.
25  A.  31.

## Page 183

1  Q.  Yelp.  So that's not overtime eligible, correct?
2  A.  No.
3  Q.  And the next week, what do you have?
4  MR. SPINOLA:  And while she's doing that,
5  let the record reflect that the witness is calculating the
6  net hours on each time card to confirm the total hours
7  worked.
8  A.  I got 37.75.
9  Q.  I got the same.  So that's not an overtime eligible
10  week since there were no deductions, right?
11  A.  Correct.
12  Q.  All right.  Let's look at the next work week, the
13  next pay per od, 10/18 through 10/31/2010.  The divide is
14  between 10/24 and 10/29.  And it looks like, other than
15  for a 1/2 an hour on 10/22 that you had you clocked in,
16  there's no deductions at all, and you had you clocked out
17  for lunch on each of these days except for the time you
18  were only working a 1/2 hour.
19  What would that be, by the way: is that for a
20  meeting?  Why would you come in for just 30 minutes like
21  that?
22  A.  Yeah, t was around 3 o'clock, and that's when our
23  meetings were.
24  Q.  Okay.  So if you weren't scheduled to work on a
25  meeting day, you would just clock in, go to the meeting

## Page 184

1  and clock out?
2  A.  Correct.
3  Q.  Okay.  So let's add up 10/18 through 10/24?
4  A.  39.
5  Q.  39, with zero deductions means it's not overtime
6  eligible, correct?
7  A.  Correct.
8  Q.  All right.  Let's look at 10/29 through 10/31.  That
9  one's pretty obvious, right?  That's 23 hours, three
10  shifts.  So that's not an overtime eligible week, right?
11  A.  Correct.
12  Q.  All right.  Let's look at the next one.  This
13  11/1/2010 through you 11/13/2010.  The cutoff is between
14  11/7 and 11/10.
15  Add up the net hours for 11/1 through 11/7?
16  A.  39 1/2.
17  Q.  And there's one deduct on that week, right?
18  A.  Correct.  It would be right at 40.
19  Q.  So that'd be right at 40, not overtime eligible,
20  correct?
21  A.  Correct.
22  Q.  And 11/10 through 11/13?
23  A.  31 1/2.
24  Q.  31.5, no deductions, not overtime eligible, right?
25  A.  Correct.

## Page 185

1  Q.  Let's look at 11/16/2010 11/27/2010.  It looks like
2  you clocked out for lunch except for one day, 11/19, where
3  there was one 30 minute deduction, right?
4  A.  Correct.
5  Q.  All right.  So you -- the cutoff is 11/19 through
6  11/22.
7  A.  You sa d there was only one.  I see two days: 16 and
8  19, there was not a clock out.  And on 16 --
9  Q.  Right.  16 was 15 minutes you were clocked in?
10  A.  Oh, sorry.
11  Q.  That's okay.
12  Yeah, that was from 7:00 to 7:15.
13  A.  Okay.
14  Q.  All right.  Can you see from 11 -- I told you the
15  break, right?  It's between 11/19 11/22.
16  A.  Uh-huh.
17  Q.  So 11/16 through 11/19 I have as 23 hours?
18  A.  Yes.
19  Q.  So even if you added the addit onal 1/2 hour, that's
20  be 23 1/2, and not overtime eligible, right?
21  A.  Correct.
22  Q.  All right.  Let's do 11/22 through 27?
23  A.  I got 37.45.
24  Q.  37 what?
25  A.  .45.  That must be wrong.

BUSHMAN COURT REPORTING
501.372.5115

## Page 186

1    Q.  I had 37.5.  You want to try it again?
2    A.  Yes.
3    Q.  37.5, right?
4    A.  Yes.
5    Q.  And no deductions, right?
6    A.  Correct.
7    Q.  So that's not an overtime eligible week.
8        Let's look at 11/29 through 12/12/2010?
9        I just wanted you to confirm, because I don't think
10   you answered that last week, 37.5 w th no deductions is
11   not an overtime eligible week, correct?
12   A.  Correct.
13   Q.  Okay.  Let's look at 11/29/2010 through 12/12/2010?
14   And there the cutoff is between 12/5 and 12/6.
15       The w tness is calculating 11/29/2010 through
16   12/5/2010, and you came up w th a grand total of?
17   A.  37.75.
18   Q.  And that's what I have, too.  37.75 w th no
19   deduct ons, that would not be an overtime eligible week,
20   correct?
21   A.  Correct.
22   Q.  And the following week, from 12/6 to 12/12, what d d
23   you get there?
24   A.  26.
25   Q.  26 hours with three deductions equaling an hour and a

## Page 187

1    half, right?
2    A.  Correct.
3    Q.  So that would be 27 1/2 hours, which would not be
4    overtime eligible, right?
5    A.  Correct.
6    Q.  Again, that would be if you had, in fact, worked
7    through each of those deducted meal periods.
8        All right.  Let's add up, now we're at 12/15/2010
9    through 12/24/2010.  The cutoff is between 12/19 and
10   12/21.
11   A.  34 1/2.
12   Q.  That's what I have, too.  34 1/2 with, looks like
13   three auto deducts, correct?
14   A.  Yes.
15   Q.  For an hour and a half?
16   A.  Yes.
17   Q.  So that would be 36 hours, if you added them all into
18   your net hours, correct?
19   A.  Correct.
20   Q.  And that would not be overtime eligible, right?
21   A.  Correct.
22   Q.  All right.  Let's look at 12/21 through 12/24?  You
23   can probably see there that four days of work, that
24   doesn't -- that's 29 hours.  Do you want to add that one?
25   A.  Yes.  29.

## Page 188

1    Q.  29 with four deductions, correct.  1/2 hour each, so
2    two hours, right?
3    A.  Correct.  Yes.
4    Q.  That'd be 31 hours?
5    A.  Correct.
6    Q.  Not overtime eligible, right?
7    A.  Correct.
8    Q.  Okay.  Let's look at 12/27 through 1/9/2011.  The
9    cutoff here is 1/2 and 1/3/2011?
10   A.  36.25.
11   Q.  The week of December 27, 2010 to January 2, 2011 is
12   36.25, and how many deduct ons?  Five deduct ons.  So even
13   if added 2 1/2 hours, that would be 38.75, and not
14   overtime eligible, correct?
15   A.  Correct.
16   Q.  All right.  And let's do the next week?
17   A.  37 1/2.
18   Q.  37 1/2 for the week January 3 through January 9,
19   2011, and there were one, two, three, four, five
20   deductions for 2.5 hours, right?
21   A.  Yes.
22   Q.  2.5 plus 37.5 is 40, right?
23   A.  Correct.
24   Q.  Not be an overtime eligible week, correct?
25   A.  Correct.

## Page 189

1    Q.  All right.  Let's look at the next week, January 10,
2    2011 --
3    A.  Uh-huh.
4    Q.  -- through January 23, 2011.  The cutoff here is
5    between January 16th and 17th.
6    A.  Okay.  On the January 11th, they said I did a time
7    adjustment.
8    Q.  How do you know that?
9    A.  I don't know.  I'm just asking.
10   Q.  You just figured that out.  Yeah, that's accurate.
11       Is that when you had the conversation that you had
12   ment oned with the DON?
13   A.  Yes.  I mean, I had conversations with her every time
14   I had a time adjustment, yes.
15   Q.  Okay.  So let's add up -- d d I tell you the cutoff,
16   between 1/16 and 1/17.  Yeah, you got it.
17       So add up January 10th through 16th?
18   A.  38 1/2.
19   Q.  38 1/2.  And how many deductions?
20   A.  Four.
21   Q.  38 1/2?
22   A.  All right.  So 38 1/2 --
23   A.  40 1/2.
24   Q.  40 1/2.  So that would be an overtime eligible week,
25   right?

Page 190

1   A.   Correct.
2   Q.   All right.  So I'm marking this one down.
3        Do the next one?
4   A.   The next week is 37.75.
5   Q.   Right.  And how many deductions?
6   A.   Five.
7   Q.   Five.  So let's add that up?
8   A.   40.25.
9   Q.   40.25.  So that one, too, would be 15 minutes of
10  overtime, correct?
11  A.   Correct.
12  Q.   So that's the week of 1/17.  Okay.  Those two are
13  overtime eligible.
14       Let's go to the work week of January 26th through
15  February 4th.  And the cutoff here is January 29th and
16  February 1st.  Add those up?
17  A.   34.
18  Q.   34 with five meal deductions, right?  So even if you
19  worked through all five of those meals, that would be 2.5
20  hours or 36.5, correct?
21  A.   I just got 36.
22  Q.   2.5.  Oh, I'm sorry.  You're right.  There's only
23  four.
24  A.   Yeah.
25  Q.   Not 5.  So that would be 36 hours, correct?

Page 191

1   A.   Correct.
2   Q.   Not overtime eligible, right?
3   A.   Correct.
4   Q.   All right.  Let's do the next week?
5   A.   30.
6   Q.   And if you added your deductions, 32, and not
7   overtime eligible, right?
8   A.   Correct.
9   Q.   All right.  Let's do the next one.  This is February
10  7th through February 20, 2011.  The cutoff is between
11  February 13th and February 14th.
12  A.   13 and 14?
13  Q.   Uh-huh.
14  A.   Well, this -- do you want me to go to the next one,
15  because this one is the same as the other one?  No?  We'll
16  just --
17  Q.   No, they're different.
18  A.   Okay.  I says 3.25 hours.
19  Q.   What did you get?
20  A.   Oh, just on 2/13 it says 3.25 hours.
21  Q.   Right.
22  A.   33.25.
23  Q.   33.25, that's what I have as well.  And there are
24  one, two, three, four deductions, right?
25  A.   So 35.25.

Page 192

1   Q.   Not overtime eligible, correct?
2   A.   Correct.
3   Q.   Okay.  The next one, 2/14 through 2/20?
4   A.   30 1/2.
5   Q.   30 1/2.  So 32.5 is not be overtime eligible, right?
6   A.   Correct.
7   Q.   Okay.  Let's go to the next one.  February 21st
8   through March 6th.  The cutoff is between 2/27 and 2/28
9   A.   30 1/2.
10  Q.   30 1/2 with 2 hours of deductions, right?
11  A.   Correct.
12  Q.   That would be 32 1/2, not be overtime eligible,
13  right?
14  A.   Correct.
15  Q.   And the next date is 2/28 through 3/6.  What do you
16  get?
17  A.   37.
18  Q.   37.  And how many deductions?
19  A.   2 1/2.  So 39.  Underneath.
20  Q.   39 1/2, not overtime eligible, right?
21  A.   Correct.
22  Q.   And each of these you're signing, I should mention,
23  right?  You see you signature on each one of these --
24  A.   Yes.
25  Q.   -- time adjustments certifying your time card is

Page 193

1   correct?
2        All right.  Let's look at the next one, 3/9 through
3   3/18/2011.  The cutoff being between 3/12 and 3/15.
4   A.   I'm sorry.  I was looking at the previous one.  3/15
5   and 3/16?
6   Q.   3/12 and 3/15.
7        And these add up to 30 hour and 28.5 hours, and
8   neither would be overtime eligible.  But you're welcome to
9   do the math.  Do you want to do the math?
10  A.   Yes.  30.
11  Q.   30 hours with 2 hours in deductions, right?
12  A.   Correct.
13  Q.   And 32, not overtime eligible, right?
14  A.   Correct.
15  Q.   And the next one?
16  A.   28.75.
17  Q.   28.75 w th another two hours in deductions, not
18  overtime eligible, right?
19  A.   Correct.
20  Q.   All right.  Let's look at the next one.  The cutoff
21  is between 3/27 and 3/28.
22       And while the witness is doing the math, this is
23  RHC11779.
24       So we're calculating 3/21 through 3/27, total hours?
25  A.   38 1/2.

49 (Pages 190 to 193)

## Page 194

1  Q.  And how many deductions?
2  A.  2 1/2.  Leaves me at 41.
3  Q.  So that is overtime eligible, right?
4  A.  Yes.
5  Q.  Okay.  So if you had worked indeed through everyone
6  of these meal periods, you would be entitled to, what did
7  you say it was: 41 1/2?
8  A.  Yes.
9  Q.  Okay.  1 1/2 hours of overtime.
10      Okay.  Look at the next week?
11  A.  30.25.
12  Q.  30.25, with two hours of deductions.  So that would
13  be 32.25, right?
14  A.  Correct.
15  Q.  Not overtime eligible, right?
16  A.  Correct.
17  Q.  Okay.  4/4 through 4/17.  The cutoff is between 4/10
18  and 4/11.
19      Let's first add up for 4/4 through 4/10?
20  A.  30.25.
21  Q.  30.25.  So even with the deductions, two hours worth
22  of deduct ons, that would be 32, not overtime eligible,
23  correct?
24  A.  Correct.
25  Q.  And the next week?

## Page 195

1  A.  36.
2  Q.  36 with?
3  A.  2 1/2.
4  Q.  2 1/2 hours is 38.5, right?
5  A.  Correct.
6  Q.  Not overtime eligible?
7  A.  Correct.
8  Q.  Okay.  Let's look at the next one.  Now here, the
9  cutoff is between 4/22 and 4/23.  So, obviously, 4/22,
10  that's one day, that's not going to be overtime eligible,
11  right?
12  A.  Correct.
13  Q.  So the week of 4/23 through 4/29, add that one up?
14  A.  37.75.
15  Q.  37.75, and then let's add up the deductions?
16  A.  2.25.
17  Q.  All right.  37.75 plus 2 --
18  A.  Exactly 40.
19  Q.  That's 40 hours, not overtime eligible, correct?
20  A.  Correct.
21  Q.  All right.  Let's look at the next week, 5/2/2011
22  through 5/15/2011.  The cutoff is between 5/8 and
23  5/9/2011.
24  A.  I'm sorry.  I didn't hear the cutoff.
25  Q.  5/8 and 5/9.

## Page 196

1  A.  33.25.
2  Q.  Okay.  And how many deductions?
3  A.  1.25.
4  Q.  1.25.  So that would only --
5  A.  Yeah.
6  Q.  -- add up to --
7  A.  34.50.
8  Q.  -- 34.50, not overtime eligible, right?
9  A.  Correct.
10  Q.  The next week?
11  A.  36.25.
12  Q.  And with how many deductions?
13  A.  Four.
14  Q.  So 2 hours, would be 38.25, not overtime eligible,
15  correct?
16  A.  Correct.
17  Q.  Look at the next pay per od, 5/16 through 5/28/2011
18  The cutoff is between 5/22 and 5/23.
19  A.  37.
20  Q.  37.  All right.  And how many deductions?
21  A.  Five.
22  Q.  Five.  So 2 1/2 hours would be 39 1/2, not overtime
23  eligible, correct?
24  A.  Correct.
25  Q.  Then the next week?

## Page 197

1  A.  Under.  It's not enough.
2  Q.  Yeah, it's 28.25, and not overtime eligible, right?
3  A.  Correct.
4  Q.  Okay.  The next week is from 6/2/2011 to 6/10/2011
5  The cutoff is between 6/4 and 6/7.
6      So one week there is a three day shift and the other
7  is a four day shift?
8  A.  Correct.  The first week isn't eligible.
9  Q.  25.5.  So that's not overtime eligible, right?
10  A.  No.
11  Q.  And the next week?
12  A.  32.75.
13  Q.  32.75 w th 2 hours of deduct ons, that would not be
14  overtime eligible, even if you had worked through all
15  those lunches, right?
16  A.  Correct.
17  Q.  Okay.  The next week, I'm going to help you out a
18  little here, because this was a vacation week.  This is
19  6/13 through 6/26/2011.  The cutoff is between 6/19 and
20  6/20.  And you actually have only worked two of those
21  days, everything else is vacation hours, wh ch don't count
22  as hours worked.  So your hours worked is actually 8.5
23  hours.
24  A.  Okay.
25  Q.  So that would not be overtime eligible, correct?

## Page 198

1    A.   Correct.
2    Q.   And the next week is 6/20 through 6/26.  Do you wan
3    to add that one up?
4    A.   Was this a paid vacation?
5    Q.   Looks like it.
6    A.   Okay.
7    Q.   Yeah, see where it says hours?
8    A.   Yeah.
9    Q.   Okay.
10   A.   30.25.
11   Q.   30.25, with an hour and a half of deductions,
12   correct?
13   A.   Correct.
14   Q.   And so that would not be overtime eligible, right?
15   A.   Correct.
16   Q.   Look at the next week.  6/28 through 7/9 is the pay
17   period.  The cutoff is between 7/3/2011 and 7/4/2011.  Do
18   you want to add those up?
19   A.   That's under.
20   Q.   Yeah.  One is 30 hours the other is 30.25 hours.  So
21   neither of those would be overtime eligible, correct?
22   A.   Correct.
23   Q.   All right.  Let's look at 7/13 through 7/21.  The
24   cutoff is between 7/16 and 7/19.  Do you want to add up
25   7/13 through 7/16?

## Page 199

1    A.   It's only 31.
2    Q.   31.5.  And you only had an hour's worth of meal
3    deducts.  So that would be 32.5, not overtime eligible,
4    right?
5    A.   Correct.
6    Q.   And I'll point out that 7/15/2011 was one of your
7    time adjustment request for missed meal period, and you
8    see that the deduction was in fact reversed, right?
9    A.   Yes.
10   Q.   Okay.  And then the next day it looks like you
11   clocked in and out for lunch, right?
12   A.   Yes.
13   Q.   All right.  So let's add up 7/19 through 21.  Do you
14   see that that -- there's no way that can be overtime
15   eligible, right?
16   A.   Yes.
17   Q.   23.75 hours?
18   A.   Yes.
19   Q.   Okay.  Neither of those are overtime eligible weeks.
20        Let's go to 7/26 through 8/7/2011.  Are you there?
21   A.   8/7 to --
22   Q.   7/26 to 8/7.
23   A.   Yeah.
24   Q.   The cutoff is 7/31 -- between 7/31 and 8/1.  So add
25   that one up?

## Page 200

1    A.   It's under.
2    Q.   That one is 31 hours and there are 2 hours worth of
3    deductions, so that would be 33 hours, not overtime
4    eligible, right?
5    A.   Correct.
6    Q.   And the next week is only 25 hours with an hour and a
7    half in potential deductions would equal 26.5, and not
8    overtime eligible, right?
9    A.   Correct.
10   Q.   Okay.  And the next one is 8/8/2011 through
11   8/21/2011.  The cutoff is between 8/14 and 8/18.  Do you
12   want to add those up?
13   A.   37 1/2.
14   Q.   Try that one again?  Between 8/14 and 8/18 is the
15   cutoff.
16   A.   I got 37 1/2 again.
17   Q.   All right.  Maybe I added this wrong.  Yeah, you're
18   right.  37 1/2.
19        Okay.  And then there are how many deductions?
20   A.   Five.
21   Q.   Which would be 2.5, right?
22   A.   Correct.
23   Q.   And the 37.5 plus 2.5 is 40, right?
24   A.   Correct.
25   Q.   So not an overtime eligible week, correct?

## Page 201

1    A.   Correct.
2    Q.   All right.  And the next week is 8/18 through 8/21.
3    A.   30.25.
4    Q.   Not overtime eligible, correct?
5    A.   No.
6    Q.   All right.  And then the next week is 8/24 through
7    9/2/2011.  The cutoff is between 8/28 and 8/30.  You can
8    add those up?
9    A.   What was the cutoff?
10   Q.   8/28 and 8/30, between those two.
11   A.   36.75.
12   Q.   Yelp, that's what I've got.  36.75, and there are
13   one, two, three, four, five.  So it's 2.5 hours?
14   A.   39.25
15   Q.   Not overtime eligible, right?
16   A.   Correct.
17   Q.   And look at the next week, 8/3 through 9/2.  You can
18   tell that that's not overtime eligible already?
19   A.   Yes.
20   Q.   Okay.  That's 30.5 hours with 2 hours of deductions,
21   that would be 32.5, not overtime eligible.
22        All right.  Let's at 9/5 through 9/18/2011.  The
23   cutoff is between 9/11 and 9/12.
24   A.   38.25.
25   Q.   And you've got one, two, three, four, five deducts,

**BUSHMAN COURT REPORTING**
**501.372.5115**

## Page 202

1  right?
2  A.  Correct.
3  Q.  So what is that?
4  A.  40.75.
5  Q.  So that is overtime eligible, right?
6  A.  Yes.
7  Q.  40.75.
8      Do the next one?
9  A.  37 1/2.
10  Q.  37 1/2 with one, two, three, four, five, 2.5 hours.
11  A.  40.
12  Q.  Not overtime eligible, correct?
13  A.  Correct.
14  Q.  Okay.  Let's look at 9/19 through 10/2.
15  A.  9/19 to 10/2?
16  Q.  Yeah.  The cutoff is between 9/25 and 9/26?
17  A.  37.75.
18  Q.  37.75.  And how many deductions?
19  A.  Five.
20  Q.  So that's 2.5 hours.  What does that equal?
21  A.  40.25.
22  Q.  So that is overtime eligible, right?
23  A.  Yes.
24  Q.  Okay.  Let's look at the next week?
25  A.  37 1/2 with five deductions making it 40.

## Page 203

1  Q.  You're getting the hang of this.
2  A.  Yeah.
3  Q.  All right.  So that one is not overtime eligible,
4  correct?
5  A.  Correct.
6  Q.  Let's look at 10/5 through 10/14.  These are, I can
7  tell by your face, not overtime eligible.  One is 24.25
8  and the other is 30 hours.  But you can do the math if
9  you'd like?  The cutoff is 10/8 and 10/11.  So can you
10  tell that those are not overtime eligible?
11  A.  Yes.
12  Q.  All right.  The next week is -- or pay period is
13  10/17 through 10/30/2011.  The cutoff is between 10/23 and
14  10/24.
15  A.  The first week is under.
16  Q.  28 hours.  So that's not overtime eligible.
17      What about the next week?
18  A.  So 38 weeks --
19  Q.  38 hours.
20  A.  Or 38 hours.  I was -- it's 40 1/2.
21  Q.  So that is overtime eligible, correct?
22  A.  Yes.
23  Q.  All right.  Let's look at the next week.  It's 10/31
24  through 11/13.  The cutoff is between 11/6 and 11/7.
25  A.  38.

## Page 204

1  Q.  38.  And how many deductions?
2  A.  Five.
3  Q.  2.5?
4  A.  40 1/2.
5  Q.  So 40.5, right?
6  A.  Yelp.
7  Q.  That is overtime eligible.
8      What about the 11/7 through 11/13?
9  A.  It's under.
10  Q.  Yes.  It's 30 hours.  So that's not overtime
11  eligible, correct?
12  A.  Correct.
13  Q.  Okay.  Let's look at 11/16 through 11/25.  That
14  cutoff is 11/19 through 11/22.
15  A.  That first week is under.
16  Q.  Yeah.  It's 29.75 and the other one is 30 hours.  So
17  neither of these weeks are overtime eligible, correct?
18  A.  Correct.
19  Q.  Look at the next two weeks.  11/28 through
20  12/11/2011.  The cutoff is between 12/4 and 12/5.
21  A.  The first week is under.  So is the second week.
22  Q.  The first week is 30.5 hours.
23  A.  Yeah.
24  Q.  It's not overtime eligible.
25      The next week is 37.5, with one, two, three, four,

## Page 205

1  five deductions, which equals 40 hours, right?
2  A.  Correct.
3  Q.  Not overtime eligible?
4  A.  Right.
5  Q.  Then the last pay period is from 12/12 through 12/25.
6  The cutoff there is between 12/18 and 12/19.
7  A.  It's all under.
8  Q.  One is 37.25.  So even with the one, two, three,
9  four, five deductions, that would be 39.75.
10      The other one is just 4.75 hours, because that was
11  the one day that you worked at your termination, correct?
12  A.  Yes.
13  Q.  Okay.  So to recap, this is what we have as potential
14  overtime eligible weeks: March 22, 2010 --
15  A.  What was these weeks?
16  Q.  These are the ones that there's potential overtime
17  that'd be owed, depending on whether or not you worked
18  through your meal periods.
19      3/22/2010 is the first one; April 5, 2010: April 26,
20  2010: June 28, 2010: January 11, 2011: January 17, 2011:
21  March 21, 2011; September 5, 2011; September 19, 2011:
22  October 24, 2011: October 31, 2011.
23      And how many weeks do you have there?
24  A.  11.
25  Q.  11 weeks.

52 (Pages 202 to 205)

## Page 206

1    All right.  Do you need to take a break, or do you
2    want to continue?
3    A.   I'd like to use the restroom.
4            MR. SPINOLA:  All right.  We'll take a
5    break.
6            (A recess was had.)
7            (Defendant's Exhibt 15 was marked.)
8    Q.   (BY MR. SPINOLA)  Ms. Crow, you had an opportunity to
9    take a break.  Is there anything that you would like to
10   change or clarify about your testimony so far today?
11   A.   No.
12   Q.   And you've told me the truth to the best of your
13   ability?
14   A.   Yes.
15   Q.   All right.  What's been handed to you, that -- this
16   is the exhibit, now I'm really begging you to try to keep
17   in order as much as you can?
18   A.   Okay.
19   Q.   So that I don't have to go through this tonight
20   without my associate here.
21   A.   It was listed by, I guess, dates?
22   Q.   Yeah, and we can look at the -- well, dates is the
23   best way to look at it.
24   A.   Right.
25   Q.   All right.  So this is -- these are the staffing logs

## Page 207

1    that we had for the shifts that you worked.
2    A.   Okay.
3    Q.   And I want to just review.  Let's review, this is
4    basically starting from, the first one that we had in
5    March of -- March 26, 2010.  Just tell me what you know of
6    this?
7        This is a form that you said that you would fill out
8    and you would accurately put in your start and end time,
9    correct?
10   A.   Correct.
11   Q.   Okay.  Go ahead.
12   A.   Where is my name on this one?
13   Q.   Your name is not on this one for some reason.  I
14   think sometimes, with all these documents, I think they
15   might have redacted t out accidentally.  But just to --
16   for this one, let's just understand how the staffing log
17   works.  Okay.  And then we'll look at one that actually
18   has your name on it.
19       All right.  So this one is actually for an evening
20   shift, right?
21   A.   Correct.
22   Q.   And we can tell that the evening shift is marked,
23   right?
24   A.   Correct.
25   Q.   And, also, by the time that people are arriving?

## Page 208

1    A.   Uh-huh.
2    Q.   It's either 1.42 p.m., 2:57 p.m., 1:58 p.m., right?
3    A.   Correct.
4    Q.   That's the evening shift times.
5        So under -- you see where it says, LPN, it says,
6    redacted, looks like there were two LPNs on -- on the
7    evening shift, right?
8    A.   There is two LPNs on the evening shift?
9    Q.   Yeah.  You see, it says, LPN 100 dash 200?
10   A.   Yes.
11   Q.   That's 100 hall and 200 hall, right, is what that LPN
12   was covering?
13   A.   Correct.
14   Q.   We can't see the person's name --
15   A.   Yeah.
16   Q.   -- because it's redacted.
17       Then there's another LPN for the 300 and 400 hall,
18   right?
19   A.   Yes.
20   Q.   Then down below we have CNAs, correct?
21   A.   CNAs down below?
22   Q.   Yeah, you see where says, hall 1?
23   A.   Oh, yes.
24   Q.   And there's two CNAs for the 100 hall, right?
25   A.   Correct.

## Page 209

1    Q.   We don't have their names, but we know that there's
2    two CNAs that were assigned.
3        And that's consistent with what you said staffing
4    would be typically two CNAs, right?
5    A.   Correct.
6    Q.   And on an occasion like that, if you were working
7    hall 1 and there was two CNAs, it would be not clear
8    whether or not you got a meal period, right, because maybe
9    the other person covered you, maybe not?
10   A.   It was harder, yes.
11   Q.   Okay.  But you had testified before, like on a hall
12   2, if there are three CNAs, then you should be able to get
13   your meal period, correct?
14   A.   Some of the time, yes.
15   Q.   All right.  Now, previously you had testified that if
16   there were three CNAs, you would always be able to get
17   your meal period?
18   A.   I meant to say, some of the time.
19   Q.   All right.  How frequently?
20   A.   Oh, an estimate, 50 percent of the time.
21   Q.   And what would be the difference?
22   A.   The difference between what?
23   Q.   From getting t and not getting it.
24   A.   Getting t, if -- you know, depending on the
25   residents.  Depending on the residents, if they're

Page 210

1  demanding, if something is going on, if -- evening shift,
2  like a late shower or something.
3  Q.  All right.  And if there were four CNAs, would you
4  say you'd defin tely be able to get a meal break on your
5  hall?
6  A.  Four.  I would say so with four.
7  Q.  All right.  And there's no way for you to tell,
8  whether it's two CNAs or three CNAs, whether you got the
9  meal period or didn't, right?
10  A.  No, you really don't know how your day is going to
11  end.
12  Q.  But I'm saying -- I'm talking about looking --
13  looking here today, you can't say, I would have gotten my
14  -- let's say that your name was on hall 1.
15  A.  Correct.
16  Q.  I would have gotten my meal period, I would not have
17  gotten my meal per od on that day: you don't know, right?
18  A.  You never know.
19  Q.  All right.  So let's look at some of these -- these
20  work weeks where you have got potential overtime.
21      What is the first date you have?
22  A.  The 26th of March.
23  Q.  Okay.  Take a look at the next page, which is March
24  29th?  Do you see that?
25  A.  Yes.

Page 211

1  Q.  Okay.  On that day, you see the census there?
2  A.  Yes, 81.
3  Q.  81.  And you believe that in 2011 the census went up
4  by about 20, right?
5  A.  That was an estimate.
6  Q.  So would that suggest that the census around this
7  time in 2011 should be about 101 patients, right?
8      MS. JACKSON:  Objection to the form of
9  the question.  You can answer.
10  A.  That was an estimate.  I'm not saying there was or
11  wasn't.
12  Q.  You did believe, though, that  t was -- the census
13  was higher in 2011 --
14  A.  It could have been.
15  Q.  -- compared to 2010?
16      In fact, that was the only explanation you could
17  possibly come up with as to -- to the extent your meal
18  practices would be different and you'd be working through
19  more meal breaks in 2011 compared to 2010, the only
20  explanat on would be that the census increased?
21  A.  I'd like to add that, also, like I said, with the
22  res dents everyday is different.  You don't know, you
23  know, what's going to happen on the hall to make something
24  change to where you may not get that break or lunch.
25  Q.  I understand.

Page 212

1      And I also understand that you testimony was that you
2  didn't believe that staffing was any different between
3  2010 and 2011, right?
4  A.  It was an estimate that it could have changed.
5  Q.  Staffing?
6  A.  Oh, staffing?
7  Q.  Yeah.  When you testified before, you said that the
8  typ cal staffing between 2011 and 2010 was consistent, it
9  was about the same?
10  A.  Yeah.  Well, two on a hall, sometimes there would be
11  three.
12  Q.  Okay.  You also testified that your job duties d dn't
13  change, right?  You were doing --
14  A.  Right.
15  Q.  -- the same thing between 2010 and 2011, right?
16  A.  Right.
17  Q.  And you sa d that the only thing that you could think of
18  that would be any different -- and I understand everyday
19  is different, but that would be true for everyday in 2010
20  and 2011, right?
21  A.  Right.
22  Q.  So the only thing that you were able to  dentify as
23  being different that would cause you to have to work
24  through more breaks in 2011 when compared to 2010 was the
25  census going up, right?

Page 213

1      MS. JACKSON:  Objection to the form of
2  the question.  But you can answer.
3  A.  Like I said, this -- it's census, it's how many
4  people, what's going on.
5  Q.  No.  I'm asking just about your prior testimony.  Do
6  you remember, before I pulled out these staffing logs, and
7  I asked you -- and asked you twice, actually.  And I
8  sa d, Is there anything else at all that you can identify
9  that was different between 2010 and 2011?  And you said,
10  No, only the census.  And then I asked you, How much did
11  the census go up?  And you estimated 20.
12  A.  I'm saying now that it's the census and this that I'm
13  saying now.
14  Q.  Okay.  So you're clarifying, changing your testimony
15  from earlier, correct?
16  A.  I'm adding on to it, yes.
17  Q.  Okay.
18  A.  I'm not changing  t.
19  Q.  And is that as a result of me pulling out these
20  staffing logs?  Have you noticed that the census actually,
21  in fact, went down and not up?
22  A.  Have I not ced?  I haven't really looked.
23  Q.  I saw you looking forward in 2011, so --
24  A.  That was that one.  I  d dn't look at all of them.
25  Q.  Okay.  Well, we can do that.

54 (Pages 210 to 213)

## Page 214

1  So tell me what, of these indiv dual patient
2  differences in 2011, do you now recall from 2010, that
3  would have made it diff cult, more difficult in 2011 for
4  you to get your meal breaks?  Can you think of any?
5  A.  It could be because they put less people on the hall,
6  or a s tuation that had happened.
7  Q.  Now, we've talked about the less people on the hall,
8  right?
9  A.  Uh-huh.
10  Q.  You said the staffing was consistent between 2010 and
11  2011.  So I think that one is off the table.
12  A.  It just depends.  Due to the census and how many CNAs
13  we have that day.  They usually do put two on the hall.
14  That's required.
15  Q.  Right.
16  A.  But, yes, sometimes it's different.
17  Q.  Okay.  Is there anything you can think of
18  specifically -- I'll ask the question again.  Anything you
19  can think of specifically about 2011 and what you
20  typically faced in your day that was different than what
21  you typ cally faced in your day in 2010?  Understanding
22  that everyday is different, was there anything about 2011
23  that changed other than -- that was different than 2010,
24  your typical experience in 2010?
25  A.  Not that I remember.

## Page 215

1  Q.  Okay.  So let's take a look at the census.  We see 81
2  here in March of 2010.  Let's just look at March of 2011.
3  And you can really look at any date.  I see here March 12,
4  2011, looks like the census was 71, March 15th it was 69.
5  A.  March 15th?
6  Q.  Yeah.
7  A.  They're out of order.
8  Q.  We're going a year forward.  So it's literally
9  two-thirds of the way in.
10  MS. JACKSON:  Can you tell us the number,
11  the Bates number?
12  MR. SPINOLA:  Sure.  The Bates number is
13  7307.  That would be March 2011.
14  Q.  If you just look at the dates at the top, they're in
15  date order?
16  A.  Okay.
17  Q.  So the census is 69 the same time in 2011 compared to
18  March 29, 2010 where t's 81, correct?
19  A.  Correct.
20  Q.  So it's signif cantly lower, right?
21  A.  Correct.
22  Q.  Not higher?
23  A.  Correct.
24  Q.  And look at the next day, 68, the next day is 68, the
25  next day is 67?

## Page 216

1  A.  I said it just depends, I guess not just the census.
2  Q.  Does this refresh your recollection that, contrary to
3  your testimony that you believed that the census actually
4  increased in 2011, that it decreased?
5  MS. JACKSON:  Objection to the form of
6  the question.  but You can answer.
7  A.  I must have had census mixed up.  I mean, I wasn't
8  keeping track of the census.
9  Q.  Right.  But it's responsibility of --
10  A.  Knowing how many patients are on your hall.
11  Q.  Okay.  So just as you said, that if the census went
12  up, that would likely mean that it would be more difficult
13  to take your breaks, wouldn't that also suggest that if
14  the census went down, that it should be easier to get your
15  breaks?
16  MS. JACKSON:  Objection.  Speculative.
17  Misstate her testimony.  You can answer.
18  Q.  I'm not stating your testimony.  I'm asking you a
19  question.
20  MS. JACKSON:  You just said, just like
21  you sa d.
22  MR. SPINOLA:  Well, she did say that.
23  She's already agreed --
24  MS. JACKSON:  Objection.  Speculative.
25  Misstates her testimony.  You can answer.

## Page 217

1  Q.  (BY MR. SPINOLA)  Let me -- let's back up and make
2  sure that I got your testimony.  You said that you
3  believed the census went up between 2011 and 2010?
4  A.  I sa d I believed.
5  Q.  You did believe that.
6  MS. JACKSON:  Object to the form.
7  Q.  You sa d that, right?
8  MS. JACKSON:  Objection.  She said what
9  she sa d.  Her testimony will reflect.
10  Q.  Did you say that?
11  MS. JACKSON:  Objection to the form of
12  the question.  You can answer.
13  Q.  Did you say that, Ms. Crow?
14  A.  I sa d t because --
15  Q.  Well, let's just start with, did you say it, because
16  I --
17  MS. JACKSON:  Just let her answer the
18  quest on.  She's answering.
19  MR. SPINOLA:  No.
20  MS. JACKSON:  You're interrupting her.
21  MR. SPINOLA:  Hold on a minute.  Hold on
22  a minute, please.  You told me that I misquoted what she
23  said.  So I'm trying to make sure that we have that unde
24  control before we go on.
25  Q.  (BY MR. SPINOLA)  So did you in fact say that you

Page 218

1  believed that the census went up between 2010 and 2011?
2       MS. JACKSON:  And what I'm telling you,
3  she started to answer your quest on and you interrupted
4  and wanted her to stop answering.
5       MR. SPINOLA:  I'm just trying to --
6       MS. JACKSON:  That is not proper.
7  Q.  (BY MR. SPINOLA)  Could you answer the question,
8  please?
9  A.  I sa d that was -- you asked if the reason for not
10  getting my breaks was because the census, and I sa d -- I
11  agreed to that.  That's what I've understood.  That you
12  said what was one of the reasons why  t could have been,
13  and I said it could have went up.  But it went down.  And
14  I told you now that there's other reasons why we missed
15  breaks or lunches.
16  Q.  Now, your prior testimony, you always said the only
17  thing you could think of as to why it would be more
18  difficult for you to get breaks in 2011 than 2010 was
19  because of census, correct?
20       MS. JACKSON:  Objection.  You can answer.
21  A.  And I added saying and there's other reasons.
22  Q.  I understand you're adding that now that you see that
23  the census has gone down and not up.
24       But I'm talking at the -- at the time when I asked
25  you, before you knew what the census was, you used census

Page 219

1  as the reason for why you would have thought it would have
2  been more diff cult for you in 2011 to get your breaks
3  than 2010, correct.
4       MS. JACKSON:  Objection.  You're
5  misstating that she saw the census.  That's not what she
6  said.  Objection to the form of the question.  You can
7  answer.
8  A.  I sa d -- you asked me what could have been the
9  differences, and I said census, and I added, there's
10  always different reasons, like in a nursing home, it's
11  hectic if anything happens, and that's what I had added.
12  Q.  Okay.  And you can't think of any reason or any
13  difference, other than census, between 2010 and 2011,
14  right?
15       MS. JACKSON:  Objection.  She just
16  answered that.  Object on.  You can answer.
17  A.  You sa d -- what about the what?
18  Q.  These objections, I know, make  t very difficult for
19  you to concentrate.
20       MS. JACKSON:  Well,  t would be easy if
21  you don't restate or rephrase her testimony.
22       MR. SPINOLA:  Now you're making a
23  speaking objection.
24  Q.  (BY MR. SPINOLA)  So your testimony --
25       MS. JACKSON:  Because you're --

Page 220

1       MR. SPINOLA:  Maryna, please.  Could I
2  please have my deposition without you interrupting me
3  every five seconds.
4       MS. JACKSON:  Yes, when --
5       MR. SPINOLA:  You're interrupting me to
6  ask my questions now, too.
7       MS. JACKSON:  Well, when you're --
8       MR. SPINOLA:  Just stop.  If you have an
9  objection to the form, say objection to the form.  But I
10  don't need to have a debate with you.  Okay?
11       MS. JACKSON:  You're making comments,
12  Angelo, on my objections.
13       MR. SPINOLA:  Exactly.
14       MS. JACKSON:  If you wouldn't make
15  comments on my objections --
16       MR. SPINOLA:  Are you done yet?
17       MS. JACKSON:  -- I wouldn't --
18       MR. SPINOLA:  Are you done?
19       MS. JACKSON:  -- I wouldn't keep
20  repeating them.
21       MR. SPINOLA:  I'll tell you what.  Why
22  don't we go off the record.  Say everything you need to
23  say --
24       MS. JACKSON:  No.  If I want to --
25       MR. SPINOLA:  No, we're going off the

Page 221

1  record.  Go ahead and just say what you want to say.
2       MS. JACKSON:  No, Jeff.  Do not go off
3  the record.  I have a right to say my objections on the
4  record.  And I'm gonna keep doing  t.
5       MR. SPINOLA:  This is your time, not
6  mine.
7       MS. JACKSON:  No, it's not.  It's your
8  time.
9       MR. SPINOLA:  I'll tell you what.  You
10  stay on the record.  I'm going to the bathroom, and you
11  can tell me when you're finished.
12       MS. JACKSON:  You can stop right.
13  Actually, you can go and we'll wait until --
14       MR. SPINOLA:  Go ahead and say what
15  you've got to say.
16       MS. JACKSON:  -- Mr. Spinola, when he
17  gets back from the restroom.  We're on the record.
18       (Mr. Spinola left the room.)
19  Q.  (BY MR. SPINOLA)  All right.  Ms. Crow, are you ready
20  to continue?
21  A.  Yes.
22  Q.  So my question is this, can you give me any reason
23  that you would think that it would be more diff cult for
24  you to get breaks in 2011 versus 2010?
25       MS. JACKSON:  Objection.  Asked and

56 (Pages 218 to 221)

Page 222

1    answered.  But you can answer.
2    A.   No, I can't think of any reason.
3    Q.   Okay.  And we've seen in 2010 that we've got a
4    significant number of your breaks, correct?
5    A.   From what the paper says, yes.
6    Q.   And you've agreed, at least three or four times today
7    in your depos tion, that what the paper says is correct,
8    correct?
9    A.   From what the paper says on the days that I clocked
10   out, that all -- I mean, that's confusing to me.
11   Q.   Okay.  I don't even think -- if you want to change
12   your testimony, that's fine.  I don't have another -- I
13   think we've been through that about three times now.
14   A.   Yeah.
15   Q.   And I think I've got your testimony that that was
16   your practice.  Unless you're telling me you want to
17   change that now, I'm not going to ask you quest ons abou
18   that again.
19        So you can't think of a reason why your meal
20   experience should be any different in 2011 when compared
21   to 2010, correct?
22   A.   There's reason, I mean, from things happening at --
23   during that time at the -- on that day would be a result
24   of why I would not get my break.
25   Q.   Can you  dentify any of those days or any specific

Page 223

1    thing that's different about 2011 and 2010?
2    A.   It could be anything that was going on on the hall
3    that day --
4    Q.   Uh-huh.
5    A.   -- that would have made it different.
6    Q.   No, I understand there could be anything.
7         I'm asking you if you have any specific recollection
8    of what it was, if anything?  Can you think of anything
9    that was different between 2010 and 2011?
10   A.   No.
11   Q.   The only thing that you identified before was the
12   census you thought went up, correct?
13   A.   Yes, and I told you that it could have been that or
14   things that are going on on the hall.
15   Q.   In fact, the census has gone down in 2011 when
16   compared to 2010, correct?
17   A.   Correct.
18   Q.   Okay.
19   A.   So it was something else that was making it not
20   happening.
21   Q.   Which you can't identify, correct?
22   A.   Call lights, being behind on a shower, another person
23   busy with another person, and I can't do anything by
24   myself to make me where I can't clock out.  My residents
25   come before me.

Page 224

1    Q.   Do you recall there being more call lights and
2    resident issues in 2011 than 2010?
3    A.   I can't recall it, but it could have happened.
4    Q.   And it also could have happened that the residents
5    had more issues in 2010 when compared to 2011, right?
6         MS. JACKSON:  Object on to the form of
7    the question.  You can answer.
8         MR. SPINOLA:  She already did.
9    Q.   (BY MR. SPINOLA)  Let's look at your -- go back to
10   Exhibit 13, please.  Let's look at the staffing log for
11   3/29 that we were just looking at when the census was 81.
12   It's the staffing log.
13   A.   The very first one?
14   Q.   It's the second one.
15   A.   2010?
16   Q.   3/29/2010.
17   A.   Okay.
18   Q.   How many CNAs were on the 100 hall with you?
19   A.   It looks like one.  The other two are in the
20   whirlpool.
21   Q.   RCNA, what is that?
22   A.   I don't remember.
23   Q.   Would that be respiratory or restorative?
24   A.   It could be the therapist.  I'm not really not sure.
25   I don't know.

Page 225

1    Q.   And does that restorative nurse work on the hall as
2    well?
3    A.   No, they work with therapy.
4    Q.   The restorative nurse would not be assigned to hall
5    100?
6    A.   They're down 100.  They are located down that hall.
7    They only get the CNAs that are scheduled to therapy that
8    day.
9    Q.   Would the restorative nurse float or cover for a CNA
10   on break?
11        MS. JACKSON:  Object on to the form of
12   the quest on.  You can answer.
13   A.   No, never for me.
14   Q.   What did you say?
15   A.   No.
16   Q.   Okay.  Do you know if they covered for anybody else?
17   A.   No.
18   Q.   Look at the next one.  How many CNAs were assigned on
19   a hall 1?
20   A.   One other person.
21   Q.   What about the whirlpool person, where do they work?
22   A.   In the shower room.
23   Q.   Why does  t say 100 by whirlpool?
24   A.   Because they do the 100 hall showers.
25   Q.   So the whirlpool person was the one doing showers?

Page 226

1    A.  Yes, that's what they do.
2    Q.  So when there was a whirlpool person doing showers,
3    that would mean you d dn't have to do them?
4    A.  No.
5    Q.  Is that correct?
6    A.  Correct.
7    Q.  Did you do any restorative work at all, physical
8    therapy stuff?
9    A.  No.  I helped out every now and then if there was one
10   therapist in the room.  And if they asked for help I would
11   help them.
12   Q.  Okay.  Look at 7/26/2010 on the staffing logs and go
13   in date order.
14   A.  Okay.
15   Q.  Are you there yet?
16   A.  Yes.
17   Q.  How many CNAs were assigned w th you on the 300 hall?
18   A.  Three or two others.  There was three of us.
19   Q.  What about the last one at --
20   A.  I guess there's four that day.
21   Q.  That would have been an example of a day you would
22   have been able to take your meal break, correct?
23   A.  Probably so.
24   Q.  Okay.
25   A.  I don't know if they were in the whirlpool.

Page 227

1    Q.  Look at 7.  Is there anything to ind cate that was a
2    whirlpool person?
3    A.  It could have been.  Some people will write just 300
4    down on a piece of paper, and not put whirlpool down.
5    I've known that to happen.  That other person was doing
6    showers, and us two would be on the hall.
7    Q.  Take a look at 7/2/2010.  Are you there?
8    A.  Almost.  Okay.
9    Q.  And how many CNAs were assigned with you on hall 1?
10   A.  Two other people.  It looks like one of them probably
11   was whirlpool.
12   Q.  Why are you saying whirlpool?
13   A.  Because no one wrote down that they were in whirlpool
14   that day.
15   Q.  So it's just a guess?
16   A.  Yes.
17   Q.  You see down there where it says, float, CNA float,
18   what does that mean?
19   A.  That means they're floating between halls.
20   Q.  Floating for what purpose?
21   A.  The float usually passes ice, does vital signs and
22   does call lights.
23   Q.  D d they float for people so that they can take their
24   meal periods?
25   A.  Yes, I guess.

Page 228

1    Q.  Do you have any reason to doubt that you would have
2    gotten your meal on this day?
3    A.  I probably would have, yes.  I see only two CNAs on
4    300 hall.  And then there's no -- I don't know if there's
5    anybody in the shower room.  There probably was a float to
6    help with these other halls.  It's possible I could have
7    had a break or not.  The float was probably between 4 and
8    3.  Those were usually the heavier halls.
9    Q.  Turn to November 2011.
10        MS. JACKSON:  Which date?
11   Q.  (BY MR. SPINOLA)  I'm sorry.  January 2011.
12   A.  You said January?
13   Q.  January 2011.
14        MS. JACKSON:  Which day on January?
15   Q.  (BY MR. SPINOLA)  Let's start with January 10th.
16   You're on hall 4 that day?
17   A.  Yes, I guess so.
18   Q.  Do you see other CNAs on hall 4 with you?
19   A.  It looks like one other person.
20   Q.  Okay.  Any idea whether you got your meal break that
21   day?
22   A.  I don't know how to say if I did or if I didn't.
23   Q.  Okay.
24   A.  That was the day before a time adjustment, wasn't it?
25   Q.  Yeah, I think that's right.  Let's look at the next

Page 229

1    day, January 11, 2011.
2    A.  I was the only one on the hall that day.
3    Q.  What happened, did that person leave?
4    A.  I don't know.
5    Q.  And this was a day you filled out a time adjustment
6    form, correct?
7    A.  Yes.
8    Q.  And you were pa d for that time, correct?
9    A.  Correct.
10   Q.  Let's look at the next date, January 14.
11   A.  January 14?
12   Q.  Yes.  It looks like you're on 300 hall, right?
13   A.  Correct.
14   Q.  How many other CNAs are on 300?
15   A.  It says four others.  It was probably whirlpool, the
16   others were in whirlpool.
17   Q.  You were working 300 hall, right?
18   A.  Correct.
19   Q.  And I see CNAs one, two, three, four, five, and then
20   down here it says, 300 extra.
21   A.  On this paper would  t say on the days that they made
22   people go home?
23   Q.  It would say the times.  It looks like this CNA on
24   300, that was the extra, came in at 7:03 and left 7:18,
25   because there was already plenty of CNAs on hall 300,

Page 230

1   right?
2   A.  So two of them were probably in the whirlpool.
3   Q.  So there would be no reason you wouldn't be able to
4   take your meal period on that day, correct, w th all those
5   CNAs?
6   A.  Yeah.
7   Q.  Let's look at the next one.  You see your name on
8   here?
9   A.  Yes.
10  Q.  400, right?
11  A.  Correct.
12  Q.  How many other CNAs?
13  A.  Four.  There were three, four all together.
14  Q.  No reason you wouldn't be able to take your meal
15  period on that day, right?
16  A.  Depending w th showers.  Because two of these people
17  have to be in the shower rooms, and at least two of us on
18  the hall.
19  Q.  Okay.  Look at 1/16.  It looks like you're on 400
20  hall again?
21  A.  Same amount of people.
22  Q.  So maybe, maybe not?  Do you think you got your meal
23  period that day?
24  A.  I don't know how that situat on would happen that
25  day.

Page 231

1   Q.  Okay.  Let's look at the next day.  That's 1/17,
2   right?
3   A.  Correct.
4   Q.  You're on hall 100?
5   A.  Correct.
6   Q.  There's one other CNA on 100.  There's some CNAs that
7   appear to be unassigned, RCNAs?
8   A.  RCNA restorative.  The other one I don't know.
9   Q.  Do you know whether or not you got a meal per od on
10  that day?
11  A.  I really don't know.  I don't see no one for the
12  whirlpool, so probably not.  We were having to do showers
13  as well.
14  Q.  Okay.  What about the 20th here.  You're on hall 100,
15  right?
16  A.  I see a float, so I may have got my break that day.
17  Q.  Okay.  The next one?
18  A.  I don't see anybody in the whirlpool that day.
19  There's just two of us.  So I probably d dn't get a break.
20  Q.  So you think maybe not on the 21st?
21  A.  Correct.
22  Q.  What about the 22nd?
23  A.  There's three of us on one hall.  There's no shower
24  room.  So I may have or may have not.
25  Q.  We'll put that one as a maybe?

Page 232

1   A.  Yes.
2   Q.  Let's look at the 23rd?
3   A.  There two of us and nobody in whirlpool, so probably
4   not.
5   Q.  Let's move forward to March 21, 2011.  Do you think
6   you got a meal period on that day?
7   A.  Yes, probably.
8   Q.  What about on the 22nd?
9   A.  There was a float, so probably.
10  Q.  What about the 23rd?
11  A.  I was a door monitor, so yes, I got a break.
12  Q.  What about the 24th?  Tell me about that, why door
13  mon tors get breaks?
14  A.  They know that you're there, and you've been sitting
15  there all day watching the door.  So they make sure you
16  can get out of there.
17  Q.  What about the 24th?
18  A.  The 24th I was a door monitor.
19  Q.  So you would have gotten a break?
20  A.  Probably, yes.
21  Q.  The 27th?
22  A.  There was three of us on 100 hall that day, so yes.
23  Q.  Let's move ahead to September 5, 2011.  It looks like
24  you were on 400 hall?
25  A.  Correct.

Page 233

1   Q.  Would you have gotten a meal period that day?
2   A.  Probably not.  There was only two of us.
3   Q.  Okay.  How about on the 6th?
4   A.  I would not, because there's two of us on the hall,
5   so one of us is probably in the shower room.
6   Q.  What about the 7th?
7   A.  No.
8   Q.  The 8th?
9   A.  No.  There was only two of us on the hall.
10  Q.  Do you know for sure you didn't, or you're just
11  thinking you might not?
12  A.  I'm estimating.  Usually there's two of us and
13  there's no one in the shower room.  That means we're
14  having to struggle with showers, call lights.  So one of
15  us in the shower room, means one of us on the hall.  It's
16  hard to get a break when that happens.
17  Q.  Okay.  Do you see where it says, need and have?
18  A.  Need and have, yes.
19  Q.  It says, 11 and 15.
20  A.  Yes.
21  Q.  11 is what the state requires, the state minimum for
22  staffing, and 15 was what actually was there?
23  A.  Okay.
24  Q.  Does that change your opinion, because there were
25  four more CNAs than were necessary?

59 (Pages 230 to 233)

## Page 234

1  A.  Two of the CNAs are restorative.  So that makes it
2  only 16.  And then transport, she's a CNA, she's never
3  hardly there.  So that's another person off.  So that
4  makes 15.  And then there's two of us on the hall, no one
5  in the shower room, two on 200 hall.  And  t looks like
6  there's a CNA in the salon, so that makes 14.  So there's
7  only 14 CNAs on the hall.
8  Q.  Don't you think the state minimums contemplate that
9  there would be transportat on and restorative CNAs
10  necessary?
11      MS. JACKSON:  Objection to the form of
12  the question.  You can answer.
13  A.  That's needed.  But you're asking me if I would take
14  my break that day.  W th these other CNAs doing other
15  things, I'm the only -- there's still just two on the
16  hall.  And I'm still in the shower room.  I'm not -- I'm
17  still having to struggle w th all the duties.
18  Q.  Let's look at 9/11, where it looks like there's five
19  CNAs on the floor.
20      MS. JACKSON:  What date?
21  Q.  (BY MR. SPINOLA)  9/11.
22  A.  There's only three of us on 400 hall.  So that means
23  one of us is in the shower, two of us on the hall.  I
24  probably didn't get a break.
25  Q.  I'm counting four.

## Page 235

1  A.  Four.  Does that say restorative?  What does that
2  say, that one?
3  Q.  Yeah.  I see 400, 400, restorative and there was
4  somebody else, and then there was you.
5  A.  Restorative is on not on that hall.
6  Q.  But restorative would be the fourth one there.
7  A.  There's three on 400 and one restorative that day on
8  100 hall.
9  Q.  Let's go through it  Do you see 6:57 to 3:04, you see
10  those times?
11  A.  Yes.
12  Q.  That's on 400 hall.  You see how there's different
13  halls here, hall 100 and everybody worked on 100 hall is
14  listed, hall 200 and the people on 200 are listed, hall
15  300 and the people on 300 are listed, and we're on 400,
16  right?
17  A.  Restorative means they're in restorative.
18  Q.  But restorative would make it the fifth one.  Let's
19  just add it.  6:57 to 3:04, you see that, right?
20  A.  Yes.  They're on 400 hall.
21  Q.  That's one, right?
22  A.  Yes.
23  Q.  Then 6:58 to 3:04, that would be two, right?
24  A.  Yes.
25  Q.  Then you're counting the next one as restorative,

## Page 236

1  right?
2  A.  They're not on 400 hall.
3  Q.  I understand.  We won't count that one.  Then
4  somebody from 6:40 to 3 o'clock.  Do you see that?
5  A.  Yes.
6  Q.  That would be three?
7  A.  That's me.
8  Q.  You're below that?
9  A.  Yes.
10  Q.  From 3:10 to whatever that is.
11  A.  That's me.
12  Q.  Yes.
13  A.  So there's four.  That probably means two in the
14  shower room and two on the hall.  So that day I probably
15  got lunch.
16  Q.  All right.  Let's go to 9/19.  I think you were
17  working on 200 hall with Amanda Hodges?
18  A.  Yes.
19  Q.  Would Amanda cover for you?
20  A.  Yes, maybe.  It just depends.  If there's only two of
21  us on a hall, we have to do our showers, and one in the
22  whirlpool room.  There's no one in shower.  So I didn't
23  get my lunch.
24  Q.  So no on 9/19 you don't think?
25  A.  No.

## Page 237

1  Q.  Okay.  What about 9/20 when you were working the back
2  door?
3  A.  Yes, since I was the door monitor that day again.
4  Q.  Let's look at 9/23.  Would you have gotten your lunch
5  on the 23rd?
6  A.  No.  There was only two of us on a hall and no one in
7  the whirlpool.
8  Q.  What about 9/24?
9  A.  There was only me on the hall, so probably not that
10  day.
11  Q.  How about 9/25?
12  A.  No.  There was no one in the whirlpool that day.
13  There's just two of us on the hall.
14  Q.  Okay.  Go to 10/24.  This says, 100, 200.  What does
15  mean?
16  A.  I was in the shower room that day.  And there's only
17  one person on the hall on 200 and 100.  So I probably
18  didn't get my break that day.  I was having to do both
19  showers on each hall.
20  Q.  What about the 25th?  It looks like there were two
21  people on 100, right?
22  A.  Yeah, hoist.
23  Q.  What does hoist mean?
24  A.  They pass drinks out for hydration.
25  Q.  Okay.

BUSHMAN COURT REPORTING
501.372.5115

Page 238

1   A.  I don't see anyone on 100 hall that day.
2   Q.  Aren't the two that are listed as the hoist and the
3   shower on 100?
4   A.  The hoist is not on a hall.  They set up the dining
5   room, pass out drinks, and clean up the dining room.  They
6   don't help out on the hall.  There's one person on 2.  Two
7   people are on 3.  There's two people on 4.  The showers --
8   that day I probably didn't, because I don't see anyone
9   assigned to -- the person that's on 100 and 200 hall
10  shower is probably on the hall by themselves, since
11  there's not anybody else on there.  Then there's one
12  person down for 200 hall.  And then I'm wr tten down for
13  100 and 200 hall showers.  So I'm probably doing the
14  showers for both that day, so probably not a break.
15  Q.  Let's look at 10/26.  What does that say?
16  A.  I was helping transport that day.  So I got a break.
17  Q.  Let's look at the 29th?
18  A.  My name is written in on the paper.
19  Q.  That one is not conclusive, right, you can't really
20  tell what's going on there?
21  A.  No.
22  Q.  Why is it that transport CNAs always get their meal
23  break?
24  A.  Because in between transporting you can take your
25  lunch whenever you want.

Page 239

1   Q.  Okay.  And the 30th?
2   A.  It looks like two people on 400 hall.  Transport was
3   helping with 300 hall.  I didn't get my lunch that day.
4   There's only two of us, no one in the shower room, and
5   transport is having to help.
6   Q.  Let's look at the 31st of October?
7   A.  I may have that day.
8   Q.  So maybe, maybe not?
9   A.  Yeah.
10  Q.  What about the next day?
11  A.  I'm floating.
12  Q.  And floating means you're covering for others?
13  A.  It means I'm passing people ice, doing their vitals,
14  answering their call lights, and if they're needing help
15  getting someone out of bed that's a two-assist, I do that.
16  Q.  Any reason not to --
17  A.  I could cover their lunches, which means I may get my
18  lunch that day.
19  Q.  Okay.  So you think that's probably a yes?
20  A.  Yes.
21  Q.  What about the next day?
22  A.  There's two people on 400.  It don't look like
23  there's anyone in the showers.  So no.
24  Q.  11/5, 100 hall, looks like there's three CNAs?
25  A.  I'm on 100 hall.  Yeah, that day I could have,

Page 240

1   because there's someone in the shower room, and there's
2   two on the hall.
3   Q.  11/6, 200 hall?
4   A.  There's three on 200 hall, one in the shower.  So I
5   probably got a break that day.
6   Q.  Let's look now at -- we're going to go back in time
7   to 7/26/2010.
8   A.  7/26.
9   Q.  Are you saying that you got a meal that day?
10  A.  Maybe.  Because there's three on a hall.  There's no
11  one in the shower.  So one in the shower room and two of
12  us on the hall.  And that just depends on how that day
13  went.
14  Q.  What about 7/28?
15  A.  There's two of us on the hall and no one in the
16  shower, so no.
17  Q.  No on 7/28?
18  A.  Right.
19  Q.  What the next one?  81, is that the next one
20  you have?
21  A.  Did someone write out this one?
22  Q.  Pardon?
23  A.  Did someone write out this one?
24  Q.  What do you mean?
25  A.  Like the handwriting.

Page 241

1   Q.  Yeah, maybe.  I don't know.
2   A.  There's two on the hall, a float on 100 hall.  That
3   just depends.  Probably not.
4   Q.  Okay.  What about 8/3?
5   A.  There's two on the hall and no float.  Defin tely
6   not.
7   Q.  Definitely not?
8   A.  There's no one in the shower that day.
9   Q.  8/6?
10  A.  Two on the hall and no one in the shower.  No.
11  Q.  No?
12  A.  No.
13  Q.  So you wouldn't have gotten a meal break?
14  A.  Correct.
15  Q.  8/7?
16  A.  There's three on the hall and one in the shower room.
17  Probably not.
18  Q.  8/8?
19  A.  Two on the hall and no one in the shower room.  No.
20  Q.  Let's go back to Exhibit 13.  I want you to turn to
21  the week of 6/28/2010.
22  A.  Okay.
23  Q.  And you confirmed on July 2nd, that you actually got
24  this meal per od, when we looked at the staffing log?
25  A.  Okay.

61 (Pages 238 to 241)

Page 242

1    Q.   If you look at the -- that would be one deduction
2    that we wouldn't remove from your hours, correct?
3    A.   Okay.
4    Q.   Were added back in.  And this was a 39 1/2 hour week
5    right?
6    A.   Okay.
7    Q.   So even if you did work through your meal period on
8    July 1st, because you got your meal period on the 2nd,
9    this would not be an overtime week, correct?
10   A.   Correct.
11   Q.   All right.  Let's look at January 11, 2011.
12   A.   Yes.
13   Q.   You confirmed that you received a meal on the 14th
14   and 15th?
15   A.   Okay.
16   Q.   When we looked at staffing logs.  And that was a week
17   where we had 38 1/2 hours, right?
18   A.   Correct.
19   Q.   And if you subtract -- we had two hours in
20   deductions, possible deductions, and that would be at most
21   one?
22   A.   Okay.
23   Q.   So that would make it 39 1/2 hours, which would not
24   be an eligible overtime week, right?
25   A.   Correct.

Page 243

1    Q.   Now, the same page there you weren't sure about
2    January 20th or 22nd.  You sad maybe you got meals.
3    There's no way for you to tell, correct?
4    A.   Correct.
5    Q.   On the 23rd you thought you did not take a meal
6    break?
7    A.   Okay.
8    Q.   So we cannot tell whether that's an overtime eligible
9    week or not, right, since you don't know whether you took
10   your meal periods on the 20th or 22nd.  It was a 37.75
11   hour work week.  And there's an hour of deductions that
12   are in quest on, right?
13   A.   Okay.
14   Q.   So that one is a question mark, right?
15   A.   Okay.
16   Q.   Let's go to 3/21.  On 3/21 if you added up all of the
17   meal deductions it came to 41.5, 38.5 plus 5?
18   A.   41 even.
19   Q.   41 even.  You confirmed that you took meal periods on
20   the 23rd, 24th and 27th, right?
21   A.   I did?
22   Q.   Yes.
23   A.   Okay.
24   Q.   Do you want to look back at it?  You were door
25   monitor on the 23rd, door mon tor on the 24th.

Page 244

1    A.   Okay.
2    Q.   And you had three CNAs on hall 1 on the 27th.
3    A.   This looks like maybe, because there's three and
4    someone's in the shower room.
5    Q.   Change to that a maybe.  Nonetheless, 23rd and 24th
6    you're saying, yes, you did get a meal, right?
7    A.   Yes.
8    Q.   So that would take out one hour, right, in
9    deduct ons, those deductions were appropriate because you
10   got your meal per od, right?
11   A.   Correct.
12   Q.   So that would be not an overtime week anymore,
13   correct?
14   A.   Okay.
15   Q.   On 1/9/11 you said that you did receive a meal
16   per od?
17   A.   Okay.
18   Q.   And there was a deduction on that day.  So that
19   deduct on was appropriately applied.  So now we're looking
20   at two hours, correct?
21   A.   Correct.
22   Q.   An additional two hours?
23   A.   I need a break.
24   Q.   Okay.  That's fine.
25        (A recess was had.)

Page 245

1    Q.   (BY MR. SPINOLA)  In the interest of time, what I'm
2    going to do is try to work through these numbers w th you.
3    And we're going to cut some corners here on trying to add
4    this up.  There's a couple of weeks where you were not
5    above 40 hours.  You were at 38 or 39 hours, and then you
6    hours would -- if you had worked through meal periods
7    would have put you into overtime.  So just for the sake of
8    ease to make sure that I have a number that wouldn't be
9    exceeded in actual overtime due, I want to just use all
10   overtime figures.  I'm not going to bother w th straight
11   time for right now.  I'll go back and recalculate later.
12        But this is what I have for you.  I'm going to add it
13   up.  What we need to remember is your rates of pay on
14   those changes.  I want to add this w th me.  Your rate
15   of pay changed in July of 2010.
16   A.   I would like to get paid for the days that -- for the
17   lunches that I d d not get.
18   Q.   I understand your pos t on, but the Fair Labor
19   Standards Act only permits payment of minimum wages and
20   overtime.
21        MS. JACKSON:  Is that a question?
22        MR. SPINOLA:  She asked me a question.  I
23   was explaining to her what the claim she's brought is.
24        MS. JACKSON:  You don't need to explain
25   it.

62 (Pages 242 to 245)

Page 246

1    MR. SPINOLA: Okay. You can explain it
2  to her.
3    Q. (BY MR. SPINOLA) So you've got on 3/22/2010 that was
4  one potential week and that was 2.5 hours.
5    A. 2.5 hours.
6    Q. 2.5, some of which would be straight wages, some of
7  which would be overtime, if you're entitled to straight
8  wages. For the sake of ease for now we'll just count it
9  all as overtime. 4/5/2010 would have been 3 hours, and
10  that would have been all overtime. 4/26, that week of
11  2010 would have been 1.5 hours. And I think that was all
12  overtime.
13    A. Okay.
14    Q. Subject to my review. We've gone through a lot
15  today. 6/28/2010.
16    A. 6/28/2010.
17    Q. There was one hour there, half of which was straight
18  time and half overtime.
19    A. Half straight time?
20    Q. Yeah. It's 39.5 hours changing to 40.5 hours, if you
21  had worked through all your meal per ods.
22    A. Okay.
23    Q. January 11, 2011.
24    A. Okay.
25    Q. Would have been two hours. I think that that would

Page 247

1  have been an hour and a half straight time and one half
2  hour of overtime. 1/17/2011 was 2.5 hours. I think that
3  2.25 of that would have been straight time and .25 would
4  have been overtime. I'm going to go back and confirm all
5  this later. You can write it down. We're going to
6  calculate t as overtime today.
7    A. Okay.
8    Q. That way there's no question that would be the most
9  that t could be. 3/21/2011 was a week. There t was 2.5
10  hours. And I had that 38 1/2, so an hour and a half of
11  straight time and an hour of overtime. 9/5/2011 I have a
12  maximum of 2.5 hours w th .75 of that being overtime of 45
13  minutes. 9/19/2011 at 2.5, with 15 minutes of that being
14  overtime or .25. 10/24/11, and maximum possible damages
15  of 2.5 hours, w th .5 of it being overtime, the other two
16  hours being straight wages. And 10/31 I have as the last
17  week, w th another 2.5 maximum potential, with five of
18  those being overtime and the other two being straight
19  wages. Let's add up that total as hours instead of
20  overtime versus straight time.
21    A. Just the overtime?
22    Q. Add it all up, all total hours.
23    A. 26 1/2.
24    Q. Let's do it one more time. Let's make sure we have
25  the numbers the same. Add t up again?

Page 248

1    A. It's 25.
2    Q. Let me add t myself. What have you got?
3    A. 25.
4    Q. I've got 24.75. Let's just round up to 25 hours.
5  And then these are the overtime eligible work weeks, in
6  which you confirmed that you d d not work through your
7  meal periods. So this would be a half hour deducted from
8  the total for each one of these, 1/14, 1/15, 3/23, 3/24,
9  3/27, 9/11, 9/20, 10/26, 11/1, 11/5 and 11/6. So that
10  adds up to 11 periods. So that would 5.5 hours. It's a
11  half hour deduct on for these 11 dates that was an
12  appropriate deduct on, meaning that there would be no time
13  owed, since you actually took your full, uninterrupted
14  meal break.
15    So the net there, and again, this is without figuring
16  out what straight wages versus overtime wages, the net
17  would be 19.5 hours. And again, for the sake of ease, I
18  will take your highest overtime rate, even though the rate
19  is going to be lower for some of these times, and use
20  that, which is, as we looked at, <sup>Redacted</sup> times 19.5. You
21  can do this math with me. I've got that at $298.35. Is
22  that what you got?
23    A. You're times that by my pay rate?
24    Q. It would be less than that, because not all of this
25  time, if it had been worked, would have been worked at

Page 249

1  that rate. I'm just trying to figure out what the maximum
2  possible overtime damages would be. So<sup>Redacted</sup> times 19.5
3  hours?
4    A. $298.35. And that's only for some of the days we
5  went through?
6    Q. That's everything.
7    A. That's everyday?
8    Q. Yeah. Because remember, there was only 11 eligible
9  weeks where you would have been potentially entitled to
10  any overtime, if you had worked through every meal per od
11  And then there was at least 11 meal periods within those
12  weeks that you confirmed you had taken. And it's actually
13  going to be less than that, because there's about time,
14  and the straight time calculat on would be at your regular
15  rate. This would be the most that I could figure that you
16  would be due in actual overtime. It's higher than the
17  actual. Why don't we take a break for a minute for me to
18  figure out what's next and then we'll finish up.
19    (A recess was had.)
20    Q. (BY MR. SPINOLA) Ms. Crow, we've taken a break. Ms.
21  Crow, is there anything about your testimony that you'd
22  like to change or clarify?
23    A. No.
24    (Defendant's Exhibit 17 was marked.)
25    Q. These are examples of daily assignment logs that we

63 (Pages 246 to 249)

## Page 250

1   were talking about earlier, I believe, at Spring Creek.
2   A.   Okay.
3   Q.   Have you seen, starting with the first page, the one
4   Bates labeled 12998.  Do you know what it is?
5   A.   This is assignment sheets.
6   Q.   Can you tell me how t works?
7   A.   Wherever your name is at is what hall you're going to
8   be on.
9   Q.   Who puts in the time there, is that you or --
10  A.   No, that's somebody else.
11  Q.   It says, Heather 7:00 to 3:15.
12  A.   No, that's me.
13  Q.   So is that when you had started and when you would
14  end?
15  A.   Yes.
16  Q.   Is this the kind of form where you would sometimes
17  indicate when you took your meal per od?
18  A.   No.  That's from clocking in and clocking out.
19  Q.   I thought you said sometimes you would mark your meal
20  period times on here?
21  A.   Yes.  That's the new sheets in the back.
22  Q.   So that's not this particular one?
23  A.   No.
24  Q.   Okay.  Let's look at when the sheet changed.  Is this
25  the holdover from what you were using at the Living

## Page 251

1   Center, did you have this kind of pract ce when it was
2   Spring Creek Living Center as opposed to the Rehab?
3   A.   These are Living Center.  They changed, yeah, over
4   the year.
5   Q.   Turn to the one that's marked 13035.
6   A.   Okay.
7   Q.   You see where it says down at the bottom, float 1, 3,
8   float 2, 4, what does that mean?
9   A.   They're floating those halls.
10  Q.   And floating means what?
11  A.   Whenever you pass out ice and do vital signs and help
12  out on call lights and assist with the two-assists.
13  Q.   Okay.  Let's go to 13038 on the bottom right corner.
14  Are you there?
15  A.   Yes.
16  Q.   There's three different floaters: is that right, on
17  the sheet on the 3:00 to 11:00 and 11:00 to 7:00, it looks
18  like there's three floaters assigned?
19  A.   Okay.  Yes.
20  Q.   Look at 13049.  You see at the top it says, For the
21  date of 5/23/2010.  It says the first lunch 11:00, second
22  lunch 11:36, it looks like, or 11:30.  Do you see that?
23  A.   I see lunch and then above where it says redacted and
24  another lunch.
25  Q.   Are you looking at your name?

## Page 252

1   A.   Yes.
2   Q.   Okay.  So that would have been a day you took a
3   lunch, right, and you're marking the time that you took a
4   lunch?
5   A.   I d dn't mark that.
6   Q.   Is that somebody telling you to go to the second
7   lunch, is that what t means?
8   A.   It may have.
9   Q.   See above t where it says, First lunch 11:00 and
10  second lunch 11:30?
11  A.   Yeah, I see that.
12  Q.   So they were telling you to go to lunch at 11:30,
13  right?
14  A.   They're telling us we need to take it by that time.
15  Q.   By that time?
16  A.   Or at that time.
17  Q.   At that time.  Okay.  Look at the next page, Bates
18  labeled 13050.  This has people down for second break and
19  first break.  Do you know what that means?
20  A.   I don't know if t means lunch or break.
21  Q.   Okay.  Look at 13056.  This is a smoker schedule,
22  what is that?
23  A.   This is for res dents.
24  Q.   When the res dents smoke?
25  A.   Yes.  This is people who are assigned to go take them

## Page 253

1   to smoke.
2   Q.   Let's go to 20 more pages in.  Look at 13071.  This
3   looks like a 3:00 to 11:00 assignment sheet.  Have you
4   ever seen this one before or one that looks like this?
5   A.   I don't remember it.  Yeah, I remember it.  I think
6   they were trying to figure out how to make a new one.
7   Q.   This is different than what we've seen before, in
8   that it identifies specific break and mealtimes, correct,
9   under break times?
10  A.   Correct.
11  Q.   And those are staggered times, right?
12  A.   Correct.
13  Q.   Turn to 13094.
14  A.   Okay.
15  Q.   July 22, 2010, do you see where it says, Heather C
16  will be late?
17  A.   Yes.
18  Q.   Is that your handwriting or is that somebody else?
19  A.   Someone else's.
20  Q.   Did you call in and tell them you were going to be
21  late, and somebody wrote it on the to notify others, is
22  that the idea?
23  A.   Yes.
24  Q.   Let's look at 13096.  This is dated June 1, 2011.
25  This looks like a different kind of form --

64 (Pages 250 to 253)

Page 254

1   A.   Yes.

2   Q.   -- than before, right?

3   A.   Correct.

4   Q.   And this also has break times listed on the bottom

5   left, right?

6   A.   Yes.

7   Q.   D d you ever use this kind of form?

8   A.   Did I ever use it?

9   Q.   Have you seen this before?

10  A.   Yes.

11  Q.   This one?

12  A.   Yes.

13  Q.   So were different sheets used by different halls?

14  A.   Yes.

15  Q.   And different shifts?

16  A.   Different shifts, I don't know if they're used for

17  different shifts.  I think this is them just trying to

18  redo it.

19  Q.   Do you know why?

20  A.   Probably because people were missing their lunches.

21  I don't know.  It make  t more organized it looks like.

22  Q.   Okay.  Turn to 12989 towards the end.  Have you got

23  it?

24  A.   Yes.

25  Q.   You see where it says, Heather, and there's an arrow

Page 255

1   pointing to your name from the 200 hall, it says, float 1

2   and 2.  What does that mean?  Do you know what was going

3   on there?

4   A.   I'm probably the only one on the hall.  Whoever was

5   scratched out here was supposed to float 1 and 2.  I was

6   the only one on that hall that day.

7   Q.   Go to 13138.

8   A.   Is that going back or forward?

9   Q.   Forward a few.  10/29/11 is the date.

10  A.   Okay.

11  Q.   It says, Heather float 1 and 2?

12  A.   Yes.

13  Q.   Were you floating for others there?

14  A.   I may have been, yes.

15  Q.   Is that what that means?

16  A.   Yes.

17  Q.   And that would mean that you would also cover for

18  their meal periods, right?

19  A.   Yes.

20  Q.   See where  t says, back door?

21  A.   Yes.

22  Q.   That's whoever is responsible for the back door that

23  day, right?

24  A.   Yes.

25  Q.   And individual would always get their meal period,

Page 256

1   right?

2   A.   Yes.

3   Q.   Let's look at 13140.

4   A.   Okay.

5   Q.   That's just another example of a day you would be

6   floating for other CNAs so they could have their meal

7   breaks, correct?

8   A.   Correct.  I float to help them on the hall, not

9   necessarily get their breaks.  I'm supposed to help them

10  get their breaks and get my breaks.

11  Q.   Say that again?

12  A.   I'm supposed to help them.  We're supposed to help

13  each other.

14  Q.   Right.

15       (Defendant's Exhibit 18 was marked.)

16  Q.   You've been handed Defendant's Exhibit Number 18.

17  This is your time clock adjustment forms.  This is the

18  form that you would fill out when there was an error in

19  your time, correct?

20  A.   Correct.

21  Q.   If you noticed something that was wrong, you would

22  fill out this form.  That was what you understood to be

23  company procedure, right?

24  A.   Correct.

25  Q.   Turn to 12370.  It's a time adjustment request made

Page 257

1   by you on or about September 7, 2010, right?

2   A.   September 7, 2010, correct.

3   Q.   It says, Reason for explanation of error, forgot to

4   clock, right?

5   A.   Yes.

6   Q.   Can you read what it says there?

7   A.   Forgot to clock back in from lunch break.

8   Q.   So that was one of the occas ons when you would have

9   left for lunch, and when you came back you forgot to clock

10  back in, right?  You identified the time back in at 11:30,

11  right?

12  A.   Right.

13  Q.   So you took a break from 11:00 to 11:30, right?

14  A.   Yeah.

15  Q.   So you're telling them what time to put your

16  punch-out, right, at 11:30, that's when you actually

17  returned?

18  A.   Right.

19  Q.   So then they made an adjustment for you to have

20  clocked in at 11:30, correct?

21  A.   I don't know.  I would have to look.

22  Q.   Let's look back at Exhibit 13.

23  A.   September 7, 2010.  It doesn't say I clocked out that

24  day.

25  Q.   You filled it out on the 6th, and it was approved on

## Page 258

1 the 7th. So look at the 6th. See where t says 11:00 out
2 and 11:30 in, because you signed it day of week of error
3 Monday.
4 A.  Okay.
5 Q.  And then it was adjusted on 9/7, which was Tuesday.
6 A.  Okay.
7 Q.  So they made the adjustment as you requested, right
8 A.  Correct.
9 Q.  Okay. Now let's look at the next one. That's dated
10 8/7/2010. I think what you really meant there was
11 9/7/2010, looking at when it was signed, right, it was
12 signed 9/8/2010?
13 A.  Yes.
14 Q.  And looking at this, that's why there's no deduction,
15 right, on 9/7, even though you worked a 9 hour shift?
16 A.  Right.
17 Q.  And there's no clock-out times. So you reported that
18 you missed a meal period, right, and then it was paid to
19 you, correct?
20 A.  It says 8/7, and there's no deductions. Okay. Yes.
21 Q.  And the 8/7 was really 9/7, right?
22 A.  Okay. I see that now.
23 Q.  Because it was approved the next day on 9/8, right,
24 and they went back and fixed it on your time sheet?
25 A.  Correct.

## Page 259

1 Q.  Let's look at the next one, 12371.
2 A.  I'm still looking at this.
3 Q.  Okay.
4 A.  Okay.
5 Q.  And here you forgot to clock out after an inservice,
6 correct?
7 A.  Yes.
8 Q.  And they adjusted your time accordingly. Look at a
9 couple down at 12372/?
10 A.  I was still looking at this one.
11 Q.  Okay.
12 A.  Okay. I'm ready.
13 Q.  And so they did make the adjustment you requested
14 right?
15 A.  Right.
16 Q.  The next one I want you to look at is 12372.
17 A.  Okay.
18 Q.  This was for a meal period on 11/30/10.
19 A.  Okay.
20 Q.  You said you forgot to clock for lunch. And the
21 actual time that you left was 11:00, and it came back as
22 11:30, right?
23 A.  They fixed that, yes.
24 Q.  They made that change?
25 A.  Yes.

## Page 260

1 Q.  Look at the next one 12374. It says that you were
2 suspended pending investigation on December 9th or 10th or
3 2010. What was that investigation of?
4 A.  I don't remember.
5 Q.  Okay. Let's look at 12377, a few more down.
6 Tuesday, January 11, 2010. This is another time sheet
7 adjustment reporting that you didn't take a lunch,
8 correct?
9 A.  Yes.
10 Q.  So that was the date of 1/11/2010?
11 A.  Correct.
12 Q.  There was no meal deduction taken from you on that
13 day, desp te you having worked 8.25 hours and not having
14 clocked out for lunch, right?
15 A.  They sa d I didn't go to lunch and they fixed it on
16 the time clock?
17 Q.  Yes.
18 A.  That's correct.
19 Q.  You see it?
20 A.  Yes.
21 Q.  So you were actually pa d for that lunch, correct?
22 A.  Correct.
23 Q.  All right. Let's look at 12381. This is another
24 example. This was now July 15, 2011, a Fr day, where you
25 reported not taking a lunch, correct?

## Page 261

1 A.  Yes.
2 Q.  And was that lunch, in fact, paid to you?
3 A.  Yes.
4 Q.  So every time you've made a request, pursuant to the
5 company's policy to fill out a time adjustment request,
6 that request was, in fact, honored, correct?
7 A.  Correct.
8       (Defendant's Exhibit 19 was marked.)
9 Q.  You've been handed what's been marked as Defendant's
10 Exhib t Number 19, which are actually documents that you
11 produced to us. They appear to be pay stubs?
12 A.  Yes.
13 Q.  Are these the pay stubs that you had when you were
14 employed at Spring Creek?
15 A.  Yes.
16 Q.  Was this the only documents that you had pertaining
17 to your employment at Spring Creek?
18 A.  Yes.
19 Q.  And you did search for documents?
20 A.  I'm sorry?
21 Q.  You looked for documents?
22 A.  Yes.
23 Q.  Did you ever receive a solicitat on letter from your
24 attorneys?
25 A.  A sol c tation letter?

66 (Pages 258 to 261)

## Page 262

1    Q.   Asking you if you were interested in joining the
2    lawsuit.
3    A.   Do what?
4    Q.   Did you ever get a letter from your attorneys, before
5    you joined the lawsuit, asking if you wanted to join the
6    lawsuit?
7    A.   Not asking me to join the lawsuit, no.
8    Q.   Did you get a letter of any kind from your attorneys
9    before actually joining the lawsuit?
10   A.   Yes.
11        (Defendant's Exhibit 20 was marked.)
12   Q.   Did the letter look like this?
13   A.   No.
14   Q.   It was something different?
15   A.   I don't remember exactly what it looked like.  It
16   wasn't exactly like this.
17   Q.   Do you remember what the letter said?
18   A.   Not to my knowledge, no.
19   Q.   Do you still have that letter?
20   A.   No.
21   Q.   Did you speak with Amanda Hodges about joining the
22   lawsuit?
23   A.   No.
24   Q.   Have you ever spoken to Ms. Hodges about the lawsuit?
25   A.   No.

## Page 263

1    Q.   At anytime?
2    A.   No.
3    Q.   When is the last time you spoke to Ms. Hodges?
4    A.   It's been a couple of weeks ago about her pregnancy.
5    Q.   How frequently do you speak to Ms. Hodges?
6    A.   Not very often.
7    Q.   Do you know anything about Ms. Hodges' meal practices
8    while at Spring Creek?
9    A.   No.
10   Q.   Okay.
11        (Defendant's Exhibit 21 was marked.)
12   Q.   I'll hand to you what's been marked as Defendant's
13   Exhibit 21.  This is a copy of the complaint filed in this
14   lawsuit.  Have you ever seen this before?
15   A.   Yes.
16   Q.   Have you ever seen it before today?
17   A.   Yes.
18   Q.   Had you ever met with any attorneys in this case
19   before today?
20   A.   Any attorneys?
21   Q.   Yes.
22   A.   No, not unless Sharon.  I don't know if she's an
23   attorney.  She came to my house to go over this.
24        MS. JACKSON:  You don't have to tell him
25   what did you talk about.  He's just asking when and who.

## Page 264

1    A.   Okay.
2    Q.   Do you know who Brandon or Bryan Adams are?
3    A.   No.
4    Q.   Have you ever heard of those names?
5    A.   No.
6    Q.   Were you aware that you had named them in the
7    lawsuit?
8    A.   Aware of what?
9    Q.   That they were named in the lawsuit?
10   A.   No.
11   Q.   Take a look at page 4 of the complaint.  I want you
12   to look at the list of entities that are listed from A to
13   S there.  Do you see that?
14   A.   Correct.
15   Q.   You see N is Spring Creek, right?
16   A.   Yes.
17   Q.   Other than N, Spring Creek, do you know anything
18   about any of these other facilities?
19   A.   I've heard of Beebe and that's it.
20   Q.   Have you ever worked at any of these other
21   facilities?
22   A.   No.  I did orientation at Beebe Retirement Center,
23   but I never worked there.
24   Q.   And when you say, you did orientation, what do you
25   mean?

## Page 265

1    A.   I went in for a day of orientation, but I never
2    worked after that.
3    Q.   How come?
4    A.   Because I had -- I already was working for another
5    company.
6    Q.   Okay.  Do you know if you were on Beebe's no rehire
7    list?
8    A.   No, I don't know.
9    Q.   And was that before or after you worked at Spring
10   Creek?
11   A.   After.
12   Q.   And you were on Spring Creek's no rehire list, right?
13   A.   As far as I know, yes.
14   Q.   Look back at the exhibit we looked at with your
15   salary information.  This one right here, the salary
16   history report, Exhibit 12.  You see at the end of Exhibit
17   12, which is the Spring Creek Health & Rehab employee
18   report, where it says, Terminated no rehire?
19   A.   Yes.
20   Q.   Does that refresh your recollection that you were not
21   eligible for rehire at Spring Creek, right?
22   A.   I know now that I'm not.
23   Q.   But Beebe was willing to hire you it sounds like,
24   right?
25   A.   Correct.

Page 266

1   Q.  Okay.  So for any of these facil ties, I'm going to
2   ask you some questions that relate specif cally to your
3   time while you were at Spring Creek Health & Rehab.  So A
4   through S on these facilities other than N.
5   A.  Okay.
6   Q.  And these questions will also relate to Reliance,
7   Reliance Health Care.
8   A.  Okay.
9   Q.  And Brandon Adams and Bryan Adams.
10  A.  Do what?
11  Q.  I'm going to ask you questions about every one of
12  these facil ties except for Spring Creek, and all these
13  facilities and those two individuals, except for Spring
14  Creek.  So that would include Reliance and Bryan and
15  Brandon Adams.  All right?
16  A.  Okay.
17  Q.  I'm asking you these all together just to make it
18  easier.  Did any of these facilities, Reliance, any of the
19  ones listed here, other than Spring Creek or Bryan or
20  Brandon Adams, have anything to do with hiring you at
21  Spring Creek, as far as you know?
22  A.  No.
23  Q.  Did any of those facilities or individuals have
24  anything to do with setting your wages?
25  A.  No.

Page 267

1   Q.  D d any of them have anything to do w th setting your
2   schedule?
3   A.  No.
4   Q.  D d any of them have any involvement in what your
5   schedule would be?
6   A.  No.
7   Q.  D d any of them schedule your breaks?
8   A.  No.
9   Q.  Have meal coverage plans for you?
10  A.  No.
11  Q.  Monitor your meals?
12  A.  No.
13  Q.  Handling reversals of meals where you worked through
14  the meal?
15  A.  No.
16  Q.  D d any of them have any supervisory responsibility
17  over you in any way?
18  A.  No.
19  Q.  D d any of them make any decision related to your
20  employment?
21  A.  No.
22  Q.  D d any of those entities or individuals do anything
23  to support any claim that you were not properly pa d?
24  A.  No.
25          (Defendant's Exhibits 22 and 23 were

Page 268

1   marked.)
2   Q.  Just for the sake of the record, I'm not going to ask
3   you questions about these interrogatories, other than do
4   you recall submitting the responses for these
5   interrogatory requests?
6   A.  Yes.
7   Q.  All right.  And you verified the interrogatory
8   requests, that's your signature on Exhibit Number 23,
9   right?
10  A.  Yes.
11  Q.  And you verified those on or about the 5th day of
12  April, 2013, correct?
13  A.  Yes.
14  Q.  Okay.  There are several statements in your
15  interrogatories that are not accurate.  I'm going to be
16  working with your counsel to get those corrected.
17  A.  Okay.
18          (Defendants Exhibit 24 was marked.)
19  Q.  I'll hand you what's been marked as Defendant's
20  Exhibit Number 24, which is an employee memorandum
21  concerning a wr te-up.  Do you recall this situat on?
22  A.  I'm going to read it over.  Yes, I remember this.
23  Q.  Can you explain the situat on?
24  A.  That day me and Dawn, and I don't know what hall we
25  were on, I d d all the v tal signs on my own.  And the

Page 269

1   nurse got upset because I did not have v tal signs done
2   before 3:00 p.m., which made her have to stay later, I'm
3   assuming.
4   Q.  And who was Dawn?
5   A.  The other CNA.
6   Q.  The other CNA.  And who was upset with you?
7   A.  Stephanie, the nurse.
8   Q.  Was she your supervisor?
9   A.  She's an LPN, yes.
10  Q.  And you're saying you didn't get any breaks that day
11  What makes you think that?
12  A.  Because I know I was on the hall constantly while she
13  was taking her breaks.  I was having to do all the vitals
14  myself.  I was on my own.
15  Q.  How sure are you that you didn't get a break?
16  A.  I'm not too sure.  I have to look at that day.
17  Q.  Let's take a look at your employee response.
18  A.  She took her break.  And I still had the vitals done.
19  I was making sure they were getting done before I did
20  anything.
21  Q.  When you're saying, break, are you referring to your
22  lunch break?
23  A.  15 minute, no.
24  Q.  You had your lunch break, right?
25  A.  I'm not sure.  I don't know how that day was.

68 (Pages 266 to 269)

Page 270

1    Q.   Take a look at your employee response.  I started
2    v tals this morning when Nurse Stephanie gave them to me
3    Had got four done when Dawn was off the hall.  She got
4    back.  We finished our turn and dries and laying res dents
5    down.  And that time it was time for me to go to lunch.
6    A.   I got a lunch.
7    Q.   You got back and finished another four vital signs,
8    answering call lights until Dawn returned.  Is that what
9    that says?
10   A.   Yes.
11   Q.   Residents got back up for lunch and another turn and
12   dry.  So you did get your meal period, right?
13   A.   Yes.
14   Q.   As did Dawn, correct?
15   A.   Yes.
16   Q.   And can you describe to me why this day would have
17   been different, why you would have been able to get a
18   this day and not some other day?
19   A.   Someone has to be in the whirlpool, someone would
20   have to do showers.  I had a lunch, but I still got wrote
21   up for something.
22   Q.   The quest on I'm asking is, obv ously on this day you
23   got your full, uninterrupted meal period?
24   A.   Yes.
25   Q.   So what was different about this day and a day where

Page 271

1    you would not have gotten a meal period?
2    A.   I went to the showers to do showers.
3    Q.   Is it true that every day truly could be different?
4    A.   Yes.
5    Q.   And everybody's experience could truly be different?
6    A.   Yes.
7    Q.   And it would be different based on which hall you
8    worked on?
9         MS. JACKSON:  Objection to the form of
10   the question.  You can answer.
11   A.   No.  It's different for every hall.
12   Q.   That's what I'm asking.  So nurses on one hall may
13   get a break, while nurses on another hall may not,
14   correct?
15   A.   Correct.
16   Q.   And it would be different based on the shift, if you
17   worked night shift it's easier to get a break than if you
18   worked on the day shift?
19   A.   No.
20   Q.   Would it surprise you that other nurses have
21   testified that that was true?
22   A.   It may be different for them.  I don't know.
23   Q.   So it's different for each individual?
24   A.   Yes.
25   Q.   Why?

Page 272

1    A.   Their experience, those people that's on the hall
2    w th them, the number of people that are on the hall to
3    work with them, that sort of thing.
4    Q.   Anything else you can think of?
5    A.   No.
6    Q.   What about whether or not their supervisor would fill
7    in for them?
8         MS. JACKSON:  Object on to the form of
9    the question.  You can answer.
10   Q.   Would that play a factor in whether or not they could
11   get a full, uninterrupted meal break?
12   A.   If the supervisor did what?
13   Q.   Covered their work for them while they were on break.
14   A.   The supervisors d dn't.
15   Q.   For you you're saying they d dn't?
16   A.   Yes.
17   Q.   Earlier you testified that LPNs sometimes would,
18   right?
19   A.   They helped out.  They never would cover me.  They
20   had to do their own duties.
21   Q.   So to the extent that LPNs did fill in for somebody
22   else, that would impact their ability to take a break,
23   correct?
24   A.   If an LPN helped with someone else?
25   Q.   Yeah, was covering for somebody else.

Page 273

1         MS. JACKSON:  Objection to the form of
2    the question.  You can answer.
3    A.   Repeat that?
4    Q.   You're saying that your supervisors didn't typically
5    cover for your lunches, right?
6    A.   Correct.
7    Q.   And you know that other supervisors do cover for
8    other CNAs?
9    A.   I don't know that.
10   Q.   You don't know one way or another?
11   A.   No.
12   Q.   If they did, that would certainly help them to be
13   able to take their lunches, right?
14        MS. JACKSON:  Objection to the form of
15   the question.
16   A.   No.  I don't know that.
17   Q.   I'm asking if they did, I'm not asking you if you
18   know, I'm asking you to assume something, which I'm
19   entitled to ask you.  If a supervisor covered a CNA's
20   shift or duties while the CNA was on meal break, the CNA
21   would be able to take a meal break, correct?
22        MS. JACKSON:  Objection, speculative.
23   You can answer.
24   A.   No.
25   Q.   Why not?

69 (Pages 270 to 273)

Page 274

1    A.   If they took a break?
2    Q.   If there's a supervisor that is willing to stand in
3    for you so you can take a break, wouldn't that help you
4    take a break?
5         MS. JACKSON:  Objection, speculative.
6    You can answer.
7    A.   I don't know.
8         (Defendant's Exhibit 25 was marked.)
9    Q.   Do you recognize this employee memorandum as a
10   write-up that you received by Wanda Harris, the DON of
11   Spring Creek Health & Rehab on July 13, 2011?
12   A.   Let me read it over.
13   Q.   Okay.
14   A.   Yes, I remember this day.
15   Q.   What happened?
16   A.   There was a combative resident.  I told the nurse
17   that he was combative, and I needed help with him.  And
18   she just didn't acknowledge me.  I had someone come in
19   there with me to help me.  And he was still combative.
20   When they say quit, you're not supposed to do something
21   that a resident -- if they say stop or something, then you
22   have to stop and leave the room.
23        And I told the nurse that.  And she took it that I
24   was refusing, I guess.  And she told Wanda and Wanda wrote
25   me up for it.

Page 275

1    Q.   And there's an indication that you took a lunch that
2    day, correct?
3    A.   Correct.
4    Q.   And there's no disagreement that you took a full,
5    uninterrupted lunch?
6    A.   She says I did.  I don't remember that day.  I don't
7    know if I did or I didn't.
8    Q.   Okay.
9         (Defendant's Exhibit 26 was marked.)
10   Q.   Do you remember this write-up on 7/21/2011?
11   A.   I don't remember.
12   Q.   You don't remember that?
13   A.   No.
14   Q.   Is that your signature?
15   A.   Yes.
16   Q.   You're saying turned the resident at 9:00, checked
17   and turned at 11:00 a.m. before I went to lunch?
18   A.   Yes.
19   Q.   You did take a lunch that day, correct?
20   A.   Yes, it says I did.
21   Q.   You said you did, right?
22   A.   Yes.
23   Q.   7/21/2011.  And do you remember failing to turn a
24   resident?
25   A.   No.

Page 276

1    Q.   Do you have any idea why you were disciplined for not
2    turning a resident?
3    A.   No.
4         (Defendant's Exhibit 27 was marked.)
5    Q.   You've been handed what we have marked Defendant's
6    Exhibit Number 27, which is the form for terminaton of
7    employment.  The last day you worked was December 19,
8    2011, correct?
9    A.   That was my last day worked, correct.
10   Q.   And you were fired for work performance, correct?
11   A.   Correct.
12   Q.   And you were terminated by who?
13   A.   Wanda.
14   Q.   Wanda Harris?
15   A.   Yes.
16   Q.   Who was the DON?
17   A.   Yes.
18   Q.   At Spring Creek, correct?
19   A.   Correct.
20   Q.   Is that your employee signature?
21   A.   Yes.
22   Q.   And it says you're not eligible for rehire, correct?
23   A.   Correct.
24   Q.   Looking at the next page.  It says the reasons for
25   terminaton was numerous issues with work performance,

Page 277

1    right?
2    A.   Correct.
3    Q.   And that included repeatedly being asked to feed a
4    resident, right, under the detailed description?
5    A.   They wrote that, but I did feed that resident.
6    Q.   I'm just saying these are the reasons for your
7    termination?
8    A.   Yes.
9    Q.   For repeatedly being asked to feed a resident, right?
10   A.   Correct.
11   Q.   Previous probation for work performance, a July 26,
12   2011 suspension, correct?
13   A.   July 26, right.
14   Q.   A write-up on 7/13/2011 for paperwork and performance
15   issues?
16   A.   Correct.
17   Q.   A written warning on February 22, 2011 for
18   inappropriate conduct?
19   A.   Correct, that's what it says.
20   Q.   A verbal warning for sitting in a room on February
21   22, 2011?
22   A.   Is there a write-up attached for that?
23   Q.   I have one.  I don't know if it's attached to this.
24   You actually responded to it and acknowledged that you
25   were sitting in a room.  I could pull it out if you like.

70 (Pages 274 to 277)

Page 278

1    We could do that at a break here.
2        Then also August 8, 2010 work performance issues fo
3    not getting vital signs, correct?
4    A.   Okay.
5    Q.   The last reason was for work performance and not
6    getting vital signs of patients, right?
7    A.   Correct.
8            MR. SPINOLA:   Let's take a break there.
9    I will finish up here the last minute or two.
10           (A recess was had.)
11   Q.   (BY MR. SPINOLA)  Is t your understanding that it
12   was Spring Creek that ran payroll for you?
13   A.   Yes.
14           (Defendant's Exhibit 28 was marked.)
15   Q.   This is the write-up about sitting in a room from
16   February 22, 2011.  You see where your signature is?
17   A.   Yes.
18   Q.   You see it says, Employee response.  Sitting in the
19   room was the other CNA on the hall.  I was checking call
20   light, inappropriate.  What was the inappropriateness?
21   A.   I don't remember.
22   Q.   I wanted to confirm something I think you said
23   earlier.  Spring Creek Health & Rehab had a policy that
24   did not permit CNAs to eat their lunches on the floor,
25   correct?

Page 279

1            MS. JACKSON:   Objection to the form of
2    the question, but you can answer.
3    A.   They d dn't permit us?
4    Q.   They didn't let you eat on the floor.  You had to go
5    eat in the breakroom or somewhere else, right?
6            MS. JACKSON:   Same objection.  You can
7    answer.
8    A.   Yes.
9    Q.   Okay.  And you would sometimes eat your lunches w th
10   Amanda Hodges, right?
11           MS. JACKSON:   Objection to the form of
12   the question.  You can answer.
13   A.   On occas on.
14   Q.   Before I close your deposit on, I want to confirm a
15   few things with you and make sure that this is your
16   testimony.  I will give you the caveat that I'll close
17   your deposition, but to the extent your testimony changes,
18   as a result of any quest oning from your counsel, I'm
19   going to reopen it to ask you other questions.  Okay?
20   A.   Okay.
21   Q.   You've never worked off the clock pre or post-shift,
22   right?
23           MS. JACKSON:   Objection to the form of
24   the question, but you can answer.
25   A.   I never worked off the clock.

Page 280

1    Q.   You never worked -- you never performed any work
2    before clocking in or after clocking out while at Spring
3    Creek?
4    A.   Correct.
5    Q.   The only claim that you are asserting is a claim for
6    unpaid overtime for meal periods, correct?
7            MS. JACKSON:   Object on.  You can answer.
8    A.   Repeat the question?
9    Q.   The only claim that you're making is one for unpaid
10   overtime for missed meal periods, right?
11           MS. JACKSON:   Object on.
12   A.   No.  I would like to also get what I missed like
13   lunch misses.
14   Q.   But that's not what you consented to join, right, in
15   the lawsuit?  You remember the consent form said that you
16   were seeking overtime, right?
17           MS. JACKSON:   Object on to the form of
18   the question, but you can answer.
19   A.   I was seeking overtime.  I would like to get pa d for
20   the lunches I missed as well.
21   Q.   Okay.  You have no records of your actual working
22   lunches to know which meal periods you would have missed
23   or taken, right?
24   A.   No record?
25   Q.   No separate record, right?

Page 281

1    A.   I have the document --
2            MS. JACKSON:   You can finish that answer
3    and then we'll stop.
4            MR. SPINOLA:   I want to finish because
5    there was a whole argument of --
6            MS. JACKSON:   It doesn't matter.  You
7    have 7 hours.
8            MR. SPINOLA:   Are you going to close the
9    deposition?
10           MS. JACKSON:   I will.
11           MR. SPINOLA:   Actually let's call the
12   Court now.
13           MS. JACKSON:   Okay.  We are done with 7
14   hours.
15           MR. SPINOLA:   Let's call the Judge.  And
16   just so you know before I call him, what I'm going to tell
17   him is that I have about three minutes left and you're
18   refusing to allow me to finish.
19           MS. JACKSON:   Angelo, you had 7 hours to
20   ask her all questions.
21           MR. SPINOLA:   We'll call the judge.
22           (The following is a telephonic hearing
23   with the Court.)
24           MR. SPINOLA:   Your Honor, This is Angelo
25   Spinola and Ms. Jackson calling you in the Reliance case.

71 (Pages 278 to 281)

Page 282

1    THE COURT:  Hello.
2    MR. SPINOLA:  I'm very sorry to disturb
3  you at this hour, Your Honor.
4    THE COURT:  Well, that's okay.
5    MR. SPINOLA:  It's a very minor dispute.
6  I'm sorry again to bother with it.  We have reached the 7
7  hour mark of a deposition of a named plaintiff.  I'm
8  taking the deposition.  I have probably another two or
9  three minutes of direct.  I've got another five questions.
10    There was a dispute earlier with Ms. Jackson where
11  there was several speaking objections.  And I was trying
12  to go off the record to preserve some time, and was not
13  able to do so.  Eventually I just got up and left and went
14  to the bathroom.
15    But I would like to be able to finish my five
16  questions, if possible.  And Ms. Jackson is closing out
17  the deposition and not allowing that to occur.
18    MS. JACKSON:  Your Honor, we've been here
19  for more than 7 hours.  We actually went a little bit over
20  the limit.  Mr. Spinola had sufficient time with the
21  plaintiff.  He took several breaks during that 7 hour
22  limit.  We accommodated this request.  I dispute that I
23  made speaking objections.
24    He's not asking any new questions.  He's asking
25  plenty of the same questions all over again.  And we're

Page 283

1  over the limit of 7 hours for a deposition.  We have a
2  court order, and it says that he is entitled to depose
3  plaintiff for 7 hours.  She has been here for more than 7
4  hours, including all the breaks and lunches that we took.
5  That's why I dispute any continuance of this deposition,
6  Your Honor.
7    THE COURT:  I don't have the order in
8  front of me, counsel.  I don't remember whether the 7
9  hours was pure deposition time, or included lunch and
10  breaks.  By hunch is that  t didn't include lunch and
11  breaks.
12    MS. JACKSON:  Yes.  It just says 7 hours.
13  And he had 7 hours w th her.
14    MR. SPINOLA:  I was just trying bas cally
15  to do my close-out questions.
16    THE COURT:  All right.  My ruling,
17  counsel, is that the depos t on of this plaintiff can
18  continue for another 20 minutes.  And, Mr. Spinola, keep
19  your questions short and sweet.  Mr. Spinola, when the
20  Adamses are deposed, I expect you to be flexible.  And if
21  there needs to be an extra 10 minutes here or an extra 15
22  minutes there, I expect you to accommodate Ms. Jackson o
23  Mr. Holleman or whomever is taking the depos tion.
24    MR. SPINOLA:  Certainly, Your Honor.
25    MS. JACKSON:  Thank you, Your Honor.

Page 284

1    THE COURT:  All right.  Y'all have a good
2  evening.  Good luck in getting done.
3    MR. SPINOLA:  Thank you.
4    (The hearing was concluded.)
5  Q.  (BY MR. SPINOLA)  I was asking you, you don't have
6  any records of your meal periods that you claim that you
7  missed, right, there's nothing that would tell you that
8  you missed a meal per od, correct?
9  A.  Correct.
10  Q.  There's no way for you, s tting here today, to be
11  able to state whether you missed a meal per od in a
12  particular week or did not, right?
13  A.  Just my word.
14  Q.  You wouldn't know which week or which day you missed
15  a meal period, and wh ch day or wh ch week you d d?
16  A.  Yes.  By looking at the document and seeing how many
17  people are scheduled that day, it gives me a good insight
18  on that I d d miss because of the scheduling.
19  Q.  Tell me what analysis you have to conduct in order to
20  determine whether you received or missed a meal period?
21  A.  Like we did before, seeing that there's only two on a
22  hall and no one in whirlpool, that says that I'm not going
23  to get one.
24  Q.  Are you aware that you in one week, and I was asking
25  you about missed meal per ods, you claim to have missed

Page 285

1  all the meal per ods in that week, and it was based on
2  that analysis of who was on the hall, and it was actually
3  a week in wh ch you had been clocking out for meal
4  per ods?
5  A.  I was, yes.
6  Q.  We were looking at staffing log for a week where you
7  had been clocking out in 2010.  You were actually clocking
8  out for your meal periods?
9  A.  Correct.
10  Q.  And when you were looking at the staffing log, you
11  were thinking that you might not have gotten a meal period
12  on one of those days where you had clocked out because of
13  the staffing.  You see what I'm saying?
14  A.  We figured that out?
15  Q.  We didn't actually -- I can show you what I'm talking
16  about.  Would that make  t easier?
17  A.  I don't want to agree to something that I'm not
18  really sure about.
19  Q.  Let's look back at it then.  You need to look at
20  Exhib t 13.  It was the week of 7/26/2010 through
21  8/8/2010.
22  A.  Okay.
23  Q.  I asked you to review the staffing logs for 7/26
24  through 8/8.  You had looked at 7/26, 7/28, 8/1, 8/3, 8/6,
25  8/7 and 8/8.  And you see on 7/26 you actually clocked out

72 (Pages 282 to 285)

Page 286

1  for your meal period, right?
2  A.  Yes.  7/28 there's two of us on the hall, nobody in
3  the whirlpool.  It says I got a break that day.  I don't
4  know.  8/1, that's possible.
5  Q.  Which one?
6  A.  8/1.  It's possible because we had a float.
7  Q.  So you think it's possible you did get a meal period
8  on 8/1?
9  A.  Yeah.
10  Q.  Just by looking at the staffing log, right?
11  A.  Correct.
12  Q.  On 8/1 you were only working for a couple of hours,
13  correct?
14  A.  Okay.  8/3 there's only two of us on the hall.
15  Q.  If you look at the clocking record, you clocked out
16  at 11:15 and clocked back in at 11:45.
17  A.  That day could have went well.
18  Q.  So even though you would think that possibly you
19  didn't have enough staffing to get a meal period, just
20  looking at the staffing log, you can see from your time
21  record that you didn't?
22  A.  It just depends on the day.  100 hall is one of the
23  easier halls.  On 8/6 there's two us.
24  Q.  So what would you say about 8/6?
25  A.  It could happen.

Page 287

1  Q.  So you're saying you could have, in fact, gotten a
2  meal per od on 8/6?
3  A.  Yes.
4  Q.  And your clock-out time showed you having clocked out
5  for 45 minutes on 8/6, right?
6  A.  On 8/6, yes.
7  Q.  Okay.
8  A.  I was 100 hall that whole week.  Yeah, that's correct
9  for that week.
10  Q.  Correct that you did, in fact, receive meal periods
11  that week?
12  A.  Yes.
13  Q.  Now, my point is prev ously when we looked at this,
14  you felt like you wouldn't have received meal periods?
15  A.  It just depends.  I was giving my estimate.
16  Q.  My point was you don't have any way of actually
17  knowing whether you worked through a meal per od or not,
18  sitting here today looking back at these records, and
19  you're kind of speculating?
20      MS. JACKSON:  Objection to the form of
21  the question.  You can answer.
22  A.  I'm estimating.
23  Q.  Estimating.  You don't have any knowledge of other
24  employees' meal pract ces, you confirmed that, right?
25  A.  Correct.

Page 288

1  Q.  And that would include Amanda Hodges, other than the
2  times you had lunch with her, right?
3  A.  Correct.
4  Q.  You don't know schedules of any other employees and
5  when they might take lunches or whether the lunches were
6  paid, right?
7  A.  Correct.
8  Q.  You don't know of anybody else that would be subject
9  to a meal deduct or not, right?
10  A.  Correct.
11  Q.  And you don't know the time adjustment pract ces of
12  other people e ther, right?
13  A.  No.
14  Q.  You were never told that you had to work through
15  lunch by anybody, correct?
16  A.  Not those exact words, no.
17  Q.  Nobody said to you that you had to work through
18  lunch, right?
19  A.  Correct.
20  Q.  You never complained to the administrator about
21  missed or interrupted meal periods, right?
22  A.  I was supposed to report to my LPN or DON.
23  Q.  You never complained to the administrator, correct?
24  A.  Correct.
25  Q.  You failed to follow the policy by turning in the

Page 289

1  time sheet adjustment for a missed meal period, and the
2  company could not have known that you missed a meal
3  per od, correct?
4  A.  No, because I told them.
5  Q.  When you were explaining to management that you
6  missed a meal period, you were typ cally turning in a time
7  sheet adjustment form to be paid for t, right?
8      MS. JACKSON:  Object on to the form of
9  the question.  You can answer.
10  A.  I was giving them a time adjustment to let them know
11  that I was missing that time.  They were telling me I
12  needed to not do that.  I was getting in trouble for other
13  things.  I didn't want to lose my job.  So I was working
14  through my lunches.  And they were aware of it.
15  Q.  Can you firmly state that any meal period that you
16  reported to have missed to management, is there any that
17  you can point to where you said, I missed this meal period
18  and it was not pa d?
19  A.  Anyone that I told?
20  Q.  Any meal period that you reported as having missed,
21  were there any meal per ods you reported as having missed
22  that were not ultimately paid to you?
23  A.  Yes.  I told you I talked to Karen and the LPNs and
24  Wanda.
25  Q.  And what you explained was you're not sure how they

73 (Pages 286 to 289)

## Page 290

1    reacted to what you told them, correct?
2    A.  No.
3    Q.  You don't know if they adjusted your time or not,
4    correct?
5    A.  No, I never sa d that.
6    Q.  When you were talking about your communication with
7    the personnel person, I asked you when you reported  t,
8    what did she do about it, and you sa d, I have no  dea.
9    And I asked did she pay you for it, and you said, I don't
10   know.  Is that still the case?
11   A.  I don't know.  But from the documents, I didn't get
12   pa d them.
13   Q.  Are you aware that there was 156 shifts that you were
14   pa d meal periods for?
15   A.  There was 156?
16   Q.  There was 156 shifts where you worked where there was
17   no auto deduction applied to your meal per ods.  D d you
18   know that?
19   A.  I d dn't know the number, no.
20   Q.  Are you aware of any, and if you can point to one
21   show me, are you aware of any meal per od that you
22   reported as having missed that was not ultimately paid?
23   A.  Report meal per od what?
24   Q.  Are you aware of any meal period that you reported as
25   not having taken, a missed meal period that wasn't

## Page 291

1    ultimately paid to you?
2    A.  There is, yes.
3    Q.  So which ones, show me which meal per ods?  You ca
4    use wh chever exhibit that you want.  There's several
5    here.  Show me which meal period you reported as having
6    worked through that wasn't paid?
7    A.  That I did work through them?
8    Q.  Is it true that you at times talked to people about
9    working through lunches, right?
10   A.  Correct.
11   Q.  I am asking you did they pay you for the meal periods
12   that you identified?  We know that you were pa d for every
13   meal period that you filled out a time sheet adjustment
14   form for, right?
15   A.  Yes.
16   Q.  Are there any other meal per ods that you reported as
17   having missed that were not pa d to you?
18   A.  Correct.
19   Q.  Which ones?
20   A.  I don't know which ones.
21   Q.  How do you know that they weren't pa d to you?
22   A.  Because it's documented that I wasn't paid for them.
23   Q.  Where?
24   A.  Where it says I didn't clock out at.
25   Q.  Show me which ones?

## Page 292

1    A.  I can't show you exactly which ones.  We already wen
2    over the documents of which days that I could not have.
3    There's an estimate of all of them.
4    Q.  What's that?
5    A.  There's an estimate that  t would be all of them.
6    Q.  So you complained about every meal per od?
7    A.  No, not every one.
8    Q.  You said that you had certain conversations about
9    meal periods you missed, right?
10   A.  Yes.
11   Q.  And you don't know what management did with that
12   informat on, right, you don't know how they paid you for
13   that or if they paid you, correct?
14   A.  Correct.
15   Q.  So you're not sure, and there's no way for you to be
16   able to say that there were meal periods that you reported
17   as having missed that were unpaid?
18   A.  Correct.
19       MR. SPINOLA:  I don't have any further
20   questions.  Thank you.
21       (WHEREUPON, the deposit on was concluded
22   at 7:42 p.m..)
23            *  *  *  *  *
24
25

## Page 293

1        C E R T I F I C A T E
2    STATE OF ARKANSAS}
           }ss.
3    COUNTY OF SALINE }
4    RE:  ORAL DEPOSITION OF HEATHER AMANDA CROW:
5        I, JEFF BENNETT, CCR, LS #19, a Notary Publ c in and
6    for Saline County, Arkansas do hereby certify that the
7    facts stated by me in the capt on of the foregoing
8    depos t on are true; and that the foregoing deposition
9    was transcribed by me, or under my supervis on, on the
10   Computerized Transcription System from my machine
11   shorthand notes taken at the time and place set
12   out in the capt on to hereto, the witness being first duly
13   cautioned and sworn, or affirmed, to tell the truth, the
14   whole truth, and nothing but the truth.
15       I FURTHER CERTIFY that I am ne ther counsel for,
16   related to, nor employed by any of the parties to the
17   action in which this deposition was taken; and further,
18   that I am not a relative or employee of any attorney or
19   counsel employed by the parties hereto, nor financially
20   interested, or otherwise, in the outcome of this action.
21       GIVEN UNDER MY HAND AND SEAL OF OFFICE on this
22   10th day of June, 2013.
23   _____
     JEFF BENNETT, CCR, LS Certificate
24   #19, Notary Public in and for Saline
     County, Arkansas
25   My commiss on expires 11-29-2020

74 (Pages 290 to 293)

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER

Date Range: 2/22/2010 - 3/7/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 3/1/2010 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 3/2/2010 | 07:00 IN<br>15:30 OUT | 8.50 | 0.50 | 8.00 | Worked |
| 3/5/2010 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 3/6/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/7/2010 | 07:00 IN<br>07:45 OUT | 0.75 | 0.00 | 0.75 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 31.75 | 0.00 | 0.00 | 0.00 | 0.00 | 31.75 |
| Grand Totals | 31.75 | 0.00 | 0.00 | 0.00 | 0.00 | 31.75 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.





EXHIBIT
13

3/22/10 — 5/5/10 — 05/26/10 — 06-28-10
01-11-11 ; 01-17-11  03-21-11
09-5-11
09-19-11 , 10-24-11
10-31-11

http://localhost/qqest/report/Timecard/Report.asp?ReportInSeparateWindow=1&BID=5&E...   3/8/2010

Confidential

RHC011745

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER

**Department:** CERTIFIED NURSING ASSISTANT - CNA

Date Range: 3/8/2010 - 3/21/2010

| Date | Time | Hours | Hours Type |
|------|------|-------|------------|
| 3/8/2010 | 06:45 IN<br>16:00 OUT | 8.75 | Worked |
| 3/10/2010 | 07:00 IN<br>15:00 OUT | 7.50 | Worked |
| 3/11/2010 | 06:45 IN<br>15:00 OUT | 7.75 | Worked |
| 3/12/2010 | 07:00 IN<br>15:00 OUT | 7.50 | Worked |
| 3/15/2010 | 07:00 IN<br>15:00 OUT | 7.50 | Worked |
| 3/16/2010 | 07:00 IN<br>15:00 OUT | 7.50 | Worked |
| 3/17/2010 | 07:00 IN<br>15:00 OUT | 7.50 | Worked |
| 3/18/2010 | 07:00 IN<br>07:30 OUT | 0.50 | Worked |
| 3/21/2010 | 07:00 IN<br>15:00 OUT | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | OT2 Total | Hours<br>OT3 Total | OT4 Total | Hours Type<br>Sub Total |
|------|------|------|------|------|------|------|
| Worked | 62.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62.00 |
| **Grand Totals** | 62.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62.00 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 3/22/2010 - 4/4/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 3/22/2010 | 06:45 IN 15:15 OUT | 8.50 | 0.50 | 8.00 | Worked |
| 3/23/2010 | 07:15 IN 15:00 OUT | 7.75 | 0.50 | 7.25 | Worked |
| 3/24/2010 | 07:00 IN 16:00 OUT | 9.00 | 0.50 | 8.50 | Worked |
| 3/26/2010 | 14:00 IN 14:30 OUT | 0.50 | 0.00 | 0.50 | Worked |
| 3/27/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/28/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/29/2010 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 3/30/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/2/2010 | 07:00 IN 08:30 OUT | 1.50 | 0.00 | 1.50 | Worked |
| 4/3/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/4/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|---|---|---|---|---|---|---|
| Worked | 71.00 | 0.00 | 0.00 | 0.00 | 0.00 | 71.00 |
| Grand Totals | 71.00 | 0.00 | 0.00 | 0.00 | 0.00 | 71.00 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 4/5/2010 - 4/18/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 4/5/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/8/2010 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 4/9/2010 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 4/10/2010 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 4/11/2010 | 07:00 IN 23:00 OUT | 16.00 | 1.00 | 15.00 | Worked |
| 4/14/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/15/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/16/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/17/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date | | Time | | Hours | | Deductions | | Net Hours | | Hours Type |
|---|---|---|---|---|---|---|---|---|---|---|
| Hour Type | | Time | Reg Total | OT1 Total | | OT2 Total | OT3 Total | OT4 Total | | Sub Total |
| Worked | Redacted | | 70.00 | 5.75 | | 0.00 | 0.00 | 0.00 | | 75.75 |
| *Disbursements*. | | | | | | | | | | |
| Grand Totals | | | 70.00 | 5.75 | | 0.00 | 0.00 | 0.00 | | 75.75 |
| Disbursements | Redacted | | | | | | | | | |
| 4/11/2010 | Shift Diff | Redacted | | | | | | | | |
| | Total: | | | | | | | | | |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*heatheracrow*

*& sean*

SPRING CREEK HEALTH & REHAB -

**SPRING CREEK HEALTH & REHAB**

**Time Card Report**
Sorted by Employee Name

Date Range: *4/19/2010 - 5/2/2010*

CROW, HEATHER - Card: 313

Date Range: 4/19/2010 - 5/2/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 4/20/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 4/21/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/22/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/23/2010 | 07:00 IN<br>08:15 OUT | 1.25 | 0.00 | 1.25 | Worked |
| 4/26/2010 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 4/27/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/28/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/29/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT<br>15:30 IN<br>23:15 OUT | 15.25 | 0.00 | 15.25 | Worked |
| 4/30/2010 | 15:00 IN<br>22:15 OUT | 7.25 | 0.00 | 7.25 | Worked |
| 5/2/2010 | 07:00 IN<br>11:30 OUT<br>12:15 IN<br>15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 63.75 | 12.50 | 0.00 | 0.00 | 0.00 | 76.25 |
| Disbursements: Redacted | | | | | | |
| Grand Totals | 63.75 | 12.50 | 0.00 | 0.00 | 0.00 | 76.25 |
| Disbursements | Redacted | | | | | |
| 4/29/2010   Shift Diff | | | | | | |
| 4/30/2010   Shift Diff | | | | | | |
| Total: | | | | | | |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA          Date Range: 4/19/2010 - 5/2/2010

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 4/20/2010 | 07:00 IN 11:30 OUT 12:00 IN 15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 4/21/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/22/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/23/2010 | 07:00 IN 08:15 OUT | 1.25 | 0.00 | 1.25 | Worked |
| 4/26/2010 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 4/27/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/28/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/29/2010 | 07:00 IN 11:30 OUT 12:00 IN 15:00 OUT 15:30 IN 23:15 OUT | 15.25 | 0.00 | 15.25 | Worked |
| 4/30/2010 | 15:00 IN 22:15 OUT | 7.25 | 0.50 | 6.75 | Worked |
| 5/2/2010 | 07:00 IN 11:30 OUT 12:15 IN 15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| Hour Type | | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
| Worked | | 63.75 | 12.00 | 0.00 | 0.00 | 0.00 | 75.75 |

Disbursements: Redacted

Grand Totals          63.75      12.00      0.00      0.00      0.00      75.75

Disbursements          Redacted

4/29/2010   Shift Diff
4/30/2010   Shift Diff

Total:

& Sean

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS, TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

heather a crow

http://localhost/qqest/report/Timecard/Report.asp?ReportInSeparateWindow=1&BID=5&E...   5/3/2010

Confidential                                                                      RHC011750

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 5/3/2010 - 5/16/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 5/4/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/5/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/8/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 5/9/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 5/10/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 5/11/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 5/14/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/15/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 5/16/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |

37.5

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 67.50 | 0.00 | 0.00 | 0.00 | 0.00 | 67.50 |
| Grand Totals | 67.50 | 0.00 | 0.00 | 0.00 | 0.00 | 67.50 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK
MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING
THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS
CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET
PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER
PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 5/17/2010 - 5/30/2010

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|-----------|-----------|------------|
| 5/17/2010 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 5/20/2010 | 07:00 IN<br>10:15 OUT<br>10:30 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 5/22/2010 | 07:00 IN<br>11:45 OUT<br>12:30 IN<br>15:15 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 5/23/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 5/26/2010 | 07:00 IN<br>11:30 OUT<br>11:45 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 5/27/2010 | 07:00 IN<br>09:15 OUT<br>09:15 IN<br>15:30 OUT<br>15:30 IN<br>17:45 OUT | 10.75 | 0.50 | 10.25 | Worked |
| 5/28/2010 | 07:00 IN<br>17:45 OUT | 10.75 | 0.50 | 10.25 | Worked |
| 5/29/2010 | 07:15 IN<br>18:00 OUT | 10.75 | 0.50 | 10.25 | Worked |

| Date | | Time | Hours | | | Net Hours | Hours Type |
|------|---|------|-------|---|---|-----------|------------|
| Hour Type | | Reg Total | OT1 Total | | | | Sub Total |
| Worked | | 68.50 | 0.00 | | | | 68.50 |

Deductions
OT2 Total   OT3 Total   OT4 Total

Disbursements: Redacted

| Grand Totals | 68.50 | 0.00 | 0.00 | 0.00 | 0.00 | 68.50 |

Disbursements

5/27/2010   Shift Diff   Redacted
5/28/2010   Shift Diff
5/29/2010   Shift Diff

Total:



I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 5/31/2010 - 6/13/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 6/1/2010 | 07:00 IN<br>11:30 OUT<br>11:45 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 6/2/2010 | 07:00 IN<br>11:30 OUT<br>11:45 IN<br>15:30 OUT | 8.25 | 0.25 | 8.00 | Worked |
| 6/3/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 6/4/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 6/7/2010 | 07:00 IN<br>10:30 OUT<br>10:45 IN<br>11:30 OUT<br>11:45 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 6/8/2010 | 07:00 IN<br>10:30 OUT<br>10:45 IN<br>14:45 OUT | 7.50 | 0.25 | 7.25 | Worked |
| 6/9/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 6/10/2010 | 07:00 IN<br>11:45 OUT<br>12:15 IN<br>13:45 OUT | 6.25 | 0.00 | 6.25 | Worked |
| 6/13/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*Handwritten notations: 3', 36, 36.75*

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 66.50 | 0.00 | 0.00 | 0.00 | 0.00 | 66.50 |
| Grand Totals | 66.50 | 0.00 | 0.00 | 0.00 | 0.00 | 66.50 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*Signature*

Confidential

RHC011753

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 6/14/2010 - 6/27/2010

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| 6/14/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 6/15/2010 | 07:00 IN<br>11:45 OUT<br>12:15 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 6/19/2010 | 07:00 IN<br>11:30 OUT<br>11:45 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 6/20/2010 | 07:00 IN<br>11:30 OUT<br>11:45 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 6/21/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 6/22/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 6/25/2010 | 07:00 IN<br>11:45 OUT<br>12:00 IN<br>17:00 OUT | 9.75 | 0.25 | 9.50 | Worked |
| 6/26/2010 | 07:00 IN<br>15:45 OUT | 8.75 | 0.50 | 8.25 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | Net Hours<br>OT3 Total | Hours Type<br>OT4 Total | Sub Total |
|------|------|------|------|------|------|------|
| Worked | 62.75 | 0.00 | 0.00 | 0.00 | 0.00 | 62.75 |
| Grand Totals | 62.75 | 0.00 | 0.00 | 0.00 | 0.00 | 62.75 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313                                      Date Range: 6/28/2010 - 7/11/2010
Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|-----------|-----------|------------|
| 6/28/2010 | 07:00 IN<br>11:00 OUT<br>11:45 IN<br>15:30 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 7/1/2010 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 7/2/2010 | 07:00 IN<br>19:30 OUT | 12.50 | 0.50 | 12.00 | Worked |
| 7/3/2010 | 07:00 IN<br>11:15 OUT | 4.25 | 0.00 | 4.25 | Worked |
| 7/4/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 7/7/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/8/2010 | 07:00 IN<br>11:15 OUT<br>11:30 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/9/2010 | 07:00 IN<br>11:15 OUT<br>11:45 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 7/10/2010 | 07:00 IN<br>11:45 OUT<br>12:15 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |

| Date | Time | Hours | | Deductions | | Net Hours | | Hours Type |
|------|------|-------|--|-----------|--|-----------|--|-----------|
| | | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | | Sub Total |
| Hour Type<br>Worked | | 69.75 | 0.00 | 0.00 | 0.00 | 0.00 | | 69.75 |
| Disbursements: Redacted | | | | | | | | |
| Grand Totals | | 69.75 | 0.00 | 0.00 | 0.00 | 0.00 | | 69.75 |
| Disbursements Redacted | | | | | | | | |

7/2/2010   Shift Diff
7/4/2010   Other
                Total:

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK
MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING
THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS
CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET
PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER
PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential                                                                    RHC011755

SPRING CREEK HEALTH & REHAB -

| SPRING CREEK HEALTH & REHAB | **Time Card Report**<br>Sorted by Employee Name | Date Range: *7/12/2010 - 7/25/2010* |
|---|---|---|

CROW, HEATHER - Card: 313

Date Range: 7/12/2010 - 7/25/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 7/13/2010 | 07:00 IN<br>11:15 OUT<br>11:30 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/14/2010 | 07:00 IN<br>10:30 OUT<br>10:45 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/15/2010 | 07:00 IN<br>11:15 OUT<br>11:30 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/16/2010 | 07:00 IN<br>10:45 OUT<br>11:00 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/19/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 7/20/2010 | 07:00 IN<br>11:30 OUT<br>11:45 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/21/2010 | 07:15 IN<br>10:30 OUT<br>11:00 IN<br>15:15 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 7/22/2010 | 07:15 IN<br>11:00 OUT<br>11:30 IN<br>15:30 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 7/25/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 3.50 | 0.00 | 3.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 64.00 | 0.00 | 0.00 | 0.00 | 0.00 | 64.00 |
| Grand Totals | 64.00 | 0.00 | 0.00 | 0.00 | 0.00 | 64.00 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*Heather a Crow*                    *[signature]*

Confidential                                                                                            RHC011756

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 7/12/2010 - 7/25/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| 7/13/2010 | 07:00 IN<br>11:15 OUT<br>11:30 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/14/2010 | 07:00 IN<br>10:30 OUT<br>10:45 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/15/2010 | 07:00 IN<br>11:15 OUT<br>11:30 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/16/2010 | 07:00 IN<br>10:45 OUT<br>11:00 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/19/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 7/20/2010 | 07:00 IN<br>11:30 OUT<br>11:45 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 7/21/2010 | 07:15 IN<br>10:30 OUT<br>11:00 IN<br>15:15 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 7/22/2010 | 07:15 IN<br>11:00 OUT<br>11:30 IN<br>15:30 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 7/25/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| Hour Type | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
| Worked | 68.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00 |
| Grand Totals | 68.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*no signature*

Confidential

RHC011757

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 7/26/2010 - 8/8/2010

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 7/26/2010 | 07:00 IN 10:30 OUT 11:00 IN 15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 7/28/2010 | 07:00 IN 10:30 OUT 11:15 IN 15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |
| 8/1/2010 | 06:45 IN 09:00 OUT | 2.25 | 0.00 | 2.25 | Worked |
| 8/3/2010 | 07:00 IN 11:15 OUT 11:45 IN 15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 8/6/2010 | 07:00 IN 11:30 OUT 12:15 IN 15:15 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 8/7/2010 | 07:00 IN 10:30 OUT 11:00 IN 15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 8/8/2010 | 07:00 IN 10:30 OUT 11:00 IN 15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|---|---|---|---|---|---|---|
| Worked | 47.25 | 0.00 | 0.00 | 0.00 | 0.00 | 47.25 |
| Grand Totals | 47.25 | 0.00 | 0.00 | 0.00 | 0.00 | 47.25 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER
Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 8/9/2010 - 8/22/2010

| Date | Time | Hours | Hours Type |
|------|------|-------|------------|
| 8/9/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:15 OUT | 7.75 | Worked |
| 8/12/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:15 OUT | 7.75 | Worked |
| 8/13/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:15 OUT | 7.75 | Worked |
| 8/14/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:15 OUT | 7.75 | Worked |
| 8/15/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:45 OUT | 8.25 | Worked |
| 8/18/2010 | 07:00 IN<br>11:15 OUT<br>11:45 IN<br>15:15 OUT | 7.75 | Worked |
| 8/19/2010 | 07:00 IN<br>16:00 OUT | 9.00 | Worked |
| 8/20/2010 | 07:00 IN<br>11:00 OUT<br>11:45 IN<br>16:30 OUT | 7.75 | Worked |
| 8/21/2010 | 07:00 IN<br>15:15 OUT | 7.75 | Worked |

*Handwritten annotations on the timecard: "NO deductions.", "39.25", "32.25", "32.25", ".5"*

| Date<br>Hour Type | Reg Total | Time<br>OT1 Total | OT2 Total | Hours<br>OT3 Total | OT4 Total | Hours Type<br>Sub Total |
|-------------------|-----------|-------------------|-----------|--------------------|-----------|-------------------------|
| Worked | 71.50 | 0.00 | 0.00 | 0.00 | 0.00 | 71.50 |
| Grand Totals | 71.50 | 0.00 | 0.00 | 0.00 | 0.00 | 71.50 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*Signature: Heather A Crow*

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 8/23/2010 - 9/5/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 8/24/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 8/25/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 8/26/2010 | 07:15 IN<br>10:45 OUT | 3.50 | 0.00 | 3.50 | Worked |
| 8/27/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 8/30/2010 | 07:00 IN<br>11:15 OUT<br>12:00 IN<br>15:15 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 8/31/2010 | 07:30 IN<br>15:00 OUT | 7.50 | 0.50 | 7.00 | Worked |
| 9/1/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:30 OUT | 8.00 | 0.00 | 8.00 | Worked |
| 9/2/2010 | 07:00 IN<br>11:30 OUT<br>12:15 IN<br>15:15 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 9/5/2010 | 07:00 IN<br>10:30 OUT<br>11:15 IN<br>15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |

*(handwritten: 37.25 and 37.5)*

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 63.50 | 0.00 | 0.00 | 0.00 | 0.00 | 63.50 |
| Grand Totals | 63.50 | 0.00 | 0.00 | 0.00 | 0.00 | 63.50 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential

RHC011760

SPRING CREEK HEALTH & REHAB -

Crow, Heather - Card: 313

Date Range: 9/6/2010 - 9/19/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| 9/6/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 9/7/2010 | 07:00 IN<br>16:00 OUT | 9.00 | 0.00 | 9.00 | Worked |
| 9/8/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 9/11/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 9/12/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 9/13/2010 | 07:00 IN<br>10:30 OUT<br>11:15 IN<br>15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |
| 9/14/2010 | 07:00 IN<br>10:45 OUT<br>11:30 IN<br>14:00 OUT | 6.25 | 0.00 | 6.25 | Worked |
| 9/17/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 9/18/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 9/19/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |

*39.5*

*30.5*

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| Hour Type | | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
| Worked | | 76.00 | 0.00 | 0.00 | 0.00 | 0.00 | 76.00 |

Disbursements: Redacted

| Grand Totals | 76.00 | 0.00 | 0.00 | 0.00 | 0.00 | 76.00 |

Disbursements   Redacted

9/6/2010   Holiday Pay   Redacted
9/7/2010   Shift Diff

Total:

*neather a cnu*

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS

Confidential

RHC011761

SPRING CREEK HEALTH & REHAB -

CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 9/20/2010 - 10/3/2010

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 9/20/2010 | 07:00 IN 10:30 OUT 11:00 IN 15:30 OUT | 8.00 | 0.00 | 8.00 | Worked |
| 9/23/2010 | 07:00 IN 10:30 OUT 11:15 IN 15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |
| 9/24/2010 | 07:15 IN 10:30 OUT 11:00 IN 15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |
| 9/25/2010 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 9/26/2010 | 07:00 IN 11:15 OUT 11:30 IN 15:15 OUT | 8.00 | 0.00 | 8.00 | Worked |
| 9/29/2010 | 07:00 IN 10:45 OUT 11:30 IN 15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |
| 9/30/2010 | 07:00 IN 11:15 OUT 11:45 IN 15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 10/1/2010 | 07:00 IN 10:30 OUT 11:00 IN 15:15 OUT | 7.75 | 0.50 | 7.25 | Worked |
| 10/2/2010 | 07:15 IN 15:15 OUT | 8.00 | 0.50 | 7.50 | Worked |

*Handwritten: 30.25*

*Handwritten: 37.25*

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|---|---|---|---|---|---|---|
| Worked | 68.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00 |
| Grand Totals | 68.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*Signature: Heather Crow*

*Signature*

Confidential

RHC011765

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 10/4/2010 - 10/17/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 10/5/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 10/6/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 10/7/2010 | 07:00 IN<br>10:30 OUT<br>11:15 IN<br>15:15 OUT | 7.50 | .00 | 7.50 | Worked |
| 10/8/2010 | 07:00 IN<br>10:45 OUT<br>11:00 IN<br>15:45 OUT | 8.50 | 0.00 | 8.50 | Worked |
| 10/11/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 10/12/2010 | 07:30 IN<br>10:45 OUT<br>11:15 IN<br>15:00 OUT | 7.00 | 0.00 | 7.00 | Worked |
| 10/13/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 10/14/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 10/15/2010 | 14:00 IN<br>14:45 OUT | 0.75 | 0.00 | 0.75 | Worked |
| 10/17/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | .00 | 7.50 | Worked |

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| Hour Type | | Reg Total | OT1 Total | OT2 Total | OT3 Total | Net Hours OT4 Total | Sub Total |
| Worked | | 68.75 | 0.00 | 0.00 | 0.00 | 0.00 | 68.75 |

Disbursements: Redacted

Grand Totals    68.75    0.00    0.00    0.00    0.00    68.75
Disbursements    Redacted
10/15/2010   Shift Diff
Total:

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET

http://localhost/qqest/report/Timecard/Report.asp?ReportInSeparateWindow=1&BID=5&...  10/18/2010

Confidential

RHC011766

SPRING CREEK HEALTH & REHAB -

PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



Confidential

RHC011767

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - **Card:** 313                                      Date Range: 10/18/2010 - 10/31/2010
**Department:** CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|-----------|-----------|------------|
| 10/18/2010 | 07:00 IN<br>11:45 OUT<br>12:15 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 10/19/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:30 OUT | 8.00 | 0.00 | 8.00 | Worked |
| 10/20/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 10/22/2010 | 14:15 IN<br>14:45 OUT | 0.50 | 0.00 | 0.50 | Worked |
| 10/23/2010 | 07:00 IN<br>11:15 OUT<br>11:45 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 10/24/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 10/29/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:30 OUT | 8.00 | 0.00 | 8.00 | Worked |
| 10/30/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 10/31/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |

*39.*

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | Net Hours<br>OT3 Total | Hours Type<br>OT4 Total | Sub Total |
|-------------------|-------------------|--------------------|-------------------------|------------------------|-------------------------|-----------|
| Worked | 62.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62.00 |
| Grand Totals | 62.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62.00 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential                                                                        RHC011768

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 11/1/2010 - 11/14/2010

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 11/1/2010 | 07:00 IN<br>10:30 OUT<br>11:15 IN<br>15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |
| 11/4/2010 | 07:00 IN<br>11:00 OUT<br>11:45 IN<br>15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |
| 11/5/2010 | 07:00 IN<br>17:15 OUT | 10.25 | 0.50 | 9.75 | Worked |
| 11/6/2010 | 07:00 IN<br>10:30 OUT<br>11:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 11/7/2010 | 08:00 IN<br>12:00 OUT<br>12:15 IN<br>16:00 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 11/10/2010 | 07:00 IN<br>11:15 OUT<br>11:45 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 11/11/2010 | 07:00 IN<br>10:30 OUT<br>11:15 IN<br>15:15 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 11/12/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>16:00 OUT | 8.50 | 0.00 | 8.50 | Worked |
| 11/13/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |

*39.5* (handwritten)

*31.5* (handwritten)

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| Hour Type | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
| Worked   Redacted | 71.00 | 0.00 | 0.00 | 0.00 | 0.00 | 71.00 |

Disbursements:

| Grand Totals | 71.00 | 0.00 | 0.00 | 0.00 | 0.00 | 71.00 |

Disbursements    Redacted

11/5/2010   Shift Diff

11/12/2010  Shift Diff

Total:

*heather a crow* (handwritten signature)

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential

RHC011769

SPRING CREEK HEALTH & REHAB ~

Page 28 of 104

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 11/15/2010 - 11/28/2010

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|-----------|-----------|-----------|
| 11/16/2010 | 07:00 IN<br>07:15 OUT | 0.25 | 0.00 | 0.25 | Worked |
| 11/17/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 11/18/2010 | 07:00 IN<br>11:15 OUT<br>11:30 IN<br>15:00 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 11/19/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/22/2010 | 07:00 IN<br>11:15 OUT<br>11:45 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 11/23/2010 | 07:00 IN<br>11:30 OUT<br>12:15 IN<br>15:00 OUT | 7.25 | 0.00 | 7.25 | Worked |
| 11/24/2010 | 07:00 IN<br>11:15 OUT<br>11:45 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 11/25/2010 | 07:00 IN<br>11:15 OUT<br>11:45 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 11/27/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |

*handwritten: 23*

*handwritten: 37.5*

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | Net Hours<br>OT3 Total | OT4 Total | Hours Type<br>Sub Total |
|------|------|------|------|------|------|------|
| Worked | 60.50 | 0.00 | 0.00 | 0.00 | 0.00 | 60.50 |
| Disbursements: Redacted | | | | | | |
| Grand Totals | 60.50 | 0.00 | 0.00 | 0.00 | 0.00 | 60.50 |

Disbursements
11/25/2010 Holiday Pay   Redacted
          Total:

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*signature: Heather Crow*

Confidential

RHC011770

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 11/29/2010 - 12/12/2010

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 11/29/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:15 OUT | 7.75 | 0.00 | 7.75 | Worked |
| 11/30/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 12/3/2010 | 07:00 IN<br>11:30 OUT<br>12:00 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 12/4/2010 | 07:00 IN<br>10:45 OUT<br>11:15 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 12/5/2010 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 12/6/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/10/2010 | 11:45 IN<br>15:00 OUT | 3.25 | 0.00 | 3.25 | Worked |
| 12/11/2010 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/12/2010 | 06:45 IN<br>15:00 OUT | 8.25 | 0.50 | 7.75 | Worked |

*37.75* (handwritten)

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| Hour Type | | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |

| Hour Type | Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | Net Hours<br>OT3 Total | Hours Type<br>OT4 Total | Sub Total |
|---|---|---|---|---|---|---|
| Worked | 63.75 | 0.00 | 0.00 | 0.00 | 0.00 | 63.75 |

Disbursements: Redacted

| Grand Totals | 63.75 | 0.00 | 0.00 | 0.00 | 0.00 | 63.75 |
|---|---|---|---|---|---|---|

Disbursements        Redacted

12/9/2010  Back Pay

12/10/2010 Incentive Pay

Total:

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*heather a crow* (signature)

Confidential

RHC011771

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313
Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 12/13/2010 - 12/26/2010

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 12/15/2010 | 07:00 IN / 11:15 OUT / 11:45 IN / 15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 12/16/2010 | 07:00 IN / 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/17/2010 | 07:00 IN / 10:30 OUT / 11:00 IN / 15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 12/18/2010 | 07:00 IN / 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/19/2010 | 07:00 IN / 12:00 OUT | 5.00 | 0.50 | 4.50 | Worked |
| 12/21/2010 | 07:00 IN / 10:15 OUT / 11:00 IN / 15:00 OUT | 7.25 | 0.50 | 6.75 | Worked |
| 12/22/2010 | 07:00 IN / 11:30 OUT / 12:15 IN / 15:15 OUT | 7.50 | 0.50 | 7.00 | Worked |
| 12/23/2010 | 07:00 IN / 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 12/24/2010 | 07:00 IN / 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*34.5*  *29*

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| Hour Type | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
| Worked | 63.50 | 0.00 | 0.00 | 0.00 | 0.00 | 63.50 |
| Grand Totals | 63.50 | 0.00 | 0.00 | 0.00 | 0.00 | 63.50 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 12/27/2010 - 1/9/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 12/27/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/29/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/30/2010 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/31/2010 | 07:00 IN 13:45 OUT | 6.75 | 0.50 | 6.25 | Worked |
| 1/2/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/3/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 1/4/2011 | 07:15 IN 15:00 OUT | 7.75 | 0.50 | 7.25 | Worked |
| 1/5/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/8/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/9/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*(handwritten: 36.25)*

*(handwritten: 37.5)*

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|---|---|---|---|---|---|---|
| Worked | 73.75 | 0.00 | 0.00 | 0.00 | 0.00 | 73.75 |
| Grand Totals | 73.75 | 0.00 | 0.00 | 0.00 | 0.00 | 73.75 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



Confidential

RHC011773

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 1/10/2011 - 1/23/2011

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 1/10/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/11/2011 | 06:45 IN 15:00 OUT | 8.25 | 0.00 | 8.25 | Worked |
| 1/14/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/15/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 1/16/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/17/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/20/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/21/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/22/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/23/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |

*Handwritten annotations: 38.5, 40.5, 37.75, 40.25*

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|---|---|---|---|---|---|---|
| Worked | 76.25 | 0.00 | 0.00 | 0.00 | 0.00 | 76.25 |
| Grand Totals | 76.25 | 0.00 | 0.00 | 0.00 | 0.00 | 76.25 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



Confidential

RHC011774

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 1/24/2011 - 2/6/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 1/26/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/27/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/28/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 1/29/2011 | 07:00 IN 19:00 OUT | 12.00 | 0.50 | 11.50 | Worked |
| 2/1/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/2/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/3/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/4/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| Hour Type | | Reg Total | OT1 Total | Hours OT2 Total | OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |

| Hour Type | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
|---|---|---|---|---|---|---|
| Worked | 64.00 | 0.00 | 0.00 | 0.00 | 0.00 | 64.00 |

Disbursements: Redacted

| Grand Totals | 64.00 | 0.00 | 0.00 | 0.00 | 0.00 | 64.00 |
|---|---|---|---|---|---|---|

Disbursements  Redacted

1/29/2011   Shift Diff   Redacted

Total:

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential

RHC011775

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 2/7/2011 - 2/20/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| 2/7/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/8/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/9/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/10/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/13/2011 | 07:00 IN 10:15 OUT | 3.25 | 0.00 | 3.25 | Worked |
| 2/14/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/15/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/16/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/19/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 2/20/2011 | 07:00 IN 07:15 OUT | 0.25 | 0.00 | 0.25 | Worked |

*Handwritten annotations: 33.25, 35.25, .00, 30.5, 32.5*

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|----------------|----------------|-----------|-----------------|----------------------|---------------------|----------------------|
| Worked | 63.75 | 0.00 | 0.00 | 0.00 | 0.00 | 63.75 |
| Grand Totals | 63.75 | 0.00 | 0.00 | 0.00 | 0.00 | 63.75 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



http://localhost/qqest/report/Timecard/Report.asp?ReportInSeparateWindow=1&BID=4&...   2/21/2011

Confidential

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 2/21/2011 - 3/6/2011

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 2/21/2011 | 07:00 IN 07:15 OUT | 0.25 | 0.00 | 0.25 | Worked |
| 2/22/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 2/25/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/26/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/27/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 2/28/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/3/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/4/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/5/2011 | 07:30 IN 15:00 OUT | 7.50 | 0.50 | 7.00 | Worked |
| 3/6/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*(handwritten annotations in right margin: 30.5, 32.5, 37, 39.5)*

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|---|---|---|---|---|---|---|
| Worked | 67.50 | 0.00 | 0.00 | 0.00 | 0.00 | 67.50 |
| Grand Totals | 67.50 | 0.00 | 0.00 | 0.00 | 0.00 | 67.50 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*(handwritten signature: heather crow)*

Confidential

RHC011777

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 3/7/2011 - 3/20/2011

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| 3/9/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/10/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/11/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/12/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/15/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 3/16/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 3/17/2011 | 07:00 IN 13:15 OUT | 6.25 | 0.50 | 5.75 | Worked |
| 3/18/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|------|------|------|------|------|------|------|
| Worked | 58.75 | 0.00 | 0.00 | 0.00 | 0.00 | 58.75 |
| Grand Totals | 58.75 | 0.00 | 0.00 | 0.00 | 0.00 | 58.75 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential

RHC011778

SPRING CREEK HEALTH & REHAB -

Page 22 of 96

CROW, HEATHER - Card: 313

Date Range: 3/21/2011 - 4/3/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 3/21/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/22/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/23/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 3/24/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/27/2011 | 07:00 IN 15:45 OUT | 8.75 | 0.50 | 8.25 | Worked |
| 3/28/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 3/29/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 4/2/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/3/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*Handwritten: 38.5 / 41. / 30.25 / 32.25*

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|---|---|---|---|---|---|---|
| Worked | 68.75 | 0.00 | 0.00 | 0.00 | 0.00 | 68.75 |
| Grand Totals | 68.75 | 0.00 | 0.00 | 0.00 | 0.00 | 68.75 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



http://localhost/qqest/report/Timecard/Report.asp?ReportInSeparateWindow=1&BID=4&E...   4/4/2011

Confidential

RHC011779

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 4/4/2011 - 4/17/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 4/4/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/5/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/8/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/9/2011 | 07:00 IN<br>07:00 OUT | 0.00 | 0.00 | 0.00 | Worked |
| 4/10/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 4/11/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/14/2011 | 07:15 IN<br>09:30 OUT<br>09:30 IN<br>15:15 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/15/2011 | 07:00 IN<br>13:45 OUT | 6.75 | 0.50 | 6.25 | Worked |
| 4/16/2011 | 07:15 IN<br>15:00 OUT | 7.75 | 0.50 | 7.25 | Worked |
| 4/17/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*Handwritten: 30.25, 36, 38.5*

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 66.25 | 0.00 | 0.00 | 0.00 | 0.00 | 66.25 |
| Grand Totals | 66.25 | 0.00 | 0.00 | 0.00 | 0.00 | 66.25 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*Signature: Heather A Crow*

Confidential

RHC011780

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 4/18/2011 - 5/1/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 4/22/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 4/23/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/26/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/27/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 4/28/2011 | 07:00 IN<br>11:15 OUT<br>11:30 IN<br>15:15 OUT | 8.00 | 0.25 | 7.75 | Worked |
| 4/29/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

37.75

40.

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| Hour Type | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
| Worked | 45.50 | 0.00 | 0.00 | 0.00 | 0.00 | 45.50 |
| Grand Totals | 45.50 | 0.00 | 0.00 | 0.00 | 0.00 | 45.50 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

http://localhost/qqest/report/Timecard/Report.asp?ReportInSeparateWindow=1&BID=4&E...   5/2/2011

Confidential

RHC011781

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 5/2/2011 - 5/15/2011

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 5/2/2011 | 07:00 IN<br>11:00 OUT<br>11:15 IN<br>15:00 OUT | 7.75 | 0.25 | 7.50 | Worked |
| 5/3/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/4/2011 | 07:00 IN<br>10:15 OUT | 3.25 | 0.00 | 3.25 | Worked |
| 5/5/2011 | 07:00 IN<br>11:15 OUT<br>11:45 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 5/8/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/9/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/10/2011 | 08:15 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 6.25 | 0.00 | 6.25 | Worked |
| 5/11/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/14/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/15/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*Handwritten notes: 3.25, 34.5, 30.25*

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 69.50 | 0.00 | 0.00 | 0.00 | 0.00 | 69.50 |
| Grand Totals | 69.50 | 0.00 | 0.00 | 0.00 | 0.00 | 69.50 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

*Signature: Heather A Crow*

http://localhost/qqest/report/Timecard/Report.asp?ReportInSeparateWindow=1&BID=4&...   5/16/2011

Confidential

RHC011782

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 5/16/2011 - 5/29/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 5/16/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/17/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/20/2011 | 07:30 IN<br>15:00 OUT | 7.50 | 0.50 | 7.00 | Worked |
| 5/21/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/22/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/23/2011 | 07:00 IN<br>13:15 OUT | 6.25 | 0.50 | 5.75 | Worked |
| 5/26/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/27/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 5/28/2011 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 65.25 | 0.00 | 0.00 | 0.00 | 0.00 | 65.25 |
| Grand Totals | 65.25 | 0.00 | 0.00 | 0.00 | 0.00 | 65.25 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



http://localhost/qqest/report/Timecard/Report.asp?ReportInSeparateWindow=1&BID=4&...     5/30/2011

Confidential

RHC011783

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 5/30/2011 - 6/12/2011

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 6/2/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 6/3/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 6/4/2011 | 07:00 IN<br>18:00 OUT | 11.00 | 0.50 | 10.50 | Worked |
| 6/7/2011 | 07:00 IN<br>18:00 OUT | 11.00 | 0.50 | 10.50 | Worked |
| 6/8/2011 | 07:15 IN<br>15:00 OUT | 7.75 | 0.50 | 7.25 | Worked |
| 6/9/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 6/10/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

32.75

| Hour Type | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| Date | | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
| Worked | | 58.25 | 0.00 | 0.00 | 0.00 | 0.00 | 58.25 |

Disbursements: Redacted

Grand Totals  58.25  0.00  0.00  0.00  0.00  58.25

Disbursements    Redacted

6/4/2011   Shift Diff
6/7/2011   Shift Diff

Total:

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



Confidential    RHC011784

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 6/13/2011 - 6/26/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 6/13/2011 | | 7.50 | N/A | 7.50 | REGULAR VACATION |
| 6/14/2011 | | 7.50 | N/A | 7.50 | REGULAR VACATION |
| 6/15/2011 | | 7.50 | N/A | 7.50 | REGULAR VACATION |
| 6/16/2011 | | 7.50 | N/A | 7.50 | REGULAR VACATION |
| 6/17/2011 | 14:00 IN 14:30 OUT | 0.50 | 0.00 | 0.50 | Worked |
| 6/17/2011 | | 7.50 | N/A | 7.50 | REGULAR VACATION |
| 6/19/2011 | 07:00 IN 15:30 OUT | 8.50 | 0.50 | 8.00 | Worked |
| 6/20/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 6/21/2011 | 07:00 IN 11:30 OUT 12:00 IN 15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 6/22/2011 | 07:00 IN 15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 6/26/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*30.25*

| Date Hour Type | Time Reg Total | Hours OT1 Total | Deductions OT2 Total | OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|---|---|---|---|---|---|---|
| REGULAR VACATION | 37.50 | 0.00 | 0.00 | 0.00 | 0.00 | 37.50 |
| Worked | 38.75 | 0.00 | 0.00 | 0.00 | 0.00 | 38.75 |
| Grand Totals | 76.25 | 0.00 | 0.00 | 0.00 | 0.00 | 76.25 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 6/27/2011 - 7/10/2011

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| 6/28/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/1/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/2/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/3/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/4/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/7/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/8/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/9/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| Hour Type | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
| Worked - Holiday Pay | 7.50 | 0.00 | 0.00 | 0.00 | 0.00 | 7.50 |
| Worked | 52.75 | 0.00 | 0.00 | 0.00 | 0.00 | 52.75 |
| Grand Totals | 60.25 | 0.00 | 0.00 | 0.00 | 0.00 | 60.25 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 7/11/2011 - 7/24/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 7/13/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 7/14/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 7/15/2011 | 07:00 IN<br>15:30 OUT | 8.50 | 0.00 | 8.50 | Worked |
| 7/16/2011 | 07:00 IN<br>11:00 OUT<br>11:30 IN<br>15:00 OUT | 7.50 | 0.00 | 7.50 | Worked |
| 7/19/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/20/2011 | 06:45 IN<br>16:00 OUT | 9.25 | 0.50 | 8.75 | Worked |
| 7/21/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*7.5* (handwritten, next to 7/15/2011)

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | Net Hours<br>OT3 Total | Hours Type<br>OT4 Total | Sub Total |
|---|---|---|---|---|---|---|
| Worked | 55.25 | 0.00 | 0.00 | 0.00 | 0.00 | 55.25 |

**Disbursements:** Redacted

| | | | | | | |
|---|---|---|---|---|---|---|
| Grand Totals | 55.25 | 0.00 | 0.00 | 0.00 | 0.00 | 55.25 |

Disbursements Redacted
7/20/2011   Shift Diff

Total:

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 7/25/2011 - 8/7/2011

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 7/26/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 7/27/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 7/28/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 7/29/2011 | 14:15 IN<br>14:30 OUT | 0.25 | 0.00 | 0.25 | Worked |
| 7/31/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 8/1/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 8/3/2011 | 07:00 IN<br>09:00 OUT | 2.00 | 0.00 | 2.00 | Worked |
| 8/6/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 8/7/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 56.00 | 0.00 | 0.00 | 0.00 | 0.00 | 56.00 |
| Grand Totals | 56.00 | 0.00 | 0.00 | 0.00 | 0.00 | 56.00 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



http://localhost/qqest/report/Timecard/Report.asp?ReportInSeparateWindow=1&BID=4&E...   8/8/2011

Confidential

RHC011788

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 8/8/2011 - 8/21/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| 8/8/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/9/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/12/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/13/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/14/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/18/2011 | 07:15 IN<br>15:15 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/19/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 8/20/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/21/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

*37.5*

*30.25*

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|-------------------|-------------------|-----------|--------------------|-------------------------|------------------------|-------------------------|
| Worked | 67.75 | 0.00 | | | | 67.75 |
| Grand Totals | 67.75 | 0.00 | 0.00 | 0.00 | 0.00 | 67.75 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Department: CERTIFIED NURSING ASSISTANT - CNA

Date Range: 8/22/2011 - 9/4/2011

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 8/24/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/25/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/26/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/27/2011 | 07:45 IN 15:00 OUT | 7.25 | 0.50 | 6.75 | Worked |
| 8/28/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 8/30/2011 | 07:00 IN 15:30 OUT | 8.50 | 0.50 | 8.00 | Worked |
| 8/31/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/1/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/2/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

36.75

| Date Hour Type | Time Reg Total | OT1 Total | Hours OT2 Total | Deductions OT3 Total | Net Hours OT4 Total | Hours Type Sub Total |
|---|---|---|---|---|---|---|
| Worked | 67.25 | 0.00 | 0.00 | 0.00 | 0.00 | 67.25 |
| Grand Totals | 67.25 | 0.00 | 0.00 | 0.00 | 0.00 | 67.25 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



Confidential

RHC011790

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 9/5/2011 - 9/18/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 9/5/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/6/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/7/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/8/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/9/2011 | 14:15 IN<br>14:45 OUT | 0.50 | 0.00 | 0.50 | Worked |
| 9/11/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 9/12/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/13/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/14/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/17/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/18/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked - Holiday Pay | 7.50 | 0.00 | 0.00 | 0.00 | 0.00 | 7.50 |
| Worked | 68.25 | 0.00 | 0.00 | 0.00 | 0.00 | 68.25 |
| Grand Totals | 75.75 | 0.00 | 0.00 | 0.00 | 0.00 | 75.75 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - Card: 313

Date Range: 9/19/2011 - 10/2/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 9/19/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 9/20/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/23/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/24/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/25/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/26/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/29/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 9/30/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/1/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/2/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | Net Hours<br>OT3 Total | Hours Type<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 75.25 | 0.00 | 0.00 | 0.00 | 0.00 | 75.25 |
| Grand Totals | 75.25 | 0.00 | 0.00 | 0.00 | 0.00 | 75.25 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK
MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING
THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS
CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET
PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER
PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential

RHC011792

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - ID:313c

Date Range: 10/3/2011 - 10/16/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 10/5/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/6/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/7/2011 | 07:00 IN<br>08:45 OUT | 1.75 | 0.00 | 1.75 | Worked |
| 10/8/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/11/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/12/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/13/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/14/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 54.25 | 0.00 | 0.00 | 0.00 | 0.00 | 54.25 |
| Grand Totals | 54.25 | 0.00 | 0.00 | 0.00 | 0.00 | 54.25 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential

RHC011793

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - ID:313c          Date Range: 10/17/2011 - 10/30/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 10/17/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/18/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/19/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/23/2011 | 07:00 IN<br>13:00 OUT | 6.00 | 0.50 | 5.50 | Worked |
| 10/24/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 10/25/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/26/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 10/29/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 10/30/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 66.00 | 0.00 | 0.00 | 0.00 | 0.00 | 66.00 |
| Grand Totals | 66.00 | 0.00 | 0.00 | 0.00 | 0.00 | 66.00 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential

RHC011794

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - ID:313c

Date Range: 10/31/2011 - 11/13/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 10/31/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 11/1/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/4/2011 | 07:00 IN<br>15:15 OUT | 8.25 | 0.50 | 7.75 | Worked |
| 11/5/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/6/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/7/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/10/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/12/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/13/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | OT1 Total | Hours<br>OT2 Total | Deductions<br>OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 68.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00 |
| Grand Totals | 68.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - ID:313c

Date Range: 11/14/2011 - 11/27/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|------|------|-------|------------|-----------|------------|
| 11/16/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/17/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/18/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/19/2011 | 07:15 IN<br>15:00 OUT | 7.75 | 0.50 | 7.25 | Worked |
| 11/22/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/23/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/24/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/25/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|-------------------|-------------------|--------------------|--------------------------|-----------|-------------------------|--------------------------|
| Worked - Holiday Pay | 7.50 | 0.00 | 0.00 | 0.00 | 0.00 | 7.50 |
| Worked | 52.25 | 0.00 | 0.00 | 0.00 | 0.00 | 52.25 |
| Grand Totals | 59.75 | 0.00 | 0.00 | 0.00 | 0.00 | 59.75 |

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.



Confidential

RHC011796

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - ID:313c                                    Date Range: 11/28/2011 - 12/11/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 11/28/2011 | 07:00 IN<br>07:00 OUT | 0.00 | 0.00 | 0.00 | Worked |
| 11/29/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 11/30/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/1/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/2/2011 | 14:00 IN<br>14:30 OUT | 0.50 | 0.00 | 0.50 | Worked |
| 12/4/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/5/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/6/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/8/2011 | 15:00 IN<br>23:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/10/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/11/2011 | 07:00 IN<br>15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |

| Date<br>Hour Type | Time<br>Reg Total | Hours<br>OT1 Total | Deductions<br>OT2 Total | OT3 Total | Net Hours<br>OT4 Total | Hours Type<br>Sub Total |
|---|---|---|---|---|---|---|
| Worked | 68.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00 |

*Disbursements:* Redacted

| | Grand Totals | 68.00 | 0.00 | 0.00 | 0.00 | 0.00 | 68.00 |

Disbursements        Redacted

| 12/3/2011 | Uniforms |
| 12/8/2011 | Shift Diff |

Total:

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

SPRING CREEK HEALTH & REHAB -

CROW, HEATHER - ID:313c

Date Range: 12/12/2011 - 12/25/2011

Department: CERTIFIED NURSING ASSISTANT - CNA

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|
| 12/12/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/13/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/16/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/17/2011 | 07:15 IN 15:00 OUT | 7.75 | 0.50 | 7.25 | Worked |
| 12/18/2011 | 07:00 IN 15:00 OUT | 8.00 | 0.50 | 7.50 | Worked |
| 12/19/2011 | 07:00 IN 12:15 OUT | 5.25 | 0.50 | 4.75 | Worked |
| 12/25/2011 | | 0.00 | N/A | 0.00 | Holiday |

| Date | Time | Hours | Deductions | Net Hours | Hours Type |
|---|---|---|---|---|---|

| Hour Type | Reg Total | OT1 Total | OT2 Total | OT3 Total | OT4 Total | Sub Total |
|---|---|---|---|---|---|---|
| Holiday | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Worked | 42.00 | 0.00 | 0.00 | 0.00 | 0.00 | 42.00 |

Disbursements: Redacted

| Grand Totals | 42.00 | 0.00 | 0.00 | 0.00 | 0.00 | 42.00 |

Disbursements   Redacted

12/12/2011   Uniforms

Total:

I certify that the above time card is correct. I UNDERSTAND THAT IF I FAIL TO COME IN AND CHECK MY TIME DURING THE ALLOTTED PERIOD PRIOR TO SUBMISSION OF PAYROLL, I AM GRANTING THE COMPANY THE AUTHORITY TO ISSUE MY PAYCHECK BASED ON THESE HOURS AS CORRECT. I ALSO UNDERSTAND THAT I WILL STILL BE REQUIRED TO SIGN THIS TIME SHEET PRIOR TO RECEIVING MY CHECK. I FULLY UNDERSTAND THAT ANY ERRORS DISCOVERED AFTER PAYROLL IS SUBMITTED WILL NOT BE CORRECTED UNTIL MY NEXT CHECK.

Confidential                                                        RHC011798



**EXHIBIT**
**27**

*Spring Creek Health & Rehab*

# TERMINATION OF EMPLOYMENT /
## LEAVE OF ABSENCE FORM

*Heather Crow*  |  313C  |  Redacted  |  CNA  |  3/1/10

Employee Name  —  Employee #  —  SS #  —  Position  —  Date of hire

Redacted  —  *Cabot, AR*  Redacted  —  Redacted

Address  —  City, State, Zip  —  Phone #

**Voluntary Termination** ( ) yes ( ) no
___(1) failed to return/no contact
___(2) walked off job
___(3) no reason given
___(4) accepted another job
___(5) failed to report availability
___(6) other job/conflict
___(7) hired/never worked
___(8) childcare problems
Dissatisfied with: ___(9) salary review
___(10) advancement ___(11) policy
___(12) co-workers ___(13) management
___(14) hours ___(15) conditions
___(16) other:_____
___(17) failed to return from leave
___(18) medical reasons
___(19) moved out too far
___(20) personal reasons
___(21) to stay at home
___(22) transportation problems
___(23) to attend school
___(24) other:_____
___(25) deceased
___(26) job elimination

**Involuntary Termination** (✓) yes ( ) no
___(32) excessive absenteeism
___(33) excessive tardies
___(34) excessive absent/tardy
___(35) failed to report to work
___(37) non-compliance/leave
___(38) left work without notice
___(39) misappropriation of funds
___(40) shortage/carelessness
___(41) falsified application/other
___(42) inability to perform
___(43) destruction of company property
___(44) misuse of equipment
___(45) insubordination
___(47) unauthorized possession of co property
___(48) violation of policies/procedures
✓(49) other: *work performance*

**Last date worked:** *12-19-11*
Additional details on reason for leaving:
*Not eligible for rehire*

**Voluntary Leave of Absence** ( ) yes ( ) no
Term: Beginning:_____
　　　Returning:_____
___(30) FMLA(Family Medical Leave Act)
___Maternity Leave
___Medical Leave
___(31) Other:_____
**Date of request:**_____

**Involuntary Leave of Absence** ( ) yes ( ) no
(Suspension) Beginning:_____
　　　Returning:_____
___Due to expiration of License
___Due to expiration of TB Skin Test
___(27) Lay off/recall date:_____
___(28) Pending outcome of investigation
___(29) Other:_____

___facility-owned keys & other
　　supplies returned
___collect:_____
upon distribution of last check

___employee comments attached
___supervisor comments attached

___ # verbal warnings
___ # written warnings

Supervisor Approval Signature: *Wanda Harris RN*  Date *12-19-11*
Administrator Signature: *Brenda Turner LPN*  Date *12-19-11*
I have read and acknowledge that the above information is true to the best of my knowledge.
Employee Signature: X *Heather A Crow*  Date:_____

*(\*desired, but not required for terminations nor for involuntary leaves of absence)*

Confidential

*Facility: Spring Creek Health & Rehab*
*Employee Memorandum*

Employee Name: _Heather Crow_      Department: _Nursing_

Supervisor Name: _Wanda Harris R_      Title: _CNA_

Date of occurrence: _12-19-11_      Date of Memorandum: _12-19-11_

Check one:   [✓] Write up      [ ] Complaint against      [ ] Compliment / Merit

Date of hire: _____   If write-up, number of prior write-ups since anniversary: ____

Please give a detailed description of the occurrence:

_poor work performance (12-19-11)_
_repeatedly asked to feed resident_

_prev. probationary for work performance 7/26/11 C Suspension_
_write up - 7/13/11 - poor work performance_
_written - 2/22/11 inappropriate conduct_
_verbal - 2/7/11 sitting in room?_
_written 8/8/10 - work performance - not getting vitals etc._

Witness statements attached? ____   Number: ____

If write-up, please record specific violation: *(i.e., insubordination, violation of policy(list policy, failure to. . ., inability to. . ., lack of respect, unprofessional conduct, allegation of. . ., etc.)*

_____

_____

Action taken:  (check one) [ ] Counsel   [ ] Disciplinary Warning      [ ] Suspension for ____

[ ]___(#) write up.   [✓] Employment Termination      days, or until

Comment/Explanation: _numerous issues with work performance_

Employee Response: _____

_____

_____

Additional pages attached? ____

I have read the preceding memorandum and responded as appropriate.  Under penalty of perjury, I hereby confirm that my response accurately and honestly reflects the events, conditions, situations as they occurred.

Signature: _Heather Crow_      Date: _____

Supervisor signature _Wanda Harris R_      Date _12/19/11_

Administrator signature _____      Date _12-19-11_

(original to personnel file – copy to supervisor – copy to employee if requested)

Confidential                                  RHC008937

## Witness Statement

Employee Name: Heather Crow                    Department: Nursing

Witness Name: Amy Ray

Address: Redacted                    Phone: Redacted

Austin, Ar    Redacted

Date of occurrence: 12/19/11    Date of Statement: 12/19/11

Check one: ☑ Facility Employee   ☐ Consultant, Vendor, other associate   ☐ Facility visitor, patient family member   ☐ Facility Patient

Please give a detailed description of the occurrence: I Amy Ray got back to facility @ 8:45 with resident Evelyn Picard I took her down the hall and told her CNA Lachisa that she needed to fed - Lachisa stated they did not have time someone else would have to do it. I brought Mrs Picard to day room @ 9:30 I went down hall 400 - (Dietary stated ) Residents tray was still in kitchen - and they (cna's) had put Mrs Picard in bed and never fed her. I reported it to the nurse Kourtney - afterwards I asked Heather Crow if anyone fed Mrs Picard. She said she didn't know anything about it. I stated that I told Lachisa and Heather got mouthy and said someone else could do it and proceeded to walk away down 400 hall. Thats when Michelle Higgins told to Heather to please go get residents tray and feed her. Heather started popping off to Michelle - Michelle told her just get the tray and go feed the resident.

_____ **YES**  I agree to allow this witness statement to be viewed in it's entirety – including my NAME, by the employee it concerns.

_____ **NO**  I do not agree to the employee concerned viewing my name. I am making this statement with the condition that my anonymity be protected.

Under penalty of parjury, I hereby confirm that the above statements are honest and accurately reflect the occurrence described.

Witness signature: Amy Ray                    Date: 12/19/11

Confidential

## Witness Statement

Employee Name: Heather Crow        Department: Nursing

Witness Name: Michelle Hoggins        Phone: Redacted

Address: Redacted

Date of occurrence: _____        Date of Statement: _____

Check one: ☐ Facility Employee   ☐ Consultant, Vendor, other associate   ☐ Facility visitor, patient family member   ☐ Facility Patient

Please give a detailed description of the occurrence: I was in Closet on 400 hall and heard heather mouthing Amy. She said she didn't know why she washed this morning. I came out waited 40 min. I asked had again to go feed Ms Picard She told me someone was gonna have to help Lachua do her work and kept on mouthing. I told her we would go talk to Wanda I didn't want to hear anymore. Amy had been trying to get Aides on 400 hall to feed Ms Picard for over 30 min. They laid her down.

_____
_____
_____

☒ YES  I agree to allow this witness statement to be viewed in it's entirety – including my NAME, by the employee it concerns.

___ NO  I do not agree to the employee concerned viewing my name. I am making this statement with the condition that my anonymity be protected.

Under penalty of perjury, I hereby confirm that the above statements are honest and accurately reflect the occurrence described.

Witness signature: Michelle Hoggins        Date: 12-19-11

## Witness Statement

Employee Name: Heather Crow   Department: CNA

Witness Name: Shirley Ramen   Phone: Redacted

Address: Redacted   Cabot, AR Redacted

Date of occurrence: 12-19-11   Date of Statement: 12-19-11

Check one: ☐ Facility Employee  ☐ Consultant, Vendor, other associate  ☐ Facility visitor, patient family member  ☐ Facility Patient

Please give a detailed description of the occurrence: Heather Crow was in your office. I witnessed discussion over write ups - and work performance. CNA being argumentative. had a reply for everything you said. stated "I knew this was going to happen." you continued changed why she stated "over you give you so bad she stated" even in talking to

_✓_ **YES** *I agree to allow this witness statement to be viewed in it's entirety – including my NAME, by the employee it concerns.*

___ **NO** *I do not agree to the employee concerned viewing my name. I am making this statement with the condition that my anonymity be protected.*

*Under penalty of perjury, I hereby confirm that the above statements are honest and accurately reflect the occurrence described.*

Witness signature: S. Ramen (RN)   Date: 12-19-11

Confidential

## Witness Statement

Employee Name: _Heather Crew_   Department: _Nursing_

Witness Name: _Wanda Harris RN_   Phone: _____

Address: _____

Date of occurrence: _12-19-11_   Date of Statement: _12-19-11_

Check one: ☐ Facility Employee   ☐ Consultant, Vendor, other associate   ☐ Facility visitor, patient family member   ☐ Facility Patient

Please give a detailed description of the occurrence: _____

_Heather Crew was brought to the DON Office to discuss write up on work performance. She became argumentative and stated "I knew this was going to happen today."_

_Michelle Higgins, Staffing Coordinator brought in once again & Heather became argumentative._

_____ **YES** I agree to allow this witness statement to be viewed in it's entirety – including my NAME, by the employee it concerns.

_____ **NO** I do not agree to the employee concerned viewing my name. I am making this statement with the condition that my anonymity be protected.

_Under penalty of perjury, I hereby confirm that the above statements are honest and accurately reflect the occurrence described._

Witness signature: _Wanda Harris RN DON_   Date: _12/19/11_

Confidential

EXHIBIT
28
PENGAD 800-631-6989

## Facility: Spring Creek Health & Rehab
### Employee Memorandum

Employee Name: _Heather Crow_    Department: _Nursing_

Supervisor Name: _Wanda Harris Rn_    Title: _DON_

Date of occurrence: _2/22/11 (11)_    Date of Memorandum: _2/22/11_

Check one:  ☐ Write up    ☐ Complaint against    ☐ Compliment / Merit

Date of hire: _____ If write-up, number of prior write-ups since anniversary: ___

Please give a detailed description of the occurrence:

_Verbal – Sitting in rooms (by administrator)_
_Written – inappropriate conduct in resident rooms_

Witness statements attached? _____    Number: _____

If write-up, please record specific violation: *(i.e., Insubordination, violation of policy(list policy, failure to. . ., inability to . . ., lack of respect, unprofessional conduct, allegation of. . ., etc.)*

Action taken:  (check one) ☐ Counsel  ☑ Disciplinary Warning  ☐ Suspension for ___ days, or until

☐ ___ (#) write up   ☐ Employment Termination

Comment/Explanation: _____

Employee Response: _Sitting in the room was the other CNA on hall Kayla. I was checking a call light. Inappropriate will change on my part._

Additional pages attached? ___

I have read the preceding memorandum and responded as appropriate.  Under penalty of perjury, I hereby confirm that my response accurately and honestly reflects the events, conditions, situations as they occurred.

Signature: _Heather A Crow_ Date: _2-22-11_

Supervisor signature _Wanda Harris R_ Date _2/22/11_

Administrator signature _____ Date _2-22-11_

(original to personnel file – copy to supervisor – copy to employee if requested)

Confidential

RHC008966