IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

CARROLYN CAMPBELL, CRYSTAL WALTERS, HEATHER CROW, AND
AMANDA HODGES, INDIVIDUALLY AND ON BEHALF OF OTHERS
SIMILARLY SITUATED

                                        Plaintiffs

VS.          Case No. 4:12-CV-00176-DPM

RELIANCE HEALTH CARE, INC., NORTHWEST HEALTH AND REHAB,
INC. d/b/a NORTH HILLS LIFE CARE AND REHAB, OCNC, INC.
d/b/a SILVER OAKS HEALTH AND REHABILITATION, SCNC, INC.
d/b/a SPRING CREEK HEALTH AND REHAB, BRANDON ADAMS, AND
BRYAN M. ADAMS, INDIVIDUALLY AND IN THEIR CAPACITY AS
OWNERS, MANAGERS, OFFICERS, AND/OR INCORPORATORS OF
RELIANCE HEALTH CARE, INC., NORTHWEST HEALTH AND REHAB,
INC., OCNC, INC. AND SCNC, INC.

                                        Defendants

* * * * * *

ORAL DEPOSITION OF CARROLYN CAMPBELL
[Taken May 21, 2013]

* * * * * *

APPEARANCES:
     MS. MARYNA O. JACKSON, Esq.
        Holleman & Associates, P.A.
        1008 West Second Street
        Little Rock, Arkansas 72201
           *** For the Plaintiffs ***
     MR. ANGELO SPINOLA, Esq.
        Littler Mendelson, P.C.
        3344 Peachtree Road, NE
        Suite 1500
        Atlanta, Georgia 30326-4803; and
     MS. DAWN D. BICKER, Esq.
        Reliance General Counsel
        Director of Risk Management
        824 Salem Road
        Suite 230
        Conway, Arkansas 72034
           *** For the Defendants ***

ALSO PRESENT: Lauren Cherry
        * * * * * *



EXHIBIT
E

BUSHMAN COURT REPORTING
501.372.5115

---

## Page 2

I N D E X

TOPIC                                        PAGE
STIPULATIONS                                  3
WITNESS SWORN:  CARROLYN CAMPBELL             3
  Examination by Mr. Spinola                  4
  Examination by Ms. Jackson                 276
  Re-Examination by Mr. Spinola             282

E X H I B I T S*

(Defendant's Exhibts)
Exhibit 1      34
Exhibit 2      44
Exhibit 3      58
Exhibit 4      71
Exhibit 5      71
Exhibit 6     142
Exhibit 7     145
Exhibit 8     164
Exhibit 9     182
Exhibit 10    188
Exhibit 11    189
Exhibit 12    191
Exhibit 13    192
Exhibit 14    192
Exhibit 15    193
Exhibit 16    195
Exhibit 17    196
Exhibit 18    199
Exhibit 19    201
Exhibit 20    205
Exhibit 21    206
Exhibit 22    210
Exhibit 23    216
Exhibit 24    224
Exhibit 25    272
Exhibit 26    288
Exhibit 27    291
          [*Under separate cover.]

REPORTER'S CERTIFICATE                        298

WITNESS' SIGNATURE                            299
          BUSHMAN COURT REPORTING
              501.372.5115

## Page 3

THE ORAL DEPOSITION OF CARROLYN CAMPBELL, a

witness produced pursuant to the Federal Rules of Civil

Procedure in the above-styled and numbered cause on the

21st day of May, 2013, before Jeff Bennett, CCR, LS

#19, a Notary Public in and for Saline County, Arkansas,

at Holleman & Associates, 1008 West Second Street,

L ttle Rock, Arkansas beginning at 10:48 a.m..

* * * * * * * * * *

CARROLYN CAMPBELL

the witness, being first duly cautioned and sworn or

affirmed to tell the truth, testified as follows:

* * * * * * *

BUSHMAN COURT REPORTING
501.372.5115

## Page 4

EXAMINATION

BY MR. SPINOLA:

Q.  Ms. Campbell, could you state your full name, for the record?

A.  Carrolyn Sue Campbell.

Q.  And your address?

A.  Number     Redacted     .

Q.  And the zip code?

A.  Redacted

Q.  Are you married?

Redacted

Q.  Is it the same address?

A.  Yes.

Q.  Do you have any children?

A.  We have five between us.

Redacted

A.  Yes, sir.

Q.  And what are the names of your children, names and

## Page 5

ages?

A.  Our oldest one is  Redacted  is 41.

Q.    Redacted   ?

A.  Yes.

Q.  Does he work?

A.  He does.  He is in Kansas City, Missouri.  He's an architect.

Q.  Do you know the name of his firm?

A.  I don't.  He just recently became a partner.  And I'm not sure what the new firm he joined.

Q.  Okay.  Next?

A.  Our middle son is    Redacted    .  He lives in Fayetteville.  And he works for Guest House Hotel.

Q.  How old did you say he was, 34?

A.  Redacted  is 37.

Q.  All right.  Next?

A.    Redacted    .

Q.  Okay.

A.  She lives -- her address Is green Forest, Arkansas.  She's a homemaker and a director of classical conversations on the school.

Q.  Okay.

A.  She is 36.

Q.  All right.  Two more?

A.    Redacted    Redacted  is our youngest son.

Page 6

1    Q.   Okay.
2    A.   He's is 32.  He works for Superior.  That's the name
3    of the company he works for.
4    Q.   Okay.  What is that?
5    A.   It's a die casting plant there in Fayetteville.  He
6    lives in Prairie Grove, which is just a little town
7    outside of Fayetteville.
8    Q.   Okay.
9    A.   And our youngest daughter is  Redacted  .  She's
10   31.  And she lives in Pryor, Oklahoma.
11   Q.   Okay.
12   A.   And I have seven grandchildren and a grandson that
13   was just born this week, that I'm very happy about.
14   Q.   Congratulat ons.  What is your maiden name?
15   A.   Black.

# Redacted

Page 7

1    Q.   That's in Arkansas?
2    A.   Yes.
3    Q.   Do you know what he does for living?
4    A.   He works for a heating and plumbing supply company
5    I'll think of the name of it later.   Redacted   in
6    Harrison.
7    Q.   Have you ever been deposed before?
8    A.   Yes.
9    Q.   In what context have you been deposed?

# Redacted

# Redacted

Page 8

1    Q.   Have you ever been arrested for anything?
2    A.   No.
3    Q.   Let me just walk through the ground rules of a
4    depos tion with you.  It sounds like you are familiar, but
5    t's been a little while, so just to refresh your
6    recollection.
7    A.   Okay.
8    Q.   I'll be asking questions.  Our court reporter will be
9    taking down the questions that I ask stenograph cally, and
10   he'll also take down your responses.
11   A.   Okay.
12   Q.   So what will be helpful is if you let me finish my
13   question before you answer.  Even if you think you know
14   where I'm going, I might ask a different question than you
15   think.  And also it will give him an opportunity to really
16   be able to wr te down what you're saying, wh ch he
17   couldn't do if we're talking at the same time.
18   A.   I understand.
19   Q.   Although, he is very except onal in his job.
20       When you do answer, if you can answer, if you're
21   answering affirmatively, yes or no rather than uh-huh or
22   huh-uh or a head nod.  It's a lot easier for him to write
23   yes or no.  If he writes uh-huh or huh-uh,  t's sometimes
24   hard to figure out is that a yes or a no.
25   A.   I understand.

3 (Pages 6 to 9)

## Page 10

1  Q.  They look very similar.  If you have any question
2  about what I've asked you and it's unclear, just ask me to
3  rephrase t.
4  A.  Okay.
5  Q.  My job is just to try to get an understanding of what
6  your claims are in this case, and understand how you
7  worked while you were at North Hills.
8  A.  Okay.
9  Q.  If you answer a question I've asked, then I'm going
10 to assume that you understood the quest on and you're
11 answering honestly and as truthful as you can.
12 A.  That's fine.
13 Q.  Is that fair?
14 A.  That's fine.
15 Q.  And you understand that you have taken an oath before
16 God today in the same manner that you would in an open
17 court?
18 A.  I understand that completely.
19 Q.  Okay.  Is there anything that would impair your
20 ability to testify today, any kind of med cation that
21 you're on or anything like that, that would affect your
22 ability to testify truthfully?
23 A.  No.
24 Q.  How long have you lived in your current home?
25 A.  Since January of this year.

## Page 11

1  Q.  What was your address prior?
2  A.  It was            Redacted            .
3  Q.  And how long did you live there?
4  A.  I lived there at that part cular house 18 months.
5  And the zip code there was Redacted .
6  Q.  And what about before then?
7  A.  I lived two miles from there on      Redacted
8  And that was Redacted , I believe was the number.  You don't
9  always use numbers out in the country, other than when
10 you're wr ting them for your address.
11 Q.  Okay.
12 A.  And I lived there a year.  I have lived in Arkansas
13 now since August of 2009.
14 Q.  Okay.  And where d d you live when you were employed
15 at North Hills?
16 A.  I lived in Winslow, both at the   Redacted
17 address and at the Redacted .
18 Q.  Do you remember roughly when you moved from Redacted
19 Redacted and Redacted ?
20 A.  It was in May of 2011.
21 Q.  How long have you had your LPN l cense?
22 A.  Since 1992.
23 Q.  Is it currently active?
24 A.  Yes.
25 Q.  Are you employed currently?

## Page 12

1  A.  Yes, I am.
2  Q.  Where?
3  A.  Jamestown Nursing and Rehab in Rogers.
4  Q.  How long have you been there?
5  A.  Since March of 2012.
6  Q.  Is that where you went after your employment at North
7  Hills ended?
8  A.  Yes, t is.
9  Q.  Was there any gap in your employment or did you go
10 straight?
11 A.  There was about 30 days.
12 Q.  Okay.  Who is your supervisor there?
13 A.  My current supervisor is Holly Epps.
14 Q.  What is her position?
15 A.  She's the director of nursing.
16 Q.  Are you an LPN there?
17 A.  Yes.
18 Q.  Charge nurse?
19 A.  Yes.
20 Q.  We'll talk more about that in a minute.  Other than
21 your LPN license, do you hold any other licenses?
22 A.  No.
23 Q.  Where did you go to school?
24 A.  I graduated from Western Grove High School in Western
25 Grove, Arkansas.

## Page 13

1  Q.  Any post high school education?
2  A.  Yes.  I have an accounting certificate from Twin
3  Lakes Vocational Technical School in Harrison.  And that
4  is also where I obtained my LPN was Twin Vocat ona
5  School in Harrison.
6  Q.  And you were also in the mil tary, correct?
7  A.  Yes, I was.
8  Q.  National Guard?
9  A.  Yes.
10 Q.  And when was that?
11 A.  That was from 1989 until 1996.  I believe t was the
12 first part of the '96.
13 Q.  You're good with your dates.
14 A.  I try to remember things.
15 Q.  Did you go into the National Guard right after high
16 school?
17 A.  No.  I was 35.  I went and I signed up two weeks
18 before my 35th birthday, just before the deadline.
19 Q.  What made you sign up for the National Guard?
20 A.  Because they were offering incentive programs where
21 you could go to school.  And I was a single mother of two,
22 and I needed to increase my ability to support them.
23 Q.  Okay.
24 A.  And that's where I obtained my nursing was through
25 the National Guard.

## Page 14

1  Q.  I see.  So you did that while you were in the
2  National Guard?
3  A.  Yes.
4  Q.  You obtained your LPN license?
5  A.  Yes.
6  Q.  Okay.  Have you ever spoken to anyone at the
7  Department of Labor?
8  A.  I have.  I owned a business in Dallas.  And I did
9  speak with them on various top cs that I would have and
10  quest ons I would ask.  So I did speak to the Texas
11  Department of Labor about various things.
12  Q.  Have you ever been audited by the Department of
13  Labor?
14  A.  No.
15  Q.  And that business was a staffing business?
16  A.  Yes, it was.
17  Q.  Tell me what kind of things you talked to the
18  Department of Labor about?
19  A.  Just in opening a business there's various questions
20  that would arise.  And I remember calling and making sure
21  that I had subm tted all of the proper paperwork and just
22  things of that nature.
23  Q.  Okay.  Were there ever any discussions about legal
24  requirements as far as paying people or pay pract ces?
25  A.  We covered that to make sure that I had the proper

## Page 15

1  documentat on to post, and what was required for that,
2  yes.
3  Q.  Did that documentat on include a notice about minimum
4  wage and overtime?
5  A.  Yes.
6  Q.  And have you seen that same poster at your other
7  employers?
8  A.  Yes.
9  Q.  Did you see that same poster at North Hills?
10  A.  Yes.  It was posted in the breakroom.
11  Q.  And what's your understanding of what the
12  requirements are, minimum wage and overtime requirement?
13  A.  The minimum wage was set, that you have to pay
14  people.  In all honesty, I don't know what the minimum
15  wage is right now.  But I know that that is what is set,
16  and that's the minimum that you can work people at.  You
17  can't work them below that.  And I know that on hourly
18  employees, if they are working more than 40 hours a week,
19  they have to be paid time and a half.
20  Q.  And you've known that since when?
21  A.  I guess ever since I've worked probably.
22  Q.  At your staffing agency were you responsible for
23  running payroll?
24  A.  Yes.
25  Q.  How many -- let's start here.  What were you

## Page 16

1  staffing, nurses?
2  A.  Nurses and CNAs.
3  Q.  Okay.  So LPNs and CNAs?
4  A.  LPNs, RNs, respiratory therapists.
5  Q.  RNs and respiratory therapists?
6  A.  Yes.
7  Q.  And CNAs.  And roughly how many people did you have
8  working at that agency?
9  A.  Approximately 15 to 20.  We were very small.
10  Q.  Okay.  And was it the same people pretty much, the 15
11  to 20?
12  A.  Pretty much.  They came and went, but pretty much  t
13  was -- I had several that started with me and were there
14  until we closed the business.
15  Q.  And were they all pa d hourly or did you pay some of
16  them --
17  A.  They were hourly.
18  Q.  Were they all entitled to overtime?
19  A.  When they worked overtime, yes.
20  Q.  How d d you record their time, how did you know how
21  many hours they worked to pay them?
22  A.  They turned in time sheets that were signed by the
23  supervisors at the facil ties where they worked, that told
24  me how many hours they worked.
25  Q.  What different facilities d d they work at, was  t

## Page 17

1  several?
2  A.  We worked with Select Specialty in Dallas.  We worked
3  w th Methodist Rehab in Dallas.  And we worked with
4  Kindred Hosp tal in Dallas.  We also worked w th Select
5  Specialty in Wichita, Kansas.  Those were the four primary
6  ones.  Hickory Trails was a small psychiatric facility
7  that we did staff some.
8  Q.  Was the idea that when the hospital had a higher
9  census they would hire you to prov de additional staff?
10  A.  Yes.
11  Q.  When the time sheets were signed by the supervisors
12  on the hours worked by your employees, did the employee
13  also sign off on the time sheet?
14  A.  Yes.
15  Q.  And what was the purpose of that?
16  A.  Just that it was their time sheet and that it was
17  correct.
18  Q.  Was there any certificat on language on the time
19  sheet, or was it just that they were to sign on their
20  hours?
21  A.  I'm not sure I understand what you mean by
22  certif cation language.
23  Q.  Was there anything on the time sheet that would say,
24  I certify that my time is correct?
25  A.  No.

5 (Pages 14 to 17)

Page 18

1   Q.   They just signed it?

2   A.   No.  I don't remember there ever being anything on

3   that.

4   Q.   And when an employee signed their time sheet, what

5   does that mean to you, when you were their boss?

6   A.   That they were giving me their time sheet.

7   Q.   And was it your expectation that the time that they

8   signed off on was their correct time?

9   A.   Yes.

10  Q.   And they didn't work anymore or less than that time

11  correct?

12  A.   Correct.

13  Q.   Did you think that was a reasonable assumption for

14  you to make?

15  A.   Yes.

16  Q.   Did you train them that way?

17  A.   That was what I explained to them, yes.

18  Q.   How did they get their schedules, was it from the

19  supervisor at the hospital or from you?

20  A.   They got them from me.

21  Q.   And did you actually physically run payroll?

22  A.   I did part of the time.  I had someone else that

23  helped part of the time.  I did have someone else that

24  worked in the office, and we both ran payroll.

25  Q.   Do you remember what software you used for the

Page 19

1   payroll?

2   A.   I used Quick Books.

3   Q.   And how did you verify the accuracy of the paychecks

4   to make sure that your employees were paid for all their

5   time worked?

6   A.   The program itself has where you can put in the pay

7   rate, and then you put in the number of hours worked, and

8   it figures that for you and figures the taxes.

9   Q.   Okay.  Did you ever have an employee come to you with

10  their paycheck and say, t's not right, I worked more

11  hours than what's in the paycheck?

12  A.   I did.  And I made the correct on.  It was simply an

13  additional error or an input error on our part.  And I

14  went back and corrected it and then paid her for the

15  additional time.

16  Q.   Was that a process that you would explain to your

17  employees, if you see something in your paycheck that

18  isn't right, come to me and report t?

19  A.   Yes.

20  Q.   Was that your expectation that somebody would do if

21  they saw something in their paycheck that was inaccurate?

22  A.   Well, yes.

23  Q.   How did you ensure that your employees were receiving

24  meal periods and rest breaks?

25  A.   That was included on the time sheet.

Page 20

1   Q.   Tell me about that, how did that work?

2   A.   Our time sheet they had where they wrote in the time

3   that they went to lunch and the time that they came back.

4   Q.   Okay.  And this time sheet, was t a paper --

5   A.   Yes.

6   Q.   -- time sheet?  Okay.  And the employee themselves

7   was the one that was filling it out?

8   A.   Yes.

9   Q.   Each one had their own time sheet?

10  A.   Yes, they did.

11  Q.   When did they subm t that, was t once a week?

12  A.   Some of them submitted once a week, some of them

13  submtted them daily.

14  Q.   What would happen if there was not a reported meal

15  period on the time sheet?

16  A.   If there was not a reported meal period, they were

17  pad for the full time that was listed on the time sheet

18  with nothing deducted.

19  Q.   And dd that sometimes happen?

20  A.   Yes.

21  Q.   What instruct on dd you provde about taking meal

22  periods?

23  A.   In what regard?  I'm afraid that I don't understand.

24  Q.   Sure, no problem.  Dd you tell the people who worked

25  for you, for your company, that they should take a meal

Page 21

1   period?

2   A.   I told them all that they were entitled to take a

3   meal break.  And that if they didn't get their meal break,

4   that they were entitled to be compensated for it.

5   Q.   Okay.  Did you expect them to follow that

6   instruction?

7   A.   Yes.

8   Q.   If they hadn't taken a meal break, you would have

9   expected them to report that, correct?

10  A.   Yes.

11  Q.   Had they not reported it, would you have known

12  whether they took it or not?

13  A.   No.  Because I was not in the facility with them at

14  all times.

15  Q.   And what's your understanding -- I guess this is

16  Texas, right?

17  A.   Yes, it was.

18  Q.   Did you understand that they're entitled to a 30

19  minute, uninterrupted meal break?

20  A.   Yes.

21  Q.   And is that what you instructed them?

22  A.   I did not specifically tell them what amount of time

23  that they had to take, no.  Because if they had time and

24  took an hour, it was left to their discretion, and based

25  on the facility that they worked in, as to what amount of

6  (Pages 18 to 21)

## Page 22

1   time they could take for a lunch break.
2   Q.  Okay.  Were these W-2 employees or --
3   A.  Yes.
4   Q.  -- contractors?
5   A.  W-2.
6   Q.  W-2.  Okay.  And how long did you have that business?
7   A.  I had it from August of 2007 until December of 2009.
8   And the last year from May of 2009, I changed everyone to
9   1099 contract employees.
10  Q.  Why did the business end?
11  A.  We were not JCAHO certified.  I d d not have the
12  funds to pay to become JCAHO certified.  And our primary
13  facil ties at that time had started to require that all of
14  their staffing agencies have JCAHO certification.
15  Q.  Can you explain what that is, JCAHO?
16  A.  JCAHO is a certification in the hospitals that comes
17  in and checks the hosp tals, and makes sure that they're
18  meeting certain regulations and gu delines and things of
19  that nature.  And t's an expensive process to become
20  JCAHO certified.  And as a small business, I did not have
21  the funds to do that.
22  Q.  Is that the time you moved to Arkansas?
23  A.  Yes.
24  Q.  Was that your first time in Arkansas?
25  A.  No, I'm an Arkansas original.

## Page 23

1   Q.  That's what I thought.
2   A.  A native.  I originally was born in Arkansas.  I'm an
3   Arkansas native.
4   Q.  We'll get back to your employment timeline in just a
5   second.  So one of the things you would do with the
6   Department of Labor, while you were in Texas, is ensure
7   you understood what the law was w th respect to how you
8   pa d your employees, correct?
9   A.  Yes, sir.
10  Q.  Okay.  And you did your best to ab de by that,
11  correct?
12  A.  Yes, sir.
13  Q.  Were there any other communications you've had to any
14  agencies, start with the DOL, other than that time frame
15  when you're talking to the Department of Labor about your
16  staffing company, have you spoken to the Department of
17  Labor about anything else that you can think of?
18  A.  No.
19  Q.  What about any state agencies?
20  A.  In what respect?  Are you just asking in general have
21  I talked to state agencies?
22  Q.  Yes.
23  A.  As in Department of Long Term Care?
24  Q.  More specifically, any kind of complaints or
25  inquiries about what the law is.

## Page 24

1   A.  I have not.
2   Q.  Okay.  Have you ever filed a Workers' Comp claim?
3   A.  No.
4   Q.  Have you ever filed a charge of discrimination?
5   A.  No.
6   Q.  Did any of your employees ever file any kind of claim
7   against you when you were in Texas?
8   A.  No.
9   Q.  Have you ever filed bankruptcy?
10  A.  Yes.
11  Q.  When was that?
12  A.  I filed for personal Chapter 13 in 1994, after my
13  first divorce.  We had filed a Chapter 11 or attempted a
14  Chapter 11 reorganizat on for my business in 2009.  We did
15  not have income to support it and it was dismissed.
16  Q.  Okay.  Where was that?
17  A.  In Dallas.
18  Q.  The Chapter 13?
19  A.  The Chapter 13 was here in Arkansas.
20  Q.  When did you --
21  A.  In 1994.  It was discharged paid in full in 1998.
22  Q.  And in 1999 you had attempted --
23  A.  No, in 2009 for the business, when the business
24  started to go under.
25  Q.  That was in Texas?

## Page 25

1   A.  That was in Texas.
2   Q.  And that was a Chapter 13 you were looking at?
3   A.  Is that the reorganization for business?
4        MS. JACKSON:  It's 11.
5   Q.  (BY MR. SPINOLA)  11, right.
6   A.  I had an attorney that was filing the paperwork.  It
7   was a business reorganization.  We did not have the income
8   to support it, so t was discharged.  It was not
9   discharged until 2010.
10  Q.  In 2010?
11  A.  2010.
12  Q.  Have you prov ded any written statements in
13  connect on with, and now I'm talking about this lawsu t,
14  have you provided any written statements to your attorneys
15  in connect on with this lawsu t?
16  A.  Yes, I have.
17  Q.  And what are those, what have you provided?
18  A.  I have answered their interrogatories, if that's the
19  correct pronunciat on.  And any information they have
20  requested, I have provided written answers as were needed
21  to that.
22  Q.  Okay.  Other than the response to questions to
23  interrogatories, have you actually reviewed any kind of
24  aff dav t or signed statement?
25  A.  I have signed different forms from them.  And things

Page 26

1    that I have submitted to them, they would send back to me
2    in a typed form.  And I would review it to see if it was
3    correct.  And I have signed those documents.
4    Q.   Do you know if any of them have been a statement like
5    the equivalent of your own testimony, for example, kind of
6    outlining your employment history and your work experience
7    at North Hills, not responses to interrogatories or
8    questions, but an actual aff dav t?
9    A.   I would have to review them.  I know there has been a
10   lot of different forms.  To be honest, I can't remember
11   the exact t tle of each one.
12   Q.   Sure.
13          MR. SPINOLA:  Ms. Jackson, are you able
14   to stipulate that there's not an affidavit?
15          MS. JACKSON:  There's not.
16          MR. SPINOLA:  Okay.
17   A.   I d dn't remember one
18   Q.   (BY MR. SPINOLA)  I haven't seen one.  I was just
19   trying to make sure that I've got what you've done and
20   that's all.
21   A.   Okay.
22   Q.   Let's talk about your preparation for today for your
23   deposit on.
24   A.   Okay.
25   Q.   What have you done to prepare for your depos tion?

Page 27

1    A.   Ms. Jackson and I went over the --
2          MS. JACKSON:  You don't have to testify
3    about what we talked about.  That was attorney/client
4    privilege.  He's not entitled to that.
5    Q.   Let me clarify.  I should have mentioned this
6    earlier.
7    A.   I'm sorry.
8    Q.   You're fine.  In the rules of a depos t on.  There
9    will be times where Ms. Jackson objects to a question.
10   Typically you would still answer the question, unless she
11   specifically instructs you not to answer the question.
12       The reason for the objection is to preserve the
13   record for using the testimony in the future.
14   A.   Okay.
15   Q.   So she may object to the form of the question.  You
16   would still typically answer that.  There may be a
17   question that pertains to attorney/client privileged
18   issues, where you've communicated with her, and she would
19   object based on privilege and instruct you not to answer.
20   A.   Okay.
21   Q.   So let me clarify the question I'm asking.  I'm just
22   trying to understand these basics:  how long you met, when
23   you met, who you met with, what documents you reviewed,
24   but not the substance of any communication you had with
25   Ms. Jackson or any other lawyer that represents you.

Page 28

1    A.   Let me make sure that I'm understanding.
2    Q.   Sure.
3          MS. JACKSON:  Maybe you just need to ask
4    one question at a time and that will help.
5    A.   Are you asking me if other than communications w th
6    my attorney that you have, if there's any other meetings
7    that have happened?
8          MS. JACKSON:  Just ask one question at a
9    time.
10   Q.   (BY MR. SPINOLA)  No.  So did you meet with your
11   attorney to prepare for your deposition today or at
12   anytime?
13   A.   Yes.
14   Q.   And when was that meeting?
15   A.   This morning.
16   Q.   How long d d you meet for?
17   A.   Maybe two hours.
18   Q.   Prior to meeting with Ms. Jackson this morning, had
19   you ever met with Ms. Jackson before?
20   A.   No.
21   Q.   Have you ever met with any other attorney, prior to
22   this morning, in connection w th this case?
23   A.   No.
24   Q.   When you met with Ms. Jackson this morning, did you
25   review any documents?

Page 29

1    A.   Yes.
2    Q.   What documents d d you review?
3    A.   We went over the questions that we had submitted.
4    She verified that it was my correct signature on various
5    documents that pertained to the case.
6    Q.   Okay.
7    A.   And just kind of showed them to me, so I would be
8    familiar w th what the documents were.
9    Q.   Okay.  Do you recall what documents those were that
10   you were looking at your signature on?
11   A.   I can't tell you exactly which ones they were.  I
12   know one was the one where I'm listed as the complainant,
13   and just var ous things of that nature.
14   Q.   So the complaint?
15   A.   Complaint.
16   Q.   Did you look at your interrogatory responses?
17   A.   Can I see which form that is, what it looks like?  I
18   know I looked at several different ones.  If that is
19   something that ordinarily would be covered, I'm sure Ms.
20   Jackson --
21          MR. JACKSON:  Just tell him what you
22   remember, which documents you remember reviewing this
23   morning and that's all.
24   A.   The only one I remember specif cally reviewing this
25   morning was the complaint.

8 (Pages 26 to 29)

## Page 30

1 Q. And had you ever seen that complaint before this

2 morning?

3 A. They had emailed me a copy of that, yes.

4 Q. And when was that?

5 A. I would have to go back and check my emails.

6 Q. Okay.

7 A. This has been an on-going process, and I couldn't

8 tell you the exact date without going back. I saved them

9 all.

10 Q. Sure. Did you look at any documents related to you

11 employment at North Hills?

12 A. Yes.

13 Q. What were those?

14 A. I know there were various sign-in logs.

15 Q. Okay.

16 A. I know she did have also various time sheets.

17 Q. Okay.

18 A. Those are the ones I remember specifically.

19 Q. You don't recall any other documents?

20 A. I don't recall. Time adjustment sheet, there was a

21 time adjustment sheet.

22 Q. Anything else?

23 A. Those are the only ones that I remember specifically

24 as to the names that I would recognize. As I said, there

25 were -- she did check my signature on various other

## Page 31

1 documents that I have signed, just to verify that they

2 were signed correctly.

3 Q. Okay. To the extent we review -- I've got several

4 documents, to the extent we review a document that you've

5 already seen, that you saw this morning, will you just let

6 me know that, that this is one of the documents I

7 reviewed?

8 A. Yes.

9 Q. Okay. Was there anybody present with you this

10 morning other than Ms. Jackson?

11 A. No.

12 Q. During the preparat on?

13 A. No.

14 Q. How did you learn about the lawsuit?

15 A. I was contacted by the firm.

16 Q. And how were you contacted?

17 A. Mail.

18 Q. You received a letter?

19 A. I received a letter.

20 Q. Do you remember what that letter sa d?

21 A. Not exactly.

22 Q Backing up. You said that you reviewed sign-in logs

23 today?

24 A. Yes.

25 Q. This morning?

## Page 32

1 A. Yes.

2 Q. Are those the staffing logs that would have other

3 employees signatures as well?

4 A. Yes.

5 Q. Were those times that were listed on those sign-in

6 logs, were those accurate?

7 A. I would have to look at them more closely. I'm sure

8 my sign-in logs when I signed in and out on the floor, I

9 signed it accurately.

10 Q. That's an obligation under the state, isn't it, to

11 sign those logs accurately?

12 A. Yes.

13 Q. Do you know what the penalty is for not signing them

14 accurately?

15 A. No.

16 Q. You don't have any reason to believe you would have

17 signed them inaccurately, correct?

18 A. I wouldn't.

19 Q. Okay. The time sheets you reviewed, did they have

20 your signatures on them?

21 A. Yes.

22 Q. And the time sheet adjustments, did they have your

23 signatures?

24 A. I don't know if those had signatures or if they just

25 had where I fill in my name.

## Page 33

1 Q. Okay. So you received a letter, correct?

2 A. Yes.

3 Q. Do you know of anyone else that received a similar

4 letter from Holleman & Associates?

5 A. I don't.

6 Q. Okay. Have you spoken to anybody other than your

7 attorneys about the case?

8 A. I have.

9 Q. And who is that?

10 A. I briefly spoke with a friend of mine that I was

11 going to go forward with the case.

12 Q. Which friend was that?

13 A. Lori Copeland.

14 Q. Lori Copeland?

15 A. Yes.

16 Q. Who is Lori Copeland?

17 A. She's an LPN that worked with me at North Hills.

18 Q. And when about was that conversation?

19 A. Probably March or April of 2011.

20 Q. Did she say whether she received a letter from

21 Holleman & Associates?

22 A. She stated that she had received a letter from a

23 firm. She did not ever tell me whether or not it was this

24 firm.

25 Q. Okay. And what was her reaction to receiving that

9 (Pages 30 to 33)

## Page 34

1  letter?
2  A.  At that time, she hadn't dec ded what she was going
3  to do.
4  Q.  Tell me what you can remember about the conversation
5  that you had with her?
6  A.  I know we both had received letters about the
7  different things.  It's been a long time ago.  When girls
8  are just talking, you talk about a dozen different things
9  at once.  I had decided that I was going to join.  And at
10  that point, she had not made a decision, to my knowledge.
11  Q.  Okay.  Can you recall anything else about the
12  conversation?
13  A.  We talked about my horses and her grandson.
14  Q.  Anything else related to the case or your employment
15  at North Hills?
16  A.  No.
17  Q.  Other than Lori Copeland, have you spoken to anybody
18  else about the lawsuit?
19  A.  My husband.
20  Q.  Your husband, sure.
21  A.  I've talked to my husband, and my children are aware,
22  but other than that, no.
23  Q.  Okay.
24        (Defendant's Exhib t 1 was marked.)
25  Q.  You've been handed what's been marked as Defendant's

## Page 35

1  Exhibit Number 1, wh ch is a copy of a Holleman &
2  Associates' sol c tation letter.  Is this an example of
3  the letter you received?
4  A.  I would have to look at the letter I received.  I
5  honestly don't remember exactly what its content was.
6  Q.  Do you still have the letter you received?
7  A.  I probably do.
8  Q.  Okay.  And it pertains to you potentially joining
9  this lawsu t, correct?
10  A.  Yes.
11  Q.  And have you produced that letter to your attorneys?
12  A.  No.
13  Q.  Do you have any documents that pertain to your
14  employment at North Hills?
15  A.  No.
16  Q.  Any handbook?
17  A.  No.
18  Q.  Appl cations, pay stubs?
19  A.  No.
20  Q.  Okay.  Do you recall whether the letter you received
21  said anything about rounding?
22  A.  I don't.
23  Q.  Do you remember if it said anything about independent
24  contractors?
25  A.  Again, I don't remember the exact content of it.  I

## Page 36

1  would have to read it.  Because I don't want to say
2  something that isn't in the letter.  And without reading
3  it, I can't tell you the exact content.
4  Q.  Okay.  What was your understanding just generally
5  about what the letter said?
6  A.  Just generally that deducting lunches and not paying
7  for time that you worked was illegal.
8  Q.  Did it say anything other than a reference to
9  lunches?
10  A.  Again I'd have to see if I have the exact copy and
11  read it.
12  Q.  Okay.  After the deposition today, will you locate
13  that letter and provide it to your counsel?
14        MS. JACKSON:  I'm going to object to this
15  request.  This is not a proper request for production of
16  documents.  And I think we already responded to the
17  interrogatories, and we preserve our objections as stated
18  there.
19        MR. SPINOLA:  Is it your position that
20  your solicitation letter is not subject to production?
21        MS. JACKSON:  I believe we addressed this
22  issue in our responses to interrogatories.
23        MR. SPINOLA:  All right.  In your
24  response to interrogatories?
25        MS. JACKSON:  Yes.

## Page 37

1        MR. SPINOLA:  All right.  Or document
2  production requests?
3        MS. JACKSON:  That may be it.
4        MR. SPINOLA:  All right.  I don't recall
5  in your document product on responses.  Let's take a look
6        Well, let me just ask this question.  I don't believe
7  your product on response sa d anything about a
8  sol c tation letter.  Is it your posit on that you won't
9  produce that letter?
10        MS. JACKSON:  Our position is that the
11  request for production of documents is not appropriate for
12  interrogatories.  If you want to ask to produce any new
13  documents that were not requested before, you have to
14  submit  t in the proper form.  And then send us a request
15  for production of documents, and we will review it and
16  respond.
17        MR. SPINOLA:  I'm just trying to make
18  sure I understand your position, because this may merit
19  another call w th the Judge.  Is  t your position that our
20  document requests don't cover the letter?
21        MS. JACKSON:  That was what you suggested
22  right now.  That was your suggestion.
23        MR. SPINOLA:  No, I'm not suggesting
24  that.
25        MS. JACKSON:  I think that's what you

10  (Pages 34 to 37)

Page 38

1  just did a minute ago.  I'm telling you I don't have them
2  in front of me right now.  If you want to request any new
3  documents that were not requested before, you're welcome
4  to send a request for product on of documents, and we will
5  review them and respond to that in an appropriate form.
6  And if  t's already addressed in request for product on
7  documents, then it's there.
8              MR. SPINOLA:  That I guess is the
9  question I'm asking.  And if you need to look at the
10  document request before answering, that's fine.  We
11  believe that we've already requested that document.  So
12  I'm not sure if your pos t on is that it wouldn't be
13  relevant, you don't have to produce it, or that we haven't
14  actually requested it.  But I'd like to know your
15  position.  If the position is going to be that you're not
16  going to produce  t, I think we've got to address that
17  with the Judge.
18              MS. JACKSON:  You're welcome to submit it
19  after this deposit on.  The deposition is not a proper
20  form for requesting documents.  If you have any problem
21  with that request for production, send us an email, I will
22  be happy to address  t, if it's already covered in your
23  request for production.  If it isn't, then you will have
24  to send a new one.
25              MR. SPINOLA:  Let me respond.  The

Page 39

1  deposit on certainly is a proper venue for me to identify
2  what documents she has in her possess on, and figure out
3  whether or not she's produced documents responsive to our
4  request.  You have ind cated that she has.  It's sounding
5  like there's at least one document that was not produced
6  that should have been.
7              MS. JACKSON:  What are you talking about?
8              MR. SPINOLA:  The sol c tation letter,
9  it's in her possession.
10             MS. JACKSON:  That's not what she sa d.
11  She said  t may be, it may not be.  You're basically
12  restating her testimony.  That's not what she said.
13             MR. SPINOLA:  I would like to hear from
14  you, and again, if you need to look at our requests before
15  you answer it, if  t is in her possession, are you going
16  to produce  t pursuant for our requests, or is that an
17  issue that we need to raise with the Judge?  If your
18  position is  t's not responsive, or it's not relevant or
19  something like that, then I just want to know that
20  position now while her deposition is still open so that we
21  can address  t.
22             MS. JACKSON:  I will have to review your
23  request for production to see if this document product on
24  is covered in that request.
25             MR. SPINOLA:  Okay.

Page 40

1              MS. JACKSON:  To answer that quest on.
2              MR. SPINOLA:  So we'll table that issue
3  for now.  And at our break, maybe at the lunch break you
4  can take a look.
5              MS. JACKSON:  Sure, I will look at it.
6              MR. SPINOLA:  And let me know what your
7  position is on that.
8              MS. JACKSON:  Okay.
9       Q.  (BY MR. SPINOLA)  Okay.  Back to the letter, what you
10  can remember.  Do you recall the letter having anything --
11  saying anything other than a statement about meal per ods?
12      A.  Again, I don't remember the full content of the
13  letter.  It's been a year and something since I read the
14  letter.
15      Q.  Okay.  When d d you say you got  t?
16      A.  I think I got it somewhere in -- I got the letter
17  somewhere in possibly March or February of last year.  I
18  don't remember exactly.  I would have to see if I actually
19  kept the letter, and if I have  t in -- if I do have  t, I
20  would have it in a file.
21      Q.  Okay.  And what else is in the file?
22      A.  I have copies of the documents that my attorney has
23  sent to me, so I would have them in case they needed to
24  call and talk to me, so that I would have them in front of
25  me, so that I could check anything for correctness that

Page 41

1  needed to be.
2       Q.  Okay.  Have your attorneys notified you not to
3  destroy any records from your employment at North Hills?
4       A.  Yes.
5       Q.  Okay.  Do you know anything about whether North
6  Hills, while you were employed there, rounded time?
7       A.  What does rounded time mean?
8       Q.  Do you know -- have you heard that term before,
9  rounding?
10      A.  I have not.  I know that if you clock in at like 7
11  minutes before or 7 minutes after, that sometimes it goes
12  into the next 15 minutes.  I know that that happens at
13  var ous places.
14      Q.  Okay.
15      A.  I know that there are different facilities where I
16  worked that you were not to clock in before a certain
17  time, unless you had started work early or something.  Is
18  that what you're asking?
19      Q.  Yes.
20      A.  Okay.
21      Q.  Do you know at North Hills whether there was a
22  pract ce of rounding?
23      A.  Yes.  We were not to clock in before certain times to
24  keep from creating time being paid for that was not worked
25  or creating overtime, yes.

## Page 42

1   Q. Do you know how the rounding policy worked while you
2 were there for you, in other words, how did that actual
3 rounding work on the time clock?
4   A. I believe that if you clocked in, I think there was a
5 7 minute leeway.
6   Q. Okay.
7   A. That you could clock in 7 minutes, no more than 7
8 minutes early, and no more than 7 minutes late.
9   Q. Okay. And if you clocked in no more than 7 minutes
10 late, do you know how your time would round? What was
11 your shift there when you started?
12   A. 7:00 to 3:00.
13   Q. 7:00 a.m. to 3:00 p.m.?
14   A. That was the day shift. And I also worked 3:00 to
15 11:00, and occasionally I worked 11:00 to 7:00.
16   Q. So let's just take the 7 example. If you clocked in
17 at 7:07 --
18   A. Then I was paid without being considered late or
19 tardy.
20   Q. And you were paid from what time, do you know?
21   A. 7:00.
22   Q. 7:00. So it would round back, correct?
23   A. Yes.
24   Q. And if you clocked in at 6:53 or 6:55, how d d the
25 rounding rule work?

## Page 43

1   A. It rounded forward to 7 o'clock as well.
2   Q. So t was your understanding at North Hills, that as
3 long as you clocked in either 7 minutes before or 7
4 minutes after the start of your shift, you would not be
5 cons dered late, correct?
6   A. Yes.
7   Q. Is there anything else you know about rounding or any
8 other --
9   A. No.
10   Q. Is that the extent of your rounding knowledge?
11   A. That's the extent.
12   Q. Looking at this letter. Do you see where it says, If
13 you clock in late at 7:01 and it rounds your time to 7:15.
14 This is completely illegal. Do you see that line?
15   A. I see t.
16   Q. So your understanding of the pract ce at North Hills
17 is different than this one, right, the one that's outlined
18 in the letter? If at North Hills you clocked in at 7:01
19 it would round back to 7 o'clock, correct?
20   A. That's what I understood.
21   Q. Okay. Did you ever see a newspaper advertisement
22 from your law firm in this case?
23   A. No.
24   Q. Do you recall submitting a consent form to join the
25 case? And I'll help you out here.

## Page 44

1         (Defendant's Exhibit 2 was marked.)
2   A. I know that I did sign something agreeing to join the
3 case. Is that what you're referring to?
4   Q. Yes.
5   A. As I said, the names of the different forms aren't
6 always -- yes, I did see this one.
7   Q. So what's been handed to you as Defendant's Exhibi
8 Number 2 are the various consent forms that have been
9 filed on your behalf in this case. Do you remember how
10 soon after you received the letter in the mail you signed
11 your first consent form?
12   A. No, I do not.
13   Q. You see at the bottom there, that's your signature,
14 right?
15   A. Yes, it is.
16   Q. and You see its March 21, 2012 looks like the date
17 you signed it?
18   A. Yes, that's the day I signed it.
19   Q. Did you have a consultation with your attorneys prio
20 to signing the consent form?
21       MS. JACKSON: I'm going to object to this
22 question. You're going into improper communication
23 between her and us.
24       MR. SPINOLA: I'm not asking for the
25 substance, I'm asking you if you had a consultation with

## Page 45

1 your attorneys prior to signing the consent form?
2       MS. JACKSON: You can answer that
3 quest on.
4   A. Yes, naturally we talked.
5       MS. JACKSON: You don't have to answer
6 what we talked about. You can just say if you d d or if
7 you did not.
8   Q. (BY MR. SPINOLA) When was that conversat on?
9   A. I don't remember the exact date on it. I'm sorry.
10   Q. You said you didn't know?
11   A. I don't know the exact date. I'm sorry.
12   Q. Do you know whether it was w thin weeks of signing
13 this consent form?
14   A. I'm sure t was within weeks of it, because that
15 would just be general. From the time frame and
16 everything, I would think that it would have been within a
17 few weeks.
18   Q. Okay. And do you remember who it was that you spoke
19 to?
20   A. I don't.
21   Q. Okay.
22   A. They have lots of help here. I've talked to a lot of
23 different people.
24   Q. Do you remember how long the conversation was?
25   A. Again, I don't know exactly how long.

## Page 46

1    Q.   What was your understanding, when you signed this
2    consent form, what you were signing up for?
3    A.   That I was joining the case as a plaintiff in the
4    issue of overtime and unpaid lunch breaks.
5    Q.   Okay.   And what was your understanding of who it was
6    you were suing?
7    A.   The company North Hills or Reliance Health Care, I
8    believe is the mother company, the corporate company I
9    guess you would call that.
10   Q.   What's your understanding of what Reliance Health
11   Care is versus North Hills?
12   A.   North Hills is an indiv dual facil ty.   Reliance
13   Health Care is a corporation that owns multiple
14   facil ties.
15   Q.   And what is your understanding of who your employer
16   was?
17   A.   I was employed by both North Hills, as the local
18   facil ty, and then at Reliance Health Care as the
19   corporation.
20   Q.   And who did you talk to at Reliance Health Care that
21   told you that you were a Reliance employee?
22   A.   No one.
23   Q.   Have you ever spoken to anybody at Reliance Health
24   Care?
25   A.   I've spoken to different people at Reliance when I

## Page 47

1    was working in medical records to obtain information and
2    things of that nature.
3    Q.   Who?
4    A.   There was a person that was over the medical records
5    department.   And I honestly can't remember that name.   She
6    would send me various information that I needed.
7    Q.   What kind of informat on?
8    A.   If I had questions about different things or
9    procedures, there's always a contact person at corporate
10   that you can talk to that kind of helps you and guides
11   you.   And I honestly would have to look and see what her
12   name was.   I d dn't contact her very frequently.
13   Q.   How many times would you say?
14   A.   Maybe a half dozen.
15   Q.   Other than these six communications, d d you ever
16   commun cate w th anyone else at Reliance Health Care?
17   A.   I honestly don't know.   There are various times that
18   you send emails or that you answer emails that naturally
19   are correspondence.   And in the course of my job, I would
20   have answered anything that was required.
21   Q.   Can you think of any communications that you had,
22   e ther via email or phone or in any way, other than the
23   six you identified, with the one contact person at
24   Reliance Health Care?
25   A.   Not that I can remember.   But like I said, in various

## Page 48

1    pos t ons you do get correspondence, and naturally you
2    respond to t.
3    Q.   I understand you responded to correspondence.   I
4    guess the quest on I'm asking is do you have any belief
5    that that correspondence, any of what you responded to
6    came from Reliance as opposed to North Hills?
7    A.   Yes, it was from the corporate people.   That's how
8    you would identify them.   For instance, if Lauren had sent
9    me an email that I needed to respond to or something, it
10   would have had her address as North Hills.   And
11   correspondence that I would have received from Reliance,
12   would have had their email and everything.   And that's how
13   I would distinguish which one was actually at North Hills
14   and wh ch one was at Reliance.
15   Q.   Do you have any recollection of an inquiry you
16   received from Reliance?
17   A.   About what?
18   Q.   About anything.
19   A.   I don't remember the content of any specific
20   correspondence, no.
21   Q.   Who was your supervisor?
22   A.   At North Hills?
23   Q.   Yes.
24   A.   Abra Pumphrey.   She was the director of nursing.
25   Q.   And d d you have any supervisor at Reliance?

## Page 49

1    A.   No, not to my knowledge.   I thought my direct
2    supervisor was Abra, and then Lauren was her direct
3    supervisor.
4    Q.   Who is Brandon Adams?
5    A.   He's one of the owners.
6    Q.   Have you ever spoken to him?
7    A.   Not to my knowledge.
8    Q.   What about Bryan Adams, who's that?
9    A.   He's one of the owners.
10   Q.   Have you ever spoken to him?
11   A.   Not to my knowledge.
12   Q.   Have you ever seen either gentlemen?
13   A.   I know that they visited the home, but whether I
14   actually met with them when they were in the home, I don't
15   remember ever directly meeting e ther of them.   But I know
16   they do visit the homes at various times.   And I know at
17   different times that they did come through.
18   Q.   Do you know what the purpose of their vis t was?
19   A.   They would come through and see how the homes were
20   running and different things of that nature.
21   Q.   And how do you know that?
22   A.   Because t would be announced that our owners were
23   coming, and that we needed to make sure everything was in
24   good shape.
25   Q.   So you never actually spoke to them when they came

**BUSHMAN COURT REPORTING**
**501.372.5115**

## Page 50

1  through, right?

2  A.  Other than maybe if they came by on the hall where I

3  was or something, to say hello in passing.  That would

4  have been the only thing.  I never had any direct

5  conversations with them, no.

6  Q.  Do you recall that happening, them coming by and

7  saying hello to you?

8  A.  I know var ous groups came through.  And when they

9  would walk down the hall, naturally they would always say

10  hello.  And in that context, yes, I probably did say hello

11  to them.

12  Q.  I'm asking about Brandon or Bryan Adams.  Have you

13  ever spoken to Brandon or Bryan Adams?

14  A.  I don't remember directly speaking to e ther of them,

15  no.

16  Q.  Can you tell me what either of them looks like?

17  A.  No.

18  Q.  Okay.  Can you tell me when either of them would have

19  vis ted while you were there?

20  A.  Not in any specific dates, no.

21  Q.  Can you provide any  specific information, if they had

22  vis ted, what they would be visiting for?

23  A.  Other than, as I said, it was not unusual for the

24  owners to just come through and see how the facilities

25  were operating, no.

## Page 51

1  Q.  Okay.

2  A.  We did have a remodeling, and I believe they came

3  through after the remodeling was completed just to check

4  the work.

5  Q.  Has anybody at Reliance ever d ctated your work

6  schedule?

7  A.  No.

8  Q.  Has anyone at Reliance ever d ctated what your pay

9  would be?

10  A.  I thought that was determined at the facility level.

11  Q.  Okay.  Has anyone at Reliance ever told you how to do

12  your job?

13  A.  Other than guidelines, is that what you're referring

14  to?

15  Q.  Well, has anybody at Reliance ever told you how to do

16  your job?  Have you ever spoken at anybody at Reliance,

17  I'm not talking about North Hills, I'm talking about

18  Reliance.

19      Have they ever communicated to you how to do your

20  job?

21  A.  No.

22  Q.  Did anybody at Reliance -- was anybody at Reliance

23  involved in your hiring process?

24  A.  Not to my knowledge.

25  Q.  Did anybody at Reliance ever discipline you?

## Page 52

1  A.  No, not to my knowledge.

2  Q.  Did anybody at Reliance ever set a break schedule for

3  you?

4  A.  No.

5  Q.  Do you know if anyone at Reliance in any way made any

6  decisions related to your employment?

7  A.  Not to my knowledge.

8  Q.  Do you have any ev dence that anyone outside of North

9  Hills d d anything to cause you to be pa d improperly, as

10  you're alleging in the case?

11  A.  Reliance is the home company, and they set the

12  standards that the facilities have to operate by.

13  Q.  Okay.

14  A.  And they direct the facilities.

15  Q.  What I'd like for you to do is give me whatever

16  evidence you have, just give it all to me, any ev dence

17  you have that Reliance, as you're calling them, corporate,

18  caused you not to be paid proper overtime?

19  A.  They are the owners of the company, and they dictate

20  what can and cannot be done.

21  Q.  Okay.  Tell me how they d ctate what can and cannot

22  be done?

23  A.  They give directives to the administrators to follow.

24  The administrators answer directly to the corporate

25  people.

## Page 53

1  Q.  In what way and how are you involved in that?

2  A.  At various times when things come down from

3  corporate, the director will say, I have this from

4  corporate.  This is what we have to do.

5  Q.  Now, I want you to be very specific here.  You're

6  using terms like things come down from corporate, and

7  you're not really identifying people or evidence.

8      And the quest on I'm asking you, because you have

9  testified that you don't know of Reliance dictating your

10  wages, schedule, hiring, discipline, termination,

11  increases in pay.  You don't have any ev dence suggesting

12  that Reliance would have anything to do with that.

13      But when I ask you is Reliance in any way responsible

14  for you, as you claim, not being paid proper overtime, I

15  want you to provide me, to the extent you think Reliance

16  is responsible for you not being pa d correctly, whatever

17  evidence you have of Reliance being responsible?

18  A.  Am I understanding correctly that you were separating

19  Reliance from North Hills?

20  Q.  Correct.

21  A.  You're treating them as two separate entities?

22  Q.  Correct.

23  A.  Okay.

24  Q.  And the question is, is Reliance responsible for the

25  way you're pa d, or is North Hills responsible for the way

Page 54

1  you're pa d, and the personnel at North Hills?

2       MS. JACKSON:  I'm going to object to the

3  form of this question.  But you can answer to the best yo

4  can.  Do you understand his question?

5  A.  I do.  It is my understanding that all of the

6  policies and everything that we operated under at North

7  Hills, were directed by the corporate off ce.

8  Q.  Are you aware of any policy requiring you to work

9  unpaid overtime?

10 A.  A policy requiring that, no.

11 Q.  The policy actually requires you to report all your

12 time worked, right?

13 A.  I am not aware of a pol cy e ther way.

14 Q.  Okay.

15       MR. SPINOLA:  Why don't we take a break

16 there, and we'll look at complaint.

17       MS. JACKSON:  How long do you want to

18 take a break?

19       MR. SPINOLA:  Five minutes.

20       MS. JACKSON:  Okay.

21       (A recess was had.)

22 Q.  (BY MR. SPINOLA)  Ms. Campbell, you had an

23 opportun ty to take a break.  Is there anything you wish

24 to change or clarify about your testimony so far today?

25 A.  No.

Page 55

1  Q.  Have you told me the truth to the best of your

2  ability?

3  A.  Yes.

4  Q.  Let's look back at the consent form here, Exhibit

5  Number 2.

6  A.  Okay.

7  Q.  I want you to take a look at where it says, You

8  consent to join the action against Reliance Health Care,

9  Northwest Health and Rehab, Brandon Adams and Bryan Adams.

10 Then it says, as a plaintiff to assert claims for overtime

11 pay.  Do you see that?

12 A.  Yes, I see that.

13 Q.  Do you have any claims in this case other than a

14 claim for overtime pay?

15 A.  No.

16 Q.  And that was filed on -- you see at the very top, not

17 when it was signed, but when  t was filed, you see where

18  t says, filed March 22, 2012, correct?

19 A.  I see that.

20 Q.  Okay.  And other than Northwest Health and Rehab, are

21 you claiming that you worked at any of the other

22 facilities?

23 A.  I worked at Westwood.

24 Q.  Westwood?

25 A.  Which is in Springdale.

Page 56

1  Q.  Westwood in Springdale?

2  A.  Yes.

3  Q.  And while you were at Westwood did you ever work --

4  you were PRN at Westwood, correct?

5  A.  Correct.

6  Q.  And what was your schedule?

7  A.  I primarily worked weekends there, since I worked

8  Monday through Friday at North Hills.

9  Q.  Okay.  So you never worked 40 hours, correct?

10 A.  I did, but  t was in two days.

11 Q.  You worked 40 hours in two days?

12 A.  Close to it a couple of times.

13 Q.  Okay.

14 A.  I would work some evenings if I was available.  So

15 there could possibly have been weeks that I could have had

16 40 hours at Westwood, but  t would have been rare.

17      Primarily I worked 32 hours on Saturday and Sunday,

18 because I worked two 16 hour shifts was primarily what I

19 worked.  But then if I was available and they needed me, I

20 did occasionally go over and help them through the week.

21 Because there was a point in time when they were very,

22 very shorthanded on staff.

23 Q.  Okay.  My understanding is you've not asserted any

24 claims against Westwood, correct?

25 A.  Correct.

Page 57

1  Q.  Let's look at the next page on that Exhibit 2.  Do

2  you know why you signed a second consent on May 15, 2012?

3  Is that your signature there?

4  A.  That is my signature.  I think something had changed

5  and we had to resubm t something.  To the best of my

6  knowledge, that's what I believe happened, that we had

7  resubm t something and I had to resign.

8  Q.  Okay.  And when you resigned the consent to join,

9  your claim was still just limited to an overtime claim,

10 correct?

11 A.  Correct.

12 Q.  It says, I also consent to join in subsequent act on

13 to assert claims against defendants for overtime pay,

14 right?

15 A.  That's correct.

16 Q.  It says, During the past three years, there were

17 occas ons when I worked over 40 hours per week while

18 employed by defendants, correct?

19 A.  Correct.

20 Q.  Let's look at the last page, which is another consent

21 to join a few months later.  This one was filed on July

22 12, 2012.  It looks like  t's the same form because it's

23 still dated May 15.  Any  dea why that was filed?

24 A.  I don't know.  You would have to ask my attorneys why

25 that one was necessary.

Page 58

1   Q.   All right.

2          (Defendant's Exhibt 3 was marked.)

3   Q.   You've been handed what's been marked as Defendant's

4   Exhibit Number 3.  This is a copy of the fourth amended

5   complaint that was filed in this case, wh ch is the latest

6   complaint.  Have you seen this before?

7   A.   Yes.

8   Q.   Have you seen it before today?

9   A.   I believe I received a copy of it.

10  Q.   Did you review t when you received  t?

11  A.   I d d review it.

12  Q.   Okay.

13  A.   I don't always understand all of them, but I do read

14  through them.

15  Q.   Okay.  This is a document you reviewed today,

16  correct, with your attorney?

17  A.   Yes.  I had to read part of  t to see if I recognized

18  and remember reading it.  She d d show me this this

19  morning.

20  Q.   Okay.  Do you know who any of these other women are?

21  A.   I don't.  I don't know any of them.

22  Q.   At the top?

23  A.   I don't know any of them.

24  Q.   Do you allege to have been employed by any of the

25  companies that are named as defendants, other than North

Page 59

1   Hills Life Care and Rehab?

2   A.   I'm sorry.  I was reading the body of it.

3          MS. JACKSON:  I'm going to object to the

4   form of the question, but you can still answer to the

5   extent you understand.

6   A.   Northwest and North Hills are the same company.

7   Q.   Right.

8          MS. JACKSON:  It says d/b/a.

9   Q.   So that means doing business as.  So other than that

10  one, are you claiming that any of these other entities

11  were your employer?

12         MS. JACKSON:  Objection to the form of

13  the question, but you still can answer.

14  A.   I don't see Northwest -- I don't see Westwood listed

15  here.  Let me make sure I understand.  Are you asking if I

16  was employed at any of the other facil ties, or if I

17  understand that as an employee of North Hills and

18  Northwest, that I was also an employee of Reliance Healt

19  Care?

20  Q.   I'm asking you both.  Do you think that Reliance

21  Health Care was your employer?

22         MS. JACKSON:  Objection to the form of

23  the question.  You can answer.

24  A.   As an employee of Northwest, yes, we were also

25  employees of Reliance Health Care.

Page 60

1   Q.   And why do you say that?  Let me just make sure I

2   have all your evidence for that position.  That is true

3   because why?

4   A.   When we were offered our employee insurance and

5   everything,  t was prov ded by Reliance Health Care as our

6   corporate office.

7   Q.   What I'm going to do is create a list of everything

8   you've got and then we'll talk about them.  So you say

9   that when you were offered health care it was offered by

10  Reliance?

11  A.   Yes, it was through Reliance Health Care.

12  Q.   Okay.

13  A.   Through the corporate office.

14  Q.   And you're talking about benefits?

15  A.   Yes.

16  Q.   Okay.  What else?

17  A.   That's the only thing that I specifically remember.

18  I do know that when we -- when they came and went over the

19  benefit packages and stuff, it was offered by Reliance

20  Health Care.

21  Q.   Okay.  Other than -- I just want to make sure I have

22  your testimony clear.  Your evidence that you are relying

23  on, to support your claim that Reliance Health Care was

24  your employer, is that when you signed up for employment

25  benefits it was w th Reliance Health Care employees?

Page 61

1   A.   Yes, because Reliance was our corporate owner.

2   Q.   Okay.  And what employees communicated the health

3   care benefits to you?

4   A.   There was a representative that came to each facility

5   and explained the various benefits that were available.  I

6   don't remember the individuals' names.  I just know that

7   they came periodically during open enrollment at various

8   times.

9   Q.   And how are you aware that these individuals were

10  employed or that representative was employed by Reliance

11  Health Care?

12  A.   I don't know that that indiv dual was employed by

13  Reliance Health Care.  I'm just saying that the forms that

14  we had were provided through Reliance Health Care.  They

15  said your life insurance, wh ch they prov ded for a per od

16  of time for us,  t stated that the life insurance policy

17  was provided through Reliance Health Care.

18  Q.   Okay.

19  A.   I don't know if the individuals were contracted

20  individuals that came or what.

21  Q.   Okay.  Do you remember who the life insurance company

22  was?

23  A.   I don't.

24  Q.   Was it an independent company?

25  A.   I don't know.

16  (Pages 58 to 61)

## Page 62

1    Q.   Like Mutual of Omaha or something like that or was it
2    Reliance --
3    A.   It wasn't Mutual of Omaha.
4    Q.   I was just using that as an example.
5    A.   I don't remember wh ch insurance company it was. If
6    t was Mutual of Omaha or Allstate, I would have
7    remembered that.  I don't remember which company.
8    Q.   Was it a third-party company though of some sort?
9    A.   I believe so.
10   Q.   And you think that -- let me just make sure I
11   understand.
12   A.   I don't believe that Reliance themselves -- is  t
13   called self-insuring where they were providing the
14   insurance?  I don't believe that was the case.  I could be
15   wrong.  I just know that we had -- the dental I remember
16   was through Delta Dental.  And I can't tell you who the
17   health insurance was offered through.  Delta is a pretty
18   common name.  I remember Delta.  I don't remember the name
19   of the insurance company itself that we were insured
20   through.
21   Q.   Okay.  So the reason you think that Reliance was an
22   employer is because the forms that you filled out had the
23   name Reliance on them?
24   A.   As our corporate office.  And I was told by our human
25   resources person, that our corporate office, for a period

## Page 63

1    of time they paid for our life insurance.
2    Q.   Do you have any direct evidence of that?
3    A.   No.
4    Q.   Okay.  Do you know what Reliance is, have you ever
5    heard the term service provider, administrative service
6    provider?
7    A.   No, I'm not familiar with that.
8    Q.   When you ran your company, d d you have any serv ce
9    providers that assisted with the administration of your
10   employees?
11   A.   No, I did not.
12   Q.   You d d payroll internally, correct?
13   A.   Correct.
14   Q.   What about your benef ts, did you have benefits for
15   them?
16   A.   I had Workers' Comp through an insurance agency that
17   I used.  Is that what you're referring to?
18   Q.   That's an example.
19   A.   Okay.  Then in that instance, I am familiar that you
20   contract through -- I had an insurance company that
21   provided my Workers' Comp.  And then I had an insurance
22   company that provided my liability insurance.  I
23   contracted w th a company.  I personally d dn't have the
24   money to pay for all of that.  Am I understanding that
25   correctly?

## Page 64

1    Q.   Right.
2    A.   Okay.
3    Q.   So there are occasions when you have a partnership
4    with another company to handle some of the aspects of --
5    A.   Correct.  I understand that, yes.
6    Q.   Other than these forms -- now, let me make sure I'm
7    right.  The benefit forms, are you saying they had
8    Reliance's name on the benefit forms or not?
9    A.   I believe they did.
10   Q.   Okay.  And you're not sure if the representatives
11   that were discussing what the health care benefits are,
12   and when I say, health care, that could be life or
13   whatever.
14   A.   I understand.
15   Q.   You don't know whether they were employed by Reliance
16   or someone else, right?
17   A.   I don't.
18   Q.   Just so I'm clear.  Do you have any ev dence other
19   than these forms for benef t purposes, having Reliance's
20   name on them, any other evidence that would suggest that
21   Reliance was your employer rather than North Hills?
22   A.   I was told that we were owned by Reliance Health
23   Care.
24   Q.   So you believe that Reliance Health Care owns North
25   Hills?

## Page 65

1    A.   That was my understanding.
2    Q.   So is  t your position that if Reliance Health Care
3    owns North Hills, then Reliance would just defacto be your
4    employer?
5    A.   That would make sense to me.
6    Q.   Okay.  Any other evidence?
7    A.   No.
8    Q.   Okay.  I'm going to ask you the same series of
9    quest ons about your wages, the details of your employment
10   is basically what I'm going to be asking you about.  Who
11   managed and controlled the details of your employment.
12   And I'm going to ask you w th respect to every entity on
13   this list: Reliance, OCNC, SCNC, JBNC, all these other
14   companies other than North Hills Life Care.  Okay?
15   A.   Okay.
16   Q.   Did any of these ent ties have anything to do w th
17   setting your wages, as far as you know?
18   A.   As far as I know, no.
19   Q.   Did any of these ent ties -- and I'm also asking
20   about Bryan Adams and Brandon Adams.  Did any of these
21   defendants have anything to do with setting your work
22   schedule?
23   A.   I believe the work schedules were set by Reliance as
24   well as North Hills, and indirectly as the owners, Bryan
25   and Brandon would have been involved in that.

17 (Pages 62 to 65)

Page 66

1    Q.  Now, are you speculating, or do you have some
2    evidence suggesting that Bryan and Brandon knew what your
3    schedule was?
4    A.  My indiv dual schedule?
5    Q.  Yeah, we're talking about you.
6    A.  No, I doubt that they d d.
7    Q.  And do you have any evidence suggesting that Reliance
8    knew what your schedule was, anyone at Reliance?
9    A.  Probably not.
10   Q.  Did any of these ent ties or individuals, other than
11   North Hills, have any role in hiring you, to your
12   knowledge?
13   A.  Not to my knowledge.
14   Q.  Did any of these individuals or entities, other than
15   North Hills, have any role in disciplining you or
16   evaluating your performance?
17   A.  Not to my knowledge.  I believe that was all done
18   ins de the facil ty.
19   Q.  Did any of these ent ties or individuals, other than
20   North Hills, in any way set your break schedule, to your
21   knowledge?
22   A.  No.
23   Q.  Did any of these individuals or entities, other than
24   North Hills, increase your pay, to your knowledge?
25   A.  No.

Page 67

1    Q.  Did any of these individuals or entities, outs de of
2    North Hills, make any decisions related to your
3    employment, as far as you know?
4    A.  Not to my knowledge.
5    Q.  Do you know who was in charge of medical records at
6    Reliance, if anyone?
7    A.  I do not.
8    Q.  Who was in charge of medical records at North Hills?
9    A.  Prior to me?
10   Q.  When you were the director, you were in charge of the
11   medical records, correct?
12   A.  Yes.
13   Q.  And what about pr or to you?
14   A.  Prior to me it was Joey Kinsler.  Prior to him  t was
15   a gentleman that was only there for a couple of months,
16   and I can't remember his name.  And then prior to him it
17   was Terri Wilson.  Terri Wilson was the one that had been
18   there the longest.
19   Q.  Look at page 4 of the complaint.  I want you to look
20   at the list A through S there.
21   A.  Okay.
22   Q.  I understand that you were a PRN at Westwood for a
23   time, correct?
24   A.  Correct.
25   Q.  And you're not claiming -- you have no claim against

Page 68

1    Westwood, correct?
2    A.  Correct.
3    Q.  And you were also employed by Northwest Health and
4    Rehab, correct?
5    A.  Correct.
6    Q.  Do you contend to have been employed by any of these
7    other facilities that are listed?
8    A.  No.
9    Q.  Do you know anything about any of these other
10   facilities?
11   A.  Other than that they are all owned by Reliance, no.
12   Q.  And how do you know that they're owned by Reliance?
13   A.  We had a list of Reliance facil ties w th the contact
14   numbers on them.  And that was provided to us and updated.
15   Q.  So you had a facil ty list, right?
16   A.  Correct.
17   Q.  Anywhere on that facility list did  t say that
18   Reliance owned these facilities?
19   A.  It says Reliance facility.
20   Q.  Have you ever seen any kind of agreement or contract
21   demonstrating that Reliance owns any of these facilities?
22   A.  No.
23   Q.  Do you know anything about the --
24   A.  The structure of the organization.
25   Q.  -- organizat onal structure of any of these

Page 69

1    facilities?
2    A.  I do not.
3    Q.  Do you know anybody in management at any of these
4    facilities?
5    A.  At Katherine's Place, if she is still there.  It was
6    one of our nurses that had worked with us at North Hills
7    that went over there.  And I'm not sure if she's even
8    still there.  I was at one time familiar w th -- and I am
9    terrible w th names.  So many people come and go.
10        But she had worked with us on weekends at North Hills
11   and graduated.  And after graduation she got the position,
12   graduation from RN school, she got the position at
13   Katherine's Place.
14   Q.  Okay.
15   A.  And that was the only one.  And naturally I was
16   familiar, at the time I was there, I was familiar with the
17   director and the administrator at Westwood.
18   Q.  Sure, because you worked there.
19   A.  And I can't remember the young lady's name.  She
20   worked with us and graduated from RN school, and got the
21   director of nursing over --
22   Q.  And you're not contending that any of these entities
23   d d anything to dictate your wages, correct?
24   A.  Correct.
25   Q.  Your schedule, correct?

18 (Pages 66 to 69)

## Page 70

1  A.  Correct.
2  Q.  Or had anything to do w th hiring you, and not
3  Westwood or Northwest Health, but the others --
4  A.  Correct.
5  Q.  -- d d not hire you, discipline you in any way,
6  correct?
7  A.  Not to my knowledge.
8  Q.  They d dn't set your break schedule, correct?
9  A.  Correct.
10  Q.  And you don't have any ev dence that they d d
11  anything to cause you to be paid improperly, correct?
12  A.  Correct.
13  Q.  And that is also true of any facility outside of
14  North Hills, correct?
15  A.  Correct.
16  Q.  And you don't have any knowledge of any of the pay
17  pract ces of any of these other facil ties listed in A
18  through S, correct?
19  A.  No, I do not, other than Northwest and Westwood.
20  Q.  And you don't know anything about the break
21  schedules, correct?
22  A.  Correct.
23  Q.  Do you know how many employees are employed by any of
24  these facil ties?
25  A.  I have no idea.

## Page 71

1  Q.  Do you know anything about their meal per ods?
2  A.  No.
3  Q.  Anything about their clock-in procedures or anything
4  like that?
5  A.  No.
6  Q.  No knowledge of their timekeeping practices?
7  A.  No, I do not.
8  Q.  Do you know anything about their policies?
9  A.  No.
10       (Defendant's Exhibit 4 was marked.)
11  Q.  I'll hand you what's been marked as Defendant's
12  Exhibit Number 4.  Do you recognize this document?
13  A.  I do.
14  Q.  And what is it?
15  A.  It's the interrogatories.
16  Q.  Okay.  And this is something you reviewed this
17  morning w th your counsel, correct?
18  A.  I don't know that we reviewed this.  This is where --
19  I remember that this is what they sent me for me to review
20  and to answer these questions and things of that nature.
21  Q.  But it's not something you looked at today?
22  A.  I don't believe we d d.
23       (Defendant's Exhibit 5 was marked.)
24  Q.  I'm also handing to you what's been marked
25  Defendant's Exhibit Number 5, which is a verif cation of

## Page 72

1  your interrogatories?
2  A.  Okay.
3  Q.  Is that your signature there?
4  A.  That is my signature.
5  Q.  And it's dated February 13, 2013?
6  A.  Yes.
7  Q.  Is that around the time frame when you provided
8  answers to your interrogatories?
9  A.  Probably.  I had this notarized at that time.  So I'm
10  sure that's when I did.  I would have immediately had it
11  done and sent them back.
12  Q.  Okay.  Let's look back to Exhibit Number 4.
13  A.  Okay.
14  Q.  And what I want to look at is the response to
15  interrogatory number 18.
16       MS. JACKSON:  You're talking about the
17  supplemental.
18       MR. SPINOLA:  Yeah, the supplemental
19  interrogatories.  It's towards the back.  It would be on
20  page 11.
21  A.  Okay.
22  Q.  (BY MR. SPINOLA)  And here what I want to ask you
23  about is the interrogatory request was to identify each
24  and every fact related to and supporting your allegation
25  in paragraph 71 of the complaint that Plaintiff Campbell

## Page 73

1  had to work through her lunch on a regular basis due to
2  understaffing and business of facility.  Plaintiff
3  Campbell also frequently had to work off the clock to
4  complete her job duties.
5       And it says here that, Plaintiff Campbell was due to
6  understaffing of the facility too busy at times to take
7  her meal breaks.
8       Can you tell me about that?
9  A.  I guess I'm not clear what you want me to tell you.
10  Do you want me to describe my duties or --
11  Q.  Explain to me the understaffing issue first, tell me
12  what that means, understaffing?
13  A.  Understaffing simply means that there are not enough
14  employees in the facil ty to handle the workload.
15  Q.  Okay.
16  A.  Adequately in a timely manner.
17  Q.  Can you give me an example?
18  A.  If you are working in a facility, and it would take
19  four nurses to do the job and do it properly, and you only
20  have three, then you would be understaffed, according to
21  the workload.
22  Q.  Okay.
23  A.  Is that what you're asking me?
24  Q.  I'm just trying to understand --
25  A.  I want to make sure that I'm understanding and

**BUSHMAN COURT REPORTING**
**501.372.5115**

## Page 74

1  answering it correctly.

2  Q.  Can you give me an example of when an understaffing

3  situation would have caused you to miss a meal period?

4  A.  If you don't have enough people to do the job, and

5  your having to do the job, you can't take time out to do

6  it.  If you have an admit come in, you got to get that

7  admit completed.

8  Q.  When you say an adm t, what does that mean?

9  A.  That's a new admission to the facil ty.  And they

10  require certain specif c things be done.  And in my

11  posit on as director of medical records, it was part of my

12  job to make sure that when we got new residents into the

13  facility, that I completed all the orders and input all of

14  those orders into the computer.  And then I was

15  responsible for printing all of them on the MAR, which is

16  medical administration record that the nurses use, and to

17  make sure that all of the forms and things that would be

18  needed by the nurses for that res dent were completed and

19  gotten to them.

20  Q.  Now, that's in your role -- you had two separate

21  roles, right, while you were at North Hills, correct, one

22  was the charge nurse LPN role?

23  A.  There were times, yes, that I also worked as charge

24  nurse LPN on the floor, and as the director of med cal

25  records.

## Page 75

1  Q.  And the director of medical records was the other

2  position, right?

3  A.  Correct.

4  Q.  And let's talk for a minute about the role as

5  director of medical records.

6  A.  Okay.

7  Q.  I've been to the North Hills facility.  And you were

8  in a room with other individuals, correct, as the director

9  of medical records?

10  A.  Correct.  At that time, there was Terri Wilson and

11  Natasha and myself in the room.

12  Q.  And in that room there were no walls, correct?

13  A.  You mean separating the --

14  Q.  Correct.

15  A.  There were no walls.

16  Q.  Everybody could see everybody, correct?

17  A.  Correct.

18  Q.  And you said Terri Wilson, she was the Medicare

19  manager, correct?

20  A.  Correct.

21  Q.  And Natasha Caswell, did you work with her?

22  A.  I worked with Natasha.  That's probably the right

23  last name.

24  Q.  She was the MDS coordinator?

25  A.  Yes, she was over the long term care.  I remember

## Page 76

1  Natasha.

2  Q.  Did you have direct patient care responsibil ty while

3  you were in the medical records room?

4  A.  You mean was I doing nursing while I was also doing

5  medical records?

6  Q.  What I'm trying to do is get an understanding of the

7  difference between the positions, the LPN position you had

8  and the director of medical records posit on.

9      So while you were an LPN you had responsibility for

10  patients, direct patient care?

11  A.  Yes.

12  Q.  And when you were the director of medical records you

13  d d not have responsibility, direct patient care

14  responsibility, correct?

15  A.  No.  There were times that I was taken out of the

16  pos t on.  I guess what you're saying is not at the same

17  exact time, no.  Even at times when I held the position of

18  medical records, I also was required at times to do direct

19  patient care, because we would not have enough nurses in

20  the facil ty, and I would be pulled out to the floor.

21  Q.  I understand that.

22  A.  Okay.

23  Q.  So just to break it down.  There was a time where you

24  were solely an LPN charge nurse?

25  A.  Correct.

## Page 77

1  Q.  On hall 300 or 400?

2  A.  I worked -- I worked all of the floors.  Primarily I

3  worked 100 hall when I was first hired.  And then I went

4  to the rehab.  I was hired 3:00 to 11:00 and worked 100

5  hall primarily.  And there was a point in time when I was

6  also the charge nurse and responsible for 300 hall.

7      And then we were -- we went from four nurses back

8  down to three, and we divided 300 hall.  So I worked -- I

9  was responsible for a port on of 300 and 400.  And I

10  believe that's the hall that I had primarily just before I

11  took the med cal records position.

12  Q.  Okay.

13  A.  But I worked all the halls in the facility as needed.

14  Q.  Prior to being promoted to the medical records

15  pos t on, you exclusively worked as an LPN, right?

16  A.  Correct.

17  Q.  Different halls, but exclusively as an LPN, right?

18  A.  Correct.

19  Q.  And I think what you're saying is that when you moved

20  to the medical records posit on, there were still

21  occasions where you served in an LPN role?

22  A.  Correct.

23  Q.  But never at the same time?

24  A.  No, you could not.

25  Q.  Okay.  So what I'm trying to find out and to make

20 (Pages 74 to 77)

## Page 78

1  sure I understand.  When you were serving as the director
2  of medical records, in that room with the other ladies,
3  you did not have direct patient responsibility, correct?
4  A.  No, I did not at the time.
5  Q.  But as an LPN, you did have direct patient
6  responsibility, correct?
7  A.  Correct.
8  Q.  And as the director of medical records, you were
9  entitled to a one hour break, correct?
10  A.  30 minutes was what I had understood my break was.
11  Q.  Okay.  As the medical records director, that did not
12  have direct patient care responsibility, did you find it
13  easier to take your meal break than when you were an LPN?
14  A.  No.
15  Q.  And why is that?
16  A.  Because the -- when I took the position it was
17  already backlogged tremendously.  And in order to try to
18  work through the backlog and work through the day-to-day
19  stuff that came in; physician's orders, admissions and
20  everything, no, it was not easier.  I frequently would
21  pick up something and eat at my desk, just so I could eat.
22  And that was in trying to get everything done and keep
23  everything flowing.
24  Q.  Would you expect that the individuals that worked in
25  the room with you would say that you infrequently got your

## Page 79

1  lunch?
2  A.  I don't know what they would say.  I don't know how
3  they would know.  They were very busy as well.
4  Q.  If you left to take your lunch they would observe you
5  leaving, correct?
6  A.  Oh, yes.  Now, there were times that I did clock out
7  and have to leave the facility and did take time.  There's
8  times that you just have to do that.
9  Q.  And when you did that, how long would you take?
10  A.  I don't know.  It varied.  I would clock out.  It
11  would be reflected on the time sheets as to how long I had
12  been gone.  It just depended on -- there are times that
13  you have to leave and go do things.
14  Q.  And you had a husband -- your husband was unemployed
15  during that time, correct?
16  A.  No.  My husband has been employed at Enterprise.
17  Q.  Was he unemployed at the time you were at North
18  Hills?
19  A.  No.
20  Q.  There was never a time he was unemployed?
21  A.  He was unemployed when we first came here.  I'm not
22  sure -- let me think.  For the first few months that I was
23  at North Hills he was unemployed.  He went to work for
24  Enterprise I'm thinking the summer of 2010, somewhere in
25  that vicinity.

## Page 80

1  Q.  And how close is Enterprise to North Hills?
2  A.  The Enterprise office at that time was on 71.  It's
3  maybe a couple of miles or something of that nature.
4  Q.  You said a couple of miles?
5  A.  A couple of miles.  I never actually clocked it.
6  Q.  And he would come to the facility and have lunch with
7  you on occasion, correct?
8  A.  He did occasionally bring me lunch.  And I would take
9  a lunch break, yes.
10  Q.  And that was at the facility, correct?
11  A.  Yes.
12  Q.  Or in his truck?
13  A.  Did I go out to the truck?
14  Q.  Yes.
15  A.  Usually when he came we ate inside.
16  Q.  And what about the picnic area that was by the rehab
17  hall 300?
18  A.  You mean the outside area where they smoked.  No, I
19  rarely went out there.  I don't smoke.  If I went out
20  there it was because I needed to be out there with a
21  resident.
22  Q.  Was there an area where there was a picnic table
23  where you could have lunches?
24  A.  Let me picture it.  I know there were benches outside
25  300 hall where the overhead canopy is.  There were

## Page 81

1  benches.  I don't remember that there was a table.  Later
2  there was a -- one of the residents donated, and there was
3  some stuff built off of the dining room off of 100 hall.
4  I know there was -- the reason is I remember is one of our
5  residents fell out there and was injured.  I'm trying to
6  remember the facility and what all was there.
7  Q.  Do you know who Darlene Whitner is?
8  A.  I'm not familiar with that name.
9  Q.  Did you on occasion take your meals outside of the
10  facility?
11  A.  Leave and take my --
12  Q.  I just mean externally outside in the air, at the
13  facility, but outside?
14  A.  Occasionally if I had time, yes.  I enjoy being
15  outside in the fresh air.
16  Q.  And that would be with your husband sometimes?
17  A.  Sometimes.
18  Q.  And if you're outside, there were other people that
19  could observe you, correct?
20  A.  Sure.
21  Q.  Okay.
22  A.  There were seats in the front of the building.  I
23  would go out to the front of the building at the very
24  front entrance.  That's where I was more likely to go sit.
25  And that was simply because those areas were away from

BUSHMAN COURT REPORTING
501.372.5115

## Page 82

1  cigarette smoke and things of that nature.
2      And I would occas onally sit outside 300 hall because
3  they d dn't smoke out there.
4  Q.  Okay.
5  A.  So when I sat outside,  t primarily was either
6  outside 300 hall or outside the main entrance.  I'm not
7  saying there's not a picnic table out the back.  I never
8  sat at it.  Because if I got an opportunity to s t outs de
9  in the summertime, I certainly would.  I just don't
10  remember a picnic table.
11  Q.  I think it may not be.  It may be --
12  A.  But I know that one of the -- one of the res dents
13  d d donate, and her family built a little Gazebo and
14  everything outside -- we called it -- what d d we call
15  that at the end of 100 hall.  Anyway, they made a nice
16  l ttle area outside there.  And if there was a picn c
17  table, I would think that's where it would have been.
18  Q.  I remember the gazebo.
19  A.  There was a table and everything just off 300 hall
20  where the residents were allowed to go outside to smoke
21  and everything.  And I know there was a table there.  But
22  I d d not take my meals there because I can't handle
23  cigarette smoke.
24  Q.  Do you recall another separate building beside the
25  facility where there was another business, do you remembe

## Page 83

1  that?  You had the North Hills facility.  Was there any
2  other facility around there?
3  A.  The hosp tal was across from us.  And then there were
4  various med cal buildings and things of that nature, those
5  were around.
6  Q.  Do you remember a rehab facility next door?
7  A.  Let me think just a minute.  HealthSouth was kind of
8  catty-corner and across from us.  HealthSouth was across
9  from us, yes.  We were always getting people in looking
10  for people that were actually over there.  So they would
11  come to us.
12  Q.  What about Insight?
13  A.  I think that was a rehab company that worked for us.
14  I think that was our actual people that worked w thin the
15  facility as our rehab personnel.  I think that was
16  Insight.
17  Q.  So that was a rehab center.  And where was Insight
18  located?
19  A.  Down at the end of 300 hall.
20  Q.  Okay.
21  A.  But they were actually inside.  They weren't in a
22  separate building.
23  Q.  So from inside where Insight was, you could see
24  outside where the break area was, correct?
25  A.  You could see the entrance and the outside area where

## Page 84

1  we parked in the back there, yes.
2  Q.  Okay.
3  A.  From ins de the rehab.
4  Q.  So if somebody was taking a meal period out there
5  you'd be able to see them, correct?
6  A.  Yes.
7  Q.  And the people that worked at the rehab company, do
8  you know who employed them?
9  A.  I know they were employed by somebody different.
10  They were not actually a part of North Hills, they were a
11  contract company.  I think Insight is the name, because
12  that's the same rehab company that works at Jamestown.
13  And we sometimes have some of the same employees come over
14  to Jamestown.
15  Q.  Did your husband ever sing gospel for the residents?
16  A.  Yes, we did.
17  Q.  How often did he do that?
18  A.  We did that together.  I don't know.  After I got off
19  work and sometimes we did that maybe three or four times,
20  maybe a few more than that.  I don't know exactly.  There
21  wasn't a specific schedule or anything, but yes, we did.
22  Q.  How frequently when you were the director of med cal
23  records did you take a meal per od?
24  A.  I would say that I may have gotten a lunch break
25  maybe 25 percent of the time.

## Page 85

1  Q.  25 percent?
2  A.  Approximately.
3  Q.  And when you were an LPN how frequently did you take
4  a meal break?
5  A.  When I was working as an LPN, maybe 25 percent.  But
6  when I was working first as an LPN, they pa d us for our
7  lunch breaks.  Our lunch breaks were not deducted.
8  Q.  Okay.  What was the difference, as far as the abil ty
9  to get meal breaks, as an LPN and as the director of
10  medical records?
11  A.  As an LPN, if you were going to get a meal break, you
12  had to have another nurse cover your hall for you.  They
13  had to be willing to cover your hall for you, or you took
14  your break, and if someone needed you, they just came and
15  got you.  And you came back and took care of that and then
16  finished eating.
17  Q.  Okay.
18  A.  Wh ch was most frequently what happened.
19  Q.  What was most frequently that happened?
20  A.  Most frequently what you do as a nurse, when you take
21  your lunch break, if another nurse doesn't cover for you,
22  if someone needs you they just come and get you, and you
23  get up and go take care of whatever needs to be taken care
24  of, and then you finish your meal.
25  Q.  Okay.  So the 25 percent of the time that you're

Page 86

1    talking about as an LPN, that was at least a 30 minute,
2    uninterrupted break, correct?
3    A.   Yes.
4    Q.   And the 25 percent of the time as the director of
5    medical records, that was at least a 30 minute,
6    uninterrupted break, correct?
7    A.   Correct.
8    Q.   And who would cover for you when you were an LPN?
9    A.   I rarely had anyone cover.  I would just tell my CNAs
10   where I was going to be, and if they needed me they would
11   come and get me.
12   Q.   Okay.  Did anyone ever cover for you as an LPN?
13   A.   If I had to leave the facility during that time, yes,
14   I would leave my keys with someone.  You never leave the
15   facility with the keys to the narcotic box.
16   Q.   Okay.
17   A.   And that was just whoever was available that could
18   take the keys or was willing to.
19   Q.   Okay.  Can you think of who would do that?
20   A.   The other LPNs on the floor.
21   Q.   Can you remember names?
22   A.   Who all was there.  If I was on the evening shift, my
23   evening nurses were Lori Copeland at the end.  You have to
24   understand that there's a big turn-over in nursing
25   facilities.

Page 87

1    Q.   Yes.
2    A.   Lori Copeland was one of the nurses on evenings when
3    I left.  She had worked day shift at times as well.
4    Debbie McClindon worked evenings and Debbie Dornan.  Those
5    were the three 3:00 to 11:00 nurses that worked at the
6    time that I left.
7         On the day shift we had Belinda was one of the day
8    shift nurses.  I can't think of her last name right now.
9    The other was Rochelle.  I'm trying to think.  I believe
10   Melissa is the third nurse that worked day shift till
11   the end.  And through the years, the almost two years I
12   was there we had various others that came and went.
13   Q.   Okay.
14   A.   So what you would do is you would just go to one of
15   them and see if they could take your keys.  We also had
16   our director of nurses, Abra Pumphrey, and our assistant
17   director of nurses, Tiffany Stills.  And when you were
18   working the floor, you also could see if one of the
19   department managers, either Terri Wilson or Natasha and
20   even Stephanie Jackson, that was our admissions, they were
21   also LPNs.
22        So you would just go to anyone of them and see
23   somebody could take your keys so that you could leave.
24   Q.   Okay.
25   A.   There wasn't any specific person at any specific time

Page 88

1    that was responsible for it.
2    Q.   Would all these individuals at one point or another
3    have done that for you?
4    A.   Yes.  We all worked together as a team.  We would all
5    cover for each other as we could.
6    Q.   Okay.
7    A.   We helped each other out.
8    Q.   Would you also cover for these individuals?
9    A.   Absolutely.
10   Q.   Did you ever ask any of these individuals to cover
11   your shift while you were still there, just to take a meal
12   break, in other words, not to clock out to take a meal off
13   campus, but to go outside and take a meal break?
14   A.   I don't remember ever doing that.  Usually I would --
15   if I was on the property, I would just take my break and
16   keep my keys.
17   Q.   Okay.  Do you know about these other individuals,
18   whether they would turn in their keys to somebody when
19   they were taking their meal breaks?
20   A.   Occasionally they would come and I would take their
21   keys for them.
22   Q.   And they would be taking a break on campus at the
23   facility?
24   A.   I don't remember if they always took it on campus or
25   off.  I just know that I did occasionally take their keys

Page 89

1    and cover for them.
2    Q.   Okay.  At least some of the time they stayed at the
3    facility?
4    A.   I'm sure they probably did.
5    Q.   Okay.
6    A.   Because sometimes you have to be on the phone taking
7    care of things.
8    Q.   Do you know anything about the meal practices of
9    anyone else at the facility other than yourself?
10   A.   In what regard?
11   Q.   Do you know when -- let's talk about this group
12   first.  Do you know how frequently or when these
13   individuals took their meal breaks?
14   A.   I know that as a group as a whole, it was rare that
15   they got uninterrupted meal breaks.
16   Q.   And how do you know that?
17   A.   By observation.
18   Q.   Okay.
19   A.   They would be eating and be called back to the floor
20   for something.
21   Q.   When did you observe that?
22   A.   At various times.
23   Q.   Can you give me a specific example?
24   A.   A specific date, I can't give you a specific date.
25   Q.   Or a situation?

23 (Pages 86 to 89)

Page 90

1   A.   I know at var ous times when I was also working on
2  the floor, Rochelle got called back out to the floor at
3  various times to do something with patients when she was
4  in the breakroom.  I know Belinda got called back.  I know
5  Lori did.  Everyone got called back quite frequently.
6   Q.   And on the occasions when they were called back, do
7  you know if they went back and took another meal break
8  later?
9   A.   I never saw them go back and take another meal break
10  later.
11   Q.   Were you with them the whole day?
12   A.   Whatever shift I was on, I was there on the hall the
13  whole day.  But was I with each individual the whole 8
14  hours, no.
15   Q.   So if they had gone and taken a break at a later time
16  you wouldn't know that, correct?
17   A.   Correct.
18   Q.   And if they didn't get a full, uninterrupted 30
19  minute meal break, do you know if they filled out a time
20  sheet adjustment form?
21   A.   I would have no reason to know that.
22   Q.   You don't know if their meal period was paid or not,
23  correct?
24   A.   Correct.
25   Q.   Do you know if any of these indiv duals had a meal

Page 91

1  deduction applied to their time?
2   A.   I know that starting in, I believe  t was late
3  November or early December of 2011, they started deducting
4  meals from LPNs.  Up to that point, the meals had been
5  paid.
6   Q.   Okay.
7   A.   And it was specifically because if you had to be
8  called back, you were paid for your time.
9   Q.   Have you seen any of the pay records for any of these
10  employees, to know if that deduction actually occurred at
11  the time that the auto deduct that you say was put in
12  place?
13   A.   Have I seen their pay records, no.
14   Q.   So you don't know for sure that a meal deduction
15  applied to them as of that date, correct?
16   A.   Correct.
17   Q.   Do you know if it applied to you as of that date
18  while you were serving as an LPN?
19   A.   Yes.
20   Q.   And how do you know that?
21   A.   It was deducted from our --
22   Q.   And how do you know?
23   A.   It showed on the time sheet.
24   Q.   And what date was that?
25   A.   It started in e ther November or December of 2011.

Page 92

1   Q.   And how sure are you that that's when you had meals
2  deducted from your time, when you were serving as an LPN?
3   A.   What do you mean how sure am I?
4   Q.   Are you positive about that?
5       MS. JACKSON:  Object on to the form of
6  the question.  Asked and answered.
7   Q.   You can answer.
8       MS. JACKSON:  You can answer.
9   A.   At that point in time it showed appearing on my time
10  sheet?
11   Q.   Correct.
12   A.   Because  t was in that time frame that those
13  deduct ons started appearing on my time sheet.
14   Q.   And you're sure that's the time frame?  That's the
15  quest on I'm asking you.
16       MS. JACKSON:  Object on to form of the
17  quest on.  You can answer.
18   A.   I'm not 100 percent positive to that exact time
19  frame.  I said it was somewhere in that vicinity.  Because
20  I know it was put out that they were going to start doing
21  that at approximately that time.  Can I tell you the exact
22  date, no, but it was somewhere in that vicinity.
23   Q.   Okay.  The 25 percent of the time that you took your
24  meal period, you're talking about the time that you were
25  at the facil ty, correct?

Page 93

1   A.   Yes.
2   Q.   And --
3   A.   Any time that I left the facil ty I clocked out and
4  left.
5   Q.   You're not talking about -- when you're talking about
6  the 25 percent of the time, you're not talking about those
7  occas ons, correct?
8   A.   Correct.
9   Q.   Okay.  So if you remained at the facility and did not
10  clock out for your meal per od and go somewhere, about 25
11  percent of the time you stayed at the facility, you would
12  have gotten a full, uninterrupted 30 minute meal period,
13  correct?
14   A.   About that.
15   Q.   And was there any difference between the time you
16  served as an LPN and director of medical records?
17   A.   Are you saying is there about the same percentage of
18  when I would get a break, was that about the same?
19   Q.   Yeah.
20   A.   It was about the same.
21   Q.   As the director of med cal records, you d dn't have
22  to get somebody to cover for you like you d d as an LPN,
23  correct?
24   A.   No, I d d not.
25   Q.   Okay.  So why wouldn't you take a meal break when you

24 (Pages 90 to 93)

Page 94

1  were the director of medical records?
2  A.  Simply in order to get the work done.  I would eat at
3  my desk.
4  Q.  Okay.  Why as an LPN didn't you ask anyone to cover
5  for you so that you could take your lunch?
6  A.  Frequently there was simply no one available to
7  cover.
8  Q.  You gave me a list of eight different names of people
9  that --
10  A.  They were not all on the same shift.  They were not
11  all there at the same time.  I'm saying the reason that
12  you don't get a break is because frequently the other
13  nurses are just as covered up as you are.
14  Q.  Okay.  When you took your full, uninterrupted 30
15  minute meal break as an LPN, you were still paid for your
16  lunch per od, correct?
17  A.  Up until the latter part of 2011, yes.
18  Q.  What was your work schedule, let's start when you
19  first started as an LPN, what was your hourly schedule?
20  A.  3:00 to 11:00.
21  Q.  3:00 p.m. to 11:00 p.m.?
22  A.  Yes.
23  Q.  And how long were you on that schedule?
24  A.  I don't remember exactly.  Maybe three to four months
25  before they had a day shift opening.

Page 95

1  Q.  Okay.
2  A.  It may have been a little bit longer.  Somewhere in
3  the vicinity, somewhere between probably three to six
4  months.
5  Q.  And what was the days of the week that you worked
6  3:00 to 11:00?
7  A.  Monday through Friday.
8  Q.  Okay.  And then after that three to six months you
9  moved to a day shift schedule?
10  A.  7:00 to 3:00, yes.
11  Q.  7:00 a.m. to 3:00 p.m., right?
12  A.  Correct.
13  Q.  And that was Monday through Friday?
14  A.  Yes.
15  Q.  That was first shift.  How long were you on that
16  schedule?
17  A.  I was on that for the rest of the time I was employed
18  there.
19  Q.  Okay.  And then you switched eventually to the
20  director of medical records, right?
21  A.  Yes.  And that was in March of 2011.
22  Q.  Okay.  And what was your shift as the director of
23  medical records?
24  A.  It was from 8:00 to 5:00.  We had some leeway in
25  there if we needed to be in.  It was basically an 8:00 to

Page 96

1  5:00, 8 hours.
2  Q.  Monday through Friday?
3  A.  Yes.
4  Q.  And when you say you had leeway, what do you mean by
5  that?
6  A.  Well, if we needed to come in at 8:30 or something,
7  all we had to do was let Abra know, and they wouldn't
8  count  t against us as being tardy or something.
9  Q.  When you arrived at work, was the first thing you did
10  to clock in at the time clock?
11  A.  Yes.
12  Q.  And then was the next thing to sign the staffing log?
13  A.  When I worked the floor, yes.
14  Q.  You d dn't have to sign the staffing log when you
15  were the director of medical records?
16  A.  No, right.
17  Q.  So you would clock in and then sign the staffing log,
18  right?
19  A.  Yes.
20  Q.  And I think you testified before that when you signed
21  the staffing log, when you signed the time, that was the
22  accurate time, correct?
23  A.  Yes.  The reason it's just easier if you go from the
24  time clock and sign and you've got the exact time.  And
25  then when you clock out and sign out.  It's just easier.

Page 97

1  That way you're signing the time.
2  Q.  Okay.  What was the next step, and let's start as the
3  LPN.  So you clocked in, signed the staffing log, the time
4  on the staffing log, and then what's next?
5  A.  You take report from the nurse that's going off shift
6  and count the narcot cs.
7  Q.  Do you have to go look where you're assigned,
8  or do you know where you're assigned?
9  A.  I always knew where I was assigned, because we had
10  our specific halls that we worked.
11  Q.  Remind me where you worked the most, what was you
12  typical hall when you were an LPN?
13  A.  I worked 100 hall when I was working 3:00 to 11:00.
14  And then there was a pos t on opened up on 300 hall, which
15  was the Med care hall.  I worked that on 7:00 to 3:00 for
16  a per od of time.  And then when we split 300 hall and
17  went back down to three nurses, I worked a portion of 300
18  and all of 400 hall.
19  Q.  And what was 400 hall?
20  A.  400 hall was a long term care hall.
21  Q.  And you said 300 was what?
22  A.  Our rehab Medicare hall.
23  Q.  Okay.  What was the difference between 100 hall and
24  300 hall?
25  A.  100 hall is a long term care hall.  You primarily

Page 98

1 have residents there that are long term care that are
2 permanent residents. Medicare is where they're there for
3 primarily rehab and a short-term stay.
4 Q. Okay. Are there more adm ts on 300 than 100?
5 A. Yes.
6 Q. And 400 was also a rehab hall?
7 A. No, it was a long term care hall.
8 Q. Okay.
9 A. 300 hall was the only rehab hall that was designated
10 rehab. You might have other patients that were Medicare
11 on the other halls, but the primary rehab was 300 hall,
12 yes, it definitely had more admits and discharges than the
13 long term care halls.
14 Q. Okay.
15 A. And that's true w th any facility. You get more
16 rehab admits and discharges simply because they are there
17 for a shorter period of time. And your long term care are
18 primarily once they're admitted there, they're pretty much
19 there to stay.
20 Q. Okay. What other differences are there between these
21 three halls, 100, 300 and 400?
22 A. 300 hall has a smaller capacity than the long term
23 care halls. I don't remember the exact capacity of each
24 hall. I can't remember, off the top of my head, how many
25 rooms each one of the long term care halls had. The rehab

Page 99

1 hall had a smaller capac ty than the others.
2 Q. Okay.
3 A. And when you have Medicare patients, you have
4 different charting guidelines that you do for them. And
5 that is more time consuming type charting than what you
6 ordinarily have on your long term care halls. You have
7 pages that you have to chart on your rehab that you don't
8 have on your long term care.
9 Q. Okay. Any other difference you can think of between
10 the halls?
11 A. Your rehab halls are normally patients that are a
12 little bit more mobile. They are able to do a little b t
13 more for themselves than what your long term care are.
14 Q. Was it easier to get a meal period when working one
15 hall than compared to another one?
16 A. It varied, depending on what was going on on the hall
17 that day. I don't know that there was any one of the
18 halls that was easier than the other.
19 Q. When you say, it varied, tell me what would impact
20 the ability to get a meal per od?
21 A. It would vary on what you had going on with your
22 patients that day. You have some patients that aren't
23 doing well that require more. You have falls and you have
24 -- and all those things require documentation and forms
25 filled out and doctor notificat ons. It just depends on

Page 100

1 what's going on on the hall that day.
2 Q. Okay.
3 A. And how well your patient are. If your patients --
4 if you are familiar with a hall and your patients are
5 stable, and no one is sick and no one is sick, and you have
6 enough CNAs to help take care of the patients, you
7 probably can get a lunch break.
8     If that's not the case, if you've got three or four
9 people that aren't doing well, or you have two or three
10 falls, or you get an admit, or you don't have enough CNAs,
11 or don't have experienced CNAs that can -- that you don't
12 have to follow behind and check and make sure that they're
13 doing everything, you're more likely to get a break. But
14 if you don't have that going on, then you probably aren't
15 going to get a lunch break.
16 Q. How much can a hall -- how much can the work
17 requirements of a hall change from day-to-day?
18 A. Tremendously.
19 Q. How so?
20 A. As I said, if your hall is stable, and that means
21 everybody's condition is stable. You don't have anybody
22 that's got anything cr tical going on with them, you don't
23 have somebody that is falling or anything, then you've got
24 a stable hall.
25     At that same time, you got CNAs that know the

Page 101

1 residents and know how to care for them, and you're not
2 having to assist them, that's a stable hall.
3     You can have another day where you've got three or
4 four people that are not stable or that fall, or
5 someone even is dying, then it requires more intense time.
6     It just varies from day-to-day as to how stable your
7 patients are on your hall. And that changes daily in a
8 nursing home. It's not always the number of patients that
9 you have that determines it, it's what condit on those
10 patients are in.
11 Q. Acu ty, right?
12 A. Acuity.
13 Q. So as an outsider, if I wanted to, specif c to an
14 LPN, look at an LPN at North Hills, and determine whether
15 that person can take their meal per od or not, should be
16 able to get their meal per od, what would I need to know
17 in order to make that evaluat on?
18 A. You would have to work their hall.
19 Q. What's that?
20 A. You would have to work their hall.
21 Q. Is there any way for me to know that --
22 A. As an outsider looking in, no, I don't believe so.
23 Q. Is there any way for me to predict, or what about if
24 one LPN on a different hall is able to take their meal
25 breaks, does that tell me anything about an LPN working on

26 (Pages 98 to 101)

## Page 102

1    another hall?

2    A.  No, not really.  Because each individual works

3    differently.  Each individual is more in tune with their

4    patients.  One nurse, she may be more involved in her

5    patient care and giving more patient care than the nurse

6    that's on this other hall.

7        That doesn't mean that the nurse over here isn't

8    doing her job.  And in looking at it, there may have not

9    been a lot going on that you can see from the outside.

10   How many call lights d d she answer.  How many people

11   she take to the bathroom.  How many things of that nature

12   did she deal with, in add tion to her normal med pass and

13   charting and documentation.

14       The nurse on this other hall, she may not have had

15   any of that going on.  It's just a -- it's a variable in

16   there.  And a lot of it is a variable in which nurses are

17   actually in tune to their patients and are there to care

18   for their patients.

19       If you've got a nurse that consistently gets her

20   breaks and consistently gets a lunch break all the time.

21   Talk to her residents, talk to her CNAs, and see how much

22   she helps them.  And that will be your answer.  Because if

23   she's not helping her residents at all, if she's not

24   helping her CNAs.  If you don't do any of that, if you

25   just say that's not my job.  And some nurses do that.  And

## Page 103

1    if you do that consistently, then you probably could get a

2    lunch break.  But if you actually get in there and take

3    good care of your residents, and help your CNAs, when they

4    need it, to make sure your residents get the care they

5    need, then that's going to be the one that probably isn't

6    getting her lunch breaks consistently.  And those both

7    exist in the nursing field.

8    Q.  Would it be fair for me to take the experience that

9    one LPN had on their hall, and attribute to that another

10   LPN on a different hall?

11       MS. JACKSON:  Objection to form of the

12   question.  You can answer.

13   A.  You're saying if I had more experience on one hall,

14   and the other nurse had less experience on that hall, or

15   are you saying experience as a nurse in general?

16   Q.  What I mean is -- let me rephrase.

17   A.  Okay.

18   Q.  We'll just take you.  After talking to Carrolyn

19   Campbell, and understanding what your experience is, with

20   respect to working, the ability to take meal breaks, the

21   activ ties you have to perform on your hall, is it fair

22   for me to say I understand what your experience was, and

23   now say that must be the experience of another LPN,

24   because you're in the same position?

25       MS. JACKSON:  Objection to form of the

## Page 104

1    quest on.  You can answer.

2    A.  Another nurse -- naturally we're all individuals.

3    Another nurse, if she can do all of  t and do everything

4    really truthfully do everything that I do and take her

5    lunch break, my hat is off to her.

6    Q.  Okay.  100 hall, that was evening shift, right?

7    A.  That's where I started was 100 hall.  I worked the

8    various shifts on all of the halls.  But when I started,

9    100 hall was my hall at that time, yes.

10   Q.  What's the difference between evening shift and day

11   shift?

12   A.  On day shift you have two meals that you have to get

13   your res dents up to and back from and everything.  Day

14   shift primarily deals more with doctors being in the

15   facility than evening shift does, because they round on

16   the day shift.

17       And primarily lab reports and things of that nature

18   come in on day shift.  And you deal with all of that in

19   add tion to your patient care and things of that nature.

20   Q.  When you say, round on the day shift, you're talking

21   about the doctors coming to visit patients?

22   A.  Yes.  The doctors come into the facility at that time

23   and see patients.  They primarily do that on the day

24   shift.

25   Q.  Okay.

## Page 105

1    A.  Occasionally they come in on evenings, but for the

2    most part, they come in on day shift.  And your nurse

3    practit oners come on on day shift generally.

4    Q.  What about on night shift?

5    A.  Are you referring to night shift as 3:00 to 11:00?

6    Because what we consider night shift in the profess on is

7    11:00 to 7:00.

8    Q.  That's what I was talking about.  I should have

9    specified.

10   A.  11:00 to 7:00, as a general rule, is where you have

11   more time, more down-time, I call it, because your

12   residents are in bed.  And while you have med passes and

13   you have certain things that you have to do.  Normally

14   that's where you have your most down-time is the 11:00 to

15   7:00 shift, just simply because the residents are in bed.

16   And your med pass on 11:00 to 7:00 is never as large as it

17   is on either 7:00 to 3:00 or 3:00 to 11:00.

18   Q.  When you say, med pass, just explain to me what that

19   is?

20   A.  Each of the res dents in the facility, they have a

21   certain number of medications prescribed for them that

22   have to be given at certain times.

23       Normally in a facility the morning med pass, wh ch is

24   generally either timed at 8 or 9 o'clock, is the largest

25   med pass in the facility.  Any medicat on that is

## Page 106

1  prescribed one time a day, generally is prescribed with

2  the morning med pass. And then you have one usually at

3  noon. And the 3:00 to 11:00 has one when they come on

4  that's usually scheduled at 4:00. And then they have an 8

5  o'clock scheduled med pass that they do.

6       If you're working 11:00 to 7:00, you may have some

7  midnight meds, and it's very few simply because they try

8  to not schedule things because you have to wake people up

9  in the middle of the night. So you're going to have fewer

10  medications to give. And primarily the med pass for 11:00

11  to 7:00 is their 6 o'clock in the morning med pass. And

12  that's when they check the diabetics, they check their

13  blood sugars and any insulins that are ordered early they

14  give. So theirs is normally the lightest of all the med

15  passes.

16       In most facilities, they try to go ahead and do t

17  all in the morning med pass and get t done for the day.

18  Q.  You've worked the 11:00 to 7:00 shift in the past,

19  correct?

20  A.  I have. It's rare, because I don't do well on 11:00

21  to 7:00. When they needed me to fill in, yes, I have

22  filled in.

23  Q.  And is there any reason you wouldn't be able to take

24  a full, uninterrupted meal period of 30 minutes or more on

25  the 11:00 to 7:00 shift?

## Page 107

1  A.  There again, it would depend on what's going on with

2  your res dents at that time, and how many -- how much you

3  have to do. It would depend on what your workload is for

4  that night.

5  Q.  Okay. It certainly would be more likely that you

6  could take an uninterrupted meal period?

7  A.  You would certainly be more likely to be able to get

8  an uninterrupted meal periods on 11:00 to 7:00, yes.

9  Q.  Were there occasions or can you tell me when you

10  worked, and it didn't look like it was very often, but

11  when you worked the night shift, d d you typically take

12  your meal per od?

13  A.  I usually did on 11:00 to 7:00. Unless I had

14  somebody critical or something going on, on the 11:00 to

15  7:00 I usually got my break.

16  Q.  Okay. Let's talk for a minute about the end of

17  shift, and we'll stick with the LPN position.

18  A.  Okay.

19  Q.  Was it your pract ce to finish your work, clock out

20  and sign the staffing log?

21  A.  Yes.

22  Q.  And d d you always sign the accurate end time on your

23  staffing log?

24  A.  Yes.

25  Q.  And d d you sign the staffing log first or the clock

## Page 108

1  first?

2  A.  You clock out and then you go sign the staffing log.

3  That way you know what time the time clock sa d to put on

4  the staffing log.

5  Q.  So you use the time on the time clock on the staffing

6  log?

7  A.  Yes.

8  Q.  As an LPN, you didn't perform any work after clocking

9  out, correct?

10  A.  No, not as an LPN on the floor.

11  Q.  Okay. Now, let's talk about the director of medical

12  records.

13  A.  Okay.

14  Q.  At the you beginning of your shift, did you clock in

15  and then begin performing your work?

16  A.  Yes.

17  Q.  There was not a staffing log you sa d, so there was

18  nothing to sign?

19  A.  We were not required to sign the staffing log in that

20  pos t on.

21  Q.  Was there anything like that?

22  A.  Not that I'm aware of.

23  Q.  Nothing you have to sign?

24  A.  Not that I was aware of. It was just clocking in and

25  out.

## Page 109

1  Q.  But you would clock in before performing any work?

2  A.  Unless you walked in the door and some disaster was

3  happening, and naturally you go ahead and help with the

4  disaster, and then clock in and go to work.

5       If you walk in and somebody is crashing, you're going

6  to help take care of that resident and do what's needed

7  and then clock in and go to work.

8            MR. SPINOLA: Let's take a break.

9            MS. JACKSON: Okay.

10            (A recess was had.)

11  Q.  (BY MR. SPINOLA) We're talking now about your time

12  as the director of medical records. Okay?

13  A.  Okay.

14  Q.  One thing I wanted to go back and do. I think t's

15  the interrogatories, Exhibit Number 4.

16  A.  Okay.

17  Q.  Interrogatory number 13. Do you want to confirm

18  this?

19  A.  Is it in the main one?

20  Q.  It's the supplemental.

21  A.  Okay.

22  Q.  And just for clarificat on, all of my quest ons will

23  be about the supplemental.

24  A.  Okay.

25  Q.  It's on page 9.

## Page 110

1    A.   Okay.

2    Q.   I just want to confirm that this is accurate.  It

3  says, Plaintiff made no complaints regarding their failure

4  to compensate her for all hours worked: is that true?

5    A.   Are you asking if I filed any type of complaints?

6    Q.   Look back at the -- here is the quest on that we

7  asked.  Interrogatory number 13 on page 8.  State whether

8  your complained to anyone at defendants about not being

9  pa d for all hours that you worked, not being paid at an

10  overtime rate for hours worked about 40 in a work week,

11  and/or any issue related to your compensation.  Identify

12  who you complained to, identify the entity that employed

13  that person, each and every date you complained, what you

14  complained about, what you said, what was sa d to you

15  about your complaint, who was present when you made such

16  complaint, the resolut on of the complaint, and identify

17  any documents that relate to such complaints.

18    So in response to that quest on or interrogatory, it

19  says that you made no complaints regarding failure to

20  compensate for all hours worked.  And I'm just verifying

21  that that is true?

22    A.   And again, let me clarify what you're saying as no

23  complaints.  I did not file any formal complaints, no.

24    Q.   Did you have any complaint, did you make any

25  complaint of any kind to anyone at defendants about not

## Page 111

1  being pa d for all the hours that you worked?

2    A.   I discussed w th both Abra and with Lauren, that

3  there was no way in 40 hours that the job could be done.

4  It was just a conversation.

5    Q.   Discussed with Abra?

6    A.   Abra is the director.  Lauren was the administrator

7  at the time.

8    Q.   What's Abra's last name?

9    A.   Pumphrey.

10    Q.   Abra Pumphrey and who?

11    A.   Lauren Dowless, the DON.  Ms. Lauren got married

12  while she was with us.

13    Q.   Dowless, right?

14    A.   Right.

15    Q.   So tell me about that conversation?

16    A.   There were various times that they were very aware of

17  the overwhelming workload and backlog, and how it needed

18  to be caught up.  And yet, they were also very adamant

19  that we could have no overtime.

20    Q.   Okay.

21    A.   And there was one week that Lauren directed me to get

22  a certain amount of filing and things done.  And it had to

23  be done before I left the facility.  And that resulted in

24  overtime.  And the next Monday she verbally reprimanded me

25  for having what she sa d was unapproved overtime.

## Page 112

1    Q.   And was this while you were the director of medical

2  records?

3    A.   Yes.

4    Q.   Okay.  So was this one conversation?

5    A.   I had one conversation with Abra that the

6  requirements could not be done in 40 hours a week.  And I

7  had one conversation with Lauren.

8    Q.   And was it over the same issue, the same period?

9    A.   It was at different times.

10    Q.   Okay.  And who d d you speak to first?

11    A.   Abra.

12    Q.   And you explained that the amount of work that you

13  had to do could not be done in a 40 hour work week?

14    A.   That's correct.

15    Q.   And what did she say?

16    A.   We cannot have any overtime.

17    Q.   And was it unapproved overtime?

18    A.   No.  We cannot have any overtime.  But these things

19  have to be done.

20    Q.   The first time you said you were disciplined for

21  working unapproved overtime; is that right?

22    A.   I said that Lauren had given me direction as to

23  certain things that had to be done before I left the

24  facility.  And I did those, and I remained working on the

25  clock.  And then that's when the following Monday, when

## Page 113

1  she got the report of time, she verbally reprimanded me

2  for working.  And I said, Lauren, you told me that you

3  wanted this done.  She said, But I wanted t done without

4  overtime.

5    Q.   Okay.  Let's go back to the Abra conversat on.  Other

6  than you saying that work needed to be done,  t couldn't

7  be done in a 40 hour work week, and her saying that the

8  work needed to be done, can you think of anything else

9  that was said in that conversation?

10    A.   No.

11    Q.   Now, with Lauren when she reprimanded you for working

12  overtime, tell me everything you can remember about that

13  conversat on?

14    A.   I remember we had had the morning meeting, which we

15  had every morning.  She just sa d, Carrolyn, I need to

16  talk to you.  You had however many hours it was of

17  overtime.  And I said, I was completing what you had told

18  me needs to be completed.  She said, We can't have any

19  overtime.  And I said, But you told me you wanted this

20  done.  And she said, I wanted t done without overtime.

21    Q.   Okay.  Anything else you can remember about that or

22  is that pretty much it?

23    A.   Pretty much.

24    Q.   Okay.  And do you know about when those conversations

25  occurred?

Page 114

1  A.  I don't.

2  Q.  Let's start with Abra.

3  A.  I was in that position for almost a year, so no.

4  Q.  Do you know if it was toward the beginning or the

5  end, in the middle?

6  A.  I don't remember exactly.  I honestly don't.  You had

7  a lot of morning meetings.

8  Q.  What documents exist that would help you identify

9  when it was?  Do you remember how many hours you worked

10  that week?

11  A.  I don't remember exactly.  In addition to working in

12  medical records, I frequently worked on the floor as a

13  nurse when we were shorthanded.  I don't know.  I'm sure

14  they could pull the records, and any overtime that was

15  directly related.

16  Because as I remember, the time was divided between

17  what I worked in medical records and what I worked in

18  nursing.  They kept a separate record, so that the state

19  looked at our nursing hours, and we had a record of who

20  all was on the floor as nursing.  And anything else that

21  would have been, would have been overtime in the medical

22  records position.  So if they wanted to look up something

23  of that nature, I'm sure they would have the capability.

24  Q.  Tell me how to do it again?

25  A.  They divided -- the time is allotted.  They have so

Page 115

1  many hours for nursing hours, and then hours for various

2  other departments.  And part of my time was allotted as

3  medical records, but then when I worked on the floor doing

4  direct patient care, that would have been nursing hours.

5  So if they wanted to pull overtime hours in medical

6  records, they should be able to do that, because it was

7  separated, the hours were separated.

8  Q.  Was that the only time you worked overtime in medical

9  records?

10  A.  Yes, other than when the state was in the building

11  when overtime was approved.  When we had a mock survey,

12  where the corporate nurses and different people came in,

13  and we went through as though we had state in the

14  building.  Overtime was approved for that.  And when the

15  state was actually in the building, overtime was approved,

16  because naturally we had to stay however long that state

17  auditors were in the building.

18  Q.  Okay.  Can you recall at all how long you were

19  employed after those conversations?

20  A.  No.

21  Q.  Do you remember the time of the year, cold, warm?

22  A.  It probably was summer, because I took the position

23  in the spring.  It probably was summer.

24  Q.  Okay.  In either the conversation with Abra or

25  Lauren, was there any direction to work off the clock?

Page 116

1  A.  Their only direction was this work has to be done.

2  There can be no overtime.

3  Q.  Okay.

4  A.  Lauren would come in, she would pull the time sheets

5  and if we had overtime, even 15 minutes, she would say,

6  You need to make sure that you clock out, so that this 15

7  minutes of overtime doesn't show up.

8  Q.  To make sure I understand.  Nobody told you to clock

9  out and continue working or anything like that, correct?

10  A.  Not directly, no.  But if you have a job that you're

11  being told has to be done, and your job is dependent on it

12  being done, then you have to complete the work.

13  Q.  Could an equal interpretation be you got to work

14  faster than this?

15  A.  If you're working as hard and as fast as you can.

16  Q.  Do you think it's reasonable to expect somebody to

17  work at a certain speed?

18  MS. JACKSON:  Objection to the form of

19  the question.  You can answer.

20  A.  I understand that you have to have people that work

21  steadily at things, yes, I have no problem with that.

22  Q.  And isn't that what they were communicating to you,

23  that there was an expectation of how long it should take

24  to perform the work that you were asked to do?

25  MS. JACKSON:  Objection to form of the

Page 117

1  question, but you can answer.

2  A.  No.  That's not what I felt they were communicating

3  to me.

4  Q.  So was it your interpretation that they were telling

5  you to work off the clock?

6  A.  That was my interpretation, yes.

7  Q.  And what is that based on?

8  A.  Again, simply that you have this amount of work that

9  needs to be done.  We expect you to get it done.  But you

10  cannot have overtime.

11  Q.  But nobody actually directed you to do that, that's

12  just your assumption of what they must have meant,

13  correct?

14  A.  Nobody ever directly told me to work off the clock,

15  no.

16  Q.  Okay.  Prior to that conversation, had you ever

17  worked off the clock?

18  A.  Prior to the conversation?

19  Q.  The conversation you had with Abra.  I think you said

20  it was your first one.

21  A.  Nothing more than an occasional you've already

22  clocked out and somebody needs something, you're not going

23  to clock in to just simply go get some small something,

24  things of that nature.

25  Q.  So you're talking about a couple of minutes here or

30 (Pages 114 to 117)

## Page 118

1  there?
2  A.  Yes.
3         MR. SPINOLA:  Why don't we take a break.
4         MS. JACKSON:  Okay.
5         (A recess was had.)
6  Q.  (BY MR. SPINOLA)  Ms. Campbell, you had an
7  opportun ty to take a break.  Is there anything about your
8  testimony that you want to change or clarify today?
9  A.  No.
10  Q.  Have you told me the truth, to the best of your
11  ability?
12  A.  Absolutely.
13  Q.  All right.  We took a break, and you're under the
14  same oath you were this morning, correct?
15  A.  I understand.
16  Q.  When we broke for lunch, we were talking about your
17  time as a director of medical records, right?
18  A.  Yes.
19  Q.  What I would like to do, since we've been going for a
20  while, I want to make sure that I summarize correctly what
21  you've told me so far.
22  A.  Okay.
23  Q.  As an LPN, you d dn't perform work before clocking in
24  or after clocking out, correct?
25  A.  Correct.

## Page 119

1  Q.  And as an LPN, you said that you worked through about
2  75 percent of your lunches, and the other 25 percent you
3  would get full, uninterrupted meal periods that were at
4  least 30 minutes long, right?
5  A.  Correct.
6  Q.  And that would exclude any days where you actually
7  have clocked out and left the facil ty for lunch?
8  A.  Correct.
9  Q.  You believe that you were not subject to an automatic
10  meal deduction as an LPN until towards the end of 2011,
11  correct?
12  A.  2011, correct.
13  Q.  As the director of med cal records, which was a
14  position you took in --
15  A.  March of 2011.
16  Q.  You say March of 2011?
17  A.  Yes.
18  Q.  Okay.
19  A.  Because I was hired in April of 2010.  And I worked
20  on the floor as a nurse right at a year, and then went to
21  med cal records.
22  Q.  Okay.  So in March of 2011, you would, in the
23  director of medical records pos tion, not perform any work
24  before clocking in, or perform any work after clocking
25  out, at least up until the conversat on you had w th Abra

## Page 120

1  and Lauren, correct?
2  A.  Correct.
3  Q.  And we haven't talked about anything after that.
4      You also sa d in that position, same experience with
5  meal periods, that about 75 percent of the time you would
6  work through a meal period, 25 percent of the time you
7  would get the meal period of at least 30 minutes
8  uninterrupted, correct?
9  A.  Correct.
10  Q.  And that would exclude any time when you're actually
11  clocking in and out for meal periods, right?
12  A.  Correct.
13  Q.  And you thought that the conversation w th Abra and
14  Lauren was sometime maybe in the summertime of 2011?
15  A.  I believe so.  I didn't wr te down the date or
16  anything.
17  Q.  Understood.  And I'm not talking about your meal
18  per od, I'm talking about any other time.  After the
19  conversation w th Abra and Lauren -- well, actually let me
20  back up one more time.  That conversation, the only thing
21  you remember about these two conversat ons were that you
22  expressed to them a concern that you couldn't perform the
23  work they wanted you to perform within a 40 hour work
24  week, correct?
25  A.  That no one could.

## Page 121

1  Q.  That no one could.  And they expressed to you that it
2  was important that you performed the work within a 40 hour
3  work week, correct?
4  A.  Right.
5  Q.  And other than that, there's nothing else you recall
6  about those conversations, correct?
7  A.  That's correct.
8  Q.  And other than those two conversat ons, you did not
9  have a discussion about your work with anybody, correct,
10  about your issues with being able to complete your work or
11  working through meal per ods or anything like that,
12  correct?
13  A.  That's correct.
14  Q.  Okay.  And you d dn't have any discuss ons w th
15  anybody about working off the clock, at any point in your
16  time at North Hills, other than these two conversations
17  you identified?
18  A.  Yes.  There was a point in time when I had been
19  directed that I needed to shave off hours one week.  And I
20  still had an adm t and things that needed to be completed.
21  And I did go clock out.  And Abra saw me clock out.  And
22  then I went back to the office and worked.  I said, I've
23  got all of this that I have to finish.  And she knew I was
24  working off the clock, yes.
25  Q.  And when was that?

Page 122

1   A.  I don't know the exact date.  It was a Friday.  That
2   much I do remember.
3   Q.  Okay.
4   A.  And she was aware that I was working off the clock to
5   complete it.  Because we had admits come in.  It was the
6   end of the month.  And at the end of the month I had MARs
7   that I had to print.  I had to print new ones and things
8   of that nature.  So there was a lot of things that had to
9   be done.  And yes, she was aware that I was working off
10  the clock.
11  Q.  This was in your LPN role?
12  A.  No, director of medical records.
13  Q.  Director of medical records?
14  A.  Yes.
15  Q.  And was there an instruction to work off the clock in
16  that case?
17  A.  There wasn't.  She never directly told me to work off
18  the clock, no.  But she was aware that I was working off
19  the clock in order to get it done and not have overtime.
20  Because if we had overtime, then she had to account for
21  it.
22  Q.  Tell me how you know that she was aware?
23  A.  She was at the time clock when I clocked out.  And
24  she came in the office and knew I was still in there
25  working.

Page 123

1   Q.  And so you clocked out while she was at the time
2   clock?
3   A.  She was standing there at the hallway.
4   Q.  Were there any words exchanged?
5   A.  Just that I still had to go back and finish
6   everything.  It was a discussion of what all still had to
7   be done.
8   Q.  And so you said to her exactly what?
9   A.  I still have work that I have to do to get everything
10  done.  And I went back to work.
11  Q.  Did she say anything to you?
12  A.  No.
13  Q.  Was this the occasion on you were actually disciplined
14  for being in the office, organizing your office?
15  A.  No.
16  Q.  Do you remember that occasion?
17  A.  No.
18  Q.  When it came to the attention of management that you
19  had come into the office over a weekend and had not
20  clocked in, and they warned you never to do that again?
21  A.  No, that never happened.
22  Q.  Okay.
23  A.  I was never warned not to do it again.
24  Q.  Do you know what I'm talking about, does any of that
25  ring a bell?

Page 124

1   A.  No.
2   Q.  Is there any other occas on that you allege that
3   there was any kind of discussion, or there was information
4   that management had that you were working off the clock?
5   A.  They knew how late I worked each night.  They had
6   time sheets showing that it wasn't on the clock.
7   Q.  Okay.  So you're saying that just general
8   observation, that you'd be around and should have compared
9   your time in the facility with the time clock records?
10  A.  That's correct.
11  Q.  And who is they?
12  A.  Lauren and Abra both had access to that.
13  Q.  When did Lauren work, what hours?
14  A.  She worked varying hours.  She would be there
15  sometimes until 5:30 or 6:00 in the evening.  Sometimes
16  she left at 4:00.  It just varied on what time she came in
17  and what time she left.  It was just depending on what all
18  she had that needed to be done that day.
19  Q.  And what about Abra?
20  A.  The same for her.  They didn't have set hours that
21  they worked as such.  As being director of nurses and
22  being the administrator, they were required to be there at
23  varying times.
24  Q.  Okay.
25  A.  And we all took turns during meal service.  So they

Page 125

1   were frequently there until 7:00 or 7:30 during the
2   evening meal service and helping with that.
3   Q.  Turn back to Exhibit Number 4.
4   A.  Okay.
5   Q.  Look at paragraph number 73.
6   A.  What page is that?
7       MS. JACKSON:  I think he's talking about
8   the complaint.
9   Q.  (BY MR. SPINOLA)  Yes.  Page 14 on Exhibit 4.  I'm
10  sorry.  Exhibit 3.  I might have had the number wrong on
11  the exhibit.
12  A.  That's fine.  The complaint is Exhibit 3.
13  Q.  Okay.  Here it says -- and paragraph 73 is referring
14  to you.
15  A.  Okay.
16  Q.  It says, Plaintiff Campbell regularly worked in
17  excess of 40 hours per week and was not compensated for
18  this time?
19  A.  That's correct.
20  Q.  Plaintiff Campbell frequently worked 60 to 65 hours
21  per work week?
22  A.  That's correct.
23  Q.  So is it your testimony that you were working 20 to
24  25 hours off the clock?
25  A.  Correct.

Page 126

1  Q.  Okay.
2  A.  I would frequently work until 10:30 or 11 o'clock at
3  night.
4  Q.  Now we can look at Exhibit Number 4.
5  A.  Okay.
6  Q.  And look at the supplemental interrogatories.  I
7  think we want to look at interrogatory number 20.
8  A.  Okay.
9  Q.  Page 13.  And here it says, Lauren Dowless, Northwest
10  administrator, warned plaintiff not to allow her hours to
11  exceed 40 per week but at the same time, assign her work
12  that could be not completed in the allotted time?
13  A.  That's correct.
14  Q.  So is it your testimony then that you didn't actually
15  get paid overtime?
16  A.  For working as the director of medical records, no, I
17  did not.
18  Q.  Okay.  And --
19  A.  Let me correct that.  As I said before, when the
20  state was in the building, we were paid for whatever hours
21  that we were required to be there for state.  And when we
22  had our mock surveys, yes, we were paid for whatever time.
23  But just in general day-to-day business, no, we were not
24  allowed to have overtime.
25  Q.  Okay.  And is that also true when you were an LPN?

Page 127

1  A.  No.  They would pay us overtime as LPNs.
2  Q.  So why would it be okay for you to work overtime as
3  an LPN, but not as the director of medical records?
4  A.  They just made the determination that department
5  heads should not be getting overtime in order to keep the
6  budget lower.  But they had to have nurses on the floor,
7  because you can't run a nursing home without nurses on the
8  floor.
9  Q.  And you would actually request additional shifts,
10  correct?
11  A.  I worked whatever shifts were needed to earn extra,
12  yes.  I always helped out wherever was needed.
13  Q.  And if the company was trying to keep overtime down,
14  why they give you an extra shift that would put you
15  into overtime?
16  A.  Because they didn't have anyone else to work.
17  Q.  Let me understand your testimony.  So as long as you
18  were working as an LPN, it was okay to earn overtime, but
19  not as a director of medical records?
20  A.  That's correct.
21  Q.  And have you told me all the evidence that you have
22  to support that belief, is there anything else, other than
23  the two conversations and the occasion when you said that
24  you clocked out in front of Abra?
25  A.  That's all that comes to memory at this point.

Page 128

1  Q.  Okay.  So this started for you sometime I guess in
2  the summertime?
3  A.  Correct.
4  Q.  After these conversations?
5  A.  Yes.
6  Q.  Did you still clock in before performing any work?
7  A.  Yes.  Because you clock in when you come through the
8  door.  It was on the way to the office, so I just clocked
9  in as I came through.
10  Q.  And what would you do when you clocked out, what time
11  would you clock out?
12  A.  It would depend on whatever time I clocked in that
13  morning, I would know what time that I needed to clock out
14  to make it an even 8 hours, and I would clock out
15  accordingly.
16  Q.  Okay.  The time records would show that you clocked
17  out exactly 8 hours after clocking in, correct?
18  A.  Correct, unless something happened and I was 5 or 10
19  minutes over.  But as a general rule, yes, it would all
20  reflect 8 hours.
21  Q.  And then what would you do after clocking out?  What
22  was your shift?
23  A.  We had some flexibility with what time we had to come
24  in, but t was basically like 8:00 to 5:00.
25  Q.  8:00 to 5:00.  Okay.

Page 129

1  A.  That was kind of the basic hours of the shift.  If we
2  needed to be there, especially like if I had worked a 3:00
3  to 11:00 shift the night before, they never objected if I
4  didn't come in until 8:30 or something.  So there was some
5  flexibility in that.
6       But basically I would say that the hours were pretty
7  much 8:00 to 5:00, something of that nature.  That was
8  just kind of the general understanding of what the hours
9  were.
10  Q.  And that was five days a week, correct, Monday
11  through Friday?
12  A.  Correct, Monday through Friday.
13  Q.  Okay.  And after you clocked out around 5:00, then
14  what would you do next?
15  A.  Go back to the office and continue working.
16  Q.  Was there anyone else in the office with you?
17  A.  Terri was, Terri Wilson, the Medcare manager, was
18  frequently there.  Natasha was frequently there.
19  Q.  And how long would you stay?
20  A.  It varied.
21  Q.  On what?
22  A.  Sometimes I would say until 9:00.  Sometimes I would
23  stay until 10:00.  Because different times of the month
24  there were different things that have to be done.  And if
25  it was a night that the MARS and TARS all had to be ready

33 (Pages 126 to 129)

## Page 130

1    for the shift, I might work until midnight.
2    Q.   What are MARS and TARS?
3    A.   That's what the nurses have to use to administer
4    their med cat on and the treatment nurses use.  MARS are
5    the med cation administrat on record.  TARS are the
6    treatment administration records.  And once a month you
7    have to print that for the whole building, and you have to
8    proof them to make sure that they are correct.
9    Q.   Okay.
10   A.   So if it happened to be one of those days, I could
11   have worked as late as midnight.
12   Q.   What would you say the average was?
13   A.   Normally around 10:00.
14   Q.   And this was every night?
15   A.   It was three or four nights a week for sure.
16   Q.   So there was one night you would clock out and
17   actually leave?
18   A.   There were times that I would leave.  If I had
19   something going on with family or something, I would clock
20   out and leave.
21   Q.   What percentage of the time?
22   A.   It was rare.  Because during the most part of that
23   time, my husband and I were separated.  He was in Oklahoma
24   and I was by myself.  So there wasn't anything pressing at
25   home that I would have to go to.  But there were times

## Page 131

1    that there would be functions going on with grandk ds and
2    stuff that I would attend.
3    Q.   Are you aware of anyone else at the facility that
4    would clock out, and then come back to work after clocking
5    out?
6    A.   Terri Wilson.
7    Q.   And do you know whether she was exempt or non-exempt?
8    A.   She was an hourly employee just like I was.
9    Q.   And how do you know she did that?
10   A.   Because she would be there working when I was there
11   working.
12   Q.   How do you know she clocked out?
13   A.   Because I saw her at the time clock.
14   Q.   Did you guys ever have a discuss on about that?
15   A.   We did.
16   Q.   What did she say?
17   A.   She also had work to get done, and she was afra d
18   that if she d dn't get her work done that she would lose
19   her position.
20   Q.   Did anybody threaten your position for not getting
21   your work done, or was that just an assumption?
22   A.   No one ever directly said that they would fire us.
23   It was just an understanding that you had certain things
24   that they expected you to get done, and you had that time
25   frame to do t.

## Page 132

1    Q.   Do you know if Terri Wilson ever reported her conduct
2    to anyone?
3    A.   No, I don't.
4    Q.   And you never d d either, correct?
5    A.   I'm sorry?
6    Q.   You d dn't report to anyone that you were clocking
7    out and going back to work, correct?
8    A.   Well, that one time that I talked to Abra about t,
9    yes.
10   Q.   And other than that time, you never reported it,
11   right?
12   A.   They knew I was there.  They were in and out of the
13   off ce.
14   Q.   You never contacted what you referred to as
15   corporate, correct?
16   A.   No, I did not.
17   Q.   Other than Terri Wilson, do you know anybody else
18   that would clock out and then return to work and work off
19   the clock?
20   A.   There was a nurse on the floor, Belinda, she was not
21   able to get her work done in a timely manner.  And she
22   would frequently clock out and stay and complete her work.
23   Q.   Did anybody instruct her to do that, as far as you
24   know?
25   A.   I never heard anyone instruct her that she had to

## Page 133

1    stay.  I did hear Abra at various times telling her that
2    she needed to hurry and get off the clock, knowing that
3    she had work that had not been completed, and that had to
4    be completed.
5    Q.   What was her position?
6    A.   She was an LPN.
7    Q.   Do you know if she filled out any kind of time sheet
8    adjustment form for any work she performed after clocking
9    out?
10   A.   I don't have any way of knowing that.
11   Q.   Do you know if Terri Wilson filled out time sheet
12   adjustment forms for any work after clocking out?
13   A.   I have no way of knowing that.
14   Q.   Is there anybody else that you're aware of who
15   clocked out and then would come back to work?
16   A.   Those were the two primary ones that did.  I don't
17   remember anyone else doing it.
18   Q.   How much overtime would you be pa d in a typical work
19   week?
20   A.   It varied.  It depended on how many shifts they
21   needed me to work the floor.  It depended on how many
22   nurses we had e ther on vacation or out sick or whatever.
23   Q.   Do you believe that t's fair for an employer to have
24   an expectation of the amount of work that should be
25   completed within a certain amount of time?

34 (Pages 130 to 133)

## Page 134

1    MS. JACKSON:  Objection to form of the
2 quest on.  You can answer.
3    A.  I do.
4    Q.  Does an employer have the right to try to limit the
5 overtime that employees receive?
6    MS. JACKSON:  Objection to the form of
7 the question.  You can answer.
8    A.  I believe if somebody is just riding the clock, and
9 that is apparent, then yes, I think the employer has the
10 right to counsel them and talk with them and see if that
11 is the case.  But I think when someone is honestly working
12 and doing the job that they are expected to do, and are
13 directed to do, then I think that person is justified in
14 expecting compensation.
15    Q.  Now, you were working extra shifts as an LPN while
16 you were working as a director of medical records, right?
17    A.  That's correct.  And that takes away from the time
18 you have for that position, to complete the work
19 associated with that.
20    Q.  And nobody required you to pick up those extra
21 shifts, correct?
22    A.  No, that is not correct.
23    Q.  So you were told that you must take extra shifts?
24    A.  Yes.  We were told that we had to work certain shifts
25 when we were short nurses on the floor.  If the nurses

## Page 135

1 were going into overtime, yes, we would be told that we
2 had to come and take a cart and work the floor, so that
3 those nurses could cut down part of the overtime those
4 nurses were receiving, yes.
5    Q.  So that would cut down their overtime and give the
6 overtime to you?
7    A.  Or we would be pulled from our department and made to
8 work those shifts, and be expected to not have overtime.
9    If a nurse, for instance, if they were looking at a
10 nurse that was going to have two or three hours of
11 overtime, they would come and pull one of us, one of the
12 department heads.  And at the time t was Stephanie
13 Jackson, Natasha, Terri and myself that would be pulled to
14 work the floor.  And that time would be taken out of our
15 time for our jobs, and no one would be paid overtime for
16 that.  Then we would be expected to somehow do the extra
17 work in our pos t ons w thout overtime.
18    Q.  So in the situat ons where you worked extra shifts,
19 and you had a 50 or 60 hour work week, that was paid?
20    A.  That the overtime was paid?
21    Q.  Yes.  Are you still claiming that you worked another
22 20 to 25 hours off the clock?
23    A.  Yes.  I would come in -- if I worked extra shifts
24 through the week to get everything done, when I was not
25 working at Westwood, t was not unusual for me to come in

## Page 136

1 on the weekend and do work to keep my department going
2    Q.  So in that week you would say that if you reported 65
3 hours, that would be an 85 or 90 hour week, correct?
4    A.  And I have done that frequently.
5    Q.  How frequently would you say you worked a 90 hour
6 work week?
7    A.  90 hour work weeks, probably 60 hours was more
8 frequent there.  Because when we had good staffing, we
9 weren't required on the floor as much.  Those were
10 occas onal.
11    But if you go back and check my work history
12 throughout, even when I was working the floor as a nurse,
13 and Lauren can attest to t too.  But I frequently would
14 work doubles to help out and cover shifts.  And when
15 you're working doubles, and then helping cover 12 hour
16 shifts, t's not unusual to have a 90 hour work week.
17    Q.  I'm just wondering if you're working 90 hours, where
18 are you finding the time to work off the clock, where is
19 that coming from?  If you're on the clock working another
20 shift, how are you also working off the clock for your
21 director of medical records job?
22    A.  If I was working 90 hours -- are you saying 90 hours
23 per week or are you looking at pay periods, because we're
24 working a two week pay period.
25    Q.  I'm asking you about each week.  What your complaint

## Page 137

1 says is that you're scheduled to work 40 hours.  You
2 weren't entitled to overtime.  But you really worked 60 to
3 65 hours, meaning that starting in the summertime of 2011,
4 that you were working 20 to 25 hours off the clock to
5 support the records department.  But your time records
6 demonstrate that you were already receiving significant
7 amounts of overtime that were recorded hours.
8    So I'm wondering are you saying that on those heavy
9 work weeks, where you got all these recorded hours, that
10 you also worked 20 to 25 hours that weren't recorded?
11    A.  It was quite possible and very frequent that that did
12 happen.  As I sa d, those periods of working the floor
13 could have taken place on Saturday and Sunday, when I
14 wasn't working medical records.  And if you stay an
15 average of 5 hours per night over, and you do that three
16 to four times a week, that's an average of 20 hours a
17 week, in addit on to the doubles that you work as a nurse.
18    Q.  Okay.  So when you were working -- how many hours
19 were you working at Westwood?
20    A.  I normally worked there just Saturday and Sunday.
21    Q.  And that was pretty much all day Saturday and Sunday?
22    A.  Sometimes t was.  Sometimes it was a 24 hour shift.
23 I've left my shift at Westwood and come back to North
24 Hills, and worked in the office to get things caught up.
25    Q.  So if you worked a 32 hour shift over the weekend at

35 (Pages 134 to 137)

Page 138

1   Westwood, you would also on top of that go back to work at
2   North Hills?
3   A.   Not on that weekend.  I would have worked during the
4   week.  While I occasionally worked through the week at
5   Westwood, primarily I worked North Hills through the week
6   and then did my shifts at Westwood.
7   Q.   And what's the most number of hours you've worked in
8   a work week?
9   A.   In one week?
10   Q.   Yes.
11   A.   I have worked 7 times 16 is my maximum that I've ever
12   worked.
13   Q.   So 112 hours?
14   A.   I've done that.
15   Q.   So at Westwood, you were there from August of 2011 to
16   January of 2012, correct?
17   A.   That sounds right.
18   Q.   And during that time frame you were working 24 to 32
19   hours, correct?
20   A.   Some weekends.  Some weekends  t was 16.  The number
21   of hours that I worked at Westwood varied.
22   Q.   So between 16 and 32 hours?
23   A.   Correct.
24   Q.   You testified before that you may have worked as many
25   as 40 hours, correct?

Page 139

1   A.   When I first started, they were so understaffed that
2   at times I did work.  Occasionally I would go in and work
3   7:00 p. to 11:00 to help them out.
4   Q.   So during the time that you were working at Westwood,
5   are you still claiming that, because that was after the
6   summer of 2011, that you also worked 20 to 25 hours off
7   the clock on top of whatever hours you recorded at North
8   Hills?
9   A.   Occasionally, yes.  Because there again, if you
10   worked three days, and you put in an extra 7 hours, wh ch
11   can be done, then you've got your 20 hours.
12   Q.   So when you say, occas onally, how frequently would
13   you work at Westwood, North Hills where you recorded time,
14   and then another 20 to 25 hours off the clock at North
15   Hills?
16   A.   On a weekly basis I worked hours at both of them.
17   Q.   So by, occasionally, you mean every week 20 to 25
18   hours?
19   A.   At North Hills?
20   Q.   Yeah.
21   A.   Yes.
22   Q.   Even while you were at Westwood, right?
23   A.   When I was working weekends at Westwood, it was not
24   unusual for me to work four nights after my shift, after I
25   clocked out at North Hills, sometimes five.

Page 140

1   Q.   I'm trying to make sure.  It's a lot of hours.  We're
2   going to add  t up in a minute.
3      So you were working a minimum of full-time at North
4   Hills, often more than full-time, that you were recording
5   your work, correct?
6   A.   There were times, yes, that I worked more than 40
7   hours a week.
8   Q.   That was recorded?
9   A.   That was recorded.
10   Q.   And then you were working somewhere between 16 and 40
11   hours at Westwood on top of that, correct?
12   A.   For the most part at Westwood, I only worked 32 hours
13   at the most.  Other than a week or two at the beginning of
14   August, I d dn't work at Westwood through the week.
15   Q.   So how frequently was  t a 32 hour work week versus a
16   16 hour work week at Westwood?
17   A.   Probably two weekends a month were defin tely 32.
18   The other two weekends it would have been somewhere around
19   16 maybe.
20   Q.   So you were averaging 24 hours?
21   A.   Be a good average, yeah.
22   Q.   So the full-time that you were recording at North
23   Hills, more than 40, we'll look at the records to find out
24   how many hours, plus on average another 24 at Westwood,
25   plus another 20 to 25 that you were working but not

Page 141

1   recording; is that accurate?
2   A.   Somewhere around 80 or 90 hours a week as an average,
3   yes.
4   Q.   And how long were you working an average of 80 or 90
5   hours a week?
6   A.   From August of 2011, until I left in February of
7   2012.
8   Q.   And that was okay with you?
9   A.   What do you mean?
10   Q.   You were --
11   A.   You do what you have to do.  It is not infrequent,
12   but I have worked that way, and it is not unusual.  You
13   can check with any of my employers.  You can check with my
14   employers, and you will find that it is not uncommon for
15   me to work those numbers of hours.
16   Q.   But what I'm asking is you're working 20 to 25 hours
17   without getting paid for that time.  And you know better
18   than anyone, that that's not lawful because you ran your
19   own company, and you communicated with the Department of
20   Labor, right?
21   A.   Correct.
22   Q.   About wage and hour rules, right?
23   A.   Correct.
24   Q.   And yet,  t sounds like you willingly worked 20 to 25
25   hours off the clock a week for a six month period or so

36 (Pages 138 to 141)

## Page 142

1  without complaining.  And my question is why, why would
2  you do that?
3  A.  Because I was very dedicated to North Hills.  We were
4  going through a transition.  I walked into the department
5  that was in a mess.  And it was a good year behind in the
6  filing.  And I was dedicated to trying to get the position
7  to where t should be.  Because I was very dedicated to
8  North Hills.  I was dedicated to our residents.  I was
9  dedicated to our staff.
10     And I believe that you should do what you can.  And I
11  also felt like that if the job wasn't done and it wasn't
12  brought up, that I would lose the position.  And I did not
13  want to lose the position.
14  Q.  And that's not based on anything anybody told you,
15  that's just what you were concerned about, correct?
16  Nobody threatened your job, you testified that way before,
17  right?
18  A.  They didn't threaten my job.  But I knew that if the
19  job wasn't done that people had been let go, because they
20  didn't feel like they were doing it properly.
21  Q.  Nobody told you that if you didn't perform work off
22  the clock your job would be terminated, correct?
23  A.  No, they did not.  The work is expected to be done,
24  and you cannot have overtime.
25          (Defendant's Exhibit 6 was marked.)

## Page 143

1  Q.  I'll hand you what has been marked as Exhibit Number
2  6, which is a declarat on from Abra Pumphrey.
3  A.  Okay.
4  Q.  Have you seen this document before?
5  A.  No.
6  Q.  And Ms. Pumphrey was the director of nursing when yo
7  were there, correct?
8  A.  That is correct.
9  Q.  I'm going to turn your attention to paragraph 6.
10  North Hills is diligent about ensuring proper coverage
11  when nurses take their meal breaks.  Our pract ce is for
12  other nurses to cover for the nurses who are taking their
13  meal break.
14     Do you agree with that statement?
15  A.  No, I do not.
16  Q.  So in your experience at North Hills, t was not the
17  practice for nurses to cover for other nurses to take a
18  meal break?
19  A.  No, it was not.
20  Q.  We have more nurses staffed than the minimum staffing
21  census ratios required by the State of Arkansas.
22     Do you agree with that?
23  A.  I am not sure what the minimum staffing rat os are.
24  Q.  Do you have any reason to believe that that statement
25  is not true?

## Page 144

1  A.  No.  I believe that they probably do staff according
2  to minimum staffing number ratios.  But as I stated
3  before, numbers don't always translate to the acu ty of
4  the patients.  So based on numbers, they probably do.
5  Q.  The ratio here is much higher (i.e. more nurses per
6  patient) than the other long term health employers I've
7  worked for, which makes it very easy to have adequate
8  staffing to allow our nurses to get all of their full,
9  paid and unpa d breaks without interruption.
10     Do you agree with that?
11  A.  No.
12  Q.  So your experience is different than what she's
13  describing, correct?
14  A.  That's correct.
15  Q.  For example, a minimum of two CNAs are scheduled to
16  be on each hall during each shift.
17     Do you disagree with that?
18  A.  I believe that's what the ratio was.
19  Q.  When one of them would take their lunch break, the
20  other would stay on the floor.
21     Do you agree with that?
22  A.  Yes.
23  Q.  If a task that required a two-person assist arose
24  while one of the CNAs was on their meal break, someone
25  from a different floor would come over to help to ensure

## Page 145

1  that the CNA on break was not interrupted.
2     Do you agree with that?
3  A.  No.
4  Q.  I frequently communicate to the employees that I
5  supervise that it is important for them to take their
6  full, uninterrupted breaks.
7  A.  No.
8  Q.  That was not true for you?
9  A.  No.
10  Q.  So to the extent that's true for somebody else, they
11  would be different than you, correct?
12  A.  That's not what I experienced, no.
13  Q.  So if somebody else did experience that, they would
14  be different than you, correct?
15  A.  That is correct.
16  Q.  I want to ask you to put that aside for just a
17  minute.
18          (Defendant's Exhibit 7 was marked.)
19  Q.  I'll hand you what's been marked as Defendant's
20  Exhibit Number 7.  Do you know what that is?
21  A.  A description of job duties.
22  Q.  Is that your description of job duties from your time
23  as an LPN at North Hills?
24  A.  Yes.  This is the one filled out at the time of
25  orientation and placed in the packet.

37 (Pages 142 to 145)

Page 146

1  Q.  Is that your signature there?
2  A.  It is.
3  Q.  And that's dated 4/21/2010, correct?
4  A.  Yes.
5  Q.  Look at the last page.  That's your signature as
6  well, right?
7  A.  Yes, it is.
8  Q.  And your job position on the first page says, The
9  primary purpose of your job position is to provide direct
10  nursing care to the patients and to supervise the
11  day-to-day nursing activities performed by nursing
12  assistants.
13      Is that true?
14  A.  Yes.
15  Q.  Such supervision must be in accordance with the
16  current federal, state and local standards, guidelines and
17  regulations that govern our facility.
18      Is that true?
19  A.  That's correct.
20  Q.  Under administrative functions, it says that you are
21  to direct the day-to-day functions of the nursing
22  assistants in accordance with current rules, regulations
23  and guidelines that govern a long term care facility,
24  correct?
25  A.  That's correct.

Page 147

1  Q.  And that was one of your responsibilities?
2  A.  Yes.
3  Q.  And you agree that that's something that you
4  performed?
5  A.  Yes.
6  Q.  You are also to ensure that all nursing personnel
7  assigned to you comply with written policies and
8  procedures established by the facility.  Is that correct?
9  A.  Yes.
10  Q.  Is that something that you did?
11  A.  To the best of my ability, yes.
12  Q.  And looking down about two-thirds of the way down on
13  that bullet list.  You are also to interpret the
14  department's policies and procedures to personnel,
15  patients, visitors and government agencies as required,
16  correct?
17  A.  Which one again?
18  Q.  It's the 6th bullet point up from the bottom.
19  A.  Okay.
20  Q.  Is that your responsibility?
21  A.  According to this, it is.
22  Q.  And this is something that you signed, right?
23  A.  I did.  I signed this during orientation when we
24  signed lots and lots of papers.
25  Q.  Let's go to the acknowledgement.  It says, I have

Page 148

1  read the job description and fully understand the
2  requirements set forth herein.
3      Do you see that language?
4  A.  I do.
5  Q.  Would you sign something that you didn't agree with?
6  A.  No, I would not sign something I didn't agree with.
7  I'm just saying that I did interpret the department's
8  policies and everything to the best of my ability.  Yes, I
9  did do that.
10  Q.  Would you ever sign something that wasn't true?
11  A.  No, not knowingly.
12  Q.  So under personnel functions, do you see that?  I
13  think it's page 2.
14  A.  Okay.
15  Q.  Did you ever participate in employee performance
16  evaluations?
17  A.  I don't remember ever doing so.
18  Q.  Was it your responsibility to inform the director of
19  nursing services of staffing needs?
20  A.  Yes.  If we had call-ins and everything, we were to
21  call and notify whoever was on-call and different things
22  of that nature, yes.
23  Q.  Was it your responsibility to develop work
24  assignments and assist in completing performing such
25  assignments?

Page 149

1  A.  Yes.  I had responsibility for assigning CNAs to
2  various halls and making sure that everyone was on their
3  hall.
4  Q.  And you were also required to provide leadership to
5  nursing personnel assigned to your unit and shift, right?
6  A.  That's correct.
7  Q.  And when they're talking about nursing personnel,
8  those are CNAs, correct?
9  A.  I believe that includes nurses and CNAs.
10  Q.  And CNA means certified nursing assistant, correct?
11  A.  Right.
12  Q.  They were reporting to you as the charge nurse?
13  A.  The ones on my hall reported to me.
14  Q.  Meet with your shift's nursing personnel on a regular
15  scheduled basis to assist in identifying and correcting
16  problem areas and/or improve services.
17      Was that one of your responsibilities?
18  A.  Yes.
19  Q.  And were you also required to ensure that the
20  department personnel, patients and visitors follow the
21  department's established policies and procedures and all
22  times?
23  A.  To the best of my ability I did, yes.
24  Q.  Were you required to review complaints and grievances
25  made or filed by your assigned personnel?  That's a few

38 (Pages 146 to 149)

## Page 150

1  bullets down.
2  A.  If they brought them to me I reviewed them.  They did
3  not always have to bring them directly to me.  They could
4  go to -- they could take grievances and things directly to
5  the director.
6  Q.  Stay on that page for a minute.  You were also
7  required to follow the facility's established procedures,
8  correct?
9  A.  Correct.
10  Q.  Let's look at staff development functions.
11  A.  Okay.
12  Q.  You were to maintain, it's the second bullet, an
13  effective orientation program that orients the new
14  employees of their shift, policies and procedures and his
15  or her job position duties, correct?
16  A.  They did not actually have us do that.  They had
17  staff development, and they did not actually include us in
18  that.  They had an orientation program that the people
19  went through and everything.  Then they were assigned to
20  the various halls.  And we were just utilized to supervise
21  them and make sure that they were doing their assigned
22  duties.
23  Q.  Let's turn back to Exhibit Number 6, paragraph number
24  7.  Are you there?
25  A.  Yes.

## Page 151

1  Q.  This relates to LPNs.  Tell me if this is accurate or
2  not.  LPNs typically take meal breaks during the first
3  three to five hours of their shift.  These breaks are not
4  scheduled at a set time.
5  A.  That's correct.
6  Q.  Rather, the LPNs work out their own coverage system
7  to ensure each of them receives a meal period this is at
8  least 30 minutes and uninterrupted.
9  A.  It was left up to the LPNs to try to work something
10  out to get coverage, yes.
11  Q.  So would the ability to get a 30 minute,
12  uninterrupted meal period depend somewhat on the system
13  that the LPNs, a particular LPN worked out with their
14  fellow nurse?
15  A.  It would also depend on whether or not anyone is
16  available to cover for them.
17  Q.  And how much they tried to get coverage, correct?
18  A.  I'm sure.
19  Q.  The meal break times for CNAs are posted each day for
20  them to review when they arrived at work.
21      Is that true?
22  A.  I believe the lead CNA did post that.
23  Q.  So you didn't actually post --
24  A.  I did not post it, no.  I was not responsible for
25  that.  There was a lead CNA that did the scheduling for

## Page 152

1  CNAs, and did their hall assignments, and scheduled their
2  breaks and lunch breaks and all of that.
3  Q.  Skip down a couple of sentences.  Other employees
4  take more than a half hour break.  And then it identifies
5  the employees.  These employees include my nurse manager,
6  such as the ADON, the long term care coordinator, the
7  medical records manager, the Medicare manager, the
8  director of nursing and the wound care treatment nurse,
9  who occasionally take one hour meal breaks.
10      Were you aware of that policy?
11  A.  Yes.  There again, especially when we had something
12  going on.  If we were in meetings, or if they had catered
13  lunches, and we were in lunch and doing things, and it
14  took more than 30 minutes, they didn't have any complaints
15  about that.
16  Q.  And you would sometimes take an hour for your meal
17  periods, correct?
18  A.  I have occasionally taken an hour, yes.
19  Q.  How frequently would you say you've taken an hour
20  meal period?
21  A.  Less than 2 percent of the time that I worked there,
22  unless it was a specific time that I clocked in and out.
23  Q.  How often do you think you clocked in and out for a
24  meal period of an hour or longer?
25  A.  I rarely left the facility.  So I rarely clocked in

## Page 153

1  and out.
2  Q.  How many times would you say that you did?
3  A.  Maybe a half dozen.
4  Q.  Look at paragraph 8.  Carrolyn Campbell was employed
5  when I was DON.  I was aware that she regularly took her
6  meal breaks.  I observed her having lunch with her husband
7  about three times a week.
8      Is that true?
9  A.  No, it is not.
10  Q.  So you contest that you had lunch with your husband
11  about three times a week, correct?
12  A.  I absolutely do.
13  Q.  Most of the time that Ms. Campbell worked at North
14  Hills, her husband was unemployed, so it was a very common
15  occurrence for him to join her during her lunch break.
16  Sometimes they would eat outside, at a table or bench near
17  the door to the 300 hall, which is the Med care hall,
18  sometimes they would eat at a table in the 300 hall, and
19  often, they would eat in his truck, which would be parked
20  outside the therapy window in 300 hall.
21      Is that true?
22  A.  We would occasionally, but not three times a week,
23  no.
24  Q.  How frequently would you say?
25  A.  He came occasionally.  He did not even come weekly.

BUSHMAN COURT REPORTING
501.372.5115

Page 154

1  Like I said, there was a period of almost a year that we
2  were separated, and he didn't come at all.  He was in
3  Oklahoma City.
4    Q.   I want to talk about the policies and training now.
5  Let's start with paragraph 9.  Did you understand that
6  North Hill's policies require that employees accurately
7  report all hours worked in the pay period for which they
8  worked?
9    A.   I never saw anything pertaining to that.  I was just
10  shown how to clock in and out.
11    Q.   So you did not know that the employees are supposed
12  to accurately report all their hours worked?
13    A.   I know that you were supposed to clock in and out for
14  the way you were working.  That was what I was shown
15  during orientation.
16    Q.   Did you understand that that clocking in and out was
17  supposed to be for all the hours that you worked, as
18  opposed to some of them?
19    A.   Until I took the medical director position, when I
20  was specifically told that it had to be completed, but I
21  was told not to work more than 40 hours.  Because Lauren
22  would regularly come down to the department, and if we had
23  15 minutes overtime, she would say, You need to be sure
24  you clock out so that you're not in overtime.
25    Q.   You understood that the facility policy was that you

Page 155

1  were to have accurately clocked in and out to record all
2  your time worked, correct?
3    A.   That is what this says the facility policy was.
4    Q.   I'm asking you.  You told me that that was your
5  understanding.
6    A.   What was covered in orientation was how you clocked
7  in and out.
8    Q.   Did you understand --
9    A.   No, I did not.
10    Q.   So you didn't know --
11    A.   I did not have anything that stated what this states,
12  no.
13    Q.   Let me just make sure I understand your testimony.
14  You did not know --
15    A.   I never saw --
16    Q.   Let me finish the question.
17         MS. JACKSON:  Let him finish the
18  question.
19    Q.   You didn't have any idea that the company expected
20  you to clock in at the time you actually started working,
21  and clock out at the time you actually finished work, you
22  didn't know you were supposed to report all your working
23  time; is that your testimony?
24    A.   Yes, we were supposed to clock in when we began and
25  clock out at the end, yes.

Page 156

1    Q.   And you knew it was the facility policy that you were
2  supposed to record all that working time, correct?
3    A.   Correct.
4    Q.   And is it your testimony that that policy changed, or
5  you just didn't follow the policy when you believe that
6  you were instructed informally to work off the clock?
7    A.   I was instructed informally to complete assignments
8  and not to have overtime.  Which resulted in my
9  understanding that if I wanted to maintain my position,
10  that I had to do the work they assigned and complete it,
11  but that I was not to work overtime.  I was not under the
12  impression that company policy had changed, no.
13    Q.   So you knew that that instruction was in violation of
14  company policy, correct?
15    A.   Correct.
16    Q.   And did you understand that you, back to paragraph 9,
17  that you're required to take a 30 minute, uninterrupted
18  meal break?
19    A.   No.
20    Q.   So you had no understanding that company policy was
21  that you were to take a 30 minute uninterrupted meal
22  break?
23    A.   No.
24    Q.   You understood that you were not to work off the
25  clock, correct?  That's the equivalent of number 1.  If

Page 157

1  you knew that you had to record all your time, then you
2  also knew that you weren't allowed to work off the clock,
3  correct?
4    A.   Yes.
5    Q.   You understand that the company policy was for you to
6  receive overtime compensation for all hours worked over 40
7  in a work week, correct?
8    A.   Yes.
9    Q.   And you understood that you were subject to
10  discipline for violating the policy and practice, correct?
11    A.   No.
12    Q.   So you thought that you could work off the clock
13  without discipline?
14    A.   Yes.
15    Q.   And you thought that was the company policy?
16    A.   Yes.
17    Q.   And you thought that at the time you started working
18  there?
19    A.   It really didn't come into play until later in my
20  position.
21    Q.   But that was your understanding, is that the company
22  would not discipline you for working off the clock when
23  you started working, right?
24    A.   Yes, that was my understanding.
25    Q.   And that wasn't based on anything anybody told you,

**BUSHMAN COURT REPORTING**
**501.372.5115**

Page 158

1    that's just what you thought?
2    A.   Yes.
3    Q.   Who conducted your orientat on?
4    A.   I do not remember her name.  She was there as
5    assistant director of nursing for a short period, and she
6    left soon after I was hired.
7    Q.   Look at paragraph 10.  Ms. Pumphrey explains that she
8    instructs employees that she supervises on days that they
9    work more than five hours or more, they're required to
10   take a 30 minute, uninterrupted meal break.
11       Did you receive that instruction?
12   A.   No.
13   Q.   I instruct employees I supervise to take their 30
14   minute unpaid meal breaks to perform work related
15   activities only when scheduled (and to record their own time
16   if they work during times other than scheduled hours so
17   that they are paid for that time), and to properly record
18   their accurate time worked.
19       Did you receive that instruction?
20   A.   No.
21   Q.   So anybody who did receive that instruct on would be
22   different than you, correct?
23   A.   Correct.
24   Q.   Look at paragraph 11.  At North Hills, starting at
25   their orientation, each new employee is trained on the

Page 159

1    pol cy that everyone is to take a meal break during any
2    shift that lasts longer than five hours.
3        Was that covered at orientat on?
4    A.   No.
5    Q.   New employees are shown the breakrooms during thei
6    initial training.
7        Were you shown the breakroom?
8    A.   Yes.
9    Q.   We also frequently discuss the top c of timekeeping,
10   recording all hours worked, and ensuring that everyone
11   takes at least a 30 minute, uninterrupted meal break every
12   day.
13       Do you remember any of those communications?
14   A.   No.
15   Q.   This is a point of emphasis that is discussed in
16   inservice trainings and in other staff meetings.
17       Is that true?
18   A.   No.
19   Q.   Have you ever conducted any of these staff meetings
20   and the training?
21   A.   I didn't.
22   Q.   Look at paragraph 12.  As the DON, I instruct my
23   employees to take at least a 30 minute, uninterrupted and
24   continuous meal break, and to fill out a time adjustment
25   form when he or she is unable to take an uninterrupted 30

Page 160

1    minute meal break.
2        Is that consistent with the training that you
3    received?
4    A.   No.
5    Q.   What training d d you receive on the time adjustment
6    forms?
7    A.   We were shown how to fill out a time adjustment form
8    if the time clock wasn't working, or if for some reason we
9    forget to clock in and out.
10   Q.   Have you ever heard of a time adjustment form being
11   associated with a missed meal period?
12   A.   No.
13   Q.   And that's at anytime of your employment, correct?
14   A.   No.  Currently my employer has one posted by the time
15   clock.
16   Q.   I'm talking about North Hills.
17   A.   I'm sorry.  No.
18   Q.   So as far as you understood, time sheet adjustment
19   forms were never to be used for meal breaks, correct?
20   A.   Correct.
21   Q.   Look at paragraph 13.  The employees who report to me
22   at North Hills are required to certify on a daily basis
23   that the time they have recorded is accurate by signing or
24   initialing the master log.
25   A.   That's the sign-in sheets that we signed, yes.

Page 161

1    Q.   Were you required to do that?
2    A.   Yes.  We signed in and out on the daily staffing
3    logs.
4    Q.   My employees are also required to review their
5    reported time each pay period, and certify that the time
6    is accurate before  t's released by payroll.
7        Is that something that you did?
8    A.   Yes.  And Brenda would have us look over the time
9    sheets.
10   Q.   And did you have the CNAs that you supervised do that
11   same thing?
12   A.   No, that was not my responsibility.  Brenda in human
13   resources took care of all the paper.
14   Q.   This includes a review of all meal periods reportedly
15   taken, correct?
16   A.   I'm sure  t does.
17   Q.   If there are any incorrect punches or meal per ods,
18   the employee is required to report the error so that it
19   can be corrected.
20       Is that accurate?
21   A.   No.
22   Q.   Explain that?
23   A.   No one ever sa d anything about d d you clock in and
24   our for lunch, or did you miss lunch, or anything of that
25   nature.  She was more -- they were more concerned about

41 (Pages 158 to 161)

Page 162

1   had you clocked in and out correctly, and did you have all
2   of that correct, rather than having missed a punch or
3   something of that nature.
4   Q.   So just to be sure that I understand your testimony.
5   Are you saying that when you were certifying the accuracy
6   of your time records, that did not include the accuracy of
7   the meal periods?
8   A.   Correct.
9   Q.   Look at paragraph 16.  Ms. Pumphrey explains, I have
10  never pressured anyone else to work through his or her
11  meal period without reporting it.
12       Do you agree with that or disagree?
13  A.   I disagree.
14  Q.   How so?
15  A.   Ms. Pumphrey has called people back to the nurse's
16  station to cover and take care of things.  And has said,
17  If they are in the building, they need to come and take
18  care of this.
19  Q.   Do you know if she paid them for that time?
20  A.   I do not.
21  Q.   It says, I've never pressured anyone to work through
22  their meal period without reporting it.
23       That's an important caveat to that statement.  Do you
24  have any knowledge that Ms. Pumphrey had pressured
25  somebody to work through meal periods without reporting

Page 163

1   the work?
2   A.   No, I do not know that she pressured anyone.
3   Q.   Look at paragraph 17.  Any North Hills employee can
4   call a toll free number to complain anonymously about
5   issues or concerns, including issues or concerns related
6   to compensation or wage and hour matters.
7       Were you aware of that?
8   A.   No, I was not.
9   Q.   So you didn't know that there was an anonymous or
10  toll free number that you could call and make anonymous
11  complaints?
12  A.   I did not.
13  Q.   In addition, North Hills displays posters on bulletin
14  boards reminding employees of the various employment and
15  labor laws, including the fact that employees are entitled
16  to be paid for all hours worked and overtime worked.
17       And these posters that you have said that you've
18  seen, correct?
19  A.   Yes, there are posters in the building.
20  Q.   During my employment as the DON, I have not
21  instructed or encouraged any current or former North Hills
22  employees to work off the clock, work through meal breaks
23  without compensation, falsely report more or less working
24  time than they have actually worked, falsely report more
25  or less overtime than they have actually worked,

Page 164

1   incorrectly or incompletely report meal breaks or fail to
2   reported missed or interrupted meal breaks.
3       Has anybody given you any of those instructions that
4   you should do those things?
5   A.   Yes, Abra did.
6   Q.   She said to you work off the clock?
7   A.   She did not say work off the clock.  She was aware
8   that I had to work off the clock to complete the
9   assignments.
10  Q.   So your evidence in contradiction to paragraph 18,
11  would be the time that you said that you clocked out, and
12  you believe she observed you doing that, correct?
13  A.   Yes.
14       MR. SPINOLA:  Let's take a break.
15       MS. JACKSON:  Okay.
16       (A recess was had.)
17  Q.   (BY MR. SPINOLA)  Ms. Campbell, you had an
18  opportunity to take a break.  Is there anything about your
19  testimony that you want to change or clarify?
20  A.   No.
21  Q.   Have you told me the truth to the best of your
22  ability today?
23  A.   Absolutely.
24       (Defendant's Exhibit 8 was marked.)
25  Q.   I've handed to you what has been marked Defendant's

Page 165

1   Exhibit number 8, which is the declaration of Tiffany
2   Stills.
3   A.   Yes.
4   Q.   Do you know Tiffany Stills is?
5   A.   She was the assistant director of nursing for part of
6   my employment there.  She was the wound care nurse when I
7   was originally hired.
8   Q.   And what does a wound care nurse do?
9   A.   She did the treatments for patients that had various
10  skin conditions, wounds, injuries, things of that nature.
11  She took care of that.  And then after she -- when she --
12  she left that position and became our assistant director
13  of nursing.
14  Q.   Are you familiar with her story, how she came to work
15  at North Hills, did she ever share that with you?
16  A.   No, I don't recall that she did.
17  Q.   Let's look at paragraph 4.  I have been a nurse for
18  26 years, and have worked in long term care most of that
19  time.  I have worked for previous long term care
20  providers, and eventually I got burned out with my career
21  in long term care.  Before I came to work for North Hills,
22  I was considering leaving the field of long term care, and
23  was thinking of applying for a job in Walmart's optical
24  lab.  My previous employers often required their employees
25  to work long shifts without taking adequate breaks, and I

Page 166

1   would sometimes work 12 hour shifts or longer without
2   enough of a break.  I didn't feel like many of my prior
3   employers cared enough about their employees or put them
4   first.  Despite my reluctance to continue a career in long
5   term care, my husband suggested that I apply for a job at
6   North Hills.  And one day when I was driving by, I stopped
7   in to apply.  When I walked in, I saw three people that I
8   used to work w th at other facil ties who were now working
9   at North Hills.  This place is different from any other
10  long term care facil ty where I have worked.  Since I came
11  to work for North Hills, I have been impressed with the
12  fact that the culture is so different here.  North Hills
13  cares about ts employees and my work experience here is
14  completely different than anywhere else I have worked.
15      Do you have any reason to disagree with Ms. Still's
16  statement there?
17  A.   No.  I don't know where else she worked.  I have no
18  -- everyone's experience is individual.  And I have no
19  reason to disagree with that.
20  Q.   And you don't doubt that what she's saying is true?
21  A.   I have no reason to doubt that what she's saying is
22  true.  She apparently had a very good experience at North
23  Hills.  And everyone's experience is individual.
24  Q.   And she no longer works at North Hills, correct?
25  A.   I have heard that.

Page 167

1   Q.   She states, As the ADON for North Hills, I directly
2   supervised between 90 to 100 employees.  I supervise
3   certified nursing assistants, licensed pract cal nurses,
4   our wound care treatment nurse, charge nurses and other
5   employees.  One of the employees that I supervised was
6   Carolyn Campbell when she worked as an LPN.  One of my
7   responsibilities is to ensure to all of the employees I
8   supervise clock in before they do any work, clock out at
9   the end of their shift, and take their full, uninterrupted
10  meal break.
11      Do you agree with that?
12  A.   I honestly do not know what her duties were.
13  Q.   I have always taken this responsibility ser ously and
14  done my best to ensure the employees I supervise do not
15  work off the work.
16      Do you have any reason to doubt that?
17  A.   Yes, I do.
18  Q.   And what is that?
19  A.   There again, Tiffany was frequently in my off ce
20  after hours, and knew that I was in there working off the
21  clock.
22  Q.   And how would she know that?
23  A.   Because she too had access to the time sheets, and
24  knew that we were -- she could check the hours, and she
25  knew how many hours I put in on a weekly basis.

Page 168

1   Q.   And do you know if she ever d d that?
2   A.   I don't know.  I know that she had access to do that,
3   but I don't know if she ever did it or not.
4   Q.   Access is different than knowledge, correct?
5   A.   I know that she had -- she knew that I was there.
6   Now, whether or not she checked the time sheets I don't
7   know.
8   Q.   Okay.  As an LPN, I learned that North Hills is
9   diligent about ensuring proper coverage when nurses would
10  take their meal breaks.  It was common pract ce for other
11  nurses to cover for someone who was taking their meal
12  break.  At the time, the typical staffing rat o was three
13  LPNs and 8 to 10 CNAs scheduled for each shift.
14      Is that accurate?
15  A.   That sounds about right.
16  Q.   One of the things I love about North Hills is that we
17  were perm tted and expected to have more nurses staffed
18  than the minimum staffing to census ratios required by the
19  State of Arkansas.
20      Do you know that to be true?
21  A.   I don't know the -- again, I don't know the
22  exact numbers.  So I don't know if they are staffing that
23  much above state regulations or not.
24  Q.   Do you have any reason to doubt Ms. Stills'
25  truthfulness?

Page 169

1   A.   Yes, I do.
2   Q.   And what is that?
3   A.   Just that Ms. Stills was not always truthful about
4   the things that she said and did.
5   Q.   And what --
6   A.   During my employment there.
7   Q.   And what d d Ms. Stills lie about, in your opin on?
8   A.   Ms. Stills was one that she would tell you what you
9   wanted to hear, and then she would tell the next person
10  what they wanted to hear.
11  Q.   Do you have any examples of that?
12  A.   Yes.  As a matter of fact, after Ms. Stills left
13  North Hills, she made a phone call and requested the phone
14  number of my attorney, and said, Carrolyn, I did you wrong
15  when you were let go.  I want to make that right.
16  Q.   In what way?
17  A.   I didn't go into it.  I did give her my attorney's
18  phone number.
19  Q.   How d d she say she did you wrong?
20  A.   She didn't go into that.  She just said, I want an
21  opportun ty to make t right.  I did not discuss w th her
22  whether she had spoken to anyone or not.
23  Q.   And when did that call occur?
24  A.   About a month or two ago.  It was when she left North
25  Hills.  She said that -- I know she called me, she had --

Page 170

1  I had heard from one of the rehab people, as I said
2  earlier, they work both at North Hills and at Jamestown.
3  One of them had come over, and in just visiting about who
4  was still at the facility and who wasn't.  She told me
5  that Tiffany had resigned as assistant director of
6  nursing.  And that Stephanie Jackson, who had been the
7  admissions coordinator, was stepping up.
8      And then after that, and again, I don't recall the
9  exact date that she called me, but Tiffany called me, and
10  the position she had taken had not worked out.  They had
11  decided to hire an RN instead of an LPN, as I recall.  And
12  she told me that she had asked Abra and the current
13  administrator, could they not find her a position in one
14  of the facilities on the floor, and had been told, no,
15  that they would not.  And she said -- because she always
16  called me mom, she said, Mom, I did you wrong.  I want to
17  make it right.  I did not know what she -- and she asked
18  for the name of the firm that was representing me, and I
19  did give her that number.
20  Q.  Okay.  Anything else about that conversation you can
21  recall?
22  A.  She told me how her son was doing in football.  Her
23  sonRedacte plays football.  She asked me, since that other
24  position hadn't worked out, if there were any positions
25  available at the nursing home that I was currently working

Page 171

1  at.  And I told her that, at that point in time, we did
2  have positions available, and to come and put in an
3  application.
4  Q.  And did she do that?
5  A.  She has not, to my knowledge.
6  Q.  I asked you earlier about any communications you had
7  about this lawsuit or --
8  A.  In all honesty, I had forgotten about it until I read
9  this.
10  Q.  Are there any other conversations you can recall that
11  you had, that you have not disclosed to me today?
12  A.  I don't remember any.  And if I do remember any I
13  honestly will tell you.
14  Q.  Okay.
15  A.  I had forgotten about that.  She didn't ask anything
16  about the case, but she contacted me again last week to
17  see if there were any positions.  And to my knowledge, she
18  still has not come in.  And she sent me a Mother's Day
19  text wishing me happy Mother's Day.
20  Q.  Okay.  Let's continue on.
21  A.  Okay.
22  Q.  A minimum of two CNAs are scheduled to be on each
23  hall during each shift.
24      And you previously agreed that's true, correct?
25  A.  To the best of my knowledge, we tried to always have

Page 172

1  at least two.
2  Q.  Okay.
3  A.  On 7:00 to 3:00 and 3:00 to 11:00.  I don't believe
4  they staffed two per shift per hall on the 11:00 to 7:00
5  shift.
6  Q.  What did Ms. Stills work, what shift?
7  A.  7:00 to 3:00 primarily.
8  Q.  Okay.  Let's look at paragraph 7.  When I worked as
9  an LPN, I often filled in as a floater when other
10  employees on other floors took their meal breaks, and they
11  filled in for me when I took my meal break.
12      Are you aware that Ms. Stills served as a floater for
13  other employees?
14  A.  I am not aware of that.
15  Q.  Do you have any reason to doubt that's true?
16  A.  I don't.  If she says that she -- I was not aware of
17  it.
18  Q.  We coordinated to cover each other's patients to
19  ensure that the person on break got their break.  This has
20  always been a point of emphasis at North Hills, and we
21  have been told frequently that it is important to get our
22  full, uninterrupted breaks.  As an LPN, my meal breaks
23  were not typically scheduled at a designated time, but the
24  LPNs would usually take meal breaks during the first three
25  to five hours of our shift.

Page 173

1      You agree with that, correct?
2  A.  I'm sorry.  Where are you reading?
3  Q.  Paragraph 7.  Would you agree that meal breaks were
4  typically between the first three to five hours of the
5  shift?
6  A.  Typically that's when you take your break, yes.
7  Q.  Look at the end of paragraph 7.  If I missed a break
8  all together or did not get a meal break, that is at least
9  30 minutes long and completely uninterrupted, I would fill
10  out a time adjustment form, so that I would be paid for
11  the missed or interrupted meal period.
12      That's different than your experience, because you
13  said you didn't understand that the time sheet adjustment
14  form could be used for meal periods, correct?
15  A.  That's correct.
16  Q.  When I moved to the wound care treatment nurse
17  position, I had more control over scheduling my work, and
18  I had more flexibility in determining when I took my meal
19  breaks.
20      Do you have any reason to disagree with that?
21  A.  No.
22  Q.  Would you think that that would be true for a wound
23  care treatment nurse?
24  A.  Yes.
25  Q.  Why is that?

44 (Pages 170 to 173)

## Page 174

1    A.  Because when you are working the floor as an LPN, and

2    you're doing your med pass, long term care gu delines

3    stipulate that you have to complete your med pass in a

4    certain time frame.  That doesn't pertain as much to the

5    treatment nurse getting her treatments done.

6        And normally to avoid that, they will schedule them

7    instead of having a specif c time, like a med might be

8    scheduled at 9 o'clock, they will schedule a treatment, if

9    it's one a day, they will schedule it 7:00 to 3:00, or if

10    it's twice a day they will schedule it 7:00 to 3:00 and

11    3:00 to 11:00, rather than a specific time.  So they're

12    not as bound by that.

13    Q.  Okay.  It seems that what she's saying here is, due

14    to different responsibilities in that position and the

15    predictable schedule for treating patients, my meal breaks

16    were not interrupted.  And I did not miss meal breaks when

17    I worked in that position.

18    A.  That would make sense.

19    Q.  When I would take my meal break, other employees,

20    including Connie Cochran, Suzie Wyeth, Stephanie Jackson

21    or Melissa Page would cover for me.

22        Do you know any of those employees?

23    A.  I know Suzie.  I know Stephanie.  And I believe Page

24    is the last name of the Melissa that worked the 200 hall.

25    Q.  D d any of those --

## Page 175

1    A.  I don't know Connie.

2    Q.  Are those nurses?

3    A.  Yes.

4    Q.  Did any of them cover for you?

5    A.  Occasionally, yes.

6    Q.  Look at paragraph 11.  I want to know if you recall

7    this situation.  It is part of the culture at North Hills

8    to ensure that all employees take their full meal breaks,

9    no matter what.  It is important to North Hills to not

10    only ensure that the employees are paid correctly, but to

11    identify trends or changes within the facility so that

12    North Hills could adjust staffing levels accordingly.

13    North Hills will adjust staffing levels when necessary to

14    ensure that all employees are able to take a meal break.

15        For example, a few years ago, North Hills changed the

16    staffing levels in 100 hall, a busy area of the facil ty,

17    to allow for more nursing coverage in that area.  Before

18    the change, 100 hall was staffed with two CNAs during the

19    day shift.  The level of acute care increased in that

20    location, so North Hills added a third CNA to provide

21    increased coverage.

22        Do you remember that?

23    A.  Yes, I do.

24    Q.  And d d you understand that the reason for adding the

25    third CNA was to allow for increased coverage for the

## Page 176

1    nurses to get their breaks?

2    A.  Adding CNAs would not ensure that the nurses could

3    take their breaks.

4    Q.  Would  t help?

5    A.  It might to some extent.  It would lessen some of the

6    things that you have to do to help the CNAs.  But no, it

7    was because we had a very large increase in acu ty of the

8    patients is why the third CNA was added.  Because we were

9    getting complaints from residents and family members that

10    the residents were not getting proper care.

11    Q.  Do you have any reason to dispute her statement that

12    before the staffing levels increased, I often floated on

13    that floor to cover for meal breaks?

14    A.  She didn't while I worked there.

15    Q.  She did not you're saying?

16    A.  She did not when I worked on that part cular hall,

17    no, she d d not.

18    Q.  When did that change occur?

19    A.  I don't know.

20    Q.  You're not suggesting that she didn't, you're just

21    saying that she d dn't when you were there, correct?

22    A.  Correct.

23    Q.  Okay.

24    A.  I don't know when she d d.

25    Q.  Let's look at paragraph 14.  At North Hills starting

## Page 177

1    at orientat on each new employee is trained on the policy

2    that everyone is to take a meal break during any shift

3    that lasts longer than five hours.

4        You're saying that that did not occur for you,

5    correct?

6    A.  It did not.

7    Q.  As the ADON, and I'm looking at paragraph 16, the

8    second sentence, as the ADON, I would actually fill in

9    myself as a floater whenever necessary to make sure that

10    employees who are on break are not interrupted by patient

11    care needs and get their full breaks.

12        Were you willing to do that same thing for the

13    employees you supervised?

14    A.  Yes.

15    Q.  And d d you do that?

16    A.  Yes.

17    Q.  How frequently?

18    A.  I d dn't necessarily supervise nurses, but I did help

19    work on my halls so that my CNAs could take their breaks.

20    Q.  Okay.

21    A.  I helped my CNAs take their breaks.

22    Q.  How frequently would you cover for a CNA so that he

23    or she could take their break?

24    A.  As frequently as I could, depending on what my

25    workload was.  If it was possible for me to cover for

45 (Pages 174 to 177)

## Page 178

1    them, I did.

2    Q.  How many times would you say you've done something

3    like that?

4    A.  I honestly don't know.

5    Q.  Would it be more than a couple of times a week?

6    A.  Yes.  Because when you only have two CNAs on the

7    hall, you have to help so that they can -- if they're

8    going to get their break.

9    Q.  Okay.  Paragraph 17.  When I was supervising Carrolyn

10    Campbell, I was aware that she regularly took her meal

11    breaks.  She would have lunch with her husband as often as

12    three to five times a week.  For most of that time that

13    Ms. Campbell worked at North Hills, her husband was

14    unemployed, so it was a very common occurrence for him to

15    join her during her lunch break.

16        And you're saying that that occurred, but not as

17    frequently as Ms. Stills says, correct?

18    A.  That's correct.

19    Q.  Almost everyday she would check her cell phone for a

20    text to see if he was going to bring her lunch that day.

21    She would sometimes joke around about how often he would

22    bring her lunch, and would say things like, I don't know

23    how he affords t, but he bought me lunch again.

24    A.  That's absolutely a lie.

25    Q.  That's not true?

## Page 179

1    A.  No.

2    Q.  Okay.  He would bring her lunch which was sometimes

3    in a styrofoam container to the facility, and the two of

4    them would eat together.

5        Is that true?

6    A.  He would sometimes bring me lunch, and often

7    carry-out styrofoam containers.

8    Q.  If she learned that he was going to join her for

9    lunch, she would say something like, I'm going to go hide

10    out there and eat.

11        Is that true?

12    A.  Yes, because you had to hide out to get away from

13    everyone so you could have time to eat.

14    Q.  Okay.

15    A.  But I would told them where I was in case they needed

16    me.

17    Q.  Sometimes they would eat outside at a table or bench

18    near the door to the 300 hall, which is the Med care hall,

19    sometimes they would eat at the table in 300 hall, and

20    often they would eat in his truck, which would be parked

21    outs de the therapy window on the 300 hall.

22        That's correct, right?

23    A.  I don't remember eating in the truck.  I could have.

24    Q.  She also says in paragraph 18 that she's aware you

25    received uninterrupted meal breaks, because I would often

## Page 180

1    cover Ms. Campbell's LPN duties when she would take her

2    lunch breaks.

3        Is that true?

4    A.  No, it is not.

5    Q.  Okay.

6    A.  It's interesting how very similar and the exact

7    wording occurs in these statements.

8    Q.  You think so?

9    A.  Yeah.

10    Q.  Her breaks often lasted more than 30 minutes, and

11    sometimes I would have to go and look for her.

12        Is that true?

13    A.  Absolutely not.

14    Q.  It says she appeared a lot.  Although t is not

15    unusual for an employee to take slightly longer than a 30

16    minute break without alerting someone else that they would

17    be gone for a longer break.  She was often gone for 45

18    minutes or longer.

19    A.  No.

20    Q.  That's not true?

21    A.  That's not true.

22    Q.  Okay.  I would usually go and look for her outs de

23    the 300 hall or call over there, since that's where her

24    and her husband usually ate together.

25        Is that accurate?

## Page 181

1    A.  Never happened to my knowledge.

2    Q.  And none of those allegations were made by Abra,

3    correct?

4    A.  I would have to look back.  I was just saying how she

5    described all of that other.  I d dn't read anything in

6    that one.

7    Q.  Look at paragraph 25 on page 12, the second half of

8    t.  It says, As the ADON, I receive time sheets every

9    couple of days by checking the time clock error sheet

10    against the master log to ensure that my employees have

11    properly entered their time and are being pa d for all

12    hours worked.

13        Were you aware of that practice?

14    A.  No, I wasn't aware she did that.

15    Q.  And for all the times that you worked as an LPN, that

16    would never have --

17    A.  I'm not saying it d dn't happen.  I'm saying that I

18    wasn't aware that she did that.

19    Q.  Yeah.  And my next question is as an LPN, the master

20    log and staffing log would match your time report, because

21    you weren't working off the clock, correct?

22    A.  Correct.

23    Q.  So her doing this would not have provided any

24    indication that you were working off the clock, correct?

25    A.  Correct.

46 (Pages 178 to 181)

## Page 182

1  Q.  And to the extent this was done or attempted to be
2  done when you were working as the director of med cal
3  records, there would be nothing to compare it to, because
4  you didn't sign a log?
5  A.  Correct.  There was no log to sign.
6  Q.  So the only thing you really have is your time punch
7  records, correct?
8  A.  Correct.
9        (Defendant's Exhib t 9 was marked.)
10  Q.  I hand you what's been marked as Defendant's Exhibit
11  Number 9.  It's a declaration from Rebecca Berry.  Do you
12  know who that is?
13  A.  She was a CNA that worked 400 hall.  I think that was
14  -- I think that's who this is.  She was a tall, slender
15  young lady and had darkish brown hair.
16  Q.  Okay.  Did you ever work with her?
17  A.  Yes.
18  Q.  Okay.  Let's look at her statement on paragraph 5.
19  She says she received her orientat on from Brenda
20  Crosswhite, the human resource manager, and shadowed
21  another CNA.  She explained that Brenda explained to me on
22  days I worked more than five hours, I was required to take
23  an uninterrupted meal break of at least 30 minutes.
24      So that's a similar instruction that you said you did
25  not receive, correct?

## Page 183

1  A.  Brenda did not -- correct.
2  Q.  Okay.  To the extent Brenda told Ms. Berry that she
3  was required to take an uninterrupted, 30 minute meal
4  period, that would be a different instruct on than what
5  you received, correct?
6  A.  Correct.
7  Q.  And she also explained, If I was unable to take all
8  or part of my lunch break, or if I forgot to clock in or
9  out, I should fill out a time adjustment form, and I would
10  be paid for all of the time I worked.
11      So you're also saying that you didn't receive that
12  instruction?
13  A.  I did not.
14  Q.  Okay.  And that makes Ms. Berry different than you,
15  correct?
16  A.  Correct.
17  Q.  Look at paragraph 9.  I would like to know for the
18  CNAs you supervised, if this practice of scheduling meal
19  periods was the same as what's described in paragraph 9
20      During the day shift one CNA works the hall while the
21  other two are assigned to work the dining room.  This is
22  on the 400 hall.  Natasha Caswell, the medical manager,
23  schedules meal breaks everyday for the CNAs who worked
24  first shift.  In 400 hall she staggers the breaks so that
25  the CNA who is working the hall each day takes the first

## Page 184

1  lunch break from 10:30 to 11:00.  One CNA who is working
2  the dining room goes to lunch at 10:45 to 11:15, and the
3  other CNA working the dining room goes on break when the
4  CNA working the hall returns.
5      Is that consistent or similar to the meal pract ce
6  for the CNAs that you supervised?
7  A.  That is consistent to what we tried to do, yes.
8  Q.  During the 15 minute window when only one CNA is on
9  the hall during the meal period, the director of nursing
10  and our assistant director of nursing will cover for us if
11  we have a job requiring a two-person assist.
12      Is that consistent with your experience when you were
13  working your halls?
14  A.  No.
15  Q.  So that's something different that Ms. Berry
16  experienced than you did, correct?
17  A.  Very.
18  Q.  What's that?
19  A.  I said, yes, that was very different from what I
20  experienced.
21  Q.  On the 3:00 p.m. to 11:00 p.m. shift, the CNAs
22  stagger their meal breaks so that there will be one CNA on
23  the floor at all times.
24      Is that consistent with your understanding of --
25  A.  Yes, that is exactly what we tried to do.

## Page 185

1  Q.  For the 3:00 p.m. to 11:00 p.m., correct?
2  A.  Yes.
3  Q.  All right.  CNAs from other floors cover for each
4  other, if necessary.
5      Is that also true?
6  A.  As they can, yes.
7  Q.  Okay.  For the CNAs that you supervised, do you
8  believe that they typically got their meal breaks?
9  A.  They occas onally -- there were times that they did
10  report that they did not get their meal breaks and thing
11  of that nature.  There were times that they did not get
12  their meal breaks.
13  Q.  How frequently would you say that occurred?
14  A.  Probably about 25 percent of the time.
15  Q.  So 25 percent of the time you think they did not get
16  meal breaks?
17  A.  They did not.
18  Q.  And what's your basis for that percentage?
19  A.  About the amount of time that I recall them coming
20  and telling me.  It could have been more or less, but
21  that's about what I remember.  I know they come and say,
22  We were so busy, we did not get to take a lunch break.
23  And if I was too busy, I could not cover for them so they
24  could.
25  Q.  So for one CNA, you're saying one out of every four

47 (Pages 182 to 185)

Page 186

1   shifts that that CNA worked, they would tell you that they
2   d dn't get a meal break?
3   A.   Approximately.
4   Q.   And what was your react on to that?
5   A.   I would try to cover as much as I could, so that they
6   could get a meal break.
7   Q.   On that same shift?
8   A.   On that shift or whenever I worked.
9   Q.   Okay.  So to make sure I understand.  Are they coming
10  to you at the time that they were scheduled for the meal
11  break, and saying I didn't get my meal break?
12  A.   Normally it was after.  They would have been too
13  busy.  And they would say, We were so busy today we didn't
14  even get to take a break.
15  Q.   Okay.  So t was after their shift?
16  A.   Or late in the shift.
17  Q.   And would you send them to take their meal break at
18  that time?
19  A.   If we could, yes, I would send them to take a break.
20  But often we were not able to take a break.  Sometimes
21  they would tell me at the end.
22  Q.   What percentage of the time would you have them go
23  take a break, when they reported to you that they hadn't
24  got a break that shift?
25  A.   I don't know exactly what percentage.  Whenever I

Page 187

1   could I would send them to take a break.  Because CNAs are
2   the backbone of the industry, and they work very, very
3   hard.  Theirs is a very phys cally demanding pos t on.
4   Q.   Okay.  Was there more than half the time you would
5   get them out on their break?
6   A.   There again, it probably was only about 25 percent of
7   the time.  Because if we were that overworked, you just
8   couldn't -- if that much was going on, you usually
9   couldn't get them out.
10  Q.   Okay.  You knew from your training and discussions
11  with the Department of Labor, that they were required to
12  be paid for the time that they worked through breaks,
13  right?
14  A.   No.  My discus on with the Department of Labor in
15  Texas, they actually told me that there is no mandate that
16  stated in Texas, and this is where I had my discus ons,
17  that they be given a break for lunch.  But however, if it
18  was the company's usual and normal practice to give
19  employees lunch breaks, and certain ones did not receive
20  it, then they were entitled to compensation.
21  Q.   And it was the usual pract ce to make sure that CNAs
22  got their breaks, correct?
23  A.   To the best of my abil ty I did.
24  Q.   So to the extent they weren't getting a break, they
25  are supposed to be pa d for it, just like they told you at

Page 188

1   the Department of Labor in Texas, correct?
2   A.   Correct.
3   Q.   And you understood that, correct?
4   A.   I understand that they should have been, yes.
5   Q.   So what did you do to ensure that your --
6   A.   I would inform the director of nursing, when they
7   came to me, that they had not gotten a break.  I would
8   tell her that so and so didn't get a meal break today.
9   Q.   And do you know what happened after that?
10  A.   I do not.
11  Q.   Did you always inform the director of nursing when a
12  CNA didn't get a break?
13  A.   Yes.
14  Q.   And you don't know whether the director of nursing
15  then ensured that that CNA then would be paid for that
16  break, correct?
17  A.   I did not.
18  Q.   Okay.
19  A.   I was not privileged to any time sheets or anything
20  of that nature.
21       (Deposition Exhibit 10 was marked.)
22  Q.   I'll hand you what's been marked as Defendant's
23  Exhibit Number 10.  Have you seen that daily break log
24  before?
25  A.   No.

Page 189

1   Q.   Do you know if some of the departments use that break
2   log at North Hills?
3   A.   Not to my knowledge.
4   Q.   You don't know one way or another?
5   A.   I never saw it.
6   Q.   Okay.  Is it possible that some departments used that
7   and you just don't know about it?
8       MS. JACKSON:  Object on to form of the
9   quest on.  You can answer.
10  A.   It's possible they did.  I d dn't -- I didn't work in
11  all of the departments.  I didn't work in laundry or
12  housekeeping.  I never saw this log.
13  Q.   Okay.
14      (Deposition Exhib t 11 was marked.)
15  Q.   I hand you what's been marked as Defendant's Exhib t
16  Number 11.  Do you recognize that document?
17  A.   My application, yes.
18  Q.   And what was the date of the application, do you see
19  that?
20  A.   The 19th of April.
21  Q.   Of 2010?
22  A.   Of 2010, yeah.
23  Q.   If you look at the second page.  Is that your
24  handwr ting there where it says, Carrolyn Black?
25  A.   Yes.

48 (Pages 186 to 189)

## Page 190

1   Q.   And the third page, that's your signature, correct?

2   A.   Yes.

3   Q.   You applied for a position of LPN, correct?

4   A.   That's correct.

5   Q.   Look at the next page.  The interviewer's comments,

6  it says, Brenda Crosswhite, do you see that?

7   A.   I see Brenda's name up there, yes.

8   Q.   Is she the person that interviewed you?

9   A.   No.

10   Q.   Who did?

11   A.   Abra.

12   Q.   And where did Abra work?

13   A.   She was the director of nursing, Abra Pumphrey.

14   Q.   Do you ever recall talking to Brenda Crosswhite

15  during the interview process?

16   A.   Brenda is the one that called me and told me what

17  time to be there for the interview.  She was the head of

18  personnel.

19   Q.   For your rank at discharge it says, Sat, on page 1.

20  What does that mean?

21   A.   Sergeant, Sgt.

22   Q.   Oh, okay.  So other than Abra and Brenda, did you

23  speak to anyone else during the actual hiring process?

24   A.   The administrator, and I do not remember his name,

25  spoke to me briefly, introduced himself and spoke to me

## Page 191

1  briefly during that.

2   Q.   That was the administrator of the North Hills

3  facility, correct?

4   A.   Correct.

5   Q.   Nobody other than North Hills employees spoke to you

6  during the hiring process, correct?

7   A.   Correct.

8        (Deposition Exhibit 12 was marked.)

9   Q.   I'll hand you what's been marked Defendant's Exhibit

10  12, which is an employee access clearance form.  Do you

11  see at the bottom where it says, Applicant cleared for

12  hire or access, yes.  And it says by Brenda Crosswhite,

13  4/20/2010, and interview scheduled with Abra, correct, for

14  4/19, and I think it's supposed to be 2010, right?

15   A.   That would have been correct.  And yes, I do see

16  that.

17   Q.   Is that Brenda's signature there at the bottom under

18  Brenda Crosswhite?

19   A.   It looks to me like it's probably Brenda's signature.

20   Q.   So who did you understand --

21   A.   Her name is -- and she was the head of personnel.

22   Q.   Who is it that you understood made the decision to

23  hire you?

24   A.   Abra.  I never saw this form.

25   Q.   Okay.

## Page 192

1        (Deposition Exhibit 13 was marked.)

2   Q.   I handed to you what's been marked as Defendant's

3  Exhibit Number 13, which is an employee file checklist.

4  And it looks like you were cleared for orientation on

5  April 21, 2010, correct?

6   A.   That's the date on here, yes.

7   Q.   And it says that you were eligible to begin work on

8  the 21st, right?

9   A.   That's correct.

10   Q.   And the form was completed by Brenda Crosswhite,

11  correct?

12   A.   Yes.

13        (Deposition Exhibit 14 was marked.)

14   Q.   I hand you what's marked as Defendant's Exhibit

15  Number 14, which is an employee information form.  And

16  this appears to be setting your effective rate of pay,

17  correct, Redact an hour?

18   A.   Correct.

19   Q.   And you signed at the bottom, correct?

20   A.   Correct.

21   Q.   And it was Brenda Crosswhite who approved this.  Do

22  you see that?

23   A.   Yes.

24   Q.   And who is it that you understood set your rate of

25  pay?

## Page 193

1   A.   I had understood that Abra set my rate of pay.  She

2  is the one that told me what it was and what she could

3  pay.

4   Q.   Okay.

5   A.   That was my understanding.

6        (Defendant's Exhibit 15 was marked.)

7   Q.   I hand you what's been marked as Defendant's Exhibit

8  Number 15.  And this is a general orientation complete

9  form.

10   A.   Okay.

11   Q.   And this is your signature on the bottom, right,

12  dated 4/21 --

13   A.   Yes.

14   Q.   -- 2010?  You see where it says at the top, I have

15  attended and completed the general employee orientation

16  including, but not limited to training and

17  policy/procedure presentation in the following areas?

18   A.   I see that.

19   Q.   You see where it says, administrative, and one of

20  those things is personnel policies?

21   A.   I see that.

22   Q.   Another is clocking in and out, correct?

23   A.   Yes, we were shown how to clock in and out.

24   Q.   And handbook overview and facility-specific policies,

25  correct?

49 (Pages 190 to 193)

Page 194

1   A.  I see that.
2   Q.  Do you recall receiving training on those areas, in
3   those areas?
4   A.  I remember being shown how to clock in and out.
5   Q.  Okay.
6   A.  And we went through the normal videos that you watch
7   about different things, the environment safety.  We went
8   through general orientation and things that they show on
9   that, yes.
10  Q.  Do you recall receiving a handbook?
11  A.  Yes, I do.  I had to think.  Yes, normally we do
12  receive a handbook at the time.
13  Q.  What about facility-specific policies, do you recall
14  receiving those?
15  A.  Not at that time, no.
16  Q.  Let's take a look at the bottom there.  It says, I
17  have received training where necessary and fully
18  understand all the policies, procedures and guidelines in
19  each of these areas.  Is that accurate?
20  A.  That's exactly what it says.
21  Q.  That's what you're certifying, correct?
22  A.  Yes.
23  Q.  So is that accurate, did you receive training and
24  fully understand all the policies, procedures and
25  guidelines that are listed above?

Page 195

1   A.  Yes, those are general things that pertain to all
2   facilities.
3   Q.  And you also agreed to abide by all policies,
4   procedures and guidelines as presented and documented in
5   this orientation, correct?
6   A.  Yes.
7   Q.  And that included the handbook, correct?
8   A.  Correct.
9   Q.  You've been handed what's been marked as Defendant's
10  Exhibit Number 16.
11      (Defendant's Exhibit 16 was marked.)
12  Q.  Which is another document from general orientation.
13  Do you recall receiving this document?
14  A.  No, I don't specifically remember receiving this
15  document.
16  Q.  Okay.  Look at clocking in and out.  It says, You
17  must clock in when you arrive, in and out for lunch, and
18  when you leave the facility at the end of your shift, and
19  should you leave for non-work or personal reasons, you are
20  expected to take a 30 minute lunch break.
21      Were you instructed in that manner?
22  A.  No, because we were not required to clock in and out
23  for lunch.
24  Q.  If your lunch break is less than 30 minutes in
25  length, you're expected to submit a time adjustment

Page 196

1   request to payroll explaining why you're unable to take 30
2   minutes.
3       Did you receive that instruction?
4   A.  No.
5   Q.  To the extent that somebody was oriented in that
6   manner, they would be different than you, correct?
7   A.  That is correct.
8       (Deposit on Exhibit 17 was marked.)
9   Q.  I'll hand you what's been marked Defendant's Exhibit
10  Number 17.  Do you recognize this document?
11  A.  It's apparently the orientation book for North Hills.
12  Q.  Do you recall receiving this?
13  A.  No.
14  Q.  Is it possible you got it and just don't remember?
15  A.  It is.
16  Q.  Okay.
17  A.  You get stacks and stacks of paper in orientation,
18  and you go through them very rapidly.
19  Q.  Do you see on page -- I'll give a Bates number.  Look
20  at the bottom right-hand corner, there's an RHC number,
21  11395.
22  A.  Okay.
23  Q.  Under clocking in and out, It is company policy that
24  you take a 30 minute lunch on each shift of five hours or
25  more.  Do you see that?

Page 197

1   A.  I see that, yes.
2   Q.  And you're saying that that's not the instruction you
3   received, right?
4   A.  No.
5   Q.  So to the extent somebody received that instruction,
6   that would have been different than you?
7   A.  That's correct.
8   Q.  Okay.  Turn to RHC11404.
9   A.  May I say something before we go to that?  The next
10  paragraph says, Nurses are expected to remain on-call
11  during lunch breaks and are paid for their time.
12      That was what I was instructed.  I do remember being
13  told that.
14  Q.  That you were paid for your lunches as an LPN,
15  correct?
16  A.  Correct.  What's the next page?
17  Q.  RHC11404.
18  A.  Okay.
19  Q.  Do you recall ever seeing this handbook addendum,
20  dated October 2011, about the new meal policy?
21  A.  I don't recall seeing it.
22  Q.  Okay.  All employees, both hourly and salaried, are
23  expected to take a meal break during each shift worked.
24      You're saying you never received that instruction,
25  correct?

BUSHMAN COURT REPORTING
501.372.5115

## Page 198

1    A.  No, I did not.

2    Q.  It says, Please make your own arrangements for your

3    meal break.  You will be provided an undisturbed meal

4    break which can be taken on or off premises.

5        You're saying that you didn't get that instruction,

6    correct?

7    A.  Correct.

8    Q.  The duration of the meal break, 30 minutes or one

9    hour) is determined by the job position and will

10   automatically be deducted from your daily hours.

11       And you're saying you didn't get that instruction,

12   correct?

13   A.  Correct.

14   Q.  Were you familiar with the meal ticket program?

15   A.  Yes.  We could buy meal tickets in the business

16   office and purchase meals from the cafeteria.

17   Q.  Did you ever do that?

18   A.  Yes, I did.

19   Q.  How often did you use your meal tickets?

20   A.  Maybe once or twice a week, sometimes more.  I often

21   would pick up my lunch and eat it at my desk.

22   Q.  Department heads/supervisors and nurses are allowed

23   up to a one hour lunch.  Do you see that?

24   A.  I see that.

25   Q.  Were you familiar with that?

## Page 199

1    A.  No.

2    Q.  And you were a department head when you were the

3    director of medical records, correct?

4    A.  That's correct.

5    Q.  But you didn't know that you were entitled to an hour

6    lunch?

7    A.  No.

8    Q.  Look at the last bullet point.  If you're unable to

9    take your lunch break and work the shift without a lunch,

10   you must submit a time adjustment form to payroll,

11   properly completed and signed, immediately following the

12   shift, in which the lunch was not taken, in order to

13   document and verify that you were actually working and a

14   lunch break was not possible.

15       You're saying you never received that instruction,

16   correct?

17   A.  Correct.

18   Q.  And did you know that disciplinary action may be

19   taken against employees who falsely claim that a lunch

20   break was not possible, or who routinely skipped lunch

21   breaks intentionally and without authorization?

22   A.  I wasn't aware that there was anything of that nature

23   going on.  So it was never discussed.

24       (Deposition Exhibit 18 was marked.)

25   Q.  I hand you what's been marked Defendant's Exhibit

## Page 200

1    Number 18.  This is a departmental orientation form.  It

2    appears that this one you signed, correct?

3    A.  Yes, that's my signature.

4    Q.  On the first page, who is Kary Anne Baldwin?

5    A.  She was the assistant director of nursing at the time

6    I was hired.

7    Q.  Okay.

8    A.  She's the young lady that I mentioned that

9    subsequently left.

10   Q.  She's the one that conducted your orientation?

11   A.  She is.

12   Q.  And she was a North Hills employee, correct?

13   A.  Correct.

14   Q.  And this is a North Hills document, as all the

15   documents we've looked at related to your orientation have

16   been, correct?

17   A.  Correct.

18   Q.  The first one is nursing department, departmental

19   meetings?

20   A.  I see that.

21   Q.  Were those meetings completed on the clock?

22   A.  Yes.

23   Q.  And they were paid, correct?

24   A.  Correct.

25   Q.  And is that also true for mandatory inservice,

## Page 201

1    correct?

2    A.  Correct.

3    Q.  Is there any meeting that you're aware of that would

4    be performed and not paid?

5    A.  Not to my knowledge.

6    Q.  Look at the last page.  It says, Check off each item

7    as completed.  Employee must verbally explain expectations

8    regarding: breaks/lunch.  And there's a check right there.

9    A.  Okay.

10   Q.  Do you recall verbally explaining the expectations

11   related to your meal periods?

12   A.  I know that we were instructed that we were --

13   because again, as an LPN, we were entitled to a lunch

14   break, and we were paid for that lunch break.

15       (Defendant's Exhibit 19 was marked.)

16   Q.  This is the handbook addendum we were just looking at

17   and you said you've never seen.  Is that your signature on

18   the bottom?

19   A.  That is my signature on the bottom.

20   Q.  And it's dated December 27, 2011?

21   A.  Yes, it is.

22   Q.  Does this refresh your recollection that you did, in

23   fact, receive the handbook addendum that we were just

24   looking at?

25   A.  Okay.  I did.

Page 202

1  Q.  And does t refresh your recollect on that you were,
2  in fact, told that you were ent tled to a one hour lunch,
3  as it states in the policy?
4  A.  I recall that these were handed out, and we signed
5  these and turned these back in during an inservice.  I
6  don't recall them actually being gone over or anything,
7  other than when we were signing for our paychecks, we were
8  asked to sign these.
9      This is about the time frame, if you recall, that I
10  told you I knew there had been a change in when LPNs --
11  when lunch breaks were being deducted from them as well.
12  So that is about the time frame that I had mentioned
13  earlier when that started.
14  Q.  Let's take a look at the top paragraph about three
15  lines down where t says, My signature following indicates
16  I have received a copy of, have read and fully understand
17  this policy and agree to abide by it completely.
18      Do you see that language?
19  A.  I do see that.
20  Q.  Did you have a hab t of signing things that you
21  wouldn't read?
22  A.  We frequently went over these very rapidly, and
23  signed them in order to get them turned back in.
24  Q.  So d d you not read this, you just signed it without
25  reading t?

Page 203

1  A.  I probably skimmed over t and then signed t, yes.
2  And it was my mistake.
3  Q.  So would you say that t is accurate what you
4  acknowledged at the top, that you have received a copy,
5  have read and fully understand the pol cy and agreed to
6  ab de by t completely?
7  A.  I would say that I received it.  I scanned over t.
8  And I always tried to abide by the policies and procedures
9  to the best of my ability.
10  Q.  And one of those was to subm t a time adjustment form
11  if you were unable to take a meal break, correct?
12  A.  That is stated on here, yes.
13  Q.  So does this refresh your recollection, that you did,
14  in fact, understand that if you had missed a meal break,
15  you were to sign a time adjustment form?
16  A.  No.  As I sa d, I apparently skimmed over this and
17  signed it and handed it back.
18  Q.  So would you acknowledge that that was your mistake,
19  and not the company's, as far as ind cating to you what
20  you are to do if you missed a meal break?
21          MS. JACKSON:  Object to form of the
22  question.  You can answer.
23  A.  I agree that I should have read it more indepth, if
24  that's your question.  Yes, I should have read it more
25  indepth.

Page 204

1  Q.  And if you had, then you would have understood the
2  pract ce of using a time sheet adjustment form to report
3  missed meal per ods, correct?
4          MS. JACKSON:  Object on to form of the
5  question.  You can answer.
6  A.  Obviously if it had actually been explained and gone
7  over, yes, I would have understood that.
8  Q.  So is it your obligation, when you're signing a
9  document that says you fully understand the policy and
10  agree to abide by it completely, to actually do what t
11  says or not?
12  A.  It's my obligation to read it, yes.  But if we are
13  being hurried, as we always were, it is hard to do that.
14  Q.  Is t your testimony you were too hurried to actually
15  read what you were signing?
16          MS. JACKSON:  Object on.
17  A.  Yes, it is.  We were frequently rushed through these
18  type things in inservice, so that we could get inservice
19  over and done.  Because as you pointed out, everyone was
20  on the time clock, and they didn't like for inservices to
21  extend for a lengthy period.
22  Q.  And had you read what you said you read, then you
23  would have also known that you were ent tled to a meal
24  period of at least 30 minutes, correct?
25  A.  Yes, I would have.

Page 205

1  Q.  And just for the record, that's a one-page document,
2  correct?
3  A.  That's what I see, yes.
4      (Defendant's Exhibit 20 was marked.)
5  Q.  I hand to you what's been marked as Defendant's
6  Exhibit Number 20, which is a handbook acknowledgement
7  correct?
8  A.  I acknowledged that, yes.
9  Q.  And that's your signature, correct?
10  A.  That is correct.
11  Q.  And what you're signing is that you acknowledge that
12  you've both received and read a copy of my facility's
13  handbook, correct?
14  A.  Yes.
15  Q.  Is that true or false?
16  A.  I apparently did receive a copy of the handbook.  And
17  being lengthy and everything, I probably again scanned
18  through t, because they're all very similar.
19  Q.  And you also said that you understood it was your
20  responsibility to make sure that you fully comprehend the
21  handbook, correct?
22  A.  Yes.
23  Q.  And d d you fully comprehend the handbook?
24  A.  I d d not in the instance of filling out time
25  adjustments at the time.

52 (Pages 202 to 205)

Page 206

1    Q.   Okay.
2    A.   There again, it did state in there that nurses were
3    compensated for their lunch breaks.  So I really would not
4    have been concerned with that, because at that point in
5    time, it did not apply to me.
6    Q.   And you also agreed to consider the handbook and
7    employee code of conduct, and to abide by all policies,
8    procedures and guidelines as contained, correct?
9    A.   Yes.
10               (Defendant's Exhibit 21 was marked.)
11   Q.   Is this a copy of the handbook that you received?
12   A.   I honestly don't know if this is the handbook and
13   this is what they handed out.  It's been three years now.
14   I couldn't tell you what the handbook looked like.
15   Q.   And at the top of this document does it say, North
16   Hills Life Care and Rehab Employee Handbook?
17   A.   Yes, I do acknowledge.
18   Q.   Do you have any reason to doubt that this is the
19   handbook you received?
20   A.   No.
21   Q.   Turn to page 11 of the handbook, RHC12733, problem
22   solving/grievances.  And this identifies the order in
23   which you should address any problems or grievances,
24   correct?
25   A.   Are you asking if that's what this particular

Page 207

1    paragraph says, problem solving and grievances?
2    Q.   Right.  It says if you have a problem with another
3    employee or if some other problem is bothering you, it is
4    to everyone's benefit to correct the situation as soon as
5    possible.  Your department head and administrator are you
6    teammates and are available to help resolve any problems
7    that relate to your job.  If a problem should arise, we
8    ask that you do the following.  Do you see that?
9    A.   Yes.
10   Q.   The first is to present the situation to your
11   supervisor immediately, correct?
12   A.   Correct.
13   Q.   The second is, If your immediate supervisor's answer
14   to your problem is not satisfactory, you may discuss the
15   problem with the department head, correct?
16   A.   The paragraph says present the situation to your
17   immediate supervisor so that it may be settled quickly.  I
18   see that.
19   Q.   And then the next step you could present the problem
20   to your administrator, correct?
21   A.   Yes.
22   Q.   And it also identifies outside remedies from
23   appropriate agencies and advocacy groups, correct?
24   A.   I see that.
25   Q.   And it also explains that you would not be penalized

Page 208

1    for seeking such a remedy, and will be supplied contact
2    informat on for such outside agents, if requested,
3    correct?
4    A.   It does say that, yes.
5    Q.   Let's look at the grounds for immediate dismissal.
6    A.   Okay.
7    Q.   Did you understand under 9 there, that acts in
8    disregard or violation of facility policies was grounds
9    for immediate dismissal?
10   A.   Yes.
11   Q.   Did you know that falsification of hours under 15 was
12   grounds for immediate dismissal?
13   A.   Yes.
14   Q.   Look at page 21 of the handbook under meals.  All
15   employees both hourly and salaried, are required to take a
16   meal break during each shift worked.
17        You had previously indicated that you weren't told
18   that you were required to take a meal break, correct?
19   A.   I was told that we were compensated for our meal
20   breaks.
21   Q.   Were you familiar with this policy?
22   A.   That meal breaks were provided?
23   Q.   This meal break policy that's on page 21 and
24   continues on 22.
25   A.   I was not familiar with that as such.

Page 209

1    Q.   And is that because you didn't read the handbook?
2    A.   It's probably because we went over it very rapidly
3    during orientation.
4    Q.   You were given --
5    A.   This was not really discussed.  And that since I was
6    told in orientation that I was paid for my meal breaks, I
7    probably did not read that indepth, because I didn't feel
8    like that there was anything in regard to that that I
9    needed to be concerned about.
10   Q.   Now, you received a copy of the handbook, correct, to
11   take home with you and have whenever you wanted to look at
12   it, right?
13   A.   Yes.
14   Q.   Whether it was working time or not working time,
15   correct?
16   A.   Correct.
17   Q.   And you could have opened it at any time and read it,
18   right?
19   A.   Absolutely.
20   Q.   In fact, you acknowledged in Exhibit Number 20, that
21   you would read it and fully understand all the policies,
22   correct?
23   A.   Yes.
24   Q.   Let's take a look at reporting of time worked, page
25   23.

53 (Pages 206 to 209)

Page 210

1    A.   Okay.
2    Q.   It says, Each employee is required to sign his or her
3    time sheet each pay period.  Time sheets for the pay
4    period are made available on Monday, following the end of
5    the pay period, but prior to payroll submission for a
6    period of time specified by the business office.  You
7    should check your time sheet and sign it during this time
8    so that any needed corrections may be made before payroll
9    goes in.  In the absence of your signature during this
10   time, your time as recorded is assumed to be correct.
11        And that's your understanding of what the time
12   certification practice was, correct?
13   A.   Yes, that is correct.
14        (Defendant's Exhibit 22 was marked.)
15   Q.   I'll hand you what's marked as Defendant's Exhibit
16   Number 22, which is the North Hills facility compliance
17   policy.  And that's your signature at the bottom, right?
18   A.   Yes, it is.
19   Q.   And it looks like you signed this on April 21, 2010,
20   during your orientation, right?
21   A.   That's correct.
22   Q.   Let's look at the compliance commitment that you
23   signed.  Employees are expected to be aware of and abide
24   by the laws governing and related to their job position,
25   the facility operations and the facility's compliance

Page 211

1    requirements, correct?
2    A.   That's what it says, yes.
3    Q.   And that's what you agreed to do, correct?
4    A.   Yes.
5    Q.   Employees are required to abide by the facility's
6    code of conduct, which is as follows:  This facility and
7    its employees are committed to, A, providing quality and
8    clinically appropriate care to its residents, and B,
9    conducting themselves in the most professional and legal
10   and ethical manner with regard to all healthcare and
11   business practices, and C, complying with applicable
12   federal and state laws and regulations that govern our
13   business practices and the healthcare services that we
14   provide.
15        And that's a commitment that you made, correct?
16   A.   That's correct.
17   Q.   And you agree that by not recording all of your time,
18   you were not comply with applicable law, correct?
19   A.   I was not reporting all of my time, because as I
20   stated, if I had reported all of my time, I felt I would
21   have been dismissed.
22   Q.   Now, I understand your excuse for not recording your
23   time, but what I'm asking is you understood that it was a
24   violation of law to not record all your time, correct?
25   A.   No, I did not.

Page 212

1    Q.   You understood it was a violation of policy not to
2    record all your time?
3    A.   No, I did not.
4    Q.   We just looked at the policies, right?
5    A.   I understand we looked at the policies.  But you
6    asked me if I fully understood it.  And I am saying, yes,
7    you have shown me these policies, and I'm saying, no, I
8    did not understand that it was a violation of that policy.
9    Q.   So if we went back to your time in Texas, when you
10   had your own company, and an employee came to you and
11   said, I'm working 40 hours, but I'm only recording 20
12   hours.  You would not have known that that was a problem
13   under the law; is that right?
14        MS. JACKSON:  Object onto the form of
15   the question, but you can answer.
16   A.   Texas law and Arkansas law are different, as I stated
17   before.  And while I am aware, as an employer of what I
18   was required to do in Texas, as an employee, I submitted
19   my time according to the instructions I received.
20   Q.   Let's back up on your testimony, because we have
21   actually covered this before.
22   A.   Okay.
23   Q.   On the punch requirements, punching in and out.  You
24   had testified before that you understood that you were
25   required to accurately punch in and punch out, so that

Page 213

1    you're recording all your time worked, correct?
2    A.   That's correct.  I was shown how to correctly punch
3    in and out, yes, I was shown that.
4    Q.   And you understood that it was the company's policy
5    that you had to record all of your time worked, correct?
6    A.   No.
7    Q.   Your testimony has changed from what you said
8    earlier.  I asked you that question, did company policy
9    require you to clock in and clock out, so that you
10   recorded all of your working time, and you said, yes, it
11   did.
12        So is it now your testimony that the company policy
13   was not to require you to record all of your working time?
14   A.   We were required to clock in and out, yes.
15   Q.   And record all of your working time?
16   A.   No.  Perhaps I misunderstood the way you worded it
17   earlier.
18   Q.   Okay.  So let's back up then.  So you're telling me
19   -- tell me what you're saying, what was the company's
20   policy, as far as you understood, about recording all time
21   worked?
22   A.   That we were required to clock in and out.  But as I
23   stated previously, we were directed by Abra and Lauren,
24   that as a department manager, we could not have overtime
25   Q.   Now, we had this -- this was the exact conversation on

54 (Pages 210 to 213)

## Page 214

1   we had before lunch.  And what you told me was the company
2   policy, and if you want to change your testimony, that's
3   fine, I just want to make sure I understand what your
4   testimony is.  You told me the company policy was that you
5   had to record all your time worked, and you had to clock
6   in before you performed any work, and you had to clock out
7   after performing all work.  And that is what you
8   understood from orientation of what the policy was.
9         You then testified about, we called it an informal
10  instruction, because you admitted that nobody told you to
11  work off the clock, but you felt like they were suggesting
12  that you work off the clock, correct?
13  A.   Correct.
14  Q.   And what you told me then was you still understood
15  what the policy was, that you were supposed to record all
16  your time, but you felt like you had to not record all
17  your time?
18  A.   Correct.  I may have misunderstood what you were --
19  the phrasing of your question there.
20  Q.   So is it correct that you understood that the
21  company's policy, irrespective of what you feel like
22  Lauren and Abra were suggesting to you that you should do,
23  you always understood that the company policy was that you
24  were to record all your working time, correct?
25        MS. JACKSON:  Objection to form of the

## Page 215

1   question.  You can answer.
2   A.   I thought I had already answered that.
3         MR. SPINOLA:  Will you repeat the
4   question for me?
5         (The question was read back.)
6         MS. JACKSON:  Objection to the form.  You
7   can answer.
8   A.   I understood that we were supposed to clock in and
9   out, yes.
10  Q.   (BY MR. SPINOLA)  That's not the question I asked.  I
11  understand that you knew that you had to clock in and out.
12        MS. JACKSON:  Let her explain.
13  A.   And that, according to this, the facility had that
14  policy, yes, I did understand that.
15  Q.   And when you say, that policy, what is that policy?
16  A.   To clock in and out, and that that was supposed to be
17  a reflection of your time worked.
18  Q.   Total time worked, correct?
19  A.   Total time worked.
20  Q.   Okay.  And you had testified previously, I want to
21  make sure that your testimony is consistent, even after
22  Lauren and Abra suggested to you whatever it is that you
23  believe they suggested, you still understood that the
24  company policy required you to record all your working
25  time, correct?

## Page 216

1   A.   That is correct.
2   Q.   And you also understood that company policy was for
3   you to certify the accuracy of that time when you signed
4   your time sheet, correct?
5   A.   That is correct.
6   Q.   And when you signed your time sheet, and the time
7   sheet did not have your accurate time worked, because you
8   were clocking out and going back to work, you were not
9   following company policy, correct?
10        MS. JACKSON:  objection to form of the
11  question.  You can answer.
12  A.   Yes.
13  Q.   Correct?
14  A.   Yes.
15  Q.   And likewise, when you were not recording all your
16  time worked, you were not following company policy,
17  correct?
18  A.   Correct.
19        MS. JACKSON:  Object on to form of the
20  question.  You can answer.
21        MR. SPINOLA:  Why don't we take a break
22  there for a minute.
23        MS. JACKSON:  Okay.
24        (A recess was had.)
25        (Defendant's Exhibit 23 was marked.)

## Page 217

1   Q.   (BY MR. SPINOLA)  You've been handed what's been
2   marked as Defendant's Exhibit Number 23.  Let's start with
3   what this is.  Can you describe what this composite
4   exhibit is, can you tell me what it is?
5   A.   It's a time sheet.
6   Q.   And there are several time sheets, correct?
7   A.   I worked there for almost two years, so there will be
8   several time sheets.
9   Q.   And these are all signed by you, correct?
10  A.   Yes.
11  Q.   And that's your signature at the bottom of page 1,
12  the first page of the exhibit, which is RHC11517, correct?
13  A.   That is correct.
14  Q.   And here it states right above your signature, I
15  certify the above time card is correct, right?
16  A.   That is correct.
17  Q.   And what you're certifying there is the accuracy of
18  the number of hours that you worked for a two week pay
19  period, correct?
20  A.   That's correct.
21  Q.   And this was the first week of your employment as an
22  LPN?
23  A.   Yes, sir.
24  Q.   And it looks like under date range it says, pay, you
25  started at Redacte an hour, correct?

55 (Pages 214 to 217)

Page 218

1    A.   Yes.

2    Q.   And that was an overtime rate of $30 an hour, right?

3    A.   Yes.

4    Q.   And this was during a period in which there was no

5    meal deduction for you, correct?

6    A.   That is correct.

7    Q.   So this time record would in fact be accurate?

8    A.   Yes, it would.

9    Q.   Before you move on.  On this pay period you were

10   paid, you see the OT1 total?

11   A.   Yes, I do.

12   Q.   2.45, and I'll submit to you that the 45 really means

13   three-quarters of an hour.

14   A.   That's what I would assume it to be.

15   Q.   So 2 hours and 45 minutes of overtime in that pay

16   period, correct?

17   A.   Yes.

18   Q.   Let's take a look at some of the actual punch times.

19   I want to make sure we're on the same page as to how the

20   rounding rule worked.  For the first date 4/21/2010, when

21   you punched in at 8:54, what time would that round to?

22   A.   That would round to 9 o'clock.

23   Q.   And when you punched -- on the next day when you

24   punched in at 9:24, what would that round to?

25   A.   9:30.

Page 219

1    Q.   And when you punched out at 14:56, what would that

2    round to?

3    A.   5 o'clock.

4    Q.   When you punched out -- punched in at 13:48, do you

5    see that?

6    A.   Yes.

7    Q.   What does that round to?

8    A.   That should have rounded to 13:45.

9    Q.   Right.  And the punch out 14:27 would round to what?

10   A.   14:30.

11   Q.   You see in the hours column it says 30 minutes?

12   A.   Yes.

13   Q.   Even though it was less than 30 minutes in your

14   actual punches, right, if you just took the actual

15   minutes?

16   A.   That's actually less than 30 minutes in that time

17   frame.  That would have been 12 minutes and then 27, would

18   have been 39 minutes.

19   Q.   I'm looking at --

20   A.   The 48 or the 27 -- I'm not sure how that rounded.

21   Ordinarily my understanding was that anything more -- like

22   if you clocked in before -- and I'm just using this as an

23   example, 8:53, if you clocked in at 8:51 or 8:52, it was

24   my understanding that that went back to include that whole

25   quarter hour.  And that if you clocked out after -- like

Page 220

1    say if you clocked out at 2:38, that would include another

2    quarter hour.  So I'm not quite sure what happened there.

3    I didn't count the minutes.

4    Q.   That's a bad example because it straddles a pay

5    period.  In any event, let's just take a couple more

6    examples.  On 4/27 clocking in at 14:44 would round to

7    what?

8    A.   14:45.  Our shifts actually we were to clock in -- if

9    we were working 3:00 to 11:00, we were required to be

10   there 15 minutes before that in order to take report and

11   things of that nature.

12   Q.   Let's look at the next one.

13   A.   Okay.

14   Q.   RHC11518.

15   A.   Okay.

16   Q.   During this pay period it looks like you were paid 3

17   hours and 45 minutes of overtime for that pay period,

18   right?

19   A.   That's correct.

20   Q.   And this is the pay period ending May 16, 2010.  And

21   you certified the accuracy of the time that it was

22   correct, right?

23   A.   Yes.

24   Q.   And it was correct?

25   A.   It was.

Page 221

1    Q.   What I want you to do is look through these -- well,

2    let's go through a few more.  The next one is 11519,

3    right?

4    A.   Yes.

5    Q.   There you worked a total of an hour and 45 minutes of

6    overtime, right, for that pay period?

7    A.   That's correct.

8    Q.   And you certified that the time was correct and it

9    was correct?

10   A.   That's correct.

11   Q.   Let's look at the next one.  Here you worked 39 hours

12   of overtime over the pay period, correct?

13   A.   That's correct.

14   Q.   For a total of 119 hours?

15   A.   That's correct.

16   Q.   And you certify that your reported time was correct,

17   and it was in fact correct?

18   A.   Correct.

19   Q.   The next pay period is 21 hours total overtime,

20   right?

21   A.   Yes, it is.

22   Q.   And you certified the accuracy of the time?

23   A.   That's correct.

24   Q.   And it was in fact all the working time that you

25   completed, right?

Page 222

1   A.   That's correct.

2   Q.   The next pay period is 20 hours and 15 minutes of

3   overtime, correct?

4   A.   Yes.

5   Q.   And you've signed and this time was in fact, correct?

6   A.   That is correct.

7   Q.   The next pay period I have is RHC11524.

8   A.   Yes.

9   Q.   There's 29 hours and 15 minutes of total overtime,

10  right?

11  A.   That is correct.

12  Q.   And you certified that the time card was correct, and

13  it was in fact correct, yes?

14  A.   Yes.

15  Q.   So I'd like you to look through these and tell me the

16  first time one of your time cards is not correct?

17  A.   It was -- and here again, I don't remember the exact

18  date, but I know it was somewhere during the summer of

19  2011.  It was probably July or somewhere in that vicinity

20  that I started working extra to try to get everything

21  caught up.  Everything was in such a mess and so far

22  behind.  And I knew we had a state survey coming up.  I

23  was trying to get everything in order for that.  I can't

24  tell you an exact date that I started working extra.  I

25  really can't.  I'm not going to try to give you an exact

Page 223

1   date.  So probably in mid July.  So probably Exhibit 11550

2   would have reflected time that I worked on the floor, in

3   addition to, but would not have reflected any extra time

4   that I worked putting in extra time without being

5   compensated trying to get everything caught up.  So it was

6   somewhere probably mid July.

7   Q.   Let's look at that one then.  11550, right?

8   A.   Yes.

9   Q.   Should we start looking at 7/11?

10  A.   That would be fine.

11  Q.   Can you tell from this, from this pay record, it says

12  the department is medical records.  You're now in the

13  medical records department, right?

14  A.   That is correct.

15  Q.   And I'll explain to you that it's I believe a Sunday

16  to Monday or Sunday to Saturday pay period.  What I've

17  done is I've identified where the -- since it's a

18  bi-weekly pay period, I've identified where each pay

19  period ends.

20  A.   Okay.

21  Q.   So one pay period is from 7/11 to 7/17, and the next

22  one is 7/19 to 7/23.

23  A.   That sounds about right.  I can't remember whether t

24  actually ended Saturday or Sunday night.

25  Q.   So in first that work week 7/11 through 7/17, was

Page 224

1   that all working in medical records or were some of these

2   LPN shifts?

3   A.   Some of those, in looking at that, I would say the

4   15th would possibly have been -- no, that's not the right

5   one.  The 19th when I came in at 7:45, that would probably

6   have been when I was working the floor as an LPN that day

7   possibly.  Because normally that would have been the start

8   -- the 12th I clocked in at 7:45.  That was the normal

9   clock in and out time for a shift on the floor.  I

10  normally came in between 8:00 and 8:30 for the medical

11  records position.  7:45 probably would have been in for

12  medical records.  I'm sorry.  Those probably were all

13  medical records.

14  Q.   On 7/19 down?

15  A.   Other than 7/17, when I clocked in at 23:00 and out

16  at 7:45 the next morning on the 17th.  That would have

17  typically been working an 11:00 to 7:00 shift on the

18  floor.

19  Q.   I've got an idea how we can try to figure this out.

20           (Defendant's Exhibit 24 was marked.)

21  A.   There you go.

22  Q.   I'll hand you what's been marked as Defendant's

23  Exhibit Number 24.  These are the daily staffing logs

24  which you would have only signed --

25  A.   On the days I worked the floor, yes.  When I worked

Page 225

1   the floor as an LPN, that's when I signed these.

2   Q.   Let's try to look at the corresponding date range and

3   see if there are any staffing records for these dates.

4   A.   We're looking for 7/17/2011; is that correct?

5           MS. JACKSON:   Look at 000084.  I think

6   that's the first --

7   Q.   7/17 is the first one I see.  That would be

8   consistent with what you said, 23:00 to 7:45, right?

9   A.   Yes.

10  Q.   23:06, are you there, RHC84?

11  A.   Yes.

12  Q.   And out at 7:48, right?

13  A.   Yes.

14  Q.   Okay.  And so that was when you were serving as an

15  LPN?

16  A.   That is correct.

17  Q.   The next one I see is 7/22.

18  A.   It looks on the 22nd that I possibly worked a 3:00 to

19  11:00 shift on the floor.

20  Q.   Okay.

21  A.   I started at 2:30 on the floor and out at 24:24,

22  which would be consistent with the 23:30.

23  Q.   So there it looks like you just went right from

24  medical records then to LPN?

25  A.   Yes.

57 (Pages 222 to 225)

## Page 226

1  Q.  That's got your shift at 16 1/2 hours or 16 1/4
2  hours, right?
3  A.  Yes.  I was just trying to find it down here.  Yes, I
4  see that.
5  Q.  So for the record, what we're comparing is RHC11550
6  with RHC85.  Is there any other that week?
7  A.  The 23rd.
8  Q.  The 23rd has got you 14:30 to 11:23?
9  A.  Clocked in at 11:15.  So what t looks like I did was
10  came back in and worked med cal records for a while and
11  then took the floor probably at 2:30, yeah.
12  Q.  So at 2:30 you then went to the LPN role, right?
13  A.  That is correct.
14  Q.  And that was without ever clocking out, correct?
15  A.  Correct.
16  Q.  So on 7/17, 7/22 and 7/23 you were working as an LPN
17  after your med cal records shift, correct?
18  A.  That is correct.
19  Q.  These other days you were working solely as medical
20  records clerk, correct?
21  A.  That is correct.
22  Q.  And that shift should be 8:00 to 5:00?
23  A.  8:00 to 5:00 is kind of the general shift, yes.
24  Q.  Is there any indicat on here, in your mind, that any
25  of these shifts you would have clocked out and then

## Page 227

1  returned to work off the clock?
2  A.  I would -- at that point in time, I didn't keep a
3  record, I stayed this day and I worked.  On the 11th being
4  Monday, that would have been one that I was very likely to
5  stay.  When you come in you have all the orders and all
6  the admits from the weekend that you have to get caught
7  up.  So that would have been a day that I could have
8  stayed.
9      I know it was in that time frame that I was trying to
10  get everything caught up and get ready, because state was
11  coming back in.  And we were concerned about getting tags
12  from the state and everything.  So any of those where  t
13  says I clocked out, could have been days that I stayed and
14  worked later.
15  Q.  Okay.
16  A.  But I did not -- I didn't keep a calendar and say
17  this day I stayed, this day I didn't stay.  I didn't keep
18  anything of that nature.
19  Q.  So if you don't have a calendar, you can't really
20  determine from this which days you stayed and which days
21  you d dn't.  How would we figure that out?  Can you think
22  of any way to figure out your actual time?
23  A.  Nothing other than that I know on a regular basis
24  that I d d stay frequently and work late.  And I also
25  worked weekends.  There is nothing here to indicate that.

## Page 228

1  Q.  And even know you're saying that you had clocked out
2  and continued to work, you did, in fact, certify that the
3  time card was correct below, right?
4  A.  Yes, I did.
5  Q.  So that was false?
6  A.  I was doing that based on my understanding that I was
7  to complete all of my work, and not have overtime in my
8  department, yes.
9  Q.  But you understood what you signed off on was not
10  true, right?
11  A.  Yes.
12  Q.  On 7/20 t looks like you took a meal period of an
13  hour with a clock out of 10:45 and clock back in at 11:45,
14  right?
15  A.  That is correct.
16  Q.  And on the next day the 21st, it looks like you took
17  a meal period of an hour and 15 minutes, clocked out at
18  14:30 and clocked back in at 15:45, right?
19  A.  That's what  t shows, yes.
20  Q.  And so on these days while you're clocking out and
21  working late, you're still taking pretty signif cant meal
22  breaks, right?
23  A.  Yes.  Those probably were days that I had
24  appointments and had things that I had to take care of.
25  Q.  Looking at these records, is there any for the

## Page 229

1  company to know which days you accurately reported your
2  time and which days you d d not?
3  A.  No, there is not.
4  Q.  Do you see the next time sheet where you think you
5  might have mis-reported your time?
6  A.  Any of them from there on out would have not been
7  probably accurate.  I apologize.  I have got to run to the
8  restroom.  I am sorry.
9      MR. SPINOLA:  Okay.
10     (A recess was had.)
11  Q.  (BY MR. SPINOLA)  Looking back at Exhib t 23 and the
12  page we were looking at there, 11550.
13  A.  Okay.
14  Q.  You had testified before that you believe there was a
15  directive that you have to clock out, so that you didn't
16  incur overtime on your medical records position, right?
17  A.  That is correct.
18  Q.  So it would need to be an 8 hour shift, right?
19  A.  That is correct.
20  Q.  An 8 hour shift 5 days a week, 40 hours a week,
21  right?
22  A.  That is correct.
23  Q.  Look at 7/14, which we've confirmed was not a day
24  that you worked as an LPN?
25  A.  That is correct.

Page 230

1   Q.   And you clocked in at 8:15 and you clocked out at
2   19:30 for a total of 10 hours and 45 minutes.
3   A.   And it was about that time that we came under direct
4   scrutiny and started being -- it was about that time that
5   Lauren would come in on a weekly and sometime a daily
6   basis and say, You have this much overtime.  You have to
7   be sure that you clock out and shave off hours and don't
8   incur overtime.
9   Q.   Hold on.  She didn't say that, right, she didn't say
10  you had to shave off hours, we've talked about what she
11  said, right?
12  A.   She said, You have to shave off time and clock out,
13  and make sure that -- you have to make sure that you don't
14  have overtime.
15  Q.   My understanding of what you said is that you had to
16  perform the work that you had to do within a 40 hour work
17  week, right?
18  A.   That is correct.  She also would say at different
19  times, You've got 15 minutes over.  You need to shave off
20  15 minutes.
21  Q.   When you're saying, shave off, you mean --
22  A.   Basically she was saying you've got 15 minutes today.
23  You need to -- you had 15 minutes yesterday.  Somewhere
24  between now and the end of this week, you need to clock
25  out 15 minutes early, so that you don't have overtime.

Page 231

1   Q.   So her instruction was basically to make sure that
2   your work was performed in a 40 hour work week?
3   A.   That is correct.
4   Q.   Okay.  But on this day, the 14th, since you did not
5   clock out within 8 hours, you would not claim that you
6   clocked out after 10 hours and 45 minutes and then went
7   back to work, right?
8   A.   I could have, because there were times that I would
9   take a break at around 7:00 and finish up, and then go
10  back and go grab something to eat and come back and work.
11  As I said, I did not keep an exact calendar of the days
12  that I clocked out and came back.
13  Q.   Now, in this pay period you received -- you think
14  that you might have performed work off the clock, because
15  of a concern that you would otherwise go into overtime,
16  you received 22 hours of overtime, correct, for this pay
17  period?
18  A.   That is correct.
19  Q.   Let's look at the next.  I want to point out on
20  7/25/2011 it looks like you took an hour lunch, right,
21  clocking out at 12:00?
22  A.   Back in at 1:00, yes.
23  Q.   On the 28th it looks like you took a 45 minute lunch,
24  right?
25  A.   Yes.

Page 232

1   Q.   And do you believe that the time that you certified
2   as accurate on this time report is accurate or not
3   accurate?  Is this your actual time or did you work off
4   the clock?
5   A.   Again, I didn't -- since there was some incremental
6   overtime in these, this may have been accurate.  And the
7   extra, where a lot of the extra work came in may have
8   started.  Because I honestly, as I have said, I did not
9   keep a record.  I don't know the exact date that she
10  mandated absolutely no overtime, not even 15 minutes.  It
11  was somewhere around -- I know it was somewhere in the
12  summer.
13  Q.   Look at the next one.
14  A.   I know throughout -- this much I know for a fact.  I
15  know throughout the fall hours, the fall months when I was
16  working, that I did work several days through the week,
17  and worked until 10 and 11 o'clock at night.  Because our
18  window for state opened in October.  And it was during
19  that.  And we had from October to January, when the state
20  would be coming in.  And I know that at that point the
21  pressure of everything has to be caught up and has to be
22  correct.  That is about the time frame.
23      Our window opened -- they had been there in October.
24  Our window opened actually September.  And they have until
25  -- I think they had until February or March.  And they

Page 233

1   actually wound up coming in February.  So it was about
2   that time that we had the crunch.  And we were having our
3   mock surveys from corporate coming through.  And it was
4   during that time frame that everything really got intense.
5   We've got to get everything that's behind caught up and
6   get everything together.
7   Q.   Okay.
8   A.   I'm saying all this was probably -- we can start with
9   August and move forward, if you wish.
10  Q.   Is that when you think you might have started?
11  A.   You have to take a minute and look back and remember
12  what was going on at the time.  And that's been a while
13  back.  And I had to remember that state came in.  And I
14  know because the regulations for state were changing, and
15  we thought we were going under a whole new regulation.
16      So it could very well have been August of when the
17  absolutely no overtime went into place.
18  Q.   Okay.  So that would be -- do you want to start then
19  with August 1st?
20  A.   We can do that.  That would be fine.
21  Q.   That's 11551?
22  A.   Correct.
23  Q.   So August 1st is actually the start of the new pay
24  week.  And do you believe -- were any of these -- any of
25  these shifts LPN shifts, as far as you know, or are they

59 (Pages 230 to 233)

## Page 234

1  all medical records?

2  A.  Those look like all medical records.  The last one on

3  that particular page, that looks like there was an LPN

4  shift involved, would have been the 31st, when I worked

5  probably 11:00 to 7:00.

6  Q.  Okay.  Just so I'm clear.  Before sometime in August

7  of 2011, you weren't clocking out and working off the

8  clock.  After sometime in August of 2011, you were

9  clocking out and working off the clock?

10  A.  That is correct.

11  Q.  So your experience, prior to August 2011, was

12  significantly different than it was post-2011, right,

13  August 2011?

14  A.  Yes.

15  Q.  Meaning that --

16  A.  Total change.  And part of this time we were under a

17  different administrator that did not mandate no overtime.

18  Q.  Say that again?

19  A.  Part of 2011, I believe -- I'm not sure when Lauren

20  came.  There were changes that took place during 2011, and

21  North Hills did change drastically.  They cut staffing.

22  They went from having four nurses on the floor, when I was

23  first hired in 2010, I was hired and told we were -- that

24  they were staffing four nurses day shift and 3:00 to 11:00

25  to improve the staffing.  In 2011 that staffing ratio was

## Page 235

1  changed and cut.  So 2011 was a year of changes for the

2  facility.

3  Q.  And what impact did that have?

4  A.  It created a greater workload on everybody.  Any time

5  you cut staff it throws more work on the rest of the

6  staff, yet we were still expected to complete all of it in

7  that time frame.

8  Q.  And what impact did changing the administrator have?

9  A.  The previous administrator --

10  Q.  Who was that again?

11  A.  I can't remember his name.  It was a gentleman.  When

12  he left us he went to Catherine's Place, one of the other

13  facilities that was new.  And I don't remember exactly

14  when he left.  He may have left sometime -- I do remember.

15  He left sometime in 2010, the fall of 2010, is when Ms.

16  Lauren came to be the administrator there.

17  Q.  Okay.

18  A.  And for a porton --

19  Q.  What was the date?

20  A.  I don't know the exact date.  I'm thinking fall.  I

21  don't believe they had Catherine's Place completed and

22  ready until the early fall or late summer, maybe early

23  fall.

24  Q.  Okay.  And what was the difference between her and

25  the prior administrator, the gentleman, what impact did

## Page 236

1  that have?

2  A.  She watched overtime and staffing and things of that

3  nature much more closely.  She staffed at a lower ratio

4  than what he did.

5  Q.  Okay.

6  A.  He was the one that had gotten to where we could have

7  four nurses, one nurse per hall, which greatly improved

8  the patient to nurse ratio and everything.  It was after

9  Lauren came on as administrator that the fourth nurse was

10  taken away.  And we went back to three nurse for four

11  halls.

12  Q.  Didn't the census at North Hills go down also by

13  about 20 patients?

14  A.  Our census varied, it would fluctuate, which it does

15  in any facility and during different times.  But normally

16  we ran at a pretty good capacity.  And the long term care

17  normally didn't fluctuate as much as rehab.  Rehab in any

18  facility fluctuates more than long term care does.  Your

19  long term care doesn't fluctuate that much.

20  Q.  So what do you attribute the dramatic change in your

21  work experience pre-August 2011, what do you attribute

22  that to?

23  A.  The fact that, as I said, the staffing numbers

24  changed, there were not as many staff, there was not as

25  many nurses, there were not as many CNAs.  And it was

## Page 237

1  about that time that the nurses on the halls were having

2  overtime, that they would be sent home, and nurse managers

3  would be pulled to fill in those positions as well.

4  Q.  Looking back at 11551.

5  A.  Yes.

6  Q.  Starting August 1st.  I submit to you that the pay

7  period there, the week is August 1st through August 5th.

8  And you actually recorded only 38.25 hours, not actually

9  40 hours.

10  A.  That is correct.  Because on the 1st I clocked out at

11  1:15 on that day, because I had worked the 11:00 to 7:00

12  shift on the 31st.  And so I clocked out, because I had

13  worked a full 8 hours on the floor and clocked out at 1:15

14  for medical records.

15  Q.  So at that time you left work; is that right?

16  A.  I probably did.  Because after you've worked from 11

17  o'clock at night, by 1 o'clock the next afternoon you're

18  pretty well done and you can't function.

19  Q.  So on that week there really was no reason for you to

20  clock out and go back to work, if you didn't even make 40

21  hours, right?

22  A.  No, based on that one, it would not have been.  As I

23  said, I don't have an exact date.

24  Q.  I'm just doing my best to try to figure it out when

25  it started.

60 (Pages 234 to 237)

Page 238

1   A.   I understand.
2   Q.   Let's look at the next pay period.  Does this look
3   like t might have been the week that --
4   A.   That could have been, because I clocked out early on
5   the 19th, I clocked out early on the 18th.  And that would
6   have made up for extra hours worked on the 16th.
7   Q.   Okay.  So on the day where you worked 10 hours and 45
8   minutes --
9   A.   I would have had to have clocked out early on other
10  days to compensate for that.
11  Q.   So on those days you wouldn't have been working off
12  the clock, right, because you weren't clocking out at the
13  end of your shift, you were clocking out later, right?
14  A.   That's pretty much the end of the shift.
15  Q.   I'm looking at 8/9, example, 8/9 was 19:15.
16  A.   7 o'clock.
17  Q.   7:15.  And you see the total shift time 10 hours and
18  45 minutes?
19  A.   Right.
20  Q.   That wouldn't have been a day that you worked off the
21  clock, right?
22  A.   That probably would not have been, since I was there
23  until 7:15, or I could have possibly clocked out at 7:15
24  and stayed another two hours and worked.
25  Q.   Okay.

Page 239

1   A.   Like on the 10th, where I clocked out at 2:30, I
2   probably stayed and worked.  Because that would have
3   compensated for the time that I d dn't clock out the night
4   before.  And sometimes when you get busy working and doi g
5   stuff, you don't always remember, I've got to get up and
6   go clock out.  You just stay and work.  But you adjusted
7   it through the rest of the week.  As long as you didn't
8   have 40 hours at the end of the week, it d dn't matter if
9   you had 10 hours or 12 hours one day, and only 5 or 6 the
10  next, as long as at the end of the week you didn't have
11  more than 40 hours is what mattered.
12  Q.   So you did have some overtime on this week, right?
13  A.   I had 30 minutes there, yes.
14  Q.   So does that suggest that this moratorium on overtime
15  had not started yet?
16  A.   No.  That would ind cate that probably it had started
17  about that time, and that we were watching it.  And that
18  somehow I missed and wound up with 30 minutes.
19  Q.   Okay.  So do you believe then that the time on this
20  time sheet that you certified as correct, is not in fact
21  correct?
22  A.   That is what I believe.
23  Q.   And do you have any sense of how many hours it is
24  off?
25  A.   It's probably total -- probably total for the two

Page 240

1   weeks, probably 30 hours off.  Like I said, without having
2   written everything down, but just looking at the different
3   times and everything, that would have been an average, 3 hours a
4   day, 5 days a week, which is very normal.  That's where I
5   got the 15 to 20 hours.
6   Q.   Do you have any rational way for concluding that this
7   pay per od you would have worked 30 hours off the clock,
8   other than just kind of guessing at it?
9   A.   No, I do not have anything where I wrote times down.
10  I do not.
11  Q.   So that's just your guess, right?
12          MS. JACKSON:  Object on to form of the
13  question.  You can answer.
14  A.   That is correct.
15  Q.   Let's look at the next pay period.  This is the pay
16  period starting 8/22 and ending September 4th.  Now, here
17  you actually received 6 hours of overtime, right?
18  A.   That is correct.
19  Q.   So would this be a week where --
20  A.   On the 29th, if you look at that, I covered a shift
21  on the floor.
22  Q.   Wh ch shift is that?
23  A.   On the 29th, where I clocked in originally at 8:30 in
24  the morning, and it looks like I clocked out at 14:45.  I
25  probably went and grabbed something to eat, since I was

Page 241

1   going to be staying until 11:00 that night.
2   Q.   And then you worked as an LPN?
3   A.   From 3:30 to 11:15, yes.
4   Q.   But there still was an opportunity, wasn't there, to
5   make sure that you d dn't work overtime, right?
6   A.   I beg your pardon?
7   Q.   You could have clocked out early.  If the real goal
8   is to make sure you d dn't work overtime, you would have
9   clocked out earlier on 9/1/2011, right?
10  A.   We could still have some overtime if we were working
11  as an LPN.  We just could not have overtime as the
12  department manager.  So occasionally they would go ahead
13  and if they were short and needed you to work, they would
14  allow you to have overtime for working the floor as an
15  LPN.  It was just as a department manager that you were
16  not supposed to get -- it was easier apparently for them
17  to justify that they had to have a nurse on the floor.
18  Because w thout -- without that nurse on the floor, they
19  would have fallen below state minimums, and they could
20  justify that they had to pay that.
21  Q.   Let's take a look at that.  This is 15:30.  This is
22  on 8/29 you're saying?
23  A.   Yes.  That would have been 3:30 in the afternoon.
24  Q.   Let's compare to that your staffing log.  RHC92.  I'm
25  sorry.  I've got the wrong date.

61 (Pages 238 to 241)

Page 242

1      MS. JACKSON:  Look at number 90.
2   A.  90 I signed in and worked 100 and 200 and signed in
3   at 3:30 and out at 23:21.
4   Q.  So that is your night shift here on 8/29, right?
5   A.  My evening shift, yes.
6   Q.  Now, take a look at the bottom of that sheet.  You
7   see where  t says --
8   A.  Are you looking -- which sheet are you wanting me to
9   look at?
10  Q.  RHC90.
11  A.  Okay.  The staffing log.
12  Q.  It says, staffing 3/8.  The state is the minimum
13  staffing requirements, which is two nurses and seven CNAs.
14  And then the staffing there is what the actual staffing
15  was, which was three nurses and eight CNAs.  So it was
16  actually higher than what the state minimum requirements
17  were.
18  A.  Okay.
19  Q.  So given that fact, why is it that you would be
20  scheduled, and it wasn't, as you said, because of state
21  minimums, so why would they throw you another shift if you
22  weren't necessary?
23  A.  Because even though they might not have been below
24  state minimums, there would have been -- none of the
25  nurses would have worked with two nurses on 3:00 to 11:00.

Page 243

1   Their nurses would not do it, because you would have a
2   patient load of approximately 50 residents.  And there is
3   not an LPN that I know on the 3:00 to 11:00 shift that
4   would do that.
5   Q.  So they had an expectat on of having more staff at
6   North Hills than what was required by the state, at least
7   in this instance, right?
8   A.  Yes.  And most facilities don't just staff at state
9   minimum.  That would be terrible.  And most facilities do
10  not do that.
11  Q.  Let's look at 8/22 through 8/27, which is the first
12  week there.  Now we're back at 11553.  Are any of these
13  shifts 8/22 through 8/27 LPN shifts?
14  A.  It looks to me like 8/26 and 8/27 possibly would have
15  been LPN shifts.  I did not ordinarily come in in the
16  afternoon when I was working med cal records.
17  Q.  So 8/26 and 8/27 you think are LPN shifts, right?
18  A.  Yes.
19  Q.  And that week you actually worked 5.25 hours of
20  overtime, 45.25, if you add up --
21  A.  Okay.
22  Q.  Let's look at the next -- do you have any sense of
23  how many hours you would have worked off the clock here
24  that are not reported on your time sheet?
25  A.  Again an average of about 15 to 20 hours a week is

Page 244

1   about what I was doing.
2   Q.  So you think there's 30 to 40 hours here that were
3   unreported?
4   A.  There well could be.
5   Q.  And that's more of a guess than any kind of science,
6   correct?
7   A.  As I said, I did not keep any -- I didn't keep clocks
8   or calendars or anything of that nature, no.
9   Q.  Okay.
10  A.  But I do know that I did stay late and work.
11  Q.  And you did certify on this record as well that the
12  time that was reported here was accurate, right?
13  A.  Yes, I did.
14  Q.  And that was false, correct?
15  A.  That is correct.
16  Q.  Let's look at the next week here, wh ch is now
17  September 2011, September 6th through 9th is one work
18  week.  And there you only reported 32 hours of work for
19  this work week.  This is a four day work week.  So in that
20  instance where you're only recording 32 hours, there would
21  have been no reason for you to clock out and work off the
22  clock, right, you had another 8 hours, according to the
23  mandate you say you were given?
24  A.  That week I may not have.
25  Q.  Would you like to add it up?

Page 245

1   A.  No.  I'm saying that week, because if I missed a day,
2   that may have been a week that I wasn't feel well.
3   Q.  Okay.  On the next week the total reported time was
4   39.75.  This is the week of 9/12 through 9/16.  Do you
5   think this would have been a week where you worked off the
6   clock and didn't report it?
7   A.  Yes.  There again, we tried to stay w thin the 40
8   hours.  It wasn't always exact.  Sometimes it was -- t
9   could be -- as long as  t was under 40, they d dn't care.
10  Q.  So how many hours on that week do you think you had
11  failed to report?
12  A.  There again, I normally averaged 15 to 20 hours a
13  week working.
14  Q.  Okay.  And you certified that the time was correct,
15  yes?
16  A.  Yes.
17  Q.  And it was not, right?
18  A.  That is correct.
19  Q.  So your certif cat on was false, correct?
20  A.  That is correct.
21  Q.  This next week, this next pay period 9/19 through
22  10/2.  Would this be a pay period where you worked off the
23  clock and did not report it?
24  A.  Yes.  Definitely the end of September and October,
25  yes.

62 (Pages 242 to 245)

Page 246

1    Q.   And is that the same guesstimate of 30 to 40 hours?
2    A.   That is correct.
3    Q.   And there it looks like a half hour overtime, right,
4    you were paid, OT1 total?
5    A.   Yes, 30 minutes.
6    Q.   This next week do you see any LPN shifts?  This is
7    11556, 10/3 to 10/16, any LPN shifts there?
8    A.   Without looking specifically at the logs, the only
9    one that I see that could possibly -- because if I got a
10   late call to come in and cover a shift, I could possibly
11   have gotten there at 7:00.  So the 3rd could possibly have
12   been.  The 12th looks like -- well, I clocked in at 6:45.
13   I also know that somewhere in that vicinity is when we
14   were having -- when we had a mock survey and all of our
15   corporate people were there.  So we were being required to
16   come in early and stay late, just as we would if state was
17   there.  So that could explain some of the coming in at
18   7:00 and 7:30 as well.
19        Unless I signed in on one of these, that could have
20   been related to that.  Because I know that was kind of in
21   the time frame of when we had what we call mock surveys,
22   which is where we go through just like state was in the
23   building.  And I know that did happen in October.
24   Q.   And in that situat on then you were permitted to work
25   overtime?

Page 247

1    A.   Yes.
2    Q.   I see that here you worked 11 1/2 hours overtime,
3    right?
4    A.   That is correct.
5    Q.   For this pay per od.  And there's no corresponding
6    staffing log entries for you?
7    A.   That was probably our mock state survey.
8    Q.   So you believe then that this time card accurately
9    reflects all the hours that you worked?
10   A.   No, because even when we were doing that, and we were
11   allowed to -- we clocked out when the corporate people
12   left.  There were still evenings during that, that I
13   stayed to work to continue getting everything caught up
14   and getting things done properly.
15   Q.   So even in weeks where you were permitted to work
16   overtime, there were still --
17   A.   We were permitted on a lim ted basis when our
18   corporate people were there.
19   Q.   So then how would you determine how many hours that
20   you claim not to have reported here on this time card?
21   A.   There again, during that time frame, since we were
22   working late and being pa d for it,  t probably would have
23   been during those weeks, maybe 12, 15, closer to that.
24   Because when you're clocking out at 6:30, and I normally
25   would leave somewhere around 10:00, 10:30.  That's just

Page 248

1    kind of the normal time I left.
2    Q.   So you think you worked 12 to 15 hours off the clock?
3    A.   That would have been approximately.
4    Q.   And you certified that the time listed here is
5    accurate, right?
6    A.   Yes.
7    Q.   But it was not accurate?
8    A.   That is correct.
9    Q.   So what you certified was false, correct?
10   A.   That is correct.
11   Q.   Now, this was also the time frame that you were
12   working at Westwood, right?
13   A.   That is correct.
14   Q.   I think we determined earlier that that was an
15   average 24 hours a week, right?
16   A.   Yes, on weekends.
17   Q.   That would have been 48 hours for the pay period?
18   A.   Correct.
19   Q.   And here you've got reported 91 1/2 hours, right?
20   A.   That's what it says, yes.
21   Q.   So 91 1/2 plus 48 hours is 139 hours, right?
22   A.   Okay.  I agree.
23   Q.   139 1/2.
24   A.   I'm sure you're adding it correctly.
25   Q.   And if we added another 15 hours on top of that of

Page 249

1    alleged off the clock work, that would be 154.5 hours,
2    right?
3    A.   Yes.
4    Q.   Div de that by two, that would be 77.25 hours that
5    you're saying you worked, right?
6    A.   I have done that frequently.
7    Q.   How often d d the state come in?
8    A.   State comes in on a regular basis for a full annual
9    survey once a year.  They can come in at anytime on
10   complaints and things of that nature.
11        As I said, during this time frame, we had just been
12   informed that they were changing the way they were
13   reviewing homes.  And we were going through a whole new
14   way that we would go through a survey.  So we were doing
15   new things and training and correcting new things during
16   that time frame as well.
17   Q.   This work that you're performing, including the work
18   that you're performing off the clock, was there any reason
19   that it had to be performed on that part cular day as
20   opposed to the following week, or was it basically work
21   that you had to just continue to work at and chip away at
22   until  t was done?
23   A.   The work that was behind could be -- and that
24   primarily what I was staying working on, was the
25   backlog that had been there when I took over.  The years

63 (Pages 246 to 249)

## Page 250

1  prior to me taking over of getting those files organized,
2  the day-to-day work orders that came in, they were
3  expected to be processed that day, physician's orders that
4  came in, admiss ons to the facil ty, all of that was
5  mandated to be done that day before I left the facil ty.
6  And those could not carry over and just chipped away at.
7  Q.   The backlog work what you were working on, was that
8  what you were doing off the clock?
9  A.   Yes.
10  Q.   Okay.
11  A.   And when I took the position it was -- there was
12  filing that should have been done and put in the files
13  from as far back as 2005.  There was a long buffet-type
14  table that was just covered w th documents that had to be
15  sorted and filed and put away.  And there were boxes where
16  physician's orders had just been thrown in there and not
17  properly put away.
18      So that was the backlog that I was working on when I
19  was working off the clock, trying to get everything caught
20  up and into a manner where, when we needed something, you
21  could actually go and find it.
22  Q.   And that backlog, how many years had it been there?
23  A.   Some of the documents were as old as 2005.  A lot of
24  t was the 2010, during the transition between the med cal
25  records people during 2010, that had not -- so there was

## Page 251

1  one full year, and then parts from other years that had to
2  be processed that was there, when I took the pos tion.
3  Q.   Pr or to Lauren taking over, is this work that you
4  were doing on the clock that was incurring overtime?
5  A.   I beg your pardon?
6  Q.   You were doing the backlog work on the clock before,
7  right?
8  A.   I was not in med cal records before Lauren took over.
9  Q.   Okay.
10  A.   That was Terri Wilson.  And I asked Terri, and she
11  told me -- I had put in a lot of hours -- she said, You
12  cannot do it in a 40 hour week.  And at that time, I'm not
13  sure if they were allowing her to have overtime, or if she
14  was doing  t on her own time.  But she told me that she
15  could not ever do that job in 40 hours.
16  Q.   Before sometime in August of 2011, you were working
17  overtime, right, you weren't working off the clock, right?
18  A.   Yes.  I was working both in medical records and on
19  the floor.  And at that point in time, they had not
20  mandated that we have to stop doing this, we can't have
21  anymore overtime.
22  Q.   Right.  So you were working overtime, you're not
23  working off the clock.  Are you working on the backlog at
24  that time?
25  A.   At the time -- because I took over in March.  So they

## Page 252

1  allowed me a couple of months to kind of get used to the
2  log that was there.  There were things for 2011 that had
3  to be caught up, before you could even get to the backlog.
4      So during that time they allowed me a little bit of
5  leeway there to go ahead and get that caught up.  And
6  being new and learning the position, at that point, they
7  allowed a little bit of leeway there.
8  Q.   I guess the quest on I'm asking is this backlog we're
9  talking about, these old documents that had been sedentary
10  for a long time and not filed, were you working on those
11  documents?
12  A.   I worked on those as I could around the other work,
13  yes.
14  Q.   And that was while you were on the clock, right?
15  A.   Yes.
16  Q.   So there was no pressing need to get those done say
17  tomorrow, right, because they had been sitting there for
18  years?
19  A.   Well, the pressing need was that we knew state was
20  coming.  And that if we d d not have all of this in order,
21  we could face a state tag.  When Lauren realized how bad
22  it was, she said, This has got to be done.  It's got to be
23  caught up.
24  Q.   Did she give you a deadline by wh ch  t had to be
25  done?

## Page 253

1  A.   Before state came.
2  Q.   Did you get it done?
3  A.   I d d.
4  Q.   You had mentioned some changes that occurred you
5  thought in some of the requirements.  What are those
6  changes?
7  A.   As I ment oned, the staffing changed.  We had fewer
8  nurses on the floor.  There again, department managers
9  were more frequently pulled to the floor to work, so that
10  the nurses on the floor were not into overtime.  It was
11  all over that they were not allowing overtime.  They would
12  actually have a nurse clock out and take her off the
13  floor, and have a nurse manager come and cover that shift.
14  Q.   You said that there was changes to the state
15  regulations that were going to cause things to be
16  different, rules to be different?
17  A.   I'm sorry if I misphrased that.  There were changes
18  to the way the state survey was going to be conducted in
19  the facil ty.  And we were preparing so that we would be
20  familiar and have everything correct, so that when they
21  came in to do the survey -- those things involved -- in
22  addition to our normal duties, we had to do a certain
23  number of resident interviews, a certain number of family
24  member interviews, different things of that nature, that
25  was changing from how the state surveys had been done in

Page 254

1  the past, to how they were going to be done now.
2      That was so that we could try to anticipate any
3  problems or complaints we might run into, if the state
4  came in and talked to the residents or the family.  And
5  also to get our residents and family members familiar w th
6  how the state surveys were going to be conducted in the
7  future.
8  Q.  And that's what I'm asking.  What changed about the
9  state surveys?
10  A.  Previously they had not conducted interviews, to my
11  knowledge, with family members, as they were going to do.
12  And they were not -- they had not -- they were changing
13  how they chose res dents and just a variety of things of
14  that nature.
15  Q.  What was your responsibility in connection with the
16  state surveys?
17  A.  When state was in the building, I was responsible for
18  -- because we were all hall managers, and we were
19  responsible for checking our halls to make sure that
20  everything was in order on the halls, to make sure that we
21  watched to see if the state surveyor was on our hall, we
22  were supposed to watch and see what rooms they would pay
23  more attention to and things of that nature.
24      We were to be more out on the halls and in and out
25  helping answering lights and things of that nature.

Page 255

1  That's what we would do during the state surveys.  And as
2  medical records, I also was responsible for any records
3  that state needed, I was responsible for getting those to
4  them.  And we had a 15 minute time limit that the records
5  had to be gotten and gotten to them.  And that's where the
6  backlog of things not being filed and being in such
7  disarray became critical, because in that disarray, if
8  they needed something, there would have been no way to get
9  it to them in the 15 minute time limit, and we would face
10  potential tags and fines.
11  Q.  Is t fair to say that the only person that was
12  really affected, as far as working time by this backlog,
13  additional working time to correct the backlog was you?
14  A.  Yes.
15  Q.  There was no other employee at North Hills that would
16  have been impacted by this backlog of records, right?
17  A.  Med cal records and having t in order was my
18  responsibility.
19  Q.  That's a very unique issue that only you faced,
20  correct?
21  A.  To my knowledge.  It would have -- if the work was
22  not done and things were not where they needed to be, it
23  would have impacted the director, t would have impacted
24  the administrator.
25  Q.  I understand that from a state perspective.  But as

Page 256

1  far as changing the manner and nature of the work you had
2  to do, and the amount of time you had to work, that was
3  only impacting you?
4  A.  Yes.
5  Q.  Let's look at the next record.  This is 11557.
6  A.  Okay.
7  Q.  The pay break here is from 10/17/2011 to 10/21.
8  That's the first work in which you recorded only 31 hours
9  of work.  So that would not have been a week where you
10  would have been working off the clock, correct?
11  A.  No, at 31 hours I would not have.
12  Q.  The next week 10/24 through 10/28 is 39.75 hours.  Is
13  this a week where you worked off the clock?
14  A.  Yes, I probably would have on that week.  And that
15  would have been approximately 15 hours.
16  Q.  Okay.  And you certified your time was correct, even
17  though t wasn't correct, yes?
18  A.  That is correct.
19  Q.  Let's look at the next one, 11558.  On the 31st, that
20  was Halloween, it looks like you clocked out from noon to
21  1:30, right?
22  A.  That is correct.
23  Q.  Do you remember what you were doing Halloween, is
24  that lunch?
25  A.  Probably.  There again, maybe an appointment that I

Page 257

1  had to go take care of.
2  Q.  Can you recall t?  I'm just asking because t was
3  Halloween.
4  A.  No.  Halloween doesn't have any special significance
5  to me.
6  Q.  Is this a work period where you would have worked off
7  the clock?
8  A.  Not on that day.  I worked from 8:00 in the morning
9  until 11:30.  I would have gone home, so I could be back
10  the next morning.
11  Q.  What about the work period in general, do you see any
12  days you would have worked off the clock?
13  A.  Yes.  Those are where I clocked out at 5:00 and 5:30.
14  Those are times that I probably would have stayed and
15  worked, again, getting everything caught up and in order.
16  Q.  So this would have been how many hours would you
17  guesstimate that you worked off the clock on this week?
18  A.  15 to 20 again.  Those are average.
19  Q.  And that's 15 to 20 total for the pay period?
20  A.  Per week.
21  Q.  Per week.  So 30 to 40 total?
22  A.  Per pay period, yes.
23  Q.  So the last one when you said 15, you were just
24  talking about the second week?
25  A.  Correct.  Because obviously if I had missed a day and

65 (Pages 254 to 257)

Page 258

1  d dn't have overtime, then I could have worked another 8
2  hours and made t up.  So that would probably be a week
3  again.
4  Q.  On this next one -- let me just confirm.  You
5  certified your time was accurate even though it wasn't?
6  A.  That is correct.
7  Q.  On 11559, the break in the two weeks is between 11/18
8  and 11/22.  And you recorded 29.5 hours on one week and 29
9  hours on the next, for a total of 58 1/2 hours.  So this
10  would not be a week where you would have worked off the
11  clock, right?
12  A.  That is correct.
13  Q.  So on this pay certification your time was accurate?
14  A.  That's accurate.
15  Q.  The next pay period is 11560.  This is 11/28 through
16  12/11, and there was 7 hours and 45 minutes of overtime
17  recorded?
18  A.  And that would have been because on the 11th I worked
19  a 3:00 to 11:00 shift, which would have been allowed
20  overtime.
21  Q.  So do you think that you had worked off the clock in
22  this week?
23  A.  During December, yes, definitely, because there
24  again, we knew that state was due in the door.
25  Q.  And that would be 30 to 40 hours of extra work here?

Page 259

1  A.  Yes.
2  Q.  This was still when you were working at the other
3  facil ty Westwood, right?
4  A.  Yes.  I d dn't work as much in December at Westwood.
5  I had cut back at that point in time.
6  Q.  The next work week you worked 9 1/2 hours of
7  overtime, 9 hours and 15 minutes of overtime.
8  A.  Okay.
9  Q.  Would this be -- it also looks like you clocked in
10  and out for lunch for a 45 minute meal period on the 22nd?
11  A.  Yes.
12  Q.  Would this be a work period where you would have
13  worked off the clock?
14  A.  Yes.  Because I probably would have come back in, and
15  when I clocked out at 3:30, I probably would have stayed
16  and worked a few more hours to get everything completed.
17  Q.  Where do you see the 3:30?
18  A.  15:30 is a clock-out time, 3:30 in the afternoon.
19  Q.  Okay.  I see t.
20  A.  And I had looks like 8 hours of vacation on that one.
21  And what that may have reflected is when they pa d us for
22  having been on-call, it fell under the category of
23  vacation time.  And any time we were going to be paid 40
24  hours, including our on-call time, we could not have
25  overtime unless we had worked the floor.  Which looks like

Page 260

1  was the case on the 18th.  It looks like I worked on the
2  17th and 18th, t looks like I worked 3:00 to 11:00
3  shifts.
4  Q.  As an LPN?
5  A.  Yes.
6  Q.  What about the 19th through the 24th, are any of
7  those LPN?
8  A.  They don't look like they were.  Those are not the
9  normal times for LPN.
10  Q.  So let's break this down a l ttle more.  The break in
11  the week here is from 12/12 to 12/18 is one week.  And
12  that total number of hours you worked there that you had
13  reported, you worked 31.75?
14  A.  Plus 8 hours of vacation.
15  Q.  Which doesn't count as hours worked.  So you had
16  another 8 hours that you could have worked before
17  incurring any overtime?
18  A.  No.  Because with that 8 hours added to the 31.75,
19  that would have put me in overtime.
20  Q.  But they don't count those hours.  I'll show it to
21  you.
22  A.  Here's the way it worked.  If you were paid for your
23  -- and that was on-call time.  They e ther pa d you for --
24  paid you 8 hours, or you could take that day off with pay.
25  But you could not utilize that time and the amount of time

Page 261

1  you worked, and still accrue more than 40 hours in that
2  week.  Even if it wasn't at a time and a half rate, you
3  couldn't accrue more than 40 hours in that week, using
4  your hours that you were being paid, either vacat on or
5  on-call.
6  Q.  So you're saying then that you think that would have
7  worked off the clock then on 12/12 through 12/18?
8  A.  Probably on the 12th, 13th and 14th I probably would
9  have stayed and worked.  It looks like they had me coming
10  in on the 17th and 18th.  I could have possibly come in
11  and worked some during that day and not clocked in.
12  Q.  Now, you had previously testified that you didn't
13  come in pre-shift and work.  Are you changing that
14  testimony?
15  A.  This was a 3 o'clock in the afternoon shift.  I'm
16  saying that typically when I came in at 8 o'clock in the
17  morning, that I could clock in.  I am saying that if t
18  was close to the times that I had 40 hours, and I came in
19  at say 1 o'clock in order to do an adm t, that I could
20  have possibly worked an hour and a half without clocking
21  in.  As a general rule, when I came in at 8:00 in the
22  morning, no, I did not start work before I clocked in.
23  Q.  So how many hours are you claiming that you worked
24  off the clock during this week?
25  A.  There again, an average week was 15 to 20 hours.

Page 262

1  That would have been an average week that I worked.  Since
2  I worked 3:00 to 11:00, that one probably would have been
3  close to between the 12 and 15.
4  Q.   The next week you actually reported 49.25 hours?
5  A.   That was Christmas week.  I probably didn't stay
6  late.  I probably spent time with my family.
7  Q.   The pay period you're saying was another 12 to 15
8  hours that you didn't report, right?
9  A.   That is correct.
10  Q.   But you did certify that the time was accurate, when
11  it was not?
12  A.   That is correct.
13  Q.   And that was false, correct?
14  A.   That is correct.
15  Q.   Let's look at the next one.  This is the day after
16  Christmas through January 2, 2012.  And there's 51.5 hours
17  there, for 11 1/2 hours of overtime.  Are you claiming
18  that you worked more hours than that?
19  A.   In January, yes, I was still averaging 15 to 20 hours
20  a week to get everything caught up.
21  Q.   So this is an example -- why would they have paid you
22  11 1/2 hours of overtime, if there's a limit on overtime
23  on that week?
24  A.   Let me look and see what I worked, and see if I
25  worked any overtime on that one.  January 1st would have

Page 263

1  been a hol day.  And I would received holiday pay, which
2  is listed as overtime.
3  Q.   Okay.
4  A.   So January 1st would have been one where that was
5  overtime.  Let me look and see if there was any shifts
6  there that I possibly worked.
7  Q.   It looks to me that on January 1st it's got you down
8  clocking in and out though, right, 2 1/2 hours?
9  A.   Right.  That would have been cons dered overtime.  So
10  that would have been 2 1/2 hours of overtime right there.
11  I'm looking to see if there would have been possibly a
12  shift that I would have worked.  12/26 I worked -- I was
13  on the floor for part of that.  I'm checking to see if any
14  of the others that I may have possibly worked on the
15  floor.  Because if you get called in late, you weren't
16  always there at the beginning of the shift.  I was looking
17  to see if there were any of those.
18  Q.   We have no staffing log for you for --
19  A.   Okay.
20  Q.   Not 12/27 through 1/2.
21  A.   Okay.  So all of those would have been in medical
22  records then.
23  Q.   I understand you're claiming that working on January
24  1st would have been overtime?
25  A.   I was looking to see if that was -- it's showing 75

Page 264

1  hours regular time and 11.30 hours overtime.
2  Q.   Okay.  Add up the hours here.
3  A.   It says 86.30 hours.
4  Q.   Just I terally add them up.  12/26 was 8 hours of
5  work time
6  A.   Yes.
7  Q.   12/27 was 8 1/2 hours work time.  12/28 was 10 1/2
8  hours of work time.  12/29 was 8 1/2 hours of work time.
9  12/30 was 11 1/2 hours of work time.  12/31 was 2 hours of
10  work time.  And the 1st was 2 1/2 hours of work time.
11  51.5 hours.
12  A.   Okay.  So it was 11 hours.
13  Q.   11 1/2 hours of overtime that was actually worked.
14  A.   Okay.
15  Q.   So it doesn't seem that there was any kind of
16  restrict on on overtime for that week?
17  A.   And there may not have been.  During Holiday weeks
18  sometimes they, in order to get people to work -- go ahead
19  and get everything done.  During that -- because that was
20  the end of the month, and I had to have everything ready
21  not only for the end of the month, but for the beginning
22  of the new year.  And there were times that -- that also
23  may have been one of the times that I worked and did what
24  I had to do, and then afterwards they said, you worked
25  overtime again.

Page 265

1  Q.   So you're not claiming any off the clock work on that
2  week, correct?
3  A.   No.
4  Q.   The next week you only reported 35 hours of work
5  time.  So there was 5 additional hours you could have
6  reported, even if there was a restr ction on that week?
7  A.   So I probably didn't work any during that one.
8  Q.   So this time you certified the accuracy of your time
9  records and they were accurate, correct?
10  A.   Yes.
11  Q.   Let's look at the next one.  Are you claiming to have
12  worked off the clock this week?
13  A.   Yes.  January there would have been -- because that's
14  when I was getting -- we knew state was due in.  And that
15  would have been approximately 15 hours per week.
16  Q.   So you're claiming 30 to 40 hours of off the clock
17  work here that is not reported on your time sheet?
18  A.   Correct.
19  Q.   And so the certification that you provided was
20  incorrect?
21  A.   That is correct.
22  Q.   Let's look at the next one here, 11564.  On this one
23  there was 12 hours and 45 minutes of overtime worked.  One
24  week was 45 hours and the other was 47 hours and 45
25  minutes.  So in these weeks it looks like the overtime

## Page 266

1  restrict on d d not apply for these weeks in which you
2  would not have falsely reported hours?
3  A.   That was when the state was in the building.  I'm
4  pretty sure that was when we -- on the 28th I worked the
5  floor.  That would account for part of that overtime.
6  Q.   Okay.
7  A.   There again, working the floor they would allow
8  overtime.  On the 4th I also worked the floor.
9  Q.   On when?
10  A.   January 28th and February 4th.
11  Q.   I don't have anything for the 4th.  I see the January
12  28th.
13  A.   That's just a normal 3:00 to 11:00 shift time.  And
14  on the 4th I would have probably worked.  Yes, I clocked
15  in at -- oh, I worked 11:00 to 7:00 on the 4th.
16  Q.   Where do you see that?  Can I see that?
17  A.   According to that, it looks like I worked a double.
18  Q.   Do you still believe state was in the building at
19  this time?
20  A.   It may have been the next week.  I know they came in
21  February.  I don't remember the exact date.  I know they
22  did come in February.  So they may not have been in there
23  that week.  But in looking at that, like on the 28th I
24  worked the floor on the -- on the 4th it looks like I
25  worked on the floor as well through 11:00 to 7:00.  The

## Page 267

1  time that I clocked in on the 4th is 22:51, which is 11
2  o'clock.  So that would account for part of that overtime.
3  It looks like the overtime was on the floor.
4  Q.   Okay.
5  A.   So with state being anticipated, again, it would have
6  possibly been 15 to 20 hours of overtime.
7  Q.   Per week?
8  A.   Yes.
9  Q.   So 30 to 40 hours, right?
10  A.   Correct.
11  Q.   I note that with state coming, you still had the
12  opportunity to take three meal periods in a row, where you
13  clocked out on the 25th for an hour, on the 26th for a
14  half hour, and on the 27th for 45 minutes, right?
15  A.   Tell me again?  I'm sorry.
16  Q.   January 25th you clocked out at 12:30 and came back
17  at 1:30 for an hour meal break, right?
18  A.   Yes.
19  Q.   On the --
20  A.   That was Christmas, yes, I probably d d take time and
21  go have lunch.
22  Q.   No, that's January.  Christmas is in December.
23  A.   I'm sorry.  Yes.
24  Q.   On the 26th you clocked out at 11 o'clock and back at
25  11:30?

## Page 268

1  A.   Yes.
2  Q.   And on the 27th you clocked out at 3 o'clock and
3  clocked back in at 3:45, right?
4  A.   Yes.
5  Q.   Let's look at the next pay period.  This is 11565,
6  the Bates number.
7  A.   Yes.
8  Q.   And the first week it looks like you recorded 40
9  hours, and the second week you record 63.5 hours, for a
10  total of 23 1/2 hours of overtime.
11  A.   Then the second week is probably definitely.  Do you
12  have anything that shows my end date, the date that I
13  left?
14  Q.   I think it's coming up here on the next one.
15  A.   Because the state was there the week before I left.
16  Q.   You left your employment on February 21st.
17  A.   Okay.  So that would make sense that they were there
18  during this week.
19  Q.   So this is the state week?
20  A.   State was in our building the week before I was
21  relieved of my position of medical records, yes.
22  Q.   Okay.
23  A.   If I was relieved on the 21st, then it would have
24  been the week pr or to that, that state would have been in
25  the building, yes.

## Page 269

1  Q.   Okay.  And --
2  A.   So that would have explained the overtime for that
3  time per od.  Because when state was in the building, we
4  were required to work and stay as long as they were there.
5  Q.   So on that week you didn't work add t onal time that
6  wasn't recorded, correct?
7  A.   That is correct.
8  Q.   What about the week before?
9  A.   That would have probably been 15 to 20 hours.
10  Because I got everything done and complete in order before
11  state walked in on Monday.  I was very proud of that
12  accomplishment.
13  Q.   The final pay period you had only recorded 16 hours,
14  right, on two days, 20th and 21st.  So that would not have
15  been a week you would have been working off the clock,
16  right?
17  A.   No.
18  Q.   What was the reason for being relieved of your
19  medical records position?
20  A.   We got a state tag that Abra felt was my fault.  And
21  she relieved me of my post on.
22  Q.   And what was the tag?
23  A.   We had a medication on a patient that had been
24  changed from eye drops to eye ointment.  And while t had
25  been put on the MAR correctly, one of the nurses changed

68 (Pages 266 to 269)

## Page 270

1  it from ointment to eye drops.  And in front of a state
2  surveyor, she administered eye drops.
3       And part of my duties was to ensure that all of the
4  med cat ons were in the building.  And I had not gotten
5  that change before the state surveyor was there.  And I
6  had not gotten -- made sure -- had time to double check
7  and make sure that that medication was in the building,
8  and she felt that I should have.
9  Q.  Was that your responsibility to make sure the
10  med cat on was in the building?
11  A.  Yes.
12  Q.  And you agree that was your responsibility?
13  A.  Yes.
14  Q.  Okay.
15  A.  And I did that.  I had come in that morning, and
16  before I could double check everything, the state surveyor
17  followed the nurse.  And had the order not been changed on
18  the MAR and administered, and had they even held off, we
19  would not have gotten a tag.  Had the nurse not changed
20  the order on the MAR to reflect giving drops, and had she
21  just left it as ointment and not administered the drops in
22  front of the state surveyor, we would not have gotten the
23  tag.
24  Q.  So what is your explanation for not meeting that
25  responsibility?

## Page 271

1  A.  It was just a matter of timing.  That when I came in
2  that morning and checked all of the orders, and checked
3  all of the medications, I had just not gotten that cart.
4  I had three halls and three carts to check, in addition to
5  checking my hall, to make sure that the patients were the
6  way they should be and things of that nature.  I had not
7  had an opportunity to check that one.
8  Q.  Let's turn for a minute to the daily staffing log
9  that we were looking at.  What I want to cover here is we
10  need to take a look at the staffing logs.  We've got
11  RHC32 through -- yours goes through what?
12  A.  The date is --
13  Q.  I've got through RHC100.  Is that same for you?
14  A.  Yes.
15  Q.  And I just want you to flip through and confirm that
16  looking at the state staffing requirements versus the
17  actual staffing, that in nearly every instance the actual
18  North Hills staffing was higher than what the state
19  minimum was?
20       MS. JACKSON:  Objection to the form of
21  the question.
22  Q.  Do you understand what I'm asking you?
23  A.  What I understand that you're asking me is what's
24  written on here as the state requirements, and what's
25  written on here as to what the actual staffing was, are

## Page 272

1  higher than what t says the state requirements are?
2  Q.  Right.
3  A.  I do see that on here, yes.
4  Q.  Okay.
5       (Defendant's Exhibit 25 was marked.)
6  Q.  What has been marked as Defendant's Exhibit Number 25
7  is a payroll check register report for you.
8  A.  Okay.
9  Q.  There's just a few things I want to establish here.
10  If you look at the first page marked 1239.
11  A.  Yes, sir.
12  Q.  And you see under your name there the very first
13  entry, regular overtime.  And it's got your hours and your
14  rate of pay,Redac andReda, do you see that?
15  A.  I see t.
16  Q.  So this is telling you this is for the year 2010,
17  payroll check register for 1/1/2010 through 12/31/2010.
18  So it's all your wages through 2010.
19  A.  Okay.
20  Q.  You see that your overtime rate in 2010 wasRedacte
21  right?
22  A.  Correct.
23  Q.  Turn to page 3.  And you see that the total paid in
24  overtime to you in 2010 wasRedacted under grand totals
25  overtime, do you see that?

## Page 273

1  A.  Yes.
2  Q.  And that rate was alwaysRedact for overtime, right?
3  A.  Yes, during that year it was.
4  Q.  That's what I'm trying to establish when you had any
5  kind of rate adjustment and the total number of hours.  So
6  205.25 hours,Redacted of overtime in 2010?
7  A.  Yes.
8  Q.  Now we move to 2011.  In the beginning of 2011 you
9  rate was stillRedact, right?
10  A.  That is correct.
11  Q.  Turn to page 1243.  And this is the first rate change
12  that we see for you on the very first entry, where the
13  rate moves up toRedacted, do you see that?
14  A.  I see that.
15  Q.  And that's for the pay period ending May 6, 2011,
16  right?
17  A.  Yes.  That was right after my annual review period.
18  Q.  And that was the first pay increase you received,
19  right?
20  A.  That is correct.
21  Q.  So at that time, if you look a couple of entries
22  down, you actually worked overtime, t says, overtime 3
23  hours, that tells us what your overtime rate was.
24  A.  Redacted, yes.
25  Q.  Redacted at the beginning of May 2011, right?

69 (Pages 270 to 273)

Page 274

1    A.  That is correct.

2    Q.  Let's look at the end of 2011.  Turn to the next page

3    to 1245.  And that year you worked 198.5 hours overtime.

4    Your actual when you blend the Redact rate versus the Redacted

5    for the whole year it was Redacted , correct?

6    A.  Yes.

7    Q.  And that was Redacted you were paid in overtime,

8    correct?

9    A.  That is correct.

10   Q.  Let's look at 2012.  In 2012 your rate -- let's see

11   when  t changed.

12   A.  It looks like  t changed in January.  Because what

13   they d d was they had done away w th paying an extra day

14   of on-call, and had actually increased our wage for that

15   for taking call.

16   Q.  I see the first change on the pay per od of January

17   27, 2012.

18   A.  That's what I see, yes.

19   Q.  And Redacted now instead of Redacted right?

20   A.  That is correct.

21   Q.  And the overtime rate is Redacted , right?

22   A.  That is correct.

23   Q.  And this was just through January through what, March

24   it looks like?

25   A.  January through --

Page 275

1    Q.  January through March, the beginning of March was

2    last -- February was your actual work, right?

3    A.  Correct.

4    Q.  So two months?

5    A.  The last pay date was the 9th of March, yes.

6    Q.  So about two months then of your experience in 2012,

7    right?

8    A.  Right.

9    Q.  And in that two month period you were pa d 47 hours

10   and 45 minutes of overtime, an average rate of Redacted for

11   Redacted , right?

12   A.  Yes.

13   Q.  And to figure that, if you worked 47 hours of

14   overtime in a two month period, what would that have

15   projected out at over a year, 47 times 6, right, is that

16   the math?

17   A.  I'm not sure what you're trying to get.

18   Q.  I'm trying to figure out, because your employment

19   ended after two months of 2012, had you had the same

20   overtime experience and you had worked a consist amount of

21   overtime, what would  t be for the whole year?

22   A.  Okay.

23   Q.  So 47 hours over two months.

24   A.  Times 6.  That would have been 284.7 hours.

25   Q.  So 284.7, and that would have been more overtime tha

Page 276

1    in either 2011 or 2010, right?

2    A.  That is correct, if  t had continued at that rate,

3    yes.

4    Q.  Put that one aside.

5        MS. JACKSON:  Jeff, where are we on time?

6        THE COURT REPORTER:  Seven hours one

7    minute and 23 seconds.

8        MS. JACKSON:  We're done.  Let's take a

9    break.

10       (A recess was had.)

11           EXAMINATION

12   BY MS. JACKSON:

13   Q.  Ms. Campbell, during your employment with Northwest,

14   at anytime during your employment with Northwest, did you

15   tell any of your supervisors that you worked through your

16   lunch?

17   A.  Yes.  I spoke with Abra about it at different times.

18   And she was frequently in the office, and knew that I did

19   not get an opportun ty to take a lunch break.

20   Q.  How would she know that?

21   A.  Because she was in the office.  And we would work

22   through breaks.  And she would know that I had admits come

23   in.  And especially on days when the doctors were in and

24   we had adm ts.  She was very aware that it was not

25   something that was possible.

Page 277

1    Q.  If she saw you working during -- you didn't have any

2    scheduled lunch, right?

3    A.  Right, I did not.

4    Q.  So if she just saw you working during your working

5    hours, how would she know that you did not take your lunch

6    break?

7    A.  She would have had to check back in and things of

8    that nature and say, Carrolyn, I know you had gone to get

9    your lunch and you were interrupted.  D d you get an

10   opportun ty to do that, or we would just infrequently talk

11   about how busy the day was, and that we didn't get a lunch

12   break.

13   Q.  How often did you talk to her about this?

14   A.  There wasn't any particular frequently.  It would

15   just come up occas onally.

16   Q.  Would you say it was a one time conversation or it

17   was several conversat ons about this?

18   A.  It happened at least three or four times that I

19   remember.  We all talked about not getting to take breaks.

20   Q.  Do you remember when it happened?

21   A.  The exact dates, no.

22   Q.  Was it after the lunch time was deducted or before?

23   A.  It was after.

24       MR. SPINOLA:  Objection to form.

25   Q.  So what she would tell you, what was her response

Page 278

1   when you told her that you didn't have an opportunity to
2   take a lunch on that day, what did she tell you in
3   response?
4   A.   Generally it was just, yes,  t was a really busy day
5   today.
6   Q.   D d she tell you to submit a time adjustment form for
7   this time?
8   A.   No.
9   Q.   D d anyone, during your employment with Northwest,
10  ever tell you that you need to subm t a time adjustment
11  form for lunch?
12  A.   No.
13  Q.   You stated before during your deposition, that you
14  understood that  t was a policy of Northwest that
15  employees should be paid for all the time worked.  I want
16  to ask you a quest on.
17  A.   Okay.
18  Q.   And what do you understand is the policy, what do you
19  understand?
20  A.   There was a company policy, as such, that stated that
21  you were supposed to get a 30 minute, uninterrupted lunch
22  break.  The reality and what was inferred by Abra and
23  Lauren, was that you had to do your job, and that you were
24  to do that w thin 40 hours a week with no overtime.  And
25  if you filled out a time adjustment form to reclaim your

Page 279

1   lunch break, which is what that says you should do, you
2   would have been over that overtime.
3       So there was a corporate policy, and then there was
4   what actually went on within the home.
5   Q.   (BY MS. JACKSON)  I want to show you one document,
6   Exhib t 19.  Angelo, this is the handbook addendum.
7       MR. SPINOLA:  Okay.
8   Q.   It says on the last paragraph of this exhibit,
9   Disciplinary actions may be taken against employees who
10  falsely claim that a lunch break was not possible, and/or
11  who routinely skip lunch breaks intent onally and without
12  authorizat on to do so for the purpose of increasing their
13  pay period hours.
14      Do you see that?
15  A.   I do see that.
16  Q.   What was your understanding of this policy?
17  A.   What this policy says to me is, if you are
18  intent onally claiming that you don't get a lunch break,
19  and you are taking your lunch break, or if your workload
20  is such that you could take a lunch break, and yet you are
21  going this to be paid additional, then there will be
22  disciplinary actions.  And that's what I understand  t to
23  say.
24  Q.   You testified that you didn't read this policy before
25  today, d d you?

Page 280

1   A.   I did sign  t during an inservice.  And I did not
2   really read  t.
3   Q.   Okay.
4   A.   This, to me, pertains to people who r de the clock,
5   hang around and take breaks, and then hang around after
6   the time per od to do their work.  That's the way I took
7   it.  I am not one of those people.  And you can ask any
8   employer that I've ever had.
9   Q.   D d you understand that you have to have an
10  authorization from your supervisor in order for you to
11  work through your lunch break?
12  A.   No.
13  Q.   Was it a common understanding among the employees of
14  Northwest that you have to have an authorization?
15  A.   No.
16      MR. SPINOLA:  Objection.  Calls for
17  speculation.
18  A.   It was not my knowledge that I had to have anyone
19  authorize working through your lunch break.
20  Q.   D d you ever discuss with other employees of
21  Northwest that you have to work through your lunch break?
22  A.   Yes.
23  Q.   D d any other employee tell you that they could
24  reclaim this time back and get pa d for this?
25  A.   No.

Page 281

1   Q.   What was the understanding between the employees of
2   Northwest about reclaiming this lunch?
3       MR. SPINOLA:  Objection.  Calls for
4   speculation.
5   A.   I don't believe anyone understood that you could
6   actually reclaim the time.  That if you worked through
7   your lunch break, you just worked through your lunch
8   break.
9   Q.   And you saw affidavits that were submitted by Mr.
10  Spinola earlier.  Those people sa d that they could submit
11  their time break, reclaim their time break.  Did these
12  people ever tell you that they could do that?
13  A.   No.
14  Q.   During your employment w th Northwest, did you ever
15  have to go and do medical testing?
16  A.   Medical testing in what respect, like some type of
17  competency test?
18  Q.   No, just to maintain your license.
19  A.   We have continuing education to maintain our Arkansas
20  license, yes.
21  Q.   Did you have to do medical testing, submit to some
22  medical testing as a part of this requirement?
23      MR. SPINOLA:  Objection to form.
24  A.   The state requires that we have continuing education,
25  which covers -- which has to cover various aspects of

71 (Pages 278 to 281)

Page 282

1  nursing.  North Hills in themselves did not.
2  Q.  I'm looking at the employment handbook.
3  A.  I'm sorry.  I was misunderstanding.  TB skin test,
4  that's a state requirement.
5  Q.  Is it a medical test that you had to do?
6  A.  It's simply a test here on your forearm that shows
7  whether or not you might have been exposed to TB.  And
8  that is required in all nursing homes.  Yes, that was a
9  requirement.
10  Q.  And t was required at Northwest that you had to do
11  this TB skin test?
12  A.  Yes.
13  Q.  Do you know if you paid for this test or if
14  Northwest, if your employer paid for this test?
15  A.  I paid for the test.
16  Q.  You did?
17  A.  Yes, at the health department.
18  Q.  Were you reimbursed later by Northwest?
19  A.  No.
20        MS. JACKSON:  No further questions.
21           RE-EXAMINATION
22  BY MR. SPINOLA:
23  Q.  I've got some followup on those top cs.  Ms.
24  Campbell, you prev ously testified that you had never seen
25  any other employee's pay records.  Is that still true?

Page 283

1  A.  Unless there's something in here that I saw.  I don't
2  remember seeing any pay records in here.  I have not seen
3  anybody else's pay records.
4  Q.  So the only other pay record -- the only pay record
5  you have seen from Northwest are your own pay records,
6  correct?
7  A.  Yes.
8  Q.  You have not reviewed any time adjustment forms,
9  correct, other than your own?
10  A.  I have signed time adjustment forms when people would
11  forget to clock in, or when the time clock was not
12  working.  I have signed those for other people.  I d d
13  that a few times, yes.
14  Q.  Have you seen the time adjustment forms that the
15  company has or the facility has, or just the ones that you
16  approved?
17  A.  The ones that I filled out when I failed to clock in.
18  I have seen those.
19  Q.  So other than your own and the ones that you've
20  approved, have you seen any other ones?
21  A.  No.
22  Q.  And you don't even recall getting this handbook
23  addendum that you did receive, right?
24  A.  I d d receive it.  My signature is on it.  And I
25  believe that was done during inservice on this date

Page 284

1  probably.
2  Q.  Do you think you're the only person that received t,
3  or do you think that all employees would have received
4  this?
5        MS. JACKSON:  Object on, speculat on.
6  You can answer.
7  A.  In general, when they handed out things at inserv ces
8  everyone received t.
9  Q.  And this clearly explains that a time sheet
10  adjustment form should be filled out if you missed a meal
11  period, right?
12  A.  This form does explain it.
13  Q.  So as long as somebody read what was given to them,
14  they would know that a time sheet adjustment form should
15  be filled out for a missed meal period, right?
16  A.  Yes.
17  Q.  And do you know any of the actual pract ces -- you
18  had started to testify on behalf of other individuals.  Do
19  you know anything about the actual pay practices and pay
20  records of anybody at North Hills, other than yourself?
21  A.  No.
22  Q.  And do you know anything about the break schedules
23  for anybody other than yourself?
24  A.  I know about the break schedules for CNAs on the
25  floor, that we discussed earlier, that they were assigned

Page 285

1  along w th their assignment sheets.  I do know how that
2  was done.
3  Q.  And you had testified previously that they typ cally
4  do get their meal periods, correct?
5  A.  About 75 percent of the time, yes, CNAs do get their
6  breaks.
7  Q.  And you also --
8  A.  And mealtimes.
9  Q.  You also testified that to the extent they do not,
10  they are working through their meal per ods, you don't
11  know whether they would have subm tted a form pursuant to
12  the policy, correct?
13  A.  I do not.
14  Q.  You had testified about Abra, having a conversation
15  with Abra about working through meal per ods, right?
16  A.  Yes.
17  Q.  Tell me about that conversat on, what exactly was
18  said?
19  A.  There were various times that Abra would come into
20  the off ce, and I would just be covered up, and she would
21  know that I was not going to get to take a meal break, or
22  she observed that I would eat at my desk while I worked.
23  It was just general conversations of that nature.
24  Q.  When she observed you eating at your desk, did she
25  instruct you to take a meal per od, to ensure you took a

72 (Pages 282 to 285)

Page 286

1  meal per od?
2  A.  No, she did not.
3  Q.  And this was in your LPN role or your medical records
4  role?
5  A.  Medical records role.
6  Q.  So she saw you eating, and is that your evidence that
7  she knew that you didn't get a meal period?
8  A.  That, and the fact that she would come in when I was
9  eating and require something be done.
10  Q.  And you said that there was no scheduled meal period
11  for you, right, you could take  t whenever?
12  A.  Correct.
13  Q.  So would Abra have been observing you for your 8 hou
14  shift to know when you were going to take a meal per od?
15  A.  No.  She was not in the office with me 8 hours a day.
16  Q.  And you could have been eating more than once,
17  correct, you had breaks as well, didn't you?
18  A.  No, I d d not.
19  Q.  You didn't have 10 minute paid breaks?
20  A.  No.
21  Q.  So that makes you very different than most employees
22  who d d get 10 minute paid breaks, correct?
23  A.  I don't know if the employees got 10 minute paid
24  breaks.
25  Q.  You don't know one way or another?

Page 287

1  A.  No, I do not.
2  Q.  Do you know anything about the pay practices of
3  employees in any other department other than your own?
4  A.  In what respect?
5  Q.  When or how people were taking meal breaks?
6  A.  Other than the CNAs that worked the floor under me,
7  no.
8  Q.  D d Abra say anything to you about a missed meal
9  period?
10  A.  Other than comments like, yes, we were really busy
11  today, no, she d d not.
12  Q.  So she would say it was busy today?
13  A.  She sa d, We really had a busy day today, haven't we,
14  or something of that nature.
15  Q.  Anything specific to meal per ods?
16  A.  No.
17  Q.  So she never made a comment to you about meal
18  periods, right?
19  A.  No, she did not.
20  Q.  D d you ever make a comment or complaint to her or
21  meal periods?
22  A.  Nothing other than we would comment that  t's been so
23  busy that we haven't taken a break all day, just general
24  comments of that nature.
25  Q.  For at least a port on of your employment you were

Page 288

1  actually paid for your meal breaks, right?
2  A.  Yes.  When I originally started working and worked
3  the floor as an LPN.  And actually the LPNs were paid for
4  their lunch breaks, I believe up through January of 2011.
5  I believe that was the date we established or somewhere in
6  that vicinity.  It may have been December.  I know we
7  established when that started.
8  Q.  Do you know when the comment that you had a busy day
9  Abra saying we had a busy day would have occurred?
10  A.  Those were primarily during -- that happened
11  frequently.  There were lots of days as LPN and as medical
12  records that we had very busy days.
13        (Defendant's Exhibit 26 was marked.)
14  Q.  I'll hand you what's marked as Defendant's Exhibit
15  26.
16  A.  Can I accept this call?
17  Q.  Of course.
18        (Interruption.)
19  Q.  (BY MR. SPINOLA)  So what this exhibit shows is the
20  deductions.
21  A.  All right.
22  Q.  You see your first day of employment is 4/21/2010,
23  right?
24  A.  Correct.
25  Q.  And you see there's zero deductions on the first

Page 289

1  page?
2  A.  That is correct.
3  Q.  And on the second?
4  A.  Yes.
5  Q.  Tell me the first time you see a deduct on?
6  A.  The first one I see a deduction on is number 11353,
7  3/10/2011.
8  Q.  That's what I've got too.  Does that satisfy you that
9  you actually did not have any meal deduct ons until March
10  of 2011?
11  A.  Yes, correct.
12  Q.  And you've never had a meal deduction when you were
13  working as an LPN, prior to you becoming the medical
14  records clerk?
15  A.  No.  They did not deduct meals at that time.
16  Q.  So you had prev ously testified that you thought
17  towards the end of 2010, they started deducting meals for
18  LPNs, but they actually d d not deduct --
19  A.  Did I say 2010?  I thought I said 2011.
20  Q.  No, because you were gone by 2011, right?
21  A.  No.
22  Q.  I'm sorry.  Did you say --
23  A.  It was somewhere in November or December that they
24  started deducting from LPNs as well.  And if I said '10,
25  it was just an error in discussing all these different

73 (Pages 286 to 289)

Page 290

1   dates.
2   Q.   You can see that even once the meal deductions
3   started, they were sometimes deducted and sometimes not,
4   right?  For example, on 3/15 there was no meal deduct on,
5   right?
6   A.   Okay.  I can possibly explain that.  Because in my
7   position as medical records, from the very beginning there
8   was always a meal deduction.  So the times that I worked
9   the floor as an LPN, during those hours there would not
10  have been a meal deduction.  So that would explain why
11  some of those days had a meal deduction.  Like on the 10th
12  I clocked out it looks like at 7:45, and I had a total of
13  15 hours for that day.
14       So it's quite possible that I worked part of that day
15  in medical records, and then worked the second half of
16  that on the floor as a nurse.  And they would have taken
17  the lunch break out from the time frame in med cal
18  records, but not the time that I worked on the floor.
19  Q.   So whether you were subject to a meal deduction or
20  not depended on the position you were working in, correct?
21  A.   Yes, up until late 2011, when they started deducting
22  them from all of them.
23  Q.   Okay.  You had also testified that you didn't think
24  that anybody else knew about the time adjustment forms,
25  right?

Page 291

1   A.   I said I wasn't aware if they had knowledge of them
2   or not.
3   Q.   So you don't know one way or another, correct?
4   A.   Correct.
5            (Defendant's Exhibit 27 was marked.)
6   Q.   I've handed you what's been marked as North Hills
7   organizational chart.  What can you tell me about the meal
8   practices of the director of maintenance?
9   A.   Absolutely nothing.
10  Q.   What about the director of social services?
11  A.   Nothing.
12  Q.   Director of activities?
13  A.   Nothing.
14  Q.   Do you know if any of these directors or the people
15  that work under them, when they take meal per ods, how
16  they take meal periods, anything at all about their meal
17  periods?
18  A.   I don't.
19  Q.   Do you know anything about their work whatsoever?
20  A.   I know that the maintenance director is the one that
21  takes care of all of the breakdowns and things of that
22  nature.  And that the activities director was the person
23  that planned the activities for the res dents in the
24  facil ty.
25  Q.   You don't know how they managed or took their breaks

Page 292

1   though, correct?
2   A.   No, I do not.
3   Q.   What about the MDS care plan coordinator?
4   A.   I don't know how Terri managed her breaks.
5   Q.   What about housekeeping and the laundry department
6   and any of the staff that work under that department?
7   A.   I d d not have any knowledge or any reason to know.
8   Q.   No knowledge of their schedules?
9   A.   No.
10  Q.   No knowledge of whether they're taking meal periods?
11  A.   No, I don't.
12  Q.   No knowledge of whether they use time sheet
13  adjustment forms?
14  A.   No, I don't.
15  Q.   No knowledge of whether they stagger lunches?
16  A.   I don't know how they do  t.
17  Q.   What about the director of food serv ces and that
18  staff, the dietary staff?
19  A.   I don't know how they d d their lunch breaks or
20  anything of that nature.
21  Q.   What about the var ous other LPNs and RNs and CNAs
22  under the director of nursing, other than yourself, can
23  you tell me anything about their practices?
24  A.   I'm not aware of any particular practice that was in
25  place by any of them.

Page 293

1   Q.   Do you know what their break schedules were?
2   A.   Nothing other than the CNAs that were assigned.  When
3   I worked the floor, breaks for nurses were not assigned.
4   Q.   Do you know about the actual meal pract ces of other
5   nurses?
6   A.   No.
7   Q.   Do you know when or where they took meal breaks?
8   A.   I have seen various ones eating their meals sometimes
9   in the conference room, sometimes in the breakroom.  I
10  have seen them eating at the nurse's stat on while they
11  were charting.  I have seen them called back to the
12  nurse's station from somewhere that they were eating.
13  Q.   And did you observe that person go back to lunch if
14  they were called away from lunch?
15  A.   I did not.
16  Q.   Do you know if they did?
17  A.   I don't.
18  Q.   Is there any way for you to be able to tell that?
19  A.   No.
20  Q.   Do you know if they were paid for any lunches that
21  they worked?
22  A.   I do not.
23  Q.   Is there any way for you to be able to tell that?
24  A.   No.
25  Q.   Is there anything you can tell me, other than what

74 (Pages 290 to 293)

Page 294

1  you said about the CNA meal schedules, or about the meal
2  practices of any other nurse at the North Hills facility?
3  A.  No.
4  Q.  What about the personnel director, can you tell me
5  anything about the personnel director and how they took
6  meal periods?
7  A.  No.  Occas onally she told us she would be gone and
8  we needed to catch the phone.  And during those times I
9  would know she was going to lunch.
10  Q.  What about the business office manager?
11  A.  No.
12  Q.  Do you know who the facility governing body is?
13        MS. JACKSON:  I'm going to object.  This
14  is outside the scope of cross examination.
15  Q.  Ms. Campbell, do you know who the facil ty governing
16  body is?
17        MS. JACKSON:  She doesn't have to answer
18  that question.  That's outs de of scope of cross
19  examination.
20        MR. SPINOLA:  Are you instructing her not
21  to answer?
22        MS. JACKSON:  Absolutely.
23  Q.  (BY MR. SPINOLA)  Do you know anything about the
24  facility administrator's meal pract ces?
25  A.  No.

Page 295

1  Q.  What about the assistant administrator?
2  A.  Didn't even know we had one.
3  Q.  Is it fair to say that you can't testify about
4  anybody's meal pract ces or pay experience other than you
5  own?
6        MS. JACKSON:  Objection.  She already
7  answered that quest on.
8  Q.  You can answer.
9  A.  That is correct.
10  Q.  You also testified, when you were being redirected by
11  your counsel, that you wouldn't think to fill out a time
12  adjustment form for a meal period, because that would put
13  you into overtime, correct?
14  A.  Correct.
15  Q.  But you also testified you didn't even know that a
16  time adjustment form could be used for meal periods,
17  right?
18        MS. JACKSON:  Objection.  Asked and
19  answered.  You can answer.
20  A.  Had I known that you could fill one out to reclaim
21  meals, even if you did, you still would be in the position
22  that you had to take that time off at another time,
23  because I was not allowed to have more than the 40 hours
24  Q.  You're saying that even if you had known about the
25  time adjustment form, by reading the addendum that you

Page 296

1  signed to the policy, you think you probably wouldn't have
2  filled one out anyway?
3        MS. JACKSON:  Object on to the form.  You
4  can answer.
5  A.  No.  There would have been no reason to fill out a
6  form to reclaim time, that you were still going to lose
7  anyway.  So why would you go through that process.
8  Q.  So you believe then that even if you had known about
9  it, you would not have followed the policy?
10        MS. JACKSON:  Object on to the form.  You
11  can answer.
12  A.  No.  I would have followed what I felt the policy of
13  Abra and Lauren was of no overtime.
14  Q.  We have reviewed  t, and you have been paid hundreds
15  of hours of overtime, correct?
16  A.  We have also established that  t was in certain
17  instances when I worked the floor as an LPN, and not
18  associated with medical records, other than certain times
19  when state was there, and when we were preparing for state
20  w th our corporate representatives.
21  Q.  Nonetheless, you were paid hundreds of hours of
22  overtime each year, correct?
23  A.  Because I worked the floor as an LPN, yes.
24  Q.  And paid overtime when you were working exclusively
25  as the director of medical records, correct?

Page 297

1  A.  There were special times that they did pay that, yes.
2  Q.  D d you ever think to ask about whether you could be
3  paid for your meal periods?
4  A.  No.
5  Q.  You had testified that no one understood that they
6  could reclaim time.  That's not correct, you don't know
7  what other people knew about --
8        MS. JACKSON:  Object on to the form of
9  the quest on.
10  Q.  (BY MR. SPINOLA)  Let me finish the question.  You
11  don't know what anyone else knew about reclaiming time and
12  submitting a time sheet adjustment form, correct?
13  A.  No.  I have no way of knowing what everybody else
14  might have known.
15  Q.  Other than they gave you the addendum and the form,
16  and it probably went to other people as well, correct?
17  A.  Correct.
18  Q.  Do you have a claim for reimbursement for TB testing
19  in this lawsuit?
20  A.  I'm not aware that there is.
21        MR. SPINOLA:  No further questions.
22        (WHEREUPON, the depos t on was concluded
23  at 7:48 p.m...)
24        * * * * *
25

75 (Pages 294 to 297)

Page 298

```
 1            C E R T I F I C A T E
 2   STATE OF ARKANSAS}
              }ss.
 3   COUNTY OF SALINE }
 4   RE:  ORAL DEPOSITION OF CARROLYN CAMPBELL:
 5        I, JEFF BENNETT, CCR, LS #19, a Notary Publ c in and
 6   for Saline County, Arkansas do hereby certify that the
 7   facts stated by me in the capt on of the foregoing
 8   deposition are true; and that the foregoing depos t on
 9   was transcribed by me, or under my supervision, on the
10   Computerized Transcript on System from my machine
11   shorthand notes taken at the time and place set
12   out on the capt on hereto, the witness being first duly
13   caut oned and sworn, or affirmed, to tell the truth, the
14   whole truth, and nothing but the truth.
15        I FURTHER CERTIFY that I am neither counsel for,
16   related to, nor employed by any of the parties to the
17   act on in which this deposition was taken; and further,
18   that I am not a relative or employee of any attorney or
19   counsel employed by the parties hereto, nor financially
20   interested, or otherwise, in the outcome of this action.
21        GIVEN UNDER MY HAND AND SEAL OF OFFICE on this
22   4th day of June, 2013.
23        _____
          JEFF BENNETT, CCR, LS Certificate
24        #19, Notary Public in and for Saline
          County, Arkansas
25   My commiss on expires 11-29-2020
```

BUSHMAN COURT REPORTING
501.372.5115

# APPLICATION FOR EMPLOYMENT
(Please Print Clearly)

Confidential

**Personal Information**

Date of Application 1-19-2010   Date Available _Immediately_

Name _Campbell_        _Carolyn_        _Sue_
     Last              First           Middle

Social Security Number [Redacted]

Present Address [Redacted]   _Winslow AR_   [Redacted]
               Street        City  State    Zip Code

Phone Number [Redacted] Home

Permanent Address (if Different than Present Address) _____ Street _____ City _____ State _____ Zip Code

Phone Number [Redacted] Cell

If you cannot be reached at above phone number, where may we contact you? Name of Person _____ Phone _____

**Employment Desired**

First Choice _L P N_       _3-11 (PREF)_   [Redacted]   7-3
Second Choice             _7-3_
Third Choice

Will You Accept Employment of: ☒ Full Time? ☐ Part Time? ☐ Temporary?

Are You 18 Yrs. of Age or Older? ☒ Yes ☐ No

Are You Employed Now? ☐ Yes ☒ No

May We Contact Your Present Employer? ☐ Yes ☐ No

How Did You Learn Of This Opening? _NEWSPAPER_

**Education**

Circle Highest Grade Completed:  9  10  11  12  13  (14)  16  16

Scholastic Honors Received _____

| | | | | Completed | |
|---|---|---|---|---|---|
| High School | _Western Grove_ | _Western Grove_ | _GEN_ | ☐ No ☒ Yes | |
| College | | | | ☐ No ☐ Yes; ___ Date | |
| Vocational or Business | _TwinLakes Vocational_ | _Harrison_ | | ☐ No ☒ Yes; _82_ Date | _LPN_ |
| Professional Education | | | | ☐ No ☐ Yes; ___ Date | |
| Laboratory or X-Ray Training | | | | ☐ No ☐ Yes; ___ Date | |

Extracurricular Activities While in School _____

Member of Professional Organizations _____

Honors Received, Volunteer or Community Service or Other Qualifications You Have Which You Feel Are Related to the Position for Which You Are Applying: _____

Were you in the U.S. Armed Forces? ☒ Yes ☐ No  If yes, what branch? _Army National_

Dates of Duty: From _7-1_ _1999_ To _1996_  Rank at Discharge _Sgt_
              Month Day Year   Month Day Year

**Professional Licenses and/or Certifications**                    Verif.

| Type | Organization or State Issued | Date Issued | Number |
|---|---|---|---|
| _LPN_ | _AR_ | _1992_ | [Redacted] |
| | | | |
| | | | |

Form 3294R  © BRIGGS, Des Moines, IA 50306  (800) 247-2349  www.BriggsCorp.com
Rev. 1/99                                    PRINTED IN U.S.A.

**EXHIBIT**

_11_

PENGAD 800-631-6989

## Employment Record (list last or present position first)

| Present and Former Employers | Dates Employed | Salary Range | Position & Duties |
|---|---|---|---|
| Name — Redacted<br>Address —<br>City/State/Zip — Dallas TX<br>Supervisor — Phone — | From 8-2007<br>To 1-2010 | Starting 1-2010<br>Ending | Owner<br>See Resume |
| Name — Redacted<br>Address —<br>City/State/Zip — Little Rock, AR<br>Supervisor — Missy Priest Phone — 501-553-9203 | From 8-2003<br>Starting Redacted<br>To 8-2007<br>Ending Redacted | | Helen Younger<br>Staffed Hospitals with<br>PRN Staff-<br>Worked as LPN |
| Name — Redacted<br>Address — 500 Hammond Ave<br>City/State/Zip — Berryville, AR<br>Supervisor — Sheila McCuIcheas Phone — 870-423- | From<br>Starting Redacted<br>To 2003<br>Ending Redacted | | LPN - Shift Supervisor<br>See Resume |
| Name —<br>Address —<br>City/State/Zip —<br>Supervisor — Phone — | From<br>To | Starting<br>Ending | |
| Name —<br>Address —<br>City/State/Zip —<br>Supervisor — Phone — | From<br>To | Starting<br>Ending | |
| Name —<br>Address —<br>City/State/Zip —<br>Supervisor — Phone — | From<br>To | Starting<br>Ending | |

If your former employment references, education or military service are under a name other than indicated on front of application, please indicate below.

Black                    Carrolyn                    Sue
Last                     First                      Middle Initial

Redacted                 If Yes, for what, when and where? _____

Conviction of a criminal offense will not necessarily preclude your employment.

Use this space to give us further information which will assist us in placing you, including at least two personal references not related to you, whom you have known at least one year.

_____
_____
_____
_____

## Do Not Answer Questions In This Area - To Be Completed After Employed

Date of Birth _____ Marital Status _____ Sex _____ Nationality _____ Number and Ages of Children _____

Notify in Case of Emergency:

Name _____                                    Relationship _____

Street _____        City _____        State _____   Zip Code _____   Telephone _____

What Language(s) (Other than English) Do You Speak? _____

Confidential

RHC008729

## Employment Understanding (Please Read and Sign)

This institution does not discriminate in hiring or any other decision on the basis of race, color, sex, citizenship, national origin, ancestry, Vietnam era veteran status, or on the basis of age or physical or mental disability unrelated to ability to perform the work required. No question on this application is intended to secure information to be used for such discrimination.

I voluntarily give this institution the right to make a thorough investigation of my past employment and activities. I agree to cooperate in such investigation and release from all liability or responsibility all persons, companies or corporations supplying such information. I consent to take the physical examination, and such future physical examinations as may be required by this institution at such times and places as the institution shall designate. I understand that an offer of employment may be contingent on passing the physical examination which relates to the essential duties I would be required to perform.

I understand that my employment is at will, and that either party is free to terminate the employment relationship at any time without cause. I also understand that my employment may be terminated for any misstatement or omission of fact appearing on this application form.

If employed, I will be required to complete an Employment Verification Form (I-9), and within three days show satisfactory evidence of identity and eligibility for employment.

_Carrolyn S Campbell_ _____  4-19-2010
                    Applicant's Signature                          Date

| Please indicate Days and/or Hours You Are Available for Work (Be Specific) | | | Availability Record | | |
|---|---|---|---|---|---|
| Day | From | To | | | |
| Sunday | A.M. | A.M. | Primary position desired  _L P N_ | | |
|  | P.M. | P.M. | Will you accept another position: | ☐ Yes | ☒ No |
| Monday | A.M. | A.M. | If so, what? | | |
|  | 3   P.M. | 11   P.M. | Are you available to work: Weekends? | ☐ Yes | ☒ No |
| Tuesday | 3   A.M. | 11   A.M. | Holidays? | ☒ Yes | ☐ No |
|  | 3   P.M. | 11   P.M. | Rotating Shifts? | ☐ Yes | ☒ No |
| Wednesday | A.M. | A.M. | If your availability changes, it is your responsibility to fill in an "Availability Card" indicating the changes. Such changes will be effective, then, for any future employment. | | |
|  | 3   P.M. | 11   P.M. | | | |
| Thursday | A.M. | A.M. | I understand that emergency conditions may require me to temporarily work shifts other than the one for which I am applying and agree to such scheduling change as directed by my department head or administrator of this institution. | | |
|  | 3   P.M. | 11   P.M. | | | |
| Friday | A.M. | A.M. | | | |
|  | 3   P.M. | 11   P.M. | | | |
| Saturday | A.M. | A.M. | _Carrolyn S Campbell_    4-19-2010 | | |
|  | P.M. | P.M. | Applicant's Signature        Date | | |

Confidential

This Page For Institution and Interviewers' Use Only

### Interviewers Comments

| Interviewer | Date | Comments |
|---|---|---|
| Brenda Crosswhite | 4/20/10 | @ Sister   150 lbs lifting<br><br>Redacted |
|  |  |  |
|  |  |  |

### Reference and Prior Employment Check

| Individual Contacted | Name of Firm | Result of Check |  |
|---|---|---|---|
| Carolyn Campbell | Triple Crown Med Staffing | Owner - Conflict of interest Check Secondary references | 4/20/10 |
| Missy Priest | RP Medical Staffy | Aug 3, 03 to Aug 3, 07<br>LPN - Rehireable | 4/20/10 |
| Jan Tyles | Berryville Health Care | LPN - Rehireable<br>4-8-97 to | 4/20/10 |

---

**For Personnel Office Use**

Hired _____   For what department _____   Position _____

Salary _____ per  Year  Month  Hour   Starting Date _____

Confidential

*North Hills Life Care and Rehab*
*47 East Appleby Road*
*Fayetteville, AR 72703*

Facility: _____

# HANDBOOK ADDENDUM – OCTOBER 2011
## New Meal Policy

*The policy below has been presented to me as a replacement policy for the one contained in the employee handbook I received upon hire. This policy will be implemented October 3, 2011, and included in the orientation presentation to new employees. My signature following indicates that I have received a copy of, have read and fully understand this policy and agree to abide by it completely. I will speak with the facility Personnel Director if I have any questions regarding. I understand that this signed acknowledgement will be placed in my permanent file as proof of my receipt and acceptance of this information.*

Meals

All employees, both hourly and salaried, are expected to take a meal break during each shift worked. Please make your own arrangements for your meal break. You will be provided an undisturbed meal break which can be taken on or off the premises. The duration of the meal break (30 minutes or one hour) is determined by the job position and will automatically be deducted from your daily hours. (Lunch time deductions do not affect salaried/exempt personnel.) If offered, meal tickets will be available through the business office, the cost of which will be deducted from your paycheck. If meal tickets are not offered, you will not be entitled to facility prepared meals; all meals are your responsibility.

- Direct care staff are expected to take a 30 minute lunch. This results in a 7.5 hour shift.
- Department Heads/Supervisors and Nurses are allowed up to a one-hour lunch. This results in a shift between 7 and 7.5 hours depending on scheduling; Department Heads/Supervisors and Nurses may routinely be scheduled for shifts that are longer than a standard "8 hour" shift. UNLESS otherwise directed by the Administrator, Payroll will place Nurses/Department heads on the same half-hour auto lunch as direct care staff.
- You MUST clock out and back in for your lunch if you leave the facility grounds.
- You MUST sign out and back in on the facility break log regardless of whether or not you leave the facility grounds.
- If you are unable to take your lunch break and work the shift without a lunch, you must submit a time adjustment form to payroll, properly completed and signed, IMMEDIATELY following the shift (no later than the following day) in which the lunch was not taken in order to document and verify that you were actually working and a lunch break was not possible. Once this documentation is received, the time can be credited back to you.

Disciplinary actions may be taken against employees who falsely claim that a lunch break was not possible, and/or who routinely skip lunch breaks intentionally and without authorization to do so for the purpose of increasing their pay period hours.

Employee Signature: *Carrolyn Campbell*        Date: 12/27/11

Employee Printed Name: *Carrolyn Campbell*



EXHIBIT
19

Confidential

RHC008827